# RECORD NO. 14-7245

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## NICHOLAS RAGIN,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE**

————————

## JOINT APPENDIX

————————

**Matthew G. Pruden
TIN, FULTON, WALKER
  & OWEN, PLLC
301 East Park Avenue
Charlotte, NC  28203
(704) 338-1220**

**Amy E. Ray
OFFICE OF THE
  UNITED STATES ATTORNEY
United States Courthouse
100 Otis Street, Room 233
Asheville, NC  28801
(828) 271-4661**

*Counsel for Appellant*

*Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

# **TABLE OF CONTENTS**

**PAGE**

**Docket Entries [3:10-cr-00488]** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Docket Entries [3:04-cr-00271]** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**Defendant's *Pro se* Motion to Vacate, Set Aside, or
Correct Sentence - Summary of Arguments**
       **filed October 1, 2010** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**Defendant's Affidavit**
       **filed January 6, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **61**

**Government's Answer to Defendant's *Pro se* Motion to
Vacate, Set Aside, or Correct Sentence**
       **filed June 8, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**

**Plea Agreement**
       **filed June 8, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **95**

**Government's Motion for Summary Judgment**
       **filed June 8, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **104**

**Defendant's *Pro se* Motion to Stay 2255 Proceeding and
Request Permission to Amend 2255 Petition**
       **filed September 12, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **107**

**Order**
       **filed March 5, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **110**

**Order**

 **filed March 31, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

**Government's Motion for Order Requiring Production of
Affidavit and Motion to Continue Evidentiary Hearing**

 **filed April 2, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

**Order**

 **filed April 8, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

**Transcript of Evidentiary Hearing before
The Honorable Robert J. Conrad, Jr.**

 **on May 12, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

 **Testimony of <u>Peter Adolf</u>:**

 **Direct Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . 128
 **Cross Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . 139

 **Testimony of <u>Andy Culler</u>:**

 **Direct Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . 142
 **Cross Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . 147
 **Redirect Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . 150

 **Testimony of <u>Pamela Vernon</u>:**

 **Direct Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . 151
 **Cross Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . 155

**Transcript of Evidentiary Hearing before**
**The Honorable Robert J. Conrad, Jr.**
**on May 12, 2014, Continued:**

**Testimony of <u>Nicholas Ragin</u>:**

**Direct Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . . . 158
**Cross Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
**Redirect Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . 174

**Testimony of <u>Terrell Tadeo</u>:**

**Direct Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . . . 176
**Cross Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

**Government's Revised Notice of Subpoena,**
**with Exhibit,**
**filed May 15, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

**<u>Exhibit</u>:**

1. **Subpoena to Appear and Testify at a**
   **Hearing or Trial in a Civil Action**
   **dated May 15, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

**Transcript of Evidentiary Hearing before**
**The Honorable Robert J. Conrad, Jr.**
  **on June 2, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

  **Testimony of <u>Nikita Mackey</u>:**

  **Direct Examination by Mr. Miller** . . . . . . . . . . . . . . . . . . . . . . . . . . 215
  **Cross Examination by Mr. Pruden** . . . . . . . . . . . . . . . . . . . . . . . . . 222

**Order**
  **filed August 19, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

**Judgment in Case**
  **filed August 19, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

**Notice of Appeal**
  **filed August 22, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

APPEAL,INTERPRETER

# U.S. District Court
# Western District of North Carolina (Charlotte)
# CRIMINAL DOCKET FOR CASE #: 3:04-cr-00271-RJC-7

Case title: USA v. Howard et al
Related Case: 3:10-cv-00488-RJC

Date Filed: 10/18/2004
Date Terminated: 01/18/2007

Assigned to: Chief Judge Robert J. Conrad, Jr
Referred to: Magistrate Judge David Keesler

Appeals court case number: '07-4147' '4th Circuit'

**Defendant (7)**

**Nicholas Ragin**
*TERMINATED: 01/18/2007*

represented by **Nikita V. Mackey**
P.O. Box 620089
Charlotte, NC 28262
704-313-9095
Email: nmackey@macklaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Thomas Norman Cochran FDO**
Federal Defenders of Western North Carolina
1 Page Avenue
Suite 210
Asheville, NC 28801
828-232-9992
Fax: 828-232-5575
Email: ross_richardson@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Pending Counts**

21:841A=CD.F and 861 CONTROLLED SUBSTANCE - SELL, DISTRIBUTE, OR DISPENSE
(1)

**Disposition**

Dismissed

7/28/2015      CM/ECF - LIVE DATABASE - NCWD

| | |
|---|---|
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1s) | 60 mos. imp + 3 yr SRT + $100 assess + CAC costs |
| CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCE (13s) | 360 mos. imp conc + Life SRT + $100 assess |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA**        represented by   **Amy E. Ray**
United States Attorneys Office
100 Otis Street
Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: amy.ray@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jenny Grus Sugar**
U.S. Attorneys Office
227 W. Trade Street
Suite 1650
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6629
Email: jenny.sugar@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen S. Marston AUSA**
U.S. Attorney's Office
1700 Carillion Bldg.

West Trade St.
Charlotte, NC 28202
Email: lorraine.simpson@usdoj.gov
*TERMINATED: 04/10/2012*
*LEAD ATTORNEY*

**Craig D. Randall**
U.S. Attorneys Office
227 W. Trade St.
Charlotte, NC 28202
704/344-6222
Fax: 704/227-0197
Email: craig.randall@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/18/2004 | 1 | INDICTMENT as to Tracy Howard (1) count(s) 1, 7, 8, 9, David Howard (2) count(s) 1, 2, 3, 4, 5, Ila Little Howard (3) count(s) 1, Eugene William Lewis (4) count(s) 1, Oscar Mario Solano-Sanchez (5) count(s) 1, 6, Keshia Burris (6) count(s) 1, 7, 8, Nicholas Ragin (7) count(s) 1 (tob) Modified on 04/21/2005 (Entered: 10/19/2004) |
| 10/19/2004 | 2 | MOTION by USA as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin to Seal referred to: Magistrate Judge David C. Keesler (sdc) Modified on 04/21/2005 (Entered: 10/20/2004) |
| 10/19/2004 | 3 | ORDER as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin granting [2-1] motion to Seal as to Tracy Howard (1), David George Howard (2), Ila Little Howard (3), Eugene William Lewis (4), Oscar Mario Solano-Sanchez (5), Keshia Burris (6), Nicholas Ragin (7) ( Signed by Magistrate Judge David C. Keesler ) (sdc) Modified on 04/21/2005 (Entered: 10/20/2004) |
| 10/20/2004 | | MOTION in open court by USA as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin to Unseal Indictment (sdc) Modified on 04/21/2005 (Entered: 10/22/2004) |
| 10/20/2004 | | ORAL ORDER as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin granting [0-0] oral motion to Unseal Indictment as to Tracy Howard (1), David George Howard (2), Ila Little Howard (3), Eugene William Lewis (4), Oscar Mario Solano-Sanchez (5), Keshia Burris (6), Nicholas Ragin (7) ( Entered by Magistrate Judge David C. Keesler ) (sdc) Modified on 04/21/2005 (Entered: 10/22/2004) |
| 10/20/2004 | | ARREST of Nicholas Ragin (mga) (Entered: 10/22/2004) |
| 10/20/2004 | | Initial Appearance as to Nicholas Ragin held Arraignment set for 10:20 10/25/04 for Nicholas Ragin ; Detention Hearing set for 10:20 10/25/04 for Nicholas Ragin |

| | | Dft informed of rights. Judge: David C. Keesler Court Rptr: FTR/mga AUSA: Karen Wilson (mga) (Entered: 10/22/2004) |
|---|---|---|
| 10/20/2004 | | MOTION in open court by Nicholas Ragin for Appointment of Counsel (mga) (Entered: 10/22/2004) |
| 10/20/2004 | | ORAL ORDER as to Nicholas Ragin granting [0-0] oral motion for Appointment of Counsel as to Nicholas Ragin (7) ( Entered by Magistrate Judge David C. Keesler ) (mga) (Entered: 10/22/2004) |
| 10/21/2004 | 9 | CJA 20 as to Nicholas Ragin : Appointment of Attorney Nikita V. Mackey (mga) (Entered: 10/22/2004) |
| 10/25/2004 | | Detention Hearing as to Nicholas Ragin held Judge: horn Court Rptr: tob FTR AUSA: Wilson (tob) (Entered: 10/25/2004) |
| 10/25/2004 | | Arraignment as to Nicholas Ragin held Judge: horn Court Rptr: tob FTR AUSA: Wilson (tob) (Entered: 10/25/2004) |
| 10/25/2004 | 19 | Arraignment Order as to Nicholas Ragin setting Calendar Call for 9:30 11/1/04 for Nicholas Ragin ; ( Signed by Magistrate Judge Carl Horn III ) (tob) (Entered: 10/25/2004) |
| 10/25/2004 | 20 | Standard Discovery Order as to Nicholas Ragin (tob) (Entered: 10/25/2004) |
| 10/25/2004 | 21 | ORDER OF DETENTION as to Nicholas Ragin ( signed by Magistrate Judge Carl Horn III ) (tob) (Entered: 10/25/2004) |
| 10/27/2004 | 32 | Arrest WARRANT Returned Executed as to Nicholas Ragin on 10/20/04 (jlk) (Entered: 10/27/2004) |
| 10/27/2004 | 37 | ORDER as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Nicholas Ragin granting [36-1] motion to Continue from the Nov. 1, 2004 trial term as to Tracy Howard (1), to Continue in Interests of Justice Time excluded from 11/1/04 to 1/3/05 , reset Calendar Call for 10:00 1/3/05 for Tracy Howard, for David Howard, for Ila Little Howard, for Eugene William Lewis, for Oscar Mario Solano-Sanchez, for Nicholas Ragin before Judge Graham C. Mullen ( Signed by Judge Graham C. Mullen ) (jlk) Modified on 04/21/2005 (Entered: 10/27/2004) |
| 12/03/2004 | 49 | MOTION by Nicholas Ragin to Review Bond referred to: Magistrate Judge Carl Horn III (clc) (Entered: 12/09/2004) |
| 12/09/2004 | | Bond Review Hearing as to Nicholas Ragin held Judge: horn Court Rptr: tob ftr AUSA: Wilson (tob) (Entered: 12/09/2004) |
| 12/09/2004 | 50 | Unsecured BOND entered by Nicholas Ragin in Amount $ 50,000 (tob) (Entered: 12/09/2004) |
| 12/09/2004 | 51 | ORDER Setting Conditions of Release as to Nicholas Ragin granting [49-1] motion to Review Bond as to Nicholas Ragin (7) ( Signed by Magistrate Judge Carl Horn III ) (tob) (Entered: 12/09/2004) |
| 12/16/2004 | 52 | MOTION by Nicholas Ragin to Continue referred to: Judge Graham C. Mullen (ssh) (Entered: 12/17/2004) |
| 12/16/2004 | 55 | ORDER as to Tracy Howard, David Howard, Ila Little Howard, Eugene William |

| | | |
|---|---|---|
| | | Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin granting [54-1] motion to Continue this matter from the January 2005 Criminal Term as to Keshia Burris (6), granting [52-1] motion to Continue as to Nicholas Ragin (7), granting [53-1] motion to Continue this matter from the January Criminal Term as to Tracy Howard (1), to Continue in Interests of Justice Time excluded from 1/3/05 to 4/4/05 , set Calendar Call for 10:00 4/4/05 for Tracy Howard, for David Howard, for Ila Little Howard, for Eugene William Lewis, for Oscar Mario Solano-Sanchez, for Keshia Burris, for Nicholas Ragin before Judge Graham C. Mullen ( Signed by Judge Graham C. Mullen ) (ssh) Modified on 04/21/2005 (Entered: 12/17/2004) |
| 12/17/2004 | 56 | ORDER as to Nicholas Ragin, to Continue in Interests of Justice Time excluded from 1/3/05 to 4/4/05 , set Calendar Call for 10:00 4/4/05 for Nicholas Ragin before Judge Graham C. Mullen ( Signed by Judge Graham C. Mullen ) (ssh) (Entered: 12/17/2004) |
| 01/10/2005 | 61 | Letter MOTION by Nicholas Ragin Inquire into Status of Counsel hearing set for 1/27/05 9:50 , for Bond Review before CH (tob) (Entered: 01/21/2005) |
| 01/21/2005 | | NOTICE of Hearing as to Nicholas Ragin :, Inquire into Status of Counsel hearing set for 9:50 1/27/05 for Nicholas Ragin before Magistrate Judge Carl Horn III , for Bond Review before Magistrate Judge Carl Horn III (tob) (Entered: 01/21/2005) |
| 01/21/2005 | 63 | MOTION by Nicholas Ragin (pro se) for Nakita Mackey to Withdraw as Attorney referred to: Magistrate Judge David C. Keesler (clc) (Entered: 01/21/2005) |
| 01/27/2005 | | Inquiry into Status of Counsel as to Nicholas Ragin held Judge: horn Court Rptr: tob ftr AUSA Cave (tob) (Entered: 01/27/2005) |
| 01/27/2005 | | ORAL ORDER as to Nicholas Ragin denying [63-1] motion for Nakita Mackey to Withdraw as Attorney as to Nicholas Ragin (7), granting [61-1] motion Inquire into Status of Counsel hearing set for 1/27/05 9:50 as to Nicholas Ragin (7) ( Entered by Magistrate Judge Carl Horn III ) (tob) (Entered: 01/27/2005) |
| 02/04/2005 | | Bond Review Hearing as to Nicholas Ragin held Judge: horn Court Rptr: tob ftr AUSA: Marston Wilson (tob) (Entered: 02/04/2005) |
| 02/04/2005 | | ORAL ORDER as to Nicholas Ragin changes conditions on Bond to allow deft to reside with cousin on EMS ( Entered by Magistrate Judge Carl Horn III ) (tob) (Entered: 02/04/2005) |
| 02/07/2005 | 65 | NOTICE OF INTENT to Use 404(b) Evidence by USA as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin (clc) Modified on 04/21/2005 (Entered: 02/08/2005) |
| 02/07/2005 | 66 | REQUEST by USA as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin for notice of alibi/insanity defense (clc) Modified on 04/21/2005 (Entered: 02/08/2005) |
| 02/07/2005 | 67 | Request for reciprocal discovery by USA as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin (clc) Modified on 04/21/2005 (Entered: 02/08/2005) |

| | | |
|---|---|---|
| 03/07/2005 | 69 | ORDER as to Tracy Howard, David Howard, Ila Little Howard, Eugene William Lewis, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin granting [68-1] motion to Continue this matter from the April 4, 2005 Criminal Term as to Eugene William Lewis (4), to Continue in Interests of Justice Time excluded from 4/4/05 to 7/11/05 , set Calendar Call for 10:00 7/11/05 for Tracy Howard, for David Howard, for Ila Little Howard, for Eugene William Lewis, for Oscar Mario Solano-Sanchez, for Keshia Burris, for Nicholas Ragin before Judge Graham C. Mullen ( Signed by Judge Graham C. Mullen ) (ssh) Modified on 04/21/2005 (Entered: 03/08/2005) |
| 04/27/2005 | | Deadline updated as to Tracy Howard, David L. Howard, Ila Little Howard, Oscar Mario Solano-Sanchez, Keshia Burris, Nicholas Ragin, reset Calendar Call for 10:00 7/18/05 for Tracy Howard, for David L. Howard, for Ila Little Howard, for Oscar Mario Solano-Sanchez, for Keshia Burris, for Nicholas Ragin before Judge Graham C. Mullen (jlk) (Entered: 04/27/2005) |
| 05/23/2005 | | Judge update in case as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard. Judge Robert J. Conrad added. Judge Graham Mullen no longer assigned to case. (Hanna, John) (Entered: 05/23/2005) |
| 05/25/2005 | | Minute Entry for proceedings held before Judge Carl Horn III:Bond Review Hearing as to Nicholas Ragin held on 5/25/2005 (Court Reporter FTR.) (O'Brien, Tammy) (Entered: 05/25/2005) |
| 05/25/2005 | 73 | ORDER OF DETENTION as to Nicholas Ragin . Signed by Judge Carl Horn III on 5/25/05. (O'Brien, Tammy) (Entered: 05/25/2005) |
| 06/02/2005 | | Set/Reset Hearings as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Ila Little Howard, David L. Howard, Tracy Howard: Docket Call set for 7/18/2005 09:30 AM in Courtroom 2 before Robert J. Conrad. (Wallace, Betsy) (Entered: 06/02/2005) |
| 06/28/2005 | | Terminate Deadlines and Hearings as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard: (Wallace, Betsy) (Entered: 06/28/2005) |
| 07/07/2005 | 84 | ORDER TO CONTINUE - Ends of Justice as to Nicholas Ragin, Keshia Burris, David L. Howard Time excluded from 7/6/05 until 9/6/05. Docket Call set for 9/6/2005 09:30 AM in Courtroom #2 before Robert J. Conrad Jr... Signed by Judge Robert J. Conrad Jr. on 7/6/05. (O'Brien, Tammy) (Entered: 07/07/2005) |
| 07/19/2005 | 86 | LETTER MOTION for Inquiry Hearing by Nicholas Ragin. (O'Brien, Tammy) (Entered: 08/08/2005) |
| 08/08/2005 | | NOTICE OF HEARING as to Nicholas Ragin Inquiry Hearing set for 8/17/2005 09:30 AM in Charlotte Magistrate Courtroom before Carl Horn III. (O'Brien, Tammy) (Entered: 08/08/2005) |
| 08/17/2005 | | Minute Entry for proceedings held before Judge Carl Horn III:Inquiry into Status of Counsel Hearing as to Nicholas Ragin held on 8/17/2005. Deft satisfied with Atty. (Court Reporter FTR.) (O'Brien, Tammy) (Entered: 08/17/2005) |
| 08/17/2005 | | ORAL ORDER finding as moot 86 Motion for Hearing as to Nicholas Ragin (7) due to deft being satisfied with Atty.. By Judge Carl Horn III on 8/17/05. |

| | | (O'Brien, Tammy) (Entered: 08/17/2005) |
|---|---|---|
| 08/23/2005 | 88 | SUPERSEDING INDICTMENT as to Tracy Howard (1) count(s) 1s, 2s-11s, 12s, 13s, 19s, 20s, 21s, David L. Howard (2) count(s) 1s, 2s-11s, 12s, 13s, 14s-15s, 16s, 17s, Ila Little Howard (3) count(s) 1s, 2s-11s, 12s, 13s, Eugene William Lewis (4) count(s) 13s, Oscar Mario Solano-Sanchez (5) count(s) 13s, 18s, Keshia Burris (6) count(s) 13s, 19s, 20s, 22s, Nicholas Ragin (7) count(s) 1s, 13s. (O'Brien, Tammy) (Entered: 08/23/2005) |
| 08/23/2005 | | NOTICE OF HEARING as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy HowardArraignment on SUPERSEDING BILL INDICTMENT set for 9/6/2005 09:30 AM in Charlotte Magistrate Courtroom before Carl Horn III. (WAIVER is AVAILABLE on WEBSITE under Court/Forms)(O'Brien, Tammy) (Entered: 08/23/2005) |
| 09/06/2005 | | Minute Entry for proceedings held before Judge Carl Horn III:Arraignment on Superseding Indictment as to Nicholas Ragin (7) Count 1s,13s held on 9/6/2005 (Court Reporter FTR.) (O'Brien, Tammy) (Entered: 09/06/2005) |
| 09/06/2005 | | Set/Reset Hearings as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard: Docket Call set for 11/7/2005 09:30 AM in Courtroom #2, 401 W. Trade St., Charlotte, NC 28202 before Robert J. Conrad Jr.. (Hankins, Susan) (Entered: 09/06/2005) |
| 10/07/2005 | 101 | Application for Writ of Habeas Corpus ad Testificandum by USA (Marston, Karen) Modified on 10/12/2005 Filer modified (Bouchard, Carolyn). (Entered: 10/07/2005) |
| 10/07/2005 | | Proposed document submitted to Judge David Keesler. (Marston, Karen) (Entered: 10/07/2005) |
| 10/11/2005 | 104 | Writ of Habeas Corpus ad Testificandum Issued as to Crystal Chumley for 11/7/05 at 9:00 am in case as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Ila Little Howard, David L. Howard, Tracy Howard (MacEwan, Cathy) (Entered: 10/14/2005) |
| 10/12/2005 | | NOTICE OF DOCKET ERROR by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard re: 101 Application for Writ of Habeas Corpus ad Testificandum ERROR: Incorrect filer selected and document contains no s/signature CORRECTION: Correct filer, USA, linked to Appl for Writ; attorney advised of signature requirements (Bouchard, Carolyn) (Entered: 10/12/2005) |
| 10/13/2005 | | Minute Entry for proceedings held before Judge Carl Horn III:Bond Review Hearing as to Nicholas Ragin held on 10/13/2005 (Court Reporter FTR.) (O'Brien, Tammy) (Entered: 10/13/2005) |
| 10/13/2005 | | ORAL ORDER denying deft motion for Release on Bond as to Nicholas Ragin . Signed by Judge Carl Horn III on 10/13/05. (O'Brien, Tammy) (Entered: 10/13/2005) |
| 10/17/2005 | 107 | MOTION peremptory by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, |

| | | |
|---|---|---|
| | | Tracy Howard. (Marston, Karen) (Entered: 10/17/2005) |
| 10/19/2005 | | TRANSCRIPT of Proceedings as to Nicholas Ragin held on 10/13/05 before Judge Carl Horn. Court Reporter: Joy Kelly. (Koechley, Jeanie) (Entered: 10/19/2005) |
| 10/25/2005 | 111 | RESPONSE to Motion by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard re 110 First MOTION to Continue *Government's opposition* (Marston, Karen) (Entered: 10/25/2005) |
| 10/28/2005 | | Set/Reset Hearings as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, David L. Howard, Tracy Howard: Docket Call set for 2/6/2006 09:30 AM in Courtroom #2, 401 W. Trade St., Charlotte, NC 28202 before Robert J. Conrad Jr.. (Hankins, Susan) (Entered: 10/28/2005) |
| 11/01/2005 | 122 | Writ of Habeas Corpus ad Testificandum Issued as to Jefferey Bernard Lineberger for 11/7/05 in case as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, David L. Howard, Tracy Howard (Anderton, Michelle) (Entered: 11/03/2005) |
| 12/22/2005 | 148 | NOTICE OF ATTORNEY APPEARANCE Craig D. Randall appearing for USA. (Randall, Craig) (Entered: 12/22/2005) |
| 01/23/2006 | 155 | NOTICE *of Intent to Use Summary Charts* by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard (Marston, Karen) (Entered: 01/23/2006) |
| 01/23/2006 | 156 | NOTICE *of Expert Testimony* by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard (Marston, Karen) (Entered: 01/23/2006) |
| 01/26/2006 | 173 | ORDER as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard re 169 First MOTION to Continue Docket Call/Trial *Date* filed by David L. Howard; ORDER TO CONTINUE - Ends of Justice as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard Time excluded from 2/6/06 until 4/3/06. Docket Call reset for 4/3/2006 09:30 AM in Courtroom #2, 401 W. Trade St., Charlotte, NC 28202 before Robert J. Conrad Jr. Signed by Judge Robert J. Conrad Jr. on 1/26/06. (Koechley, Jeanie) (Entered: 01/27/2006) |
| 01/26/2006 | 188 | LETTER by Nicholas Ragin (Hankins, Susan) (Entered: 02/17/2006) |
| 01/27/2006 | 178 | Application for Writ of Habeas Corpus ad Testificandum for CRYSTAL KAY CHUMLEY by Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard (O'Brien, Tammy) (Entered: 01/30/2006) |
| 01/27/2006 | 179 | Writ of Habeas Corpus ad Testificandum Issued as to CRYSTAL KAY CHUMLEY for term beginning 2/6/06 in case as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard (O'Brien, Tammy) (Entered: 01/30/2006) |
| 02/27/2006 | 192 | ORDER directing the clerk to schedule a hearing regarding inquiry as to counsel re 188 Letter filed by Nicholas Ragin, . Signed by Judge David Keesler on 2/27/06. (Wallace, Betsy) (Entered: 02/27/2006) |

| | | |
|---|---|---|
| 02/27/2006 | | NOTICE OF HEARING as to Nicholas Ragin: Inquiry into Status of Counsel Hearing set for 3/6/2006 10:15 AM in Charlotte Magistrate Courtroom before David Keesler. *This is your only notice - you will not receive a separate document.*(Anderton, Michelle) (Entered: 02/27/2006) |
| 03/06/2006 | | Minute Entry for proceedings held before Judge David Keesler :Inquiry into Status of Counsel Hearing as to Nicholas Ragin held on 3/6/2006 Government attorney: Craig Randall.Defendant attorney: Nikita Mackey. (Court Reporter FTR.) (Anderton, Michelle) (Entered: 03/06/2006) |
| 03/08/2006 | 193 | MOTION to Adopt Motions of Co-Defendants by Nicholas Ragin. (Mackey, Nikita) (Entered: 03/08/2006) |
| 03/13/2006 | 194 | ORDER granting 193 Motion to Adopt Motions of Co-Defendants as to Nicholas Ragin (7). Signed by Judge David Keesler on 3/13/2006. (Koechley, Jeanie) (Entered: 03/14/2006) |
| 03/24/2006 | 202 | NOTICE *of Expert Witnesses* by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard (Marston, Karen) (Entered: 03/24/2006) |
| 03/27/2006 | 204 | GOVERNMENT's NOTICE of Intent to Use Evidence as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard *Supplemental Notice* (Marston, Karen) (Entered: 03/27/2006) |
| 04/02/2006 | 224 | First MOTION in Limine by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard. (Attachments: # 1 Exhibit Childress)(Randall, Craig) (Entered: 04/02/2006) |
| 04/02/2006 | 226 | Proposed Voir Dire by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard (Randall, Craig) (Entered: 04/02/2006) |
| 04/03/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Selection as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/3/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolph, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/05/2006) |
| 04/03/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Voir Dire begun on 4/3/2006 Nicholas Ragin (7) on Count 1s,13s and Oscar Mario Solano-Sanchez (5) on Count 13s,18s and Tracy Howard (1) on Count 1s,2s-11s,12s,13s,19s,20s,21s and David L. Howard (2) on Count 1s,2s-11s,12s,13s,14s-15s,16s,17s Government attorney: Marston, Randall.Defendant attorney: Culler, Adolph, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/05/2006) |
| 04/04/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/4/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolph, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/05/2006) |

| | | |
|---|---|---|
| 04/05/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/5/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolph, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/06/2006) |
| 04/07/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/7/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/07/2006) |
| 04/07/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/7/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Gavilanez, Garcia-Hein. (Hankins, Susan) (Entered: 04/11/2006) |
| 04/10/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/10/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Antonio Gavilanez, Liz Carico. (Hankins, Susan) (Entered: 04/12/2006) |
| 04/11/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/11/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Antonio Gavilanez, Liz Carico. (Hankins, Susan) (Entered: 04/12/2006) |
| 04/12/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/12/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Antonia Gavilanez, Liz Carico. (Hankins, Susan) (Entered: 04/13/2006) |
| 04/13/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/13/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Roy Stawsky, Antonio Gavilanez. (Hankins, Susan) (Entered: 04/18/2006) |
| 04/14/2006 | 254 | *Response to Court's Request for Briefings on Bruton Issues* by USA as to Nicholas Ragin, Keshia Burris, Oscar Mario Solano-Sanchez, Eugene William Lewis, Ila Little Howard, David L. Howard, Tracy Howard (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Marston, Karen) (Entered: 04/14/2006) |
| 04/17/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/17/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Roy Stawsky, Antonio Gavilanez. (Hankins, Susan) (Entered: 04/18/2006) |
| 04/18/2006 | 258 | TRANSCRIPT of Detention hearing as to Nicholas Ragin held on 10-25-04 |

| | | before Judge Carl Horn, III. Court Reporter: Joy Kelly. (Kelly, Joy) (Entered: 04/18/2006) |
|---|---|---|
| 04/18/2006 | 259 | TRANSCRIPT of Status of Counsel and Bond Review Hearing as to Nicholas Ragin held on 1-27-05 before Judge Carl Horn, III. Court Reporter: Joy Kelly. (Kelly, Joy) (Entered: 04/18/2006) |
| 04/18/2006 | 260 | TRANSCRIPT of Bond Review Hearing as to Nicholas Ragin held on 12-9-04 before Judge Carl Horn, III. Court Reporter: Joy Kelly. (Kelly, Joy) (Entered: 04/18/2006) |
| 04/18/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/18/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Roy Stawsky, Laura Garcia-Hein. (Hankins, Susan) (Entered: 04/19/2006) |
| 04/18/2006 | | Oral MOTION for Acquittal as to counts 1s & 13s by Nicholas Ragin. (Hankins, Susan) (Entered: 04/19/2006) |
| 04/18/2006 | | Oral ORDER denying [] Motion for Acquittal as to Nicholas Ragin (7). Signed by Judge Robert J. Conrad Jr. on 4/18/06. (Hankins, Susan) (Entered: 04/19/2006) |
| 04/19/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/19/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Roy Stawsky, Laura Garcia-Hein. (Hankins, Susan) (Entered: 04/24/2006) |
| 04/19/2006 | | Oral MOTION for Acquittal by Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard after all defendants rest. (Hankins, Susan) (Entered: 04/24/2006) |
| 04/19/2006 | | Oral ORDER denying [] Motion for Acquittal as to Tracy Howard (1), David L. Howard (2), Oscar Mario Solano-Sanchez (5), Nicholas Ragin (7) after all defendants rest. entered by Judge Robert J. Conrad Jr. on 4/19/06. (Hankins, Susan) (Entered: 04/24/2006) |
| 04/20/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/20/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Roy Stawsky, Maria Garcia-Hein. (Hankins, Susan) (Entered: 04/24/2006) |
| 04/21/2006 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr.:Jury Trial as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/21/2006 Government attorney: Marston, Randall.Defendant attorney: Culler, Adolf, Mackey, Brown. (Court Reporter Nuccio.)(Interpreter: Maria Garcia-Hein. (Hankins, Susan) (Entered: 04/24/2006) |
| 04/21/2006 | 271 | JURY VERDICT as to Nicholas Ragin (7) Guilty on Count 1s,13s. (Hankins, Susan) (Entered: 04/24/2006) |
| 07/12/2006 | 298 | Letter MOTION for new counsel (no hearing required) by Nicholas Ragin. (Hankins, Susan) (Entered: 07/12/2006) |

-11-

| 07/13/2006 | 299 | ORDER denying 298 Pro-se Motion to replace his counsel as to Nicholas Ragin (7). Signed by Judge Robert J. Conrad Jr on 7/13/2006. (Koechley, Jeanie) (Entered: 07/13/2006) |
| 09/13/2006 | 301 | TRANSCRIPT of charge conference and charge to the jury as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/19/06 and 4/20/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 09/13/2006) |
| 12/13/2006 | 310 | LETTER by Nicholas Ragin (no hearing required) (ssh) (Entered: 12/13/2006) |
| 12/13/2006 | 311 | Letter MOTION to Dismiss Indictment (no hearing required - to be addressed at sentencing) by Nicholas Ragin. (ssh) (Entered: 12/13/2006) |
| 12/27/2006 | 317 | NOTICE OF PSI COMPLETION as to Nicholas Ragin, defendant can be scheduled for sentencing anytime after 1/5/07. (ssh) (Entered: 12/28/2006) |
| 12/28/2006 | | NOTICE OF HEARING as to Nicholas Ragin: Sentencing set for 1/18/2007 02:30 PM before Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 12/28/2006) |
| 01/17/2007 | 324 | RESPONSE in Opposition by USA as to Nicholas Ragin re 311 MOTION to Dismiss *Indictment* (Randall, Craig) (Entered: 01/17/2007) |
| 01/18/2007 | 326 | SENTENCING MEMORANDUM by Nicholas Ragin (Mackey, Nikita) (Entered: 01/18/2007) |
| 01/18/2007 | | Minute Entry for proceedings held before Judge Robert J. Conrad Jr:Sentencing held on 1/18/2007. Party Nicholas Ragin terminated. Government attorney: Karen Marston & Craig Randall.Defendant attorney: Nikita Mackey. (Court Reporter V. Dario Stanziola.) (chh) (Entered: 01/19/2007) |
| 01/29/2007 | 330 | NOTICE OF APPEAL by Nicholas Ragin. (Mackey, Nikita) (Entered: 01/29/2007) |
| 01/29/2007 | 332 | Transmission of Notice of Appeal as to Nicholas Ragin to US Court of Appeals re 330 Notice of Appeal - Final Judgment - USCA (cbb) (Entered: 01/30/2007) |
| 02/02/2007 | 341 | Pro se NOTICE OF APPEAL by Nicholas Ragin. *(Judgment not entered yet)* (com) (Entered: 02/06/2007) |
| 02/05/2007 | 338 | USCA Case Number as to Nicholas Ragin 07-4147 for 330 Notice of Appeal - Final Judgment - USCA USCA Case Manager: Lisa D. Nesbitt. (smj) (Entered: 02/05/2007) |
| 02/05/2007 | 339 | 4th Circuit NOTICE/Letter stating the appeal will not proceed until the judgment is forwarded to the 4th Circuit as to Nicholas Ragin (smj) (Entered: 02/05/2007) |
| 02/07/2007 | 342 | Transmission of Notice of Appeal as to Nicholas Ragin to US Court of Appeals re Pro se 341 Notice of Appeal (com) (Entered: 02/07/2007) |
| 02/15/2007 | 349 | JUDGMENT as to Nicholas Ragin (7), Count(s) 1, Dismissed; Count(s) 13s, 360 mos. imp conc + Life SRT + $100 assess; Count(s) 1s, 60 mos. imp + 3 yr SRT + $100 assess + CAC costs. Signed by Judge Robert J. Conrad Jr on 2/15/07. (ssh) (Entered: 02/16/2007) |

| 02/22/2007 | 366 | ORDER of USCA as to Nicholas Ragin re: appointing Nikita V. Mackey as counsel for appellant (smj) (Entered: 02/23/2007) |
| 02/22/2007 | 367 | ORDER of USCA as to Nicholas Ragin re: Consolidating cases for purposes of briefing and oral argument (smj) (Entered: 02/23/2007) |
| 02/22/2007 | 368 | 4th Circuit NOTICE/Letter as to Nicholas Ragin regarding advising counsel of Appellate Procedures (smj) (Entered: 02/23/2007) |
| 04/18/2007 | 385 | ORDER of USCA as to Nicholas Ragin, David L. Howard, Tracy Howard re: granting court reporter's motion for extension of time for filing transcript without sanctions to 8/6/07 (ejb) (Entered: 04/19/2007) |
| 05/16/2007 | 391 | SENTENCING TRANSCRIPT filed as to Nicholas Ragin for dates of 1/18/2007 before Judge Robert Conrad, re 341 Notice of Appeal - Final Judgment - USCA, 330 Notice of Appeal - Final Judgment - USCA Court Reporter: V. Dario Stanziola (Huseby). (smj) (Entered: 05/18/2007) |
| 06/29/2007 | 395 | TRANSCRIPT of Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/3/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 06/29/2007) |
| 06/29/2007 | 396 | TRANSCRIPT of Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/4/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 06/29/2007) |
| 08/06/2007 | 401 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/5/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 08/06/2007) |
| 08/06/2007 | 402 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/6/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 08/06/2007) |
| 08/07/2007 | 403 | ORDER of USCA as to Nicholas Ragin, David L. Howard, Tracy Howard re: extending time for court reporter to file transcript (ejb) (Entered: 08/07/2007) |
| 09/04/2007 | 404 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/7/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 09/04/2007) |
| 09/04/2007 | 405 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/10/2006 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 09/04/2007) |
| 09/04/2007 | 406 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/11/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 09/04/2007) |
| 09/05/2007 | 407 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/12/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 09/05/2007) |
| 09/05/2007 | 408 | ORDER of USCA as to Nicholas Ragin, David L. Howard, Tracy Howard re: granting court reporter extension of time to file transcript, without sanctions, to 11/5/07 (ejb) (Entered: 09/06/2007) |

| | | |
|---|---|---|
| 10/05/2007 | 410 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/13/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/05/2007) |
| 10/19/2007 | 411 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/17/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/19/2007) |
| 10/19/2007 | 412 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/18/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/19/2007) |
| 10/24/2007 | 413 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/19/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/24/2007) |
| 10/31/2007 | 414 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/20/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/31/2007) |
| 10/31/2007 | 415 | TRANSCRIPT of Trial Proceedings as to Nicholas Ragin, Oscar Mario Solano-Sanchez, David L. Howard, Tracy Howard held on 4/21/06 before Judge Conrad. Court Reporter: Nuccio. (Nuccio, Cheryl) (Entered: 10/31/2007) |
| 11/07/2007 | 416 | 4th Circuit NOTICE/Letter as to Nicholas Ragin, David L. Howard, and Tracy Howard requesting Certificate of Readiness (smj) (Entered: 11/08/2007) |
| 11/08/2007 | 417 | CERTIFICATE of Readiness as to Nicholas Ragin, David L. Howard, and Tracy Howard re 341 Notice of Appeal - Final Judgment - USCA, 334 Notice of Appeal - Final Judgment - USCA, 330 Notice of Appeal - Final Judgment - USCA, 329 Notice of Appeal - Final Judgment - USCA. USCA served by electronic notice. (smj) (Entered: 11/08/2007) |
| 01/08/2008 | 419 | ORDER of USCA as to Nicholas Ragin re: Appointment of Sue A. Berry as counsel for appellant. (smj) (Entered: 01/08/2008) |
| 02/06/2008 | 421 | Judgment Returned Executed as to Nicholas Ragin on 5/1/2007. (klg) (Entered: 02/07/2008) |
| 07/07/2008 | 430 | NOTICE OF ATTORNEY APPEARANCE Amy E. Ray appearing for USA. (Ray, Amy) (Entered: 07/07/2008) |
| 01/29/2009 | 448 | UNPUBLISHED Opinion from Fourth Circuit Court of Appeals as to Nicholas Ragin, David L. Howard, Tracy Howard re: 341 Notice of Appeal, 334 Notice of Appeal, 330 Notice of Appeal, 329 Notice of Appeal. 4th Circuit decision - AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART. (Attachments: # 1 Judgment)(nll) (Entered: 01/29/2009) |
| 08/26/2009 | 458 | PRESENTENCE INVESTIGATION REPORT (Supplement Pursuant to Crack Cocaine Amendment) *(SEALED - government and defense counsel)* as to Nicholas Ragin, (available to: Nicholas Ragin, USA) (Easley, Cynthia) (Entered: 08/26/2009) |
| 08/26/2009 | 459 | PRESENTENCE INVESTIGATION REPORT (Supplement Pursuant to Crack |

| | | Cocaine Amendment - Recommendation) *(SEALED - Court)* as to Nicholas Ragin (Easley, Cynthia) (Entered: 08/26/2009) |
|---|---|---|
| 10/29/2009 | 475 | **CJA 20** *(Restricted - Defense Counsel)* **as to Nicholas Ragin: Authorization to Pay Nikita Mackey. Amount: $ 20,104.10, Voucher # 091019000091. Signed by Chief Judge Robert J. Conrad, Jr on 9/23/09. Signed by Circuit Chief Judge on 10/9/09 (lhg)** (Entered: 10/29/2009) |
| 10/01/2010 | 483 | MOTION to Vacate under 28 U.S.C. 2255 by Nicholas Ragin. (tmg) Civil case 3:10-cv-00488 opened. (Entered: 10/01/2010) |
| 04/12/2011 | 487 | TRANSCRIPT of STATUS OF COUNSEL HEARING as to Nicholas Ragin held on 3-6-06 before Judge DAVID C. KEESLER. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 7/11/2011. (Reporter: Joy Kelly, 704-350-7495) (Entered: 04/12/2011) |
| 06/28/2012 | 503 | NOTICE OF ATTORNEY APPEARANCE: Thomas Norman Cochran appearing for Nicholas Ragin (Cochran, Thomas) (Entered: 06/28/2012) |
| 06/29/2012 | 504 | NOTICE of Ineligibility regarding Crack Cocaine Offense 18:3582 as to Nicholas Ragin (Cochran, Thomas) (Entered: 06/29/2012) |
| 08/16/2012 | 505 | PRESENTENCE INVESTIGATION REPORT (Supplement Pursuant to Crack Cocaine Amendment) *(SEALED - Attorney)* as to Nicholas Ragin, (available to: USA, Nicholas Ragin)(Kathleen Golden - smr) (Entered: 08/16/2012) |
| 05/03/2013 | | Request by the Clerk to USPO for Presentence Report as to Nicholas Ragin regarding 483 MOTION to Vacate under 28 U.S.C. 2255 (cbb) (Entered: 05/03/2013) |
| 05/06/2013 | 519 | PRESENTENCE INVESTIGATION REPORT (Appeal/2255) *(SEALED - Attorney)* as to Nicholas Ragin. (available to USA, Nicholas Ragin)(smr) (Entered: 05/06/2013) |
| 03/12/2014 | 524 | 4th Circuit NOTICE as to Nicholas Ragin regarding Docketing Notice Writ of Mandamus Case no 14-1218 (ssh) (Additional attachment(s) added on 3/20/2014: # 1 Petition) (ssh). Modified on 3/20/2014 to attach petition (ssh). (Entered: 03/13/2014) |
| 04/08/2014 | 525 | **ORDER as to Nicholas Ragin, ( Evidentiary Hearing set for 5/13/2014 10:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr.). Signed by District Judge Robert J. Conrad, Jr on 4/8/14.** (ssh) (Entered: 04/08/2014) |
| 04/14/2014 | | NOTICE OF HEARING as to Nicholas Ragin: Evidentiary Hearing RESET for 5/12/2014 10:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. **All parties are directed to appear 30 minutes prior to the scheduled hearing.** *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 04/14/2014) |

| 05/12/2014 | | Minute Entry: EVIDENTIARY HEARING re: Petitioners 2255 Motion as to Nicholas Ragin held before District Judge Robert J. Conrad, Jr. Government attorney: Miller. Defendant attorney: Pruden. Court Reporter: Valecia Marseilles w/ Huseby. (ssh) (Entered: 05/12/2014) |
|---|---|---|
| 05/28/2014 | 527 | 4th Circuit NOTICE as to Nicholas Ragin regarding Unpublished Opinion and Judgment granting IFP, denying Motion for Writ of Mandamus (Attachments: # 1 Judgment)(ssh) (Entered: 05/29/2014) |
| 08/19/2014 | 528 | **ORDER denying and dismissing 483 Motion to Vacate (2255) as to Nicholas Ragin (7). Signed by District Judge Robert J. Conrad, Jr on 8/19/2014. (Attachments: # 1 Clerks Judgment) (eef)** Civil Case 3:10-cv-00488-RJC closed. (Entered: 08/19/2014) |
| 08/22/2014 | 529 | NOTICE OF APPEAL as to 528 Order on Motion to Vacate (2255), by Nicholas Ragin (IFP/CJA) (ssh) (Entered: 08/27/2014) |
| 09/29/2014 | 531 | TRANSCRIPT of Evidentiary Hearing as to Nicholas Ragin held on May 12, 2014 before Judge Robert J. Conrad, Jr. Court Reporter Velicia Marseille w/ Huseby, Telephone number 704-333-9889.. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at http://www.ncwd.uscourts.gov Release of Transcript Restriction set for 12/29/2014.** (jde) (Entered: 09/29/2014) |
| 10/15/2014 | 532 | **CJA 24 *(Sealed - Court)* as to Nicholas Ragin: Authorization to Pay Huseby, Incorporated Voucher # 141014000018.. Signed by District Judge Robert J. Conrad, Jr on 10/8/14. (lhg)** (Entered: 10/15/2014) |
| 12/04/2014 | | Original Assembled Electronic Record as to Nicholas Ragin re-transmitted to Fourth Circuit per request re 529 Notice of Appeal. (ssh) (Entered: 12/04/2014) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/28/2015 15:23:24 | | |
| PACER Login: | nt0044 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 3:04-cr-00271-RJC |
| Billable Pages: | 12 | Cost: | 1.20 |

APPEAL,CLOSED,PSLC2

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CIVIL DOCKET FOR CASE #: 3:10-cv-00488-RJC

Ragin v. USA
Assigned to: Chief Judge Robert J. Conrad, Jr
Related Case: 3:04-cr-00271-RJC-7
Case in other court: FCCA, 14-07245
Cause: 28:2255 Motion to Vacate Sentence

Date Filed: 10/01/2010
Date Terminated: 08/19/2014
Jury Demand: None
Nature of Suit: 510 Prisoner: Vacate
Sentence
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Nicholas Ragin**                    represented by    **Leah A. Kane FDO**
                                                        Federal Defenders of Western North
                                                        Carolina
                                                        129 W. Trade St.
                                                        Suite 300
                                                        Charlotte, NC 28202
                                                        704-374-0720
                                                        Fax: 704-374-0722
                                                        Email: ross_richardson@fd.org
                                                        *TERMINATED: 08/19/2013*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Matthew G. Pruden**
                                                        301 E. Park Avenue
                                                        Charlotte, NC 28203
                                                        704-338-1220
                                                        Fax: 704-338-1312
                                                        Email: mpruden@tinfulton.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**                               represented by    **Amy E. Ray**
                                                        United States Attorneys Office
                                                        100 Otis Street
                                                        Room 233
                                                        Asheville, NC 28801
                                                        828-271-4661
                                                        Fax: 828-271-4670
                                                        Email: amy.ray@usdoj.gov
                                                        *LEAD ATTORNEY*

-17-

*ATTORNEY TO BE NOTICED*

**William Michael Miller**
United States Attorneys Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
Email: William.Miller@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/01/2010 | | Case assigned to Chief Judge Robert J. Conrad, Jr. *This is your only notice - you will not receive a separate document.* (tmg) (Entered: 10/01/2010) |
| 10/01/2010 | 1 | MOTION to Vacate, Set Aside or Correct Sentence (2255) re: Criminal Case No. 3:04-cr-271-7, filed by Nicholas Ragin. (tmg) (Entered: 10/01/2010) |
| 10/08/2010 | 2 | **ORDER TO ANSWER 2255 MOTION. Responses due by 11/22/2010. Signed by Chief Judge Robert J. Conrad, Jr on 10/7/2010. (Pro se litigant served by US Mail.) (tmg) (Entered: 10/08/2010)** |
| 11/22/2010 | 3 | MOTION for Extension of Time to file answer to 2255 motion *filed by* USA.Responses due by 12/9/2010. (Ray, Amy) (Entered: 11/22/2010) |
| 11/23/2010 | | **TEXT-ONLY ORDER granting 3 Motion for Extension of Time to File Response/Reply** *Text of Order: The Government's Motion for Extension of Time to respond to Petitioner's Motion to Vacate is GRANTED. The Government's Response is due on or before December 22, 2010. So Ordered.* **Entered by Chief Judge Robert J. Conrad, Jr on 11/23/2010. (Pro se litigant served by US Mail.) (Frasche, Mary) (Entered: 11/23/2010)** |
| 11/23/2010 | | Set/Reset Deadlines: Response to Motion to Vacate due by 12/22/2010 (tmg) (Entered: 11/23/2010) |
| 12/21/2010 | 4 | MOTION for Extension of Time to Answer by USA. (Ray, Amy) (Entered: 12/21/2010) |
| 12/21/2010 | | **TEXT-ONLY ORDER granting 4 Motion for Extension of Time to File Response/Reply re 4 MOTION for Extension of Time to Answer Responses due by 1/31/2011.** *Text of Order: For good cause shown, the Goverment's Motion for Extension of Time is GRANTED. The Government shall have up to and including January 31, 2011 in which to file a Response to Petitioner's Motion to Vacate, Set Aside or Correct Sentence. So Ordered.* **Entered by Chief Judge Robert J. Conrad, Jr on 12/21/2010. (Pro se litigant served by US Mail.) (Frasche, Mary) (Entered: 12/21/2010)** |
| 12/29/2010 | 5 | MOTION for Judgment on the Merits by Nicholas Ragin. Responses due by 1/18/2011. (Attachments: # 1 Envelope) (tmg) (Entered: 12/29/2010) |
| 01/06/2011 | 6 | RESPONSE to Motion re 4 MOTION for Extension of Time by Nicholas Ragin. |

| | | (Attachments: # 1 Envelope) (tmg) (Entered: 01/06/2011) |
|---|---|---|
| 01/06/2011 | 7 | AFFIDAVIT by Nicholas Ragin (tmg) (Entered: 01/06/2011) |
| 01/27/2011 | 8 | Third MOTION for Extension of Time to respond to 2255 motion *filed* by USA.Responses due by 2/14/2011. (Ray, Amy) (Entered: 01/27/2011) |
| 01/28/2011 | | **TEXT-ONLY ORDER granting 8 Motion for Extension of Time to File Response/Reply Responses due by 3/14/2011. *Text of Order: The Government's Third Motion for Extension of Time is GRANTED. The Government shall have up to and including March 14, 2011 in which to file a Response. So Ordered.* Entered by Chief Judge Robert J. Conrad, Jr on 01/28/2011. (Pro se litigant served by US Mail.)(Frasche, Mary) (Entered: 01/28/2011)** |
| 02/07/2011 | 9 | RESPONSE in Opposition to Motion re 8 Third MOTION for Extension of Time to respond to 2255 motion *filed* by Nicholas Ragin. (Attachments: # 1 Envelope) (tmg) (Entered: 02/08/2011) |
| 03/09/2011 | 10 | MOTION for Extension of Time to respond to 2255 motion *filed* by USA.Responses due by 3/28/2011. (Ray, Amy) (Entered: 03/09/2011) |
| 03/18/2011 | | **TEXT-ONLY ORDER granting 10 Motion for Extension of Time to File Response/Reply re 10 MOTION for Extension of Time to respond to 2255 motion *filed* Responses due by 4/4/2011. *Text of Order: The Government's Motion for Extension of Time is GRANTED nunc pro tunc. The Government shall have up to and including April 4, 2011 to file a Response. So Ordered.* Entered by Chief Judge Robert J. Conrad, Jr on 03/18/2011. (Pro se litigant served by US Mail.)(Frasche, Mary) (Entered: 03/18/2011)** |
| 04/04/2011 | 11 | MOTION for Extension of Time to respond to 2255 motion *filed* by USA.Responses due by 4/21/2011. (Ray, Amy) (Entered: 04/04/2011) |
| 04/08/2011 | 12 | **ORDER granting 11 Motion for Extension of Time to Respond to Motion to Vacate 2255. Responses due by 4/25/2011. Signed by Chief Judge Robert J. Conrad, Jr on 4/8/2011. (Pro se litigant served by US Mail.) (tmg) (Entered: 04/08/2011)** |
| 04/25/2011 | 13 | MOTION for Extension of Time to Answer by USA. (Ray, Amy) (Entered: 04/25/2011) |
| 04/27/2011 | | **TEXT-ONLY ORDER granting 13 Motion for Extension of Time to File Response/Reply re 13 MOTION for Extension of Time to Answer Responses due by 5/16/2011. *Text of Order: For good cause shown, the Government's Motion for Extension of Time is GRANTED nunc pro tunc. The Government shall have up to and including May 16, 2011 in which to file a Response. So Ordered.* Entered by Chief Judge Robert J. Conrad, Jr on 04/27/2011. (Pro se litigant served by US Mail.)(Frasche, Mary) (Entered: 04/27/2011)** |
| 05/16/2011 | 14 | MOTION for Extension of Time to File Response/Reply by USA.Responses due by 6/3/2011. (Ray, Amy) (Entered: 05/16/2011) |
| 05/17/2011 | | **TEXT-ONLY ORDER granting 14 Motion for Extension of Time to File Response/Reply re 14 MOTION for Extension of Time to File Response/Reply Responses due by 6/7/2011. *Text of Order: For good cause shown, the** |

| | | |
|---|---|---|
| | | *Government's Motion for Extension of Time is hereby GRANTED nunc pro tunc. The Government shall have up to and including June 7, 2011 in which to file a Response to Petitioner's Motion to Vacate, Set Aside or Correct Sentence. So Ordered.* **Entered by Chief Judge Robert J. Conrad, Jr on 05/17/2011. (Pro se litigant served by US Mail.)(Frasche, Mary) (Entered: 05/17/2011)** |
| 06/08/2011 | 15 | RESPONSE in Opposition re 1 Motion to Vacate/Set Aside/Correct Sentence (2255) by USA. (Ray, Amy) (Entered: 06/08/2011) |
| 06/08/2011 | 16 | Exhibit by USA. Exhibit to 15 Response in Opposition (Ray, Amy) (Entered: 06/08/2011) |
| 06/08/2011 | 17 | MOTION for Summary Judgment by USA.Responses due by 6/27/2011. (Ray, Amy) (Entered: 06/08/2011) |
| 06/08/2011 | 18 | MOTION for Extension of Time to File Response/Reply by USA.Responses due by 6/27/2011. (Ray, Amy) (Entered: 06/08/2011) |
| 06/09/2011 | | **TEXT-ONLY ORDER granting 18 Motion for Extension of Time to File Response/Reply** *Text of Order: For good cause shown, Respondent's Motion for Leave to File Response One Day Out of Time is GRANTED, nunc pro tunc. So Ordered.* **Entered by Chief Judge Robert J. Conrad, Jr on 06/09/2011. (Pro se litigant served by US Mail.)(Frasche, Mary) (Entered: 06/09/2011)** |
| 06/14/2011 | 19 | Exhibit by USA. Exhibit to 15 Response in Opposition *filed by USA* (Ray, Amy) (Entered: 06/14/2011) |
| 06/21/2011 | 20 | **ORDER/NOTICE as to 17 MOTION for Summary Judgment. (Responses due by 7/25/2011). Signed by Chief Judge Robert J. Conrad, Jr on 6/21/2011. (Pro se litigant served by US Mail.) (tmg) (Entered: 06/21/2011)** |
| 06/21/2011 | 21 | MOTION for Summary Judgment by Nicholas Ragin.Responses due by 7/8/2011. (Attachments: # 1 Envelope)(bsw) (Entered: 06/22/2011) |
| 07/08/2011 | 22 | MOTION for Extension of Time to File Response/Reply re: 17 MOTION for Summary Judgment by Nicholas Ragin. Responses due by 7/25/2011. (Attachments: # 1 Envelope) (tmg) (Entered: 07/08/2011) |
| 07/19/2011 | 23 | RESPONSE in Opposition re 17 MOTION for Summary Judgment and 15 Answer to Petitioner's Motion by Nicholas Ragin. Replies due by 7/29/2011. (Attachments: # 1 Envelope) (tmg) (Entered: 07/19/2011) |
| 07/28/2011 | 24 | **ORDER dismissing as moot 22 Motion for Extension of Time to File Response/Reply. Signed by Chief Judge Robert J. Conrad, Jr on 7/28/2011. (Pro se litigant served by US Mail.) (tmg) (Entered: 07/28/2011)** |
| 09/12/2011 | 25 | MOTION to Stay; and MOTION to Amend/Correct 1 Motion to Vacate/Set Aside/Correct Sentence (2255) by Nicholas Ragin. Responses due by 9/29/2011. (Attachments: # 1 Envelope) (tmg) (Entered: 09/13/2011) |
| 09/12/2011 | 26 | NOTICE of Change of Address to USP Florence by Nicholas Ragin. REQUEST for Status *[Docket Sheet mailed to Petitioner]* (tmg) (Entered: 09/14/2011) |
| 12/20/2011 | 27 | Pro Se MOTION to Amend 1 Motion to Vacate/Set Aside/Correct Sentence (2255) by Nicholas Ragin.Responses due by 1/6/2012. (Attachments: # 1 Attachments, # 2 Envelope)(bsw) (Entered: 12/21/2011) |

| 12/20/2011 | 28 | Pro Se MOTION for Judgment on the Pleadings by Nicholas Ragin.Responses due by 1/6/2012. (Attachments: # 1 Envelope)(bsw) (Entered: 12/21/2011) |
| --- | --- | --- |
| 03/05/2012 | 29 | **ORDER denying 5 Motion for Judgment on the Merits; denying 25 Motion to Amend/Correct and Motion to Stay; granting 27 Motion to Amend/Correct (deemed to be a Motion to Supplement Response); denying 28 Motion for Judgment on the Pleadings. Signed by Chief Judge Robert J. Conrad, Jr on 3/2/2012. (Pro se litigant served by US Mail.) (tmg) (Entered: 03/05/2012)** |
| 10/19/2012 | 30 | NOTICE of Appearance by Leah A Kane on behalf of Nicholas Ragin (Kane, Leah) (Entered: 10/19/2012) |
| 07/30/2013 | 31 | MOTION to Withdraw as Attorney by Nicholas Ragin. (Richardson, Ross) (Entered: 07/30/2013) |
| 08/19/2013 | 32 | **ORDER granting 31 Motion to Withdraw as Attorney. Attorney Leah A. Kane /FDO terminated. Signed by District Judge Robert J. Conrad, Jr on 8/19/13. (bsw) (Entered: 08/19/2013)** |
| 10/07/2013 | 33 | NOTICE of Change of Address by Nicholas Ragin (Attachments: # 1 Envelope) (blf) (Entered: 10/08/2013) |
| 03/31/2014 | 34 | **ORDER setting Evidentiary Hearing re 1 Motion to Vacate/Set Aside/Correct Sentence (2255) 4/28/14 at 9:30 am. USM to have deft Ragin present, FDO shall designate counsel promptly.. Signed by District Judge Robert J. Conrad, Jr on 3/31/14. (Pro se litigant served by US Mail.)(ssh) (Entered: 04/01/2014)** |
| 03/31/2014 | | NOTICE of Hearing: Evidentiary Hearing set for 4/28/2014 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 04/01/2014) |
| 04/02/2014 | 35 | **CJA 20: *(Restricted)* Appointment of Attorney Matthew G. Pruden for Nicholas Ragin (Click on this link to obtain the CJA 19 Notice to Appointed Counsel of Public Disclosure of Attorney Fee Information) . Entered by District Judge Robert J. Conrad, Jr on 4/1/14. (Pro se litigant served by US Mail.)(mga) (Entered: 04/02/2014)** |
| 04/02/2014 | 36 | MOTION to Compel *Production of Affidavit and Motion to Continue Evidentiary Hearing* by USA.Responses due by 4/21/2014 (Ray, Amy) (Entered: 04/02/2014) |
| 04/08/2014 | 37 | **ORDER granting in part - Evidentiary Hearing is rescheduled to 5/13/14 @ 10:30 and denying in part 36 Motion to Compel production of an affidavit.. Signed by District Judge Robert J. Conrad, Jr on 4/8/14. (ssh) (Entered: 04/08/2014)** |
| 04/10/2014 | | Set/Reset Hearings: Evidentiary Hearing set for 5/13/2014 10:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. (ssh) (Entered: 04/10/2014) |
| 04/14/2014 | | NOTICE of Hearing: Evidentiary Hearing RESET for 5/12/2014 10:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 04/14/2014) |

| 04/21/2014 | 38 | NOTICE by USA (Attachments: # 1 Exhibit)(Ray, Amy) (Entered: 04/21/2014) |
|---|---|---|
| 04/29/2014 | 39 | NOTICE of Appearance by William Michael Miller on behalf of USA (Miller, William) (Entered: 04/29/2014) |
| 05/12/2014 | | Minute Entry: EVIDENTIARY HEARING re: Petitioner's 2255 Motion held and kept open before District Judge Robert J. Conrad, Jr.. Counsel to file further briefs. Evidentiary Hearing set for 6/2/2014 09:45 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Plaintiffs attorney: Miller. Defendants attorney: Pruden. Court reporter: Valecia Marseilles w/ Huseby. (ssh) (Entered: 05/12/2014) |
| 05/15/2014 | 40 | NOTICE by USA *Government's Revised Notice of Subpoena* (Attachments: # 1 Exhibit 1)(Miller, William) (Entered: 05/15/2014) |
| 05/28/2014 | 41 | 4th Circuit NOTICE as to Nicholas Ragin regarding Unpublished Opinion and Judgment granting IFP, denying Motion for Writ of Mandamus (Attachments: # 1 Judgment)(ssh) (Entered: 05/29/2014) |
| 06/02/2014 | | Minute Entry: EVIDENTIARY HEARING re: Petitioner's 28:2255 held before District Judge Robert J. Conrad, Jr.. Counsel to file further briefs within 2 weeks. Plaintiffs attorney: Miller. Defendants attorney: Pruden. Court reporter: Andersen. (ssh) (Entered: 06/02/2014) |
| 06/11/2014 | 42 | USMS Return of Service for Subpoena served on Nakita Mackey on 6/5/2014. (jde) (Entered: 06/11/2014) |
| 06/16/2014 | 43 | MEMORANDUM in Support re 28 MOTION for Judgment on the Pleadings, 25 MOTION to Amend/Correct 1 Motion to Vacate/Set Aside/Correct Sentence (2255) MOTION to Stay, 27 MOTION to Amend/Correct 1 Motion to Vacate/Set Aside/Correct Sentence (2255), 5 MOTION for Judgment on the Pleadings *Additional Memorandum in Support of Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. ss 2255* by Nicholas Ragin. (Pruden, Matthew) (Entered: 06/16/2014) |
| 06/16/2014 | 44 | MEMORANDUM in Opposition re 25 MOTION to Amend/Correct 1 Motion to Vacate/Set Aside/Correct Sentence (2255) MOTION to Stay *Supplemental Memorandum of Law in Opposition to Petitioner's Motion to Vacate* by USA. Replies due by 6/26/2014 (Miller, William) (Entered: 06/16/2014) |
| 06/25/2014 | 45 | USMS Return of Service for Order served on Nicholas Ragin on 6/23/14. (jlk) Modified on 6/26/2014 (jlk). (Entered: 06/26/2014) |
| 08/19/2014 | 46 | **ORDER granting in part 17 Motion for Summary Judgment; denying 21 Motion for Summary Judgment; Denying and Dismissing 1 Petitioner's Motion to Vacate, Set Aside or Correct Sentence (2255). Court declines to issue a Certificate of Appealability. Signed by District Judge Robert J. Conrad, Jr on 8/19/2014. (eef) Modified on 8/27/2014 (ssh). (Entered: 08/19/2014)** |
| 08/19/2014 | 47 | **CLERK'S JUDGMENT is hereby entered in accordance with the Court's Order dated 8/19/2014. Signed by Clerk, Frank G. Johns. (eef) (Entered: 08/19/2014)** |
| 08/22/2014 | 48 | NOTICE OF APPEAL as to 46 Order on Motion for Summary Judgment,,, by |

| | | |
|---|---|---|
| | | Nicholas Ragin. *Use this link* www.ca4.uscourts.gov *to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (IFP) (Pruden, Matthew) (Entered: 08/22/2014) |
| 08/25/2014 | 49 | Transmission of Notice of Appeal to US Court of Appeals re 48 Notice of Appeal, (jlk) (Entered: 08/25/2014) |
| 08/26/2014 | | USCA Case Number 14-7245 for 48 Notice of Appeal, USCA Case Manager: T Fischer. (ssh) (Entered: 08/27/2014) |
| 08/27/2014 | | Original Assembled Electronic Record Transmitted to Fourth Circuit re: 48 Notice of Appeal,. (along with 3:04cr271-7) (ssh) (Entered: 08/27/2014) |
| 08/28/2014 | 50 | TRANSCRIPT REQUEST by Nicholas Ragin for proceedings held on 5/12/2014 before Judge Conrad (Pruden, Matthew) Modified on 9/11/2014 to correct judge(ssh). (Entered: 08/28/2014) |
| 08/28/2014 | 51 | TRANSCRIPT REQUEST by Nicholas Ragin for proceedings held on 6/2/2014 before Judge Conrad (Pruden, Matthew) Modified on 9/11/2014 to correct judge (ssh). (Entered: 08/28/2014) |
| 09/22/2014 | 52 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT re 48 Notice of Appeal, Evidentiary hearing 5/12/14 (ssh) (Entered: 09/22/2014) |
| 09/22/2014 | 53 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT re 48 Notice of Appeal, Evidentiary hearing 6/2/14 (ssh) (Entered: 09/22/2014) |
| 10/29/2014 | 54 | **CJA 20 *(Sealed - CJA Counsel)*: Authorization to Pay Matthew Pruden. Amount: $ 5,318.10, Voucher # 141021000004. Signed by District Judge Robert J. Conrad, Jr on 10/8/14. (lhg) (Entered: 10/29/2014)** |
| 11/17/2014 | 55 | TRANSCRIPT of Evidentiary Hearing held on 6/2/2014 before Judge Robert J. Conrad, Jr. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 2/17/2015. (Reporter: Laura Andersen, 704-350-7493) (Entered: 11/17/2014)** |
| 12/04/2014 | | Original Assembled Electronic Record re-transmitted to Fourth Circuit per request re: 48 Notice of Appeal,. (ssh) (Entered: 12/04/2014) |
| 06/01/2015 | 56 | ORDER of USCA appointing Matthew Ragin counsel on appeal as to 48 Notice of Appeal, (ssh) (Entered: 06/02/2015) |
| 06/01/2015 | 57 | ORDER of USCA as to 48 Notice of Appeal, USCA grants certificate of appealability as to one issue. (ssh) (Entered: 06/02/2015) |
| 06/02/2015 | 58 | ORDER of USCA as to 48 Notice of Appeal, appointing nunc pro tunc 6/1/05 Matthew Pruden counsel on appeal. Modified on 6/2/2015 (ssh). (Entered: |

06/02/2015)

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/09/2015 09:42:01 | | |
| **PACER Login:** | nt0044 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:10-cv-00488-RJC |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

-24-

FILED
CHARLOTTE, NC

OCT 0 1 2010

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

Nicholas G. Ragin                             Case No. 3:04 CR 271-MU
   Defendant
   v.
   Plaintiff                                  2255 Motion to Vacate, Set Aside, or
United States of America               Correct Sentence – <u>Summary of Arguments</u>

    **Defendant's Pro Se Motion to Vacate, Set Aside, or Correct His Sentence for the following Constitutional Violations are as follows:**

I.    <u>Ineffective Assistance of Counsel</u>

    **Counsel Nikita V. Mackey was appointed as trial counsel for Nicholas Ragin on October 21, 2004. Defendant experienced lack of professionalism, performance and communication from the time of the appointment up until the date of sentencing on January 18, 2007. The following subjects will show and prove that counsel's performance rendered ineffectiveness.**

    **A. Counsel failed to provide defendant with complete discovery as it was readily made available to him. Advised defendant that he wanted to take the case to trial on the basis that the government possessed no evidence against him. During the course of the three week trial defendant discovered numerous statements from government witnesses that had been in counsel's possession on CD-ROM for at least a year and a half while defendant was held in the Mecklenburg County Jail awaiting trial. Withholding this information from his client subjected him to a trial resulting in a 360 month sentence when his client had he known of all evidence against him could have entered a plea for less.**

    **B. Counsel for defendant did no investigating concerning**

defendant's background or prior convictions.  Counsel failed to go over PSR with defendant and at sentencing phase objected to the Criminal History Score, however counsel did not provide any evidence to support the objections to prior convictions.  If client's criminal history had been properly investigated by counsel, he would have discovered that the error on the PSR had applied one (1) point for reckless driving and resisting a public officer.  The 2007 Sentencing Guidelines excluded these offenses from being counted towards criminal history points.  Counsel would have been aware that the following points were issued for priors such as Escape by Hired Prisoner which only resulted in a sentence of twenty-three days,  Larceny which resulted in a sentence of thirty-nine days.  In both cases, counsel was not provided and has subjected his client to being categorized as a career criminal IV.

C.  Counsel for defendant failed to inform defendant of a plea offer made by the government which was 10 to life.  Counsel for defendant instructed his client to go to trial on the basis that the government had no evidence against him.  Defendant was not made aware of the plea bargain by the government until after counsel announced to the government that he was preparing to go to trial.

D.  Counsel for defendant failed to let defendant testify in his own behalf.  Counsel specifically stated to his client that he was not prepared to ask his client any questions if he chose to testify.  Defendant was informed by his counsel that even if he still chose to testify that he could not give his testimony in a narrative form.  By counsel being unprepared for his client to take the stand he hindered his client from presenting evidence in his own behalf that very well could have affected the jury's decision.

E.  Counsel deliberately tried to cause a mistrial because he felt that the trial was not going to be a success.  Counsel deliberately took a statement made by the case agent and implicated a non-testifying co-defendant when the case agent never mentioned the co-defendant's name.

F.  Counsel failed to properly admit into evidence "impeachment material" and afterwards failed to impeach the witness Keisha Burris as to her testimony concerning Nicholas Ragin.  Had he properly handled this matter, the jury may not have considered Burris' testimony to be credible for she was on of the two (2) key witnesses for the government.

2

G. Counsel fell asleep during the trial.  When asked by the trial judge if he had any "cross examination" of the witness, he had to be asked twice by the judge and his client looked at him and noticed that he was sleeping.  Client had to nudge counsel and wake him up.  Counsel displayed that he was very inattentive during the proceedings.  Counsel made the comment to the press when asked if he was sleeping "I was not sleeping – I may have been resting my eyes, but I was listening to the testimony".

H.  Counsel did not return all evidence over to replacement counsel which resulted in a below average direct appeal.  Counsel failed to return evidence of letters written to the defendant by one of the government's key witnesses, which should have been an issue on direct for the defendant.

I.  Counsel failed to investigate witnesses supplied by the defendant for his defense.  Witnesses that could have made a critical impact on the government's case were not contacted.

J.  Counsel presented a conflict of interest when he chose to run for judge before and during the course of defendant's trial.  The same conflict of interest arose when counsel for defendant chose to run for Mecklenburg County Sheriff's office at which time he filed a motion to withdraw from defendant's case on direct appeal.  This motion for withdrawal should have been submitted at the trial stage, running for these two (2) positions presented a clear conflict of interest.

The above subtitles are true facts to establish that counsel's performance was deficient and that deficient performance prejudiced the entire defense.  Counsel's performance fell below an objective standard of reasonableness.  The result or the proceedings would have been different had counsel been professional in handling this case and addressed the errors when presented.

Counsel did not function or render the assistance guaranteed by the 6th Amendment so as to provide reasonably effective assistance, but also that counsel's errors were so serious as to deprive the defendant of a fair trial.

3

In representing a criminal defendant counsel owes the client a duty of loyalty a duty to avoid conflicts of interest – a duty to advocate the defendant's cause – a duty to consult with the defendant on important decisions – a duty to keep defendant informed of important developments in the course of the prosecution – and a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

The court agreed that the 6th Amendment imposes on counsel a duty to investigate, because reasonable effective assistance must be based on professional decisions and informed legal choices can be made only after an investigation of options. The court observed that counsel's investigative decisions must be assessed in light of the information known at the time of the decisions, not in hindsight, and that the amount of pretrial investigation that is reasonable defines precise measurement.

An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. Cayler v. Sullivan, 446 U.S., at 344, 64 L. Ed 201 333, 100 Sct. 1708 (actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective. Powell v. Arizona, 287 U.S., at 68-69, 77 L. Ed 158, 53 Sct. 55, 84 ALR 527, Faretta v. California, 422 U.S. 806, 415 L.Ed 2a 562, 95 Sct. 2525.

In conclusion, defendant has proven that counsel's performance fell below the normal standards. United States v. Cronic, 466 US 648 (1984), Strickland v. Washington, 466 U.S. 668, 687 (1984), Frazier v. United States, 18F. 3d 778, 785 (9th Cir 1999), Osborn v. Shillinger, 861 F. 2d 612 (10th Cir 1985).

II. The District Court erred when they sentenced defendant to a drug amount not found by the jury. The court imposed a higher sentence based on judicially found facts, therefore violating defendant's 5th, 6th and 14th Amendment rights pursuant to Booker and Apprendi.

Violation of 5th, 6th, and 14th Amendment Rights as to drug amount not found by the jury and not charged in the indictment.

4

The jury did return a specific finding regarding the amount of cocaine base involved in defendant's offense, more than 50 grams.

If a defendant is held accountable for less than 5 kilograms the statutory maximum sentence is capped at 20 years, USC 841.

Under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt". The amount of cocaine base involved in defendant's offense is a fact that increased his penalty, but was not submitted to a jury. Had defendant been sentenced after 2000 the sentence would have violated Apprendi.

Denying defendant reduction would ignore the rationale and spirit of Apprendi and the 6th Amendment protections recognized therein. Would be consistent with the current state of the law and in the interest of justice. Under these circumstances, the court cannot demonstrate harmlessness beyond a reasonable doubt, and defendant's sentence must be vacated and remanded for re-sentencing.

## CONCLUSION

For the reasons stated in this brief, this court should vacate Appellant's convictions and remand to the District Court for a new trial. In the alternative, the court should vacate Appellant's sentence and remand for re-sentencing.

### Request For Evidentiary Hearing

Appellant ask that the court grant him an evidentiary hearing concerning the above issues.

   This the 1st day of October, 2010

cc: U.S. Attorney Office
    227 West Trade Street
    Suite 1700
    Charlotte, North Carolina  28202

5

Page 14

Therefore, movant asks that the Court grant the following relief: *Vacate conviction for a new trial or resentence the defendant,*

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ _____ (month, date, year).

Executed (signed) on *Nicholas B. Rogin* (date).

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. _____

_____

_____

IN FORMA PAUPERIS DECLARATION

*United States District Court Western District*

[Insert appropriate court]

* * * * *

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District Western District of N.C. |
|---|---|

| Name (under which you were convicted): Nicholas Ragin | Docket or Case No.: 3:04-cr-00271-RJC-M |
|---|---|

| Place of Confinement: United States Penitentiary Lewisburg | Prisoner No.: 19191-058 |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) |
|---|---|

v. Nicholas Ragin

### MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging: _____
    U.S. District Court Western District of North Carolina

    (b) Criminal docket or case number (if you know): 3:04-cr-00271-RJC-M

2.  (a) Date of the judgment of conviction (if you know): _____

    (b) Date of sentencing: 1/18/07

3.  Length of sentence: Count 13  360 months    Count 1  60 months

4.  Nature of crime (all counts): Count 1 (18:371 Conspiracy to commit an offense against the U.S.) Count 13 ( 21:846, 841, 861 Conspiracy to possess with intent to distribute cocaine base and using a person under 18 years of age in furtherance thereof.

5.  (a) What was your plea? (Check one)

    (1) Not guilty ☑    (2) Guilty ☐    (3) Nolo contendere (no contest) ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to? _____

6.  If you went to trial, what kind of trial did you have? (Check one)    Jury ☑    Judge only ☐

Page 3

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ☐     No ☑

8. Did you appeal from the judgment of conviction?     Yes ☑     No ☐

9. If you did appeal, answer the following:

(a) Name of court: U.S. Court OF Appeals For the Fourth Circuit

(b) Docket or case number (if you know): 3:04-cr-00271-RJC-7 (07-4168)

(c) Result: Judgment affirmed

(d) Date of result (if you know): January 29, 2009

(e) Citation to the case (if you know): 07-4168

(f) Grounds raised: The District Court Plainly Erred by failing to give the Jury a Collins/Pinkerton instruction on drug amount in violation of the 6th Amendment — Appellants sentences were imposed pursuant to a mandatory crack guideline and violated the fifth and sixth amendments.

(g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☑   No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: Petition denied

(3) Date of result (if you know): 10/5/09

(4) Citation to the case (if you know): 07-4168

(5) Grounds raised: Relief sought on grounds that appeals court denied petitioner sentencing relief on his claim that the 5th and 6th amendment rights were violated when the district court made factual findings on drug amounts pursuant to a mandatory crack guideline in conflict with the court's ruling in United States v. Booker.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 8 of 36

Page 4

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?     Yes ☐ No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?     Yes ☐ No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:     Yes ☐ No ☐

(2) Second petition:     Yes ☐ No ☐

Page 5

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly
why you did not: _____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the
Constitution, laws, or treaties of the United States. Attach additional pages if you have more
than four grounds. State the facts supporting each ground.

GROUND ONE: Ineffective Assistance Of Counsel

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
Trial Counsel Failed to do the following — Provide all discovery available —
Investigate background and prior convictions — Go over PSR and prepare
for sentencing — Failed to communicate a plea offer — Let defendant
testify — Ask questions in proper form — Use impeachment evidence
as directed by defendant — Lost important evidence — Counsel was
inattentive during trial — Counsel sleeping during trial — Appellant
Counsel appointed at the last minute — Failed to investigate all
witnesses supplied by defendant — Conflict of interest presented
itself when counsel ran for Federal Judge during the course of defendant
trial and sheriff during the appeal phase.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes ☐  No ☑

(2) If you did not raise this issue in your direct appeal, explain why: This issue was a
Constitutional issue that couldn't be raised on direct.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?
Yes ☐  No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 10 of 36

-34-

Page 6

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐    No ☑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

GROUND TWO: Violation of 5th, 6th and 14th Amendments.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Improperly found facts as to drug amount by the court and indictment was deficient in the same regards.

_____

_____

_____

_____

_____

_____

Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 11 of 36

-35-

Page 7

**(b) Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐  No ☑

(2) If you did not raise this issue in your direct appeal, explain why: _Counsel failed to consult me with the issues_

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐  No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐  No ☑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐  No ☑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐  No ☑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee

     v.                      Docket No. 07-4146

DAVID L. HOWARD,
NICHOLAS RAGIN and
TRACY HOWARD
Defendants-Appellant



### ATTORNEY NIKITA V. MACKEY'S MOTION
### TO WITHDRAW AS COUNSEL FOR NICHOLAS RAGIN

Appellant Nicholas Ragin's counsel, Nikita V. Mackey, pursuant to Rule 44

of the Federal Rules of Criminal Procedure and Rule 46(c) of the Local Rules for

the United States Court of Appeals for the Fourth Circuit, hereby moves the court

for leave to withdraw as counsel for the Appellant and to have new counsel

appointed for Mr. Ragin in this case. In support of this Motion, counsel shows the

Court the following:

    1.     Undersigned counsel was appointed to represent Appellant Nicholas

Ragin on direct appeal by Order of this Court.

    2.     On December 6, 2007, Appellant's counsel was elected Sheriff of

Mecklenburg County, North Carolina. Counsel expects to take office before the

brief is due in this case on March 5, 2008, and possibly as early as January 2008.

Counsel's status as Sheriff-elect presents a conflict of interest requiring him to

withdraw from representing Mr. Ragin.  Additionally, because of the complex

nature of this appeal and the voluminous transcripts (in excess of 4,000 pages) and

exhibits (over 300) involved, immediate appointment of new counsel will aid in

avoiding extended delays in briefing the case.

     3.    Ann Hester, counsel for Appellant David Howard, has informed

undersigned counsel that Attorney Eric Foster of Asheville, North Carolina, has

agreed to accept an appointment to represent Mr. Ragin in this appeal.

     4.    Counsel has served a copy of this motion on Appellant and has

advised him in writing of his right to respond to this motion within seven days.

     WHEREFORE, Counsel requests that he be withdrawn as counsel for

Nicholas Ragin in this case and that new counsel be appointed for Mr. Ragin.

     This, the 2nd day of January, 2008.

                                   _____
                                   Nikita V. Mackey
                                   Mackey & Associates, PLLC
                                   101 N. McDowell St., Suite 114
                                   Charlotte, NC 28204
                                   (704) 593-0210
                                   Attorney for Nicholas Ragin

-2-

# CERTIFICATE OF SERVICE

Undersigned counsel certifies that the foregoing Motion was served on

opposing counsel, counsel for the codefendants, and Appellant Nicholas Ragin by

United States Mail, postage prepaid, as follows:

| | |
|---|---|
| Ms. Amy Ray | Ms. Ann L. Hester |
| U.S. Attorney's Office | Mr. Peter Adolf |
| 100 Otis Street, Room 233 | Assistant Federal Defenders |
| Asheville, NC 28801-2611 | 227 W. 4th Street, Suite 300 |
| Attorney for the United States | Charlotte, NC 28202 |
| | Counsel for Appellant David Howard |
| | |
| Mr. Richard A. Culler | Mr. Nicholas Ragin |
| Culler & Culler, P.A. | Reg. # 19791-058 |
| 212 N. McDowell St., Suite 212 | USP Lee |
| Charlotte, NC 28204 | U.S. Penitentiary |
| Attorney for Tracy Howard | P.O. Box 305 |
| | Jonesville, VA 24263 |

This the 2nd day of January, 2008.

_Nikita V. Mackey_
Nikita V. Mackey
Mackey & Associates, PLLC
101 N. McDowell St., Suite 114
Charlotte, NC 28204
(704) 593-0210
Attorney for Nicholas Ragin

-3-

# Panel suspended attorney

## Complaints led to sheriff-elect being taken off list of lawyers who defend the poor

**Some reported to legal committee that Mackey fell asleep in court**

By Gary L. Wright
gwright@charlotteobserver.com

Nick Mackey's privileges to defend Mecklenburg County's poor people were suspended for almost a year after complaints to a legal committee about his handling of cases.

Judges had complained that he did not return telephone calls after missing court. The committee, in charge of lawyers appointed to indigent cases, also learned that Mackey possibly fell asleep during a criminal trial.

Since the suspension was lifted last February, clients have raised concerns about Mackey's professional conduct in at least two other pending cases. And

Mackey, 40, also faces a contempt hearing after he failed to show up for court last month.

Mackey's handling of cases comes under scrutiny as he is fighting to become Mecklenburg's new sheriff.

Local Democratic party leaders chose Mackey as sheriff to re-

place Jim Pendergraph, who left last month for a federal immigration job. But Mackey has been dogged by questions surrounding his background, including accusations that he lied about the hours he worked as a police service, wrote Mackey, informing him that he had been temporarily suspended from the list of lawyers who are appointed to defend indigent criminal suspects.

"The committee received information that you had not re-

ment, could not be reached Thursday, Friday or Saturday.

In a May 2006 letter to Mackey, Charlotte lawyer Bob Trobich, who chaired Mecklenburg's indigent defense committee, and resigned from the Charlotte-Mecklenburg Police Department while facing possible firing. Mackey also filed for bankruptcy in 2005.

Mackey, who has denied any wrongdoing at the police depart-

SEE MACKEY | 3B

# Lawyer bidding to 1

**Mackey** from 1B

turned telephone calls to clerks or judges after missing court, and that you fell asleep during a trial in federal court while representing a client in a criminal matter," Trobich said.

Trobich told Mackey that he could present information about why the suspension should be lifted. Last February, the committee voted to reinstate him after he appeared before its members.

Mackey told committee members that he did not fall asleep during the federal trial. He acknowledged that his eyes might have been closed but he said he was listening to the testimony, Trobich said.

Mackey said he missed court because he was handling cases in other courtrooms. Trobich said the committee admonished Mackey that he must keep judges informed of his whereabouts when he has cases in more than one courtroom.

About three lawyers a year are removed from the appointed list of about 90 lawyers, said Trobich, who no longer chairs the committee. Most are suspended for 30 days, he said, because their caseloads are too high, making it difficult for them to devote adequate time to all their clients.

The suspensions, Trobich said, allow the lawyers to catch up with their work.

Two months after Mackey was suspended from handling new indigent cases, client Nicholas Ragin complained about Mackey in a letter to a federal judge.

# e Mecklenburg sheriff suspended in '06

"Mr. Mackey advised me to go to trial," Ragin wrote. "I don't know what the reason for that was because he certainly wasn't prepared when the time came. He was totally clueless when certain witnesses got on the stand.

"He even had the audacity to fall asleep twice during the trial."

## Other complaints

The N.C. State Bar, meanwhile, has been investigating Mackey following a complaint from a client.

Charlotte-Mecklenburg police Officer John Frison told the Observer that he filed a complaint with the state regulatory agency, accusing Mackey of not returning his calls and not handling his case. Frison says he hired Mackey in 2005 to represent him after he was injured in a car crash

during a police training exercise.

But Frison said he fired Mackey last January after deciding to settle the case himself.

"I was not satisfied with his work and lack of communication," Frison wrote in a letter to the State Bar. "Basically, I did all the work."

Mackey, licensed in 2003, has not been publicly disciplined by the State Bar. A deputy counsel with the State Bar informed Frison by letter that his complaint against Mackey would be investigated.

Complaints about lawyers become public only if the State Bar charges lawyers with misconduct.

More than 22,000 lawyers are licensed in North Carolina. During the past six years, more than 9,600 complaints about lawyers

have been filed with the State Bar. In 2006, 19 lawyers were disbarred and another 28 were suspended. The State Bar that year also issued 37 admonitions, 39 reprimands and 17 censures.

Mackey also faces a complaint in small claims court filed last month. Morris and Janicea Chisolm claim they paid him to handle an adoption but Mackey did not provide the service. The Charlotte couple seek $1,200.

"He took money and promised the service would be done...," the complaint says. "Mr. Mackey has not followed through with his responsibility."

## Contempt hearing

Last month Mecklenburg District Judge Tom Moore said Mackey failed to show in his courtroom for a trial. The judge

summoned him to appear next day at 9:15 a.m. to explain why Mackey, the judge said, was 45 minutes late to that meeting.

A few days later, Moore ordered Mackey to appear in court to show why he shouldn't be held in contempt. Moore told the Observer he was not satisfied with Mackey's explanations.

Moore gave Mackey a choice: pay a $100 fine for failing to appear in court or a hearing on criminal contempt would be scheduled. Mackey, the judge said, opted for the hearing.

The hearing, scheduled for Monday, has been moved to Jan. 28.

— STAFF WRITER APRIL BETHEA CONTRIBUTED.



NORTH CAROLINA

WAKE COUNTY

BEFORE THE
DISCIPLINARY HEARING COMMISSION
OF THE
NORTH CAROLINA STATE BAR
09 DHC 18

| | |
|---|---|
| THE NORTH CAROLINA STATE BAR<br>Plaintiff,<br><br>v.<br><br>NIKITA V. MACKEY, Attorney,<br>Defendant. | FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND CONSENT ORDER<br>OF DISCIPLINE |

This matter was considered by a hearing panel of the Disciplinary Hearing Commission composed of the Chair, Tommy Jarrett, Harriett Smalls, and Joe Castro. Katherine E. Jean and William N. Farrell represented Plaintiff, the North Carolina State Bar. Defendant, Nikita V. Mackey, was represented by Alan M. Schneider. Both parties stipulate and agree to the findings of fact and conclusions of law recited in this consent order and to the discipline imposed. Defendant knowingly, freely and voluntarily waives any and all right to appeal the entry of this consent order of discipline. Based upon the stipulations of fact and the consent of the parties, the hearing panel hereby finds by clear, cogent, and convincing evidence the following

### FINDINGS OF FACT

1.  Plaintiff, the North Carolina State Bar (hereinafter "State Bar"), is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar promulgated thereunder.

2.  Defendant, Nikita V. Mackey (hereinafter "defendant" or "Mackey"), was admitted to the North Carolina State Bar on August 26, 2003, and is an Attorney at Law licensed to practice in North Carolina, subject to the rules, regulations, and Rules of Professional Conduct of the North Carolina State Bar and the laws of the State of North Carolina.

3.  Defendant was employed by the Charlotte-Mecklenburg Police Department (formerly the Charlotte Police Department) as a police officer from about October 1989 until about June 2003.

4.  On or about December 27, 2002, defendant signed and submitted an application (hereinafter "the application") to the Board of Law Examiners of the State of North Carolina (hereinafter "BOLE") to be permitted to take the North Carolina Bar Exam.

5.    Question number 13 of defendant's application to the BOLE asked defendant: "Have you failed to file any personal local, state, or federal income tax return, or failed to pay any taxes due? If YES, give full details below and furnish documentation showing that taxes are current."

6.    Defendant answered "no" to question number 13 of the application and wrote "none" as to details and documentation.

7.    In his BOLE application defendant failed to disclose and failed later to supplement that he failed to fully pay Federal income taxes for the years 1997, 1999 and 2002 at the times such taxes were due.

8.    In his BOLE application defendant failed to disclose and failed later to supplement that he failed to fully pay State income taxes for the years 1999 and 2002 at the times such taxes were due.

9.    Question number 18(a) of defendant's application to the BOLE asked defendant: "Have you ever had a complaint filed against you personally, or as a member of a professional association, or corporation, or any legal entity in any civil, criminal or administrative forum alleging fraud, deceit, misrepresentation, forgery or professional malpractice. If YES, list details below."

10.    Defendant answered "no" to question number 18(a) of the application and wrote "none" as to the details.

11.    In or about December 1991, defendant was suspended without pay for being untruthful to the Chain of Command Review Board at the Charlotte Police Department during an official administrative investigation regarding his improper conduct at an off duty security job.

12.    In his BOLE application, defendant failed to disclose that he had been suspended without pay for being untruthful to the Chain of Command Review Board of the Charlotte Police Department during an official administrative investigation regarding his improper conduct at an off duty security job in December 1991.

13.    On or about October 21, 2002, defendant was the subject of an official administrative investigation of the Charlotte-Mecklenburg Police Department.

14.    On or about October 21, 2002, defendant was verbally and in writing advised of his "Employee Disciplinary Interview Advice of Rights" as part of an official administrative investigation into the "abuse of comp. time" and inclusion of false information on "daily duty status reports."

2

15.     In his BOLE application, defendant failed to disclose and failed later to supplement that he was the subject of an official administrative investigation by the Charlotte-Mecklenburg Police Department.

16.     Question number 25 of defendant's application to the BOLE gives defendant an opportunity to make a full disclosure as to any other incident or occurrence in his life which is not otherwise referred to in the application which he would like to acknowledge in the interest of full disclosure. The application states as follows: "FULL DISCLOSURE: Is there any other incident or occurrence in your life which is not otherwise referred to in this application which you would like to acknowledge in the interest of full disclosure? It is crucial that you honestly and fully answer all questions, regardless of whether you believe the information is relevant. If YES, give full details below."

17.     Defendant answered "no" to question number 25 of the application and wrote "none" under details.

18.     In his December 2002 BOLE application, defendant failed to disclose and failed later to supplement that he was suspended without pay for being untruthful to the Chain of Command Review Board at the Charlotte Police Department regarding his improper conduct at an off duty security job in December 1991. In the BOLE application defendant also failed to disclose and later supplement that he was the subject of an official administrative investigation of the Charlotte-Mecklenburg Police Department.

19.     On or about February 24, 2003, defendant was suspended without pay and cited to the Civil Service Board with the recommendation that his employment with the Charlotte-Mecklenburg Police Department be terminated.

20.     Defendant failed to provide a supplement to his BOLE application disclosing that he had been suspended without pay and that a recommendation had been made that his employment with the Charlotte Police Department be terminated.

21.     Question number 49 of defendant's application to the BOLE asks defendant to handwrite that he understands that the application is a continuing application as follows: "THE FOLLOWING PARAGRAPH IS TO BE COPIED BY THE APPLICANT IN THE APPLICANTS USUAL HANDWRITING IN THE SPACE PROVIDED. I understand that this application is a continuing application and must give correctly and fully the information herein sought as of the date of my taking the North Carolina Bar Examination. I will, therefore, notify the Board as to any change in respect to any matter regarding which information is herein, and as to any incident which may have any bearing upon the information herein sought."

3

22.     Defendant did not believe he was required to supplement his BOLE application with the information that he was suspended without pay along with a recommendation that his employment be terminated because only the Civil Service Board had the authority to terminate his employment.

23.     Defendant resigned his employment with the police department before the Civil Service Board acted on the recommendation that his employment be terminated.

24.     Defendant now recognizes that he should have disclosed to the Board of Law Examiners that he was the subject of an official administrative investigation of the police department at the time he submitted his application to the BOLE and should have later supplemented his application regarding his suspension and recommendation of termination.

25.     On November 29, 2006, Morris Chisholm (hereinafter "Chisholm") retained defendant for a fee of $1,000 to represent him in the uncontested adoption of Chisholm's then seventeen year old stepdaughter.

26.     Defendant filed the adoption petition and all required paperwork on or about December 13, 2006 with the Clerk of Court of Mecklenburg County.

27.     At the time of the filing, the minor child was approximately four months short of her eighteenth birthday, April 15, 2007, which was the last day the child was legally eligible to be adopted as a minor.

28.     Between the time defendant was retained in November 2006 and April 15, 2007, the deadline for the minor's adoption, defendant failed to reasonably consult and communicate with Chisholm.

29.     Communication with Chisholm was critical in this case because defendant knew that the adoption had to be completed by a date certain or it could not occur.

30.     The adoption was not finalized before April 15, 2007, such that the child could not be adopted as a minor.

31.     Chisholm did not learn the adoption did not occur until July 2007, when his wife called the Clerk of Court's office and was advised by that office that there was no adoption.

32.     Defendant failed to advise Chisholm that the adoption had not occurred.

33.     Chisholm filed a small claims action against defendant for the attorney fees he paid in connection with the failed adoption.

34.     The court entered judgment in favor of Chisholm against defendant in the sum of $1,000.00.

4

35.    During the calendar years 2003, 2004, 2005 and 2006, defendant received sufficient income to require him to file Federal and State income tax returns.

36.    For each of these tax years, defendant knew the deadlines for the filing of his Federal and State income tax returns.

37.    Defendant failed to timely file Federal and State income tax returns for years 2003, 2004, 2005 and 2006 at the times required by State and Federal law.

38.    When defendant did file the State and Federal tax returns for the years 2003, 2004, 2005 and 2006, he was due a refund for each of these years or did not owe taxes for those years.

Based on the foregoing Findings of Fact the Panel enters the following:

## CONCLUSIONS OF LAW

1.    All parties are properly before the Hearing Panel and the Panel has jurisdiction over the defendant, Nikita V. Mackey, and the subject matter.

2.    Defendant's conduct, as set forth in the Findings of Fact above, constitute grounds for discipline pursuant to N.C. Gen. Stat. § 84-24(b)(2) in that defendant violated the Rules of Professional Conduct as follows:

    a.    Defendant failed to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter and knowingly failed to respond to a lawful demand for information from an admissions or disciplinary authority in violation of Rule 8.1(b) by failing to disclose in his application to the North Carolina Board of Law Examiners and failing to later supplement his BOLE application with the following information:

        1.    His failure to timely pay Federal income taxes for the years 1997, 1999 and 2002 when due;

        2.    His failure to timely pay State income taxes for the years 1999 and 2002 when due;

        3.    His failure, up and until the date of taking the Bar Examination, to disclose that he owed past due income taxes;

        4.    That he was, at the time of his December 2002 BOLE application and thereafter, the subject of an existing official administrative investigation of his conduct by the Charlotte-Mecklenburg Police Department; and

5

5.    His suspension for being untruthful to the Chain of Command
Review Board of the Charlotte Police Department during an
official administrative investigation of his improper conduct at an
off duty security job in December 1991.

b.  Defendant failed to act with reasonable diligence and promptness in
representing a client in violation of Rule 1.3 by failing to complete and
obtain the adoption;

c.   Defendant failed to keep his client reasonably informed in violation of
Rules 1.4(a)(3) and 1.4(a)(4); and

d.  Defendant engaged in dishonest conduct in violation of Rule 8.4(c) by
failing to timely file the required Federal and State income tax returns for
years 2003, 2004, 2005 and 2006.

Based on the foregoing Findings of Fact and Conclusions of Law the Hearing
Panel enters the following:

## CONCLUSIONS REGARDING DISCIPLINE

1.      The Hearing Panel has carefully considered all of the different forms of
discipline available to it, including admonition, reprimand, censure and suspension.

2.      The Hearing Panel has considered all of the factors enumerated in 27
N.C.A.C. 1B § .0114 (w)(1) and (3) of the Rules and Regulations of the State Bar and
finds the following factors are applicable.

a.  Circumstances reflecting the defendant's lack of honesty,
trustworthiness, or integrity;

b.  Negative impact of defendant's actions on the client's or the public's
perception of the profession;

c.  Acts of dishonesty, misrepresentation, deceit, or fabrication;

d.  Multiple offenses;

e.  A pattern of misconduct;

f.  Cooperative attitude during the Disciplinary Hearing Commission
procedure;

g.  Remorse; and

h.  Recognition of the wrongfulness of the conduct.

6

Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 24 of 36

3.     Defendant's conduct caused significant harm to the legal profession in that his acts bring the legal profession into disrepute.

4.     The Hearing Panel has considered lesser alternatives and finds that a censure, reprimand, or admonition would not be sufficient discipline because of the gravity of the actions and potential harm to the public and the legal profession caused by defendant's conduct.

5.     The Hearing Panel finds that discipline short of an active suspension would not adequately protect the public for the following reasons:

    a.     Defendant's conduct reflects adversely on his trustworthiness or fitness as a lawyer.

    b.     Entry of an order imposing less severe discipline would fail to acknowledge the seriousness of the misconduct and would send the wrong message to applicants to the BOLE, attorneys and public regarding the conduct expected of applicants to and members of the Bar of this State.

Based on the foregoing Findings of Fact, Conclusions of Law and Conclusions of Law Regarding Discipline, the Hearing Panel hereby enters the following:

ORDER OF DISCIPLINE

1.     The law license of defendant, Nikita V. Mackey, is hereby suspended for three years effective thirty days after service of this Order of Discipline on defendant.

2.     Defendant shall submit his license and membership card to the Secretary of the North Carolina State Bar no later than thirty days following service of this Order on Defendant.

3.     Defendant shall comply with the wind down provisions contained in 27 N.C.A.C. 1B § .0124, the North Carolina State Bar Discipline and Disability Rules. Defendant shall file an affidavit with the Secretary of the North Carolina State Bar within ten days of the effective date of this Order of Discipline certifying he has complied with the wind down rule.

4.     Within fifteen days of the effective date of this Order, defendant will provide the State Bar with a street address and mailing address at which clients seeking return of their files and records in defendant's possession or control may obtain such files and records and at which the State Bar may serve any notices or other matters upon him.

5.     After the completion of one year of active suspension of his license, defendant may apply for a stay of the balance of the suspension upon filing a petition

7

with the Secretary of the North Carolina State Bar at least thirty days before any proposed effective date of the stay and demonstrating the following by clear, cogent, and convincing evidence:

    a.  That defendant has kept the North Carolina State Bar Membership Department advised of his current business and home addresses and notified the Bar of any change in address within ten days of such change;

    b.  That defendant has responded to all communications from the North Carolina State Bar, including communications from the Attorney Client Assistance Program, within thirty days of receipt or by the deadline stated in the communication, whichever is sooner, and has participated in good faith in the State Bar's fee dispute resolution process for any petition received after the effective date of this Order;

    c.  That defendant has not violated the Rules of Professional Conduct or the laws of the United States or any state or local government during his suspension;

    d.  That defendant has timely filed his Federal and State income tax returns and timely paid any taxes owed; and

    e.  That defendant has properly wound down his law practice and complied with the requirements of 27 N.C.A.C. 1B § .0124, the North Carolina State Bar Discipline and Disability Rules.

    6.    If defendant successfully seeks a stay of the suspension of his law license, such stay will continue in force only as long as he complies with the following conditions:

    a.  Defendant shall keep the North Carolina State Bar Membership Department advised of his current business and home addresses;

    b.  Defendant shall respond to all communications from the North Carolina State Bar, including communications from the Attorney Client Assistance Program, within thirty days of receipt or by the deadline stated in the communication, whichever is sooner, and participate in good faith in the State Bar's fee dispute resolution process for any petition received during the stay;

    c.  Defendant shall not violate the Rules of Professional Conduct or the laws of the United States or any state or local government during his suspension;

    d.  Defendant shall timely comply with all State Bar membership and continuing legal education requirements and shall pay all fees and costs assessed by the applicable deadline; and

8

    e.   Defendant has timely filed his Federal and State income tax returns and timely paid any taxes owed.

7.    If defendant fails to comply with any of the conditions of the stayed suspension provided in paragraph 6 above, the stay of the suspension may be lifted as provided in § .0114(x) of the North Carolina State Bar Discipline and Disability Rules.

8.    If defendant does not seek a stay of the active portion of the suspension or if some part of the suspension is stayed and thereafter the stay is revoked, defendant must comply with the condition set out in paragraphs 5(a) through (e) above before seeking reinstatement of his license to practice law.

9.    Defendant is taxed with the costs of this action as assessed by the Secretary.

Signed by the Chair of the Hearing Panel with the consent of the other Hearing Panel members, this the 30 day of _April_, 2010.

Chair, Disciplinary Hearing Panel

CONSENTED TO:

Nikita V. Mackey, Defendant

Alan M. Schneider, Attorney for Defendant

Katherine E. Jean, Counsel
Attorney for Plaintiff

William N. Farrell, Deputy Counsel
Attorney for Plaintiff

9

NORTH CAROLINA

WAKE COUNTY

BEFORE THE
GRIEVANCE COMMITTEE
OF THE
NORTH CAROLINA STATE BAR
07G1418

IN THE MATTER OF

Nikita V. Mackey,
Attorney At Law

)
)
)
)
)

REPRIMAND

On April 23, 2009, the Grievance Committee of the North Carolina State Bar met and considered the grievance filed against you by The North Carolina State Bar.

Pursuant to Section .0113(a) of the Discipline and Disability Rules of the North Carolina State Bar, the Grievance Committee conducted a preliminary hearing. After considering the information available to it, including your response to the letter of notice, the Grievance Committee found probable cause. Probable cause is defined in the rules as "reasonable cause to believe that a member of the North Carolina State Bar is guilty of misconduct justifying disciplinary action."

The rules provide that after a finding of probable cause, the Grievance Committee may determine that the filing of a complaint and a hearing before the Disciplinary Hearing Commission are not required, and the Grievance Committee may issue various levels of discipline depending upon the misconduct, the actual or potential injury caused, and any aggravating or mitigating factors. The Grievance Committee may issue an admonition, a reprimand, or a censure to the respondent attorney.

A reprimand is a written form of discipline more serious than an admonition issued in cases in which an attorney has violated one or more provisions of the Rules of Professional Conduct and has caused harm or potential harm to a client, the administration of justice, the profession, or a member of the public, but the misconduct does not require a censure.

The Grievance Committee was of the opinion that a censure is not required in this case and issues this reprimand to you. As chairman of the Grievance Committee of the North Carolina State Bar, it is now my duty to issue this reprimand.

In 2005 you filed a bankruptcy petition. A question on the petition called for your marital status. You typed "single." At the time you prepared and filed the petition with the court, you were married. You falsely indicated single status on the bankruptcy petition in violation of Rule 3.3(a): Candor Toward the Tribunal and Rule 8.4(c): Misconduct.

On December 13, 2007 you failed to appear for your criminal client's trial. Because of your absence, the court continued the trial. Your client remained in custody. The presiding judge issued a Show Cause Order for Criminal Contempt of Court against you. After a hearing, you were found guilty, held in criminal contempt of court and ordered to pay a $100 fine. Your failure to handle your client's matter is neglect and a violation of Rule 1.3: Diligence. Your failure caused your client's trial to be delayed and caused disruption to the court in violation of Rule 3.2: Expediting Litigation and Rule 8.4(d): Misconduct.

During the State Bar's investigation of the grievance, you were repeatedly asked to provide your federal and state income tax returns. You failed to provide the records. The State Bar served you with a subpoena to produce signed federal and state tax returns for years 1997 through 2002. Thereafter, the State Bar received from you IRS transcripts for years 1997 through 2002. You did not provide the state tax returns. You were served with a second subpoena to appear and produce your signed federal and state tax returns. While you did provide additional copies of the federal tax transcripts, you did not provide any records pertaining to your state tax returns. Your failure to provide state tax records is a violation of Rule 8.1(b): Bar Admission and Disciplinary Authority.

You are hereby reprimanded by the North Carolina State Bar for your professional misconduct. The Grievance Committee trusts that you will heed this reprimand, that it will be remembered by you, that it will be beneficial to you, and that you will never again allow yourself to depart from adherence to the high ethical standards of the legal profession.

In accordance with the policy adopted January 24, 2008 by the Council of the North Carolina State Bar regarding the taxing of the administrative and investigative costs to any attorney issued a reprimand by the Grievance Committee, the costs of this action in the amount of $100.00 are hereby taxed to you.

Done and ordered, this the ___18th___ day of ___May_____, 2009

_____
James R. Fox, Chair
Grievance Committee

JRF/npm

The indictment to be sufficient must allege each material element of the offense; if it does not, it fails to charge that offense. This requirement stems directly from one of the central purposes of an indictment: to ensure that the grand jury finds probable cause that the defendant has committed each element of the offense, hence justifying a trail, as required by the Fifth Amendment. "The failure of the indictment to charge each and every essential element of an offense is a serious Constitutional violation. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant. See U.S. v. Cabrera-Ieran 168 F.3d 141, 143 (5th cir 1999). The test of the validity of the indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards, Chaney 964 F.2d at 446.

An indictments most basic purpose is to fairly inform a defendant of the chare against him. The Fifth Amendment thus requires that a defendant be convicted only on charges considered and founded by a grand jury. See U.S. v. Hooker 841 F.2d 1225, 1230 (4th cir 1988). The Fifth Amendment Indictment clause requires that in federal prosecutions facts that have such an effect on the "statutory maximum" must also be included in the indictment. See…. U.S. v. Higgs, 353 F.3d 281, 296 (4th cir 2003). In those two cases "statutory maximum" means " the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. " Blakey, 124 S.ct at 2537. Also virtually every circuit has held that Apprendi dictates that in order to Authorize the imposition of a sentence exceeding the maximum allowable without a jury finding of a specific threshold quantity must be

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 3 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 30 of 36

-54-

treated as an element of an aggravated drug trafficking offense, charged in the indictment and prove to the jury beyond a reasonable doubt.  See.... <u>U.S. v. Promise</u>, 255 F.3d 150, 156-157 (4th cir 2001).

This indictment only recites the statues under 21 U.S.C. 841 (a)(1) and 861.  The 21 U.S.C. § 841 (A)(1) statue does not contain a penalty provision.  The statue of conviction in this case is a disjointed criminal statue which prescribes <u>no penalty</u> and which, therefore cannot constitutionally serve as the basis for a criminal conviction in that it does not create a crime as a matter of law.  The base sentencing element is under 21 U.S.C. § 841 ⬛b⬛ <u>which</u> <u>was</u> <u>not</u> charged in the indictment, nor was the jury instructed as to this element.  See.... <u>U.S. v. Prentiss</u>, 206 F.3d 960 (2000) U.S. v. DuBo, 186 F.3d 1177 (9th cir 1999) U.S. v. Spinner, 180 F.3d 514 (3rd cir 1999) U.S. v. Rudisill 2000 U.S. App Lexus 10380 (4th cir 2001).  Failure of an indictment to allege an essential element is not subject to harmless error analysis as it constitutes a structural defect in the trial mechanism.  See.... U.S. v. Matthews 178 F.3d 1053, 59 (9th cir 2000).

Section 841 (A) contains no penalty provision.  841 (A), entitled "<u>Unlawful Acts</u>" set forth the elements of the offense, providing that it shall be unlawful for any person knowingly or intentionally (1) To manufacture distribute or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance; or (2) – to create, distribute, or dispense, or possess with intent to distribute or dispense a counterfeit substance.

Subsection 841 (b) is entitled "<u>Penalties</u>", and it provides that any person who violates subsection (A) of this section shall be sentenced as follows.  It then provides for penalties based upon factors traditionally determined by the sentencing judge by a

2

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 4 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 31 of 36

-55-

preponderance of the evidence, the amounts, and types of drugs along with increased

penalties if death of serious bodily injury results, or if the defendant has a prior

conviction for a felony drug offense.  Under this structure we just examine only

subsection (A).  It makes no Constitutional difference whether a single subsection covers

both elements and penalties, whether these are divided across multiple subsections (As 21

U.S.C. § 841 does), or even whether they are scattered across multiple statues.

"Apprendi" holds that the Due Process Clauses of the 5th and 14th Amendments make the

jury the right decision-maker (unless the defendant elects a bench trial) and the

Reasonable-doubt standard the proper burden, when a fact raises the maximum lawful

punishment or any fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

See…. Appredi, 530 U.S. At 490, 120 S.ct 2348.  U.S.v. Cotton, 533 U.S. 625, 627, 122

S.ct 1781, 152 L.Ed 2d 860 (2002).  Blakely V. Washington, 542 U.S. 296, 124 S.ct 2531,

159 L.Ed 2d 403 (2004).

   All essential elements should be listed in the Indictment.  U.S. V. Nance, 236 F.3d

820 (7th cir 2000).  And Appredi requires and approach that all facts (other than prior

convictions) that set the maximum possible punishment under 841 (b) must be

established beyond a reasonable doubt to the satisfaction of the same body that

determines culpability under § 841 (A).  See also …U.S.V. Westmoreland No. 99-1491

(7th cir Feb. 15, 2001) and U.S.V. Candelario, 2001 U.S. App Lexis 1524 (11th cir 2001)

at pg. 28 N. 16; Apprendi strongly affects how § 841 is implemented as it is concluded in

Wstmoreland, a past-Apprendi indictment should specify, and the tries of fact must be

instructed to determine, not only the elements of the offense, which appear in 841 (A),

3

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 5 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 32 of 36

-56-

but also the events listed in 841 (B) on which the prosecutor relies to establish the

maximum sentence.

The statue section 841 (A)(1) on the indictment of the defendant sets out the core

crime. The aggravating facts depend upon drug and amounts which have various degrees

of punishment, by statutory sections of provision they are so separated. There is no

collective statutory within his indictment. The decisions of Jones, Ring, Apprendi and

Blakely sets forth the foundation which is argued by the defendant today. A statutory

provision that has subsections, must plead those subsections in the indictment, in order

for a heavier penalty to be charged if prosecutor is seeking such penalty of the offense so

mentioned in subsection. The statutory provision contain a statutory offense if the

statutory provision is silent of an offense, it is not an offense when the statutory provision

does not charge, it is only because there are no other statutory offenses to speak of and

thus becomes no need for subsections. If the statue does contain subsections it is because

there is a likely chance that the offenses vary and if the offenses vary so does the penalty,

if the penalty changes then the offense will be separated by subsection, alphabetically of

numerically. The defendant must be notified that he is subject to a statutory provisions

subsection that the defendant has to prove against.

The defendant states with Constitutional accuracy that the Supreme Court has

held that a "crime" includes every fact that is by law a basis for imposing the punishment

of that crime upon a finding of some aggravating fact of whatever sort, including the fact

of a prior conviction, the core crime and the aggravating fact together constitute and

aggravated crime, just as much as grand larceny is an aggravated form of petit larceny.

The aggravating fact is an element of the aggravated crime. Thus we understand why

4

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 6 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 33 of 36

-57-

section 841 (A)(1) is a core crime only.  In the defendants case the aggravating fact is not

section 841 (A)(1), but the subsections that are alphabetized and numbered as was in

Jones, and U.S. v. Castillu at 122 L.Ed 2d 94, 120 S.ct 2090 as well as U.S. v. Rogers,

228 F.3d 1318 (11ᵗʰ cir 2000).  So it is known today that drug quantity in section 841

(b)(1)(A) and section 841 (b)(1)(b) cases must be charged in the indictment and proven to

a jury beyond a reasonable doubt in light of Apprendi.  See…. U.S. v. Cotlon, 535 U.S.

625, 122 S.ct. 1781, 152 L.Ed, 2d 860 (2002).

As stated earlier, the Sixth Amendment requires that, "other than the fact of a

prior conviction, any fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

See…. Apprendi 530 U.S. at 490, 120 S.ct. 2348.  The Fifth Amendment Indictment

clause further requires that, in federal prosecutions, facts that have such an effect on the

"statutory maximum must be included in the indictment.  See….U.S. v. Cotlon, 535 U.S.

625, 627, 122 S.ct 1781, 152 L.Ed. 2d 860 (2002).

In these contexts "statutory maximum" means the maximum sentence a judge

may impose solely on the basis f the facts reflected in the jury verdict or admitted by the

defendant.  Blakely, 124 S.ct at 2537.  But in the recent decision in Booker, 125 S.ct at

756, the Supreme Court stated that any fact that increases the maximum penalty for a

crime even though previously treated as part of the sentencing process must now be

treated as an element of the offense, and as to that element a defendant enjoys the

protection of the Sixth Amendment.

To let a conviction stand in such a case as this, with an indictment that was

wholly silent as to an essential element of the offense would be to demean rights to indict

5

Case 3:04-cr-00271-RJC    Document 311    Filed 12/13/06    Page 7 of 9
Case 3:10-cv-00488-RJC    Document 1    Filed 10/01/10    Page 34 of 36

-58-

by a Grand Jury and to the Due Process, including full and fair Notice of all elements of a criminal offense or offenses charged against a defendant.

One of the most fundamentally important Constitutional principles in the criminal arena is the right to have every fact of a crime and element of the criminal offense charged submitted beyond a reasonable doubt. See….In RE Winship, 397 U.S. 358, 364 (1970). Lest there remain any doubt about the Constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

The Failure of the District Court to submit the essential elements of the offense charged-(penalty)-to the jury and to require that such an element be proved to the jury's satisfaction beyond a reasonable doubt renders any conviction to be reversed and vacated. The concurring opinion by Justice Thomas, joined by Justice Sealia in Apprendi, also provides persuasive support for such a conclusion. See…. Apprendi, 120 S.ct at 2367-2380.

The application of Apprendi to 21 U.S.C. 841 (A) and 861 (A) leads inescapably to the conclusion that this statutory section simply has no penalty provisions and therefore, do not constitutionally state a crime. And it is understood that failure of the indictment to allege all the essential elements of an offense is a jurisdictional defect requiring a dismissal. See….U.S. v. Spruill, 118 F.3d 221, 227 (4th cir 1997), and U.S. v. Brown, 995 F.2d 1493 (10th cir 1993). The Absence of prejudice to the defendant does not cure what is in the indictment. See….U.S. v. Gayle, 967 F.2d 483 (11th cir 1992). A criminal conviction which it is based does not set forth the essential elements of the

6

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 8 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 35 of 36

-59-

offense. citing….U.S. v. Italinao, 837 F.2d 1480 and U.S. v. Deisch, 20 F.3d 139 (5th cir

1994). To be sufficient, an indictment must allege each material element of the offense,

if it does not it fails to charge that offense…. citing 961 F.2d 476, 478-479 (4th cir 1992).

Also the criminal information that does not charge the second element of the

offense…. And the failure of information to charge an offense is a jurisdictional defect

that is not waived by a guilty plea. The failure to charge an essential element of a crime

is by no means a mere technicality. See….U.S. v. King, 587, F.2d 956, 963 (9th cir

1978). U.S. v. Kurka, 818 F.2d 1427, 1431 (9th cir 1987) Neder v. U.S., 119 S.ct 1827.

U.S. v. Dubo, 186 F.3d 1177 (9th cir 1999).

A court is without jurisdiction to impose a sentence for an offense not charged in

the Indictment. U.S. v. Gaudin, 515 U.S. 506, 510 (1995).

To the conclusion….The defendants indictment violated his constitutional rights

under Apprendi, Cotton, Blakely, and Booker because all the elements of the offense

weren't alleged in the indictment which violates the defendant's 5th, 6th, and 14th

Amendments. So therefore this indictment should be dismissed.

7

Case 3:04-cr-00271-RJC   Document 311   Filed 12/13/06   Page 9 of 9
Case 3:10-cv-00488-RJC   Document 1   Filed 10/01/10   Page 36 of 36

-60-

RECEIVED
CHARLOTTE, N.C.

JAN - 6 2011

Clerk, U. S. Dist. Court
W. Dist. of N. C.

Nicholas G. Ragin
97791 - 058
Lewisburg US Penitentiary
P.O. Box 1000
Lewisburg, PA 17837

## Affidavit

I, Nicholas G. Ragin am writing this affidavit in support of my motion addressed to the United States District Court of the Western District of North Carolina Charlotte Division in regards to my Ineffective Assistance Claim against court appointed counsel in my case Nikita V. Mackey as well as the claim against the Court pertaining to facts used to sentence me other than those found by a jury.

Counsel Nikita V. Mackey was appointed by the Courts as trial counsel in my case on October 21, 2004. Counsels performance from that date up until sentencing on January 18, 2007 had been unprofessional and under the 6th Amendment my Constitutional Rights have been Violated. Counsel did not function or render the assistance guaranteed by the 6th Amendment so as to provide reasonably effective assistance, but also his errors were so serious as to deprive me of a fair trial. The law specifically states that while representing a criminal defendant counsel owes the client a duty of loyalty — a duty to avoid conflicts of interest — a duty to advocate the defendant's cause — a duty to consult with the defendant on important decisions — a duty to keep defendant informed of important developments in the course of the prosecution — and a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

Case 3:10-cv-00488-RJC  Document 7  Filed 01/06/11  Page 1 of 5

The Court also agrees that the 6th Amendment imposes on counsel a duty to investigate, because reasonable effective assistance must be based on professional decisions and informed legal choices can be made only after an investigation of options. The Court observed that counsels investigative decisions must be assessed in light of the information known at the time of the decisions, not in hindsight, and that the amount of pretrial investigation that is reasonable defines precise measurement.

The following issues concerning Nikita V. Mackey's performance as trial counsel will more than render his assistance ineffective:

1) In a letter to the court dated January 9th, 2006 I addressed the court about my lawyer's lack of communication and the fact that he had failed to explain anything about my case at hand as well as denying me my "discovery".

2) I gave my lawyer a list of witnesses to interview one being another inmate by the name of Andre McRae. This was brought up late in the trial and the US Attorney made it clear that they were opposed to that matter. The judge stated that we would cross that path at a later date. Counsel never addressed it again. This witness was a critical witness on my behalf and the US Attorney knew this because my witness had information pertaining to the case agent providing individuals with the necessary information needed to testify against the defendant for the goverment if their particular case went to trial. My lawyer demonstrated that his knowledge concerning interviewing and securing a witness for trial was minimal. He demonstrated at the time the issue came about that he was unaware that he needed to file for a writ to produce the witness. This lack of knowledge was critical to my case because it was his [un]knowledge that has made the

Case 3:10-cv-00488-RJC   Document 76   Filed 01/06/14   Page 201 of 5

-62-

Court and or the jury look at the circumstances in a different light. The Government knew this, because one of it's key witnesses Elizabeth White told the jury when asked ' What is it that they ask you to do' - The witness stated ' We do whatever they tell us to do'. This remark was ignored and when the opportunity came to readdress the situation the Government opposed my key witness.

3) As the trial transcripts will reflect and the sentencing transcripts as well - I initially was gonna testify on my own behalf. My lawyer knew well in advance that I planned to testify. He waited until Court resumed to tell me that he didn't have any questions to ask me and if I got on the stand I'd just be sitting there because he wasn't prepared. I stressed at my sentencing hearing that my lawyer wasn't prepared to ask me any questions and he stated to me that I couldn't tell my story in a narrative form. At the time not fully knowing his duty and the law I listened to him. My testimony would have shed alot of light on the situation.

4) During the beginning of the trial it was brought to my attention that Mr. Mackey was running for Federal Judge. Again not fully knowing his duty and the law I didn't recognize that this presented a conflict of interest. During the course of the trial Mr. Mackey made it known to me that he was involved with Judge Conrads secretary who he pointed out sitting in the back of the courtroom. Mr. Mackey also stated to me after a brief side-bar that he thought that he had pissed the judge off and that he couldn't afford to do that again because he needed Judge Conrads vote. The brief side bar was called due to Mr. Mackey trying to intentionally Case 3:10-cr-00488-RJC Document 47 Filed 01/06/21 Page 3 of 5 Mackey trying to intentionally Use of an

appeal. Shortly after he was denied the spot for Federal Judge and decided to run for Sheriff. On March 5, 2008 a month before my appeal brief is due Mr. Mackey files for a withdrawal from my case pursuant to Federal Rules of Criminal Procedure and Rule 46(c) of the Local Rules for the United States Court of Appeals for the Fourth Circuit. This move should have been made before my trial began. That's two incident's that represent a clear conflict of interest.

5) Counsel purposely tried to cause a mis-trial because he felt that the trial wouldn't be a success,

6) Counsel failed to go over PSI with me. Met with me in a back room of the court house the day of sentencing and stated to me "Everything looks to be in order." Then during sentencing he objects to almost everything in the report with no information to provide for the objection's concerning my criminal history. All because he did no research at all in the matter.

7) Counsel failed to return all evidence to replacement counsel which resulted in a below average direct appeal.

8) Finally counsel fell asleep twice during trial which more than show's his lack of interest and dedication to my case.

Counsels performance was deficient and to date still is, because the record will show that the governments numerous attempts to contact Mr. Mackey concerning an affidavit contesting these allegations have failed. After being contacted concerning the allegations he refuses to contact the U.S. Attorney on this matter. Might I add that this is not the first time he has ignored the courts or his clients. Mr. Mackey is currently disbarred for this type of conduct and the court would be wasting everyones time if it considered Mr. Mackey to be credible in regards to the events that took place, because it has been made known that from the start of his career he has been anything but truthful.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this affidavit was placed in the prison mailing system on January, 2, 2011.

Executed on January, 2 2011

Nicholas G. Rogin

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:10CV488-RJC-5
(3:04CR271-7)

NICHOLAS RAGIN,                          )
                                         )
                    Petitioner,          )
                                         )
          vs.                            )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                    Respondent.          )
_____   )

## GOVERNMENT'S ANSWER TO PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

NOW COMES THE UNITED STATES OF AMERICA, by and through Anne M.

Tompkins, United States Attorney for the Western District of North Carolina, and answers the

allegations of Petitioner as stated in his Motion to Vacate, Set Aside, or Correct Sentence

pursuant to Title 28, United States Code, Section 2255, filed January 21, 2010, and shows unto

the Court the following:

## PROCEDURAL BACKGROUND

Petitioner Nicholas Ragin was initially indicted, along with seven others, by the Grand

Jury for the Western District of North Carolina on October 18, 2004, and later by superseding

indictment, charging Petitioner and his co-defendants, first, with conspiracy to commit offenses

against the United States, in violation of 18 U.S.C. § 371 (Count One). Superseding Bill of

Indictment at 1-4. These offenses included knowingly persuading and coercing individuals to

travel in interstate commerce for the purpose of engaging in prostitution, in violation of 18

U.S.C. § 2422; knowingly transporting minors in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2423; and using interstate commerce to distribute the proceeds of unlawful activity and to promote, manage, and facilitate prostitution, in violation of 18 U.S.C. § 1952. *Id.* at 3. Petitioner also was charged with conspiracy to possess with intent to distribute at least 50 grams of cocaine base and to employ, hire, use, persuade, induce, entice, and coerce minors to violate Chapter 13 of Title 21 of the United States Code, all in violation of 21 U.S.C. §§ 841, 846, and 861 (Count Thirteen). *Id.* at 6.

On October 21, 2004, Nikita V. Mackey was appointed to represent Petitioner; four days longer, Petitioner was ordered detained pending trial. Several weeks later, Mr. Mackey filed a motion to review Petitioner's bond, and following a hearing, this Court released Petitioner on bond.

In January of 2005, Petitioner filed a letter with the Court, complaining that Mr. Mackey had not been returning phone calls or communicating with Petitioner or his family and that Petitioner had had more success communicating directly with the Assistant United States Attorney handling the case and the case agents. 01/10/05 Letter from Pet. to Court. Petitioner also complained that counsel had "denied [him] a copy of [his] discovery." *Id.* Two weeks later, Petitioner also filed a motion to require counsel to withdraw. Following a hearing, this Court denied Petitioner's motion.

On July 19, 2005, Petitioner filed a second letter seeking more information about the Government's case against him. 07/19/05 Letter from Pet. to Court. In this letter, Petitioner acknowledged that he had been incarcerated for "a conspiracy in which [he] had very little involvement in." *Id.* Petitioner asserted that his counsel was aware that his role in the

2

conspiracy consisted of "an assault on a female, being present at a shooting that supposedly involved two other individuals on [his] case, and being employed as an escort driver for an adult entertainment business." *Id.* Petitioner asserted further that he had been "involved with these people for a little over a month," while the conspiracy was alleged to have begun in 2001. *Id.* Petitioner stated that he wanted the Government to "produce a factual finding for [his] role within the last month" of the conspiracy. *Id.* Petitioner also expressed an interest in pleading guilty and stated that he and Mr. Mackey had "been on a not so understanding each other relationship." *Id.* Approximately a month later, the Court conducted a hearing in response to Petitioner's letter, after which it issued an oral order finding the issues "moot," as Petitioner was "satisfied" with his counsel. Docket Entry Dated 08/17/05.

On August 23, 2005, the Grand Jury returned the superseding indictment, which added a drug-conspiracy count against Petitioner and others. Superseding Indictment. Five months later, on January 26, 2006, Petitioner wrote another letter to the Court. 01/26/06 Letter from Pet. to Court. In this letter, Petitioner asserted that counsel had failed to inform him of his basic offense level, criminal history category, or the maximum sentence he could receive if found guilty following a trial. *Id.* Petitioner also asserted that counsel had "denied [him] once again of [his] discovery on [his] new charges. *Id.* Petitioner stated that he had asked the Government to produce a factual finding of the drugs that he was accountable for and that counsel had failed to "pursue that matter." *Id.* Petitioner asserted further that Mr. Mackey had failed to follow up on leads he had given counsel concerning the credibility of the agent, had failed to interview witnesses who "may be for or against" Petitioner, and had "failed to raise the issue of [his] Miranda rights." *Id.* Concerning his opportunities to plead guilty, Petitioner asserted that he had

3

been offered two plea agreements but that counsel had not "taken the time to go over either one

with [him]." *Id.* According to Petitioner, Mr. Mackey brought the first agreement to him and

dropped it off but did not make it back to see Petitioner before the 15-day deadline had elapsed.

*Id.* Petitioner stated that he was offered the second plea agreement a week after his superseding

indictment was returned but that counsel did not bring it to Petitioner and Petitioner did not learn

about it until a month later. *Id.* Petitioner also stated in the letter that he had reviewed his "first

discovery" and that he faced "the risk of spending the rest of [his] life in prison." *Id.*

On March 6, 2006, this Court conducted a hearing in response to Petitioner's letter. In

response to the Court's questions, Mr. Mackey reported that while Petitioner was unhappy that he

could not contact Mr. Mackey as often and as quickly as he would like, when they were able to

meet, their meetings were productive. 03/06/06 Status of Counsel Inquiry Transcript at 3-4. Mr.

Mackey stated that he would leave the decision as to whether he should continue representing

Petitioner "up to [Petitioner]." *Id.* at 4-5. When asked whether he was satisfied with Mr.

Mackey, Petitioner responded, "as long as [he could] remain in contact." *Id.* at 7. Petitioner

stated that he had gone over his "first discovery motion in the first indictment" and that he had

"received the motion of discovery . . . for [his] superseding indictment," though he received the

latter only the day before the hearing. *Id.* Petitioner stated that it "[s]eemed like [he had] to keep

putting letters in to get what [he wanted]." *Id.* Mr. Mackey insisted that he had met with

Petitioner "a number of times," often in response to Petitioner's call to his office and assertion

that he had some information. *Id.* at 8.

Concerning Petitioner's opportunity to plead guilty, Mr. Mackey acknowledged that

Petitioner had asserted that he had not been given the opportunity to plead guilty, but Mr.

4

Mackey disagreed, stating that he had reviewed the plea agreement with Petitioner in the same cell in which he had met with Petitioner the day before the hearing, concluding that he and Petitioner had "different recollections of exactly what[ had] been going on." 03/06/06 Status of Counsel Inquiry Transcript at 8. Government counsel stated that believed that Petitioner could still plead guilty–that there was an outstanding plea agreement available for his signature–and Mr. Mackey confirmed that "the Plea Agreement [had] not been pulled." *Id.* at 8-9. Mr. Mackey reported, however, that he and Petitioner had discussed the offered plea agreement and Petitioner "adamantly did not want to sign." *Id.* at 9. The Court acknowledged that going to trial was Petitioner's right, after which the Court asked Mr. Mackey if he was "willing to continue to make [his] best efforts on [Petitioner's] behalf, in response to which Mr. Mackey assured the Court that he was. *Id.* The Court then asked Petitioner if he was "willing to continue working with Mr. Mackey in the defense of [his] case, and Petitioner answered, "[y]es, sir." *Id.*

Beginning April 3, 2006, approximately a month after the status of counsel hearing, Petitioner's case was tried before a jury. Following the conclusion of the evidence, the district court instructed the jurors prior to their deliberations. With respect to drug quantity, the district court instructed the jury if it concluded unanimously and beyond a reasonable doubt that the substance involved in the drug conspiracy was cocaine base, the jury would then complete the special verdict specifically addressing the drug and the quantity to be considered. Trial Transcript at 3489. At the conclusion of the trial, the jury found Petitioner guilty on all counts. Verdict. With respect to the drug conspiracy count, the jury found that more than 50 grams of cocaine base was "reasonably foreseeable" to Petitioner. *Id.* at 2.

5

Prior to Petitioner's sentencing hearing, the probation office completed a Presentence Report ("PSR"), in which the probation officer began with a base offense level of 39 based on Petitioner's responsibility for 1.2 kilograms of crack cocaine and the use of underage individuals in furtherance of the drug conspiracy. PSR at 16. The probation officer recommended a two-level enhancement based on Petitioner's possession and use of firearms in furtherance of the conspiracy, resulting in a total offense level of 41. *Id.* at 16-17. Combined with a criminal history category of VI, this offense level generated an applicable Sentencing Guidelines range of imprisonment of between 360 months and life. *Id.* at 30.

Finally, on January 18, 2007, the district court conducted Petitioner's sentencing hearing. After hearing argument as to each of Petitioner's objections to the PSR, the court overruled those objections and sentenced him to 360 months' imprisonment, finding that this sentence was sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Petitioner appealed his conviction and sentence, arguing, in part, that this Court erred in instructing the jury as to drug quantity and that the Court sentenced Petitioner based on a mandatory sentencing scheme, in violation of his Sixth Amendment right to a jury trial. On January 29, 2009, the Fourth Circuit affirmed this Court's judgment as to Petitioner's conviction and sentence, rejecting Petitioner's claims of error.[1] *United States v. Howard*, 309 Fed. App'x 760 (4th Cir. 2009). The Fourth Circuit issued its mandate on February 20, 2009; Petitioner filed a petition for writ of *certiorari*, which petition was denied on October 14, 2009.

---

[1]The Fourth Circuit vacated Co-Defendant David Howard's sentence, but in all other respects, this Court's judgment was affirmed.

6

Nearly a year later, on October 1, 2010. Petitioner filed a motion to vacate pursuant to 28 U.S.C. § 2255. Petitioner has asserted numerous claims of ineffective assistance of counsel. The Government attempted to contact Petitioner's prior counsel in order to obtain an affidavit responsive to Petitioner's claims, but Petitioner's counsel has not responded to the Government's request. Notwithstanding this failure to respond by Petitioner's prior counsel, the Government is entitled to judgment of law as to each of Petitioner's claims.

## **FACTUAL BACKGROUND**

The evidence presented at trial, through numerous young women victimized as a result of Defendants' conduct, co-conspirators, and law enforcement officers, established cruel and heinous conduct on the part of Petitioner and his co-defendants. As set forth below, these defendants preyed upon young girls and women with nowhere to go, some of whom were addicted to crack cocaine or heroin, and, using force and violence or other means of coercion, created a prostitution and crack cocaine distribution business, using their victims as currency. During the trial, minor victims testified to being required to have sexual intercourse with as many as 20 men in an evening, one after another, in squalid conditions, while both minor and adult victims testified to severe beatings and threats of violence for attempting to escape or otherwise violating the "rules" established by Petitioner's co-defendants, Tracy or David Howard. While Petitioner claims to have participated in the conspiracy only at its end and not to have engaged in the coercive abuse of young women, the Government's evidence established that Petitioner sold crack cocaine at the same apartment complex where victims were forcibly prostituted and that Petitioner also beat a young woman who did not do as he had instructed.

7

The genesis of the prostitution ring begun by Tracy Howard was a book about pimping he read while incarcerated between 2000 and 2001, as a result of which he hatched a plan to become a pimp upon his release. (Trial Transcript at 324.) Consistent with that plan, after his release from prison, Tracy Howard invited a sixteen-year-old girl, Kristin ("Krissy") Roach, to live with them.[2] (Id. at 324-25, 342.) Tracy took Krissy's identification card from her and then began prostituting her, taking her to apartment complexes where groups of Mexican men resided and offering "her" for sale. (Id. at 326.) Krissy would have sex with eight to ten men in a given apartment, one after another, and then move on to another apartment, having sex with 20 or more men. (Id. at 326, 620.) Tracy and Krissy ultimately moved into an apartment leased by Elizabeth White, Tracy's girlfriend; at some point thereafter, Ms. White and Tracy saw a missing persons poster identifying Krissy as a missing person, after which Krissy was not permitted to leave the apartment for any reason except prostituting. (Id. at 325, 341, 457, 480.) Some time before August of 2001, Tracy kicked Krissy out of the apartment, after beating her for allegedly telling Ms. White that they had been intimate. (Id. at 459.) Krissy was then moved to several different locations, and on at least one other occasion, Tracy "beat [her] up pretty bad," after which he told her she wasn't going anywhere. (Id. at 460-61.) Krissy never received any of the proceeds of her prostitution. (Id. at 485.)

At the same time Tracy was prostituting Krissy, he was also selling crack cocaine with Ms. White's assistance, purchasing between half of an ounce and an ounce three or four times a

---

[2]Krissy Roach turned sixteen-years-old three days before she went to live with Tracy Howard. (J.A. at 616-17.)

8

week for distribution. (Trial Transcript at 329-31, 458.) Ms. White testified that Tracy used the firearm for protection while he was selling drugs and prostituting Krissy. (*Id.* at 336.)

In August of 2001, Tracy met three more girls who stated that they were "stranded" in North Carolina and did not have anywhere to go. (Trial Transcript at 337.) Offering to take care of them and make them into "somebody" with nice clothes and grooming, Tracy Howard offered to let the girls stay with him. (*Id.*) Two of the girls, Shanda and Tabitha, agreed, and Tracy immediately put them to work prostituting just as he had Krissy. (*Id.* at 337, 606-07.) According to Tabitha, she agreed to be prostituted because she "had no where else to go, nothing but the clothes that was on [her] back, no money to get back home, and no one to call." (*Id.* at 607.) Tabitha testified that depending on the night, she had sex with between 10 and 20 johns. (*Id.* at 611.) None of the money earned through prostitution went to the girls prostituted. (*Id.* at 338-39, 611.) With respect to locations where the girls were prostituted, Tracy Howard took the girls to Maple Run Apartments, North Pointe Apartments, Park Apartments, Magnolia Apartments, and to a group of apartments known as "Little Mexico." (*Id.* at 348, 454, 456, 519.) The conditions in Little Mexico were squalid, with roaches, bugs, rodent infestations, and holes in the walls. (*Id.* at 348, 610, 1699, 1704.)

In December of 2001, just prior to her sixteenth birthday, Katherine ("Kathy") Stiles, met Defendant Tracy Howard after being kicked out of her house. (Trial Transcript at 511-13.) Tracy offered Kathy a place to stay and brought her to his mother's house where he was living with Tabitha whom he continued to prostitute. (*Id.* at 516-17.) Tracy told Kathy about Tabitha prostituting, Kathy eventually realized that she "basically . . . had to do it," with Tracy letting her know that if she did not like it, "then [she] could get [her] ass whipped." (*Id.* at 517.) On

9

Kathy's first outing, Tracy instructed the john to beat Kathy if she resisted, telling the john, "No

fucky, fucky" and then hitting Kathy in the face to let the john know that if Kathy refused to have

sex with him, Tracy would "whip [her] ass" and the john could, too.  (*Id.* at 518, 557.)  Kathy

testified that Tracy took her out to apartment complexes every night, where she had sex with five

or six men, stopping "[w]henever [Tracy] felt like his pockets was [*sic*] full enough."  (*Id.* at

524.)  While Kathy was living with Tracy Howard, he continued to sell crack cocaine, getting it

from a supplier in a house on Idlewild Road in Charlotte.  (*Id.* at 526-30.)  Tracy Howard also

carried a firearm during his drug trafficking activities.  (*Id.* at 531-32.)  In November of 2002,

Kathy managed to escape, but Tracy found her a couple of days later, chasing her down, grabbing

her, putting her into his car, and returning her to his home.  (*Id.* at 443-536.)  When they got

there, Tracy instructed Kathy to take a bath and then to return to him before drying off.  (*Id.* at

536.)  Kathy did as instructed, and Tracy whipped her with a "big, old thick piece of leather

belt."  (*Id.*)

Some time between 2002 and 2003, Ila Howard, Tracy and David Howard's mother,

began an escort service through which all three of the Howards offered the sexual services of

young women to customers.  (Trial Transcript at 625-26, 2346-49, 2357-60.)  Although the

business name and address changed over the course of time, its purpose remained to provide

income to Ila, Tracy, and David Howard through the prostitution of young women.  (*Id.* at 626,

1404.)  The Howards advertised their businesses through magazine and telephone book

advertisements in and out of North Carolina, advertising both the availability of female "escorts,"

as well work for interested women.  (*Id.* at 627, 630-41, 79, 1114, 1375, 2380.)  These

businesses accepted credit card payments, and the women who worked for the businesses through

10

Ila Howard were permitted to keep a portion of the money earned from each call. (*Id.* at 643, 1115, 1139, 1266-67, 2865.) Although Tracy and David Howard provided girls and women to work through escort services managed primarily by Ila Howard, they also began their own escort service under the business name of Mistress by October of 2003. (*Id.* at 633, 1549, 2596-97.) According to the girls and women who were prostituted through these businesses by either Tracy or David Howard, the money earned by them went directly to Tracy or David, depending on whose "girl" she was, with a portion going to Ila Howard if they were prostituted through one of her businesses. (*Id.* at 780, 787-88, 1115, 1117, 1407-08, 1613-14, 2596, 2599.) Additionally, the calls for these girls and women were always arranged through Tracy or David Howard, who would notify the business as to when a particular girl was available or "ready." (*Id.* at 655-56, 673-74, 780, 961-62.) In addition to servicing johns in Charlotte, the escort services provided girls and women to johns in South Carolina, with the girls traveling from North Carolina to South Carolina to provide prostitution and other services. (*Id.* at 662, 679, 781, 1115, 1417, 2382, 2595.) While some calls did not involve sexual intercourse and, instead, involved only dancing or companionship, most involved sex, and in the case of Tracy and David Howard, if they received complaints about the "performance" of any of the girls he provided to the business, they would punish them by beatings or requiring that they be offered to johns in the apartment complexes. (*Id.* at 782, 968, 1017, 1116-17, 1326, 1614, 2596, 2598.) Concerning his use of minors, Tracy Howard commented to Tabitha on one occasion that "you'll never go broke with a young female," as "the younger they are, the more money they'll make and the more they'll work." (*Id.* at 677.)

11

Petitioner worked as a driver for Ila Howard's escort service. (J.A. at 2369, 2865.)
Angenita Davis, an office employee for the escort service, testified that after Tracy Howard was
arrested toward the end of the escort service in September of 2004, Petitioner had a conversation
with Ila Howard, during which she heard them discuss a concern about David Howard
"snitching." (*Id.* at 2370.) Petitioner also acknowledged to police that he had been paid $100 on
one occasion to beat up one of the prostitutes as punishment for something she did wrong. (*Id.* at
2867.)

Keshia Burris, was a fifteen-year-old runaway when she met Tracy Howard through
Shenita ("Honey") Lindsay in the summer of 2002. (J.A. at 2570, 2574.) Keshia moved into Ila
Howard's house and was informed by Tracy Howard on the day after she arrived that if she was
to stay there, she would be prostituted. (*Id.* at 2574-75.) Keshia was prostituted initially in
apartment complexes, having sex with "[a]t least seven or eight" in a night, with Tracy Howard
keeping all of the money she earned. (J.A. at 645, 2575-76, 2578.) Keshia later began going on
calls for Ila Howard's escort service during the week. (*Id.* at 2585.) According to Keshia, she
was driven to the calls by either Tracy or David Howard. (*Id.* at 2586.) On one occasion, after
Keshia had expressed reluctance about going on a call, Tracy beat her with his fists. (*Id.* at
2638.) When asked at trial whether Tracy Howard had hit her before, Keshia responded, "[o]h,
yeah. . . . [a] lot," to the extent that she "stopped counting." (*Id.* at 2639.) When Keshia left after
one beating, Tracy found her at an acquaintance's house where he instructed Keshia to leave with
him and not to run or he would hurt her. (*Id.* at 2680-81.)

Davia Alverson was fourteen years old when she met Tracy Howard in November of
2003. (Trial Transcript at 775.) Davia testified that she was on the run and needed a place to

12

stay and that she moved into Tracy's mother's house with him, Keshia, and Ila Howard. (*Id.* at 773-75.) Not long thereafter, Tracy began taking Davia to apartment complexes where she was told to have sexual intercourse with Mexican johns. (*Id.* at 775, 777.) Davia had sex with four or five men each evening, with Tracy collecting the money and not providing her with any of the income. (*Id.* at 778, 800.) After a couple of months of prostituting at the complexes, Tracy Howard began arranging for Davia to prostitute herself through Ila Howard's escort service, again keeping the money earned, except the portion he paid to Ila Howard. (*Id.* at 779, 787-88.) According to Davia, Tracy Howard kept two handguns at the apartment and obtained a rifle on one outing to a gun store. (*Id.* at 788.)

Hilari Levine, a heroin addict, met Tracy Howard in January of 2004 and was also prostituted by Tracy Howard through Ila Howard's escort service. (Trial Transcript at 1109-13.) Although Hilari was permitted eventually to keep some of the money she earned, unlike the other girls, Tracy Howard beat her on several occasions, dragging her up to their apartment by her hair, head-butting her, hitting her hard enough to knock her contact lens out of her eye, and throwing her into the wall a couple of times on the first occasion he beat her. (*Id.* at 1120.) On another occasion, when Tracy Howard learned that Hilari had been using heroin, he beat her, giving her black eyes and causing bruises that prevented her from working for the escort service for a couple of days. (*Id.* at 798, 1121-22.) As for why she stayed with Tracy, Hilari testified that shortly after she moved in with Tracy, she told him that she wanted to leave, in response to which he told her that if she left, he would find her and her family. (*Id.* at 1136.) According to Hilari, she "wasn't going to go when he was around because [she] didn't want to die," and she had gotten "beaten up so many times." (*Id.* at 1137.) Hilari ultimately left after a severe beating,

13

during which Tracy punched her, kicked her, choked her, hit her in the head with heavy boots, and told her to get up after she fell into her dog's food dish, stating, "Get up, bitch, you're not dead." (*Id.* at 1144-45, 1259-60.) He then whipped her with his belt on her back, feet, and arms. (*Id.* at 1145.) Hilari ultimately filed charges against Tracy, and after a court appearance, David Howard followed Hilari and her family to see where they lived in per Tracy's instructions. (*Id.* at 2614.)

Courtney Ange moved into the apartment with Tracy Howard in late March of 2004 when she was fifteen years old. (Trial Transcript at 1131, 1326.) Tracy prostituted Courtney as well, taking her to apartment complexes where she would have sex with five or six Mexican johns each evening. (*Id.* at 1260-63.) She eventually began working for Ila Howard's escort service, going on between 10 and 15 calls in two months. (*Id.* at 1263-65.) Courtney's family eventually found her, and Tracy Howard fired shots at them to prevent them from taking Courtney. (*Id.* at 1135, 1283.) On another occasion, Tracy got a towel wet with water, instructed Courtney to take her shirt off and turn around, and proceeded to beat her with the towel. (*Id.* at 1288.) He then told Courtney to take her pants off and continued beating her with the towel on the back of her legs and back, punching her in the chest when she asked him to stop. (*Id.* at 1289.)

Catherine ("Cathy") Wills ran away from her grandmother's house just two days after her seventeenth birthday and moved in with Tracy Howard, Keshia, and Courtney shortly thereafter. (Trial Transcript at 1593-94, 1599.) Cathy moved into the apartment shortly before Hilari Levine's beating and testified that within days of that beating, Tracy Howard left the apartment and David Howard came to the apartment and told the girls that they needed to leave, moving them to an apartment in the Waterford Lakes apartment complex. (*Id.* at 1603, 1610, 1620-21.)

14

Cathy was prostituted to Mexican johns in apartment complexes, along with Courtney, testifying that how many johns she serviced in a night depended on how many of them were there on any given night. (*Id.* at 1606.) Cathy was also prostituted through Ila Howard's escort service, with Tracy Howard, Keshia, and Petitioner driving her to her calls. (*Id.* at 1613-14.)

Throughout the time period Tracy Howard was prostituting these girls, he continued to sell crack cocaine and possessed firearms while doing so. (Trial Transcript at 1127, 1432-33, 1606, 2700.) He regularly cooked powder cocaine into crack, and Keshia, Hilari, and Cathy assisted him in preparing and distributing the crack cocaine. (*Id.* at 1128-30, 1268, 1605, 1617, 2607-08, 2610-11.) Eugene Lewis distributed crack cocaine in Little Mexico for Tracy Howard. (*Id.* at 2067-70.) According to Mr. Lewis, David Howard had previously been "running that area" for Tracy, but the two had a disagreement and in June of 2004, Mr. Lewis began selling crack out of two apartments rented by Tracy, using a hole in the wall between the apartments to exchange the crack cocaine for the money. (*Id.* at 2070-73, 2627.) Tracy would send Mr. Lewis packages of crack cocaine worth $500 or $700, and when Mr. Lewis began to run low, he would call Tracy who would have another package delivered. (*Id.* at 2075, 1620-21, 2623.) Tracy Howard was arrested in September of 2004, at which time Mr. Lewis agreed to sell crack cocaine for David Howard. (*Id.* at 2098.) Cathy corroborated Mr. Lewis's testimony and testified further that she and Keshia also delivered crack cocaine to David Howard, delivering, in fact, a larger quantity to David Howard. (*Id.* at 1621-21.)

Petitioner assisted Tracy Howard in his drug trafficking, bagging and delivering crack cocaine to Little Mexico and beating severely, on Tracy's orders a woman who lived in Little Mexico and was selling cocaine from there in competition with Tracy. (*Id.* at 1445-46, 1451,

15

2079-82, 2636-37.) On another occasion, when another group of people began selling crack cocaine in Little Mexico, Tracy Howard, Petitioner, and Mr. Lewis opened fire on the group, Mr. Lewis using a handgun provided by Tracy Howard. (*Id.* at 2094.)

With respect to girls and women prostituted by David Howard, Elizabeth White testified that she saw David Howard and Tracy Howard prostituting Keshia in 2003. (Trial Transcript at 345, 433.) Additionally, Carmen ("Candy") Draper testified at trial that she began working for Ila Howard's escort service in 2003 and met David who took her in to live with him. (*Id.* at 937-39.) David began arranging for all of Candy's calls and took the money she earned after each call. (*Id.* at 940-42.) On nights when Candy did not have a call, David Howard took her to apartment complexes where she had sex with between three and ten Mexican johns. (*Id.* at 953-56.) As with the money earned through her escort calls, David Howard kept all of the money paid by these johns. (*Id.* at 954-56.) On one occasion, according to Candy, David Howard tried to drown her in the bathtub to scare her. (*Id.* at 947.) Candy ultimately ran away, stealing the money she had made that night, putting a piece of furniture up against her bedroom door, climbing out of the window, running into the woods, and going to a motel, where she hid out of fear of David, who had threatened that he would kill her if she ever left. (*Id.* at 953, 1017, 1035, 1425.)

Crystal ("Donna") Chumley initially met Tracy Howard in the North Pointe apartment complex where he was prostituting Keshia and two other girls. (Trial Transcript at 1392.) She later met David Howard and ultimately began working for Ila Howard's escort service, with David arranging for her calls, receiving all of the money, and on at least one occasion driving Donna to Fort Mill, South Carolina for a call. (*Id.* at 1400-03, 1417.) Not long after Donna

16

moved to Ila Howard's house, Tracy Howard punched her in the eye, causing a rift between Tracy and David Howard and resulting in David's move to a hotel room. (*Id.* at 1409-11.) Donna testified that David hit her "a bunch" of times for lying or otherwise not doing as she was told. (*Id.* at 1420-21.) Donna also testified about an incident when she threw her crack pipe into the fireplace, and David burned her with a hot fire poker. (*Id.* at 1423-25.)

In addition to providing girls or women to the escort services and prostituting girls in apartment complexes with Tracy Howard, David Howard also earned income during the time period of the conspiracies by distributing crack cocaine. (Trial Transcript at 674.) According to Tracy and David's cousin, Lionel Anthony, and Keshia, David would come several times a week to the apartment where Tracy lived, and Tracy would provide "eight-balls" of crack cocaine to David Howard. (*Id.* at 847, 2671.) David Howard moved to Little Mexico in 2004, and Tracy Howard delivered crack cocaine to him at that location. (*Id.* at 1275-76, 2671-72.) From Little Mexico, David Howard sold crack cocaine to Donna and others. (*Id.* at 1429-32, 2092-93.)

## **ARGUMENT**

I.    THE UNITED STATES IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
      AS TO EACH OF PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF
      COUNSEL.

A.    Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. *See* U.S. CONST., art. VI.  To merit relief on a claim of ineffective assistance of counsel pursuant to § 2255, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687-88

17

(1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . *Strickland* if the 'result of the proceeding was fundamentally unfair or unreliable.'" *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." *Bowie v. Branker*, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." *United States v. Rhynes*, 196 F.3d 207, 232 (4th Cir. 1999), *opinion vacated on other grounds*, 218 F.3d 310 (4th Cir. 2000).

B.   Failure to provide discovery claim

Petitioner's first claim of ineffective assistance of counsel is that Mr. Mackey failed to provide him with discovery, such that he was surprised by the statements of certain witnesses at trial, whose testimony, had he known of it earlier, would have prompted him to accept the Government's plea offer and would have led to a lower sentence. Petitioner's claim fails for several reasons.

First, in response to this allegation during Petitioner's sentencing hearing, Mr. Mackey explained that, during the trial, the Government continued to provide discovery and that this discovery was a surprise to all of the defendants and defense counsel, including Mr. Mackey. Sentencing Transcript at 40. Second, as set forth above, Petitioner explicitly acknowledged in his letters to the Court that he was guilty of the § 371 conspiracy for which he was ultimately convicted and implied as much with respect to the drug conspiracy, complaining specifically that

18

counsel had not obtained a "factual finding" from the Government of the drugs for which he was

accountable, rather than alleging a failure to satisfy Petitioner that the Government could prove

his guilt. While he suggests that, had he known of the strength of the Government's case against

him, he would not have pled guilty, he acknowledged during the status-of-counsel hearing a

month or so before his trial that counsel had provided him with discovery related both to the

initial charges and to the charges in the superseding indictment, and he did not assert during that

hearing that the discovery did not establish his guilt. Petitioner also stated during his sentencing

hearing that he "took [his case to] trial because [he] didn't do anything" insofar as he "simply

drove some females and got involved in something that . . . had been going on for a couple of

years and [he] knew nothing about it." *Id.* at 39. While this statement suggests, contrary to his

July 19, 2005, letter to the Court, that he did not participate in the prostitution conspiracy, he

makes clear that he made the decision to go to trial because he did not believe he was actually

guilty and did not want to take responsibility for more something he did not do.

With respect to Petitioner's allegation that, during the trial, he "discovered numerous

statements from government witnesses that had been in counsel's possession on CD-ROM for at

least a year and a half," he has not identified what evidence or testimony surprised him, nor has

he explained the basis for his assertion that the substance of these witnesses' statements was on

the CD-ROM but not part of the discovery Petitioner acknowledged he had reviewed prior to

trial. Such conclusory allegations are not sufficient to prove ineffective assistance of counsel.

Finally, Petitioner suggests that he would have pled guilty in order to receive a lower

sentence, but as reflected in the proposed plea agreement attached hereto as Exhibit 1, the

Government's plea offer required that Petitioner plead guilty to both offenses for which he was

19

Case 3:10-cv-00488-RJC   Document 15   Filed 06/08/11   Page 19 of 29

ultimately convicted and included a drug-quantity stipulation that set him in the highest statutory range. *See* Proposed Plea Agreement attached hereto as Exhibit 1[3]; 21 U.S.C. § 841(b)(1)(A)(iii) (2007), subsequently amended by Pub. L. 111-220, Aug. 3, 2010, 124 Stat. 2372. Petitioner cannot show that he would have been subject to a lower drug quantity than the investigation into the conspiracy of conviction revealed. Thus, the only benefit that Petitioner would have received from pleading guilty would have been a three-level reduction in his total offense level for acceptance of responsibility, yielding a total offense level of 38. Based on his criminal history category of VI, Petitioner would still have faced an applicable Sentencing Guidelines range of 360 months to life. Because Petitioner cannot show a reasonable probability that this Court would have entered a downward variance sentence had he pled guilty, he cannot show that he was prejudiced by his decision to go to trial, even if he would have pled guilty had he been aware of the strength of the Government's case against him.

    C.    <u>Criminal history calculation and review of PSR.</u>

    Petitioner next asserts that counsel failed to review his PSR with him and failed to assert objections to the criminal history calculation that would have affected his Guidelines range. With respect to counsel's review of the PSR with Petitioner, Mr. Mackey informed this Court during Petitioner's sentencing hearing that he had, in fact, reviewed the original PSR with Petitioner, and the Court observed that there were no changes in the revised PSR that affected the Guidelines calculations or the criminal history category. Sentencing Hearing Transcript at 5-6.

---

[3]The Government expects to file an affidavit from Assistant United States Attorney Karen Marston attesting to her having provided the proposed plea agreement to Petitioner's counsel in September of 2005. The Government expected to have that affidavit ready to file today but was unable to obtain it in time for filing its response. The Government will file the affidavit as soon as possible.

20

The Court also explained that after counsel argued Petitioner's objections, the Court would permit Petitioner to argue any other objections he had to the PSR. *Id.* at 6. When given the opportunity to do that, Petitioner denied that he had any further objections, stating that "Mr. Mackey covered just about everything." *Id.* at 32. Petitioner cannot show either deficient performance or prejudice, then, as to a lack of opportunity to review the PSR.

Turning to the allegation concerning criminal-history points, Petitioner argues that he was improperly assessed a point for a reckless driving conviction for which he was sentenced to 39 days' imprisonment. *See* PSR at 22. Sentencing Guidelines § 4A1.2(a)(2) provides that prior sentences are counted separately as long as the sentences were imposed for offenses that were separated by an intervening arrest. Paragraphs 96 and 97 of Petitioner's PSR reflect that Petitioner was sentenced to 39 days' imprisonment for the May 7, 2000, reckless driving offense and the September 16, 2000, larceny offense. While the PSR does not reflect whether those offenses were separated by an intervening arrest, Petitioner has not presented any evidence that they were not separated by an intervening arrest. Additionally, the probation officer calculated 16 criminal history points, three points higher than the 13 points required to place Petitioner in the highest criminal-history category. Thus, even if the single point was assessed in error, it did not affect Petitioner's applicable Guidelines range.

Petitioner also complains that points were assessed for his convictions for larceny and escape by hired prisoner. First, he received only two points cumulatively for those two offenses and, as set forth above, he had a total of 16 criminal history points, three higher than necessary to place him into criminal history category VI. Thus, even if these points were improperly assessed, it would not have affected his applicable Guidelines range. Additionally, Petitioner has not

21

explained why those sentences of 39 days' and 23 days' imprisonment, respectively, do not count as prior sentences under Sentencing Guidelines § 4A1.2(a)(1), sufficient to warrant one point each under § 4A1.1(c). Thus, Petitioner has shown neither deficient representation nor prejudice.

### D.    Plea Agreement

Petitioner next complains that counsel failed to inform him of a plea offer of 10 years to life and that Petitioner learned of it only after counsel announced to the Government that he was preparing to go to trial. Counsel explicitly reported to the Court, however, during the status-of-counsel hearing that he had reviewed the proposed plea with Petitioner and that Petitioner was adamant that he wanted to go to trial. Although Petitioner had already spoken up about counsel's lack of diligence, Petitioner did not correct counsel's statement or make any other assertion to the Court to refute counsel's statement that he had, in fact, conveyed the plea offer to Petitioner. Additionally, while Petitioner again states that counsel told him that the Government did not have any evidence of his guilt, Petitioner acknowledged that he had reviewed the Government's discovery. Finally, as set forth above, even if Petitioner could have entered into a plea agreement in which he pled guilty to offenses for which the statutory sentencing range of 10 years to life, he cannot show a reasonable probability of a lower sentence, because he received a sentence at the bottom of his applicable Guidelines range.

### E.    Defendant's Testimony

During the trial, the Court informed Petitioner that he had a constitutional right to testify and that it was "entirely" Petitioner's choice to make. Trial Transcript at 2930. Upon further inquiry, Petitioner informed the Court that he would testify, *id.* at 2941-42, but later, Petitioner's counsel informed the Court that Petitioner would not be presenting any evidence, *id.* at 3293.

22

While Petitioner asserts that he did not testify because counsel was not prepared to ask him any questions, counsel's cross-examination of numerous Government witnesses makes clear that counsel was prepared to try this case, and a review of the trial transcript does not support the assertion that counsel would have been unprepared to question his own client. Even if true, however, Petitioner has not presented any evidence as to how he would have refuted the Government's evidence against him. Further, in his letters to the Court, Petitioner, though asserting that his participation was limited, admitted that he participated in the conspiracy charged in the initial indictment and implied as much with respect to the drug conspiracy charged in the superseding indictment. Petitioner has not shown, therefore, that even if counsel did convince him not to testify, a reasonable likelihood of a different result.

F.    Counsel's attempt to obtain a mistrial and failure to impeach Government witness testimony.

Petitioner next asserts that Mr. Mackey deliberately tried to cause a mistrial by taking "a statement made by the case agent and implicat[ing] a non-testifying co-defendant when the case agent never mentioned the co-defendant's name" and that counsel "failed to properly admit into evidence 'impeachment material'" that could have been used to impeach the testimony of Keisha Burris. Mot. to Vacate Summary of Arguments at 2. With respect to the mistrial allegation, Petitioner does not identify either the case agent whose testimony is at issue or the particular question(s) that elicited the objectionable testimony. Because Petitioner has failed to provide enough information even for the Government to respond, this claim fails as well. Similarly, with respect to counsel's failure to impeach Ms. Burris, Petitioner fails to explain what "impeachment material" existed or how it could have impeached Ms. Burris.

23

Case 3:10-cv-00488-RJC   Document 15   Filed 06/08/11   Page 23 of 29

G.    Falling asleep.

Petitioner also asserts that trial counsel fell asleep during the trial, requiring that Petitioner nudge him to wake him so that counsel could respond to the Court's question. While the Government would not suggest that falling asleep during a trial is not deficient representation, Petitioner must still show that counsel's doing so, assuming it happened, prejudiced him. In this case, Petitioner has not produced any evidence that had counsel not fallen asleep briefly during the trial, there is a reasonable probability of a different result. This claim, therefore, fails as well.

H.    Failure to provide letters to appellate counsel.

Petitioner next asserts that Mr. Mackey failed to provide all of the discovery and letters to appellate counsel, resulting in a weak appeal. Petitioner mentions "letters," but he does not explain what those letters would have revealed or why they might have provided a stronger argument on appeal than was raised by appellate counsel. Again, then, Petitioner's claim fails because the allegations supporting the claim are conclusory and no evidence supporting that claim has been provided.

I.    Failure to investigate witnesses

In his next claim of ineffective assistance of counsel, Petitioner alleges that Mr. Mackey failed to investigate "witnesses supplied by the defendant for his defense," asserting that these witnesses "could have made a critical impact on the government's case." Pet. Mot. to Vacate at 3. In an affidavit filed in January of 2011, Petitioner asserts that he informed counsel that another inmate, Andre McRae, who "had information pertaining to the case agent providing individuals with the necessary information needed to testify against the defendant for the

24

government if their particular case went to trial." Ragin Affidavit at 2. Petitioner also asserts that Elizabeth White, one of the Government's witnesses, testified that she did whatever she was asked to do, presumably by the agents but it is not clear from Petitioner's allegations.

As an initial matter, it is not clear from Petitioner's allegation whether Mr. McRae could have impeached the case agent as to Petitioner's prosecution or based on his conduct in a different prosecution. Second, to the extent Petitioner relies on Ms. White's testimony, she testified repeatedly on cross-examination that she was instructed to tell the truth and only the truth. *See, e.g.*, Trial Transcript at 352-54, 414-16. Finally, even if Mr. McRae could have impeached one of the agent's testimony, one of the escort service's employees testified to Petitioner's participation in the prostitution ring, and Crystal Chumley, Eugene Lewis, and Keshia Burris all testified to Petitioner's participation in the drug trafficking. There is no reasonable probability, then, that even had Andre McRae provided testimony that impeached the testimony of the case agent, the result would have been different.

J.    Conflict of interest

Finally, with respect to his claims of ineffective assistance of counsel, Petitioner asserts that Mr. Mackey labored under a conflict of interest by running for a federal judgeship and Mecklenburg County Sheriff during his representation of Petitioner. Where a petitioner asserts an ineffective assistance of counsel claim based on an actual conflict of interest, he must show: (1) that his lawyer operated under a conflict of interest; and (2) that such conflict adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010).

25

In this case, Petitioner asserts that Mr. Mackey was running for a federal judgeship, but as federal judges are appointed and not elected, even if Petitioner had been seeking a federal judgeship, he cannot show an actual conflict of interest because none of the individuals who would have made the decision as to whether to recommend his appointment were involved in Petitioner's prosecution or trial. Petitioner also asserts a conflict of interest based on Mr. Mackey's position as sheriff, but Mr. Mackey withdrew from this matter when he became sheriff and the sheriff's position was not available until the fall of 2007, when the former sheriff announced that he was retiring after 13 years to take a position with the Department of Homeland Security. *See* http://www.wsoctv.com/news/14242796/detail.html. As Petitioner was sentenced in January of 2007, approximately nine months before the former sheriff announced his retirement and Mr. Mackey withdrew from Petitioner's appeal prior to the filing of his appellate brief, there were no proceedings during which Mr. Mackey labored under a conflict of interest.

Even if Mr. Mackey had represented Petitioner under an actual conflict of interest, Petitioner has not shown that this conflict adversely affected his representation. While Petitioner has alleged that Mr. Mackey did not want to upset the Court, he has not cited any action taken or not taken by Mr. Mackey that adversely affected either his trial or his sentencing proceeding. Therefore, Petitioner's ineffective assistance of counsel claim fails.

II.   PETITIONER'S CLAIM OF *APPRENDI* ERROR IS PROCEDURALLY BARRED AND, IN ANY EVENT, FAILS ON ITS MERITS.

As a general rule, a claim of error that was not raised on direct appeal is procedurally defaulted and is not cognizable on collateral review, because "[h]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley*, 523 U.S. at 621 (internal

26

quotations and citations omitted); *see also United States v. Pettiford*, 612 F.3d 270, 279 n.7 (4th Cir. 2010) (recognizing that claim challenging predicate offenses for purposes of defendant's classification as an armed career criminal was procedurally defaulted based on defendant's failure to challenge those predicates in the district court or on appeal, unless defendant can establish exception to procedural bar). Where a defendant has procedurally defaulted a claim by failing to raise it on direct appeal, the claim is cognizable in *habeas* "only if the defendant can first demonstrate either 'cause' and actual 'prejudice' . . . or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (citations omitted).

In order to show "cause" for a procedural default, the defendant must demonstrate that some objective factor external to the record impeded his counsel's efforts to bring a claim on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 497 (1986); *Turner v. Jabe*, 58 F.3d 924, 927 (4th Cir. 1995). It is not enough that counsel failed to present an argument that was unlikely to succeed; rather, cause only exists based on counsel's failure to present the claim if the claim "'is so novel that its legal basis is not reasonably available to counsel.'" *Bousley*, 523 U.S. at 622 (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)).

In order to establish "actual prejudice" the defendant must show "not merely that the errors at his trial create[d] a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 167-68, 170 (1982) (emphasis in original). In attempting to avoid a procedural default based on the "actual innocence" exception to the default, a defendant must show, by clear and convincing evidence, *United States v. Mikalajunas*, 186 F.3d 490, 494

27

(4th Cir. 1999), that it is more likely than not that no reasonable juror would have convicted him because of his "factual innocence, not mere legal insufficiency," *Bousley*, 523 U.S. at 623.

In this case, Petitioner's claim that his constitutional rights were violated by the Court's finding of a drug quantity that was not alleged in the indictment is procedurally barred, because it was not raised on direct appeal and Petitioner has shown neither cause nor prejudice. Even if not procedurally barred, this claim fails because a sentencing court has a duty to find facts related to the application of the Sentencing Guidelines, including drug quantity, and it is not constitutional error to do so as long as the Guidelines are advisory. *See United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008); *United States v. Battle*, 499 F.3d 315, 322-23 (4th Cir. 2007).

## CONCLUSION

Petitioner has failed to produce any evidence showing either deficient performance or prejudice by his trial counsel, nor has Petitioner shown any other claim of error. Accordingly, the Government requests that this Court dispense with an evidentiary hearing and summarily dismiss this action in its entirety.

RESPECTFULLY SUBMITTED, this 8th day of June, 2011.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY
s/Amy E. Ray
Amy E. Ray Bar Number: 22762
Assistant United States Attorney
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina 28801
Telephone: (828) 271-4661
Fax: (828) 271-4670
E-mail: Amy.Ray@usdoj.gov

28

## CERTIFICATE OF SERVICE

I certify that on this 8th day of June 2011, a copy of the foregoing *Government's Answer in Opposition to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence* will be served on Petitioner the next business day, addressed to his address pursuant to the Inmate Locator, Bureau of Prisons, as follows:

> Nicholas Ragin
> No. 19791-058
> USP Lewisburg
> PO Box 1000
> Lewisburg, PA 17837

> ANNE M. TOMPKINS
> UNITED STATES ATTORNEY
> s/Amy E. Ray
> Amy E. Ray Bar Number: 22762
> Assistant United States Attorney
> Room 233, U.S. Courthouse
> 100 Otis Street
> Asheville, North Carolina 28801
> Telephone: (828) 271-4661
> Fax: (828) 271-4670
> E-mail: Amy.Ray@usdoj.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:04CR271-MU |
| | ) | |
| v. | ) | **PLEA AGREEMENT** |
| | ) | **(Superseding Bill of Indictment)** |
| (7) NICHOLAS RAGIN | ) | |

NOW COMES the United States of America, by and through Gretchen C.F. Shappert, United States Attorney for the Western District of North Carolina, and the defendant, NICHOLAS RAGIN, in person and through counsel, Nikita V. Mackey, and respectfully inform the Court that they have reached the following agreement:

### I.  Plea

1.    The defendant agrees to enter a voluntary plea of guilty to Counts One and Thirteen as set forth in the Superseding Bill of Indictment, and admits to being in fact guilty as charged in these Counts.

2.    If the Court finds the defendant's plea to be voluntary and knowingly made, and accepts the plea, then the United States will move at the appropriate time to dismiss any remaining counts pertaining to this defendant in the Superseding Bill of Indictment.

3.    The defendant agrees that the Court may consider any such dismissed counts and all pertinent information as "relevant conduct," *United States Sentencing Guidelines [U.S.S.G.] § 1B1.3*.  The Court may also consider any dismissed count as a "conviction" for purposes of 28 U.S.C. §§ 1918 (costs of prosecutions, including fines and forfeitures), 920 (court costs, including fees for interpreters), as well as for purposes of forfeiture and restitution.

### II.  Sentence

4.    The defendant is aware that the statutory minimum and maximum sentences for Counts One and Thirteen are as follows:

Count 1:          A fine of up to $ 250,000, not more than five years imprisonment, or both.

Count 13:          A mandatory minimum sentence of 10 years, up to a maximum of life imprisonment, a $

1

4,000,000 fine, and no more than 5 years supervised release.

5.    The defendant understands that supervised release is a term of supervision that runs consecutively to any sentence of incarceration and that if the Court imposes a term of supervised release, the United States Probation Office will supervise him during that term and will require that he make regular reports and visits to its office. The defendant understands that a violation of the conditions of supervised release may subject him to an additional period of incarceration up to the maximum term of years imposed as supervised release.

6.    The defendant is aware that any sentence imposed will be in conformity with the *United States Sentencing Guidelines* [U.S.S.G.], and that a sentence imposed under the Guidelines is without parole. The defendant is further aware that the Court has not yet determined the sentence, that any estimate from any source, including defense counsel, of the likely sentence is a prediction rather than a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum for each count. The defendant further understands that no recommendations or agreements by the United States are binding upon the Court.

7.    With regard to the Sentencing Guidelines, the defendant and the United States, pursuant to Fed. R. Crim. P. 11(c)(1)(B), **stipulate and agree to the following**:

    a.    The amounts of cocaine base (crack) that was known to or reasonably foreseeable by the defendant was more than 50 grams

    b.    Provided that the defendant acknowledges to the government, the Probation
Office, and the Court the nature and extent of all relevant criminal conduct, the government will recommend a two-level reduction in offense level pursuant to U.S.S.G. § 3E1.1(b)(2).

    c.    Provided that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, the government will move for an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b). The United States will determine in its sole discretion whether to move for the additional one-level reduction.

        However, the defendant understands that any reduction in offense level is ultimately for the Court's determination.

    d.    Notwithstanding any recommendations in the Plea Agreement as to the

2

offense level, if the Probation Office determines from the defendant's criminal history that U.S.S.G. § 4B1.1 (Career Offender), or a statutory minimum sentence applies, then that provision will be used in determining the sentence.

e. The defendant and the United States agree that the sentence will be within "the applicable guideline range" (U.S.S.G. § 5C1.1) and that neither party will seek a departure from that range.

8. The defendant agrees to pay full restitution, regardless of the resulting loss amount, which restitution will be included in the Court's Order of Judgment. The defendant agrees that such restitution will include all victims directly or indirectly harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 3663 or 3663A. The defendant consents to a civil judgment in state or Federal court concerning a claim filed by a "victim" as defined in 18 U.S.C. §§ 3663(a)(2) and 3663A(a)(2). The defendant understands that with a Judgment and Commitment Order that requires the payment of restitution, a lien will be filed on his property. Defendant also understands that his obligation to make restitution shall last for twenty years after the entry of the judgment, release from imprisonment, or until his death. 18 U.S.C. § 3613.

For the preparation of his Presentence Report, the defendant agrees to cooperate fully with and make a full disclosure of all current and projected assets and property to the United States Probation Office. If the defendant is ordered to serve a term of supervised release or probation, he agrees to make a full disclosure of his assets and property to the United States Probation Office prior to the termination of his supervised release or probation. If the defendant should fail to make the aforementioned full disclosures, then the United States will be relieved of its obligations under the Plea Agreement, but the defendant will not be allowed to withdraw his guilty plea.

9. The parties agree that the Court shall set the amount of fine from the Fine Table in U.S.S.G. § 5E1.2.

10. If more than $500.00 in restitution, fines, and/or assessment is owed to the United States government, a lien will be filed. The defendant understands that if a lien is filed against his property, his obligation to pay restitution shall last for twenty years after any imprisonment ordered or until his death. 18 U.S.C. § 3613.

11. The parties stipulate that, pursuant to 21 U.S.C. §§ 862 and 862(a), the defendant will be ineligible for all federal benefits for five years after the date of sentencing.

3

If the Court determines that this conviction is the second federal or state offense for distributing controlled substances, the defendant will be ineligible for all federal benefits for ten years after the sentencing. If the Court determines that this conviction is the third or subsequent such offense, the defendant will be permanently ineligible for all federal benefits.

12.    The defendant hereby agrees to pay the total amount required for assessment ($200) to the Clerk, United States District Court, before 5:00 p.m. on the date of pleading guilty. The defendant further agrees to participate in the Inmate Financial Responsibility Program to the extent necessary to fulfill all financial obligations due and owing under this agreement and the law.

13.    The defendant agrees to reimburse the United States for the cost of court-appointed counsel and agrees that the Court may include such reimbursement in the Order of Judgment.

### III. Procedure

14.    The defendant agrees that a duly-qualified Federal Magistrate Judge may conduct the hearing required by Fed. R. Crim. P. 11.

15.    With the Court's permission, the factual basis, as required by Fed. R. Crim. P. 11(b)(3), will be deferred until the time of sentencing. The defendant stipulates that there is a factual basis for the plea of guilty and that the Court may use the offense conduct set out in the Presentence Report, except any facts to which the defendant has objected, to establish a factual basis for the defendant's plea.

### IV. Waivers

16.    The defendant understands and agrees that if he should fail to specifically perform or to fulfill completely each and every one of his obligations under this Plea Agreement, then the United States will be relieved of its obligations under the agreement, but the defendant will not be allowed to withdraw his guilty plea.

17.    The defendant is aware that the law provides certain limited rights to withdraw a plea of guilty. The defendant has discussed these rights with defense counsel and knowingly and expressly waives any right to withdraw the plea once the District Court has accepted it.

18.    The defendant acknowledges that Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 are rules which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. The defendant knowingly and

4

voluntarily waives the rights which arise under these Rules. As a result of this waiver, he understands and agrees that any statements which are made in the course of his guilty plea or in connection with his cooperation pursuant to this plea agreement will be admissible against him for any purpose in any criminal or civil proceeding if his guilty plea is subsequently withdrawn.

19.    The defendant understands and agrees that by pleading guilty, he is expressly waiving the following rights:

    a.    to be tried by a jury;
    b.    to be assisted by an attorney at trial;
    c.    to confront and cross-examine witnesses; and,
    d.    not to be compelled to incriminate himself.

20.    Defendant and defendant's counsel warrant that they have discussed: (1) defendant's rights pursuant to 18 U.S.C. § 3742, 28 U.S.C. § 2255, and similar authorities to contest a conviction and/or sentence through an appeal or post-conviction action after entering into a plea agreement; (2) whether or not there are potential issues which might be relevant to an appeal or post-conviction action; and (3) the possible impact of any such issue on the desirability to the defendant of entering into this plea agreement.

Defendant, in exchange for the concessions made by the United States in this plea agreement, waives all such rights to contest the conviction and/or the sentence except for: (1) claims of ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) the sentence, but only to the extent defendant contests the sentence that one or more findings on guideline issues were inconsistent with the explicit stipulations contained in any paragraph in the plea agreement filed herein, or on the basis of an unanticipated issue that arises during the sentencing hearing and which the District Judge finds and certifies to be of such an unusual nature as to require review by the Fourth Circuit Court of Appeals.

Also, in exchange for the concessions made by the United States, defendant agrees that the United States preserves all its rights and duties with respect to appeal as set forth in 18 U.S.C. § 3742(b), while the defendant waives all rights to appeal or collaterally attack the sentence of conviction with three the exceptions set for above. This agreement does not limit the United States in its comments in or responses to any post-conviction matters.

21.    The defendant waives all rights, whether asserted directly or by a representative, to request or to receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of

Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

22. **The defendant stipulates that any sentence that falls within the applicable guideline range as determined by the United States Probation Office and pursuant to any departures from the applicable range as recommended by the government is *per se* reasonable.  The defendant waives any right to contest such a sentence on the basis that the Court's imposition of such a sentence was unreasonable or an abuse of its discretion.**

### V. Assistance to Government

23. If requested by the United States, but only if so requested, the defendant agrees to cooperate with the United States, including but not limited to the following:

   a.    The defendant will provide truthful information about the subject charges and about any other criminal activity within the defendant's knowledge to any government agent or agency that the United States designates.

   b.    The defendant will testify truthfully in any trial, hearing, or grand jury proceeding, including, but not limited to, testimony against any co-defendants, as the United States designates.

   c.    The defendant will truthfully disclose all monies, negotiable instruments, securities, or other things of value that are proceeds of or have been involved in, or have been used or intended to be used to facilitate a violation of state or federal law.  The defendant further agrees to voluntarily forfeit said property to the United States.

   d.    In the event that the defendant's cooperation includes testifying, the defendant hereby waives payment of any witness fees or expenses to which he may be otherwise entitled pursuant to 28 U.S.C. § 1821.

   e.    The defendant understands that the United States desires only truthful and accurate information and testimony and, in fact, that knowingly giving false information or testimony can be prosecuted as an additional criminal offense.

   Further, if the defendant knowingly gives false testimony, the United States will be relieved of its obligations under this Plea Agreement, except that the defendant's plea of guilty and the resulting guilty verdict will stand.

6

  f.  The defendant will not violate any federal, state, or local law, or any order of any court, including any conditions of pretrial, pre-sentence, or post-sentence release.

    Nothing that the defendant discloses pursuant to this Plea Agreement will be used against him in any other criminal proceeding, subject to the following exceptions:

    1.  the United States or other jurisdiction may use any and all relevant information regarding crimes of violence;

    2.  the United States may use any and all information as necessary in a prosecution for perjury, or in any trial for impeachment or rebuttal;

    3.  if the defendant withdraws his plea of guilty, the United States may use any and all disclosures in any subsequent trials or criminal proceedings;

    4.  if the defendant violates any of the terms of this Plea Agreement, including the obligation to provide truthful information, then the United States may use any and all disclosures in subsequent trials or criminal proceedings; and,

    5.  the United States may make indirect use of any information that the defendant provides, including investigative leads or other witnesses.

  g.  The defendant's obligation under this section is a continuing one, and will continue after sentencing until all investigations and/or prosecutions to which the defendant's cooperation may be relevant have been completed. This provision is a material condition of this Plea Agreement and of all benefits that accrue to the defendant pursuant to this agreement.

    In the interests of fulfilling all obligations under this section, the defendant agrees to waive all rights under Chapters 213 and 208 of Title 18 until such time as the United States determines that all relevant investigations and/or prosecutions have been completed.

  h.  The defendant fully understands that any breach of this agreement, including but not limited to withholding information, misleading the United States or any law enforcement officer, or failing to testify truthfully at any trial, grand jury, or other judicial proceeding, will allow the government, in its sole discretion, to withdraw from its obligations under

<div align="center">7</div>

this Plea Agreement. In such event, the United States will be free to proceed on any properly-filed pending, superseding, or additional charges, including any charges dismissed pursuant to this agreement.

24.    When and if the defendant assists the government as described above:

a.    The United States, in its sole discretion, will determine whether said assistance has been substantial.

b.    Upon a determination that the defendant has rendered substantial assistance, the government may make a motion pursuant to U.S.S.G. § 5K1.1 for imposition of a sentence below the applicable Sentencing Guidelines. The United States may also, within its sole discretion, move the Court pursuant to 18 U.S.C. § 3553(e) to impose a sentence below any applicable statutory mandatory minimum.

The defendant recognizes that the Court cannot depart below the Sentencing Guidelines for substantial assistance [U.S.S.G. § 5K1.1] absent a motion from the United States. The defendant further recognizes that, even if the United States makes a recommendation pursuant to U.S.S.G. § 5K1.1, the Court cannot depart below the statutory minimum unless the United States also includes a specific recommendation pursuant to 18 U.S.C. § 3553(e).

c.    Regardless of the nature and extent of any substantial assistance that the defendant renders, the United States will not move for a downward departure if the defendant also knowingly furnishes information that is materially false.

d.    Any determination that the defendant has failed to provide substantial assistance or has knowingly provided false information is within the sole discretion of the United States, and the defendant waives all objections and rights of appeal or collateral attack of such a determination.

e.    The defendant understands that if the United States makes a motion for downward departure, the motion is not binding on the District Court. The Court will determine in its discretion whether to grant or deny such departure and the extent of the departure.

## VI.    Conclusion

25.    The defendant understands that if he breaches this Plea Agreement, or violates any federal, state or local law, or any order of any court, including any condition of

8

pre-trial or pre-sentence, or post-sentence release, the United States will be relieved of its obligations under this Plea Agreement, but the defendant will not be allowed to withdraw his guilty plea.  The United States will be free to proceed on any properly-filed dismissed, pending, superseding, or additional charges.

26. **There are no agreements, representations, or understandings between the parties in this case, other than those explicitly set forth in this Plea Agreement and none will be entered into unless executed in writing and signed by all parties.**

SO AGREED:
GRETCHEN C.F. SHAPPERT, UNITED STATES ATTORNEY

_____        DATED: _____
KAREN S. MARSTON, Assistant United States Attorney

_____        DATED: _____
NIKITA V. MACKEY, Attorney for Defendant

_____        DATED: _____
NICHOLAS RAGIN, Defendant

9

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:10CV488-RJC-5
(3:04CR271-7)

NICHOLAS RAGIN,                          )
                                         )
                    Petitioner,          )
                                         )
        vs.                              )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                    Respondent.          )
_____)

## GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the United States of America, by and through Anne M. Tompkins, United

States Attorney for the Western District of North Carolina, and, pursuant to Rule 56(b), Federal

Rules of Civil Procedure, moves for summary judgment as to all issues alleged in Petitioner's

Motion to Vacate, Set Aside, or Correct Sentence pursuant to Title 28, United States Code,

Section 2255.  In support of its Motion for Summary Judgment, the United States hereby

incorporates by reference its Answer in Opposition to Petitioner's Motion to Vacate, Set Aside,

or Correct Sentence and all exhibits filed therewith.

For the reasons stated in the Government's Answer in Opposition to Petitioner's § 2255

Motion, the Government respectfully requests that Petitioner's motion be denied.  The

Government also requests that this Court dispense with an evidentiary hearing and summarily

dismiss this action in its entirety.

RESPECTFULLY SUBMITTED, this the 8th day of June, 2011.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/Amy E. Ray
Amy E. Ray Bar Number:  22762
Assistant United States Attorney
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina  28801
Telephone:  (828) 271-4661
Fax:  (828) 271-4670
E-mail:  Amy.Ray@usdoj.gov

2

Case 3:10-cv-00488-RJC   Document 17   Filed 06/08/11   Page 2 of 3

## CERTIFICATE OF SERVICE

I certify that I will serve on the next business day a copy of the ***Government's Motion for Summary Judgment*** upon Petitioner by mailing a copy thereof, postage prepaid and properly addressed to Petitioner at his address pursuant to the Federal Bureau of Prisons, Inmate Locator, as follows:

Nicholas Ragin
No. 19791-058
USP Lewisburg
PO Box 1000
Lewisburg, PA 17837

This the 8th day of June, 2011.

<div align="right">

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/Amy E. Ray
Amy E. Ray Bar Number:  22762
Assistant United States Attorney
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina  28801
Telephone:    (828) 271-4661
Fax:              (828) 271-4670
E-mail:          Amy.Ray@usdoj.gov

</div>

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
NORTH CAROLINA

NICHOLAS G. BAGIN,

        Petitioner        Case No: 3:10 cv 488-RJC

    V.

UNITED STATES OF AMERICA,

        Respondent

RECEIVED
CHARLOTTE, N.C.

SEP 12 2011

Clerk, U. S. Dist. Court
W. Dist. of N. C.

MOTION TO STAY 2255 PROCEEDING
AND REQUEST FOR PERMISSION TO
AMEND 2255 PETITION

    COMES NOW NICHOLAS G. BAGIN PRO-SE and in good faith respectfully submits the motion in this Honorable Court, to stay petitioners 2255 proceedings, and request for permission to amend 2255 petition for the following reasons:

    1.) Petitioner is currently trying to obtain affidavits from members of his jury and from the trial court judge to support petitioners claim that his trial counsel was sleeping during trial

    2.) Petitioner is in the process of trying to obtain a copy of the trial transcript audio tape which will without a doubt prove that counsel was sleeping during trial after the judge had to ask him twice if he had any cross examination for the governments witness. In addition to this request petitioner would add that the

current typed transcript is not accurate due to the omission of a jurors response to certain questions during the `Voir Dire' examination. So petitioners request would be that any decision thats made be made according to an accurate reflection of the proceedings.

3.) Petitioner is seeking to amend his current claims with additional facts that were not known to him at the time he filed the current 2255 motion in regards to enhancements the government used against him at sentencing.

Where Fore premice stated petitioner respectfully prays that this Honorable Court will grant this motion to correct a gross miscarriage of justice and to afford petitioner an opportunity to present all his claims in the current 2255, Petitioner would also kindly request the appointment of counsel to represent him where counsel is necessary to file a subpeona to have the jury and judge provide an affidavit regarding his attorney sleeping.

Respect fully Submitted
Nicholas G. Ragin 19791-058
Nicholas G. Ragin 19791-058

September 8, 2011                  United States Penitentiary Florence
                                   P.O. Box 7000
                                   Florence, Co 81226



COLORADO SPRINGS CO 801 11

Charles R. Jonas Federal Building
401 West Trade Street, Room 210
Charlotte, N.C., 28202

Name: Julius Rush
Reg. No: 15751-058
U.S. PENITENTIARY
P.O. BOX 7000
FLORENCE, CO 81226-7000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:10-cv-488-RJC

NICHOLAS RAGIN,  )
)
        Petitioner,  )
)
Vs.  )        **<u>ORDER</u>**
)
UNITED STATES OF AMERICA,  )
)
        Respondent.  )
)

**THIS MATTER** is before the court on the following motions filed by Petitioner:

    (1)    Motion for Judgment on the Merits (Doc. No. 5);

    (2)    Motion to Stay and Motion to Amend/Correct Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 25);

    (3)    Motion to Amend Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 27); and

    (4)    Motion for Judgment on the Pleadings (Doc. No. 28).

The Court has carefully considered each motion as well as the other pleadings of record. The court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

The Motion for Judgment on the Merits was filed before cross motions for summary judgment were filed by the parties. Such motion will, therefore, be denied as premature.

The Motion to Stay and Motion to Amend/Correct Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 25) seeks a stay of the action so that petitioner can secure affidavits from the trial judge and jurors concerning his allegation that he received ineffective assistance of counsel because his counsel fell asleep during trial. To the extent Petitioner seeks leave to amend his petition to add a claim based on trial counsel falling asleep, that claim is adequately raised in the petition and addressed by Respondent in its Response, (Doc. No. 15 at 24). To the extent Petitioner seeks a stay to secure affidavits concerning others observing counsel sleeping, review of subsequent

pleadings indicates that Petitioner actually secured a statement from a juror, which he considers to be an affidavit. As the inquiry on summary judgment does not involve weighing evidence as to whether counsel fell asleep, but whether Petitioner can show that such alleged behavior prejudiced the presentation of his defense, the motion will be denied.

The Motion to Amend Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 27) seeks not to amend the claims of the petition, but to provide the Court with additional arguments and evidence that has been annexed to such motion. The Court will, therefore, deem such motion to be a Motion to Supplement Response and allow the request. Respondent will be allowed to file a reply to such supplement within 14 days. Petitioner is advised that he need take no further action to place such supplemental materials and arguments before the Court, and that the pleadings will close with Respondent's Reply, if any.

Finally, in the Motion for Judgment on the Pleadings (Doc. No. 28), petitioner seeks to bring to the Court's attention the fact that the cross motions for summary judgment have been ripe for decision since July 19, 2011. The Court has noted such and will issue its decision within a reasonable time after the filing of Respondent's Reply (or the passage of such deadline).

**IT IS, THEREFORE, ORDERED** that Petitioner's

1.   Motion for Judgment on the Merits (Doc. No. 5) is **DENIED** as premature;

2.   Motion to Stay and Motion to Amend/Correct Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 25) is **DENIED**;

3.   Motion to Amend Motion to Vacate/Set Aside/Correct Sentence (2255) (Doc. No. 27) is **DEEMED** to be a Motion to Supplement Response and is **ALLOWED**. Respondent is **GRANTED** leave, but is not required, to file a Reply to such supplement within 14 days; and

4.   Motion for Judgment on the Pleadings, (Doc. No. 28), is **DENIED**.

-2-

Signed: March 2, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

-3-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-CV-00488-RJC
3:04-CR-271-07-RJC

| | | |
|---|---|---|
| NICHOLAS RAGIN | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |

**THIS MATTER** comes before the Court upon Petitioner's Motion to Vacate, pursuant to 28 U.S.C. § 2255, (Doc. No. 1); the Government's Response and Motion for Summary Judgment (Doc. Nos. 15, 17); and Petitioner's Cross-Motion for Summary Judgment, (Doc. No. 21).

After careful review of the pleadings, the Court has determined that an evidentiary hearing is necessary to resolve Petitioner's claim that his attorney provided ineffective assistance when he fell asleep during trial. (Doc. No. 1: Motion at 3).

Rule 8(c) of the Rules Governing Section 2255 Proceedings requires the appointment of counsel for such a hearing if the petitioner qualifies under 18 U.S.C. § 3006A. Petitioner previously qualified for appointed counsel in the underlying criminal case (Case No. 3:04-cr-271: Doc. No 9: CJA 20), and the Court is not aware of any change in Petitioner's financial status. Accordingly, the Court finds that the defendant qualifies for appointed counsel in this matter.

**IT IS, THEREFORE, ORDERED** that:

1. an evidentiary hearing regarding Petitioner's claim that his attorney provided ineffective assistance when he fell asleep during trial is scheduled for Monday, April 28, 2014, at

9:30 a.m. in Robert D. Potter Courtroom of the United States Courthouse in Charlotte, North Carolina;

2.  the United States Marshal have the defendant Nicholas Ragin (Reg. No. 19791-058) present in Charlotte, North Carolina forthwith, but not later than April 28, 2014, at 9:30 a.m. for the hearing; and

3.  the Community Defender shall designate counsel promptly to represent Petitioner on the limited issue identified for the evidentiary hearing.

The Clerk is directed to certify copies of this Order to Petitioner, the Community Defender, the United States Attorney, and the United States Marshals Service.

Signed: March 31, 2014

Robert J. Conrad, Jr.
United States District Judge

2

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10CV488-C
(3:04CR271-07)

NICHOLAS RAGIN,                          )
                                         )
                        Petitioner,      )
                                         )
        vs.                              )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                        Respondent.      )
_____      )

## GOVERNMENT'S MOTION FOR ORDER REQUIRING PRODUCTION OF AFFIDAVIT AND MOTION TO CONTINUE EVIDENTIARY HEARING

Petitioner Nicholas Ragin seeks relief from his conviction based on numerous claims of ineffective assistance of counsel.   Yesterday, this Court ordered an evidentiary hearing on one of those claims and calendared the evidentiary hearing for 9:30 a.m. on April 28, 2014.   Because the Government has been able to locate trial counsel who has stated his willingness to provide an affidavit responsive to the claim at issue and because the undersigned will not be able to be present for the hearing on the date it is currently calendared, the Government respectfully moves this Court to order trial counsel to provide an affidavit and to postpone the evidentiary hearing until after counsel provides the affidavit and the Government

1

amends its response in light of the affidavit.   In the alternative, the Government requests that this Court reschedule the evidentiary hearing.

1.   Petitioner Nicholas Ragin was convicted following a jury trial of offenses related to drug trafficking and prostitution involving minors.   This Court ultimately sentenced Petitioner to 360 months in prison, and the Fourth Circuit affirmed this Court's judgment.

2.   In October of 2010, Petitioner filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255.   In his motion, Petitioner asserted numerous claims of ineffective assistance of counsel, one of which was that trial counsel fell asleep during Petitioner's trial.   This Court ordered the Government to file a response to Petitioner's motion to vacate, and the undersigned attempted several times to reach Petitioner's trial counsel, Nikita Mackey, in order to obtain an affidavit responsive to Petitioner's claims of ineffective assistance of counsel.   After failing to reach Mr. Mackey, notwithstanding both letters and telephone calls, the Government filed a motion to dismiss Petitioner's motion, arguing that Petitioner's claims were due to be dismissed as a matter of law.   The Government filed its response on June 8, 2011.

3.   Yesterday, this Court entered an order scheduling an evidentiary hearing in order to receive testimony pertinent to Petitioner's claim that trial counsel fell asleep during Petitioner's trial and provided constitutionally deficient representation.   This Court has scheduled the evidentiary hearing for 9:30 a.m. on April 28, 2014.

<center>2</center>

4.    After receiving the Court's order, the undersigned tried again to locate Mr. Mackey, and after leaving a message at Mr. Mackey's law firm, received a response phone call from Mr. Mackey.   Mr. Mackey explained that between October of 2010, when Petitioner filed his motion to vacate, and June of 2011, when the Government filed its response, he was residing out of the state.   Although Mr. Mackey expressed some hesitation to provide an affidavit voluntarily, he agreed that if this Court were to order that he provide an affidavit responsive to Petitioner's claim that he fell asleep during the trial, he would comply. The undersigned believes Mr. Mackey would do so in short order.

5.    On Monday, April 28, the undersigned needs to be in Asheville to attend an annual doctor's appointment with her minor son.   This appointment is scheduled months in advance and concerns a chronic but serious medical condition that must be evaluated annually.

6.    Because Petitioner's trial counsel has returned to the Charlotte area and is now available to answer Petitioner's allegations in an affidavit, an evidentiary hearing on the ineffective-assistance-of-counsel claim is unlikely to be necessary. The Government, therefore, respectfully requests that this Court order Nikita Mackey to provide an affidavit responsive to Petitioner's claim that Mr. Mackey fell asleep during the trial and that this Court postpone the currently scheduled evidentiary hearing until after that affidavit is filed and the Government amends its response in light of Mr. Mackey's attestations.

3

7.   Alternatively, because the undersigned will be unable to attend the hearing as currently scheduled, the Government moves the Court to continue the hearing.

Respectfully submitted, this the 2nd day of April, 2014.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/Amy E. Ray
Amy E. Ray Bar Number:   22762
Assistant United States Attorney
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina   28801
Telephone:   (828) 271-4661
Fax:              (828) 271-4670
E-mail:        Amy.Ray@usdoj.gov

4

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing ***Government's Motion for Order Requiring Production of Affidavit and Motion to Continue Evidentiary Hearing*** will served upon Petitioner's counsel through electronic case filing.

This the 2nd day of April, 2014.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/Amy E. Ray
Amy E. Ray Bar Number:   22762
Assistant United States Attorney
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina   28801
Telephone:  (828) 271-4661
Fax:            (828) 271-4670
E-mail:       Amy.Ray@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-CV-00488-RJC
3:04-CR-271-07-RJC

| | | |
|---|---|---|
| NICHOLAS RAGIN | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |

**THIS MATTER** comes before the Court upon the Government's Motion to require former counsel to produce an affidavit and to continue the evidentiary hearing scheduled for April 28, 2014. (Doc. No. 36).

The Court previously determined that an evidentiary hearing is necessary to resolve Petitioner's claim that his attorney provided ineffective assistance when he fell asleep during trial. (Doc. No. 34: Order at 1). Therefore, the Court finds that compelling former counsel to provide an affidavit would not likely resolve this matter; rather, the Government may choose to subpoena witnesses to give testimony at the hearing.

For the reasons stated in the Government's motion, the Court finds good cause for a continuance of the hearing.

**IT IS, THEREFORE, ORDERED** that:

1. The Government's motion for an order compelling the production of an affidavit is **DENIED**; and

2. The Government's motion to continue the hearing is **GRANTED**, and the hearing is re-scheduled to Tuesday, May 13, 2014, at 10:30 a.m. in Robert D. Potter Courtroom of the United States Courthouse in Charlotte, North Carolina.

Case 3:10-cv-00488-RJC   Document 37   Filed 04/08/14   Page 1 of 2

The Clerk is directed to certify copies of this Order to Petitioner, Counsel for Petitioner, the United States Attorney, and the United States Marshals Service.

Signed: April 8, 2014

Robert J. Conrad, Jr.
United States District Judge

2

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF NORTH CAROLINA

 3                  CHARLOTTE DIVISION

 4

 5    ----------------------------x

 6    UNITED STATES OF AMERICA,

 7

 8    -vs-                        3:04-CR-00271-RJC-7

 9

10    NICHOLAS RAGIN,

11    ----------------------------x

12

13          TRANSCRIPT OF EVIDENTIARY HEARING

14            BEFORE ROBERT J. CONRAD, JR.

15          UNITED STATES DISTRICT COURT JUDGE

16              CHARLOTTE, NORTH CAROLINA

17                  MAY 12, 2014

18
      A P P E A R A N C E S:
19    On Behalf of the Government:
      William Michael Miller, Esq.
20    UNITED STATES ATTORNEYS OFFICE
      227 West Trade Street, Suite 1650
21    Charlotte, North Carolina 28202

22    On Behalf of the Defendant:
      Matthew G. Pruden, Esq.
23    TIN FULTON WALKER & OWEN, PLLC
      301 East Park Ave
24    Charlotte, North Carolina 28203

25    Reported by: Velicia Marseille
```

```
 1              T A B L E   O F   C O N T E N T S

 2                E X A M I N A T I O N S

 3

 4    EXAMINATION                              PAGE

 5    PETER ADOLF

 6    Direct, Mr. Pruden                        7

 7    Cross, Mr. Miller                         18

 8

 9    ANDY CULLER

10    Direct, Mr. Pruden                        21

11    Cross, Mr. Miller                         26

12    Redirect, Mr. Pruden                      29

13

14    PAMELA VERNON

15    Direct, Mr. Pruden                        30

16    Cross, Mr. Miller                         34

17

18    NICHOLAS RAGIN

19    Direct, Mr. Pruden                        37

20    Cross, Mr. Miller                         45

21    Redirect, Mr. Pruden                      53

22

23    TERRELL TADEO

24    Direct, Mr. Pruden                        55

25    Cross, Mr. Miller                         60
```

```
 1              T A B L E   O F   C O N T E N T S

 2                    E X H I B I T S

 3

 4      DEFENDANT'S

 5      EXHIBIT              DESCRIPTION          INTRODUCED

 6      Exhibit No. 1A-1T    Transcript pages        45

 7      Exhibit No. 2        Transcript pages        17

 8                           2878 and 2879

 9

10      Government's

11      Exhibit

12

13      Exhibit No. 1        Letter                  47

14

15      Exhibit No. 2        2255 motion             49

16

17      Exhibit No. 3        2255 motion             51

18

19

20

21

22

23

24

25
```

```
 1      THE COURT:  We're here in the matter
 2   of the United States vs. Nicolas Ragin,
 3   for an evidentiary hearing with respect
 4   to the issue of whether trial counsel
 5   was ineffective with respect to Mr.
 6   Ragin's claim that he fell asleep
 7   during trial.
 8      Mr. Pruden, I believe its your
 9   burden to show ineffective assistance
10   of counsel in governing cases.  So
11   I'll be glad to hear from you.  And
12   you're free to call witnesses if you
13   have any to call at this time.
14   MR. MILLER:  Your Honor, if I may,
15   before we begin, as the government has
16   notified the court, we issued the
17   subpoena to Mr. Mackey in this case.
18      I have not had an opportunity to
19   speak with Mr. Mackey, despite several
20   attempts to contact him myself.
21      Ms. Amy Ray, from our office, who is
22   the one who prepared the subpoena, has
23   also attempted to reach out to Mr. Mackey
24   with no success.
25      I also spoke with the paralegal in
```

1    our office, Linda Cole, this morning,

2    who prepared the form for the marshal

3    to serve that subpoena on Mr. Mackey,

4    and despite the government's efforts,

5    Mr. Mackey is not here as of right now.

6      THE COURT:  Has he in fact been

7    served?

8      MR. MILLER:  I thought I was getting

9    the return from Ms. Cole.  But what I

10   have here is the form that she filled

11   out to the marshal for service.

12     I can tender that to the court as well.

13     THE COURT:  That doesn't tell me

14   whether he in fact was served.

15     MR. MILLER:  My understanding from

16   speaking with Ms. Cole was that he was

17   served.

18     Again, I thought I was getting the

19   return of service.  But what she's

20   provided me here is the form.

21     THE COURT:  Have you talked to the

22   marshals whether they in fact served

23   Mr. Mackey?

24     MR. MILLER:  I have not spoken with

25   the marshals about that, your Honor.

```
 1    As late of Friday, I was attempting
 2   to reach Mr. Mackey myself with no
 3   success.
 4    I will say Mr. Pruden and I have
 5   spoken.  Our recommendation to the
 6   court would be to proceed with the
 7   hearing, not to inconvenience the
 8   other witnesses who have taken the
 9   time to be here today, and then at
10   the appropriate time we can determine
11   whether or not additional evidence
12   from Mr. Mackey is required.
13    THE COURT:  Is that an agreed upon
14   procedure, Mr. Pruden?
15    MR. PRUDEN:  Yes, your Honor.
16    THE COURT:  That's how we'll go
17   forward.
18    But absence of evidence that there's
19   been service of subpoena, but we'll
20   deal with that at the end of the hearing.
21    Mr. Pruden, the floor is yours.
22    MR. PRUDEN:  Thank you.  Your Honor,
23   before I call the witnesses, if the
24   court will like them sequestered.
25   There are some that are selected by
```

1            the government.

2               MR. MILLER:  I think sequestration

3            is appropriate in this case, your

4            Honor, with the exception obviously

5            of the defendant.

6               THE COURT:  All right.  Why don't we

7            do that.

8               MR. PRUDEN:  The first witness we'll

9            call is Peter Adolf.

10   THEREUPON,

11           PETER ADOLF,

12   having first been duly sworn, was examined and

13   testified as follows:

14   DIRECT EXAMINATION

15   BY MR. PRUDEN:

16   Q.   Would you please state your name for the court.

17   A.   Peter Adolf, A-d-o-l-f.

18   Q.   Mr. Adolf, where are you employed?

19   A.   The Federal Defenders of Western North Carolina,

20        Incorporated.

21   Q.   How long have you been employed there?

22   A.   Going on 9 years, 8-and-a-half years.

23   Q.   Were you employed there as of April of 2006?

24   A.   I was.

25   Q.   As part of your work as a federal public

```
 1        defender, did you represent an individual named
 2        David Howard?
 3   A.   I did.
 4   Q.   Do you recall when you represented Mr. Howard?
 5   A.   I know we tried the case in April of 2006.
 6             I think I had it for about 3 or 4 months
 7        before that, if I'm not mistaken.
 8   Q.   Did Mr. Howard have any codefendants?
 9   A.   He did; Tracy Howard and Nicolas Ragin, and I
10        think his name was Solano Oscar something, the
11        forth defendant that went to trial.
12             There were a number who also pled guilty
13        pretrial.
14   Q.   Had all those defendants went to trial with
15        Mr. Howard?
16   A.   The four.
17   Q.   Were all of those defendants tried together?
18   A.   Yes.
19   Q.   Were you present for the entire trial?
20   A.   I was.
21   Q.   Were you present for all sidebar conferences
22        at the trial?
23   A.   I was.
24   Q.   During the course of the trial, do you recall
25        who represented Mr. Ragin?
```

1   A.    Yes, Nick Mackey.

2   Q.    Would you describe how -- where were the

3         defendants sitting during the trial?

4   A.    Well, we had the table that you're sitting at

5         right now, and then there was a second table

6         that I guess was parallel to the sidewalls to

7         the two tables formed an L shape.

8             So it was Tracy Howard was the closest to

9         the isle I guess where you and Mr. Ragin are

10        sitting right down with Andy Culler was his

11        counsel.

12            And myself and David Howard were the next

13        ones down on this other defense table that's

14        always there.  And then the other two defendants

15        were at the other table that was parallel to the

16        windows; Nick Ragin first and I think his name

17        was Solano.  I don't know his name.

18            Sanchez; he was known by a couple of

19        different names.  But anyway he was closest to

20        the bench.

21  Q.    Was Mr. Mackey sitting next to Mr. Ragin?

22  A.    Yes.

23  Q.    Where were you sitting in relation to Mr.

24        Mackey?

25  A.    I can't remember whether I was in the seat

```
 1            directly next to Mr. Mackey or one seat over.
 2                 But we was the closest to the corner of
 3            where the L shape formed, and then I was either
 4            one or two seats right next to him at the
 5            regular defense table.
 6   Q.   During the trial, did you notice Mr. Mackey
 7            sleeping on any occasion?
 8   A.   I did once, definitely.
 9   Q.   Can you describe what you saw?
10   A.   Yes.
11                 There was a -- it was Karen Marston, who
12            was the lead prosecutor, and she was about to go
13            up and show a witness an exhibit, and I remember
14            Mr. Culler asked if the defense could review the
15            exhibit before she approached with it.
16                 And what she did was, because there were a
17            number of people that had to see it before
18            defense counsel and of course all the four
19            defendants, and what she did -- the exhibit was
20            some sort of document, I don't know what the
21            document was, but an eight-and-a-half-by-eleven
22            type of document, and she held it out at arms
23            length and walked slowly along the tables
24            waiting for each counsel to look at it over the
25            table and then say it was okay and move on.
```

```
 1                 So she walked up in front of the defense

 2           table, leaned over to Mr. Culler, he looked at

 3           the document for a few seconds and said it was

 4           okay, and then she moved down to me and showed

 5           it to me and I looked at it and recognized it

 6           and said it was okay, and then she walked over

 7           to Mr. Mackey, and I remember that Mr. Mackey

 8           was sort of sitting back, leaning back in his

 9           chair with his left elbow on his left thigh, I

10           guess it was, and sort of with his chin resting

11           on his fist, and she held the document in front

12           of him and he didn't move, he sort of sat there.

13   Q.      Were his eyes open or closed?

14   A.      He was sort of facing the front.

15                 I didn't really look at his eyes until,

16           because I was doing other stuff at that point,

17           until, my recollection is that, Judge Conrad

18           leaned into his microphone, because we were all

19           sitting there and he wasn't moving and said,

20           "Mr. Mackey" like that, very loudly, and Nick

21           sort of jumped up out of his seat, didn't

22           actually get off his seat, but jumped to the

23           front seat and started looking.

24   Q.      When you say "Nick" are you referring to

25           Nick Mackey?
```

```
 1   A.   Yes.

 2             Mr. Mackey jumped up and sort of looked

 3        around and was licking his lips and moving his

 4        mouth and looked sort of confused and looked all

 5        over the room except at Ms. Marston.

 6             And after a few seconds, he saw her

 7        standing there and looked at the document.  I

 8        guess at that point he realized what was going

 9        on, he was supposed to be reviewing something,

10        and said okay, that's fine, and went back into

11        the position that he was before with his chin on

12        his fist.

13   Q.   At the moment before he started looking around

14        the court, were you able to observe anything or

15        hear anything from Mr. Mackey?

16   A.   Well, he was not -- during the time when we were

17        all sitting there waiting for him to respond, he

18        was totally silent, didn't move, and didn't say

19        anything, and that's when we realized that he

20        was asleep, and the judge woke him up when he

21        said his name into the microphone.

22   Q.   Could you hear his breathing?

23   A.   I didn't really notice his breathing.

24             I just remember it was apparent to me that

25        was what happened when he jumped up and sort of
```

```
 1           gasped when his name was said loudly over the

 2           speaker system.

 3    Q.     Based on what you said earlier, evidence was

 4           being presented at the time before he jumped up?

 5    A.     Yes.

 6    Q.     Was that when the government's evidence was

 7           being presented?

 8    A.     It was.

 9    Q.     Were there any other occasion where you noticed

10           him sleeping?

11    A.     I don't remember any other specific occasion.

12               I remember hearing later that there was

13           another occasion, but I don't really have an

14           independent recollection of that.

15    Q.     Did you ever witness him with his head down on

16           any other occasion or doing anything that

17           appeared to be sleeping?

18    A.     I really didn't pay a lot of attention to what

19           he was doing throughout the trial.

20               I was dealing with my own client and our

21           own issues.  He wasn't directly in my line of

22           sight unless I looked to the right.

23               I don't remember seeing him obviously

24           falling asleep at any other time like he had

25           at that point.
```

```
 1   Q.   During this trial were you trying to pay

 2        attention to the evidence?

 3   A.   I was.

 4   Q.   Do you recall an occasion where Mr. Mackey

 5        mischaracterized some testimony that was given

 6        by Mr. Terry Tadeo?

 7   A.   Yes.

 8             You showed me a transcript recently, I

 9        think it was last week --

10             MR. MILLER:  I object to this.  It's

11             not based on his, Mr. Adolf's, recollection

12             of event.

13             THE COURT:  What's the relevance of

14             this?

15             MR. PRUDEN:  It's a very small

16             portion of the transcript, your Honor.

17             THE COURT:  What's the relevance of

18             his mischaracterizing?

19             MR. PRUDEN:  Because, your Honor,

20             there will be some testimony from

21             Mr. Ragin later on.

22             Mr. Ragin can pinpoint certain

23             moments in the trial when he believes

24             Mr. Mackey was sleeping.

25             THE COURT:  I'll allow.
```

```
 1                    MR. PRUDEN:  Thank you.

 2    BY MR. PRUDEN:

 3    Q.   So you had an opportunity to review the trial

 4         transcripts in this case?

 5    A.   I did.

 6              And it did refresh my memory about what

 7         happened.  There was an ongoing issue in the

 8         trial, a Bruton issue, where codefendants had

 9         made statements implicating each other, naming

10         each other, and that had been the subject of a

11         lot of litigation involving my client particularly,

12         Andy's client, and Judge Conrad had made a

13         number of rulings about that.

14              I remember there was a sidebar, which is

15         reflected in the transcript.  It was because

16         Mr. Mackey started cross-examining Mr. Tadeo,

17         and bought out that fact that we had been trying

18         to suppress, which was that statements had been

19         made by one codefendant about Tracey Howard, and

20         his honor called us up for sidebar to deal with

21         the fact that after we had gone through a lot of

22         trouble and a lot of litigation to try to deal

23         with that Bruton issue, Mr. Mackey had sort

24         of blurted out the fact that one of the

25         codefendants had implicated another codefendant.
```

```
 1   Q.   So you recall that sidebar?

 2   A.   I do.

 3   Q.   You had an opportunity to look at the transcript

 4        pages from that sidebar?

 5   A.   I did.

 6   Q.   I'm going to go a little bit out of order.

 7             I'm going to show you --

 8             MR. PRUDEN:  Your Honor, for

 9             purposes of this hearing, typically

10             when there's a jury trial I know that

11             the judge sees the exhibit, but should

12             I allow the defendant to see this at

13             this point?

14             THE COURT:  Sure.

15             For purposes of time, if it's in the

16             transcript and you've gotten the

17             refreshed testimony, unless there's

18             something new and different that you

19             want to bring out, the transcript will

20             speak for itself that Mr. Adolf has

21             testified to.

22             MR. PRUDEN:  I just wanted to

23             introduce it as evidence.

24             THE COURT:  It will be a part of

25             the record.  I think it's pretty
```

1   self-authenticated.

2     MR. PRUDEN:  If there's no objection,

3   your Honor, at this point I'll tender

4   to introduce this as evidence.

5     These are transcript pages, 2878 and

6   2879.

7     THE COURT:  Let's refer to that as.

8   Exhibit 1.

9     MR. PRUDEN:  This is actually marked

10   as Exhibit 2.  I did go out of order.

11     Again, for evidentiary purposes, I

12   don't know if I should provide this to

13   the court.

14     THE COURT:  If you would tender

15   that.

16     MR. PRUDEN:  If I may approach?

17     THE COURT:  Yes.

18     Mr. Pruden, if there is something

19   that you need out of Mr. Adolf with

20   respect to that, go ahead and ask him,

21   but if it's in the transcript itself,

22   I've got it.

23     MR. PRUDEN:  Your Honor, no further

24   questions of this witness.

25     THE COURT:  Any cross?

```
 1                      MR. MILLER:  Yes, your Honor.
 2    CROSS-EXAMINATION
 3    BY MR. MILLER:
 4    Q.   Mr. Adolf, my name is William Miller, I'm here
 5         from the United States today.
 6              You remember this trial from April of 2006,
 7         and do you recall if that was over 2 weeks of
 8         the trial?
 9    A.   I think it was 3 weeks actually.
10    Q.   From jury selection to verdict, approximately
11         3 weeks?
12    A.   Yes.
13    Q.   You testified on the record that there were four
14         defendants at that trial?
15    A.   Yes.
16    Q.   You also recall there were multiple counts being
17         tried at that trial?
18    A.   Yes.
19    Q.   It's your recollection not every defendant was
20         charged of each of those counts?
21    A.   Yes.
22    Q.   You also recall there were dozens of witnesses
23         during that nearly 3-week trial?
24    A.   Yes.
25    Q.   Would more than 40 witnesses sound like too many
```

```
 1        based on your recollection?
 2   A.   It sounds about right.
 3   Q.   Would you agree that not every witness testified
 4        about acts committed by each of the four
 5        defendants?
 6   A.   Yes.
 7   Q.   Would you agree that, in fact, some of the
 8        witnesses didn't even know all four defendants?
 9   A.   That's true.
10   Q.   You testified about one incident you recall in
11        some detail where Mr. Mackey appeared to be
12        sleeping.
13            Do you recall who the witness was at the
14        time that Mr. Mackey -- that you made this
15        observation?
16   A.   No.
17   Q.   Do you recall which day of trial it was during
18        that 3-week trial?
19   A.   No.
20   Q.   Do you recall the nature of the exhibit that
21        Ms. Marston was presenting other than the fact
22        that it was a document?
23   A.   No.
24   Q.   Moving to this Bruton issue during Mr. Tadeo's
25        or Special Agent Tadeo's testimony, that
```

ADOLF - CROSS                                          **Page 20**

```
 1          discussion was held at sidebar, correct, prior
 2          to Mr. Mackey's questioning regarding the Bruton
 3          issue?
 4               You testified that there was a sidebar,
 5          correct, about a Bruton issue?
 6    A.    It was.
 7    Q.    That sidebar occurred at the bench, correct?
 8    A.    Right.
 9    Q.    So Mr. Mackey would have been standing and awake
10          for that portion of the trial?
11    A.    Most definite.
12    Q.    During his questioning, is it your recollection,
13          based on refreshing your memory from this
14          transcript, that Mr. Mackey ran a foul of the
15          court's order at sidebar regarding this Bruton
16          issue?
17    A.    The sidebar I'm talking about is where the court
18          was addressing his violation of his order.
19               So I'm not sure when it was that the court,
20          if the court specifically ordered Mr. Mackey or
21          anyone else not to mention the fact that one
22          codefendant had implicated another.
23               It was an ongoing issue throughout the
24          trial that we've dealt with in a number of
25          context.
```

```
 1   Q.   The particular violation that Mr. Mackey was
 2        admonished for was for naming your client by
 3        name during the testimony of Mr. Ragin's
 4        confession; is that your recollection?
 5   A.   I think it was actually Tracy Howard, which
 6        would have been Andy Culler's client.
 7   Q.   But that particular violation was during the
 8        course of -- was testimony from Special Agent
 9        Tadeo about Nicolas Ragin's confession, correct?
10   A.   I believe it was.
11             MR. MILLER:  No further questions.
12             THE COURT:  Any redirect?
13             MR. PRUDEN:  No, your Honor.
14             THE COURT:  Thank you.
15             (Witness is excused.)
16             MR. PRUDEN:  At this time Mr. Ragin
17          calls Richard Andy Culler.
18   THEREUPON,
19           RICHARD ANDY CULLER,
20   having first been duly sworn, was examined and
21   testified as follows:
22   DIRECT EXAMINATION
23   BY MR. PRUDEN:
24   Q.   Good morning, sir.
25   A.   Good morning.
```

```
 1   Q.   Would you please state your name?

 2   A.   Andy Culler.

 3   Q.   Mr. Culler, what do you do for a living?

 4   A.   I'm an attorney here in Charlotte.

 5        Sorry, my voice is a little hoarse.

 6   Q.   What type of law do you practice?

 7   A.   Primarily criminal.

 8   Q.   How long have you been a lawyer?

 9   A.   Since '87.

10   Q.   As a lawyer, have you practiced here in

11        Charlotte?

12   A.   Since '90, '91.

13   Q.   As a lawyer practicing here in Charlotte, did

14        you happen to represent Tracy Howard?

15   A.   I did.

16   Q.   Do you recall when you represented Mr. Howard?

17   A.   I believe his trial was 8 years ago last month.

18   Q.   Did Mr. Howard have any codefendants?

19   A.   He did.

20        His brother David, the gentleman seated to

21        your right I believe is Mr. Ragin.

22        There was an Hispanic gentleman last name I

23        can't remember right now.

24             THE COURT:  Sanchez?

25             THE WITNESS:  Your Honor, I'm sure
```

```
 1              you're right that's his name but I
 2              don't recall his last name.
 3  A.    But he was represented by Richard Brown.
 4              And I believe the four of us are the ones
 5         that went to trial.
 6  Q.    Were you present during the entire trial in that
 7         case?
 8  A.    I was present during the entire trial.
 9  Q.    Were all four codefendants tried at the same
10         time?
11  A.    We were.
12  Q.    Do you recall who Mr. Ragin's attorney was at
13         trial?
14  A.    Mr. Mackey.
15  Q.    Do you recall how the courtroom was set up at
16         that time?
17  A.    I was seated -- the answer is yes.
18  Q.    Could you describe that?
19  A.    I was seated where you are right now in the lead
20         counsel's chair, is what I call it.
21              Tracy Howard was seated immediately to my
22         right.  And Mr. Adolf was seated to the right of
23         Mr. Howard.  David Howard was then seated to
24         Mr. Adolf's right.  As I recall, that was the
25         end of the first table.
```

```
 1              Then there was another table, and as I
 2        recall it was next Mr. Mackey, then Mr. Ragin,
 3        then Mr. Brown, and then the Hispanic gentleman,
 4        Mr. Sanchez or whatever his last name is.
 5              But I believe it's the gentleman that
 6        passed away.
 7   Q.   How long did that trial last?
 8   A.   I believe it took over the course of 5 weeks as
 9        I recall.  But we were only in court for about
10        4 weeks.
11   Q.   During the course of that trial, do you recall
12        any occasion where you noticed Nick Mackey
13        sleeping?
14   A.   Yes.
15   Q.   What do you recall about that?
16   A.   Initially when asked this question, I remembered
17        leaning back into my chair and turning to Mr.
18        Adolf, Peter Adolf, and saying, look, he's
19        asleep again or he's asleep again, or words to
20        that effect.
21              I remember from thinking about that as --
22        it's been 8 years, but I'm sure now, I remember
23        that Mr. Mackey had his head down and the only
24        thing that I can do is demonstrate his arms
25        crossed and his head down and his head down on
```

```
 1          his arm as I recall.

 2              And I recall him breathing very regularly

 3          as if he was sleeping.  He was not snoring.  I

 4          cannot say he was sleeping.  It appeared that he

 5          was sleeping.

 6              I thought he was sleeping.  I'll say that.

 7          I know that was one time that I saw that.

 8          Because I said again, and I remember saying that

 9          to Mr. Adolf, that's the only reason that I said

10          that I remember he was sleeping at that time.  I

11          don't have an independent recollection of that.

12    Q.    Do you recall what was going on in the trial

13          when he was sleeping?

14    A.    No.

15              I can't say if the judge was on the bench

16          for sure.  I know we were in court.  And that's

17          about all I can say about it.

18    Q.    Is there any other occasion that you can recall

19          seeing him sleeping?

20    A.    Well, because I said, again, I believe he was

21          sleeping one other occasion, but I don't

22          remember seeing that in my head like I do

23          that one time.

24              That specifically stood out.

25                  MR. PRUDEN:  No further questions.
```

```
 1                    THE COURT:  Any cross?

 2                    MR. MILLER:  Yes.

 3    CROSS-EXAMINATION

 4    BY MR. MILLER:

 5    Q.   Mr. Culler, you testified that this trial

 6         stretched across several weeks; is that correct?

 7    A.   That's correct.

 8    Q.   There were four defendants involved in the

 9         trial?

10    A.   That's correct.

11    Q.   There were multiple counts being tried in that

12         joint trial; is that also correct?

13    A.   That's correct.

14    Q.   Not every defendant was named in each of those

15         counts; would you agree with that?

16    A.   That's correct.

17    Q.   Over the course of this multi-week trial, would

18         you agree that there were dozens of witnesses

19         involved?

20    A.   I would agree with that.  Yes, sir.

21    Q.   Does more than 40 sound like too many?

22    A.   No.

23    Q.   Not every witness testified about acts committed

24         by each of the defendants; would you agree with

25         that?
```

 1    A.    Absolutely.

 2    Q.    In fact, some of the witnesses didn't even know

 3          all of the defendants?

 4    A.    That's correct.

 5    Q.    Your client, he was the focus of many of the

 6          witnesses; would you agree with that

 7          characterization?

 8    A.    I would agree with that.

 9    Q.    Would you agree that Mr. Ragin, Mr. Mackey's

10          client, was not the focus of many of the

11          witnesses?

12    A.    I would agree with that.

13    Q.    If not, most of the witnesses?

14    A.    Say that again?

15    Q.    Many, if not, most of the witnesses were not

16          focused on Mr. Ragin?

17    A.    I can't recall right now how many specifically

18          comparing this to Mr. Ragin, because I remember

19          there were a couple of incidents that he was

20          involved in and there were a few witnesses that

21          had information about that.

22              But there's no question that the majority

23          of the evidence related to Tracy Howard and

24          David Howard.

25    Q.    During the course of this trial, you testified

```
 1        that you specifically recall one instance during

 2        the multi-week trial where Mr. Mackey was

 3        sleeping?

 4   A.   That's correct.

 5   Q.   And perhaps a second?

 6   A.   I believe there's a second based on what I said.

 7            I know what I remember saying that to

 8        Mr. Adolf.

 9   Q.   But you don't recall which of the witnesses was

10        testifying at the time or if there was a witness

11        testifying at the time?

12   A.   No.

13   Q.   You didn't bring this incident to the court's

14        attention when you observed it, did you?

15   A.   No, I didn't.

16   Q.   Did you recall specifically confronting

17        Mr. Mackey about your observation?

18   A.   I considered it.

19            But I don't recall it ever being a problem

20        after that occasion.

21            I just mentioned.  I don't recall him being

22        asleep any time after that.

23            We were all pretty tired.  To be honest,

24        perhaps I should have but I didn't.

25                MR. MILLER:  No further questions.
```

```
 1                    THE COURT:  Any redirect?

 2                    MR. PRUDEN:  Very briefly.

 3    REDIRECT EXAMINATION

 4    BY MR. PRUDEN:

 5    Q.   Were there conspiracy charges in this trial, was

 6         that part of the case?

 7    A.   Yes.

 8    Q.   All of these defendants were charged in the

 9         conspiracy?

10    A.   Yes.

11                    MR. PRUDEN:  No further questions,

12              your Honor.

13              THE COURT:  Mr. Culler, any ballpark

14              estimate as to when you saw that in

15              the course of the trial?  Early on in

16              the trial?  Middle?  Late?

17              THE WITNESS:  It was not early on,

18              your Honor.

19              I believe it was after we lost that

20              one juror who was in the wreck, and we

21              had to replace a juror with an alternate.

22              I recall it being after that, for

23              some reason.  But I know it was when

24              there had been a number of witnesses

25              that had testified, and it was the
```

government focusing on my client.

And I really, other than that one segment, I was focussed on the witnesses at that time because they were talking about my client mostly. And so I didn't pay any attention to Mr. Mackey after seeing that.

And I know that he was -- he made objections and he was awake after that. So I don't have any other recollection of him being asleep.

THE COURT: Thank you. You may step down. Thanks.

(The witness is excused.)

MR. PRUDEN: At this time Mr. Ragin calls Pamela Vernon.

THEREUPON,

PAMELA VERNON,

having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PRUDEN:

Q. Good morning.
A. Good morning.
Q. Would you please state your name.

http://www.yeslaw.net/help

```
 1   A.   Pamela Vernon.

 2   Q.   Spell your name.

 3   A.   V-e-r-n-o-n.

 4   Q.   Ms. Vernon, you don't need to give your specific

 5        address, but where do you live?

 6   A.   Wadesboro, North Carolina.

 7   Q.   Ms. Vernon, in April of 2006, did you serve on a

 8        jury in the Western District of North Carolina?

 9   A.   Yes, I did.

10   Q.   Was the jury that you served on, was it for a

11        case known as the United States vs. David

12        Howard, Tracy Howard, and Nicolas Ragin, and

13        Mr. Solano Sanchez?

14   A.   Yes.

15   Q.   As a juror, were you present for the entire

16        trial?

17   A.   Yes, I was.

18   Q.   During that trial, do you recall where the

19        defendants were sitting?

20   A.   Yes.

21             They were sitting on the left-hand side,

22        and we were sitting on the right.

23   Q.   Do you remember how many defendants there were?

24   A.   Yes.  There were four and four lawyers.

25   Q.   Do you recall where defendant Nicolas Ragin was
```

```
 1         sitting during that trial?
 2    A.   Yes, I do.
 3    Q.   Where was he sitting?
 4    A.   You want me to go from the right or from the
 5         left?
 6    Q.   As you were looking from the jury box, where
 7         was he sitting in relation to you from where the
 8         jury box is?
 9    A.   Well, directly across from us.
10              There was an Hispanic defendant and his
11         lawyer, and then Nicolas Ragin and his lawyer,
12         Nick Mackey, I believe, and then Tracy Howard
13         and his lawyer, and David Howard and his lawyer.
14    Q.   From where you were sitting, how would you
15         describe your ability to see Mr. Mackey, Mr.
16         Ragin's lawyer?
17    A.   We were facing them.
18              We could see them clearly, and we were
19         facing them completely.
20    Q.   During the course of the trial, were you able to
21         see Mr. Mackey as the trial was going on?
22    A.   Yes.
23    Q.   During the trial, was there any other occasion
24         that you noticed Mr. Mackey sleeping?
25    A.   Yes.  Frequently.
```

```
 1   Q.   How many times did you notice that?

 2   A.   Well, I can't say exactly but almost every day

 3        I would say morning and evening.

 4   Q.   How long did this trial last?

 5   A.   Three weeks.

 6   Q.   And you said that you saw him sleeping every

 7        day.

 8             Do you recall what was happening when you

 9        saw him sleeping?

10             Do you recall what was happening in the --

11        was evidence being presented at the trial?

12   A.   Yes.

13             Evidence was being presented and questions

14        and witnesses were being questioned.

15   Q.   Would you describe how he appeared when you

16        noticed him sleeping?

17   A.   Totally dozed off.

18             He was propped with his hand on the table

19        and head down and did not appear to be alert at

20        all.

21   Q.   During those times that you noticed him

22        sleeping, do you recall how long he was sleeping

23        in terms of duration of time?

24   A.   Well, that was hard to say.

25             Most of the time until he was called upon
```

```
 1          to respond for Nicolas.

 2   Q.    Would you say that lasted for minutes?

 3   A.    At least, maybe 30 minutes at least.

 4   Q.    When you say you saw him sleeping every day,

 5          was it once a day or more than once a day?

 6   A.    Usually in the morning and in the afternoon.

 7   Q.    Are you aware if any other jurors noticed him

 8          sleeping?

 9   A.    Yes.

10          As a matter of fact, we commented on it

11          in the jury room.

12              MR. PRUDEN:  No further questions,

13           your Honor.

14              THE COURT:  Cross?

15              MR. MILLER:  Yes.

16   CROSS-EXAMINATION

17   BY MR. MILLER:

18   Q.    Ms. Vernon, my name is William Miller, and I

19          have a couple of questions for you.

20          These instances when you saw Mr. Mackey

21          with his head propped, you don't know for sure

22          whether or not he was listening at that time,

23          do you?

24   A.    No.

25          But Nicolas would have to punch him when he
```

```
 1        was called on or kind of roused him.  That was
 2        evident.
 3   Q.   When you say "Nicolas" are you referring to
 4        Mr. Ragin?
 5   A.   Yes.
 6   Q.   How many times would you say that you saw
 7        Mr. Mackey nudged by the defendant?
 8   A.   I can't tell you exactly but it was probably
 9        daily.
10   Q.   Do you remember there being dozens of witnesses
11        in that trial?
12   A.   Yes.
13   Q.   Do you recall specifically any witness who was
14        testifying at the time that you saw Mr. Mackey
15        with his head propped?
16   A.   No.  I couldn't tell you that.
17   Q.   Ms. Vernon, do you remember the judge giving you
18        instructions periodically throughout the course
19        of the trial?
20   A.   Yes.
21   Q.   Do you recall the judge telling you, the jurors,
22        would be the ones to find the facts in the case?
23   A.   Yes.
24   Q.   And he, the judge, would provide the
25        instructions on the law?
```

```
 1    A.    Yes.
 2    Q.    Do you remember Judge Conrad instructing you
 3          something to the effect about what the lawyers
 4          say is not evidence, and that it's your
 5          recollection of the facts?
 6                MR. PRUDEN:  I'll object to the
 7             relevance.
 8                THE COURT:  Overruled.
 9    Q.    Do you need me to repeat the question?
10    A.    Yes.  Repeat?
11    Q.    Do you recall Judge Conrad instructing you
12          something to the effect that it's your
13          recollection of the evidence that controls,
14          not what the lawyers say?
15    A.    Yes.
16    Q.    When you went back to deliberate were you able
17          to follow that instruction?
18    A.    Yes.
19    Q.    During your deliberations did you hold your
20          observation of Mr. Mackey resting his head
21          against his client, the defendant, did you hold
22          what you observed Mr. Mackey propping his head,
23          did you consider that in your verdict against
24          the defendant?
25    A.    We discussed it.  Yes.
```

1    Q.    But was your verdict against the defendant were

2          you able to follow the court's instructions?

3    A.    Yes, we were.

4    Q.    Was that verdict based on the facts and evidence

5          that you heard?

6    A.    Yes.

7                MR. MILLER:  No further questions.

8                THE COURT:  Any redirect?

9                MR. PRUDEN:  No.

10               THE COURT:  You may be excused.

11               (The witness is excused.)

12               MR. PRUDEN:  At this time the

13               defense will call Mr. Ragin to the

14               stand.

15   THEREUPON,

16           NICHOLAS RAGIN,

17   having first been duly sworn, was examined and

18   testified as follows:

19   DIRECT EXAMINATION

20   BY MR. PRUDEN,

21   Q.    Mr. Ragin, would you please state your name for

22         the record.

23   A.    Nicolas Jermaine Ragin.

24   Q.    Mr. Ragin, are you presently incarcerated?

25   A.    Yes, I am.

RAGIN - DIRECT                                          **Page 38**

```
 1   Q.   Where are you incarcerated?

 2   A.   Big Sandy USP, in Inez, Kentucky.

 3   Q.   How long have you been incarcerated there?

 4   A.   Four months.

 5   Q.   Mr. Ragin, in 2004, were you charged in a

 6        federal case in the United States vs. Tracy

 7        Howard and yourself, Nicolas Ragin, among other

 8        defendants?

 9   A.   Yes, I was.

10   Q.   Did you go to trial in that matter?

11   A.   Yes, I did.

12   Q.   Who was your attorney representing you at trial?

13   A.   Nick Mackey.

14   Q.   Was he appointed or retained?

15   A.   He was appointed.

16   Q.   Going back to that trial, where were you sitting

17        in relation to Mr. Mackey?

18   A.   With an extra table connected to that one,

19        I was seated six seats to your right.

20   Q.   In relation to Mr. Mackey, where were you

21        sitting?

22   A.   I was on his right-hand side.

23   Q.   So you were directly next to him?

24   A.   Yes.

25   Q.   Did you observe Mr. Mackey throughout periods
```

```
 1        of this trial?

 2   A.   Yes, I did.

 3   Q.   During the trial did you notice Mr. Mackey

 4        sleeping on any occasion?

 5   A.   Yes.

 6   Q.   Approximately how many times did you notice

 7        him sleeping?

 8   A.   More than ten, less than twenty.

 9   Q.   On those occasions do you recall how long you

10        witnessed him sleeping?

11   A.   Sometimes a period of 5 minutes, no more than

12        ten.

13   Q.   During those times can you describe what you saw

14        from Mr. Mackey or heard during those times?

15   A.   He would lean back in his chair.

16             His hand would be posted on the side of his

17        face with two fingers like this or he would be

18        dozing or sleeping and nonresponsive.

19             When questions were being asked and certain

20        witnesses were on the stand and things were

21        being said about me he wouldn't respond.

22   Q.   When you noticed that what did you do?

23   A.   Sometimes I would nudge him.

24   Q.   What would happened when you nudged him?

25   A.   He would jump up or raise up or rub his eyes and
```

```
 1         sit up in his chair like he was focused.
 2    Q.   What happened after that?
 3    A.   He just continued on with testimony and
 4         sometimes he would doze back off and other
 5         times he wouldn't.
 6    Q.   What was going on during the trial at the times
 7         you noticed him sleeping?
 8    A.   Sometimes witnesses were on the stand and they
 9         may not have been saying anything about me,
10         because he would ask me at the beginning what
11         was this witness going to say about you, and if
12         I said nothing, then I guess his attention was
13         diverted and he would just doze off.
14            Other times there were a few witnesses on
15         the stand and they were being questioned about
16         me and he was asleep.
17    Q.   How could you tell he was sleeping?
18    A.   Because I'm sitting right beside him, and I
19         could hear him snoring and his eyes were closed
20         and he wouldn't move.
21    Q.   Did Mr. Mackey ever say anything to you about
22         being tired?
23    A.   He asked at one point in the trial, if I'm not
24         mistaking, it was during the testimony of
25         Crystal Chumley, he had asked your Honor for a
```

Appeal: 14-7245    Doc: 38    Filed: 09/02/2015    Pg: 167 of 252

```
 1            bathroom break, and he had been sleep and he
 2            woke himself up.
 3                 And after he got the bathroom break, he
 4            said, I need to get myself together because I'm
 5            tired.
 6   Q.   Did Mr. Mackey ever have to ask you questions
 7        about what was going on in the trial?
 8   A.   Couple of times, yes.
 9   Q.   What type of questions did he ask?
10   A.   There was one occasion when there was a witness
11        on the stand he was dozing and he caught
12        himself, and the case agent had started his
13        testimony about me.
14                 And I had wrote it down on a piece of
15        paper.  When he woke up he said, what did I
16        miss.  And I slid it to him.  And this was the
17        same testimony that he had misquoted later on
18        during cross examination.
19   Q.   Do you recall any of the witnesses who were
20        on the stand during times that you noticed
21        Mr. Mackey sleeping?
22   A.   Yes, I do.
23   Q.   Can you name some of those witnesses or any of
24        the ones you can remember?
25   A.   We had an Officer White, Officer Decker.
```

```
 1              We had a lab technician that was testifying
 2         about the accuracy and the chemicals that were
 3         in the drugs that they had.
 4              We had an apartment manager for Hanover
 5         Landing on the stand.  Elizabeth White, she was
 6         a witness for the government.
 7              And the people that were on the stand at
 8         the time saying stuff about me:  Crystal
 9         Chumley, Keisha Burris, Eugene Lewis, and
10         Katherine Wilkes.
11    Q.   Did you have an opportunity to review the trial
12         transcripts in this case?
13    A.   Yes, I did, more than once.
14    Q.   Going through those trial transcripts, were you
15         able to identify showing testimony where you
16         recall Mr. Mackey sleeping?
17    A.   Yes.
18    Q.   Did you have an opportunity to look at those
19         particular pages?
20    A.   Yes, I did.
21              MR. PRUDEN:  Your Honor, I have
22              several pages, if I may approach the
23              witness?
24              THE COURT:  You may.
25    Q.   I have what has been marked as Defendant's
```

```
 1          Exhibits 1A through 1T.

 2              Mr. Ragin, would you just quickly look at

 3          those.

 4   A.     I already did.

 5   Q.     Do you know what those items are?

 6   A.     Yes.

 7   Q.     What are they?

 8   A.     Transcripts that I initialed.

 9   Q.     Why did you initial those transcript pages?

10   A.     Because those were the times that I looked over

11          and noticed Mr. Mackey dozing.

12              And I don't know how long he had been

13          sleeping before I noticed him, only after.

14   Q.     How were you able to identify those pages?

15   A.     I've been going over them for the last 4 years.

16   Q.     Would you just go through and tell the court who

17          was testifying on those pages that you marked?

18   A.     Crystal Chumley, Katherine Wilkes.

19              Exhibit A is Crystal Chumley's testimony;

20          1D is Katherine Wilkes' testimony; 1F is also

21          Katherine's Wilkes' testimony; 1G is Katherine

22          Wilkes' testimony; and 1H is Katherine Wilkes'

23          testimony; 1I, 1J is all Katherine Wilkes'

24          testimony.

25              1K is Eugene Williams testimony as well as
```

```
 1        1L, 1M, 1N, 1O, 1P.
 2            Keisha Burris' testimony starts at 1Q, 1R,
 3        1S would also be Keisha Burris' testimony.  And
 4        a page from Tadeo's direct is 1T.
 5   Q.   Mr. Ragin, what was going on during that --
 6        strike that.
 7            Was that the government's evidence being
 8        presented?
 9   A.   Yes.  It was against me.
10   Q.   Were you being discussed in that testimony?
11   A.   Yes, I was.
12   Q.   Can you just briefly summarize what the
13        testimony was with those witnesses?
14   A.   Basically all of them were testifying in regards
15        to my involvement in drug activity, possession
16        of guns and things of that nature.
17   Q.   Now, other than the transcript pages that were
18        handed up to you, were there other occasions
19        where Mr. Mackey was sleeping?
20   A.   Yes, there were.
21   Q.   Some of those you listed earlier?
22   A.   Yes.
23   Q.   In addition to those pages, about how many
24        witnesses were testifying when you noticed
25        Mr. Mackey sleeping?
```

1   A.   There were a handful.

2        I just don't remember the names of all of

3        them, mainly because they were not of importance

4        to me because nobody said anything in relation

5        to me.

6             MR. PRUDEN:  Your Honor, at this

7             time we would just move to introduce

8             into evidence Defendant's Exhibits 1A

9             through 1T.

10            And no further questions.

11            THE COURT:  Any cross?

12            MR. MILLER:  Yes.

13  CROSS-EXAMINATION

14  BY MR. MILLER:

15  Q.   Mr. Ragin, the trial we've been talking about

16       was 8 years ago, isn't that right?

17  A.   Yes, sir.

18  Q.   In April of 2006?

19  A.   Yes.  That's right.

20  Q.   You were one of four defendants?

21  A.   Yes.

22  Q.   The trial lasted for several weeks?

23  A.   Yes.

24  Q.   We talked about dozens of witnesses in that

25       trial?

```
 1   A.   Yes.

 2   Q.   At the end of that trial you were found guilty

 3        of two counts?

 4   A.   Yes.

 5   Q.   Some of your codefendants were found guilty of

 6        additional counts that you weren't charged in;

 7        do you remember that?

 8   A.   Yes, I do.

 9   Q.   Now, over the course of this trial and since

10        then, you've written several letters to the

11        court; do you recall that?

12   A.   Yes, I do.

13   Q.   One of those letters you wrote two months after

14        your trial; do you remember that letter?

15   A.   That's correct.

16   Q.   And that was in June of 2006; is that correct?

17   A.   That's correct.

18   Q.   In that letter you described several complaints

19        that you had against your attorney Mr. Mackey;

20        do you remember that?

21   A.   Yes, I do.

22   Q.   One of the complaints that you mentioned was

23        Mr. Mackey sleeping; do you remember that?

24   A.   Yes.

25   Q.   You knew that since you were sending this letter
```

```
 1          to the court that it was important to be

 2          accurate; do you remember that?

 3   A.     At the time no.

 4   Q.     You were not trying to be accurate in the

 5          letter?

 6   A.     I just wanted him to know he was sleeping.

 7   Q.     Do you remember saying in that letter something

 8          to the effect of Mr. Mackey even had the

 9          audacity to fall asleep twice during the trial?

10   A.     Yes, I do.

11              MR. MILLER:  I'm going to mark this

12          as Government's Exhibit 1.

13              THE COURT:  Mr. Ragin, I think

14          that's going to show up on your screen.

15          And you can tilt it to see it.

16   Q.     Mr. Ragin, is this the letter we were discussing

17          here?

18   A.     Yes, it is.

19   Q.     This is in your handwriting?

20   A.     Yes, it is.

21   Q.     It's dated June 25, 2006?

22   A.     That's correct.

23   Q.     Is this your signature here at the end of the

24          letter?

25   A.     Yes, it is.
```

```
 1    Q.    Is this the letter that you sent to the court

 2          two months after your trial; is that correct?

 3    A.    That's correct.

 4    Q.    Mr. Ragin, this proceeding that we're here for

 5          today, that's a result of a motion that you

 6          filed after you were convicted; is that correct?

 7    A.    That's correct.

 8    Q.    That's what we call a 2255 motion; do you recall

 9          that?

10    A.    Yes, I do.

11    Q.    You understand that in that motion you are

12          attacking your conviction?

13    A.    That's correct.

14    Q.    That's a motion that you also are submitting to

15          the court, correct?

16    A.    Correct.

17    Q.    In that motion, you sign it at the end, right?

18    A.    Yes.

19    Q.    And that's signed under the penalty of perjury?

20    A.    Yes.

21    Q.    And that means that you're under oath; is that

22          your understanding?

23    A.    Yes, it is.

24    Q.    Just like you're under oath today?

25    A.    Yes.
```

1    Q.    In your 2255 motion, you raise several different

2          claims challenging your conviction; do you

3          recall that?

4    A.    Yes, I do.

5    Q.    It's important to be thorough in that motion?

6    A.    Yes.

7    Q.    Included within the claims, you listed

8          approximately ten claims of ineffective

9          assistance from counsel; do you remember that?

10   A.    Yes.

11   Q.    One of those claims related to Mr. Mackey

12         sleeping; do you remember that one?

13   A.    Yes.

14   Q.    In that particular claim, do you recall

15         allegedly that counsel fell asleep during trial,

16         and that when asked by the trial judge if he had

17         any cross-examination of a witness, the judge

18         had to ask him twice, and you had to nudge him

19         to wake him up?

20   A.    Yes.

21   Q.    I'm going to show you now what I'm marking as

22         Government's Exhibit 2.

23             Do you recognize this as the first page of

24         that 2255 motion?

25   A.    Yes.

```
 1   Q.   Is this your signature here on this page?

 2   A.   Yes.

 3   Q.   You filed this particular motion in October of

 4        2010; is that right?

 5   A.   That's right.

 6   Q.   I'm going to show you now page 3 of that motion.

 7             This paragraph G, is that the paragraph

 8        that you were discussing where you made the

 9        allegations about Mr. Mackey sleeping?

10   A.   Yes.

11   Q.   Is there any mention in there of Crystal

12        Chumley?

13   A.   No, there's not.

14   Q.   Is there any mention in there of Kathy Wilkes?

15   A.   No, there's not.

16   Q.   Any mention of Eugene Lewis?

17   A.   No, there's not.

18   Q.   What about Keisha Burris?

19   A.   No, there's not.

20   Q.   What about Special Agent Tadeo?

21   A.   No, there is not.

22   Q.   A couple of months after you filed that motion,

23        do you remember submitting an affidavit to the

24        court?

25   A.   Yes, I do.
```

1   Q.   That affidavit was to support your motion?

2   A.   Yes.

3   Q.   That affidavit you signed that under penalty of

4        perjury?

5   A.   Yes.

6   Q.   That affidavit that you filed to support your

7        motion contained a number of allegations, right?

8   A.   Yes.

9   Q.   In fact to contain about eight allegations; is

10       that right?

11  A.   I can't recall exactly how many but I know it

12       was a few.

13  Q.   One of those allegations related to Mr. Mackey

14       sleeping during trial; is that right?

15  A.   Yes.

16  Q.   You filed this affidavit to support your motion

17       to vacate your conviction in January of 2011;

18       does that sound about right?

19  A.   I filed a lot.

20  Q.   But do you remember a specific affidavit that

21       you filed shortly after your motion to vacate to

22       support that motion?

23  A.   I filed a couple.

24  Q.   I'll show you this one in particular, and I'm

25       going to mark it as Government's Exhibit 3.

```
 1                    THE COURT:  There's two 2255?

 2                    MR. MILLER:  Yes, your Honor.

 3    Q.   This is Government's Exhibit 3, do you recognize

 4         your handwriting on this affidavit?

 5    A.   Yes.

 6    Q.   Do you see here where it says, filed in

 7         January of 2011?

 8    A.   Yes.

 9    Q.   Would that have been approximately 3 months

10         after the 2255 that we just looked at?

11    A.   Yes.

12    Q.   And here on the last page is this your

13         signature, Mr. Ragin?

14    A.   Yes.

15    Q.   Do you agree that you signed this under penalty

16         of perjury?

17    A.   Yes.

18    Q.   And this affidavit, as we discussed, contained

19         eight allegations; do you recall that now?

20    A.   Yes.

21    Q.   Here is this allegation about Mr. Mackey

22         sleeping at trial, and I'm going to read it,

23         and make sure that I read it correctly, please.

24              "Finally counsel feel asleep twice during

25         trial, which more than shows his lack of
```

1        interest and dedication to my case."

2            Did I read that correctly?

3   A.   Yes, you did.

4   Q.   There is no mention of any particular witness in

5        this affidavit?

6   A.   No, there is not.

7   Q.   It says that Mr. Mackey feel asleep twice?

8   A.   Yes.

9   Q.   It does not say more than ten or less than

10       twenty?

11  A.   No, it doesn't.

12           MR. MILLER:  May I have just one

13       moment, your Honor?

14           THE COURT:  You may.

15           MR. MILLER:  No further questions,

16       your Honor.

17           THE COURT:  Any redirect?

18           MR. PRUDEN:  Yes, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. PRUDEN:

21  Q.   Mr. Ragin, when you filed those motions and

22       affidavits that were shown as exhibits, did

23       you have assistance of counsel then?

24  A.   No, I didn't.

25  Q.   Did anybody go over with you at that time the

```
 1        trial transcript to determine when Mr. Mackey
 2        was sleeping?
 3   A.   No.
 4             Actually, I didn't really have access when
 5        I filed my 2255, because I was in a special
 6        management program.
 7             And due to fire hazard restrictions, they
 8        wouldn't let me have that paperwork.
 9   Q.   Did anybody ask you specific questions about
10        when Mr. Mackey was sleeping at that time?
11   A.   No, they didn't.
12             MR. PRUDEN:  No further questions,
13         your Honor.
14             MR. MILLER:  Nothing further from
15         the government, your Honor.
16             MR. PRUDEN:  That's it for this
17         witness.  We have no further evidence.
18         (The witness left the stand.)
19             THE COURT:  Any evidence from the
20         government?
21             MR. MILLER:  Yes.  The government
22         calls Special Agent Tadeo.
23   THEREUPON,
24             TERRELL A. TADEO,
25   having first been duly sworn, was examined and
```

```
 1   testified as follows:

 2   DIRECT EXAMINATION

 3   BY MR. PRUDEN:

 4   Q.   State and spell your name for the court.

 5   A.   Terrell A. Tadeo, T-a-d-e-o.

 6   Q.   Special Agent Tadeo, how are you employed?

 7   A.   I'm an agent with ATF.

 8   Q.   How long have you been employed by ATF?

 9   A.   Approximately 22 years.

10   Q.   Agent Tadeo, were you involved in the trial of

11        the defendant Nicolas Ragin in 2006?

12   A.   Yes.

13   Q.   How were you involved in that trial?

14   A.   I was the case agent for that trial.

15   Q.   What does it mean to be the case agent?

16   A.   Being the case agent means you initiate the

17        investigation, you run all course of the

18        investigation along with your partners, at that

19        time were detectives from Charlotte-Mecklenburg

20        Police Department.

21            And then during the trial part of the case

22        you prepare the case with the prosecutor for

23        trial.

24   Q.   As the case agent, were you present for the

25        trial in April of 2006?
```

```
 1   A.   I was.

 2   Q.   Do you recall how long that trial lasted?

 3   A.   It was approximately 3 weeks long.

 4   Q.   Where were you seated during that trial?

 5   A.   Beside the prosecutor.

 6             It was Ms. Marston and Mr. Randall, and

 7        I was seated in the next chair, that chair right

 8        there.

 9   Q.   Was the trial actually conducted in this

10        courtroom?

11   A.   It was.

12   Q.   Do you recall how the defendants and their

13        counsel were arranged?

14   A.   They were in an L-shaped, that table and then

15        there was one more table attached coming up with

16        the leg of the table coming towards the judge.

17   Q.   Just to be clear, you have a counsel table as it

18        appears now that faces the judge, correct?

19   A.   Correct.

20   Q.   And there was a second table in a L-shape that

21        faced the well and the jury?

22   A.   Correct.

23   Q.   Do you recall where the defendant Nicolas Ragin

24        was seated?

25   A.   Not positive.  There were four defendants.
```

```
 1                I know that the defendant was seated on
 2         that side of the L, beside Oscar Sanchez.
 3   Q.    When you say "that side of the L," is that the L
 4         that faces the jury box?
 5   A.    Yes.
 6                I can't remember if Mr. Ragin was closest
 7         to this table here, closest to the back end of
 8         the courtroom or up where the judge is.
 9                I think he was in the middle of it, more to
10         the back of the courtroom.
11   Q.    Do you recall the defense counsel who
12         represented Mr. Ragin during that trial?
13   A.    Mr. Nick Mackey.
14   Q.    Were you able to see Mr. Mackey from your seat
15         at the government's table?
16   A.    Yes.
17   Q.    There's been an allegation in this case of Mr.
18         Mackey sleeping.  Do you recall any incidents
19         related to that?
20   A.    I do remember one incident where I recall him
21         nodding off, and there may have been one
22         occasion for a total of two occasions from
23         my memory.
24   Q.    Approximately how long from the one to two
25         instances that you recall?
```

TADEO - DIRECT                                    **Page 58**

```
 1   A.   I don't recall exactly how long he nodded off.

 2            It wasn't long.  It was, to my memory,

 3        briefly.  But I do recall him nodding off.

 4   Q.   We've been saying "nodding off," would you

 5        describe for the court how Mr. Mackey appeared?

 6   A.   It was kind of eyes closed, head dropping.

 7            He was kind of struggling to stay awake.

 8        But, at no time did I see him just absolutely

 9        outright sleeping.

10   Q.   Do you remember what day of the trial those one

11        or two instances took place?

12   A.   I don't remember what day.

13   Q.   Do you recall if any witness was testifying at

14        the time?

15   A.   I do not recall exactly which witness that would

16        have been testifying at the time I saw that

17        occurring.

18   Q.   Do you recall approximately how many witnesses

19        testified in that trial?

20   A.   It was over 40, 50.

21            There were a lot of witnesses.

22   Q.   Special Agent Tadeo, did you also testify during

23        the trial in April of 2006?

24   A.   I did.

25   Q.   What were the main topics did you testify about?
```

```
 1   A.   I had arrested the defendant, and he had given

 2        me a fairly lengthy confession.

 3   Q.   When you say "the defendant" you're referring to

 4        Mr. Ragin?

 5   A.   That's correct.

 6   Q.   From the witness stand, were you able to see the

 7        defendant and Mr. Mackey?

 8   A.   Yes.

 9   Q.   And I know it's been a while, but do you have

10        any specific recollections of what you saw

11        during that time?

12   A.   I can recall him preparing to cross me as I was

13        going through direct, and then I recall his

14        cross of me rather clearly.

15   Q.   It's been a while, but do you remember seeing

16        him at any time while you were testifying do you

17        recall at any time Mr. Mackey appearing to be

18        asleep?

19   A.   Not when I was on the witness stand.

20            He appeared to be alert and preparing to

21        cross me.

22   Q.   Special Agent Tadeo, how many times would you

23        guess you've testified in federal court?

24   A.   Hundreds of times.

25   Q.   If you remember, how would you characterize
```

1       Mr. Mackey's cross-examination in the Ragin's

2       trial?

3   A.  He was aggressive, fairly typical of a

4       cross-examination.  I remember there were four

5       defendants.

6           So the Bruton issue kept coming up, and I

7       remember he was aggressive to the point having

8       to be admonishing by the court to be careful

9       that he didn't get into the Bruton issue.

10          And I recall a couple of times that he

11      tried to rattle my feathers a bit, as

12      cross-examiners do.  And it was a fairly

13      thorough cross-examination that I recall him

14      doing an adequate job with.

15              MR. MILLER:  No further questions.

16              THE COURT:  Cross?

17              MR. PRUDEN:  Thank you, your Honor.

18  CROSS-EXAMINATION

19  BY MR. PRUDEN:

20  Q.  Good afternoon, Special Agent Tadeo.

21  A.  Good afternoon.

22  Q.  Special Agent Tadeo, you mentioned that you were

23      sitting at the government's table; is that

24      correct?

25  A.  Yes.

```
 1   Q.   And the defendants were to the right of that

 2        table?

 3   A.   Yes.

 4   Q.   Were you on the far left of that table?

 5   A.   Yes.

 6             It would have been Ms.  Marston, Mr.

 7        Randall and then myself.

 8   Q.   So Ms. Marston and Mr. Randall were sitting

 9        between you and the defendants?

10   A.   Yes.

11             Well, between that table they were between

12        me and that side I can see clearly.

13   Q.   As a case agent on the trial, you were paying

14        attention to the evidence that was being

15        presented?

16   A.   Yes.

17   Q.   You were engaging in some conversations with

18        either Ms. Marston or Mr. Randall, is that

19        correct, during the trial?

20   A.   Most of the time I listen to the witness.

21             Usually during trials I listen to witnesses

22        and pay attention to what witnesses are saying,

23        and there are some conversation with the

24        prosecutor as well.

25   Q.   The witnesses who testified would have been
```

```
 1        straight ahead of you when you sat at the

 2        government's table?

 3   A.   That's correct.

 4   Q.   Now, you mentioned Mr. Mackey's

 5        cross-examination of you earlier.

 6            Do you recall an occasion where he

 7        mischaracterized the testimony you gave

 8        on direct examination?

 9   A.   I don't recall that incident specifically.

10            Can you elaborate a little bit?

11   Q.   Do you recall him referring to your testimony

12        asking you about a reference Mr. Ragin made to

13        Tracy Howard, when in fact you did not mention

14        Tracy Howard during your testimony?

15   A.   I do recall some instance like that, but I don't

16        remember the specifics of it.

17            MR. PRUDEN:  No further questions,

18         your Honor.

19            THE COURT:  Any redirect?

20            MR. MILLER:  No, your Honor.

21            THE COURT:  You may step down.

22            (The witness left the stand.)

23            MR. MILLER:  Your Honor, that's all

24         of the government's evidence at this

25         time.
```

```
 1      I have an update on the subpoena

 2    issue.  And all I can do is apologize

 3    to the court on this front.  A subpoena

 4    was issued from our office in Asheville.

 5    My understanding now is that subpoena

 6    was unsuccessfully served on the

 7    attempt that the marshals made.

 8      I apologize to the court.  I should

 9    have followed up with the marshals to

10    obtain the returned receipt.

11      All I can suggest at this point is

12    that we either move the court for a

13    continuance or the government is

14    prepared to argue based on the

15    evidence as it stands now as well.

16      THE COURT:  Marshals, can you give

17    me any other insight to the service of

18    that subpoena?

19      THE MARSHAL:  No, sir.  It was

20    issued out.  No service attempt was

21    made that we know of.

22      THE COURT:  What I'm going to do is

23    hold this open.  I'm going to give you

24    2 weeks to effect service on that

25    subpoena.
```

1    And if service is executed within

2  that 2-week period of time, I'll

3  reschedule for you to call that

4  witness, and we'll go from there.

5    But does either side believe that in

6  light of the evidence, any further

7  briefing is necessary?

8    MR. PRUDEN:  Your Honor, yes.

9    I was going to propose that, your

10 Honor.  I don't know if your Honor

11 would want to wait until Mr. Mackey

12 were to testify for some further

13 briefing.

14   But I do if the court would like it

15 now or if the court would --

16   THE COURT:  What I would be inclined

17 to do is set a hearing date maybe

18 sometime in June, June 2.

19   It's the first Monday of the

20 criminal term.

21   MR. MILLER:  It's no problem for the

22 government.

23   THE COURT:  That's several weeks

24 away.  We'll be here for calendar

25 call.

```
 1     So what I'll do is continue this
 2  hearing to the morning of June 2.
 3  We have calendar call at 9:30, and
 4  we'll take this up after calendar call.
 5     If your witness is served by then,
 6  we'll hear from them, and if not I'll
 7  hear from you all that morning.
 8     MR. MILLER:  Just one housekeeping
 9  matter, I think the government's
10  exhibits were properly authenticated.
11  I don't know if I moved them into
12  evidence.
13     THE COURT:  Any objection?
14     MR. PRUDEN:  No objection.
15     THE COURT:  Let me make sure that I
16  have a copy from each side.
17     MR. PRUDEN:  There are exhibits that
18  I introduced.
19     THE COURT:  Suzanne, make sure that
20  you have everything that's been
21  tendered so far.
22     Before you lawyers leave, get
23  together with Suzanne and make sure
24  you've got what you admitted into evidence.
25     Anything further from either side at
```

1  this time?

2    MR. PRUDEN:  The only question with

3  regard to briefing, would you like us

4  to brief prior to the hearing or

5  should we wait to see what happens?

6    THE COURT:  We're 3 weeks away.

7    Don't come in prepared to argue.

8  Just see if there's any evidence to be

9  taken on the 2nd, and then why don't

10  you submit simultaneous briefs 2 weeks

11  from the 2nd.  So the 16th.  All right?

12    MR. PRUDEN:  Thank you, your Honor.

13    THE COURT:  See you on the 2nd.

14    (Whereupon, at 12:02 p.m., the above

15  proceeding was adjourned to June 2, 2014.)

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2    State of North Carolina

3    Mecklenburg County

4

5         I, Velicia Marseille, Court Reporter and

6    Notary Public, the officer before whom the foregoing

7    proceeding was conducted, do hereby certify that the

8    witness(es) whose testimony appears in the foregoing

9    proceeding were duly sworn by me; that the testimony

10   of said witness(es) were taken by me to the best of

11   my ability and thereafter transcribed under my

12   supervision; and that the foregoing pages, inclusive,

13   constitute a true and accurate transcription of

14   the testimony of the witness(es).

15        I do further certify that I am neither

16   counsel for, related to, nor employed by any of

17   the parties to this action in which this proceeding

18   was conducted, and further, that I am not a relative

19   or employee of any attorney or counsel employed by

20   the parties thereof, nor financially or otherwise

21   interested in the outcome of the action.

22        This is the 23rd day of September, 2014.

23                    _____

                      Velicia Marseille
24                    Notary No. 200810800101

25                    My Commission Expires:  4/15/2018
```

Index: 1..admitted

**1**

**1** 17:8
  47:12

**12:02** 66:14

**16th** 66:11

**1A** 43:1
  45:8

**1D** 43:20

**1F** 43:20

**1G** 43:21

**1H** 43:22

**1I** 43:23

**1J** 43:23

**1K** 43:25

**1L** 44:1

**1M** 44:1

**1N** 44:1

**1O** 44:1

**1P** 44:1

**1Q** 44:2

**1R** 44:2

**1S** 44:3

**1T** 43:1
  44:4 45:9

**2**

**2** 17:10
  18:7 49:22
  63:24

64:18 65:2
66:10,15

**2-week** 64:2

**2004** 38:5

**2006** 7:23
  8:5 18:6
  31:7 45:18
  46:16
  47:21
  55:11,25
  58:23

**2010** 50:4

**2011** 51:17
  52:7

**2014** 66:15

**22** 55:9

**2255** 48:8
  49:1,24
  52:1,10
  54:5

**25** 47:21

**2878** 17:5

**2879** 17:6

**2nd** 66:9,
  11,13

**3**

**3** 8:6 18:9,
  11 50:6
  51:25
  52:3,9
  56:3 66:6

**3-week** 18:23
  19:18

**30** 34:3

**4**

**4** 8:6 24:10
  43:15

**40** 18:25
  26:21
  58:20

**5**

**5** 24:8
  39:11

**50** 58:20

**8**

**8** 22:17
  24:22
  45:16

**8-and-a-half**
  7:22

**87** 22:9

**9**

**9** 7:22

**90** 22:12

**91** 22:12

**9:30** 65:3

**A**

**A-d-o-l-f**
  7:17

**ability**
  32:15

**absence** 6:18

**absolutely**
  27:1 58:8

**access** 54:4

**accuracy**
  42:2

**accurate**
  47:2,4

**activity**
  44:15

**acts** 19:4
  26:23

**addition**
  44:23

**additional**
  6:11 46:6

**address** 31:5

**addressing**
  20:18

**adequate**
  60:14

**adjourned**
  66:15

**admitted**
  65:24

**admonished**
 21:2

**admonishing**
 60:8

**Adolf**  7:9,
 11,17,18
 16:20
 17:19 18:4
 23:22
 24:18 25:9
 28:8

**Adolf's**
 14:11
 23:24

**affidavit**
 50:23
 51:1,3,6,
 16,20
 52:4,18
 53:5

**affidavits**
 53:22

**afternoon**
 34:6
 60:20,21

**agent**  19:25
 21:8 41:12
 50:20
 54:22
 55:6,7,10,
 14,15,16,
 24 59:22
 60:20,22
 61:13

**aggressive**

 60:3,7

**agree**  19:3,7
 26:15,18,
 20,24
 27:6,8,9,
 12 52:15

**agreed**  6:13

**ahead**  17:20
 62:1

**alert**  33:19
 59:20

**allegation**
 52:21
 57:17

**allegations**
 50:9 51:7,
 9,13 52:19

**allegedly**
 49:15

**alternate**
 29:21

**Amy**  4:21

**Andy**  9:10
 21:6,17,19
 22:2

**Andy's**  15:12

**apartment**
 42:4

**apologize**
 63:2,8

**apparent**
 12:24

**appeared**
 13:17
 19:11 25:4
 33:15 58:5
 59:20

**appearing**
 59:17

**appears**
 56:18

**appointed**
 38:14,15

**approach**
 17:16
 42:22

**approached**
 10:15

**approximately**
 18:10 39:6
 49:8 55:9
 56:3 57:24
 58:18

**April**  7:23
 8:5 18:6
 31:7 45:18
 55:25
 58:23

**argue**  63:14
 66:7

**arm**  25:1

**arms**  10:22
 24:24

**arranged**
 56:13

**arrested**
 59:1

**Asheville**
 63:4

**asleep**  4:6
 12:20
 13:24
 24:19
 28:22
 30:11
 40:16 47:9
 49:15
 52:24 53:7
 59:18

**assistance**
 49:9 53:23

**ATF**  55:7,8

**attached**
 56:15

**attacking**
 48:12

**attempt**
 63:7,20

**attempted**
 4:23

**attempting**
 6:1

**attempts**
 4:20

**attention**
 13:18 14:2
 28:14 30:6
 40:12
 61:14,22

**attorney**
22:4 38:12
46:19

**audacity**
47:9

**authenticated**
65:10

**awake** 30:9
58:7

**aware** 34:7

_____

B
_____

**back** 11:8
12:10
24:17
38:16
39:15 40:4
57:7,10

**ballpark**
29:13

**based** 13:3
14:11 19:1
20:13 28:6
37:4 63:14

**Basically**
44:14

**bathroom**
41:1,3

**begin** 4:15

**beginning**
40:10

**believes**
14:23

**bench** 9:20
20:7 25:15

**Big** 38:2

**bit** 16:6
60:11
62:10

**blurted**
15:24

**bought** 15:17

**box** 32:6,8
57:4

**break** 41:1,3

**breathing**
12:22,23
25:2

**briefing**
64:7,13
66:3

**briefly** 29:2
44:12 58:3

**briefs** 66:10

**bring** 16:19
28:13

**brother**
22:20

**Brown** 24:3

**Bruton** 15:8,
23 19:24
20:2,5,15
60:6,9

**burden** 4:9

**Burris** 42:9

50:18

**Burris'**
44:2,3

_____

C
_____

**calendar**
64:24
65:3,4

**call** 4:12,
13 6:23
7:9 23:20
37:13 48:8
64:3,25
65:3,4

**called** 15:20
33:25 35:1

**calls** 21:17
30:16
54:22

**careful** 60:8

**Carolina**
7:19 31:6,
8

**case** 4:17
7:3 8:5
15:4 23:7
29:6 31:11
35:22 38:6
42:12 53:1
55:14,15,
16,21,22,
24 57:17
61:13

**cases** 4:10

**caught** 41:11

**chair** 11:9
23:20
24:17
39:15 40:1
56:7

**challenging**
49:2

**characterizati
on** 27:7

**characterize**
59:25

**charged**
18:20 29:8
38:5 46:6

**charges** 29:5

**Charlotte**
22:4,11,13

**Charlotte-
mecklenburg**
55:19

**chemicals**
42:2

**chin** 11:10
12:11

**Chumley**
40:25 42:9
43:18
50:12

**Chumley's**
43:19

**claim** 4:6
49:14

**claims**  49:2, 7,8,11

**clear**  56:17

**client**  13:20 15:11,12 21:2,6 27:5,10 30:1,5 36:21

**closed**  11:13 40:19 58:6

**closest**  9:8, 19 10:2 57:6,7

**codefendant** 15:19,25 20:22

**codefendants** 15:8,25 22:18 23:9 46:5

**Cole**  5:1,9, 16

**commented** 34:10

**committed** 19:4 26:23

**comparing** 27:18

**complaints** 46:18,22

**completely** 32:19

**conducted** 56:9

**conferences** 8:21

**confession** 21:4,9 59:2

**confronting** 28:16

**confused** 12:4

**connected** 38:18

**Conrad**  11:17 15:12 36:2,11

**considered** 28:18

**conspiracy** 29:5,9

**contact**  4:20

**contained** 51:7 52:18

**context** 20:25

**continuance** 63:13

**continue** 65:1

**continued** 40:3

**controls** 36:13

**conversation** 61:23

**conversations** 61:17

**convicted** 48:6

**conviction** 48:12 49:2 51:17

**copy**  65:16

**corner**  10:2

**correct** 20:1,5,7 21:9 26:6, 7,10,12, 13,16 28:4 46:15,16, 17 47:22 48:2,3,6, 7,13,15,16 56:18,19, 22 59:5 60:24 61:19 62:3

**correctly** 52:23 53:2

**counsel**  4:4, 10 9:11 10:18,24 49:9,15 52:24 53:23 56:13,17 57:11

**counsel's**

**23:20**

**counts** 18:16,20 26:11,15 46:3,6

**couple**  9:18 34:19 41:8 50:22 51:23 60:10

**court**  4:1,16 5:6,12,13, 21 6:6,13, 16,24 7:6, 16 12:14 14:13,17, 25 16:14, 24 17:7, 13,14,17, 25 20:17, 19,20 21:12,14 22:24 24:9 25:16 29:1,13 30:12 34:14 37:8,10 42:24 43:16 46:11 47:1,13 48:1,15 50:24 52:1 53:14,17 54:19 55:4 58:5 59:23

60:8,16
62:19,21
63:3,8,12,
16,22
64:14,15,
16,23
65:13,15,
19 66:6,13

**court's**
20:15
28:13 37:2

**courtroom**
23:15
56:10
57:8,10

**criminal**
22:7 64:20

**cross** 17:25
26:1 34:14
41:18
45:11
59:12,14,
21 60:16

**cross-
examination**
18:2 26:3
34:16
45:13
49:17
60:1,4,13,
18 62:5

**cross-
examiners**
60:12

**cross-
examining**

15:16

**crossed**
24:25

**Crystal**
40:25 42:8
43:18,19
50:11

**Culler** 9:10
10:14 11:2
21:17,19
22:2,3
26:5 29:13

**Culler's**
21:6

———————
     D
———————

**daily** 35:9

**date** 64:17

**dated** 47:21

**David** 8:2
9:12 22:20
23:23
27:24
31:11
32:13

**day** 19:17
33:2,7
34:4,5
58:10,12

**deal** 15:20,
22

**dealing**
13:20

**dealt** 20:24

**Decker** 41:25

**dedication**
53:1

**defendant**
7:5 8:11
16:12
18:19
26:14
31:25
32:10 35:7
36:21,24
37:1 55:11
56:23
59:1,3,7

**Defendant's**
42:25 45:8

**defendants**
8:14,17
9:3,14
10:19
18:14
19:5,
26:8,24
27:3 29:8
31:19,23
38:8 45:20
56:12,25
60:5 61:1,
9

**defender** 8:1

**Defenders**
7:19

**defense** 9:13
10:5,14,18

11:1 37:13
57:11

**definite**
20:11

**deliberate**
36:16

**deliberations**
36:19

**demonstrate**
24:24

**Department**
55:20

**describe** 9:2
10:9 23:18
33:15
39:13 58:5

**detail** 19:11

**detectives**
55:19

**determine**
6:10 54:1

**direct** 7:14
21:22
30:21
37:19 44:4
55:2 59:13
62:8

**directly**
10:1 13:21
32:9 38:23

**discussed**
36:25
44:10
52:18

**discussing**
47:16 50:8

**discussion**
20:1

**District**
31:8

**diverted**
40:13

**document**
10:20,21,
22 11:3,11
12:7 19:22

**doze** 40:4,
13

**dozed** 33:17

**dozens** 18:22
26:18
35:10
45:24

**dozing** 39:18
43:11

**dropping**
58:6

**drug** 44:15

**drugs** 42:3

**due** 54:7

**duly** 7:12
21:20
30:19
37:17
54:25

**duration**
33:23

———————
**E**
———————

**earlier** 13:3
44:21 62:5

**early** 29:15,
17

**effect** 24:20
36:3,12
47:8 63:24

**efforts** 5:4

**eight-and-a-
half-by-eleven**
10:21

**elaborate**
62:10

**elbow** 11:9

**Elizabeth**
42:5

**employed**
7:18,21,23
55:6,8

**end** 6:20
23:25 46:2
47:23
48:17 57:7

**engaging**
61:17

**entire** 8:19
23:6,8
31:15

**estimate**
29:14

**Eugene** 42:9

43:25
50:16

**evening** 33:3

**event** 14:12

**evidence**
6:11,18
13:3,6
14:2 16:23
17:4 27:23
33:11,13
36:4,13
37:4 44:7
45:8
54:17,19
61:14
62:24
63:15 64:6
65:12,24
66:8

**evident** 35:2

**evidentiary**
4:3 17:11

**examination**
7:14 21:22
29:3 30:21
37:19
41:18
53:19 55:2
62:8

**examined**
7:12 21:20
30:19
37:17
54:25

**exception**

7:4

**excused**
21:15
30:14
37:10,11

**executed**
64:1

**exhibit**
10:13,15,
19 16:11
17:8,10
19:20
43:19
47:12
49:22
51:25 52:3

**exhibits**
43:1 45:8
53:22
65:10,17

**extra** 38:18

**eyes** 11:13,
15 39:25
40:19 58:6

———————
**F**
———————

**face** 39:17

**faced** 56:21

**faces** 56:18
57:4

**facing** 11:14
32:17,19

**fact** 5:6,
14,22

15:17,21,
  24 19:7,
  20:21 27:2
  34:10 51:9
  62:13

**facts**  35:22
  36:5 37:4

**fairly**  59:2
  60:3,12

**fall**  47:9

**falling**
  13:24

**feathers**
  60:11

**federal**
  7:19,25
  38:6 59:23

**feel**  52:24
  53:7

**fell**  4:6
  49:15

**filed**  48:6
  50:3,22
  51:6,16,
  19,21,23
  52:6 53:21
  54:5

**filled**  5:10

**Finally**
  52:24

**find**  35:22

**fine**  12:10

**fingers**

**39:17**

**fire**  54:7

**fist**  11:11
  12:12

**floor**  6:21

**focus**  27:5,
  10

**focused**
  27:16 40:1

**focusing**
  30:1

**focussed**
  30:3

**follow**  36:17
  37:2

**form**  5:2,
  10,20

**formed**  9:7
  10:3

**forward**  6:17

**foul**  20:14

**found**  46:2,5

**free**  4:12

**Frequently**
  32:25

**Friday**  6:1

**front**  11:1,
  11,14,23
  63:3

—————
G
—————

**gasped**  13:1

**gave**  62:7

**gentleman**
  22:20,22
  24:3,5

**give**  31:4
  63:16,23

**giving**  35:17

**glad**  4:11

**Good**  21:24,
  25 30:23,
  24 60:20,
  21

**governing**
  4:10

**government**
  4:15 30:1
  42:6
  54:15,20,
  21 63:13
  64:22

**government's**
  5:4 13:6
  44:7 47:12
  49:22
  51:25 52:3
  57:15
  60:23
  62:2,24
  65:9

**guess**  9:6,9
  11:10 12:8

**40:12**
**59:23**

**guilty**  8:12
  46:2,5

**guns**  44:16

—————
H
—————

**hand**  33:18
  39:16

**handed**  44:18

**handful**  45:1

**handwriting**
  47:19 52:4

**Hanover**  42:4

**happen**  22:14

**happened**
  12:25 15:7
  39:24 40:2

**happening**
  33:8,10

**hard**  33:24

**hazard**  54:7

**head**  13:15
  24:23,25
  25:22
  33:19
  34:21
  35:15
  36:20,22
  58:6

**hear**  4:11
  12:15,22

40:19 65:6,7

heard 37:5 39:14

hearing 4:3 6:7,20 13:12 16:9 64:17 65:2 66:4

held 10:22 11:11 20:1

Hispanic 22:22 24:3 32:10

hoarse 22:5

hold 36:19, 21 63:23

honest 28:23

honor 4:14 5:25 6:15, 22 7:4 14:16,19 15:20 16:8 17:3,23 18:1 21:13 22:25 29:12,18 34:13 40:25 42:21 45:6 52:2 53:13,16, 18 54:13, 15 60:17 62:18,20,

23 64:8,10 66:12

housekeeping 65:8

Howard 8:2, 4,8,9,15 9:8,12 15:19 21:5 22:14,16, 18 23:21, 27:23,24 32:12,13 38:7 62:13,14

Hundreds 59:24

I

identify 42:15 43:14

immediately 23:21

implicated 15:25 20:22

implicating 15:9

importance 45:3

important 47:1 49:5

incarcerated 37:24

38:1,3

incident 19:10 28:13 57:20 62:9

incidents 27:19 57:18

inclined 64:16

Included 49:7

inconvenience 6:7

Incorporated 7:20

independent 13:14 25:11

individual 8:1

ineffective 4:5,9 49:8

Inez 38:2

information 27:21

initial 43:9

initialed 43:8

Initially 24:16

initiate 55:16

insight 63:17

instance 28:1 62:15

instances 34:20 57:25 58:11

instructing 36:2,11

instruction 36:17

instructions 35:18,25 37:2

interest 53:1

introduce 16:23 17:4 45:7

introduced 65:18

investigation 55:17,18

involved 26:8,19 27:20 55:10,13

involvement 44:15

involving 15:11

isle 9:9

**issue** 4:4
15:7,8,23
19:24
20:3,5,16,
23 60:6,9
63:2

**issued** 4:16
63:4,20

**issues** 13:21

**items** 43:5

---
**J**
---

**January**
51:17 52:7

**Jermaine**
37:23

**job** 60:14

**joint** 26:12

**judge** 11:17
12:20
15:12
16:11
25:15
35:17,21,
24 36:2,11
49:16,17
56:16,18
57:8

**jump** 39:25

**jumped**
11:21,22
12:2,25
13:4

**June** 46:16
47:21
64:18 65:2
66:15

**juror** 29:20,
21 31:15

**jurors** 34:7
35:21

**jury** 18:10
31:8,10
32:6,8
34:11
56:21 57:4

---
**K**
---

**Karen** 10:11

**Katherine**
42:10
43:18,20,
21,22,23

**Katherine's**
43:21

**Kathy** 50:14

**Keisha** 42:9
44:2,3
50:18

**Kentucky**
38:2

**kind** 35:1
58:6,7

**knew** 46:25

---
**L**
---

**L-shape**
56:20

**L-shaped**
56:14

**lab** 42:1

**lack** 52:25

**Landing** 42:5

**lasted** 34:2
45:22 56:2

**late** 6:1
29:16

**law** 22:6
35:25

**lawyer** 22:8,
10,13
32:11,13,
16

**lawyers**
31:24
36:3,14
65:22

**lead** 10:12
23:19

**lean** 39:15

**leaned** 11:2,
18

**leaning** 11:8
24:17

**leave** 65:22

**left** 11:9

32:5 54:18
61:4 62:22

**left-hand**
31:21

**leg** 56:16

**length** 10:23

**lengthy** 59:2

**letter**
46:14,18,
25 47:5,7,
16,24 48:1

**letters**
46:10,13

**Lewis** 42:9
50:16

**licking** 12:3

**light** 64:6

**Linda** 5:1

**lips** 12:3

**listed** 44:21
49:7

**listen**
61:20,21

**listening**
34:22

**litigation**
15:11,22

**live** 31:5

**living** 22:3

**long** 7:21
22:8 24:7
33:4,22

38:3 39:9 43:12 55:8 56:2,3 57:24 58:1,2

**looked** 11:2, 5 12:2,4,7 13:22 52:10

**lost** 29:19

**lot** 13:18 15:11,21, 22 51:19 58:21

**loudly** 11:20 13:1

---

**M**

---

**Mackey** 4:17, 19,23 5:3, 5,23 6:2, 12 9:1,21, 24 10:1,6 11:7,20,25 12:2,15 14:4,24 15:16,23 19:11,14 20:9,14,20 21:1 23:14 24:2,12,23 28:2,17 30:7 32:12,15, 21,24 34:20

35:7,14 36:20,22 38:13,17, 20,25 39:3,14 40:21 41:6,21 42:16 43:11 44:19,25 46:19,23 47:8 49:11 50:9 51:13 52:21 53:7 54:1,10 57:13,14, 18 58:5 59:7,17 64:11

**Mackey's** 20:2 27:9 60:1 62:4

**made** 15:9, 12,19 19:14 50:8 62:12 63:7,21

**main** 58:25

**majority** 27:22

**make** 52:23 65:15,19, 23

**management** 54:6

**manager** 42:4

**mark** 47:11 51:25

**marked** 17:9 42:25 43:17

**marking** 49:21

**marshal** 5:2, 11 63:19

**marshals** 5:22,25 63:7,9,16

**Marston** 10:11 12:5 19:21 61:6,8,18

**matter** 4:1 38:10 65:9

**means** 48:21 55:16

**memory** 15:6 20:13 57:23 58:2

**mention** 20:21 50:11,14, 16 53:4 62:13

**mentioned** 28:21 60:22 62:4

**microphone** 11:18

12:21

**middle** 29:16 57:9

**Miller** 4:14 5:8,15,24 7:2 14:10 18:1,3,4 21:11 26:2,4 28:25 34:15,17, 18 37:7 45:12,14 47:11 52:2 53:12,15 54:14,21 60:15 62:20,23 64:21 65:8

**minutes** 34:2,3 39:11

**mischaracterized** 14:5 62:7

**mischaracterizing** 14:18

**misquoted** 41:17

**mistaken** 8:7

**mistaking** 40:24

**moment** 53:13

**moments** 14:23

Monday   64:19

month   22:17

months   8:6
  38:4 46:13
  48:2 50:22
  52:9

morning   5:1
  21:24,25
  30:23,24
  33:3 34:6
  65:2,7

motion   48:5,
  8,11,14,17
  49:1,5,24
  50:3,6,22
  51:1,7,16,
  21,22

motions
  53:21

mouth   12:4

move   10:25
  11:12
  12:18
  40:20 45:7
  63:12

moved   11:4
  65:11

moving   11:19
  12:3 19:24

multi-week
  26:17 28:2

multiple
  18:16
  26:11

**N**

named   8:1
  26:14

names   9:19
  45:2

naming   15:9
  21:2

nature   19:20
  44:16

NICHOLAS
  37:16

Nick   9:1,16
  11:20,24,
  25 32:12
  57:13

Nicolas   4:2
  21:9
  31:12,25
  32:11
  34:1,25
  35:3 37:23
  38:7 55:11
  56:23

nodded   58:1

nodding
  57:21
  58:3,4

nonresponsive
  39:18

North   7:19
  31:6,8

notice   10:6
  12:23 33:1

39:3,6

noticed   13:9
  24:12
  32:24
  33:16,21
  34:7 39:22
  40:7 41:20
  43:11,13
  44:24

notified
  4:16

nudge   39:23
  49:18

nudged   35:7
  39:24

number   8:12
  10:17
  15:13
  29:24 51:7

**O**

oath   48:21,
  24

object   14:10
  36:6

objection
  17:2
  65:13,14

objections
  30:9

observation
  19:15
  28:17
  36:20

observe
  12:14
  38:25

observed
  28:14
  36:22

obtain   63:10

occasion
  10:7 13:9,
  11,13,16
  14:4 24:12
  25:18,21
  28:20
  32:23 39:4
  41:10
  57:22 62:6

occasions
  39:9 44:18
  57:22

occurred
  20:7

occurring
  58:17

October   50:3

office   4:21
  5:1 63:4

Officer
  41:25

ongoing   15:7
  20:23

open   11:13
  63:23

opportunity
  4:18 16:3

42:11,18

**order** 16:6
17:10
20:15,18

**ordered**
20:20

**Oscar** 8:10
57:2

**outright**
58:9

**Overruled**
36:8

——————

**P**

——————

**p.m.** 66:14

**pages** 16:4
17:5
42:19,22
43:9,14,
44:17,23

**Pamela**
30:16,18
31:1

**paper** 41:15

**paperwork**
54:8

**paragraph**
50:7

**paralegal**
4:25

**parallel**
9:6,15

**part** 7:25
16:24 29:6
55:21

**partners**
55:18

**passed** 24:6

**pay** 13:18
14:1 30:6
61:22

**paying** 61:13

**penalty**
48:19 51:3
52:15

**people** 10:17
42:7

**period** 39:11
64:2

**periodically**
35:18

**periods**
38:25

**perjury**
48:19 51:4
52:16

**Peter** 7:9,
11,17
24:18

**piece** 41:14

**pinpoint**
14:22

**place** 58:11

**pled** 8:12

**point** 11:16
12:8 13:25
16:13 17:3
40:23 60:7
63:11

**Police** 55:20

**portion**
14:16
20:10

**position**
12:11

**positive**
56:25

**possession**
44:15

**posted** 39:16

**practice**
22:6

**practiced**
22:10

**practicing**
22:13

**prepare**
55:22

**prepared**
4:22 5:2
63:14 66:7

**preparing**
59:12,20

**present**
8:19,21
23:6,8
31:15

55:24

**presented**
13:4,7
33:11,13
44:8 61:15

**presenting**
19:21

**presently**
37:24

**pretrial**
8:13

**pretty** 16:25
28:23

**Primarily**
22:7

**prior** 20:1
66:4

**problem**
28:19
64:21

**procedure**
6:14

**proceed** 6:6

**proceeding**
48:4 66:15

**program** 54:6

**properly**
65:10

**propose** 64:9

**propped**
33:18
34:21
35:15

**propping**
  36:22

**prosecutor**
  10:12
  55:22 56:5
  61:24

**provide**
  17:12
  35:24

**provided**
  5:20

**Pruden**  4:8
  6:4,14,15,
  21,22 7:8,
  14:15,19
  15:1,2
  16:8,22
  17:2,9,16,
  18,23
  21:13,16,
  23 25:25
  29:2,4,11
  30:15,22
  34:12 36:6
  37:9,12,20
  42:21 45:6
  53:18,20
  54:12,16
  55:3
  60:17,19
  62:17 64:8
  65:14,17
  66:2,12

**public**  7:25

**punch**  34:25

**purposes**
  16:9,15
  17:11

———————————
         Q
———————————

**question**
  24:16
  27:22 36:9
  66:2

**questioned**
  33:14
  40:15

**questioning**
  20:2,12

**questions**
  17:24
  21:11
  28:25
  29:11
  33:13
  34:12,19
  37:7 39:19
  41:6,9
  45:10
  53:15
  54:9,12
  60:15
  62:17

**quickly**  43:2

———————————
         R
———————————

**Ragin**  4:2
  8:9,25
  9:9,16,
  14:21,22

  21:16
  22:21 24:2
  27:9,16,18
  30:15
  31:12,25
  32:11 35:4
  37:13,16,
  21,23,24
  38:5,7
  43:2 44:5
  45:15
  47:13,16
  48:4 52:13
  53:21
  55:11
  56:23
  57:6,12
  59:4 62:12

**Ragin's**  4:6
  21:3,9
  23:12
  32:16 60:1

**raise**  39:25
  49:1

**ran**  20:14

**Randall**  56:6
  61:7,8,18

**rattle**  60:11

**Ray**  4:21

**reach**  4:23
  6:2

**read**  52:22,
  23 53:2

**realized**
  12:8,19

**reason**  25:9
  29:23

**recall**  8:4,
  24 14:4
  16:1 18:7,
  16,22
  19:10,13,
  17,20
  22:16
  23:2,12,
  15,24
  24:2,9,11,
  15 25:1,2,
  12,18
  27:17
  28:1,9,16,
  19,21
  29:22
  31:18,25
  33:8,10,22
  35:13,21
  36:11 39:9
  41:19
  42:16
  46:11 48:8
  49:3,14
  51:11
  52:19
  56:2,12,23
  57:11,18,
  20,25
  58:1,3,13,
  15,18
  59:12,13,
  17 60:10,
  13 62:6,9,
  11,15

receipt
  63:10

recently
  14:8

recognize
  49:23 52:3

recognized
  11:5

recollection
  11:17
  13:14
  14:11
  18:19 19:1
  20:12 21:4
  30:11
  36:5,13

recollections
  59:10

recommendation
  6:5

record  16:25
  18:13
  37:22

redirect
  21:12
  29:1,3
  37:8
  53:17,
  62:19

refer  17:7

reference
  62:12

referring
  11:24 59:3

62:11

reflected
  15:15

refresh  15:6

refreshed
  16:17

refreshing
  20:13

regard  66:3

regular  10:5

regularly
  25:2

related
  27:23
  49:11
  51:13
  57:19

relation
  9:23 32:7
  38:17,20
  45:4

relevance
  14:13,17
  36:7

remember
  9:25 10:13
  11:7 12:24
  13:11,12,
  23 15:14
  18:6 22:23
  24:21,22
  25:8,10,22
  27:18 28:7
  31:23

35:10,17
36:2 41:24
45:2 46:7,
14,20,23
47:2,7
49:9,12
50:23
51:20
57:6,20
58:10,12
59:15,25
60:4,7
62:16

remembered
  24:16

repeat  36:9,
  10

replace
  29:21

represent
  8:1 22:14

represented
  8:4,25
  22:16 23:3
  57:12

representing
  38:12

required
  6:12

reschedule
  64:3

respect  4:3,
  5 17:20

respond

12:17 34:1
39:21

resting
  11:10
  36:20

restrictions
  54:7

result  48:5

retained
  38:14

return  5:9,
  19

returned
  63:10

review  10:14
  15:3 42:11

reviewing
  12:9

Richard
  21:17,19
  23:3

right-hand
  38:22

room  12:5
  34:11

roused  35:1

rub  39:25

rulings
  15:13

run  55:17

**S**

**Sanchez** 9:18
 22:24 24:4
 31:13 57:2

**Sandy** 38:2

**sat** 11:12
 62:1

**screen** 47:14

**seat** 9:25
 10:1
 11:21,22,
 23 57:14

**seated** 22:20
 23:17,19,
 21,22,23
 38:19
 56:4,7,24
 57:1

**seats** 10:4
 38:19

**seconds** 11:3
 12:6

**sees** 16:11

**segment** 30:3

**selected**
 6:25

**selection**
 18:10

**self-
authenticated**
 17:1

**sending**

46:25

**sequestered**
 6:24

**sequestration**
 7:2

**serve** 5:3
 31:7

**served** 5:7,
 14,17,22
 31:10 63:6
 65:5

**service**
 5:11, 6:19
 63:17,20,
 24 64:1

**set** 23:15
 64:17

**shape** 9:7
 10:3

**shortly**
 51:21

**show** 4:9
 10:13 16:7
 47:14
 49:21 50:6
 51:24

**showed** 11:4
 14:8

**showing**
 42:15

**shown** 53:22

**shows** 52:25

**side** 31:21

38:22
 39:16
 57:2,3
 61:12 64:5
 65:16,25

**sidebar** 8:21
 15:14,20
 16:1,4
 20:1,4,7,
 15,17

**sidewalls**
 9:6

**sight** 13:22

**sign** 48:17

**signature**
 47:23 50:1
 52:13

**signed** 48:19
 51:3 52:15

**silent** 12:18

**simultaneous**
 66:10

**sir** 21:24
 26:20
 45:17
 63:19

**sit** 40:1

**sitting** 9:3,
 4,10,21,23
 11:8,19
 12:17
 31:19,21,
 22 32:1,3,
 7,14

38:16,21
 40:18
 60:23 61:8

**sleep** 41:1

**sleeping**
 10:7
 13:10,17
 14:24
 19:12
 24:13
 25:3,4,5,
 6,10,13,
 19,21 28:3
 32:24
 33:6,9,16,
 22 34:4,8
 39:4,7,10,
 18 40:7,17
 41:21
 42:16
 43:13
 44:19,25
 46:23 47:6
 49:12 50:9
 51:14
 52:22
 54:2,10
 57:18 58:9

**slid** 41:16

**slowly** 10:23

**small** 14:15

**snoring** 25:3
 40:19

**Solano** 8:10
 9:17 31:13

sort  10:20
  11:8,10,
  12,14,21
  12:2,4,25
  15:23

sound  18:25
  26:21
  51:18

sounds  19:2

speak  4:19
  16:20

speaker  13:2

speaking
  5:16

special
  19:25 21:8
  50:20
  54:5,22
  55:6 59:22
  60:20,22

specific
  13:11 31:4
  51:20 54:9
  59:10

specifically
  20:20
  25:24
  27:17
  28:1,16
  35:13 62:9

specifics
  62:16

spell  31:2
  55:4

spoke  4:25

spoken  5:24
  6:5

stand  37:14
  39:20
  40:8,15
  41:11,20
  42:5,7
  54:18
  59:6,19
  62:22

standing
  12:7 20:9

stands  63:15

started
  11:23
  12:13
  15:16
  41:12

starts  44:2

state  7:16
  22:1 30:25
  37:21 55:4

statements
  15:9,18

States  4:2
  18:5 31:11
  38:6

stay  58:7

step  30:12
  62:21

stood  25:24

straight

62:1

stretched
  26:6

strike  44:6

struggling
  58:7

stuff  11:16
  42:8

subject
  15:10

submit  66:10

submitting
  48:14
  50:23

subpoena
  4:17,22
  5:3 6:19
  63:1,3,5,
  18,25

success  4:24
  6:3

suggest
  63:11

summarize
  44:12

support
  51:1,6,16,
  22

supposed
  12:9

suppress
  15:18

Suzanne
  65:19,23

sworn  7:12
  21:20
  30:19
  37:17
  54:25

system  13:2

_____

T

T-a-d-e-o
  55:5

table  9:4,5,
  13,15
  10:5,25
  11:2 23:25
  24:1 38:18
  56:14,15,
  16,17,20
  57:7,15
  60:23
  61:2,4,11
  62:2

tables  9:7
  10:23

Tadeo  14:6
  15:16 21:9
  50:20
  54:22,24
  55:5,6,10
  59:22
  60:20,22

Tadeo's
  19:24,25
  44:4

**talked** 5:21
45:24

**talking**
20:17 30:5
45:15

**technician**
42:1

**telling**
35:21

**ten** 39:8,12
49:8 53:9

**tender** 5:12
17:3,14

**tendered**
65:21

**term** 64:20

**terms** 33:23

**Terrell**
54:24 55:5

**Terry** 14:6

**testified**
7:13 16:21
18:13
19:3,10
20:4 21:21
26:5,23
29:25
30:20
37:18 55:1
58:19
59:23
61:25

**testify**
58:22,25

64:12

**testifying**
28:10,11
35:14 42:1
43:17
44:14,24
58:13,
59:16

**testimony**
14:5,20
16:17
19:25
21:3,8
40:3,24
41:13,17
42:15
43:19,20,
21,22,23,
24,25
44:2,3,10,
13 62:7,
11,14

**thigh** 11:9

**thing** 24:24

**things** 39:20
44:16

**thinking**
24:21

**thought** 5:8,
18 25:6

**tilt** 47:15

**time** 4:13
6:9,10
12:16
13:4,24

16:15
19:14
21:16
23:10,16
25:7,10,23
28:10,11,
22 30:4,15
33:23,25
34:22
35:14
37:12 42:8
45:7 47:3
53:25
54:10
55:19
58:8,14,16
59:11,16,
17 61:20
62:25 64:2
66:1

**times** 33:1,
21 39:6,
13,14
40:5,6,14
41:8,20
43:10
59:22,24
60:10

**tired** 28:23
40:22 41:5

**today** 6:9
48:5,24

**topics** 58:25

**total** 57:22

**totally**
12:18

33:17

**Tracey** 15:19

**Tracy** 8:9
9:8 21:5
22:14
23:21
27:23
32:12 38:6
62:13,14

**transcript**
14:8,16
15:15
16:3,16,19
17:5,21
20:14 43:9
44:17 54:1

**transcripts**
15:4
42:12,14
43:8

**trial** 4:4,7
8:11,14,
19,22,24
9:3 10:6
13:19
14:1,23
15:3,8
16:10
18:6,8,14,
17,23
19:17,18
20:10,24
22:17
23:5,6,8,
13 24:7,11
25:12

26:5,9,12,
17 27:25
28:2 29:5,
15, 31:16,
18 32:1,
20,21,23
33:4,
35:11,19
38:10,12,
16 39:1,3
40:6,23
41:7
42:11,14
45:15,22,
25 46:2,9,
14 47:9
48:2
49:15,16
51:14
52:22,25
54:1
55:10,13,
14,21,23,
25 56:2,4,
9 57:12
58:10,19,
23 60:2
61:13,19

trials  61:21

trouble
  15:22

true  19:9

turning
  24:17

twenty  39:8
  53:10

type  10:22
  22:6 41:9

typical  60:3

typically
  16:9

_____

U

understand
  48:11

understanding
  5:15 48:22
  63:5

United  4:2
  18:5 31:11
  38:6

unsuccessfully
  63:6

update  63:1

USP  38:2

_____

V

V-e-r-n-o-n
  31:3

vacate
  51:17,21

verdict
  18:10
  36:23
  37:1,4

Vernon
  30:16,18
  31:1,4,7
  34:18

35:17

violation
  20:18
  21:1,7

voice  22:5

_____

W

Wadesboro
  31:6

wait  64:11
  66:5

waiting
  10:24
  12:17

wake  49:19

walked  10:23
  11:1,6

wanted  16:22
  47:6

week  14:9

weeks  18:7,
  9,11 24:8,
  10 26:6
  33:5 45:22
  56:3 63:24
  64:23
  66:6,10

Western  7:19
  31:8

White  41:25
  42:5

Wilkes  42:10
  43:18

50:14

Wilkes'
  43:20,21,
  22,23

William  18:4
  34:18

Williams
  43:25

windows  9:16

witnessed
  39:10

witnesses
  4:12 6:8,
  23 18:22,
  25 19:8
  26:18
  27:2,6,11,
  13,15,20
  28:9 29:24
  30:4 33:14
  35:10
  39:20
  40:8,14
  41:19,23
  44:13,
  45:24
  58:18,
  61:21,22,
  25

woke  12:20
  41:2,15

words  24:19

work  7:25

wreck  29:20

**written**
  46:10

**wrote**  41:14
  46:13

———————————
**Y**
———————————

**years**  7:22
  22:17
  24:22
  43:15
  45:16 55:9

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10CV488-RJC
(3:04CR271-RJC)

NICHOLAS RAGIN )
)
Petitioner, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
Respondent. )
_____ )

## GOVERNMENT'S REVISED NOTICE OF SUBPOENA

The United States of America gives notice, pursuant to Federal Rule of Civil

Procedure 45(a)(4), that a subpoena has been issued this date, (Exhibit 1), directing

Nikita V. Mackey to appear as a witness for the Government at the evidentiary

hearing scheduled herein on June 2, 2014, and to bring with him any notes taken

during the trial of *United States v. Nicholas Ragin* (3:04-cr-271).

RESPECTFULLY SUBMITTED, this the 15th day of May, 2014.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/William M. Miller
Assistant United States Attorney
NC Bar No. 36946
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
William.Miller@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing *Notice of Subpoena* has been served upon Petitioner by serving his attorney, Matthew G. Pruden, through electronic case filing.

This the 15th day of May, 2014.

s/William M. Miller
Assistant United States Attorney

2

AO 88 (Rev 12/13) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of North Carolina

| | |
|---|---|
| Nicholas Ragin | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.   3:10-CV-00488-RJC |
| United States of America | ) |
| _Defendant_ | ) |

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A CIVIL ACTION

To: Nikita V. Mackey, Mackey Law Offices, PLLC, 301 McCullough Dr., Fourth Floor, Charlotte, NC  28262
Business Telephone:  704-412-3030    Home Address:  11142 Hunters Trace, Charlotte, NC  28262-9210

_(Name of person to whom this subpoena is directed)_

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place set forth below to testify at a hearing or trial in this civil action.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | United States Courthouse 401 West Trade Street Charlotte, NC  28202 | Courtroom No.:  Courtroom 2 |
|---|---|---|
| | | Date and Time:  06/02/2014 9:15 am |

You must also bring with you the following documents, electronically stored information, or objects _(leave blank if not applicable)_:
Any notes taken during the trial of United States v. Nicholas Ragin, case number 3:04-CR-271-7

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 5/15/2014

CLERK OF COURT

OR

_____          _____
Signature of Clerk or Deputy Clerk                    Attorney's signature

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_  United States of America                    , who issues or requests this subpoena, are:

William M. Miller, Assistant United States Attorney, Suite 1650, Carillon Building, 227 West Trade Street, Charlotte, N.C. 28202, Telephone:  (704) 344-6222, E-mail:  William.Miller@usdoj.gov

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

Case 3:10-cv-00488-RJC   Document 40-1   Filed 05/15/14   Page 1 of 3

AO 88 (Rev. 12/13) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 2)

Civil Action No.  3:10-CV-00488-RJC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Case 3:10-cv-00488-RJC   Document 40-1   Filed 05/15/14   Page 2 of 3

AO 88 (Rev. 12/13) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 (1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
   (i) is a party or a party's officer; or
   (ii) is commanded to attend a trial and would not incur substantial expense.

 (2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 (1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 (2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 (3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   (i) fails to allow a reasonable time to comply;
   (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
   (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   (i) disclosing a trade secret or other confidential research, development, or commercial information; or

   (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 (1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 (2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   (i) expressly make the claim; and
   (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,          )   DOCKET NO. 3:10-CV-488
                                   )
            Plaintiff,             )
                                   )
      vs.                          )
                                   )
NICHOLAS RAGIN,                    )
                                   )
            Defendant.             )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
JUNE 2, 2014

APPEARANCES:

On Behalf of the Government:

        WILLIAM MICHAEL MILLER, ESQ.,
        Assistant United States Attorney
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202

On Behalf of the Defendant:

        MATTHEW PRUDEN, ESQ.,
        301 E. Park Avenue
        Charlotte, North Carolina
        28203

        LAURA ANDERSEN, RMR
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

I N D E X

GOVERNMENT WITNESS:                                    PAGE

NIKITA V. MACKEY
    Direct Examination By Mr. Miller              3
    Cross Examination By Mr. Pruden              10

* * * * * *

DIRECT - MACKEY                          3

1              P R O C E E D I N G S

2  MONDAY, JUNE 2, 2014, COURT CALLED TO ORDER 9:50 A.M.:

3              THE COURT:  Mr. Pruden, when your client arrives, if

4  you'll let me know when you're ready to proceed.

5              MR. PRUDEN:  Yes, Your Honor.  Thank you.

6              (Pause.)

7              MR. PRUDEN:  We're ready, Your Honor.

8              THE COURT:  Very well.  We're reconvening the

9  evidentiary hearing that we continued last month, for the

10 purpose of the Government securing the presence of additional

11 witness or witnesses.

12             Are you ready to proceed, Mr. Miller?

13             MR. MILLER:  Yes, Your Honor.  And the Government

14 would call Mr. Nick Mackey at this time.

15          NIKITA V. MACKEY, GOVERNMENT WITNESS, SWORN

16                     DIRECT EXAMINATION

17 BY MR. MILLER:

18             THE COURT:  Good morning.

19             THE WITNESS:  Good morning.

20             THE COURT:  Mr. Miller, when you're ready.

21             MR. MILLER:  Thank you, Your Honor.

22 Q    Please state your name for the record.

23 A    Nikita Mackey.

24 Q    And Mr. Mackey, have you and I prepared your testimony in

25 any way today?

DIRECT - MACKEY

4

1   A    Well, I don't know what your name is.

2   Q    I'm William Miller.

3   A    No, we have not.

4   Q    Mr. Mackey, what do you do for a living?

5   A    I'm an attorney.

6   Q    And did you represent Nicholas Ragin in a federal

7   criminal trial in 2006?

8   A    Yes, I did.

9   Q    Do you recall whether or not you were appointed or

10  retained in that representation?

11  A    I believe that was an appointment.

12  Q    And at what stage of proceeding were you appointed, if

13  you remember?

14  A    I believe it was at the very beginning.

15  Q    Did you receive discovery from the government in

16  connection with Mr. Ragin's case?

17  A    I believe that I did.

18  Q    Did you review that discovery yourself?

19  A    I believe that I did.

20  Q    Did you also review that discovery with Mr. Ragin?

21  A    I believe that I did.

22  Q    Did Mr. Ragin ultimately make the decision to go to trial

23  in that case?  Did Mr. Ragin go to trial in that case?

24       THE WITNESS:  Well, let me answer the first question

25  you asked, if I may, Your Honor?

DIRECT - MACKEY

5

1    THE COURT:  You may.

2    THE WITNESS:  All right.  I don't believe -- if I

3    remember correctly -- and this was a very long time ago, so --

4    but if I remember correctly, he was forced to go to trial by

5    the government.  But he did go to trial, in answer to your

6    second question.

7    Q   (Mr. Miller) And if you could explain for the Court how

8    you prepared for that trial?

9    A   Well, I prepared for it the same way I prepare for all

10   trials.  I reviewed the discovery, I discussed it with my

11   client.  We went over any possible defenses, and we got ready

12   for trial.  We came to trial.

13        But I would like to state that in that particular case

14   one thing that stood out to me, because I think I talked to --

15   it wasn't you, but I talked to another U.S. Attorney named

16   Amy -- I don't know the last name, but -- and I had told her

17   maybe a month or two ago that I didn't remember much about

18   this trial.

19        But something that stood out very clear to me in that

20   trial was that my client -- well, me and the U.S. Attorney had

21   discussed that my client was considered a low-level person in

22   this case, and that we were working on some kind of a plea

23   deal.  They wanted him to help the government right up until

24   the point where he filed some kind of federal complaint

25   against one of the special agents, Tadeo.  And after that the

DIRECT - MACKEY                                    6

1   government told me they were not going to take any deals and

2   we had to go to trial.

3        So that's -- just by way of explaining -- what stood out

4   to me.  Because I felt like, you know, once they told me they

5   didn't think he was really involved, then they got mad and

6   wanted to prosecute.  But -- so that stood out to me.

7        But other than that it's been so long -- a lot of

8   stuff -- I mean I hadn't thought about this case since the end

9   of it.

10  Q    Understood.  But during your preparation for trial, did

11  you speak -- were you able to work with the defendant in that

12  preparation?

13             MR. PRUDEN:  Your Honor, I'm just going to object to

14  this line of questioning based on relevance.

15             THE COURT:  Overruled at this point.

16             THE WITNESS:  I don't -- well, I do know we spoke.

17  I mean, that's just the attorney-client relationship.  We

18  spoke.  But it seems like -- and I don't know the record would

19  be a better source than I am right now.  It seems like we had

20  some difficulties, and that we may have had some hearings, as

21  far as status of counsel, but I'm not positive on that.

22             But we -- I mean, we did speak.  We spoke right up

23  until the end of the trial and through sentencing.  But I do

24  think, if I remember correctly -- and I want to preface that

25  with, I defer to the record on this, but I think we may have

1  had some contentious times.

2  Q    Is it your opinion that the defendant was able to

3  participate in his own defense in working with you?  How would

4  you characterize your working relationship with the defendant

5  at that time?

6  A    Well, just like I said, I believe, if -- and I would

7  defer to the record.  But I think the Court records may show,

8  and I'm not positive, that we had some hearings as to status

9  of counsel.  But we worked through them, obviously, since we

10  came to trial.

11      But, I mean, I didn't think he -- as far as your question

12  of, could he participate, I didn't think he was deficient,

13  mentally deficient or anything.

14  Q    I'd like to move to discussing that trial at this point.

15      Do you remember how many other defendants went to trial

16  with Mr. Ragin?

17  A    I want to say three others, is what I'd like to say.

18  Q    And I know it's been a while, but do you recall

19  approximately how long the trial lasted?

20  A    It was more than a week, if I remember right.

21  Q    And, I know, again, just for approximation here.  But do

22  you recall proximately how many witnesses testified during

23  that trial?

24  A    I have no idea.  None.

25  Q    Would you say it was dozens or --

DIRECT - MACKEY

1  A    I honestly have no idea.  I mean, none.  It was a long

2  trial, but I have no idea of how many witnesses were called.

3  Q    Do you remember today approximately what percentage or

4  how many of those witnesses had anything to say about the

5  defendants' actions in the conspiracy?

6  A    I do not.

7  Q    Do you recall when the defendants allegedly joined the

8  conspiracy, relative to the length of the conspiracy in that

9  case?

10  A    Could you repeat your -- let me ask you if I understand

11  you right.

12  Q    Okay.

13  A    Are you asking me do I recall what the discovery

14  indicated when he entered the conspiracy?  Is that what you're

15  asking me, or maybe I'm not understanding.

16  Q    My question is really, just -- over the length of this

17  conspiracy, do you recall when your client -- when the

18  evidence showed he joined that conspiracy or when he was

19  alleged to have joined that conspiracy?

20  A    I do not.  I would have to defer to the actual discovery

21  documents on that.

22  Q    All right.  Mr. Mackey, there's an allegation in this

23  case that you were sleeping or nodding off during trial.  What

24  if anything do you remember about that?

25  A    I do remember in 2007 when I was trying to be appointed

DIRECT - MACKEY                                    9

1   sheriff that that allegation came up.  That was the first that

2   I had heard of it.

3        There was nothing that I remember during the court

4   thing -- and I told Amy when I spoke with Amy that I would

5   have to defer to the -- the transcripts of the trial.  Because

6   I think that if something like that had happened, knowing the

7   reputation for this Court, that that would have been

8   addressed.

9   Q    So just to be clear, you don't specifically recall

10  anything about incidents of sleeping during that trial?

11  A    No.  I think I would have recalled something like that.

12  And I think that this Court would have addressed it, or my

13  client would have addressed it, or the attorney -- other

14  attorneys or the prosecution, somebody would have addressed

15  it, so --

16            MR. PRUDEN:  I'm going to object to speculation,

17  Your Honor.

18            THE COURT:  Overruled.

19            THE WITNESS:  I would say that, like I said before,

20  it's so long ago I don't pretend to be a more accurate

21  representation than the transcripts.  So I would defer to what

22  the transcripts said.

23            MR. MILLER:  No further questions at this time, Your

24  Honor.

25            THE COURT:  Any cross?

Case 3:10-cv-00488-RJC  Document 55  Filed 11/17/14  Page 9 of 15

CROSS - MACKEY

1    MR. PRUDEN: Yes, Your Honor.  Thank you.

2                    CROSS EXAMINATION

3    BY MR. PRUDEN:

4    Q    Good morning, Mr. Mackey.

5    A    Good morning.

6    Q    So Mr. Mackey, if I understand your testimony correctly,

7    you don't remember very much about this trial?

8    A    Oh, not too much.  Just, you know, the stuff that -- you

9    know, if you ask me something I may remember it.  But I hadn't

10   thought about this trial since sentencing, is probably the

11   last time that I thought -- that I had to give it much

12   thought.

13   Q    And you don't have a lot of recollection about whether

14   you fell asleep at any time or not; is that what you were

15   saying?

16   A    Well, no.  That's not what I said.  I said that I doubt

17   that very seriously.  And I think if something like that would

18   have occurred, that someone in the courtroom, including my

19   client or the Court would have addressed it at that point.

20        The first time I even saw some allegations such as that,

21   was in the newspaper a year or so later when I was trying to

22   be appointed to Mecklenburg County sheriff and I took that as

23   just some kind of -- I don't know if you were in town back

24   then, but I think you were.  I took that as political kind of

25   fodder.

CROSS - MACKEY                                                    11

1   Q    And -- now during the time of this trial -- this was a

2   lengthy trial; is that correct?

3   A    It was at least -- it was more than one week.  I do

4   remember that.  But I don't remember exactly how long.

5   Q    And it required a great deal of work to prepare each day?

6   A    It did.  It was -- like I said, the reputation of this

7   Court is, you're going to stay long.  I mean, so it was a

8   great deal of work each day and each night.

9   Q    And you were -- you were in the courtroom probably from

10  about 9:00 to 6:00 every day; is that right?

11  A    That's -- you know the reputation of this Court, yeah,

12  6:00.

13  Q    And doing -- after that you would go home and work on

14  this case; is that correct?

15  A    That is correct.  Back to my office.

16  Q    Back to your office?

17  A    Yeah.

18  Q    During that time you were also running for district court

19  judge?

20  A    I was.

21  Q    And that required a lot of work too; is that right?

22  A    Well, let me be specific about that.  Running for

23  district court judge requires a lot of work, yes.  During that

24  time it required zero work, because I had no time to do -- I

25  was here until 6:00 and then I had to go back to my office.

CROSS - MACKEY                                    12

1  Because if I remember correctly, most days the government
2  would bring in more discovery and say hey, we just got this.
3  And it was just a -- no campaign period.  And I'm not sure
4  what the length of time that was.  But during the trial there
5  was no campaigning.
6  Q    And during the course of this trial, with everything that
7  you had to do, that caused you to stay late hours; is that
8  right?
9  A    That is correct.  But I mean, that was no different than
10 most days.  I mean, I stayed in my office until at least
11 midnight every day.  It's just during this trial my activities
12 were dictated while I was there.
13 Q    And that certainly made you tired, would that be a safe
14 thing to say?
15 A    (Chuckle.)  I don't know if I could agree to that.  I
16 mean, I think, no more than any other time.  You know, just
17 every day if you're up late, you get the normal amount of
18 fatigue, I would imagine.  But I don't remember any hardship
19 as far as trying to stay up.
20      Because like I told you, if you check with my office
21 building over there, they would tell you I never left before
22 11:00 or 12:00 at night.
23 Q    And do you recall telling somebody else that you were
24 just resting your eyes during this trial when the allegations
25 came out about you being asleep?

CROSS - MACKEY                              13

1   A    I do not recall that, but I wouldn't doubt that.

2   Q    And do you recall resting your eyes at any point during

3   the trial?

4   A    I don't recall that, but I would not doubt that.

5              MR. PRUDEN:  May I just have one moment, Your Honor?

6              THE COURT:  You may.

7              MR. PRUDEN:  No further questions, Your Honor.

8              THE COURT:  Any redirect?

9              MR. MILLER:  No, Your Honor.

10             THE COURT:  Mr. Mackey, you may step down.

11             THE WITNESS:  Thank you, Your Honor.

12             THE COURT:  Thank you.

13             Any other witnesses?

14             THE WITNESS:  Am I excused?

15             THE COURT:  You are.

16             THE WITNESS:  Thank you.

17             MR. MILLER:  That concludes the evidence from the

18  Government.

19             THE COURT:  Any additional evidence?

20             MR. PRUDEN:  No, Your Honor.  Thank you.

21             THE COURT:  All right.  Well, I'll take this under

22  advisement and get something out as soon as I can.

23             MR. PRUDEN:  Thank you, Your Honor.

24             THE COURT:  Mr. Haycox has brought to my attention

25  the issue of briefing.

Case 3:10-cv-00488-RJC  Document 55  Filed 11/17/14  Page 13 of 15

14

CROSS - MACKEY

1          Does either side feel additional briefs are

2   necessary?

3          MR. PRUDEN:  Your Honor, we do.

4          THE COURT:  All right.  And so let's -- how much

5   time do you need?

6          MR. MILLER:  Last time I believe the Court mentioned

7   two weeks, and the Government's fine with that arrangement if

8   that please the Court.

9          THE COURT:  Simultaneous briefs in two weeks; any

10  objection?

11         MR. PRUDEN:  Your Honor, no objection to that.

12         THE COURT:  All right.  So two weeks from today.  If

13  there is any briefing to be done, each side will submit briefs

14  by the end of the day two weeks from today.

15         MR. PRUDEN:  Thank you, Your Honor.

16         MR. MILLER:  Thank you, Your Honor.

17         MR. PRUDEN:  Your Honor, Mr. Ragin just mentioned to

18  me -- he does not know if he would be needed any further.

19  Obviously he's in the Mecklenburg County jail.  He does want

20  to go back to the Bureau of Prisons whenever he can.

21         THE COURT:  Mr. Ragin, we'll do -- I don't

22  anticipate anymore evidentiary hearings.  The Court will rule

23  on what's before it on the paper.  And so we will take steps

24  to return you as soon as we can.

25         THE DEFENDANT:  Thank you.

15

CROSS - MACKEY

1          THE COURT:  Thank you.

2          (The matter is concluded at 10:03 a.m.)

3                    * * * * * *

4     UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF NORTH CAROLINA
5     CERTIFICATE OF OFFICIAL REPORTER

6

7          I, Laura Andersen, Federal Official Court Reporter,

8     in and for the United States District Court for the Western

9     District of North Carolina, do hereby certify that pursuant to

10    Section 753, Title 28, United States Code that the foregoing

11    is a true and correct transcript of the stenographically

12    reported proceedings held in the above-entitled matter and

13    that the transcript page format is in conformance with the

14    regulations of the Judicial Conference of the United States.

15         Dated this the 17th day of November, 2014.

16

17

18                         S/Laura Andersen
19                         Laura Andersen, RMR
                           Federal Official Court Reporter
20

21

22

23

24

25

Case 3:10-cv-00488-RJC  Document 55  Filed 11/17/14  Page 15 of 15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-cv-488-RJC
(3:04-cr-271-RJC-7)

| | | |
|---|---|---|
| NICHOLAS RAGIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** comes before the Court upon Petitioner's Motion to Vacate, pursuant to 28 U.S.C. § 2255, (Doc. No. 1); the Government's Response and Motion for Summary Judgment (Doc. Nos. 15, 17); Petitioner's Cross-Motion for Summary Judgment, (Doc. No. 21), and related pleadings.  For the reasons that follow, the Government's motion will be granted in part, Petitioner's cross-motion will be denied, and Petitioner's § 2255 motion will be denied and dismissed.

I.      BACKGROUND

A.      Procedural Background

Petitioner Nicholas Ragin and six others were named in a twenty-two count superseding indictment charging  conspiracy to promote prostitution, as defined in 18 U.S.C. §§ 2422, 2423, 1952, in violation of 18 U.S.C. § 371 (Count 1) and conspiracy to possess with intent to distribute more than fifty grams of cocaine base, in violation of 21 U.S.C. § 846 (Count 13). (Case No. 3:04-cr-271, Doc. No. 88: Superseding Indictment).  Attorney Nikita V. Mackey was appointed to represent Ragin on October 21, 2004. (Id., Doc. No. 9: CJA 20).

1

Three co-defendants chose to plead guilty, while Ragin and three co-defendants pleaded not guilty and were tried jointly by a jury in April 2006. Following numerous days of testimony, the jury found Ragin guilty of both counts. (Id., Doc. No. 271: Verdict). Within three months of the verdict, Ragin wrote to the Court complaining about Mackey's representation and alleging that he fell asleep twice during trial. (Id., Doc. No. 298 at 2).

Ragin appeared with counsel for his sentencing hearing on January 18, 2007. The Court found that Ragin had a total offense level of forty and a criminal history category VI, based on his status as a career offender and sixteen criminal history points, resulting in a guideline range of 360 months to life imprisonment. (Id., Doc. No. 350: Statement of Reasons at 1). Mackey argued for a departure from the guideline range and the Government recommended a life sentence, but the Court sentenced Ragin to the low end of the advisory guideline range. (Id., Doc. No. 349: Judgment at 2).

Ragin appealed to the United States Court of Appeals for the Fourth Circuit on the ground that the sentence was erroneously imposed based on a mandatory crack guideline that violated his Fifth and Sixth Amendment rights. The appellate court found no error in the calculation of Ragin's sentence and his criminal judgment was affirmed in all respects. United States v. Howard, 309 F. App'x 760, 770-71 (4th Cir.), cert. denied, 558 U.S. 830 (2009).

Ragin timely filed the instant § 2255 motion claiming that counsel was ineffective for a number of reasons and that the Court erred in determining the sentence. (Doc. No. 1). In support of his motion, Ragin submitted a sworn affidavit claiming Mackey fell asleep twice during trial. (Doc. No. 7). The Government responded by opposing Ragin's motion to vacate and seeking summary judgment. (Doc. Nos. 15, 17). Ragin also sought summary judgment on his claims. (Doc. No. 21). The Court determined that an

2

evidentiary hearing was necessary to resolve Ragin's claim that his attorney provided ineffective assistance when he fell asleep during trial and appointed counsel to represent Ragin at that hearing. (Doc. No. 34: Order).

The first evidentiary hearing was held on May 12, 2014. Ragin called trial attorneys for two co-defendants and a juror as witnesses and testified himself. The Government called the case agent but was unable to subpoena Mackey. The Court held the evidentiary hearing open for the Government to secure Mackey's attendance and then heard his testimony on June 2, 2014. With the filing of post-hearing briefs, (Doc. Nos. 43, 44), this matter is ripe for disposition.

B.    Factual Background

From the years of 2001 to 2004, Tracy and David Howard operated a prostitution ring and crack cocaine conspiracy in Charlotte, North Carolina. Their mother, Ila Howard, also organized a parallel prostitution service that utilized the same women and teenage girls and laundered illegal proceeds. Out of approximately forty witnesses who testified during the trial, six testified directly about Ragin's role in the conspiracies. The witnesses included Crystal Chumley, (Case No. 3:04-cr-271, Doc. No. 404: Trial Tr. at 1438-40), Catherine Wills, (Id., Doc. No. 405: Trial Tr. at 1614-15), Eugene Lewis, (Id., Doc. No. 407: Trial Tr. at 2080), Angentia Davis, (Id., Doc. No. 410: Trial Tr. at 2369), Keshia Burris, (Id., Doc. No. 411: Trial Tr. at 2626), and Special Agent Terry Tadeo, (Id., Doc. No. 412: Trial Tr. at 2863). Each of these witnesses testified that Ragin drove the prostitutes to their appointments. In addition, every witness except Davis testified that Ragin was the "enforcer" for the conspiracies, referencing Ragin beating up a woman or using firearms to defend the drug territory, or both. (Id., Doc. No. 404: Trial Tr. at 1451, 1456; Doc. No. 405: Trial Tr. at 1635; Doc. No. 407: Trial Tr. at 2080-83, 2094-95; Doc. No. 411: Trial Tr. at 2636-37). Chumley and Wills also testified about times

3

when they witnessed Ragin bagging drugs. (Id., Doc. No. 404: Trial Tr. at 1445-46, 1457; Doc. No. 405: Trial Tr. at 1652). Special Agent Tadeo testified about Ragin's admissions to him about driving the prostitutes to their appointments, using firearms to defend the drug territory, and receiving $100 to beat up a woman. (Id., Doc. No. 412: Trial Tr. at 2864-69).

During the direct examinations of these witnesses Mackey made several objections. During Chumley's direct examination Mackey objected when Chumley was asked why Ragin kept some of the money she earned while prostituting. (Id., Doc. No. 404: Trial Tr. at 1445). In addition, Mackey objected when Chumley was asked whether she was aware of an encounter between Ragin and Kelly Roland, and when Chumley testified that Ragin was bragging about beating her up. (Id. at 1451). During Lewis's direct examination, Mackey objected to Lewis identifying Ragin's handwriting on the grounds that he had not been qualified as an expert, (Case No. 3:04-cr-271, Doc. No. 407: Trial Tr. at 2108), and also objected to speculation when Lewis stated that Ragin was supposed to watch the girls, (Id. at 2121). During Burris's direct examination, Mackey objected to a question by the Government as being asked and answered, (Case No. 3:04-cr-271, Doc. No. 411: Trial Tr. at 2632), and also objected to the Government's attempt to introduce a letter allegedly written by Ragin, (Id. at 2633).

Mackey cross-examined all of the six witnesses whose testimony related to Ragin, (Case No. 3:04-cr-271, Doc. No. 404: Trial Tr. at 1528-29 (Chumley); Doc. No. 405: Trial Tr. at 1683-85 (Wills); Doc. No. 407: Trial Tr. at 2192-2212 (Lewis); Doc. No. 410: Trial Tr. at 2405-08 (Davis), Doc. No. 411: Trial Tr. at 2785-91, 2800-02 (Burris); Doc. No. 412: Trial Tr. at 2877-90 (Tadeo)), and during several of the cross-examinations he referenced the witness's prior testimony. For example, during the cross-examination of Special Agent Tadeo, Mackey referenced a letter asked about during the agent's direct testimony. (Id., Doc. No. 412: Trial Tr. at 2885). During Lewis's cross-examination, Mackey attempted to impeach his credibility by

4

referring to earlier conflicting statements Lewis made. (Id., Doc. No. 407: Trial Tr. at 2195). He also exposed Lewis's conflicting statements about his recollection of one of the shooting incidents involving Ragin. (Id. at 2207). During his cross-examination of Burris, Mackey referenced statements made by her during a previous cross-examination and direct testimony in which she admitted that she had lied about drugs in the past. Case No. 3:04-cr-271, Doc. No. 411: Trial Tr. at 2787).

At the first evidentiary hearing on the instant motion, Richard Culler, Tracy Howard's trial counsel, testified that he remembered one specific instance during the trial where Mackey had his head down on his arms and appeared to be sleeping but breathing regularly.[1] Culler stated that he remembered a conversation with Peter Adolf, David Howard's trial counsel, in which he observed that Mackey was asleep "again," but he could not specifically recall any other instance of apparent sleeping. He also could not recall what was going on in the trial during that time and whether court was in session.

Similarly, Adolf recalled one specific instance during the trial in which Mackey was silent and looked as if he was asleep. Adolf stated that the Assistant United States Attorney was showing defense counsel a document and Mackey did not respond until the Court called out his name. Adolf could not remember who was testifying at the time or the nature of the document. He confirmed that dozens of witnesses testified during the three week trial, but not every witness testified about each of the four co-defendants on trial.

One of the jurors, Pamela Vernon, stated that she observed Mackey with his head in his hands propped up on the table, not seeming alert. Vernon testified that she observed this type of behavior from Mackey frequently and that other jurors commented on it in the jury room.

---

[1] A transcript of the hearing has not been filed.

5

However, she admitted that she could not say for certain that Mackey was asleep when she observed him with his head in his hands.

Ragin testified at the hearing and expanded his allegation from Mackey sleeping two times to sleeping ten to fifteen times during the trial. He presented a trial transcript marked with the places Mackey slept. He stated he heard Mackey snoring with his eyes closed sometimes and that he had to nudge Mackey to wake him up. During cross-examination, Ragin acknowledged that he had previously only alleged two instances of sleeping in his post-trial letter to the Court and in his § 2255 motion. He explained that he did not recall the other incidents until he reviewed the trial transcript.

Special Agent Tadeo testified about one or two instances in which Mackey briefly had his eyes closed, but was not outright sleeping. He could not remember which day or during which witness that behavior occurred. He did remember seeing Mackey preparing for cross-examination of witnesses. Special Agent Tadeo recalled that during his own testimony Mackey was alert and his cross-examination was "aggressive."

Mackey testified at the second evidentiary hearing. He stated that he did not recall falling asleep during trial and that he would have remembered something like that if it had happened. In addition, he testified that he believed the Court would have admonished him had he been asleep and that the record would reflect him sleeping if that had been the case. He stated that he had difficulty recalling particular details from the trial as a result of the time that had passed since then.

## II.    STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief.

6

Summary judgment is appropriate in cases where there is no genuine dispute as to a material fact and it appears that the moving party is entitled to judgment as a matter of law. United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991) (applying summary judgment to a motion to vacate). Any permissible inferences which are drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, when the record taken as a whole could not lead a trier of fact to find for the non-moving party, granting summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The Court has considered the record in this matter and applicable authority and concludes that claims other than counsel's alleged sleeping can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970) (affirming summary disposition where files and records conclusively show that petitioner is entitled to no relief).

III.    DISCUSSION

 A. Ineffective Assistance of Counsel

 The Sixth Amendment guarantees that in all criminal prosecutions, the accused shall have the right to the effective assistance of counsel for his defense. U.S. Const. amend. VI. In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In measuring counsel's performance, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. A petitioner seeking post-conviction relief bears a "heavy burden" to overcome this presumption. Carpenter v. United States, 720 F.2d 546, 548 (8th Cir. 1983). Conclusory allegations do not overcome the presumption of competency. Id.

7

To demonstrate prejudice, a petitioner "must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Murray v. Carrier, 477 U.S. 478 (1986) (emphasis omitted) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). Under these circumstances, a petitioner "bears the burden of proving Strickland prejudice." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Hutchins v. Garrison, 724 F.2d 1425, 1430-31 (4th Cir. 1983)). If a petitioner falls short of meeting his burden here, then "a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1297 (citing Strickland, 466 U.S. at 697). In considering the performance prong, the Court must not grant relief solely because a petitioner can show that, but for counsel's performance, the outcome of the proceeding would have been different. See Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). Rather, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Id. (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

1.    Failure to Provide Discovery

Ragin first contends that Mackey was deficient in failing to provide him with timely and complete discovery. Consequently, he argues that if he had known about certain witness statements before trial, then he would have accepted the Government's plea offer. In his § 2255 motion, Ragin does not identify which witnesses offered surprising or damaging testimony. In response to the Government's motion for summary judgment, Ragin argues vaguely that the testimony of Keisha Burris and Eugene Lewis could have been impeached if counsel had provided him with discovery from the Government. (Doc. No. 23 at 3).

It is Ragin's burden to demonstrate both deficient performance and prejudice. Ragin provides no facts to impeach these witnesses and fails to show how the outcome of his trial

8

would have been affected.  To the extent that discovery was provided on the eve of or during

trial, Mackey was not responsible for the Government providing additional discovery during the

course of the trial. (Doc. No. 15: Response at 18).  Ragin has not shown that any ongoing

disclosure caused him prejudice.[2]

Ragin contends that he would have elected to plead guilty and would have faced a lesser

sentence if his attorney had informed him of the nature of the Government's evidence.  This

assertion is belied by the record.  The Government filed an unsigned plea agreement in this case

which provides that Ragin would plead guilty to Counts 1 and 13 and be held responsible for at

least 50 grams of cocaine base, which would have triggered the same penalty as the jury verdict

under 21 U.S.C. § 841(b)(1)(A) of ten years to life. (Compare Doc. No. 16: Plea Agreement at 1-

2 with Case No. 3:04-cr-271, Doc. No. 271: Verdict at 1-2).  Thus, even if he had accepted the

plea agreement and received a three-level reduction for acceptance of responsibility, his total

offense level would have been 37, but the advisory guideline range would have remained of 360

months to life, given a criminal history category of VI.[3]  Therefore, the Court finds that the

record clearly shows Ragin is not entitled to relief on this claim.

---

[2] Petitioner also argues that his counsel failed to properly investigate potentially favorable
witnesses for the defense. Other than claiming that the witnesses "could have made a critical
impact on the government's case," (Doc. No. 1: Motion at 3), Petitioner fails to alert this Court
to how these witnesses may have assisted him. The blanket assertion that they may have been
helpful is wholly conclusory and fails to rebut the presumption of competency.

[3]  Although Petitioner claims counsel failed to inform him of the plea agreement, (Doc. No. 1:
Motion at 2), the record shows clearly that he did.  On March 6, 2006, approximately one month
before the trial, counsel informed a magistrate judge that he and Petitioner discussed its terms
and the Government confirmed it was still available to be accepted. (3:04-cr-271, Doc. No. 487:
Hr'g Tr. at 8-9). Petitioner did not respond when counsel informed the magistrate judge that
Petitioner "adamantly" rejected the offer. (Id.).  Therefore, this claim is without merit.

9

2.    Failure to Review PSR and Address Criminal History

Ragin next argues that Mackey was ineffective in failing to properly discuss his presentence report (PSR) with him and in failing to properly investigate and challenge his criminal history points. (Doc. No. 1 at 2). During his sentencing hearing, Ragin claimed that counsel "didn't really go over" the PSR until the night before. (Case No. 3:04-cr-271, Doc. No. 391: Sent. Hr'g Tr. at 3). Mackey clarified that Ragin was referring to the second revised PSR, issued that week, with no change to the advisory guideline range. (Id.). Mackey further stated that he had previously provided a copy of the draft PSR and discussed it with Ragin. (Id.). Following Mackey's presentation of objections to the PSR, the Court gave Ragin the opportunity to present any other objections, but he declined and stated that counsel had covered "just about everything." (Id.).

Similarly, Ragin states Mackey failed to investigate his criminal history properly, which would have avoided his career offender designation. (Doc. No. 1 at 2). The record shows that counsel challenged the prior convictions at sentencing, (Case No. 3:04-cr-271, Doc. No. 391: Sent. Hr'g Tr. at 17), and Ragin has not provided any evidence that should have been uncovered by Mackey to alter the Court's conclusion.[4] Therefore, Ragin is not entitled to a hearing on this claim.

3.    Defendant's Right to Testify

Ragin contends that Mackey refused to permit him to testify in his own defense and that counsel was unprepared to conduct his direct examination. (Doc. No. 1 at 2). However, after the close of the Government's evidence, the Court addressed Ragin directly about his right to testify or not. (Case No. 3:04-cr-271, Doc. No. 412: Trial Tr. at 121). Ragin initially indicated that he

---

[4] Because Petitioner was found to be a career offender, (Case No. 3:04-cr-271, Doc. No. 519: PSR at 17), his arguments about criminal history points for reckless driving, resisting, escape, and larceny are moot because they did not affect that determination.

10

would testify, (Id. at 122); however, counsel later informed the Court that he would not present any evidence, (Case No. 3:04-cr-271, Doc. No. 413: Trial Tr. at 325). Although Ragin asserts that Mackey was unprepared and did not allow him to testify, the record clearly shows that Ragin understood that it was his decision whether or not to testify. Therefore, Ragin is not entitled to relief on this claim of ineffective assistance of counsel.

4.       Mistrial

Ragin claims Mackey deliberately elicited a statement of a non-testifying co-defendant from the case agent to cause a mistrial because he believed that Ragin would be convicted. (Doc. No. 1 at 2). Although counsel did improperly seek to impeach the agent with Ragin's out-of-court statement about Tracy Howard, Ragin has asserted no facts to show how such performance prejudiced him. Therefore, he is not entitled to a hearing on this claim.

5.       Failure to Introduce Impeachment Evidence

Next, Ragin argues that Mackey was ineffective by failing to impeach Keisha Burris regarding her testimony against Ragin at trial. Ragin has failed to show what damaging information was available to counsel and that his performance fell below an objective standard of reasonableness. Therefore, this claim is without merit.

6.       Asleep During Trial

Ragin contends that Mackey fell asleep during the trial and that he had to touch him to awaken him when it was his opportunity to cross-examine a witness. (Doc. No. 1 at 3). Some courts have found a presumption of prejudice applies where counsel's sleeping at trial was so extensive as to effectively result in the denial of counsel for the defendant. Burdine v. Johnson, 262 F.3d 336 (5th Cir. 2001) (presumption of prejudice limited to "egregious" facts of case where attorney was repeatedly unconscious during guilt-innocence phase of capital murder trial). However, courts have only applied the presumption of prejudice when the evidence shows

11

counsel slept through a "substantial portion" of the defendant's trial. Muniz v. Smith, 647 F.3d 619, 623 (6th Cir. 2011) (collecting cases from the Ninth, Fifth, and Second Circuits holding denial of counsel with presumed prejudice only occurs if counsel sleeps through a "substantial portion" of trial).

In Muniz, the appellate court examined the allegation that the defense counsel was asleep when the Government cross-examined his client, who was on trial for assault with intent to commit murder. 647 F.3d at 621, 624. The allegation was supported by an affidavit from a juror. Id. In evaluating the defendant's ineffective assistance of counsel claim, the Sixth Circuit held that a presumption of prejudice did not apply because the defendant could not show that his trial counsel was asleep for a "substantial portion" of his trial. Id. at 624. Applying the Strickland standard, the court held that the defendant could not establish prejudice because he could not show that the alleged deficient performance would have affected the outcome of the trial, as the evidence against him was overwhelming. Id. at 625.

The Court finds that Ragin's testimony during the evidentiary hearing and his exhibit listing ten to fifteen times during the trial that Mackey was asleep are not credible. His earliest accusation, made within three months of the trial, was of only two instances. (Case No. 3:04-cr-271, Doc. No. 298). That limited claim was repeated in his affidavit in support of the instant motion. (Doc. No. 7 at 4). Defense attorneys Culler and Adolf, along with Special Agent Tadeo, testified at the evidentiary hearing consistently with Ragin's initial allegations of only one or two occasions where Mackey appeared to be asleep during the trial. The trial transcript shows Mackey's attention to the testimony of several witnesses Ragin listed as affected by the alleged sleeping. Ragin has great incentive to embellish his claim at this stage in the proceedings and the juror, who repeatedly referred to Ragin by his first name during her testimony, may be

12

remorseful for the severity of the sentence imposed.[5]  It is telling that neither Ragin nor the juror

brought Mackey's alleged sleeping to the attention of the Court during the trial when it could

have been effectively addressed if it were occurring so frequently.  Therefore, the Court finds

that Mackey was not asleep for "substantial portions" of the trial.  Even if Mackey fell asleep

once or twice during the protracted trial involving over forty witnesses, the transcript reflects his

attention to the six witnesses who directly implicated Ragin.   Thus, the Court will apply the

usual Strickland standard and not presume prejudice in this case.[6]

    Ragin has not shown that Mackey's behavior actually prejudiced the outcome of the trial.

The Court finds, after a careful review of the trial transcript, that most of the witnesses at trial did

not know Ragin and did not mention him in their testimony, during which other trial counsel

lodged objections adequate to protect Ragin as an alleged conspirator with their clients.[7]  As

detailed above, the transcript reflects that Mackey made timely objections during the direct

examinations of the six witnesses that did implicate him and also cross-examined each of those

witnesses.[8]  Their testimony was consistent with Ragin's own admission that he aided the

---

[5]  Even so, the juror affirmed at the evidentiary hearing that she had followed the Court's
instructions and rendered a verdict based on the facts in evidence.

[6]  Even if a presumption of prejudice applied, the Court would find that the weight of the
evidence against Ragin would overcome that prejudice.

[7]  For example, counsel for Tracy Howard objected to the introduction of a graphic photograph
of Kelly Roland's injuries, which the Court sustained on Fed. R. Evid. 403 grounds. (Case No.
3:04-cr-271, Doc. No. 407: Trial Tr. at 2083-84).

[8]  Ragin argues that there were three instances during Catherine Wills's direct testimony in
which a competent attorney would have objected if he were not asleep. (Doc. No. 43:
Memorandum at 5).  In the first instance, Wills guessed that Ragin's purpose in living with her in
an apartment was to keep watch over her. (Case No. 3:04cr271, Doc. No. 405: Trial Tr. at 1618).
Given the ample other evidence of Ragin's role in prostitution, this claim is without merit.  In the
second instance, Wills speculated that Ragin beat up a woman named Kelly because he bragged
about it. (Id. at 1635).  There, Tracy Howard's defense attorney objected and the Court instructed
the jury to disregard the statement, so there was no need for Mackey to object.  In the third

13

prostitution and drug conspiracies by driving prostitutes to clients and using violence to defend

drug territory, as well as beating up a woman.[9] In light of the substantial evidence against him,

Ragin has not demonstrated a reasonable probability of a different outcome if Mackey had not

been ineffective as alleged in this claim. Additionally, the Court will not grant relief based on

counsel's performance because the result of the trial was not fundamentally unfair or unreliable.

Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

### 7. Transfer of Evidence to Appellate Counsel

Ragin contends that his Mackey did not provide important evidence to his appellate

counsel, including letters written to Ragin by a key Government witness, which made his appeal

"below average." (Doc. No. 1 at 3). Ragin has not identified the witness at issue, the information

contained in the letters, or how the outcome of the appeal would have been different. Therefore,

he is not entitled to a hearing on this claim.

### 8. Failure to Investigate Witnesses

Ragin argues that Mackey failed to investigate witnesses supplied by him for his defense.

(Id. at 3). He lists three witnesses, one who allegedly lied for the Government and two who

potentially could have provided an alibi during the time of the conspiracy. (Doc. No. 23:

Response at 5-6). Ragin has not asserted facts to show the substance of the lie or alibi testimony.

---

instance, Wills guessed that the drugs she saw Ragin sell were Tracy Howard's. (Id. at 1651).
The form of her answer was not objectionable as to Ragin, and Tracy Howard's counsel objected
to the speculation about his client's role in Ragin's observed drug dealing.

[9] Ragin also argues that Mackey was asleep during Special Agent Tadeo's testimony about his
confession. (Doc. No. 43: Memorandum at 5). The fact that Mackey misstated agent's testimony
on direct does not establish that he was asleep during that portion of the trial. The nature of the
misstatement involved Ragin's implication of Tracy Howard, which was part of the agent's
report, but the Court had excluded under Bruton v. United States, 391 U.S. 123 (1968). (Case
No. 3:04-cr-271, Doc. No. 412: Trial Tr. at 2878-81). Rather, Special Agent Tadeo testified at
the evidentiary hearing that Mackey was alert during his testimony and that his cross-
examination was "aggressive." Therefore, Ragin has not shown a reasonable probability of a
different outcome for him based on this performance.

14

Therefore, he has not provided any basis to conclude that counsel's performance worked to his actual and substantial disadvantage and is not entitled to relief on this claim.

9. Conflict of Interest

Finally, Ragin claims Mackey was ineffective because of conflict of interest before and during trial when he sought election as a judge and during appeal when he sought election as county sheriff. (Doc. No. 1 at 3). In order to establish a claim under Strickland based on an actual conflict of interest, a petitioner "must show that his interests diverged with respect to a material factual or legal issue or to a course of action." United States v. Nicholson, 475 F.3d 241, 249 (4th Cir. 2007). In short, a petitioner must demonstrate that there was a conflict and this conflict operated to adversely impact his counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). Yet, Ragin points to no facts showing that Mackey's decisions or conduct were affected by his political ambitions. Therefore, he is not entitled to a hearing on this claim.

B.     Apprendi Error

Next, Ragin argues that the district court erred by sentencing him based on an amount of drugs that was greater than that found by the jury. The jury found that more than fifty grams of cocaine base was reasonably foreseeable to the Ragin. (3:04-cr-271, Doc. 271: Verdict at 2). The statutory penalty for that drug quantity at the time Ragin committed the offense and was sentenced was ten years to life. 21 U.S.C. § 841(b)(1)(A) (2007). The Court sentenced him to thirty years, within the statutory range of punishment based on the jury's verdict. (Case No. 3:04-cr-271, Doc. No. 349: Judgment at 2). Therefore, the record clearly shows that the Court did not violate the rule in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.").

IV.     CONCLUSION

15

After reviewing the entire record in the light most favorable to Petitioner, the Court finds no genuine issues of material fact such that a rational trier of fact could find that Petitioner is entitled to relief on any of his claims other than counsel's alleged sleeping.  On that claim, after a hearing, the Court finds that Petitioner has not established any prejudice from the alleged sleeping.

**IT IS, THEREFORE, ORDERED** that:

1.    The Government's Motion for Summary Judgment, (Doc. No. 17), is **GRANTED in part**;

2.    Petitioner's Cross-Motion for Summary Judgment, (Doc. No. 21), is **DENIED**;

3.    Petitioner's Motion to Vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**; and

4.    Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court **DECLINES** to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).  Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

Signed: August 19, 2014

Robert J. Conrad, Jr.
United States District Judge

16

**United States District Court**
**Western District of North Carolina**
**Charlotte Division**

| | | |
|---|---|---|
| Nicholas Ragin , | ) | JUDGMENT IN CASE |
| | ) | |
| Plaintiff(s), | ) | 3:10-cv-00488-RJC |
| | ) | |
| vs. | ) | |
| | ) | |
| USA, | ) | |
| Defendant(s). | ) | |

 DECISION BY COURT. This action having come before the Court and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Court's August 19, 2014 Order.

August 19, 2014

*Frank G. John*

Frank G. Johns, Clerk
United States District Court

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO. 3:10CV00488-RJC
(NO. 3:04CR271-RJC)


NICHOLAS RAGIN                          )
                                        )
        v.                              )
                                        )
UNITED STATES OF AMERICA                )
_____       )


## NOTICE OF APPEAL

NOW COMES Nicholas Ragin, through counsel and pursuant to Rule 4 (a) and

of the Federal Rules of Appellate Procedure, and hereby gives notice of appeal of the

Judgment entered on August 19, 2014 in accordance with the Court's Order denying

and dismissing his 28 U.S.C. § 2255 motion and granting in part the government's

motion for summary judgment, signed on August 19, 2014, to the United States Court of

Appeals for the Fourth Circuit.


This the 19th day of August, 2014.


Respectfully submitted,

/s/ Matthew G. Pruden

1

Matthew G. Pruden
Bar No. 32888
Attorney for Mr. Ragin
Tin Fulton Walker & Owen, PLLC
301 East Park Ave.
Charlotte, NC 28203
Phone: 704-338-1220
Fax: 704-338-1312
E-mail: mpruden@tinfulton.com

2

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing **NOTICE OF APPEAL** on opposing counsel by submitting a copy thereof through ECF to:

William Miller
Assistant United States Attorney
227 West Trade Street
Suite 1650
Charlotte, NC 28202
William.miller@usdoj.gov

This the 19th day of August, 2014.

Respectfully submitted,

/s/ Matthew G. Pruden
Matthew G. Pruden
Bar No. 32888
Attorney for Mr. Ragin
Tin Fulton Walker & Owen, PLLC
301 East Park Ave.
Charlotte, NC 28203
Phone: 704-338-1220
Fax: 704-338-1312
E-mail: mpruden@tinfulton.com

3