No. 14-7245

## UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

NICHOLAS RAGIN,

*Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA

SUPPLEMENTAL JOINT APPENDIX
VOLUME I of II
(Pages 1-790)

Jill Westmoreland Rose
United States Attorney

William M. Miller
Assistant United States Attorney
227 West Trade Street
Carillon Building, Suite 1650
Charlotte, North Carolina   28202
(704) 344-6222
Counsel for Appellee

# TABLE OF CONTENTS
## Supplemental Joint Appendix
## Volume I of II

Page:

Excerpts from Transcript of Jury Trial Proceedings before
The Honorable Robert J. Conrad, Jr.
from April 3, 2006 to April 21, 2006 ................................................. 1

Testimony of <u>Crystal Chumley</u>
Direct Examination by Ms. Marston .......................................... 1

Cross Examination by Mr. Culler ............................................. 83

Cross Examination by Mr. Adolf .............................................. 94

Cross Examination by Mr. Mackey ......................................... 149

Cross Examination by Mr. Brown ........................................... 151

Redirect Examination by Ms. Marston ................................. 155

Testimony of <u>Catherine Wills</u>
Direct Examination by Ms. Marston ...................................... 169

Cross Examination by Mr. Culler .......................................... 232

Cross Examination by Mr. Adolf ........................................... 252

Cross Examination by Mr. Mackey ........................................ 259

Redirect Examination by Ms. Marston ................................. 261

Recross Examination by Mr. Culler ...................................... 268

Recross Examination by Mr. Mackey .................................... 270

Testimony of <u>Eugene William Lewis</u>
    Direct Examination by Ms. Marston.......................................272

    Cross Examination by Mr. Culler ..........................................339

    Cross Examination by Mr. Adolf...........................................389

    Cross Examination by Mr. Mackey ......................................406

    Cross Examination by Mr. Brown.........................................426

    Redirect Examination by Ms. Marston .................................433

    Recross Examination by Mr. Adolf.......................................439

Testimony of <u>Angenita Denise Davis</u>
    Direct Examination by Ms. Marston.......................................440

    Cross Examination by Mr. Culler ..........................................494

    Cross Examination by Mr. Adolf...........................................505

    Cross Examination by Mr. Mackey ......................................512

    Redirect Examination by Ms. Marston .................................515

Testimony of <u>Keshia Burris</u>
    Direct Examination by Ms. Marston.......................................517

    Cross Examination by Mr. Culler ..........................................666

    Cross Examination by Mr. Adolf...........................................717

    Cross Examination by Mr. Mackey ......................................733

    Cross Examination by Mr. Brown.........................................747

    Redirect Examination by Ms. Marston .................................753

Recross Examination by Mr. Mackey.....................................756

Testimony of Terrell A. Tadeo
Direct Examination of Ms. Marston......................................759

Cross Examination by Mr. Culler .........................................770

Cross Examination by Mr. Adolf...........................................772

Cross Examination by Mr. Mackey ......................................774

Redirect Examination by Ms. Marston ..................................787

Letter from Nicholas Ragin to the Honorable Robert J. Conrad, Jr.
dated June 25, 2006. ..................................................789

## <u>TABLE OF CONTENTS</u>
### Supplemental Joint Appendix
### Volume II of II (sealed)

Page:

Revised Final Presentence Investigation Report
    filed January 4, 2007........................................................................ 791

LORI PARKER - RECROSS

1  the way that the ad would have appeared in the Creative

2  Loafing Magazine itself?

3  A.   Correct.  Our ads are -- they're extracted from the

4  computer program in which I generated those from.

5           MR. RANDALL:  Thank you very much.  No further

6  questions.

7           MR. ADOLF:  Judge, can I have one more question

8  based upon that?

9           THE COURT:  Based upon that question?

10          MR. ADOLF:  Yes.

11          THE COURT:  You may.

12                    RECROSS EXAMINATION

13 BY MR. ADOLF:

14 Q.   When was it the government asked you to do this search,

15 ma'am, do you recall?

16 A.   Probably two, two and a half weeks ago.

17          MR. ADOLF:  Thank you very much.

18          THE COURT:  You may step down and be excused.

19          (Witness stepped down.)

20          THE COURT:  Call your next witness.

21          MS. MARSTON:  United States calls Crystal Chumley.

22                    CRYSTAL CHUMLEY,

23 being first duly sworn, was examined and testified as follows:

24                    DIRECT EXAMINATION

25 BY MS. MARSTON:

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

                              1

CRYSTAL CHUMLEY - DIRECT

1   Q.   You may have to pull that mic down towards your face just

2   a little bit.

3            (Witness complied.)

4   Q.   Can you please tell the jury what your name is.

5   A.   Crystal Chumley.

6   Q.   Ms. Chumley, do you also go by another name?

7   A.   Yes.

8   Q.   And what is that?

9   A.   Donna.

10  Q.   Now, how old are you, Ms. Chumley?

11  A.   Twenty-four.

12  Q.   And where were you born?

13  A.   Decatur, Alabama.

14  Q.   And how much school have you completed?

15  A.   To the eighth grade.

16           MR. BROWN:  We can't hear, Your Honor.

17           THE WITNESS:  To the eighth grade.

18  Q.   Now, Ms. Chumley, where -- what happened when you were

19  about one year old?

20  A.   I was tooken from my mama.

21  Q.   And where were you placed?

22  A.   Foster care.

23  Q.   Now, at some point were you placed in an adoptive home?

24  A.   Yes.

25  Q.   How old were you then?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2

CRYSTAL CHUMLEY - DIRECT

1  A.   Five.

2  Q.   And what started happening to you after you turned six?

3  A.   I was being molested.

4  Q.   Was that by people close to you?

5  A.   (Affirmative nod.)

6  Q.   Who was it by?

7  A.   My -- my dad and my granddad.

8  Q.   Now, when did you start using alcohol?

9  A.   When I was 13.

10  Q.   And who gave you the alcohol when you were 13?

11  A.   My granddaddy.

12  Q.   Now, at some point did you try to run away?

13  A.   Yes.

14  Q.   How old were you when you first tried to run away?

15  A.   Ten years old.

16  Q.   Why did you try to run away when you were ten years old?

17  A.   Ten?

18  Q.   Yeah, why?

19  A.   I wanted to get away.

20  Q.   And every -- how many times do you think you ran away

21  between ten and when you were a teenager?

22  A.   Five times.

23  Q.   And did -- at one point did you eventually succeed in

24  running away?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

3

CRYSTAL CHUMLEY - DIRECT

1   Q.   And where did you run to?

2   A.   Hanover, Indiana.

3   Q.   And when you got to Indiana, what did you do then?

4   A.   I got in a fight.

5   Q.   Then what did you do?

6   A.   I left the state.

7   Q.   And where did you go then?

8   A.   Charlotte.

9   Q.   And how did you get to Charlotte from Indiana?

10  A.   Greyhound bus.

11  Q.   And how old were you at this time?

12  A.   Seventeen.

13  Q.   Now, when you arrived in Charlotte at the age of 17, what

14  happened first?

15  A.   (No response.)

16  Q.   When you got off the bus, what happened first?

17  A.   I met a dude.

18  Q.   And what did that dude give you?

19  A.   Crack.

20  Q.   Is that the first time you'd ever tried crack?

21  A.   Yeah.

22  Q.   And the first time you tried crack, how did it make you

23  feel?

24  A.   Funny.

25  Q.   And did you want to try it again?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  A.   Yeah.

2  Q.   So what did you do once you first tried crack?

3  A.   I pawned my stuff.

4  Q.   What did you pawn?

5  A.   My radio.

6  Q.   Did you pawn anything else that you had?

7  A.   My jewelry.

8  Q.   And why did you pawn your radio and your jewelry?

9  A.   To get money at first.

10  Q.   And why did you need money?

11  A.   Because I ran away from home.

12  Q.   And what were you going to use that money on?

13  A.   Alcohol.  Somewhere to stay.

14  Q.   Now, from then till now, have you been in and out of jail

15  a number of times?

16  A.   Yes.

17  Q.   How many times do you think you've been in and out of

18  jail?

19  A.   Over forty times.

20  Q.   Over forty times?

21  A.   (Affirmative nod.)

22  Q.   And right now you are currently in the Mecklenburg County

23  Jail; is that right?

24  A.   Yes.

25  Q.   And you actually have been designated as a material

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   witness in this case; is that correct?

2   A.   Yes.

3   Q.   And at some point were you put out on probation or bond

4   as a material witness in this case?

5   A.   Yes.

6   Q.   And where were you -- where did -- where were you placed

7   on that probation?

8   A.   McLeod Center.

9   Q.   Tell the jury what McLeod Center is.

10  A.   It's a drug place for drugs.

11  Q.   With substance abuse problems, right?

12  A.   Yes.

13  Q.   And how long did you stay there?

14  A.   Four days.

15  Q.   And then what happened?

16       MR. CULLER:  I'm sorry, what did she say?

17       THE WITNESS:  Four days.

18       MR. CULLER:  Four days, thank you.

19  Q.   Then what happened?

20  A.   I got caught doing something I wasn't supposed to do.

21  Q.   And what happened then?

22  A.   I got kicked out so I ran.

23  Q.   Now, I'm going to show you what I've marked for

24  identification purposes and it's going to pop up on that

25  screen.  And you can lift -- you can pull that screen up and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  you'll be able to see it better.

2      I'm going to show you what's been marked for

3  identification purposes as Government's Exhibit 120B.  This is

4  the first page of Government's Exhibit 120B.  Okay.  This is

5  the next page.  Third page.  And then finally, the fourth

6  page.

7      Do you recognize all those pages of Government's Exhibit

8  120B?

9  A.   Yes.

10  Q.   How do you recognize them?

11  A.   It's me.

12  Q.   Are those various photographs of you at various times in

13  your life since you came to Charlotte?

14  A.   Yes.

15          MS. MARSTON:  At this time the government moves into

16  evidence Government's Exhibit 120B.

17          THE COURT:  Any objection?

18          MR. CULLER:  No.

19          THE COURT:  Let it be admitted.

20          (Government's Exhibit Number 120B was received into

21  evidence.)

22  Q.   Now, Ms. Chumley, you've met with me a couple of times,

23  right?

24  A.   Yes.

25  Q.   And when was the first time that we met?  Do you remember

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  where you were?

2  A.   (Affirmative nod.)

3  Q.   And where was that?

4  A.   (No response.)

5  Q.   Did we meet the first time a while back when you were in

6  jail?

7  A.   Yes.

8  Q.   And then the next time we actually saw each other was at

9  the law enforcement center.

10  A.   Yes.

11        MR. ADOLF:  Objection to the leading questions.

12        THE COURT:  Overruled.

13  Q.   And were you able to communicate with me that night at

14  the law enforcement center?

15  A.   No.

16  Q.   And why was that?

17  A.   I was drunk.

18  Q.   And then the most recent times that you and I have

19  chatted, have you had your attorney present with you?

20  A.   Yes.

21  Q.   And what's her name?

22  A.   Julia Mimms.

23  Q.   And who has been with me every time that we've met?

24  A.   (No response.)

25  Q.   Do you recognize anybody at the table that's been with

Cheryl A. Nuccio, RMR-CRR (704)350-7494

8

1    me?

2    A.   Yes.

3    Q.   And who is that?

4    A.   The dude beside you.

5    Q.   All right.  Any other dudes in the courtroom that you

6    recognize?

7    A.   Yes.

8    Q.   And who else do you recognize?

9    A.   Scott Maxfield and (witness indicated.)

10   Q.   The person back here in the yellow shirt?

11   A.   Yes.

12   Q.   All right.  Now, I want to go back and talk about when

13   you first got to Charlotte, okay, when you got off that

14   Greyhound bus.  And what did you start doing after you

15   finished pawning off your stuff?  How did you start making

16   money for yourself?

17   A.   Prostituting.

18   Q.   And at some point did you run into somebody that you

19   began to live with?

20   A.   Yes.

21   Q.   Who was that?

22   A.   Alex Howard.

23   Q.   I'm going to show you what's been marked for

24   identification purposes only as Government's Exhibit 85W.  Do

25   you recognize the photograph that you see in Government's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1389

CRYSTAL CHUMLEY - DIRECT

1   Exhibit 85W?

2   A.   Yes.

3   Q.   And how do you recognize it?

4   A.   Alex.

5         MS. MARSTON:  At this time the government moves into

6   evidence Government's Exhibit 85W.

7         THE COURT:  Any objection?

8         MR. CULLER:  No.

9         THE COURT:  Let it be admitted.

10        (Government's Exhibit Number 85W was received into

11   evidence.)

12   Q.   Now, how did you first meet Alex?

13   A.   North Tryon.

14   Q.   On North Tryon.  And tell the jury how it came about that

15   you met him on North Tryon.

16   A.   I was walking.

17   Q.   And while you were walking, what happened?

18   A.   He pulled over.

19   Q.   And then what happened?

20   A.   He asked me if I wanted to make money and I said yes.

21   Q.   And did you get in the car?

22   A.   Yes.

23   Q.   And then what happened?

24   A.   (No response.)

25   Q.   Where did you go after you got in the car?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

10

CRYSTAL CHUMLEY - DIRECT

```
 1   A.   Apartments.

 2   Q.   Do you remember where those apartments were located?

 3   A.   Near Wal-Mart.

 4   Q.   Near Wal-Mart.  Okay.  Which Wal-Mart?

 5   A.   University.

 6   Q.   I'm sorry?

 7   A.   University.

 8   Q.   University City.  Okay.  When you got to those

 9   apartments, did you then stay?

10   A.   Huh?

11   Q.   Did you stay at those apartments for a while?

12   A.   Yes.

13   Q.   And who did you then meet after that?

14   A.   Tracy.

15   Q.   Do you see somebody in the courtroom that you know as

16   Tracy?

17   A.   Yes.

18   Q.   Can you please tell me what chair he's sitting in.

19   A.   The second one.

20        MS. MARSTON:  Your Honor, may the record reflect

21   she's identified the defendant Tracy Howard.

22        THE COURT:  It may.

23   Q.   Now, when you first met Tracy, who was he with?

24   A.   Keshia, Destiny, Honey.

25   Q.   I'm going to show you first what's been marked as
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Government's Exhibit -- and already introduced into evidence,

2   Government's Exhibit 116C.  Do you recognize the photograph

3   I'm showing you in Government's Exhibit 116C?

4   A.    Yes.

5   Q.    How do you recognize it?

6   A.    Honey.

7   Q.    I'm also going to show you what's been marked as

8   Government's Exhibit 116B.  Do you recognize the photograph

9   that you see in 116B?

10  A.    Yes.

11  Q.    How do you recognize it?

12  A.    Destiny.

13  Q.    And did you know her by any other name?

14  A.    No.

15  Q.    Do you recognize where she's standing in front of?

16  A.    Yes.

17  Q.    How do you recognize that?

18  A.    North Pointe.

19  Q.    I'm also going to show you what's been marked as

20  Government's Exhibit 116A.  Do you recognize the photograph in

21  Government's Exhibit 116A?

22  A.    Yes.

23  Q.    Who is that?

24  A.    Tracy.

25  Q.    Now, I'm also going to show you what's already been

Cheryl A. Nuccio, RMR-CRR (704)350-7494

12

CRYSTAL CHUMLEY - DIRECT

1  introduced into evidence as Government's Exhibit 85G.  Do you

2  recognize who I'm showing you in Government's Exhibit 85G?

3  A.   Yes.

4  Q.   And how do you recognize that?

5  A.   Keshia.

6  Q.   Now, when you first met defendant Tracy Howard and

7  Keshia, Honey, and Destiny, what was everyone doing?

8  A.   Making money.

9  Q.   How were you all making money?

10 A.   Going on Mexicans.

11 Q.   And where would you go to see these Mexicans?

12 A.   North Pointe.

13 Q.   I'm going to show you Government's Exhibits 1D and 1E.

14 Do you recognize those two photographs, 1E and 1D?

15 A.   North Pointe.

16 Q.   Do you recognize those photographs?

17 A.   Yes.

18 Q.   How do you recognize them?

19 A.   North Pointe.

20 Q.   Is that one of the places you went to see some Mexicans?

21 A.   Yes.

22 Q.   I'm also going to show you what's been marked and I

23 believe already introduced into evidence as Government's

24 Exhibit 2D.  Do you recognize what you see in Government 2D?

25 A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

13

CRYSTAL CHUMLEY - DIRECT

1   Q.   I'm going to show you what's been marked as Government's
2   Exhibit 4C.  Do you recognize what you see in Government's
3   Exhibit 4C?
4   A.   The Park.
5   Q.   And was the Park an apartment complex that you went to?
6   A.   Yes.
7   Q.   I'm going to show you Government's Exhibit 6.  Do you
8   recognize Government's Exhibit 6?
9   A.   Yes.
10  Q.   How do you recognize that photograph?
11  A.   Idlewild.
12  Q.   Did you ever go to Idlewild?
13  A.   Yes, but not for that.
14  Q.   Okay.  What did you go --
15          MR. ADOLF:  I'm sorry, I can't see the witness.
16          THE COURT:  Can't see her.
17          MR. ADOLF:  I guess we'll have to wait until the
18  photos are over.  I apologize.
19  Q.   What did you go to Idlewild for?
20  A.   Friends.
21  Q.   Now, who took you to North Pointe apartment at first?
22  A.   Alex.
23  Q.   And who else was going at the same time that you were
24  going with Alex?
25  A.   Like in girls?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

14

1394

CRYSTAL CHUMLEY - DIRECT

1  Q.   Was it -- was it another man also going at the same time
2  you and Alex were going?
3           MR. CULLER:  Object to leading.
4           THE COURT:  Overruled.
5  Q.   You can answer that question.  Was somebody else also
6  going with girls at the same time that you were going with
7  Alex?
8  A.   Yes.
9  Q.   And who was that?
10  A.   Tracy.
11  Q.   And which girls was he taking with him at that point?
12  A.   Honey, Destiny, Keshia.
13  Q.   Now, at some point did you leave Alex?
14  A.   Yes.
15  Q.   And why was that?
16  A.   Which time?
17  Q.   The first time.
18  A.   Because I went to jail.
19  Q.   And what happened when you got out of jail?
20  A.   I went the other way.
21  Q.   Now, at some point did you run back into him?
22  A.   Yes.
23  Q.   And then what happened?
24  A.   He found me at the hotel.
25  Q.   And then what happened?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1395

CRYSTAL CHUMLEY - DIRECT

```
 1   A.   He pulled me by my hair and then drug me.
 2   Q.   And did you end up staying with him again for some period
 3   of time?
 4   A.   Yes.
 5   Q.   Now, at some point did Alex go to prison?
 6   A.   Huh?
 7   Q.   At some point did Alex go to prison?
 8   A.   Yes.
 9   Q.   And at that point were you on your own?
10   A.   Yes.
11   Q.   And at some point did you run in to somebody else from
12   the Howard family?
13   A.   Yes.
14   Q.   And who was that?
15   A.   Tracy.
16   Q.   And how did you run into Tracy?
17   A.   Sugar Creek.
18   Q.   On Sugar Creek.  Okay.  And who was with Tracy at the
19   time you ran into him?
20   A.   Keshia.
21   Q.   And what happened when you first ran into Tracy and
22   Keshia on Sugar Creek?
23   A.   He wanted to know if I was ready to come with him.
24   Q.   And what did you say?
25   A.   I said I was with my boyfriend right now.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

16

CRYSTAL CHUMLEY - DIRECT

1   Q.   And did you get away?

2   A.   Yes.

3              MR. CULLER:  Objection.

4              THE COURT:  Sustained.

5   Q.   What happened after you -- after he asked you if you

6   wanted to come with him?

7   A.   He sent his brother to act like he was a date.

8   Q.   All right.  And who was his brother?

9              MR. ADOLF:  I'm sorry, I couldn't understand the

10  answer.

11             THE COURT:  Madam Court Reporter, would you read

12  back the question and answer.

13             THE COURT REPORTER:  Question:  What happened after

14  you -- after he asked you if you wanted to come with him?

15             Answer:  He sent his brother to act like he was a

16  date.

17  BY MS. MARSTON:

18  Q.   Now, which brother was that?

19  A.   David.

20  Q.   Do you see David in the courtroom today?

21  A.   Yes.

22  Q.   Can you please tell me where he's seated and what he's

23  wearing.  Point out the chair that he's seated in.

24  A.   The fourth.

25             MS. MARSTON:  Your Honor, may the record reflect she

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   has identified defendant David Howard.

2          THE COURT:  It may.

3   Q.   Well, tell -- explain to the jury what you mean that he

4   sent his brother to act like he was a trick.

5          MR. CULLER:  Well, objection.  That's not what she

6   said.

7          THE COURT:  Sustained.

8   Q.   To act like he was a date, I'm sorry.

9   A.   He acted like he was a date.  He came up and said, You

10  want to make some money?  I said yes.  Then when he brought me

11  back to the car, Tracy was there.

12  Q.   So what happened when you got near the car?

13  A.   He said that he was going to let me go back out there

14  when I got finished.

15  Q.   And so what happened next?

16  A.   I went to their house.

17  Q.   Which house did you go to?

18  A.   Greenlefe Village.

19  Q.   And when you got to Greenlefe Village, what happened?

20  A.   I did whatever and then they didn't want me to go.

21  Q.   What do you mean you did whatever?

22  A.   I had sex.

23  Q.   Who did you have sex with?

24  A.   David.

25  Q.   And after you had sex with David, what happened?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   A.   They said I wasn't going no where.

2   Q.   And who said you weren't going no where?

3   A.   Tracy.

4   Q.   I'm going to show you what's been previously introduced

5   into evidence as Government's Exhibit 15C.  Do you recognize

6   Government's Exhibit 15C?

7   A.   Yes.

8   Q.   And how do you recognize it?

9   A.   Greenlefe Village.

10  Q.   Now, I'm also going to show you -- I'm first going to

11  show you what's already been introduced into evidence as

12  Government's Exhibit 22C.  Do you recognize Government's

13  Exhibit 22C?

14  A.   Yes.

15  Q.   And what is that?

16  A.   The living room.

17  Q.   Of what house?

18  A.   Greenlefe Village.

19  Q.   I'm also going to show you 22D.  Do you recognize 22D?

20  A.   Yes.

21  Q.   And what's that?

22  A.   Kitchen.

23  Q.   I'm going to show you 22G.  Do you recognize 22G?

24  A.   Yes.

25  Q.   And who -- what's that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1    A.    Bedroom.

2    Q.    Whose bedroom?

3    A.    Ila.

4    Q.    I'm sorry?

5    A.    Ila.

6    Q.    Who's Ila?

7    A.    Their mother.

8    Q.    I'm going to show you -- I'm going to show you

9    Government's Exhibit 85E.  Do you recognize Government's

10   Exhibit 85E?

11   A.    Yes.

12   Q.    And how do you recognize it?

13   A.    Ila.

14   Q.    And did you know Ila by any other names?

15   A.    No.

16   Q.    Now, I'm also going to show you Government's Exhibit 22F.

17   Do you recognize Government's Exhibit 22F?

18   A.    Yes.

19   Q.    How do you recognize that?

20   A.    The second bedroom.

21   Q.    In which house?

22   A.    Greenlefe Village.

23   Q.    Then I'm going to show you Government's Exhibit 22E.  Do

24   you recognize Government's Exhibit 22E?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   How do you recognize that?

2   A.   The third bedroom.

3   Q.   I'm going to show you Government's Exhibit 22I.  Do you

4   recognize Government's Exhibit 22I?

5   A.   Yes.

6   Q.   How do you recognize that?

7   A.   The hall bathroom.

8   Q.   I'm going to show you Government's Exhibit 22H.  Do you

9   recognize Government's Exhibit 22H?

10  A.   Yes.

11  Q.   How do you recognize that?

12  A.   Ila's bathroom.

13  Q.   Now, what happened after you were told you weren't

14  allowed to leave Greenlefe Village?

15  A.   Started working the escort service.

16  Q.   And do you recall what escort service you started working

17  for?

18  A.   Discreet Delight.

19  Q.   I'm going to have to have you lower that thing one more

20  time.  Sorry to keep doing that.

21       (Witness complied.)

22  Q.   Now, explain to the jury how you started working for

23  Discreet Delight.

24  A.   (No response.)

25  Q.   How did it first come up as conversation?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

```
 1   A.   I don't remember.
 2   Q.   Who suggested that you work for Discreet Delight?
 3   A.   Everybody.
 4   Q.   I'm sorry?
 5   A.   Everybody.
 6   Q.   Who's everybody?
 7   A.   David, Tracy, Ila.
 8   Q.   So David, Tracy, and Ila all talked to you about Discreet
 9   Delight?
10   A.   (Affirmative nod.)
11   Q.   And what were you supposed to do when you worked for
12   Discreet Delight?
13   A.   Make money.
14   Q.   How were you supposed to make money?
15   A.   Whatever they wanted.
16   Q.   And what did whatever they wanted include?
17   A.   Sex.
18   Q.   Now, did it ever include oral sex?
19   A.   Yeah.
20   Q.   And were you able to do that?
21   A.   Yeah.
22   Q.   And did you ever say no to that?
23   A.   Yeah.
24   Q.   And why would you say no?
25   A.   Because I don't like doing it.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   Why don't you like doing it?

2   A.   Because I was made to do it when I was six years old.

3   Q.   Now, when you worked for the service, how would you get

4   to the calls?

5   A.   They would take me.

6   Q.   Who's they?

7   A.   David.

8   Q.   And how would David take you to the calls?

9   A.   Car.

10  Q.   Do you recall what kind of car he was driving at that

11  time?

12  A.   Jaguar.

13  Q.   Now, when he took you to the calls, tell us what happened

14  when you got to the place for the call.

15  A.   I would call.

16  Q.   Who would you call?

17  A.   Ila.

18  Q.   And why did you need to call Ila when you got there?

19  A.   To give two forms of ID.

20  Q.   And what happened after you got the two forms of ID?

21  A.   I collect the money.

22  Q.   How much money were you to collect?

23  A.   Two hundred.

24  Q.   Then what did you do?

25  A.   Then whatever.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  Q.   And after you did whatever, what happened?

2  A.   I'd call and say I was through.

3  Q.   Now, were you given anything to take in when you went

4  into this call?

5  A.   Condoms.

6  Q.   And who gave you those condoms?

7  A.   David and them.

8  Q.   I'm sorry, David and who?

9  A.   David and Tracy and Ila.

10 Q.   Now, when you worked for the escort service, did you ever

11 see the business cards?

12 A.   Yes.

13 Q.   And why would you see the business cards?

14 A.   Because I gave them cards.

15 Q.   And who did you give the cards to?

16 A.   The clients.

17 Q.   I'm going to show you what's been previously introduced

18 into evidence as Government's Exhibit 57P.  Do you recognize

19 Government's Exhibit 57P?

20 A.   Yes.

21 Q.   Now, do you notice the name on Government's Exhibit 57P?

22 A.   Yes.

23 Q.   Do you recognize that name?

24 A.   Yes.

25 Q.   And how do you recognize that name?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

24

CRYSTAL CHUMLEY - DIRECT

1   A.   Fantasia.

2   Q.   How do you know the name Fantasia?

3   A.   The escort service.

4   Q.   And so did you know the escort service to have more than

5   one name?

6   A.   Yes.

7   Q.   What are all the different names that you knew the escort

8   service to have?

9   A.   Fantasia and Discreet Delight.

10  Q.   And any others?

11  A.   No.

12  Q.   Now, I'm also going to show you what's already been

13  introduced into evidence as Government's Exhibit 57Q.  Do you

14  recognize Government's Exhibit 57Q?

15  A.   Yes.

16  Q.   And how do you recognize it?

17  A.   It's a credit card slip.

18  Q.   Now, did you actually use the credit card sometimes?

19  A.   Yes.

20  Q.   Can you explain to the jury how you would go about doing

21  that.

22  A.   Yes.

23  Q.   Do you need the piece of paper?

24  A.   Yes.

25        MS. MARSTON:  Your Honor, if I may approach?

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

25

CRYSTAL CHUMLEY - DIRECT

1              THE COURT:  You may.

2              You can put the screen down.

3    A.   The card right here --

4    Q.   The card on top?

5    A.   Yes.  You give to the client.  And I sign my fake name

6    right there.

7    Q.   Okay.  Now, let's stop there a second.  You're talking

8    about the second card underneath the card that says Discreet

9    Delight?

10   A.   Yes.

11   Q.   And you would sign a fake name there.

12   A.   Yes.

13   Q.   What fake name did you use?

14   A.   Jasmine and Destiny.

15   Q.   So you actually used the name Destiny even though you

16   knew another girl named Destiny?

17   A.   Yes.

18   Q.   And you also used the name Jasmine?

19   A.   Yes.

20   Q.   Now, why would you give out a fake name?

21   A.   Because I can't give my real name.  I don't know.

22   Q.   Now, do you recognize the next document underneath the

23   first two business cards?

24   A.   Yes.

25   Q.   And what's that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

26

CRYSTAL CHUMLEY - DIRECT

1  A.   It's a credit card slip.

2  Q.   And tell the jury how you would use that credit card

3  slip.

4  A.   You -- at first we had a slider thing.

5  Q.   Hang on one second.

6         MS. MARSTON:  Your Honor, if I may approach?

7         THE COURT:  You may.

8  Q.   I'm going to show you what's been marked for

9  identification purposes as Government's Exhibit 76D.  Do you

10  recognize Government's Exhibit 76D?

11  A.   Yes.

12  Q.   And how do you recognize it?

13  A.   Credit card slider.

14         MS. MARSTON:  Your Honor, may I introduce at this

15  time Government's Exhibit 76D.

16         THE COURT:  Any objection?

17         MR. CULLER:  No.

18         THE COURT:  Let it be admitted.

19         (Government's Exhibit Number 76D was received into

20  evidence.)

21  Q.   So is this what you used for your credit card slip at

22  some time?

23  A.   At first.

24  Q.   All right.  And what did you do after this?

25  A.   After we stopped that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

```
 1   Q.   Right.
 2   A.   We put the credit card on here and we get a pen and rub
 3   it.
 4   Q.   And why did you stop using this?
 5   A.   Because it was kind of obvious in hotels.
 6   Q.   Now, going to the next document.  What's the next
 7   document?
 8   A.   That's where you put the amount on there and you put
 9   their name right here and then you give it to the client.
10   Q.   All right.  And what's the amount that you would fill in
11   there?
12   A.   Two hundred.  Or if they got tips, you put that in, too.
13   Q.   And why did you have to put the tips in there, too?
14   A.   That way we can get our tip money out of it.
15   Q.   Now, did you ever get your tip money?
16   A.   No.
17   Q.   Why not?
18   A.   They kept it.
19   Q.   Who's they?
20   A.   David.
21   Q.   Now, the next document, do you recognize that?
22   A.   Yes.
23   Q.   And how do you recognize that document?
24   A.   This is where you put your cardholder's name on it and
25   then the billing address, the city, state and zip, and then
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

28

CRYSTAL CHUMLEY - DIRECT

1  the expiration date and a photo ID, and then you write down

2  Visa, Master or Discover and their credit card number, and

3  they sign it, and we keep it.

4  Q.   And once you keep that document, who do you give it to?

5  A.   Ila.

6  Q.   Now, when do you give that document to Ila?

7  A.   Sometimes at the end of the night when we're through

8  doing calls.

9  Q.   Now, who do you give your money to?

10 A.   David.

11 Q.   And when does David get the money?

12 A.   After every call.

13 Q.   Now, do you know what David did with the money after the

14 calls?

15 A.   Bought us clothes.

16 Q.   And what kind of clothes did he buy you?

17 A.   Nice clothes, professional.

18 Q.   And why were you -- why were you buying nice,

19 professional clothes?

20 A.   To look presentable.

21 Q.   Why did you need to look presentable?

22 A.   To go on calls.

23 Q.   Now, did you stay at Greenlefe Village long at that time?

24 A.   No.

25 Q.   Where did you go next?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

29

CRYSTAL CHUMLEY - DIRECT

1   A.   A hotel.

2   Q.   And do you recall who you were at the hotel with?

3   A.   Candy.

4   Q.   I'm going to show you what's been previously introduced

5   into evidence as Government's Exhibit 86.  Do you recognize

6   Government's Exhibit 86?

7   A.   Yes.

8   Q.   And how do you recognize it?

9   A.   Candy.

10   Q.   Now, how did you meet Candy?

11   A.   I been knowing her on North Tryon.

12   Q.   Now, when you were at the hotel with Candy, who got you

13   that hotel room?

14   A.   David.

15   Q.   And why were you staying at the hotel at that point in

16   time?

17   A.   Because we had split up at first.

18   Q.   And who did you split up from?

19   A.   Tracy and them.

20   Q.   And why did you split up from Tracy and them?

21   A.   Because they had a fight.

22   Q.   And tell us about the fight.

23   A.   Tracy had lost his money and he couldn't find his money.

24   Q.   And where was his money lost?  What location?

25   A.   At the house.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  Q.   And which house are you talking about?

2  A.   Greenlefe Village.

3  Q.   All right.  So when he lost his money at Greenlefe

4  Village, what happened after that?

5  A.   He got mad and was asking me and Keshia where his money

6  was.

7  Q.   And then what happened?

8  A.   And then he asked me if I wanted to leave.  I said yes.

9  Q.   And then what happened?

10  A.   He hit me in my left eye.

11  Q.   What happened after he hit you in your left eye?

12  A.   I got in the shower because my head was bleeding.

13  Q.   And after you got --

14        MR. ADOLF:  I'm sorry, I didn't hear the answer.

15        THE COURT:  Madam Reporter, will you read back the

16  answer.

17        THE COURT REPORTER:  Answer:  I got in the shower

18  because my head was bleeding.

19  BY MS. MARSTON:

20  Q.   And what happened when you got out of the shower?

21  A.   I went to the hospital.

22  Q.   Who took you to the hospital?

23  A.   Tracy.

24  Q.   Who picked you up from the hospital?

25  A.   David.


Cheryl A. Nuccio, RMR-CRR (704)350-7494



31

CRYSTAL CHUMLEY - DIRECT

1    Q.    Now, what happened after David picked you up?

2    A.    They got in an argument because Tracy had hit me.

3    Q.    And why did they get in an argument over Tracy hitting

4    you?

5    A.    Because I couldn't make money.

6    Q.    And who couldn't you make money for?

7    A.    David.

8    Q.    So where did you go after you got out of the hospital?

9    A.    With David to a hotel.

10   Q.    And do you recall what hotel you went to?

11   A.    Yes.

12   Q.    What hotel did you go to?

13   A.    Studio 6.

14   Q.    I'm going to show you what's been marked, I believe, just

15   for identification purposes Government's Exhibit 26B.  Do you

16   recognize Government's Exhibit 26B?

17   A.    Yes.

18   Q.    And how do you recognize it?

19   A.    The hotel.

20   Q.    Is that the hotel you went to after you left Greenlefe

21   Village --

22   A.    Yes.

23   Q.    -- after you got hit?

24         MS. MARSTON:  At this time the government moves into

25   evidence Government's Exhibit 26B.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1           THE COURT:  Any objection?

2           MR. CULLER:  No.

3           THE COURT:  Let it be admitted.

4           (Government's Exhibit Number 26B was received into

5    evidence.)

6    Q.    Now, did something happen with law enforcement while you

7    were at this hotel?

8    A.    Yes.

9    Q.    Tell us about that.

10   A.    Candy had went down to get her wine and then when she

11   came back up, the police was right behind her and they came in

12   with her.

13   Q.    Now, what were you doing at this hotel?

14   A.    We was -- she was smoking and...

15   Q.    And were you doing anything else while you were at this

16   hotel?

17   A.    Not at that hotel.

18   Q.    What were you doing at another hotel?

19   A.    Doing escort service, in calls.

20   Q.    All right.  What are in calls?

21   A.    When you have your own hotel.  Like if somebody don't

22   want you to come to their house, you go in call.  You pay for

23   it yourself.

24   Q.    And where was the hotel that you were doing in calls out

25   of?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

33

CRYSTAL CHUMLEY - DIRECT

1   A.   Next door.

2   Q.   And so you actually had two hotel rooms that evening?

3   A.   Yes.

4   Q.   Now, do you recall when this was?

5   A.   No.

6   Q.   If I show you a document, might it refresh your memory as

7   to when this hotel visit was?

8   A.   I don't know.

9          MS. MARSTON:  Your Honor, may I approach the

10  witness?

11         THE COURT:  You may.

12  Q.   I'm going to show you what's been marked for

13  identification purposes as Government's Exhibit 130.  I'm

14  going to show you the first page of Government's Exhibit 130.

15  And then the second page of Government's Exhibit 130.

16      Does that help refresh your memory of when you were

17  visited by law enforcement at the hotel?

18  A.   November.

19  Q.   First answer my question.  Does it help refresh your

20  memory of when it was, this piece of paper, looking at it?

21  A.   Not really.

22  Q.   Well, by looking over this piece of paper --

23         MR. ADOLF:  Objection.

24         MR. CULLER:  Objection.

25         THE COURT:  Overruled.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.    By looking over this piece of paper, if I take it away,

2   do you now remember approximately when you were at the hotel

3   with law enforcement?

4            MR. ADOLF:   Asked and answered and leading.

5   A.    Winter.

6            THE COURT:   Overruled.  I didn't hear the answer.

7            MS. MARSTON:   She said winter.

8   Q.    What month were you at the hotel?

9   A.    November.

10  Q.    Do you remember what year?

11  A.    No.

12  Q.    Now, at the time that law enforcement came to the room,

13  who all was in the room?

14  A.    Just me and Candy.

15  Q.    And what happened after you had that visit by law

16  enforcement?

17  A.    We went to jail.

18  Q.    And what happened when you got to jail?

19  A.    I had to stay because I had probation violations.  She

20  got bailed out.

21  Q.    Who bailed her out?

22  A.    David.

23  Q.    Now, once you got out of jail, where did you go?

24  A.    David.

25  Q.    Did he pick you up?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1    A.    Yes.

2    Q.    And then where did you go?

3    A.    A house.

4    Q.    Do you recall where that house was located?

5    A.    I don't know the name.

6    Q.    I'm going to show you what's been already introduced into

7    evidence as Government's Exhibit 17A.  Do you recognize the

8    intersection you see there in Government's Exhibit 17A?

9    A.    Yes.

10   Q.    And how do you recognize that?

11   A.    It's the street sign near where we live.

12   Q.    I'm also going to show you what's already introduced into

13   evidence as Government's Exhibit 17C.  Do you recognize

14   Government's Exhibit 17C?

15   A.    Yes.

16   Q.    And how do you recognize that?

17   A.    The house we lived in.

18   Q.    Now, who all lived at this house?

19   A.    Crystal, Candy, and me.

20   Q.    Now, your name is also Crystal, right?

21   A.    Yes.

22   Q.    But what name were you going by at that point in time?

23   A.    Donna.

24   Q.    Now, who was the other Crystal?

25   A.    (No response.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   Do you recall why the other Crystal was at the house?

2   A.   Same thing we do.

3   Q.   And what was the same thing we do?

4   A.   Escort service.

5   Q.   I'm going to show you what's already been introduced into

6   evidence as Government's Exhibit 85L.  Do you recognize

7   Government's Exhibit 85L?

8   A.   Yes.

9   Q.   And how do you recognize it?

10  A.   Crystal.

11  Q.   Now, your voice just changed a little bit there.  Why did

12  your voice change when you looked at Government's Exhibit 85L?

13  A.   I don't like her.

14  Q.   Why didn't you like her?

15  A.   Because she became David's girlfriend.

16  Q.   And before she came into the picture, what did you

17  consider David?

18  A.   My boyfriend.

19  Q.   Now, do you recall some of the places that you went on

20  calls for the service?

21  A.   Ballantyne.

22  Q.   Anywhere else?

23  A.   I can't remember them.  And hotels.

24  Q.   You went to hotel rooms throughout?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1417

CRYSTAL CHUMLEY - DIRECT

1   Q.   Did you go to downtown Charlotte?

2   A.   Yes.

3   Q.   Did you go to Ft. Mill?

4   A.   Yes.

5   Q.   Who did you go to Ft. Mill with?

6        MR. CULLER:  Object to the leading.

7   A.   David.

8        THE COURT:  Overruled.

9   Q.   Who took you to Ft. Mill?

10  A.   David.

11  Q.   Now, at any point in time, were you still going to the

12  North Pointe Apartments?

13  A.   No.

14  Q.   Why not?

15  A.   I don't know.

16  Q.   Tell us about the living arrangements at that house where

17  you, David, Crystal, and Candy lived.

18  A.   What do you mean?

19  Q.   Tell us about the house.  What did you do when you

20  weren't going out on calls?

21  A.   What do we do?  Clean.

22  Q.   And who would do the cleaning?

23  A.   Everybody.

24  Q.   And were you ever allowed to go outside the house?

25  A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   And when were you allowed to go outside the house?

2   A.   Whenever we wasn't cleaning.

3   Q.   And who did you go with?

4   A.   By ourselves.

5   Q.   Did you have a car?

6   A.   Yes.

7   Q.   And what car were you driving?

8   A.   We wasn't driving.

9   Q.   All right.  Who was driving?

10  A.   David.

11  Q.   So when you went outside the house, you were with David?

12  A.   Yes.

13  Q.   Now, was there one time that you were allowed to drive

14  the car?

15  A.   Not me, but Candy.

16  Q.   And did you go with Candy that one time?

17  A.   Yes.

18  Q.   She drove the car?

19  A.   Yes.

20  Q.   And where were you supposed to go?

21  A.   Tanning bed.

22  Q.   Where did you go?

23  A.   The dope dealer's house.

24  Q.   And where was the dope dealer's house?

25  A.   Hidden Valley.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   And had you been getting dope before that day that you

2   went to Hidden Valley?

3   A.   I wasn't.

4   Q.   Who was getting dope before that day?

5   A.   Candy.

6   Q.   Who was she getting her dope from?

7   A.   David.

8   Q.   And what kind of dope was she getting?

9   A.   A gram.

10  Q.   A gram of what?

11  A.   Crack.

12  Q.   And how often would she get a gram of crack?

13  A.   Every day.

14  Q.   Now, why didn't you get a gram of crack?

15  A.   He didn't like it when I smoked.

16  Q.   I'm sorry, I didn't hear that.

17  A.   He didn't like it when I smoked.

18  Q.   Now, at the beginning were you given crack?

19  A.   Yeah.

20  Q.   How long did he give you crack, how many days?

21  A.   Every day until I started acting crazy.

22  Q.   And when you started acting crazy, what did he do?

23  A.   He stopped letting me smoke.

24  Q.   So where would you get your crack then?

25  A.   I didn't get none.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   Did you ever borrow any from anybody else?

2   A.   Yeah, Candy.

3   Q.   So on the day that you didn't go to the tanning salon but

4   went to the dope dealer's house in Hidden Valley, why didn't

5   you get your crack from David?

6   A.   Because I couldn't have none and we had money.

7   Q.   And why did you have money?

8   A.   We was supposed to be going to the tanning bed.

9           MR. ADOLF:  I'm sorry, I didn't hear that.

10          THE COURT:  Madam Court Reporter, would you repeat

11   that last answer.

12          THE COURT REPORTER:  Answer:  We was supposed to be

13   going to the tanning bed.

14   BY MS. MARSTON:

15   Q.   And who gave you the money for the tanning bed?

16   A.   David.

17   Q.   What happened when you got home that day?

18   A.   He said where y'all been.

19   Q.   And then what happened?

20   A.   We lied.  We said we was at the tanning bed.

21   Q.   And after you lied about where you had been, what

22   happened?

23   A.   We got -- we got -- we got hit.

24   Q.   Now, was that the first time you'd gotten hit?

25   A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

41

CRYSTAL CHUMLEY - DIRECT

1    Q.    When had you been hit before?

2    A.    For lying.

3    Q.    How many times before that had you been hit?

4    A.    A bunch.

5    Q.    And who hit you?

6    A.    David.

7    Q.    Now, on that day that you all went to Hidden Valley, did

8    you know where the crack was in the house that you lived in

9    with David?

10   A.    Yes.

11   Q.    Where was it?

12   A.    Sometimes in the closet in a bag.

13   Q.    Now, did you ever go into the closet and get it out of

14   the bag?

15   A.    No.

16   Q.    Why not?

17   A.    Because I wouldn't do that.

18   Q.    Why wouldn't you do that?

19   A.    I'm not that brave and I don't do people like that.

20   Q.    Now, why couldn't Candy get more -- get dope from David

21   that day?

22   A.    Because you can only get a gram a day.  Once you run out,

23   you don't get no more.

24   Q.    Now, was there a point in time when you were smoking

25   crack around David?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

42

1   A.   Yes.

2   Q.   And what happened that day?

3   A.   When?

4   Q.   When you were smoking crack around David.

5   A.   (No response.)

6   Q.   Do you recall a time when you were smoking crack around

7   David and the crack fell?

8            MR. ADOLF:  Objection to leading, Judge.

9            MR. CULLER:  Objection.

10           THE COURT:  Haven't heard the question.

11  Q.   And the crack fell.

12           MR. ADOLF:  Objection to leading.

13           THE COURT:  Overruled.

14           MR. CULLER:  Objection.

15           THE COURT:  Overruled.

16           Did you hear the question?

17           THE WITNESS:  I don't understand it.

18  Q.   Do you recall a time when you were smoking crack and the

19  crack fell?

20           MR. CULLER:  Objection.

21  A.   Crack fell?

22  Q.   You weren't able to smoke the crack.

23           MR. ADOLF:  Objection.

24           MR. CULLER:  Objection.

25           MR. ADOLF:  The witness is --

CRYSTAL CHUMLEY - DIRECT

1    A.    Oh.

2              THE COURT:  Hang on a second.  Pardon me?

3              MR. ADOLF:  Your Honor, can the record reflect that

4    the witness has said that she doesn't understand, that she has

5    a puzzled expression.  She's clearly expressing she doesn't

6    know what the prosecutor is talking about and she keeps adding

7    more information.

8              THE COURT:  I think that's an objection.  I'll

9    overrule it.  Go ahead and ask your question.

10   Q.    Did you hear my question?

11   A.    Yeah.

12   Q.    Did you understand my question?

13   A.    The crack fell, no.

14   Q.    Was there a time that you got in trouble when you were

15   smoking crack?

16   A.    Yes.

17   Q.    Do you recall what happened on that particular occasion?

18   A.    Yes.

19   Q.    Can you tell the jury about that.

20   A.    I got mad and threw my stem in the fireplace.

21   Q.    All right.  When you threw your stem in the fireplace,

22   what happened?

23   A.    I said I quit.

24   Q.    And what is a stem?

25   A.    It's a tire gauge.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1424

CRYSTAL CHUMLEY - DIRECT

1   Q.   I'm sorry?

2   A.   A tire gauge.

3   Q.   And how do you use a tire gauge while you're smoking?

4   A.   Take the top out of it and you put Chore Boy in it.

5            THE COURT REPORTER:  Put what in it?

6            THE WITNESS:  Chore Boy.  Brillo.

7   Q.   Brillo, is that what you just said?

8   A.   Yeah.

9   Q.   And what happens then when you put the Brillo in it?

10  A.   You put it in and put the crack on it and smoke it.  You

11  would light it with a lighter.

12  Q.   All right.  What happened when you threw it into the

13  fireplace?

14  A.   I had to get it back out.

15  Q.   Who told you to get it back out?

16  A.   David.

17  Q.   Now, why did you throw it into the fireplace?

18  A.   Because I couldn't -- I didn't have a lighter and I asked

19  for a lighter.  He said light it off the fireplace.

20  Q.   And why didn't you want to light it off the fireplace?

21  A.   Because it burned my face.

22  Q.   So when you threw it into the fireplace, what happened

23  next?

24  A.   I had to get it back out.

25  Q.   And then what happened?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

45

CRYSTAL CHUMLEY - DIRECT

1  A.   He took the fire poker and poked me with it because I

2  was -- I didn't want to stick my hand in there.

3  Q.   Where did he put the fire poker before he poked you with

4  it?

5  A.   In the fireplace.

6  Q.   Now, did there come a point in time where Candy ran away?

7  A.   Yes.

8  Q.   And how did she get out of the house?

9  A.   She put the chest of drawers up against the door and went

10  out the window.

11          MR. ADOLF:  Objection to the witness's knowledge,

12  Judge.  No foundation.

13          THE COURT:  Overruled.

14  Q.   How do you know how she got out of the house?

15  A.   Because when David went to push the door open, he

16  couldn't get in --

17          MR. ADOLF:  Objection.

18  A.   -- and the chest of drawers was up against it.

19          MR. ADOLF:  Objection, Your Honor.  Nonresponsive.

20  Move to strike.  It doesn't establish the basis of her

21  knowledge.

22          THE COURT:  Overruled.

23  Q.   Were you there when David tried to push that door open?

24  A.   I was asleep.

25  Q.   And did you hear about that from David?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

46

CRYSTAL CHUMLEY - DIRECT

1  A.   Well, I came downstairs and noticed Candy was gone.

2         MR. ADOLF:  Move to strike all of the testimony from

3  my first objection along this line based on hearsay and

4  there's no foundation.

5         THE COURT:  Overruled.

6  Q.   Have you seen Candy since then?

7  A.   Yes.

8  Q.   Where did you see her after that?

9  A.   In jail.

10  Q.   Now, at some point did you run away from the house?

11  A.   Yes.

12  Q.   And when did you do that?

13  A.   Huh?

14  Q.   When did you do that?

15  A.   A little -- few -- few days after Candy did.

16  Q.   And where did you go?

17  A.   I went down the -- well, the neighbor gave me a ride to

18  North Tryon.

19  Q.   And after you got to North Tryon, where did you go?

20  A.   I went to a hotel.

21  Q.   And at some point did you end up in Little Mexico?

22  A.   Yes.

23  Q.   I'm going to show you what's already been introduced into

24  evidence as Government's Exhibits first 11J, 11G, and 11F.  Do

25  you recognize those three photographs?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.  Yes.

2  Q.  And how do you recognize them?

3  A.  Little Mexico.

4  Q.  Now, when you got to Little Mexico, who was there?

5  A.  David.

6  Q.  I'm sorry?

7  A.  David.

8  Q.  And who was David living with in Little Mexico?

9  A.  Crystal.

10 Q.  And is that the same Crystal that was living with you in

11 the house with Candy?

12 A.  Yes.

13 Q.  Now, do you see anybody else in the courtroom that you

14 know from Little Mexico?

15 A.  (No response.)

16 Q.  You may have to put your...

17 A.  Yes.

18 Q.  Who else do you see in the courtroom that you know from

19 Little Mexico?

20 A.  Puerto Rico.

21 Q.  And can you please point out where the person you know as

22 Puerto Rico, what he's wearing and where he's sitting.

23 A.  There (indicating).

24 Q.  You're going to have to give me a little bit more

25 information than there.  Can you tell me what he's wearing.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   You can stand up if you need to.

2   A.   Huh-uh.

3   Q.   Okay.  Can you tell me what he's wearing.

4   A.   Blue shirt.

5   Q.   And do you know what seat he is?

6   A.   Huh?

7   Q.   Do you know what number seat he's sitting in?

8   A.   Third.

9          MS. MARSTON:  Your Honor, may the record reflect

10  that she has identified defendant Oscar Sanchez as the person

11  she knows as Puerto Rico.

12         THE COURT:  It will.

13  Q.   Now, what did you know Puerto Rico to do in Little

14  Mexico?

15  A.   Sell.

16  Q.   Sell what?

17  A.   Crack.

18  Q.   And where did he get the crack that he sold?

19  A.   Tracy.

20         MR. BROWN:  Objection, calls for speculation.

21         THE COURT:  Overruled.

22  Q.   Where did he get the crack that he sold in Little Mexico?

23         MR. CULLER:  Objection.

24  A.   Tracy.

25         THE COURT:  Overruled.


Cheryl A. Nuccio, RMR-CRR (704)350-7494


49

CRYSTAL CHUMLEY - DIRECT

```
 1   Q.   How do you know he got it from Tracy?

 2   A.   I saw him.

 3   Q.   Now, did you ever purchase crack from Puerto Rico?

 4   A.   One time.

 5   Q.   And why did you only purchase it from him one time?

 6   A.   Because he cheated.

 7   Q.   What do you mean he cheated?

 8   A.   He, like, ripped me off.

 9   Q.   Well, explain what rip me off means to the jury.

10   A.   It wasn't the size I was supposed to got.

11   Q.   It wasn't the size that you paid for.

12   A.   No.

13   Q.   Now, what was David doing in Little Mexico?

14   A.   Selling.

15   Q.   And what was he selling?

16   A.   Crack.

17   Q.   Did you ever purchase any crack from David?

18   A.   Yes.

19   Q.   How would you purchase crack from David in Little Mexico?

20   A.   I'd buy it.

21   Q.   And where would you go to buy it?

22   A.   The house he lived in and then I moved in.

23   Q.   I'm sorry, I didn't hear the answer.

24   A.   The house I moved into.

25   Q.   The house you moved into?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  A.   Yes.

2  Q.   Are you talking about Little Mexico or the previous

3  house.

4  A.   Little Mexico.

5  Q.   All right.  And what house did you -- what house did he

6  live in, do you recall?

7  A.   Yes.

8  Q.   What was it?

9  A.   Little Mexico.

10  Q.   All right.  And where would you go when you purchased

11  crack from David in Little Mexico?

12  A.   To the apartment I moved in.

13  Q.   To the apartment that you moved in.  All right.  What do

14  you mean, that David ended up with your apartment?

15  A.   It was his and then I moved in there in his.

16  Q.   And why did you move into that apartment?

17  A.   Because I had a boyfriend there and I moved out of his

18  apartment.  We split.  So I moved in to an apartment.

19  Q.   And when you moved into the apartment, was David living

20  there?

21  A.   He was.  He moved out.

22  Q.   And where did he move to?

23  A.   To another one.

24  Q.   Another apartment in Little Mexico?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

51

CRYSTAL CHUMLEY - DIRECT

1    Q.    Was there a lot of moving around with the apartments in

2    Little Mexico?

3    A.    Yes.

4             MR. CULLER:  Objection.

5             MR. ADOLF:  Objection.

6             THE COURT:  Overruled.

7    Q.    How do you know that?

8    A.    Because everybody moved all the time.

9    Q.    And why was that?

10   A.    I don't know.

11            MR. ADOLF:  Objection, basis of her knowledge.

12            THE COURT:  If she knows.

13   A.    I don't know.

14   Q.    Well, why did you move at times?

15   A.    Because one day I would pay my rent and one day I

16   wouldn't.  And then the police kept knocking on my door.

17   Q.    Now, when you went to purchase crack from David at his

18   apartment in Little Mexico, explain to the jury how you asked

19   for the crack that you were going to purchase.

20   A.    I knocked on the door.

21   Q.    And when you knocked on the door, what happened?

22   A.    I went in.

23   Q.    And then what happened?

24   A.    I got it and I left.

25   Q.    Well, how much did you buy?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

52

CRYSTAL CHUMLEY - DIRECT

1   A.   Twenty.

2   Q.   And is a twenty known as anything else?

3   A.   Dub.

4   Q.   A dub.  And what would you give in exchange for that dub?

5   A.   Money.

6   Q.   How much money did you give?

7   A.   Twenty.

8   Q.   Now, who handed you the crack?

9   A.   David.

10  Q.   And how --

11           MR. ADOLF:  Objection.  It sounded like a question

12  in response to the question rather than an answer.

13           THE COURT:  Overruled.

14  Q.   How often did you purchase crack from David in Little

15  Mexico?

16  A.   Not much.

17  Q.   And why was that?

18  A.   Because I called people.

19  Q.   Now, at some point did you meet a person that you knew as

20  D?

21  A.   Yes.

22  Q.   And who was D?

23  A.   A friend.

24  Q.   Well, where did D -- where did you meet D?

25  A.   Little Mexico.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1433

CRYSTAL CHUMLEY - DIRECT

1   Q.   And what was D doing in Little Mexico?

2   A.   Selling.

3   Q.   Who was he selling for?

4   A.   Tracy.

5   Q.   Why was D selling for Tracy in Little Mexico?

6   A.   I don't know.

7   Q.   Do you recall what apartment D was selling out of?

8   A.   Yes.

9   Q.   Tell the jury what apartment he was selling out of.

10  A.   I don't know the number.

11  Q.   How would you recognize it?

12  A.   A hole in the wall.

13  Q.   I'm going to show you what's been marked for

14  identification purposes as Government's Exhibit 85D.  Do you

15  recognize Government's Exhibit 85D?

16  A.   Yes.

17  Q.   How do you recognize it?

18  A.   D.

19          MR. ADOLF:  I'm sorry, Judge, can I get that last

20  answer read back.

21          THE COURT:  Madam Court Reporter, would you read

22  that last answer back.

23          THE COURT REPORTER:  Answer:  D.

24          MS. MARSTON:  At this time the government moves into

25  evidence 85D.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

54

CRYSTAL CHUMLEY - DIRECT

1            THE COURT:  Any objection?

2            MR. CULLER:  No.

3            THE COURT:  Let it be admitted.

4            (Government's Exhibit Number 85D was received into

5    evidence.)

6    BY MS. MARSTON:

7    Q.    Now, where did D get his crack to sell?

8    A.    Tracy.

9    Q.    I'm going to show you what's been marked for

10   identification purposes only as Government's Exhibits 11E,

11   11D, 11B, 11C, and 11A.  Do you recognize those photographs?

12   A.    Yes.

13   Q.    And how do you recognize those photographs?

14   A.    That's where they sell from.

15   Q.    That's where they -- where who sold?

16   A.    Tracy.

17   Q.    Tracy and who?

18   A.    D.

19   Q.    And what did they sell?

20   A.    Crack.

21            MS. MARSTON:  At this time the government moves into

22   evidence Government's Exhibits 11A through E.

23            THE COURT:  Any objection?

24            MR. CULLER:  No.

25            THE COURT:  Let it be admitted -- let them be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   admitted.

2              (Government's Exhibits Numbers 11A, 11B, 11C, 11D,

3   and 11E were received into evidence.)

4   Q.   Tell the jury what 11A is a picture of.

5   A.   A hole in the wall.

6   Q.   And then what's 11C a picture of?

7   A.   Hole in the wall.

8   Q.   Now, what is this piece of fabric there?

9   A.   It's carpet.

10  Q.   And why was the carpet there?

11  A.   To cover up the hole.

12  Q.   And why did the hole need to be covered up?

13  A.   So that people won't see it.

14  Q.   Going to show you 11B.  How would you make that hole

15  work?

16  A.   I don't know.

17  Q.   How did you purchase crack through that hole in the wall?

18  A.   They opened it.

19  Q.   All right.  Explain to the jury what you did when you

20  used the hole in the wall.

21  A.   I didn't use it.

22  Q.   How did you know the hole in the wall was there?

23  A.   Because I was in there.

24  Q.   All right.

25  A.   At the other house where people bought from.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   So were you in there when other people used the hole in

2   the wall?

3   A.   (Affirmative nod.)

4   Q.   All right.  Explain to the jury what you saw when other

5   people were using the hole in the wall.

6   A.   I didn't really see.  They just flipped something up.

7   Q.   Do you recognize those two photographs as well?

8   A.   Yes.

9   Q.   And what is that?

10  A.   Hole in the wall.

11  Q.   Now, explain the room where the hole in the wall was.

12  A.   (No response.)

13  Q.   What did people do in that room?

14  A.   Smoke.

15          MR. CULLER:  Objection, asked and answered.

16          THE COURT:  Overruled.

17  Q.   What did people do in that room where the hole in the

18  wall was?

19  A.   Smoke.

20  Q.   Smoke what?

21  A.   Crack.

22  Q.   Now, at some point did you run into Tracy again?

23  A.   Yes.

24  Q.   And where did you run into him?

25  A.   Little Mexico.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

57

CRYSTAL CHUMLEY - DIRECT

1    Q.   And explain what happened when you ran into Tracy again

2    at Little Mexico.

3    A.   He said are you ready?  I said yes.

4    Q.   I'm sorry, what?

5    A.   He asked me if I was ready to go with him.  I said yes.

6    Q.   Why did you say yes?

7    A.   Because he said we was going -- I could make money as I

8    pleased and stuff and that it was different than it used to

9    be.

10   Q.   And what did he mean it was different than it used to be?

11   A.   Meaning --

12              MR. CULLER:  Objection.

13              THE COURT:  Sustained as to form.

14   Q.   What did you think he meant when he said it was different

15   than it used to be?

16              MR. CULLER:  Objection.

17              THE COURT:  Overruled.

18   Q.   You can answer that question.

19   A.   I make money as I pleased and get to keep some of the

20   money or whatever.

21   Q.   And how would that be different than it was before?

22   A.   Because I had more freedom.  It's better.

23   Q.   Were you able to keep money before?

24   A.   No.

25   Q.   So did you go with him?

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   A.   Yes.

2   Q.   And where did you go?

3   A.   Apartments.

4   Q.   Which apartments?

5   A.   I don't know the name of them.

6   Q.   Would you recognize a photograph?

7   A.   Yes.

8   Q.   I'm going to show you what's been marked for

9   identification purposes only as Government's Exhibit 13B.  Do

10  you recognize Government's Exhibit 13B?

11  A.   Yes.

12  Q.   How do you recognize it?

13  A.   Sailboat Bay.

14  Q.   Oh, I'm sorry.  You're going to need to press the bottom

15  right-hand corner of your screen.  I think when you're

16  touching the screen, it's putting -- there you go.

17       I'm sorry, how do you recognize Government's Exhibit 13B?

18  A.   Sailboat Bay.

19  Q.   And is that where you went?

20  A.   No.

21  Q.   Okay.  When did you -- when did you go to Sailboat Bay?

22  A.   After the other apartment.

23  Q.   Who did you go to Sailboat Bay with?

24  A.   Nick.

25  Q.   Do you see somebody in the courtroom that you know as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1    Nick?

2    A.    Yes.

3    Q.    Can you please tell me what he's wearing and where he's

4    sitting.

5              MR. ADOLF:  Judge, could we have the screen put down

6    again, please.

7              THE COURT:  You may.  Yeah, let's do that.

8    A.    White shirt and a black tie.

9              MS. MARSTON:  Your Honor, may the record reflect

10   she's identified defendant Nicholas Ragin.

11             THE COURT:  What seat is he sitting in from the

12   left?

13             THE WITNESS:  Fifth.

14             THE COURT:  It will.

15   Q.    Now, who was paying for the apartment at Sailboat Bay?

16   A.    Tracy.

17   Q.    Did you live there with anybody else besides Nick?

18   A.    Cathy.

19   Q.    I'm going to show you what's been previously identified

20   as Government's Exhibit 85A and introduced.  Do you recognize

21   Government's Exhibit 85A?

22   A.    Yes.

23   Q.    How do you recognize it?

24   A.    Cathy.

25   Q.    Now, what were you and Cathy doing when you lived with

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Nick at Sailboat Bay?

2   A.   Escort service.

3   Q.   And so you were back with the escort service?

4   A.   Yes.

5   Q.   And do you recall what the name of the escort service

6   was?

7   A.   Discreet Delight.

8   Q.   Now, how would you go about getting your calls this time?

9   A.   Same way.

10  Q.   Now, before you went to Sailboat Bay, you said you were

11  at another apartment.

12  A.   Yes.

13  Q.   I'm going to show you what's been introduced into

14  evidence as Government's Exhibit 12C.  Do you recognize

15  Government's Exhibit 12C?

16  A.   Yes.

17  Q.   And how do you recognize that?

18  A.   Apartments.

19  Q.   Is that the first apartment you went to with defendant

20  Tracy Howard?

21  A.   Yes.

22  Q.   And who else was at that apartment with you?

23  A.   Keshia.

24  Q.   And Keshia is the person you previously have identified?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1    Q.    Now, why did you move from Government's Exhibit 12C to

2    Sailboat Bay?

3    A.    Because Keshia had left and had called the police.

4    Q.    Now, I'm going to go back to that photograph of

5    Government's Exhibit 13C.

6          MS. MARSTON:  At this time the government -- at this

7    time the government moves into evidence Government's Exhibit

8    13C.

9          MR. CULLER:  Objection.  She didn't -- I don't think

10   she --

11   Q.    Is this the photograph you previously identified?

12   A.    Yes.

13   Q.    And how do you recognize this photograph?

14   A.    Sailboat Bay.

15   Q.    And is that the place you went second?

16         MR. CULLER:  Withdraw that.

17   A.    Yes.

18         MS. MARSTON:  At this time the government moves into

19   evidence Government's Exhibit 13C.

20         THE COURT:  It will be admitted.

21         (Government's Exhibit Number 13C was received into

22   evidence.)

23         MR. MACKEY:  Your Honor, may we have a side-bar?

24         THE COURT:  You may.

25         (Side-bar conference as follows:)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1            MR. MACKEY:  I don't know how Your Honor would like

2     to handle it, but I really need to take a bathroom break.  I'm

3     about to bust.  I've been holding it for about 45 minutes

4     straight.

5            THE COURT:  You owe me one.

6            MS. MARSTON:  No objection.

7            (End of side-bar conference.)

8            THE COURT:  Members of the jury, we're going to take

9     an early afternoon break at this time.  It's 3:30 and I'd ask

10    you to be ready to come back into court at 3:45.  Thank you.

11           (Brief recess at 3:30 p.m.)

12           THE COURT:  Mr. Mackey, are you doing all right?

13           MR. MACKEY:  Doing good, Your Honor.

14           THE COURT:  Call the jury.

15           (Jury entered the courtroom.)

16           THE COURT:  Ms. Marston, you may continue.

17           MS. MARSTON:  Thank you, Your Honor.

18                        CRYSTAL CHUMLEY

19                  DIRECT EXAMINATION (Cont'd.)

20    BY MS. MARSTON

21    Q.   Ms. Chumley, I think before the break we were beginning

22    to talk about the different apartments that you were living

23    in.  Do you recall which apartment we were just talking about?

24    A.   Sailboat Bay.

25    Q.   And who were you living at -- who were you living with at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  Sailboat Bay?

2  A.   Nick, Cathy.

3  Q.   And while you were living there with Nick and Cathy, what

4  were you doing?

5  A.   Escort service.

6  Q.   Now, you had mentioned previously that you thought it was

7  going to be different this time.  Was it different?

8  A.   I thought it was going to be different.  I didn't have

9  to -- no more being mean.  And I thought they was going to --

10 I was going to get to go and come as we please.

11 Q.   And what about the money?

12 A.   I thought I was going to get to keep some of it.

13 Q.   And were you able to keep some of it?

14 A.   No.

15 Q.   Who did the money go to?

16 A.   Tracy.

17 Q.   Now, when you were going on the calls for the escort

18 service this time, how were you getting your calls?

19 A.   The same way.

20 Q.   And how -- what was the same way?

21 A.   Half and half.

22 Q.   Well, how did you get the call to tell you where to go?

23 A.   They called -- Ila called.

24 Q.   And who did Ila call?

25 A.   Well, Nick now since...

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   And what -- why was she calling Nick now?

2   A.   Because Tracy was gone.

3   Q.   Where was Tracy?

4   A.   Jail.

5   Q.   Now, when he -- when she started calling Nick, what would

6   Nick then tell you?

7   A.   Get dressed.

8   Q.   And then what happened?

9   A.   We'd go to the call.

10  Q.   And who would drive you to the calls?

11  A.   Nick.

12  Q.   Now, when Nick drove you to the calls, where did he drive

13  you to?

14  A.   Hotels.  I don't remember where.

15  Q.   Now, when you got to the hotel, what did you do?

16  A.   Call Ila.

17  Q.   And you called Ila to go through the two forms of ID

18  again?

19  A.   Yes.

20  Q.   And then what did you do?

21  A.   Did the same as usual.

22  Q.   All right.  What was that same thing that you were doing

23  when you were in those hotel rooms?

24  A.   Whatever they wanted.  Having sex.

25  Q.   Now, when you say having sex, what do you mean?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   A.   What do you mean?

2   Q.   Is there a different term for having sex, a more

3   dictionary term?

4   A.   Prostitute, I guess.  I don't know.

5   Q.   Is that what you were doing?

6   A.   Yeah.

7   Q.   And then when you left, who did you give the money to?

8   A.   Nick.

9   Q.   And what would Nick do with the money?

10  A.   Give it to Ila.

11  Q.   Did Nick keep any of the money?

12  A.   Yes.

13  Q.   And why did Nick keep some of the money?

14  A.   To give to Tracy when he got out of jail.

15  Q.   Now --

16          MR. MACKEY:  Objection, Your Honor.

17          THE COURT:  Overruled.

18  Q.   Did Nick do anything else for Tracy?

19  A.   Yes.

20  Q.   What do you know that Nick did for Tracy?

21  A.   He helped him.

22  Q.   Helped him what?

23  A.   Bag.

24  Q.   I'm sorry?

25  A.   Bag up the stuff.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.  Bag up what stuff?

2  A.  Crack.

3  Q.  And then what would he do with that crack?

4  A.  Deliver it.

5  Q.  And where did he deliver it?

6  A.  Little Mexico.

7  Q.  Now, how do you know he did that?

8  A.  Because he told him to go to Little Mexico.

9  Q.  Who told him to go to Little Mexico?

10  A.  Tracy.

11  Q.  And was that when you were living with Nick and Cathy?

12  A.  Yes.

13  Q.  Now, I'm going to show you -- what -- what did Nick and

14  Tracy -- did you ever see anything used to weigh the crack

15  around the apartments?

16  A.  Yes.

17  Q.  What did you see?

18  A.  Scales.

19  Q.  Do you recall what those scales looked like?

20  A.  Yes.

21  Q.  What did those scales look like?

22  A.  One was round and one was square.

23  Q.  I'm going to first show you Government's Exhibit 57C.  Do

24  you recognize Government's Exhibit 57C?

25  A.  Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1    Q.    How do you recognize it?

2    A.    It's a scale.

3    Q.    I'm also going to show you what's been introduced as

4    Government's Exhibit 57F.  Do you recognize Government's

5    Exhibit 57F?

6    A.    Yes.

7    Q.    How do you recognize that?

8    A.    Scale.

9    Q.    And are those, 57C and 57F, similar to the scales that

10   you saw around the apartment?

11   A.    Yes.

12   Q.    And which apartment did you see these in?

13   A.    Hanover Landing.

14   Q.    Now, when did you get to Hanover Landing?

15   A.    After we had to move out of Sailboat Bay.

16   Q.    Now, what name was the Hanover Landing apartment in?

17   A.    D.

18   Q.    Now, I'm going to show you what's been already introduced

19   as Government's Exhibit 14A.  Do you recognize Government's

20   Exhibit 14A?

21   A.    Yes.

22   Q.    And how do you recognize that?

23   A.    Hanover Landing.

24   Q.    Now, who was living at the Hanover Landing Apartment?

25   A.    D, Tracy, me, and Cathy.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

68

CRYSTAL CHUMLEY - DIRECT

1   Q.   Were you still working for the service while you were at

2   Hanover Landing?

3   A.   Yes.

4   Q.   I'm going to show you what's been introduced into

5   evidence as Government's Exhibit 85R.  Do you recognize

6   Government's Exhibit 85R?

7   A.   Yes.

8   Q.   And how do you recognize it?

9   A.   Tabitha.

10  Q.   How do you know Tabitha?

11  A.   The escort service.

12  Q.   And do you know what she did for the escort service?

13  A.   The same thing.

14  Q.   And when you mean the same thing, what are you talking

15  about?

16  A.   Making money.

17  Q.   Making money doing what?

18  A.   Sex and stuff.

19  Q.   When you say sex and stuff, what do you mean by the stuff

20  part?

21  A.   Prostituting.

22  Q.   Now, I'm also going to show you Government's Exhibit 85T.

23  Do you recognize Government's Exhibit 85T?

24  A.   Yes.

25  Q.   And how do you recognize it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

```
 1   A.    Jamaica.

 2   Q.    Who's Jamaica?

 3   A.    A drug dealer.

 4   Q.    What did you know Jamaica to be?

 5   A.    Drug dealer.

 6   Q.    How did you meet him?

 7   A.    I met him in a drug program.

 8   Q.    Okay.  Once you met him in that drug program, did you

 9   meet him again?

10   A.    Yes.

11   Q.    And when did you meet him again?

12   A.    I met him again in a trailer park.

13   Q.    And who was with you when you met him in the trailer

14   park?

15   A.    My ex.

16   Q.    I'm sorry, who?

17   A.    I was with my ex then.

18   Q.    Who was your ex?

19   A.    Jeff Truesdale.

20   Q.    Now, when you met him at the trailer park with Jeff

21   Truesdale, what were you doing there?

22   A.    I was smoking crack.

23   Q.    And what kind of drug dealer was he?

24   A.    Crack.

25   Q.    Now, did you ever see him any other time?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   A.   Yes.

2   Q.   When else did you see him?

3   A.   At the club.

4   Q.   And who were you with at the club?

5   A.   David, Tracy.

6   Q.   And are you aware whether David or Tracy know Jamaica?

7   A.   Yes.

8   Q.   How are you aware of that?

9   A.   They spoke to him when they got there.

10  Q.   I'm sorry?

11  A.   They spoke to him when they got there.

12  Q.   When they got what?

13  A.   When they got to the club.

14  Q.   I'm also going to show you what's been marked for

15  identification purposes only, I believe, 85C.  Do you

16  recognize Government's Exhibit 85C?

17  A.   Yes.

18  Q.   How do you recognize Government's Exhibit 85C?

19  A.   Kelly.

20  Q.   And who is Kelly?

21  A.   My friend.

22       MS. MARSTON:  At this time the government moves into

23  evidence 85C.

24       THE COURT:  Any objection?

25       MR. CULLER:  No objection.


Cheryl A. Nuccio, RMR-CRR (704)350-7494


71

                           CRYSTAL CHUMLEY - DIRECT

1              THE COURT:  Let it be admitted.

2              (Government's Exhibit Number 85C was received into

3    evidence.)

4    Q.    Now, where was Kelly living?

5    A.    Little Mexico.

6    Q.    And are you aware of an encounter that she had with Nick?

7              MR. CULLER:  Objection.

8    A.    Yes.

9              MR. MACKEY:  Objection.

10             THE COURT:  Overruled.

11   Q.    How are you aware of that?

12   A.    He was bragging about it.

13   Q.    What did he brag about?

14   A.    That he beat her up.

15   Q.    And why did he beat her up?

16             MR. MACKEY:   Object.

17   A.    I don't know.

18   Q.    Do you recognize Government's Exhibit 85U?

19   A.    No, I don't.

20   Q.    I'm going to show you what's been marked for

21   identification purposes as Government's Exhibit 85H.  Do you

22   recognize Government's Exhibit 85H?

23   A.    Yes.

24   Q.    How do you recognize that?

25   A.    Nick.


                   Cheryl A. Nuccio, RMR-CRR (704)350-7494

1452

CRYSTAL CHUMLEY - DIRECT

1  Q.   Is that what Nick looked like at the time that you were

2  living with him?

3  A.   Yes.

4         MS. MARSTON:   At this time the government moves into

5  evidence Government's Exhibit 85H.

6         THE COURT:   Any objection?

7         MR. CULLER:   No.

8         MR. MACKEY:   No.

9         THE COURT:   Let it be admitted.

10        (Government's Exhibit Number 85H was received into

11  evidence.)

12  Q.   Now, I'm also going to show you what's been marked for

13  identification purposes as Government's Exhibit 85I.  Do you

14  recognize Government's Exhibit 85I?

15  A.   Yes.

16  Q.   How do you recognize that?

17  A.   Puerto Rico.

18  Q.   And is that what Puerto Rico looked like at the time that

19  you knew him in Little Mexico?

20  A.   Yes.

21        MS. MARSTON:   Government moves into evidence

22  Government's Exhibit 85I.

23        THE COURT:   Any objection?

24        MR. BROWN:   No objection, Your Honor.

25        THE COURT:   Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1             (Government's Exhibit Number 85I was received into
2     evidence.)
3     Q.   I'm also going to show you what's been marked for
4     identification purposes as Government's Exhibit 85M.  Do you
5     recognize Government's Exhibit 85M?
6     A.   Yes.
7     Q.   How do you recognize it?
8     A.   Crystal.
9     Q.   And what -- who is this Crystal?
10    A.   Little Mexico.
11            MS. MARSTON:  Okay.  At this time the government
12    moves into evidence Government's Exhibit 85M.
13            THE COURT:  Any objection?
14            MR. CULLER:  No objection.
15            THE COURT:  Let it be admitted.
16            (Government's Exhibit Number 85M was received into
17    evidence.)
18    Q.   And what did you know Crystal to do in Little Mexico?
19    A.   Prostitute.
20    Q.   And what else?
21    A.   That's all I know.
22    Q.   Who did she live with?
23    A.   D.
24    Q.   I'm also going to show you what's been marked for
25    identification --

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1          MR. ADOLF:  I'm sorry, Judge, the last answer wasn't

2    clear.

3          MS. MARSTON:  D.

4          MR. ADOLF:  D, thank you.

5    Q.   I'm also going to show you what's been marked for

6    identification purposes as Government's Exhibit 85N.  Do you

7    recognize Government's Exhibit 85N?

8    A.   Yes.

9    Q.   How do you recognize it?

10   A.   David.

11   Q.   Is this what David looked like at the time that you knew

12   him?

13   A.   Yes.

14         MS. MARSTON:  At this time the government moves into

15   evidence Government's Exhibit 85N.

16         THE COURT:  Any objection?

17         MR. CULLER:  No.

18         THE COURT:  Let it be admitted.

19         (Government's Exhibit Number 85N was received into

20   evidence.)

21   Q.   Now, did you ever see any guns while you were living in

22   either Sailboat Bay or Hanover Landing?

23   A.   Yeah.

24   Q.   What kind of guns did you see?

25   A.   I don't know.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  Q.  And have you ever had a gun?

2  A.  Me?

3  Q.  Yes.

4  A.  No.

5  Q.  Can you describe what the guns you saw looked like.

6  A.  No.

7  Q.  Can you describe the size of the guns you saw.

8  A.  No.

9  Q.  Why not?

10         MR. CULLER:  Well, objection.

11         THE COURT:  Overruled.

12         MR. ADOLF:  Your Honor, can we have the screen put

13  down again, I'm sorry.

14  Q.  Ms. Chumley, why are you having difficulty describing the

15  guns that you saw?

16         MR. ADOLF:  Objection.  Assumes facts not in

17  evidence.

18  A.  I only remember one.

19  Q.  And what one do you remember?

20  A.  It was a white pearl.

21  Q.  A what?

22  A.  White pearl handle.

23  Q.  Black pearl handle?

24  A.  White.

25  Q.  White.  And where did you see that gun?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   The apartment.

2   Q.   What apartment?

3   A.   Hanover.

4   Q.   And where was that gun kept?

5   A.   Backpacks.

6   Q.   And what else was in the backpack?

7   A.   Nothing.

8   Q.   Whose backpack was it?

9   A.   I don't know.

10   Q.   Was it your backpack?

11   A.   No.

12   Q.   Did you ever see anyone pick up the backpack?

13   A.   Yes.

14   Q.   Who picked up the backpack?

15   A.   Tracy, D, Nick.

16   Q.   Now, back when you were at Greenlefe, did you ever see a

17   gun back at Greenlefe?

18   A.   Yes.

19   Q.   And what -- when did you see a gun back at Greenlefe?

20   A.   When he lost his money.

21   Q.   When who lost his money?

22   A.   Tracy.

23   Q.   And what happened then that made you see a gun?

24   A.   He pointed it at me and Keshia because he couldn't find

25   his money and he asked us where his money was.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

77

CRYSTAL CHUMLEY - DIRECT

1  Q.   Is that the same time you got hit above the eye?

2  A.   Yes.

3  Q.   Now, what kind of gun was that?

4  A.   I don't know.

5  Q.   Do you recall anything about the way the gun looked?

6  A.   It had a white handle.

7  Q.   I'm going to show you what's already been introduced into

8  evidence as Government's Exhibit 23D.  Did the gun look

9  similar to Government's Exhibit 23D?

10  A.   No.

11  Q.   Now, do you know where the crack was kept at the Hanover

12  Landing apartment?

13  A.   No.

14  Q.   Did you ever know where the crack was kept in any of the

15  apartments?

16  A.   No.

17  Q.   When did you see the crack?

18  A.   When they was bagging it up.

19  Q.   And who is they?

20  A.   Nick and Tracy.

21  Q.   And did you ever go with Nick or Tracy after they bagged

22  up the crack?

23  A.   Yes.

24  Q.   And where did you go?

25  A.   Little Mexico.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

78

CRYSTAL CHUMLEY - DIRECT

1    Q.    And why did you go to Little Mexico with Nick and Tracy?

2    A.    To deliver it.

3    Q.    And where did you deliver it to?

4    A.    D.

5    Q.    Do you know approximately how much crack you saw them

6    bagging up?

7    A.    No.

8              MS. MARSTON:  May I have a moment, Your Honor?

9              THE COURT:  You may.

10             (Pause.)

11   BY MS. MARSTON:

12   Q.    Did you ever go to any meetings for the escort service?

13   A.    Yes.

14   Q.    And when did you attend those meetings?

15   A.    Restaurants.

16   Q.    And what kind of restaurants did you go to?

17   A.    Shoney's and stuff.

18   Q.    And how many of those meetings did you attend?

19   A.    Not very many.

20   Q.    Why not?

21   A.    Because of bruises.

22   Q.    And why couldn't you attend the meeting with bruises?

23   A.    Because it didn't look great, I guess.

24   Q.    Who ran those meetings when you did attend them?

25   A.    Ila.

             Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1  Q.   I'm going to show you an advertisement in Government's

2  Exhibit 65C.  Do you recognize what you see on this page in

3  Government's Exhibit 65C?

4  A.   Yes.

5  Q.   How do you recognize it?

6  A.   David's escort service.

7  Q.   Now, when did he have this escort service?

8  A.   When we moved into the house.

9  Q.   And at the time were you working for this escort service

10 or for Ila's?

11 A.   Both.

12 Q.   And how did you work for both at the same time?

13 A.   Whenever they called for whichever one, David would tell

14 me which one it's for.

15 Q.   And who kept the money when you went out on the escort

16 service for Mistress?

17 A.   He did.  David.

18 Q.   And who kept the money when you went out on the escort

19 service for Discreet Delight or Fantasia?

20 A.   Ila and David.

21 Q.   And do you recognize the telephone number that you see

22 here?

23 A.   Yes.

24 Q.   How do you recognize that telephone number?

25 A.   David.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

80

1460

CRYSTAL CHUMLEY - DIRECT

1  Q.   And how do you know that was David's telephone number?

2  A.   Because.  That was his escort service.

3  Q.   Now, I'm also going to show you another page in

4  Government's Exhibit 65C.  Do you recognize that page of

5  Government's Exhibit 65C?

6  A.   Yes.

7  Q.   And how do you recognize that page?

8  A.   Fantasia and Discreet Delight.

9  Q.   Now, did you work for all three, Fantasia and Discreet

10 Delight and Mistress?

11 A.   Yes.

12 Q.   And when you went on calls for all three of those, did

13 you do the same thing?

14 A.   Yes.

15 Q.   And what was that?

16 A.   Sit down, talk, have sex.  Whatever they liked.

17 Q.   Did you get to keep the money for any of those calls you

18 went out for?

19 A.   No.

20 Q.   Now, I'm going to show you what's been marked for

21 identification purposes only as Government's Exhibit 57U.  Do

22 you recognize Government's Exhibit 57U?

23 A.   Yes.

24 Q.   And how do you recognize it?

25 A.   I drew that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - DIRECT

1   Q.   Do you recall when you drew that?

2   A.   No.

3            MS. MARSTON:  At this time the government moves into

4   evidence Government's Exhibit 57U.

5            MR. CULLER:  Objection.

6            THE COURT:  Basis?

7            MR. CULLER:  May we see the exhibit first?

8            (Government's Exhibit 57U was tendered to defense

9   counsel.)

10           MS. MARSTON:  Is the objection still standing?

11           THE COURT:  Let all defense counsel see what's being

12  offered.

13           MS. MARSTON:  I'm sorry.

14           MR. CULLER:  No objection.

15           THE COURT:  Let it be admitted.

16           (Government's Exhibit Number 57U was received into

17  evidence.)

18  Q.   Now, Ms. Chumley, did there come a point where you had to

19  move out of Hanover Landing?

20  A.   Yes.

21  Q.   Do you recall when that was?

22  A.   No.

23  Q.   And where did you go after that?

24  A.   Sailboat -- no.  Hotel.

25  Q.   And why did you have to move out of Hanover Landing?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  A.   Because D had shot a Mexican with a BB gun and the police

2  came.

3              MR. ADOLF:  Can we move the screen down, I

4  apologize.

5              THE COURT:  Yes.

6  Q.   And after that, were you still with D?

7  A.   No.

8  Q.   And after that, were you still with either Tracy or

9  David?

10 A.   No.

11 Q.   Have you seen them since?

12 A.   No.

13             MS. MARSTON:  No further questions.

14             THE COURT:  Any cross?

15             MR. CULLER:  Yes.

16                     CROSS EXAMINATION

17 BY MR. CULLER:

18 Q.   It's Ms. Chumley; is that right?

19 A.   Yes.

20 Q.   Did I understand you to say that you came to Charlotte

21 when you were about 17?

22 A.   Yes.

23 Q.   Can you tell us what year that was.

24 A.   No.

25 Q.   Well, okay.  What's your date of birth?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1463

CRYSTAL CHUMLEY - CROSS

```
 1   A.    7/17/81.  July 17th, 1981.

 2   Q.    And so if you came when you were 17, it sounds like about

 3   1998.

 4   A.    Yeah.

 5   Q.    And when you came here in 1998, or thereabouts, did you

 6   have any means of support?

 7   A.    No.

 8   Q.    And did you start working?

 9   A.    Not right away.

10   Q.    Well, how did you -- how did you survive?

11   A.    Prostituting.

12   Q.    So you started working illegally?

13   A.    Yes.

14   Q.    And were you 17 when you started prostituting?

15   A.    Yes.

16   Q.    And is that something that you started on your own?

17   A.    Yes.

18   Q.    I believe you said you met a dude and he gave you some

19   crack.

20   A.    Yes.

21   Q.    And that was when you were 17?

22   A.    Yes.

23   Q.    And is it correct that after you tried crack the first

24   time, you basically started working to get crack?

25   A.    Yes.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  Q.   Pretty much.

2           MR. CULLER:  Your Honor, if I can have just one

3  moment.

4           THE COURT:  You may.

5           (Pause.)

6  BY MR. CULLER:

7  Q.   Have you ever used the name Crystal Gore?

8  A.   Yes.

9  Q.   Is that your correct name?

10  A.   That's my birth name.

11  Q.   Is that -- is that your correct name, then?

12  A.   No, that's my birth name before I was adopted.

13  Q.   Oh, I'm sorry.  Your adopted name is Chumley; is that

14  right?

15  A.   Yes.

16  Q.   Why do you -- why would you use the name Crystal Gore

17  now?

18  A.   Like when I go to the hospital.

19  Q.   Uh-huh.

20  A.   So they don't know my real last name in case I have

21  warrants or whatever.

22  Q.   All right.  Would you agree that you went to the hospital

23  on November 6th, 2003?

24  A.   Yes.

25  Q.   And do you recall telling the doctor that you fell while

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    wrestling?

2    A.   Yes.

3    Q.   Now, let me just stay with that for a moment and I'll go

4    back to what we were talking about.   But that was

5    November 2003 from what you said.   That incident was a result

6    of Mr. Howard got upset about his money being lost; is that

7    right?

8    A.   Yes.

9    Q.   Now, you were with David Howard at that time; is that

10   right?

11   A.   Yes.

12   Q.   You said to the jury Mr. Howard did not allow you to use

13   crack; is that right?

14   A.   Yes.

15   Q.   And so this lady Candy that you talked about, you weren't

16   supposed to use crack with her as far as David was concerned;

17   is that right?

18   A.   Yes.

19   Q.   And you weren't allowed to be around crack as far as

20   David was concerned; is that correct?

21   A.   Yes.

22   Q.   And as of November 2003 when this incident occurred, you

23   said that David Howard and Tracy Howard got in a big fight; is

24   that right?

25   A.   Yes.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

1466

CRYSTAL CHUMLEY - CROSS

1    Q.    And they split up and didn't have any dealings with each

2    other after that point; is that correct?

3    A.    Yes.

4    Q.    Then -- well, okay.

5          Let's see.  After November 2003, when would it have been

6    that you last saw David Howard?

7    A.    What do you mean?

8    Q.    Okay.  You said this incident when you went to the

9    hospital was November of 2003.  When was the last time you saw

10   David Howard?

11   A.    Little Mexico.

12   Q.    When would that have been?

13   A.    I don't know.

14   Q.    2004?

15   A.    Before -- before it got knocked down.

16   Q.    I'm sorry, before...

17   A.    Before it got tore down.

18   Q.    Well, do you remember when that was?

19   A.    No.

20   Q.    Well, would it have been the next year, 2004?

21   A.    2004 probably.

22   Q.    So fair to say from November 2003 until whenever Little

23   Mexico was knocked down, Tracy and David didn't have dealings

24   together, correct?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

87

CRYSTAL CHUMLEY - CROSS

1    Q.    Based on this big fight, right?

2    A.    Yes.

3    Q.    All right.  Back up now and -- let's see.  Now, you --

4    from '98 until -- strike that.

5          If you started using crack in 1998, how long was it until

6    you met David Howard?

7    A.    Do what?

8    Q.    When did you first meet David Howard?  Let me ask you

9    that.

10   A.    When Tracy sent him to play as a date.

11   Q.    Okay.  Now, before you actually met either David or

12   Mr. -- Tracy Howard, you actually knew another of the Howard

13   boys; is that right?

14   A.    Yes.

15   Q.    And that was Alex Howard.

16   A.    Yes.

17   Q.    And you actually were prostituting for Alex Howard; isn't

18   that true?

19   A.    Yes.

20   Q.    And he was the one taking you to North Pointe Apartments,

21   right?

22   A.    Yes.

23   Q.    And that was totally unrelated to David and Tracy,

24   correct?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   Q.   Then -- now, you eventually came to know a girl named

2   Tabitha Johnson; is that right?

3   A.   Yes.

4   Q.   And you came to know Keshia Burris.

5   A.   Yes.

6   Q.   And let's see.  This girl named Destiny; is that right?

7   A.   Yes.

8   Q.   Do you know Destiny's correct name?

9   A.   No.

10  Q.   Now, did you work with them, with those girls?  Were

11  y'all --

12  A.   Yes.

13  Q.   -- still working together?

14  A.   Yes.

15  Q.   Okay.  Did you work together with Alex?

16  A.   No.

17  Q.   When you -- when do you say that you stopped working for

18  Alex?

19  A.   When I -- last time I went to jail; and then when I got

20  out, he was in prison -- he went to -- he was locked up.

21  Q.   When did you last go to jail?

22  A.   I don't remember.

23  Q.   Of course, not including this time, but...

24  A.   Yeah.  I don't remember.

25  Q.   All right.  Well, in any event, when you got out from

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  custody, whenever that was, Alex Howard was no longer around.

2  A.    Yes.

3  Q.    Did you have any means to support yourself at that point?

4  A.    What do you mean?

5  Q.    Did you have any way to support yourself?  Did you have a

6  job?  Did you have any income?

7  A.    No.

8  Q.    Did you have a place to live?

9  A.    Yes.

10  Q.    Where were you living?

11  A.    With my boyfriend.

12  Q.    And who was that?

13  A.    Mitchell.

14  Q.    Mitchell?

15  A.    Thomas.

16  Q.    Mitchell Thomas?

17  A.    On Bradford Drive.

18  Q.    I'm sorry?

19  A.    Mitchell Thomas on Bradford Drive.

20  Q.    On Bradford Drive.  And so did you move in with him?

21  A.    Yes.

22  Q.    Did you stay there with him?

23  A.    Yes.

24  Q.    How long did you stay with him?

25  A.    For 60 days, and then we had a fight so I relapsed.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

90

1470

CRYSTAL CHUMLEY - CROSS

1   Q.    When you say you relapsed, that means you started using

2   crack again?

3   A.    Yes.

4   Q.    Okay.  And so when you started using crack, did you leave

5   him?

6   A.    Yes.

7   Q.    All right.  Then did I -- I think you testified there was

8   a point in time that you saw David and Tracy and, like, there

9   was a pretend date, right?

10  A.    Yes.

11  Q.    And then after that you started living with -- you

12  started living with David?

13  A.    David and Tracy.

14  Q.    Okay.  Now, where was that that you say you were living

15  with both of them?

16  A.    On Greenlefe.

17  Q.    That's Ila's house?

18  A.    Yes.

19  Q.    Now, how long do you think it was you stayed at

20  Greenlefe?

21  A.    I don't know.  Not long.

22  Q.    Less than a month?

23  A.    I don't know.

24  Q.    Well, when you left Greenlefe, where did you go?

25  A.    A hotel.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    Q.   And was that -- I'm sorry, excuse me.

2              (Counsel and defendant conferred.)

3    BY MR. CULLER:

4    Q.   When you were at Greenlefe, were you -- did you become

5    involved with David during that time?

6    A.   Yes.

7    Q.   And so y'all were boyfriend and girlfriend as of the time

8    you left Greenlefe.

9    A.   Yes.

10   Q.   And y'all moved in the hotel together.

11   A.   Yes.

12   Q.   And Tracy Howard didn't go to the hotel; is that right?

13   A.   No.

14   Q.   Okay.  And Tracy didn't go with y'all because at that

15   point he and David weren't getting along, right?

16   A.   Yes.

17   Q.   And so then we know that must have been November of 2003,

18   right?

19   A.   Yes.

20   Q.   And that was during the time that you were using again,

21   right?

22   A.   Uh...

23   Q.   No, you were not using.

24   A.   No, I wasn't.

25   Q.   Because David was stopping you by that point, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

92

1   A.   Yes.

2   Q.   Okay.  All right.  And you said you weren't even allowed

3   to see any drugs during that time, right?

4   A.   Yes.

5   Q.   Okay.

6        MR. CULLER:  Your Honor, if I can have a moment, I

7   may...

8        (Counsel and defendant conferred.)

9   BY MR. CULLER:

10  Q.   When is it that you first met D?

11  A.   Little Mexico.

12  Q.   Okay.  In Little Mexico.  When you were living there?

13  A.   Yes.

14  Q.   All right.  I guess -- so obviously, that was before

15  Little Mexico was tore down, right?

16  A.   Yes.

17  Q.   All right.  How long did you -- from the point that you

18  met D to the point Little Mexico was tore down, can you say

19  how long that was?  Couple of weeks or...

20  A.   Months.

21  Q.   A couple of months?

22  A.   Yeah.

23  Q.   And now --

24       MR. CULLER:  I'm sorry.  Excuse me, Your Honor.

25       (Counsel and defendant conferred.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

93

CRYSTAL CHUMLEY - CROSS

1    BY MR. CULLER:

2    Q.   When you said that D was living in Little Mexico, you

3    actually saw him in that apartment, right?

4    A.   Yes.

5    Q.   Okay.  And you saw him -- did you -- did you see my

6    client -- did you see Tracy give D any drugs in that

7    apartment?

8    A.   Yes.

9             MR. CULLER:  That's all I have, Your Honor.  Thanks.

10            THE COURT:  Mr. Adolf, any cross?

11                      CROSS EXAMINATION

12   BY MR. ADOLF:

13   Q.   Good afternoon.  It's Crystal, right?

14   A.   Yes.

15   Q.   Do you mind if I call you Donna?

16   A.   If you want to.

17   Q.   Is that the name you usually -- generally go by or not?

18   A.   On the street, yeah.

19   Q.   Okay.  Would you prefer Crystal then?

20   A.   Yeah.

21   Q.   I'll stick with that.

22        Crystal, when you started talking today, you talked about

23   the first time you met David; is that right?

24   A.   Yes.

25   Q.   And you said you were out on the street at that point?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

94

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   Who were you living with when you first met David?

3   A.   Nobody.

4   Q.   Nobody.

5   A.   Well, my boyfriend in a hotel.

6   Q.   Who?

7   A.   My boyfriend in a hotel.

8   Q.   Who was your boyfriend at the time?

9   A.   Who was my boyfriend?  I'd rather not say.

10   Q.   We need to know.

11        THE COURT:  Ms. Chumley, you need -- when you're

12   asked a question, unless I sustain an objection, you need to

13   answer the question.

14        THE WITNESS:  Demarcus.

15   Q.   Do you know his last name?

16   A.   No.

17   Q.   Did you know him by his street name?

18   A.   Yeah.

19   Q.   What was his street name?

20   A.   D.

21   Q.   Okay.  So when you first met David, you already knew D?

22   A.   Yeah.  Not that other D, but another D.

23   Q.   Oh, a different D.

24   A.   Yeah.

25   Q.   Okay.  And what hotel was it you were staying at?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  A.  Continental Inn.

2  Q.  Okay.  And that kind of stuck in your mind because that

3  was the first time you met David, right?

4  A.  Yes.

5  Q.  And you all ended up having a relationship, right?

6  A.  Yes.

7  Q.  Personal relationship.

8  A.  Yeah.

9  Q.  And you're telling us the first time you met him was that

10  he pretended that he was a -- he was looking for a prostitute.

11  A.  Yes.

12  Q.  And how did he approach you?

13  A.  He just walked up to me.  He said you want to make some

14  money.  I was like -- actually, first I was like nah, because

15  I wanted to go back to the hotel.  And then -- then I was like

16  yeah.

17  Q.  Why did you -- why did you want to go back to the hotel

18  at first?

19  A.  Because I -- I knew it was probably going to be a while

20  so I was like -- I wanted to tell my boyfriend I'll be gone a

21  little while.

22  Q.  Okay.  So you were out -- you were out on the street

23  looking for work, right?

24  A.  Yeah.

25  Q.  And somebody drove up looking to give you money, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

96

CRYSTAL CHUMLEY - CROSS

1    A.    No, he walked up.

2    Q.    I'm sorry, he walked up.

3    A.    Yes.

4    Q.    He just walked up to you on the street and...

5    A.    Yeah.

6    Q.    And you knew what he wanted and --

7    A.    Yes.

8    Q.    -- he knew what you wanted.

9    A.    Yeah.

10   Q.    But before you wanted to go somewhere, you wanted to go

11   let your boyfriend know --

12   A.    Yeah.

13   Q.    -- that you were going to be gone for a while.

14   A.    Yeah.

15   Q.    And so -- and then what?  Then you changed your mind?

16   A.    Then we walked -- huh?

17   Q.    I'm sorry, but you changed your mind at some point,

18   right?

19   A.    Yeah.  And then I did like, yeah, I'll go ahead.

20   Q.    And then, so you -- where did you two go from there?

21   A.    We went to his car.

22   Q.    Okay.  So he was -- he was walking, but there was a car

23   nearby.

24   A.    Yeah.

25   Q.    And who was in the car?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  A.   Tracy and Keshia.

2  Q.   So it was Tracy and Keshia and then David was out there.

3  A.   Yeah.

4  Q.   And at that point, you knew Tracy or you knew Keshia or

5  you didn't know either of them?

6  A.   I knew them.

7  Q.   Okay.  And you knew them because what?

8  A.   From Alex.

9  Q.   Okay.  So Alex had introduced you to them at that point?

10  A.   Huh?

11  Q.   Alex had introduced you to them, right?

12  A.   Yeah.

13  Q.   And had you stayed with Alex before that or not?

14  A.   What do you mean?

15  Q.   Before that day.

16  A.   Before I met David?

17  Q.   Yeah.

18  A.   Yeah, until he went to prison.

19  Q.   Okay.  And then at some point -- and where was it that

20  you were staying with Alex?

21  A.   University near the Wal-Mart.

22  Q.   And then when Alex went to prison, you went to live

23  with -- who did you say it was, D?

24  A.   Yes.  Demarcus.

25  Q.   Demarcus.  And you were living with D at some hotel.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

98

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   And then -- so at the time you're in the hotel.  You had

3   left Alex.  And this man came up to you on the street, took

4   you back to the car, and there was Keshia and there was Tracy.

5   Right?

6   A.   Yes.

7   Q.   And you hadn't seen him in a while at that point, right?

8   A.   Yes.

9   Q.   Because you were living somewhere else.

10  A.   Yes.

11  Q.   And then they -- at that point did you get into the car

12  with them?

13  A.   Yes.

14  Q.   And -- but what did you say?  Did you say hello?

15  A.   I was like, oh, Lord.  And then I -- because I thought,

16  oh, no, that's Tracy.  And they was like it's okay.  So I went

17  with them.

18  Q.   Okay.  He didn't grab you and throw you in the car.

19  A.   No, he didn't grab me.

20  Q.   And you -- you didn't have any problem going with

21  anybody, right?

22  A.   No.

23  Q.   And then where did you -- where did they tell you you

24  were going?

25  A.   We was going to the house and when we got through, I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   could leave.

2   Q.   Say that again.

3   A.   We was going to the house and then when I got through, I

4   could leave.

5   Q.   I'm sorry, I didn't really understand your answer.  You

6   said you got to the house and then you could leave?

7   A.   No, I said we was going to the house and that when I got

8   through, I could leave.

9   Q.   You were going to the house.  When you got through, you

10  could leave.

11  A.   What they said.

12  Q.   Who's they?

13  A.   Tracy said.

14  Q.   So Tracy said to you we're going to the house and when

15  you're through, you can leave?

16  A.   Yes, when I was through with the date.

17  Q.   Okay.  So this date was then -- was David paying you; is

18  that what you're saying?

19  A.   It was made to be like that.

20  Q.   Well, you just said that when it was through, the date --

21  A.   Yeah.

22  Q.   -- then you could leave.

23  A.   Yeah.

24  Q.   So was it a date?

25  A.   Not really.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  Q.    It -- was David paying you?

2  A.    It was made out to be like that.

3  Q.    I'm saying when you got to the house --

4  A.    No.

5  Q.    -- did David rape you?  That's what I'm --

6  A.    No, he didn't rape me, no.

7           MS. MARSTON:  Objection.

8           MR. ADOLF:  What's the objection, Judge?

9           THE COURT:  Overruled.

10 Q.    Did she -- did he pay you to have sex with him?

11 A.    No.

12 Q.    Well, how did that happen?

13 A.    It was like made out to be a date; but when I got there,

14 I did it with him on my own.  I wasn't raped.  And then when

15 we got through, I was like can I go now.  And they was like

16 you're not going no where.

17 Q.    Okay.  So let me get this straight.  You thought that he

18 was going to pay you to have sex with you, right?

19 A.    Yes.

20 Q.    You got in the car with him --

21 A.    Yes.

22 Q.    -- thinking that he was going to pay you to have sex with

23 him, right?

24 A.    Yes.

25 Q.    You got to the house and he said no, actually, I don't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   want to pay you to have sex with me?

2   A.   No, he didn't say that.

3   Q.   What did he say?

4   A.   We just -- we just did it.  He didn't say no, I'm not

5   going to pay you or nothing.

6   Q.   Well, so you were expecting him to pay at that point?

7   A.   I was expecting to get some crack or something.

8   Q.   You just said, didn't you, that when you first met him on

9   the street, he said you want to make some money.

10  A.   Yeah.

11  Q.   Money, right?

12  A.   Yeah.

13  Q.   Nothing about drugs.

14  A.   They supposed to went and picked some up.

15  Q.   What's that?

16  A.   They supposed to went and picked some up.

17  Q.   Okay.  So now what you're telling us is that at some

18  point they told you you were going to go get some crack?

19  A.   Yeah, but they didn't.

20  Q.   Okay.  So how did that first come up that they were going

21  to go get some crack?

22  A.   I said, well, can I get paid and can I go.  They said

23  we're going to go get some crack and then after that, then

24  we'll take you back.

25  Q.   Okay.  So now you're talking about after you had sex with

Cheryl A. Nuccio, RMR-CRR (704)350-7494

102

CRYSTAL CHUMLEY - CROSS

1   David --

2   A.   Yeah.

3   Q.   -- right?

4        So now what you're telling us is he first said you want

5   to make some money?

6   A.   Yes.

7   Q.   Got in the car with him.  You were expecting some money,

8   right?  You went over to the house.

9   A.   Yes.

10  Q.   Then you decided that he didn't have to pay, right?  You

11  were just going to have sex with him on your own.

12  A.   Yes.

13  Q.   All that same day, right?

14  A.   Yes.

15  Q.   And then he decided that -- you asked him if you could

16  go, right?

17  A.   Yes.

18  Q.   And you all got back in the car; is that what you're

19  saying?

20  A.   No.

21  Q.   You just told us you were going looking for some crack.

22  A.   They was going to go get some crack for me and he didn't

23  never go.  Then I got ready to go and they didn't want me to

24  go.  They said I wasn't going.

25  Q.   They said what?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

103

CRYSTAL CHUMLEY - CROSS

1   A.   They said I was not going.

2   Q.   Okay.  So at that point they basically kidnapped you; is

3   that what you're saying?

4   A.   I ain't saying they kidnapped me, but they...

5   Q.   They just said what?

6   A.   That I'm not going.

7   Q.   That you're not going.  Well, you wanted to go; is that

8   what you're saying?

9   A.   I wanted to go.

10  Q.   You begged them to let you go?

11  A.   Yeah.

12  Q.   What did you say?

13  A.   I want to go.  Just take me back.

14  Q.   Okay.  Because you wanted to go back to the hotel.

15  A.   Yes.

16  Q.   Because that's where you tell us you were living --

17  A.   Yes.

18  Q.   -- at the time when you first met David.

19  A.   Yes.

20  Q.   Right?

21  A.   Yes.

22  Q.   All right.  Now, so you -- what you're telling us is at

23  that point you were living in the hotel, right?

24  A.   Yes.

25  Q.   With your boyfriend.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

104

CRYSTAL CHUMLEY - CROSS

1    A.    Yes.

2    Q.    And you needed money, right?

3    A.    Yes.

4    Q.    Your boyfriend have money?

5    A.    No.

6    Q.    So you were prostituting for him.

7    A.    No.  For me.

8    Q.    Okay.  But he was sharing the money?

9    A.    No.

10    Q.    Were you giving him the money?

11    A.    No.

12    Q.    No part of the money.

13    A.    No.

14    Q.    But he didn't have any money of his own.

15    A.    No.

16    Q.    So you were paying for the hotel?

17    A.    Yes.

18    Q.    All out of the money that you were making --

19    A.    Yes.

20    Q.    -- prostituting, right?

21    A.    Yes.

22    Q.    What was he doing?

23    A.    (No response.)

24    Q.    What was he doing?

25    A.    Sometimes he sold drugs.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1485

CRYSTAL CHUMLEY - CROSS

1    Q.    Okay.   So he sold drugs and you prostituted, right?

2    A.    Yes.

3    Q.    You kept all your money separate.

4    A.    Yes.

5    Q.    Okay.   So your boyfriend was giving you drugs, right?

6    A.    Yeah, when he had them.

7    Q.    Well, okay.   So your boyfriend was a drug dealer, right?

8    He sold crack.

9    A.    Yes.

10   Q.    And he'd give you some, right?

11   A.    Yes.

12   Q.    Because you smoked crack, right?

13   A.    Yes.

14   Q.    And the two of you would split the expenses for the hotel

15   room, right?

16   A.    Yes.

17   Q.    And then you're telling us so you were out on the street

18   trying to make the money, right?

19   A.    Yes.

20   Q.    And David came by.

21   A.    Yes.

22   Q.    That was the first time you ever saw him, right?

23   A.    Yes.

24   Q.    And how old were you at this time?

25   A.    I don't know.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

106

CRYSTAL CHUMLEY - CROSS

1   Q.   Was it about three years ago?  Sound about right?

2   A.   I guess.

3   Q.   Okay.  And you got in the car with him expecting to make

4   money, right?

5   A.   Yes.

6   Q.   Went back to the house, right?

7   A.   Yes.

8   Q.   And then you decided to have sex with him just because

9   you felt like it.

10  A.   Yes.

11  Q.   Not for money; is that right?

12  A.   Yes.

13  Q.   Even though you had a boyfriend who you just wanted to

14  check with --

15  A.   Yes.

16  Q.   -- to tell him that you might be a little while because

17  you were earning money for him, right?

18  A.   Yes.

19  Q.   So you decided immediately you liked David better than

20  your boyfriend?

21  A.   Yeah.

22  Q.   Right from the first time you met him, right?

23  A.   Yes.

24  Q.   And that's why you stayed with David, right?

25  A.   Well, at first -- at first I wanted to leave and they

Cheryl A. Nuccio, RMR-CRR (704)350-7494

107

CRYSTAL CHUMLEY - CROSS

1  said no, I couldn't go.  And then after that I was like -- I
2  was like -- I cried and cried wanting to go, wanting to go.
3  Then I turned around and thought about it and then I turned
4  around and I did like him.

5  Q.   Okay.

6  A.   To stay.

7  Q.   I see.  So you showed up at the house and you were about
8  to have sex for money.

9  A.   Yes.

10  Q.   You talked to David for a little while and you decided
11  that you liked him, right?

12  A.   Yes.

13  Q.   And you wanted to have sex with him, right?

14  A.   Yes.

15  Q.   And you liked him better than your boyfriend, right?

16  A.   Yes.

17  Q.   And you decided you wanted to stay with David now, right?

18  A.   Yes.

19  Q.   And then you changed your mind the same day, right?

20  A.   Yes.

21  Q.   And you started crying, right?

22  A.   Yes.

23  Q.   And begging to be released --

24  A.   Yes.

25  Q.   -- right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1        But they wouldn't let you go.

2   A.   No.

3   Q.   So then you were crying and begging to be released --

4   A.   Yes.

5   Q.   -- right?

6        And they wouldn't let you go.  Did they hold you down?

7   A.   They didn't hold me down.

8   Q.   Did you run for the door or --

9   A.   No.

10  Q.   -- scream or anything like that?

11  A.   No.

12  Q.   And then after you thought about it, you changed your

13  mind again and decided it wasn't so bad, right?

14  A.   Yes.

15  Q.   And that was all -- and that was all that day, the first

16  day you met David.

17  A.   Yes.

18  Q.   That was quite a memorable day for you, right?

19  A.   Uh-huh.

20  Q.   Wouldn't you say?

21       Crystal, isn't it true you just made up that whole story

22  you just told us?

23            MS. MARSTON:  Objection.

24            THE COURT:  Sustained, argumentative.

25  Q.   Crystal, isn't it true --

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1         MS. MARSTON:  Ob --

2         MR. ADOLF:  May I finish the question, Your Honor?

3         (No response.)

4         MR. ADOLF:  I'm sorry, I thought there was an

5    objection.  I'll continue.

6         THE COURT:  Please do so.

7    Q.   Isn't it true, Crystal, that you were working at the

8    escort service for Tracy before you ever met David?  Isn't

9    that true?

10   A.   No.

11   Q.   Isn't it true that you were actually living in Ila's

12   house and working for Ila when you first met David?

13   A.   I didn't start until after I met David.

14   Q.   You were living in the house, though, right?

15   A.   Before I met David?

16   Q.   Yes.

17   A.   No.

18   Q.   Isn't it true that when David got out of prison, you --

19   at the time he got out of prison, you were living in Ila's

20   house and David moved in when he got out of prison; isn't that

21   true?

22   A.   No.

23   Q.   That never happened.

24   A.   I didn't move in to Ila's house until after David got out

25   of prison.


          Cheryl A. Nuccio, RMR-CRR (704)350-7494



                            110

CRYSTAL CHUMLEY - CROSS

1  Q.   You knew David when he got out of prison, right?

2  A.   I didn't know him until I met him on Sugar Creek.

3  Q.   You've been stopped by the police a number of times over

4  the years, right?

5  A.   Yes.

6  Q.   That's something that happens to you all the time; isn't

7  that fair to say?

8  A.   Yes.

9  Q.   And that's because of the nature of what you do and where

10  you're doing it that the police are stopping and questioning

11  you a lot; isn't that right?

12  A.   Yes.

13  Q.   And you know that as a prostitute out on the street,

14  particularly if you're using crack all the time, the police

15  could arrest you pretty much all the time, right?

16  A.   Yeah.

17  Q.   Because you're out doing illegal things every day, right?

18  A.   Yeah.

19  Q.   And you were doing them in particular neighborhoods where

20  you tend to stay, right?

21  A.   Yes.

22  Q.   And it's the same police in the same neighborhoods all

23  the time, right?

24  A.   Yeah.

25  Q.   And you deal with the same officers a lot of the time,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

111

CRYSTAL CHUMLEY - CROSS

1   right?

2   A.   Yeah.

3   Q.   You got the same officer stopping you sometimes over and

4   over and over again, right?

5   A.   Yeah.

6   Q.   And sometimes they arrest you, right?

7   A.   Yeah.

8   Q.   But not always.  Not all the time, right?

9   A.   Yeah.

10  Q.   Sometimes they just want to question you, want to talk to

11  you, right?

12  A.   Yeah.

13  Q.   And sometimes you -- and you know that a lot of times

14  they're just looking for information about what's going on,

15  right?

16  A.   Yes.

17  Q.   Because they're investigating all kinds of people, right?

18  A.   Uh-huh.

19  Q.   And a lot of times what you're doing is really pretty

20  minor compared to some of the big things they're

21  investigating, right?

22  A.   Yeah.

23  Q.   And they let you know that, right?

24  A.   Yeah.

25  Q.   And so very often what they'll tell you is that you're

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  not in any trouble, right?

2  A.   Yeah.

3  Q.   But we need to talk to you and we want information about

4  what's going on in the neighborhood, right?

5  A.   Yeah.

6  Q.   Sometimes those police officers even know you're a

7  prostitute, right?

8  A.   Yes.

9  Q.   They can just tell that, right?

10 A.   Yeah.

11 Q.   You know that and they know that.

12 A.   Yeah.

13 Q.   And so sometimes these officers talk to you and you know

14 that if they really wanted to, they could arrest you for

15 prostitution, right?

16 A.   Yes.

17 Q.   But a lot of times they don't arrest you, right?

18 A.   Yeah.

19 Q.   And that's because they ask you questions, you give them

20 the information they want and they leave you alone, right?

21 A.   I don't all the time.

22 Q.   I'm sorry?

23 A.   Not always.

24 Q.   Not always.  I know not always.  Sometimes you get

25 arrested, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1493

CRYSTAL CHUMLEY - CROSS

1  A.   No.  I don't always tell them nothing.

2  Q.   I understand you don't always tell them.  Sometimes you

3  don't tell them anything at all, right?

4  A.   Yes.

5  Q.   Sometimes you do, sometimes you don't, right?

6  A.   Yes.

7  Q.   Depends on the situation you're in.

8  A.   Yes.

9  Q.   Depends on if you think that they're really trying to go

10 after you or if you can just sort of distract them and get

11 them off to somebody else; is that fair to say?

12 A.   I don't know.

13 Q.   Well, is it fair to say sometimes you feel like you

14 really need to give them information to protect yourself?

15 A.   Sometimes, yeah.

16 Q.   Sometimes that does happen, right?

17 A.   Yes.

18 Q.   Because you know if you don't tell them information,

19 sometimes, you know, they might get upset with you.  They

20 might think you're trying to hide things from them, and they

21 might decide that you really do need to get arrested for the

22 illegal things you both know that you're doing; isn't that

23 fair to say?

24 A.   Yeah.

25 Q.   Yeah, that does happen sometimes, right?  And one of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

114

CRYSTAL CHUMLEY - CROSS

1  those times was on September 30th of 2004.  Do you remember

2  that?

3  A.   No, I don't.

4  Q.   Do you remember talking to Detective John Fish in the

5  courtroom?

6  A.   Yes.

7  Q.   The fella in the -- do you see over on the other side

8  there a fella in the yellow shirt?  He's got a blue jacket on

9  and a bright yellow shirt and blue tie.  Do you see who I'm

10 talking about?

11 A.   Yes.

12 Q.   You know him, right?

13 A.   Yes.

14 Q.   You've talked to him out on the street before, right?

15 A.   Yes.

16 Q.   He's one of those police officers that sometimes is out

17 in the neighborhood and trying to find out what's going on,

18 right?

19 A.   Yes.

20 Q.   Because he investigates crimes, right?

21 A.   Yeah.

22 Q.   And one of the things that you know that he and other

23 officers do is they go out and talk to prostitutes to see what

24 they can find out, right?

25 A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   Q.   And he's done that with you, hasn't he?

2   A.   Yeah.

3   Q.   I'm sorry, I didn't hear the answer.

4   A.   Yes.

5   Q.   Yes, that's something that you've done before, right?

6   A.   Yeah.

7   Q.   And you need to do that to protect yourself, right?

8   A.   Yeah.

9   Q.   And -- now --

10          (Counsel and defendant conferred.)

11  BY MR. ADOLF:

12  Q.   Now, isn't it true that when you spoke to Detective Fish

13  on September 30th, 2004, just so you know, that's the year

14  Little Mexico was torn down, right?   2004.

15  A.   Yeah.

16  Q.   Late in the year, right?

17  A.   Yeah.

18  Q.   And you had one of these situations where the police

19  stopped you and wanted to talk to you, right?

20  A.   Yes.

21  Q.   And obviously, that means you were a little nervous when

22  the police first came up to you, right?

23  A.   Yes.

24  Q.   Because you knew that you were doing illegal things on a

25  daily basis, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1496

CRYSTAL CHUMLEY - CROSS

1   A.    Yes.

2   Q.    And that they could arrest you for that, right?

3   A.    Yeah.

4   Q.    And they told you that they wanted to get information

5   from you, right?

6   A.    Yeah.

7   Q.    And they told you that what they were doing was they were

8   trying to get information about the Howard brothers, right?

9   A.    Yes.

10  Q.    And you gave them that information, right?

11  A.    Yes.

12  Q.    You knew that it was important for them to feel like you

13  were being straight with them, you were telling them

14  everything you knew because that might be able to keep you out

15  of jail, right?

16  A.    (No response.)

17  Q.    Yes?

18  A.    Yes.

19  Q.    Now, you told them that you knew the Howard family,

20  right?

21  A.    Yes.

22  Q.    And you told them that from time to time you had worked

23  for two of the brothers, right?

24  A.    Yes.

25  Q.    Now, this is right before Little Mexico got torn down,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

117

1    right?

2    A.    Yes.

3    Q.    Late 2004.  And you told them that you first started

4    working as a prostitute for Alex Howard.

5    A.    Yes.

6    Q.    Is that right?

7    A.    Yes.

8    Q.    That was the first of the two brothers that you worked

9    for, right?

10   A.    Yes.

11   Q.    And you told them that that was about two years ago.  And

12   you told them that -- you told them, well, Alex is in prison

13   now.  That's what you told them, right?

14   A.    Yes.

15   Q.    Because he was.  Right?

16   A.    Yes.

17   Q.    That was the truth and that's what you told him, right?

18   A.    Yes.

19   Q.    And you told them that you then started working for Tracy

20   Howard, right?

21   A.    Yes.

22   Q.    And you told them that two or three months earlier than

23   that you had started working for Tracy's mother's escort

24   service, right?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  Q.   And at the escort service you told them that you were

2  working for Tracy and Ila, right?

3  A.   Yes.

4  Q.   That's the second of the two brothers you worked for,

5  right?

6  A.   Yes.

7  Q.   And you told them that because that was the truth, right?

8  A.   Yes.

9  Q.   And you didn't want to get into trouble for lying out on

10 the street, right?

11 A.   Yes.

12 Q.   You told them truthfully, right?  You were talking to

13 them truthfully.

14 A.   Yes.

15 Q.   That as of September of 2004, right?

16 A.   Yes.

17 Q.   Little Mexico was about to get torn down.  That you had

18 worked for two of the Howard brothers, right?

19 A.   Yes.

20 Q.   And you told them how the operation worked --

21 A.   Yes.

22 Q.   -- right?

23      And you told them about going out on calls.

24 A.   Yes.

25 Q.   And you told them about going to motels --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   -- where people would come there to have sex with you for

3   money, right?

4   A.   Yes.

5   Q.   You told them about drug dealing.

6   A.   Yes.

7   Q.   You told them you had seen drug deals.

8   A.   Yes.

9   Q.   You told them all that, right?

10  A.   Yes.

11  Q.   And you knew you needed to tell them everything you knew

12  because that would keep you out of jail, right?

13  A.   Yes.

14  Q.   And so you did that.

15  A.   Yes.

16  Q.   And not once did you mention anything about David, did

17  you?

18  A.   No.

19  Q.   Not once.

20  A.   Nope.

21  Q.   Because David wasn't prostituting you, right?

22  A.   He was.

23  Q.   I understand that's what you're saying in court today.

24  But back in 2004, you just told us -- you weren't in court,

25  right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

120

1500

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   You hadn't been spoken to by the prosecutors yet, right?

3   A.   Because --

4   Q.   I'm sorry.

5        MS. MARSTON:  Objection, Your Honor.

6        THE COURT:  Wait a second.  You asked a question and

7   the witness is entitled to answer it.  Go ahead.

8   A.   Because I liked David and I didn't want to get him in

9   trouble.

10  Q.   In fact, you more than liked him, right?

11  A.   Yeah.  That's why I didn't mention nothing about him

12  then.

13  Q.   And you more than liked him, didn't you?

14  A.   Yes.

15  Q.   How did you feel about him?

16  A.   I loved him.

17  Q.   You still do, don't you?

18  A.   Yeah.

19  Q.   And even though he basically left you for another girl,

20  didn't he?

21  A.   Yeah.

22  Q.   And that was Crystal, right?

23  A.   Yeah.

24  Q.   You didn't like Crystal for that, right?

25  A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

121

CRYSTAL CHUMLEY - CROSS

1    Q.    And when the two of you were together, you were David's

2    girlfriend, right?

3    A.    Yes.

4    Q.    Because you wanted to be with him, right?

5    A.    Yes.

6    Q.    And you enjoyed being with him, right?

7    A.    Yes.

8    Q.    And you were working as a prostitute while you were with

9    him, right?

10   A.    Yes.

11   Q.    You weren't working for him, were you?

12   A.    Yes.

13   Q.    Yes, you weren't -- you were not working for him, were

14   you?

15   A.    I was.

16   Q.    But he was your boyfriend, wasn't he?

17   A.    Yes.

18   Q.    You were in love with him, right?

19   A.    Yes.

20   Q.    He wasn't forcing you to be a prostitute, right?

21   A.    No.  Not at first, no.

22   Q.    Didn't you just tell us a little bit earlier that the

23   first time you met David he brought you back to Ila's house

24   and then forced you to be a prostitute for him.  Didn't you

25   tell us that earlier?  Isn't that what you said?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   That wasn't true, was it?

3   A.   At first.

4   Q.   At first what?

5   A.   He wasn't forcing me.

6   Q.   You just told us that the very first time he was forcing

7   you, didn't you?

8   A.   I didn't say forced.

9   Q.   You didn't say forced when?

10  A.   No.

11  Q.   You said that he brought you home by pretending to be

12  somebody who was going to pay you --

13  A.   Yeah, I didn't say he forced.  I said that I started the

14  escort.

15  Q.   You said the very first day he kept you in the house,

16  right?

17  A.   Yes.

18  Q.   You were crying and begging to get out?

19  A.   Yes.

20  Q.   And then by the end of the day you had changed your mind

21  and you decided you liked staying there?

22  A.   Yeah, and I started the escort service.

23  Q.   Okay.  So what you're telling us when you say at first he

24  didn't force you, you're talking about after he first forced

25  you to stay, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

123

CRYSTAL CHUMLEY - CROSS

1  A.  Huh?

2  Q.  Well, he first -- he forced you to stay the first day you

3  were there, right?

4  A.  Yeah, and then I willingly stayed.

5  Q.  So first he forced you to stay and then you willingly

6  stayed.

7  A.  But I didn't say he forced me into the escort service.

8  Q.  So you decided to do that on your own?

9  A.  Well, he set me up with it.  I didn't say I didn't

10  disagree or nothing.

11  Q.  Because that was something that you wanted to do, right?

12  A.  Yes.

13  Q.  You could make money at it?

14  A.  Yes.

15  Q.  I mean, you were prostituting anyway, right?

16  A.  Yes.

17  Q.  And -- because you were prostituting anyway, right?

18  A.  Yes.

19  Q.  And now you were with David, right?

20  A.  Yes.

21  Q.  And you heard about this business that his mother had.

22  A.  Yes.

23  Q.  Right?

24      And so you figured that's a better way to prostitute than

25  being out on the street, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

124

1504

CRYSTAL CHUMLEY - CROSS

1   A.   Yes.

2   Q.   And you wanted to make money, right?

3   A.   Yes.

4   Q.   And you were going to share that money with David, right?

5   A.   Yeah.

6   Q.   Because that was your boyfriend and you were in love with

7   him, right?

8   A.   Yeah.

9   Q.   And you wanted to be with him.

10  A.   Yeah.

11  Q.   And he wanted to be with you.

12  A.   Yeah, I guess.

13  Q.   Right.  And then you became his girlfriend, right?

14  A.   Yeah.

15  Q.   And that's what you've told everybody.  That's what you

16  told the police; isn't that true?

17  A.   Yes.

18  Q.   And he was your boyfriend for a long time.

19  A.   Yes.

20  Q.   Until Crystal came into the picture.

21  A.   Yeah.

22  Q.   And that's why you told us before you didn't like her,

23  right?

24          (Counsel and defendant conferred.)

25  BY MR. ADOLF:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

125

CRYSTAL CHUMLEY - CROSS

1    Q.    And then the two of you moved into your own house, right?

2    A.    Yes.

3    Q.    After you got that house.  And where was that house?

4    A.    I don't know the name of the street.  I can't pronounce

5    it.

6    Q.    It was Strawberry Circle and Tiburon, was that the name

7    of it where the house was?

8    A.    Yes.

9    Q.    And you and David moved into the house together, right?

10   A.    Well, we was in the process.

11   Q.    And then you moved in.

12   A.    When I got out of jail.

13   Q.    What's that?

14   A.    When I got out of jail.

15   Q.    Okay.  So you got locked up somewhere in there, right?

16   A.    Yeah.

17   Q.    And why -- what had you got arrested for, do you

18   remember?  That time.

19   A.    I don't know.

20   Q.    Okay.  And who came to get you out of jail?

21   A.    David bailed me out.

22   Q.    He went to court for you actually, right?

23   A.    Yes.

24   Q.    Okay.

25   A.    Stood up for me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   Q.   I'm sorry?

2   A.   He stood up for me.

3   Q.   He stood up for you because you were his girlfriend,

4   right?

5   A.   Yeah.

6   Q.   And he loved you.

7   A.   I guess.

8   Q.   And then Candy was at the house, right?

9   A.   Yeah.

10   Q.   Tell us about how Candy got there.

11   A.   She was a nice girl.  She looked out for me.

12   Q.   Right.  And so the three of you were all living there

13   together.

14   A.   Yeah.

15   Q.   And actually, at that time you weren't on drugs, right?

16   A.   No, I wasn't.

17   Q.   You actually stayed off drugs, right?

18   A.   Yes.

19   Q.   And that was something that you had wanted for yourself,

20   right?

21   A.   At first, yeah.

22   Q.   And also something David wanted for you, right?

23   A.   Yes.

24   Q.   Because he was your girlfriend -- I mean, he was your

25   boyfriend, I'm sorry.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

127

CRYSTAL CHUMLEY - CROSS

1    A.    Yes.

2    Q.    I got confused.  And he loved you, right?

3    A.    Yes.

4    Q.    And he hated seeing you on drugs; is that right?

5    A.    Yes.

6    Q.    And he liked you a whole lot better when you weren't on

7    drugs; is that fair to say?

8    A.    Yeah.  He hated it when I was on drugs.

9    Q.    He did.  He hated it.

10              MS. MARSTON:  Objection.

11              THE COURT:  Basis?

12              MS. MARSTON:  It's not a question, Your Honor.

13              THE COURT:  Overruled.

14   Q.    Isn't that right?

15   A.    Yes.

16   Q.    So what were things like in the house when David was

17   there in that house and Candy?

18   A.    (No response.)

19   Q.    Y'all were just living there, right?

20   A.    Yeah.

21   Q.    And you were -- were you working on the street or working

22   for the escort service then or what were you doing?

23   A.    Escort service.

24   Q.    Right.  And so you were bringing home some money to help

25   pay for the bills, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   A.   Yeah, and clothes.

2   Q.   And Candy was staying in the house, too, right?

3   A.   Yeah.

4   Q.   Because you needed roommates so that you all could split

5   the expenses, right?

6   A.   Yeah.

7   Q.   But -- but there was also stuff going on with you and

8   Candy; isn't that right?

9   A.   Yeah, but I didn't mind.

10  Q.   Okay.  He was -- and what you're saying is that he was

11  actually sleeping with Candy too, right?

12  A.   (Affirmative nod.)

13  Q.   On a regular basis, right?

14  A.   Not all the time.  There was no kind of...

15  Q.   Just occasionally, right?

16  A.   Yeah.

17  Q.   But that didn't bother you, right?

18  A.   No.

19  Q.   Because you knew that in the end he was your boyfriend,

20  right?

21  A.   Yeah.

22  Q.   And you didn't mind sharing him a little bit with Candy,

23  right?

24  A.   Yeah.

25  Q.   That was something that she didn't mind and you didn't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    mind, correct?

2    A.   Yeah.

3    Q.   Wasn't something somebody forced you to do.

4    A.   No.

5    Q.   Right?

6    A.   Right.

7    Q.   You weren't scared of him then, right?

8    A.   No.

9    Q.   And she wasn't scared of him.

10   A.   No.

11   Q.   You all were both doing that because that's what you

12   wanted to do, right?

13   A.   Yes.

14   Q.   And you were prostituting because that was a way to pay

15   the bills, right?

16   A.   Yeah.

17   Q.   And at the time do you remember David selling meat?

18   A.   Yeah.

19   Q.   He was working at the Superior Meat Company.

20   A.   Yes.

21   Q.   Do you remember that?

22        And do you remember how he used to drive around and sell

23   meat?

24   A.   Yeah.

25   Q.   Did you ever go out with him on those calls?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1510

CRYSTAL CHUMLEY - CROSS

1   A.   No.  I went and met the people he worked with, though.

2   Q.   Did you?  And they were nice people.

3   A.   Yeah, real nice.

4   Q.   That was -- they were a regular business, right?  I

5   mean...

6   A.   Yeah, just regular.

7   Q.   They weren't doing anything illegal or anything like

8   that, right?

9   A.   No.

10  Q.   And David would drive around -- he drove a truck and he

11  would sell meat that was in the truck, right?

12  A.   Yeah.

13  Q.   That was his job, right?

14  A.   Yeah.

15  Q.   He worked there -- I mean, it wasn't full-time work; it

16  was part-time work.

17  A.   Yeah.

18  Q.   And he was contributing to the house with that money,

19  right?

20  A.   Yeah.

21  Q.   And you were contributing with your prostitution that you

22  were doing with his mother, right?

23  A.   Yeah.

24  Q.   And then Candy was also prostituting, right?

25  A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

131

1511

CRYSTAL CHUMLEY - CROSS

1  Q.   And she -- and she actually worked for Ila, too; is that

2  right?

3  A.   Yes.

4  Q.   And so you all would pool that money and pay the bills

5  and everything; is that right?

6  A.   Yes.

7  Q.   Let me ask you, back then did you actually have a

8  driver's license?

9  A.   I've always had a driver's license, but they expired and

10 somebody stole them.

11 Q.   Right.  So what I mean is you didn't actually have one

12 that was real and worked and -- at the time where you could

13 actually legally drive --

14 A.   No.

15 Q.   -- is that fair to say?

16      And Candy didn't have one either, right?

17 A.   I thought she did.  I don't know.

18 Q.   Well, she didn't drive herself around, right?

19 A.   No, she didn't.

20 Q.   As far as you knew she didn't have a driver's license,

21 right?

22 A.   I don't know.

23 Q.   And now, if you -- if there was a call where you were

24 working for Ila and you went out on a call, you couldn't drive

25 yourself, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    A.    No.

2    Q.    And David was your boyfriend so you would ask him for a

3    ride, right?

4    A.    Yeah.

5    Q.    So he'd take you.

6    A.    Yeah.

7    Q.    Because -- because one of the things the business said

8    was that if -- if you had to get a driver, you had to pay the

9    driver extra money, right?

10   A.    Yes.

11   Q.    But if you had got somebody -- either had your own car or

12   just had somebody give you a ride, then you didn't have to pay

13   that extra money, right?

14   A.    Yeah.

15   Q.    The ride was free, right?

16   A.    Yeah.

17   Q.    And so you had David do it because David wouldn't charge

18   you $20.  He was your boyfriend, right?

19   A.    Yeah.

20   Q.    And you'd share all the money, right?  Right?

21   A.    Yes.

22   Q.    So you're talking about for a while y'all were living in

23   that same house with you and him and Candy, right?

24   A.    Yeah.

25         MS. MARSTON:  Objection, asked and answered.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

133

CRYSTAL CHUMLEY - CROSS

1              THE COURT:  Sustained.

2    Q.   And then at some point things changed, right?

3    A.   Yes.

4    Q.   And that was when Crystal showed up, right?

5    A.   Yeah.

6    Q.   Do you remember the first time Crystal showed up at the

7    house?

8    A.   Yes.

9    Q.   Can you tell us about it.

10   A.   Yeah.  I didn't like her.

11   Q.   What was it you didn't like about her?

12   A.   She was snobby.

13   Q.   Now, you all -- the two of you knew each other before you

14   met David; isn't that right?

15   A.   Yeah.

16   Q.   Right.  And you didn't like her from way back.

17   A.   No.

18   Q.   Right?

19        Do you remember about when it was you first met her?

20   A.   At the Relax Inn.

21   Q.   I'm sorry?

22   A.   At the Relax Inn.

23   Q.   The Relax Inn.  Is that a hotel?

24   A.   Yeah.

25   Q.   And she was prostituting?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

134

CRYSTAL CHUMLEY - CROSS

1   A.   Yeah.

2   Q.   And you were, too?

3   A.   Yeah.

4   Q.   You were also, right?

5   A.   Yes.

6   Q.   Now, at that time -- you just told us this was before you

7   met -- you ever met David, right?

8   A.   Yes.

9   Q.   So you didn't know him and you never saw him with Crystal

10  or anything like that.  You just never saw him.  Right?

11  A.   No, I never saw him.

12  Q.   Now, you were at the house and Crystal at some point

13  moved in, is that what happened?

14  A.   Ain't none of us really moved in.  When I was in jail --

15  we was fixing the place up to move in.  And then when I went

16  to jail, they moved all in.

17  Q.   Right.  You were all fixing the place up, getting ready

18  to move in.

19  A.   Yeah.

20  Q.   All three of you, right?

21  A.   Yeah.

22  Q.   And then you moved in.  And you were there for a little

23  while before Crystal showed up?

24  A.   No.

25  Q.   She showed up --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

135

CRYSTAL CHUMLEY - CROSS

1  A.   They moved in while I was in jail.

2  Q.   Okay.  And so what happened when you got out of jail and

3  went back to the house?

4  A.   Crystal was there.

5  Q.   Crystal -- I'm sorry?

6  A.   Crystal was there.

7  Q.   Crystal was there when you walked in, right?

8  A.   Yeah.

9  Q.   So you had just gotten out of jail and David was your

10 boyfriend when you went in, right?

11 A.   Yeah.

12 Q.   And then when you showed up, there was somebody else

13 there.

14 A.   Yeah.

15 Q.   Crystal.  And all of a sudden she was with David, right?

16 A.   Yeah.

17 Q.   And she was living in the house, right?  And you talked

18 about how you and David had had an intimate relationship up to

19 that point, right?

20 A.   Yeah.

21 Q.   Yeah.

22 A.   Yeah.

23 Q.   But that -- that didn't continue anymore after that, did

24 it?

25 A.   Say what?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    Q.    That relationship that you had with David didn't continue

2    the same way it had before, right?

3    A.    No.

4    Q.    Instead, you found yourself in a new situation with

5    David, right?

6    A.    Yeah.

7    Q.    And that was because it was Crystal that he was all of a

8    sudden treating like a girlfriend, right?

9    A.    Yeah.

10   Q.    And he stopped -- in fact, he stopped having sex with

11   you; isn't that right?

12   A.    We had sex one more time and then that was it.

13   Q.    One more time and then that was it, right?

14   A.    Yeah.

15   Q.    Now, he was still having -- but he was having sex with

16   Crystal then, right?

17   A.    Yes.

18   Q.    And still with Candy, wasn't he?

19   A.    Yeah.

20   Q.    And that had been your boyfriend when you went to jail,

21   right?

22   A.    Yeah.

23   Q.    And you came out and all of a sudden he had a new

24   girlfriend and he was still having sex with Candy also; is

25   that right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   A.   Yeah.

2   Q.   And that was something that Crystal seemed like she

3   wanted to do, right?

4   A.   Yeah.

5   Q.   She liked being with David, right?

6   A.   Yeah.

7   Q.   And so did Candy.

8   A.   Yeah.

9   Q.   And now, you talked about when you first got there, at

10  that first time you were off -- you were off of crack, right?

11  A.   Huh?

12  Q.   You weren't using crack at that time, right?

13  A.   When?

14  Q.   When you got out of jail and came back to the house.

15  A.   No.

16  Q.   Right.  You were off for a period of time, right?

17  A.   Yeah.

18  Q.   And all of a sudden you had to deal with the fact that

19  your boyfriend was having sex with somebody else, has this

20  girlfriend, and also with Candy, right?

21  A.   Yeah.

22  Q.   And he didn't seem all that interested in you anymore,

23  right?

24  A.   Yeah.

25  Q.   And that hurt, didn't it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   A.   Yeah.

2   Q.   That hurt a lot, right?

3   A.   Yeah.

4   Q.   And that made you angry, didn't it?

5   A.   (No response.)

6   Q.   And isn't it true that that's when you started to relapse

7   a little bit with Candy, right?

8   A.   (Affirmative nod.)

9   Q.   I remember you telling us a minute ago that David really

10  hated it when you were on drugs, right?

11  A.   Yeah.

12  Q.   And he wanted to see you clean, right?

13  A.   Yeah.

14  Q.   But at that point that wasn't something you could handle,

15  right?

16  A.   No.

17  Q.   Because basically, he broke your heart, didn't he?

18  A.   Yeah.

19  Q.   And the reason -- you told us a little earlier about when

20  David threw that crack pipe in the fireplace, right?  Do you

21  remember telling us about that?

22  A.   I threw it in there.

23  Q.   Why did you throw it in there?

24  A.   Because he wanted me to light it on the fire, but at

25  first I didn't realize what he was doing.  But then I kind of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  thought about it right then.  At first I thought he was being

2  mean.

3  Q.   Okay.

4  A.   Because he poked me with the fire poker.  And I threw it

5  in there and I said, Okay, I give up.  I quit.  He said, No,

6  get it back out.  Then at the end I realized -- because at the

7  end he did say, You really mean you can quit?  I said, I just

8  want one more and that's it.  He said, Okay.  I promise I'll

9  give you one more if you stop.

10 Q.   That meant a lot to you, right?

11 A.   Yeah.

12 Q.   Because you realized --

13 A.   I thought he was being mean when I said that to them.

14 Q.   What's that?

15 A.   I thought he was being mean when he did that, when I said

16 that -- to what I just said about him making me try to light

17 it off the fireplace, but then I just now realized...

18 Q.   I understand.  And when you talked to them over there, it

19 was because you really -- you had forgotten about how much

20 David cared about you.

21 A.   Yeah.

22 Q.   And is it coming back to you a little bit?

23 A.   Yeah.

24 Q.   And you realize that, in fact, David does care about you,

25 right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

140

CRYSTAL CHUMLEY - CROSS

1   A.   Yeah.

2   Q.   And you need to tell them what was really going on,

3   right?

4   A.   Yeah.

5   Q.   And you still love him today, don't you?

6   A.   Yeah.

7   Q.   And what really went on was not that David was trying to

8   keep you off crack because you looked better on the calls; it

9   was because he wanted you clean for you; isn't that true?

10  A.   Yes.

11  Q.   But what you told them before was that it was for a whole

12  other thing, right?

13  A.   Because I thought he was being mean.  I didn't realize

14  it.

15  Q.   I understand.

16  A.   I didn't realize what he was trying to do until I thought

17  it over.

18  Q.   He was trying to get you clean, right?

19  A.   Uh-huh.

20        MS. MARSTON:  Objection, asked and answered.

21        THE COURT:  Sustained.

22  Q.   Now, I wanted to ask you about -- you were talking about

23  when Candy stole the money.

24  A.   Huh?

25  Q.   You talked about -- you told them that Candy stole money

Cheryl A. Nuccio, RMR-CRR (704)350-7494

141

CRYSTAL CHUMLEY - CROSS

1    from David.

2    A.    Yes.

3    Q.    Can you tell us what really went on with that whole

4    thing.  Do you remember?

5    A.    She had blocked up the thing and stole money from him.

6    Oh, you talking about when he got robbed?

7    Q.    Yeah, you were talking about before when Candy went out

8    the window and stole the money, right?

9    A.    Yeah.

10   Q.    Now, I understand you left around the same time, right?

11   A.    Yes.

12   Q.    Why was that?

13   A.    Because I was ready to go.

14   Q.    Now, Crystal Welsh, we were talking about her a little

15   bit before, right?

16   A.    Huh?

17   Q.    Remember we were talking about Crystal?

18   A.    Yeah.

19   Q.    Now, it was right before that whole thing with Candy and

20   the money that Crystal was in jail; is that right?

21   A.    Yeah.

22   Q.    And do you remember something going on when Crystal was

23   in jail?

24   A.    Yeah.

25   Q.    And that was when you all took some ecstasy pills.  Do

Cheryl A. Nuccio, RMR-CRR (704)350-7494

142

CRYSTAL CHUMLEY - CROSS

1  you remember what I'm talking about?

2  A.    Yeah.

3  Q.    Can you tell us about what happened then.

4  A.    What do you mean?

5  Q.    Well, it was you and David and Candy and you were all in

6  the house, right?

7  A.    Right.

8  Q.    You remember what I'm talking about, right?

9  A.    Yeah.

10  Q.    And you all took some ecstasy, right?

11  A.    Yeah.  We kind of had a little freak show.

12  Q.    Is that right?

13  A.    Yeah.

14  Q.    Tell us what that was about.

15  A.    I was in the shower and all of a sudden I look on the

16  radio and there's an X pill there and I'm like what the hell,

17  because I locked the door.  I come out, look on the radio,

18  there's an X pill there.  And then I'm like -- and then all of

19  a sudden the phone rings upstairs.  Candy had called on the

20  cell phone.  She had said come on down to the sofa.  And I was

21  like -- she was like come naked.  I said, huh-uh, hell no.  I

22  said I'm not.  And finally, I took the X pill.  I went

23  downstairs and I had on -- I went in there.

24        And later on, I don't know, sometimes I get dizzy when

25  I'm on it and I fell down the stairs.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

143

CRYSTAL CHUMLEY - CROSS

1  Q.   Well, you just told us Candy called you on the phone,

2  right?

3  A.   From a cell phone onto the house phone.

4  Q.   So she was in the house?

5  A.   Yeah.

6  Q.   So she called you on the -- to the house phone from the

7  cell phone?

8  A.   Yeah.

9  Q.   So where was she?

10  A.   She was in the bedroom with David.

11  Q.   All right.  So I think I see what you're talking about.

12  So you're saying --

13         MS. MARSTON:  Objection.

14         THE COURT:  Sustained.

15  Q.   So he -- she called you from the bedroom and she was in

16  there with David, right?

17  A.   Yeah.

18  Q.   And she was naked, right?

19  A.   Yeah.

20  Q.   And David was naked, too, right?

21  A.   Yeah.

22  Q.   And there was a little bit of ecstasy going around,

23  right?

24  A.   Yeah.

25  Q.   And what she was telling you on that little cell phone

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1   was that she wanted you to come and join them, right?

2   A.   Yeah.

3   Q.   That's what you did, right?

4   A.   Yeah.

5   Q.   You had fun.

6   A.   Yeah.

7   Q.   And that was when -- and you remember that was when

8   Crystal was in jail --

9   A.   Yeah.

10  Q.   -- while that was going on, right?  It was good when

11  Crystal was in jail that time, right?

12  A.   Yeah.

13  Q.   And then Crystal got out.

14  A.   Yeah.

15  Q.   And things changed a little bit.

16  A.   Yeah.

17  Q.   And there was a lot of stress when she came back, right?

18  A.   Yeah.

19  Q.   And so there was a lot of stress between everybody that

20  was there, right?

21  A.   Yeah.

22  Q.   And so at some point David realized that this was a bad

23  situation and so he asked the two of you if Crystal could stay

24  in the house or not, right?

25  A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

145

CRYSTAL CHUMLEY - CROSS

1  Q.   You remember that, right?

2  A.   Yes, I remember that.

3  Q.   What did you think when he said that?

4  A.   Hell no.

5  Q.   What did Candy say?

6  A.   I don't know.  I don't remember.

7  Q.   Okay.  But Crystal did come back in the house anyway,

8  right?

9  A.   Yeah.

10  Q.   You didn't want her there.

11  A.   No.

12  Q.   Things had been a lot better without her, right?

13  A.   Yeah.

14  Q.   And it was almost like after all that, after all that had

15  gone on with you all, now you felt like you had to go back to

16  being like roommates again, right?

17  A.   Yeah.

18  Q.   Like all of a sudden after all that, his girlfriend was

19  back and now, instead of being his girlfriend, instead of all

20  that that was to you, you had to just go back to being a

21  roommate, right?

22  A.   Yeah.

23  Q.   That hurt a lot, right?

24  A.   Yeah.

25           MS. MARSTON:  Objection, Your Honor, asked and

1  answered.

2          THE COURT:  Sustained.

3  Q.   So at some point David had to talk to everybody about it,

4  right?

5          MS. MARSTON:  Objection, asked and answered.

6          THE COURT:  Overruled.

7  Q.   David had to talk to everybody about that whole stress

8  and the situation in the house, right?

9  A.   Yeah.

10  Q.   And what he said was, look, do you all want to leave?  Do

11  you want to split up as roommates?  He asked everybody that,

12  right?

13  A.   Yeah.  I was like no.

14  Q.   You wanted to stay anyway, right?

15  A.   Yeah.

16  Q.   Now, David wasn't -- David wasn't going to leave you out

17  on the street, right?  He wasn't just kicking you out or

18  anything, was he?

19  A.   No.

20  Q.   No.  In fact, he offered -- he said he would help you, he

21  would give you some money -- everybody, that he would help

22  everybody try to -- if they needed a little money to set up

23  their own place where they wanted to live, he was going to try

24  to do that, right?

25  A.   I don't remember that part.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    Q.    Okay.  And is that the reason why you ended up leaving

2    the house?

3    A.    No.

4    Q.    Why did you leave the house?

5    A.    Because me and Candy had gotten into it.  Because she

6    thought I took some of her crack, but I did not.

7    Q.    You didn't take any of her crack, right?

8    A.    Yeah.  And then that night at one of the calls...

9    Q.    Yeah, what happened?

10   A.    I messed it up and so David got mad.  So while we was

11   at -- he was at the office, I jumped out of the car and ran.

12   Q.    Later on did you come back?

13   A.    Yeah.  One day I called him.  I called him, he came and

14   picked me up.  We went to McDonald's.

15         And then some time or other he was on the cell phone.  We

16   had had an argument.  He said, okay, just get your stuff

17   together, leave.  So I was scared so I went up there.  I just

18   changed clothes and ran out the door and got the neighbor, got

19   one of the neighbors to take me to North Tryon while I was

20   still on the phone.

21   Q.    At the time you were staying with David, you didn't see

22   any guns around the house, right?

23   A.    No.

24            MR. ADOLF:  I have nothing further, Your Honor.

25            THE COURT:  Mr. Mackey, any cross?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

```
 1                MR. MACKEY:  Yes, Your Honor.
 2                     CROSS EXAMINATION
 3    BY MR. MACKEY:
 4    Q.   Ms. Chumley.
 5    A.   Yes.
 6    Q.   Isn't it true that you had a long running drug addiction?
 7    A.   Yes.
 8    Q.   And you've never completed treatment for that, have you?
 9    A.   No.
10    Q.   And when you're high on, what was it, crack?  When you're
11    high on crack, it affects your memory and your perception,
12    doesn't it?
13    A.   No.
14    Q.   Now, isn't it true that no one lived with you at the
15    Sailboat Bay Apartments?  Wasn't that an empty apartment?
16    A.   No, it wasn't.
17    Q.   Now, on direct -- on direct examination, you stated that
18    you lived at Sailboat Bay Apartments with Nicholas Ragin.  Do
19    you remember giving a statement to Agent Tadeo on -- in
20    October of 2005 where you stated that you lived at Hanover
21    Landing with Nicholas Ragin?  Do you remember that?
22    A.   Yes.
23    Q.   But today you stated that you didn't live at Hanover
24    Landing with Nicholas Ragin, did you?
25    A.   No, I didn't say I didn't.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1    Q.    Well, you were asked who lived there with you and you

2    didn't say Nicholas Ragin.

3    A.    Because he hadn't moved in yet when y'all was talking

4    about it.

5    Q.    And isn't it true that you've never seen Nicholas Ragin

6    bagging any crack cocaine?

7    A.    I have.

8    Q.    And isn't it also true that you've never seen Nicholas

9    Ragin assault anyone?

10   A.    I have not.

11   Q.    And isn't it also true that you've never seen Nicholas

12   Ragin give Tracy any money?

13   A.    I have.

14   Q.    Well, now, you stated earlier that Tracy was in jail.

15   A.    When he took me to calls before he got out and then he

16   went back to jail again.

17   Q.    Tracy.

18   A.    Yes.

19   Q.    But I'm saying -- you never saw Nicholas Ragin give Tracy

20   any money.

21   A.    When he got out of jail the first time he did.  But the

22   second time I didn't see him because Tracy didn't get out of

23   jail.

24          MR. MACKEY:  No further questions at this time.

25          THE COURT:  Mr. Brown, do you have any cross?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

1           MR. BROWN:  I do, Your Honor.

2                      CROSS EXAMINATION

3   BY MR. BROWN:

4   Q.   Ms. Chumley.

5   A.   Yes.

6   Q.   You're in custody right now; isn't that correct?

7   A.   Yes.

8   Q.   And can you tell the jury why you're in custody.

9   A.   Material witness.

10  Q.   What does that mean?

11  A.   Means I have to stay in here to make sure I go to trial

12  to testify.

13  Q.   To make sure that you testify.

14  A.   Yes.

15  Q.   And they put you in custody because they didn't feel you

16  were reliable to come and show up, didn't they?

17  A.   Yes.

18  Q.   And you would agree that you're not reliable, correct?

19  A.   I agree.

20  Q.   In fact, in some of these interviews you have not been

21  reliable; isn't that correct?

22  A.   (No response.)

23  Q.   Well, when I say these interviews, I mean when you were

24  talking to some of the officers, you have not been reliable;

25  isn't that correct?

CRYSTAL CHUMLEY - CROSS

1   A.   Like when I was drunk?

2   Q.   Well, were you drunk when you were talking to the

3   officers sometimes?

4   A.   I was high when I talked to them the first day.

5   Q.   Okay.  And when was that?

6   A.   In Little Mexico.

7   Q.   And is there a reason that you continue to look at this

8   side when I ask you questions before you answer?

9   A.   No.

10            MS. MARSTON:  Objection.

11            THE COURT:  Overruled.

12   Q.   Now, you talked to Officer, I think it's Tadeo, in

13   October of 2005; isn't that correct?

14   A.   I don't remember.

15   Q.   Do you remember being in jail in October of last year?

16   A.   Yes.

17   Q.   And an officer came down there to talk to you, correct?

18   A.   I believe so.

19   Q.   And you had your public defender there with you, correct?

20   A.   Public defender?

21   Q.   Your attorney.

22   A.   Yes.

23   Q.   And why were you in jail?

24   A.   State charges and federal, I believe.

25   Q.   And what -- I'm sorry?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  A.    I believe.

2  Q.    I'm sorry, I didn't hear your answer.  Could you repeat

3  your answer.

4  A.    State charges and then I ended up with a federal hold.

5  Q.    Okay.  So they came down to talk to you when you had

6  charges pending, correct?

7  A.    Yes.

8  Q.    And they asked you to help them; isn't that correct?

9  A.    Yes.

10  Q.    Now, at one point in time in one of these interviews, you

11  admitted that you had bagged dope for Tracy; isn't that

12  correct?

13  A.    Say what?

14  Q.    At one point in time in one of these interviews, you

15  admitted that you had bagged dope for Tracy.  You admitted

16  that at one point in time; isn't that correct?

17  A.    For D.  I did one time.

18  Q.    Okay.  And in your interview on October 30 in 2004, you

19  stated that you never took part in the drugs; isn't that

20  correct?

21  A.    In selling?  What do you mean?

22  Q.    In selling.

23  A.    No, I didn't.

24  Q.    Okay.  And do you consider bagging not taking any part of

25  selling it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - CROSS

1  A.   No.  I don't know.  I don't know.

2  Q.   Now, did you live out in Little Mexico at one point in

3  time?

4  A.   Yes.

5  Q.   And you did some prostitution work out in Little Mexico

6  at one point in time?

7  A.   Yes.

8  Q.   And how many times -- or how many occasions did

9  Mr. Sanchez have to shoo you away from being with johns there?

10 A.   You mean tell me to leave?

11 Q.   Yes.

12 A.   A couple times.

13 Q.   And you didn't like that, did you?

14 A.   No.

15 Q.   He had a problem with you having johns there, correct?

16 A.   Yeah.

17 Q.   And that's why he wanted y'all to leave or shooed you all

18 away, correct?

19 A.   Yeah.

20 Q.   Now, did you tell the truth in all of your interviews

21 that you gave with the police officers?

22 A.   Yes, I did.

23 Q.   And even on the ones where you were high?

24 A.   Yes, I did.

25 Q.   Do you remember everything you said because you were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1  high?

2  A.   Yes, I did.

3  Q.   How many times were you interviewed?

4  A.   Three or four times.

5  Q.   Do you remember, I'll ask you again, the interview on

6  September 30th, 2004?

7  A.   Yes, sir.  I think so.

8  Q.   And in that interview you made absolutely no mention

9  whatsoever of anyone named Puerto Rico; isn't that correct?

10  A.   Say what?

11  Q.   In that interview you made absolutely no mention of

12  anyone by the name of Puerto Rico; isn't that correct?

13  A.   Correct.

14         MR. BROWN:  Your Honor, may I have a moment to have

15  a translation?

16         (Counsel and defendant conferred.)

17         MR. BROWN:  Your Honor, I think that's all at this

18  time.

19         THE COURT:  Very well.  Any redirect?

20         MS. MARSTON:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MS. MARSTON:

23  Q.   Ms. Chumley, who lived with you at Hanover Landing?

24  A.   Hanover Landing?  Cathy, Tracy, D, and then Nick moved

25  in.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1   Q.   At some point did Tracy go away?

2   A.   Yes.

3   Q.   Now, there's been a lot of talk about that first day,

4   September 30th, 2004, before Little Mexico got demolished.

5   What was your condition that day?

6   A.   When?

7   Q.   On September 30th when you talked to Detective Fish out

8   at Little Mexico.

9   A.   I was high.

10  Q.   Now, are you high today?

11  A.   No.

12  Q.   And have you -- how long has it been since you smoked

13  some crack?

14  A.   Nearly two or three weeks now.

15  Q.   Since the time that you were -- you ran away afrom McLeod

16  Center?

17  A.   Yes.

18  Q.   Now, I want to go back to that fake date.  Do you know

19  what I'm talking about when I say that?

20  A.   Yes.

21  Q.   Right before that fake date happened, who had you run

22  into on Tryon?

23  A.   Tracy.

24  Q.   And who was Tracy with?

25  A.   Keshia.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1   Q.   And had you seen them a while before that or was that the

2   first time you'd seen them?

3   A.   I had seen them.

4   Q.   Where had you seen them?

5   A.   I mean, that's the first time I seen them in a while.

6   Q.   And when you saw Tracy and Keshia, what did you do at

7   that time?

8   A.   I stopped and talked to them.

9   Q.   And then what?

10  A.   Then I went back to the hotel and then I came back out

11  later.

12  Q.   And when you came back out later, what happened?

13  A.   David came -- walked up to me.

14  Q.   Now, why do you call it a fake date?

15  A.   Because it wasn't really a date.

16  Q.   Why wasn't it a real date?

17  A.   Because on a real date you go and you come back.

18  Q.   And so how was this different from a real date?

19  A.   I didn't come back.

20  Q.   And why didn't you come back?

21  A.   Because they said I wasn't going nowhere.

22  Q.   Who is they?

23  A.   And then -- Tracy, David.  And then I turned around and

24  decided I wanted to stay.

25            MR. ADOLF:  Objection, Judge.  This is repeating the

CRYSTAL CHUMLEY - REDIRECT

1  direct examination.

2          THE COURT:  Sustained.

3  Q.  Were you expecting something when you went with David on

4  that fake date?

5  A.  Yes.

6          MR. ADOLF:  Objection, Your Honor, repeating the

7  direct examination.

8          THE COURT:  Overruled.

9  Q.  What were you expecting?

10  A.  Some money at first.

11  Q.  And then what were you expecting?

12  A.  Some crack.

13  Q.  And why did it change from money to crack?

14  A.  Because they was like we can get you some crack.

15  Q.  So at that point who was willing to give you crack that

16  day?

17  A.  I don't know.  They just said they would.

18  Q.  Who said they would?

19  A.  Both of them.

20  Q.  Who's both of them?

21  A.  David and Tracy.  But they never went.  And David says

22  you don't need it anyway.

23  Q.  Now, later did David give you some crack?

24  A.  No.

25  Q.  Did he ever give you crack when you were at the house?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1   A.   No.

2           MR. ADOLF:   Objection, asked and answered, Your

3   Honor.

4           THE COURT:   Overruled.

5   Q.   And why didn't he give you crack there?

6   A.   He didn't want me on crack.

7   Q.   So the day when you had the crack, the fire poker

8   incident, do you recall that day?  Where did you get the crack

9   you had that day?

10  A.   From David.

11  Q.   So there were times that he did give you crack?

12  A.   Yeah, but he didn't like it.

13  Q.   And why didn't he like it?

14  A.   Because the way I acted and plus he wanted me to get off

15  of crack.

16  Q.   Now, I heard on cross examination you still have some

17  very deep feelings for David; is that right?

18  A.   Yes.

19  Q.   And I understand that you now think that whole incident

20  was okay; is that correct, with the fire poker?

21  A.   Yeah.

22  Q.   Well, just tell me -- go back.  How did it feel when he

23  poked you with that hot fire poker?

24  A.   I felt like he hated me.  I felt like he did it on --

25  being mean.  And then now --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1  Q.   Why did you --

2            MR. ADOLF:  Objection, Your Honor.  The witness is

3  explaining her answer.

4            THE COURT:  Sustained.  You can go ahead and finish

5  your answer.

6  Q.   I'm sorry, were you not finished?

7  A.   No.

8  Q.   Go ahead.

9  A.   I started thinking because after I did it, I realized

10  when I said I'm through and then I said I just want one more,

11  he said -- he said, I'll give you one more if you'll stop.  I

12  said, I'll be through, just give me one more.

13  Q.   So in your opinion, it was okay that he poked you with

14  that hot fire poker that day?

15  A.   At first it wasn't.

16  Q.   But now after talking with David's attorney here today,

17  you think it's okay?

18  A.   Yeah.

19  Q.   Now, there was some talk about -- I guess you started to

20  say something about when he got robbed on cross examination.

21            MR. ADOLF:  Objection to leading, Judge.

22            THE COURT:  Overruled.

23  Q.   What were you talking about then?

24  A.   I didn't know if he was talking about Candy stealing

25  money or Crystal setting him up to be robbed.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1    Q.    When did Crystal set him up to be robbed?

2    A.    When we was -- I was on my way to a call and she was

3    already on a call.  She kept saying that -- calling and saying

4    that she was on -- going to keep staying, so when he got to

5    the house, she had had her friends to rob him.

6    Q.    And what did they rob him of?

7    A.    Money and -- I don't know what all, but she took the car.

8    Q.    And what car did she take?

9    A.    The Jaguar.

10   Q.    And do you know what happened that day?

11   A.    I don't know all of it.  I just know bits and pieces what

12   Candy and them said.  That's all I know.

13   Q.    Did David tell you anything about that?

14   A.    No.

15   Q.    Now, there was some talk about pooling the money

16   together.  Do you know what that means to pool the money?

17   A.    No.

18   Q.    Did you have any of your own money when you lived with

19   David?

20   A.    No.

21   Q.    Who had all your money?

22   A.    David.

23   Q.    Who would buy your clothes?

24   A.    David.

25   Q.    Who bought your food?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

161

CRYSTAL CHUMLEY - REDIRECT

1   A.   David.

2   Q.   Who paid the rent for the house?

3   A.   David.

4   Q.   If you wanted to do something, who did you have to ask

5   for money?

6   A.   David.

7            MR. ADOLF:  Objection, Judge, leading.

8            THE COURT:  Overruled.

9   Q.   Who kept Candy's money?

10  A.   David.

11  Q.   Who kept Crystal's money?

12  A.   David.

13  Q.   Were you able to keep any of your tips?

14  A.   No.

15  Q.   Why not?

16  A.   I don't know.

17  Q.   Who got your tip money?

18  A.   David.

19  Q.   So when you were prostituting for the services, Mistress

20  or Fantasia or Discreet Delight, who were you really working

21  for?

22  A.   Ila.

23  Q.   And anyone else?

24           MR. ADOLF:  Objection, Your Honor.

25           THE COURT:  Overruled.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

162

CRYSTAL CHUMLEY - REDIRECT

1  A.   David.

2  Q.   I'm going to show you what I've marked for identification

3  purposes as Government's Exhibit 130.

4       MS. MARSTON:  Actually, Your Honor, may I approach

5  the witness and flip through pages?

6       THE COURT:  You may.

7       MR. ADOLF:  Objection, Judge.  This is beyond the

8  scope of cross.

9       MS. MARSTON:  I don't believe it is.  In

10 Mr. Culler's cross examination he actually was referring to

11 this document.

12      MR. ADOLF:  I withdraw that objection.

13 Q.   I'm going to direct your attention to the bottom of this

14 first page, okay.

15      THE COURT:  Can you identify what you're showing the

16 witness.

17      MS. MARSTON:  I'm showing the witness what's been

18 marked for identification purposes as Government's Exhibit

19 130.

20 Q.   Now, beginning on the first page, and I would direct your

21 attention to the bottom of that page.  Do you recognize a name

22 there on the bottom of the page?

23 A.   Yes.

24 Q.   And how do you recognize that?

25 A.   Crystal K. Gore.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1   Q.   And whose name is that?

2   A.   Mine.

3   Q.   Looking at the bottom of the second page, do you

4   recognize the name at the bottom of that page?

5   A.   Yes.

6   Q.   And what name is that?

7   A.   Crystal Gore.

8   Q.   And do you recognize the date that's underneath that

9   name?

10  A.   11/06/2003.

11  Q.   And again, bottom of the third page.  Do you see the same

12  name at the bottom of the third page?

13  A.   Yes.

14  Q.   Can you repeat the name that's on...

15  A.   Crystal Gore.

16  Q.   Now, at the top of the fourth page, do you see a name at

17  the top of the fourth page?

18  A.   Yes.

19  Q.   And what is that?

20  A.   Crystal Gore.

21  Q.   Bottom of the next page, do you see a name on that?

22  A.   Yes.

23  Q.   And what name is that?

24  A.   Crystal Gore.

25  Q.   Bottom of the next page.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1  A.    Yes, Crystal Gore.

2  Q.    Now, are these your emergency room records from the day

3  that you got hit in the eye by defendant Tracy Howard?

4  A.    Yes.

5        MS. MARSTON:  At this time the government moves into

6  evidence Government's Exhibit 130.

7        THE COURT:  Any objection?

8        MR. CULLER:  No.

9        THE COURT:  Let it be admitted.

10       (Government's Exhibit Number 130 was received into

11 evidence.)

12 Q.    Now, do you recall Mr. Culler talking to you about how

13 you told the doctors that you fell while wrestling?

14 A.    Yes.

15 Q.    Why did you tell the doctors you fell while wrestling?

16 A.    Because they would call the police.

17 Q.    And why didn't you want them to call the police?

18 A.    Because I didn't want nobody going to jail.

19 Q.    And who might go to jail if you called the police?

20 A.    Tracy.

21 Q.    Why?

22 A.    For hitting me.

23 Q.    Now, is this down here at the bottom where it shows the

24 face of the person, is that a fair and accurate reflection of

25 where your injury was?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

165

CRYSTAL CHUMLEY - REDIRECT

1  A.    Right here (indicating).

2  Q.    And is that the same place where the doctor marked on

3  this photograph, approximately?

4  A.    It's close to it.

5  Q.    And did you have any stitches?

6  A.    Yes.

7  Q.    Do you recall how many?

8  A.    I don't know.

9  Q.    Now, I understand there were a couple different occasions

10 that you ran away and came back to that house when you were

11 living with David and Crystal and Candy at one time.  Why were

12 you scared when you got your clothes and went to a neighbor's

13 house to leave the last time?

14        MR. ADOLF:  Objection, Judge.  Facts not in

15 evidence.

16        THE COURT:  Overruled.

17 A.    I was scared he was going to come after me and tell me to

18 come back.

19 Q.    And why didn't you want to go back then?

20 A.    Because I was just ready to go back out on the street

21 away from them.  I was just ready to get out of the house and

22 ready to get away from him.

23 Q.    And why were you scared of him then?

24 A.    I was afraid that he was going to make me come back in

25 the house.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

CRYSTAL CHUMLEY - REDIRECT

1           MS. MARSTON:  No further questions.

2           MR. ADOLF:  Your Honor --

3           THE COURT:  You may step down and be excused.

4           MR. ADOLF:  Your Honor, I'm sorry, may I have two

5    additional questions?

6           THE COURT:  No.

7           MR. ADOLF:  Based directly on what the U.S. attorney

8    said.

9           THE COURT:  No.

10          The witness may step down and be excused.

11          (Witness stepped down.)

12          THE COURT:  Ms. Marston, how long is your next

13   witness?

14          MS. MARSTON:  Actually, we have a witness we can do

15   fairly quickly, Your Honor.

16          THE COURT:  Very well.

17          MS. MARSTON:  Within five minutes; is that correct?

18          MR. RANDALL:  Yeah.

19          MR. ADOLF:  Judge, may I have a brief side-bar

20   before that?

21          THE COURT:  You may.

22          (Side-bar conference as follows:)

23          MR. ADOLF:  I just wanted to put on the record that

24   my objection to the witness not being allowed to answer

25   recross at that point is based on the fact that it's violating

Cheryl A. Nuccio, RMR-CRR (704)350-7494

167

CATHERINE WILLS - DIRECT

1   just this morning when my client got here that he is very

2   sick.  I've actually looked.  He's been bitten by a spider or

3   something.  He's actually shown me something on his leg.  He's

4   asking me to ask the court if he could have some immediate

5   medical attention.

6           THE COURT:  Well, we'll try to arrange that at

7   lunchtime.

8           MR. BROWN:  Okay, Your Honor.

9           THE COURT:  The marshals will take note of the

10  defendant's complaint.  See if he can be examined at

11  lunchtime.  Thank you.

12          MR. BROWN:  Thank you, Your Honor.

13          THE COURT:  Anything further?

14          MR. CULLER:  No thank you, Your Honor.

15          THE COURT:  All right.  Call the jury.

16          (Jury entered the courtroom.)

17          THE COURT:  Good morning, members of the jury.  I

18  hope you had a refreshing weekend.

19          THE JURY:  Good morning.

20          THE COURT:  Ms. Marston, are you prepared to call

21  your next witness?

22          MS. MARSTON:  Yes.  United States calls Cathy Wills.

23                       CATHERINE WILLS,

24  being first duly sworn, was examined and testified as follows:

25                       DIRECT EXAMINATION

Cheryl A. Nuccio, RMR-CRR (704)350-7494

168

CATHERINE WILLS - DIRECT

1   BY MS. MARSTON:

2   Q.   Please state your name for the jury.

3   A.   Catherine Wills.

4   Q.   And where do you live, Ms. Wills?

5   A.   In Charlotte.

6   Q.   And are you originally from Charlotte?

7   A.   No.

8   Q.   Where are you originally from?

9   A.   New York.

10  Q.   And how long have you been in Charlotte?

11  A.   For about two years.

12  Q.   And how old are you right now?

13  A.   Nineteen.

14  Q.   In fact, was your birthday yesterday?

15  A.   Yes.

16  Q.   Now, how much school have you completed?

17  A.   Up until the eleventh grade.

18  Q.   Now, when you came to Charlotte approximately two years

19  ago, who were you living with at that time?

20  A.   My grandmother.

21  Q.   And at some point in time, did you run away from your

22  grandmother's home?

23  A.   Yes.

24  Q.   Do you remember approximately when that was?

25  A.   It was around -- it was a couple of days after my

Cheryl A. Nuccio, RMR-CRR (704)350-7494

169

1    birthday, after my 17th birthday.

2    Q.    I'm sorry?

3    A.    It was a couple of days after my 17th birthday.

4    Q.    And was that back in 2004?

5    A.    Yes.

6    Q.    Now, where did you go to?

7    A.    I went to my friend's house.

8    Q.    And where was your friend's house?

9    A.    In Idlewild Apartment.

10   Q.    I'm going to show you what's been marked for

11   identification purposes as Government's Exhibit 6.  Do you

12   recognize Government's Exhibit 6?

13   A.    Yes.

14   Q.    And how do you recognize it?

15   A.    It's Idlewild Apartments.

16   Q.    And is that where you went to when you ran away from your

17   grandmother's house?

18   A.    Yes.

19           MS. MARSTON:  I'm not sure if Government's Exhibit 6

20   has been introduced into evidence.  At this time the

21   government moves Government's Exhibit 6 into evidence.

22           THE COURT:  Any objection?

23           MR. CULLER:  No.

24           THE COURT:  Let it be admitted.

25           (Government's Exhibit Number 6 was received into

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1    evidence.)

2    Q.    Now, I'm also going to show you what's been marked and

3    introduced into evidence as Government's Exhibit 85A.  Do you

4    recognize Government's Exhibit 85A?

5    A.    Yes.

6    Q.    And is that a -- how do you recognize that photograph?

7    A.    It's me.

8    Q.    Is that what you looked like back in 2004?

9    A.    Yes.

10   Q.    Now, do you recall when that photograph was taken?

11   A.    Yes.

12   Q.    Was it -- when was it taken?

13   A.    After -- after I had went down to the police department.

14          THE COURT:  Ms. Wills, if you could try to speak

15   into that microphone.  The court reporter and others -- the

16   court reporter has to take down your testimony and others have

17   to hear it, so lean forward just a little bit.

18   Q.    Now, at the time that that photograph was taken, what

19   name had you given the officers at the police department?

20   A.    I gave them two different names.

21   Q.    And do you remember what those two different names were?

22   A.    I told them my name was Barbara first and then I told

23   them my name was Cathy Spruil.

24   Q.    And why did you give them two different names?

25   A.    Because I was a runaway, so...

Cheryl A. Nuccio, RMR-CRR (704)350-7494

171

CATHERINE WILLS - DIRECT

1  Q.   Because why?

2  A.   I was a runaway so I didn't give them my real name

3  because I didn't want to.

4  Q.   And did you have any identification on you at that point

5  in time?

6  A.   Yes.

7  Q.   And do you recall what that was?

8  A.   Yes, a social security card.

9  Q.   I'm going to show you what's been marked --

10         MS. MARSTON:  I'm sorry, Your Honor, if I can just

11  have a moment.

12         THE COURT:  You may.

13         (Pause.)

14  BY MS. MARSTON:

15  Q.   Do you remember the name on that social security card?

16  A.   Yes.

17  Q.   What was the name?

18  A.   Ashley Nicole Miller.

19         MR. CULLER:  Ashley Nicole, what was the last name?

20         THE WITNESS:  Miller.

21         MR. CULLER:  Miller?

22         THE WITNESS:  Yes.

23  Q.   I'm going to show you what's been marked for

24  identification purposes as Government's Exhibit 63.  Do you

25  recognize Government's Exhibit 63?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   Yes.

2   Q.   How do you recognize it?

3   A.   It was the social security card I had.

4           MR. CULLER:  Your Honor, I can't hear her.

5           THE COURT:  All right.  You're going to have to do

6   your best to try to talk a little louder.

7           THE WITNESS:  It was the social security card I had

8   in my office.

9           MS. MARSTON:  At this time the government moves into

10  evidence Government's Exhibit 63.

11          THE COURT:  Any objection?

12          MR. CULLER:  No objection.

13          THE COURT:  Let it be admitted.

14          (Government's Exhibit Number 63 was received into

15  evidence.)

16  Q.   Now, you weren't happy with law enforcement that night,

17  were you?

18  A.   No.

19  Q.   And that's because you ended up being arrested that

20  night; is that right?

21  A.   Well, yeah.

22  Q.   And is that because there was a secured custody order?

23  A.   Yes.

24  Q.   Do you know what a secured custody order is?

25  A.   I guess it's for when you run away, or whatever, so they

Cheryl A. Nuccio, RMR-CRR (704)350-7494

173

CATHERINE WILLS - DIRECT

1   make you go back home.

2   Q.   Okay.  Well, let's go back to when you did start -- when

3   you did run away and you ended up at the Idlewild Apartments.

4   Who did you end up meeting over there at the Idlewild

5   Apartments?

6   A.   It was some guy named Little B.

7   Q.   I'm going to show you what's already been introduced into

8   evidence as Government's Exhibit 85Q.  Do you recognize

9   Government's Exhibit 85Q?

10  A.   Yes.

11  Q.   How do you recognize it?

12  A.   It's Little B.

13  Q.   Now, once you met Little B, who did he introduce you to?

14  A.   Tracy.

15  Q.   And do you see Tracy in the courtroom today?

16  A.   Yes.

17  Q.   Can you please tell me where he's sitting and what he's

18  wearing.

19  A.   He's sitting over there and he has on a -- right there

20  and he has on a black shirt.

21  Q.   And can you tell me what number chair he's in.

22  A.   The second from the right.

23       MS. MARSTON:  At this time the government asks the

24  court would the record please reflect that she has identified

25  the defendant Tracy Howard.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

174

1        THE COURT:  It so reflects.

2   Q.   Now, what happened after you met Tracy Howard?

3   A.   I moved in with him maybe a couple of days or a week

4   later.

5   Q.   And where did you move in to?

6   A.   Hanover Landing.

7   Q.   I'm going to show you what's been marked as Government's

8   Exhibit 14F.  Do you recognize Government's Exhibit 14F?

9   A.   Yes.

10  Q.   How do you recognize it?

11  A.   It's the apartment we were staying in at Hanover Landing.

12  Q.   Now, you said we.  Who was we?

13  A.   Me, Tracy, Keshia, and Courtney.

14  Q.   Now, I'm going to show you what's been marked, already

15  introduced into evidence as Government's Exhibit 85G.  Do you

16  recognize Government's Exhibit 85G?

17  A.   Yes.

18  Q.   And how do you recognize it?

19  A.   It's Keshia.

20  Q.   Now, I'm also going to show you what's already been

21  introduced into evidence as Government's Exhibit 85B.  Do you

22  recognize Government's Exhibit 85B?

23  A.   Yes.

24  Q.   And how do you recognize that?

25  A.   It's Courtney.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   Now, tell the jury about how you and Courtney and Keshia
2   got along in that apartment.
3   A.   Well, me and Courtney was fine, but me and Keshia didn't
4   get along.
5   Q.   And why didn't you and Keshia get along?
6   A.   Because -- we just didn't because we were both competing
7   for Tracy's attention, so we didn't get along.
8   Q.   Now, was there somebody else living in that apartment
9   other than Tracy, you, Keshia, and Courtney for a short period
10  of time?
11  A.   Oh, Hilari.
12  Q.   I'm going to show you what's been marked as Government's
13  Exhibit 85S.  Do you recognize that photograph?
14  A.   Yes.
15  Q.   How do you recognize that?
16  A.   It's Hilari.
17  Q.   Now, tell the jury about your relationship with Hilari.
18  A.   She didn't like me from the day I got there.
19  Q.   And did -- was there friction between the two of you?
20  A.   She just didn't like me.
21  Q.   Now, at some point did something happen to Hilari?
22  A.   Yeah.
23  Q.   And do you know what that was?
24  A.   Yes.
25  Q.   Can you tell the jury about that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

176

CATHERINE WILLS - DIRECT

1   A.   She got in trouble.

2   Q.   Well, what did she get in trouble for?

3   A.   From telling Keshia that me and Tracy was laying in the

4   bed.

5   Q.   And what happened to Hilari?  How did she get in trouble?

6   A.   Tracy hit her.

7   Q.   And how did she get hit?

8   A.   With a -- like a belt on her feet and he smacked her a

9   couple of times.

10  Q.   Now, do you recall how long that beating took?

11  A.   No.

12  Q.   And who did that beating?

13  A.   Tracy.

14  Q.   Now, at that point had you been hit?

15  A.   No.

16  Q.   And at some point were you hit?

17  A.   Yeah.

18  Q.   And why were you hit?

19  A.   Because me and Courtney had got into a fight.

20  Q.   Now, what fight did you and Courtney get into?

21  A.   Because she was not listening so we got into a fight.

22  Q.   Okay.  What happened if one girl, whether it was you or

23  Courtney did something wrong, what happened to the other

24  girls?

25  A.   We got in trouble.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

177

CATHERINE WILLS - DIRECT

1 Q.   And who did you get in trouble from?

2 A.   Tracy.

3 Q.   Now, after Hilari got beaten with a belt on her feet in

4 different places, what happened to Hilari?

5 A.   She left.

6 Q.   And do you know where she went?

7 A.   No.

8 Q.   And did she leave the same day?

9 A.   I don't know if it was the same day or not, but she left.

10 Q.   Where did you go after she got beaten?

11 A.   I stayed.

12 Q.   Well, did you leave the apartment at some point that day?

13 A.   Oh, yeah.

14 Q.   And where did you go?

15 A.   I don't remember where we went, but we left.

16 Q.   All right.  Who left?

17 A.   Me and Courtney.

18 Q.   With who?

19 A.   Well, Tracy had left so we were just sitting there.  And

20 then David came to the door and when David got there, he told

21 us to leave.

22 Q.   I'm sorry, I think you're going to have to -- if you lean

23 towards the microphone, it's going to be a little bit easier.

24 A.   Okay.  Well, Tracy left.  And then, like, we were sitting

25 in there, me and Courtney, and then David came to the door,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

178

CATHERINE WILLS - DIRECT

1   and then that's when we left.

2   Q.   All right.  Do you see somebody in the courtroom that you

3   know as David?

4   A.   Yes.

5   Q.   And what number chair is he sitting in?

6   A.   The third one on the left.

7   Q.   All right.  Can you describe what he's wearing.

8   A.   He has on a white shirt.

9   Q.   And describe what color he is.

10  A.   He's black.

11  Q.   Okay.

12         MS. MARSTON:  Your Honor, may the record reflect she

13  has identified the defendant David Howard.

14         THE COURT:  Would you point to the person in the

15  courtroom that you believe is David Howard.

16         THE WITNESS:  That one right there, sitting like

17  right there.  Like sitting right there where the little corner

18  thing is (indicating).

19         THE COURT:  The record will reflect.

20  Q.   Now, at some point after moving in to the Hanover Landing

21  apartment with Tracy, Keshia, Courtney, and Hilari, what did

22  you do for a living?

23  A.   When I got there?

24  A.   Yes.

25  Q.   I worked for Tracy.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1    Q.    All right.  How did you work for Tracy?

2    A.    By prostituting.

3    Q.    And where did you go to prostitute?

4    A.    We went to some neighborhood called North Pointe.

5    Q.    I'm going to show you what's been previously identified

6    as Government's Exhibits 1D and 1E.  Do you recognize those

7    two photographs?

8    A.    Yes.

9    Q.    And how do you recognize those?

10   A.    That's North Pointe.

11   Q.    All right.  And who went to North Pointe with you?

12   A.    Courtney.  And -- well, Tracy drove us, but Courtney came

13   with me.

14   Q.    All right.  When he drove you to North Pointe, what

15   happened then?

16   A.    We worked.

17   Q.    And tell the jury what you mean by we worked.

18   A.    Like the Mexicans over there would give him some money

19   for us to have sex with them and stuff.

20   Q.    And what did he give you so you could have sex with

21   Mexicans?

22   A.    Rubbers, condoms.

23   Q.    And approximately how many Mexicans would you do when you

24   went over there?

25   A.    It depends.  Like -- because a lot of them stay together.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

180

CATHERINE WILLS - DIRECT

1    It depends who was in there.

2    Q.   Okay.  And when you say a lot of them stay together, who

3    are you referring to?

4    A.   To the Mexicans.

5    Q.   Now, when it was you and Courtney there, how was it

6    determined as to which girl went where?

7    A.   They picked.

8    Q.   And how did they pick?

9    A.   Like they just pointed out whatever they wanted.

10   Q.   Now, did you have -- how did you get your clothes?

11   A.   Tracy bought them.

12   Q.   Now, was there an issue with Courtney and clothes?

13   A.   Well, not really.  She was just big so she had to get her

14   clothes from a different place than we did.

15   Q.   And was that causing some problems?

16   A.   Well, yeah, a little bit.

17   Q.   And why?

18   A.   Because she was big.  She was getting big.

19   Q.   And who was upset by that?

20   A.   Tracy.

21   Q.   And what did Tracy have Courtney do in order to help with

22   that situation?

23   A.   He put her on a diet.

24   Q.   And do you recall what that diet was?

25   A.   Some kind of little diet meals in a box.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   Now, at some point did you learn that Tracy was doing

2   something else to make money as well?

3   A.   Yes.

4   Q.   And what was that?

5   A.   Selling dope.

6   Q.   And when you say dope, what kind of drugs are you talking

7   about?

8   A.   Cocaine, crack, whatever.

9   Q.   Well, do you know what the difference is between cocaine

10  and crack?

11  A.   Yeah.  Cocaine is soft and crack is hard.

12  Q.   Now, what kind of drugs did you see at the apartment?

13  A.   That's all I ever saw.  It was either which one.

14  Q.   Cocaine and crack?

15  A.   Yes.

16  Q.   Now, what did you do to help with the cocaine and the

17  crack?

18  A.   After he cooked it up, me and Keshia would bag it up.

19  Q.   What did you use to bag it?

20  A.   Some baggies and a razor blade or some scissors.

21  Q.   Okay.  I'm going to show you what I'm going to mark as

22  Government's Exhibit, and I'm just going to mark it for

23  identification purposes as 140.  I'm not exactly sure where I

24  am.

25            MS. MARSTON:  Your Honor, may I approach the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

 1   witness?

 2              THE COURT:  You may.

 3   Q.   I'm going to show you what I've marked for identification

 4   purposes as Government's Exhibit 140.  Do you recognize what

 5   140 is?

 6   A.   Yes.

 7   Q.   And how do you recognize it?

 8   A.   It's a bag.

 9   Q.   Now, when did you use these bags?

10   A.   When we bagged up his dope.

11   Q.   Now, who taught you how to bag up the cocaine or the

12   crack?

13   A.   Well, I seen it done before so I knew how to do it.

14   Q.   All right.  Show the jury how you would bag up the

15   cocaine or crack for Tracy Howard.

16   A.   Open the bag like this, put your two fingers -- open the

17   bag like this, put your two fingers in the corner, you drop it

18   in there --

19   Q.   What do you drop in there?

20   A.   The dope.  Drop it in there, you tie a knot after, and

21   then you cut it right after the knot.

22   Q.   All right.  Show how you would tie the knot.

23   A.   You put it in there and you bang it like this so it goes

24   straight down in the corner, then you just -- tie it?

25   Q.   Yeah, tie it.  If that's in the way, I'll take that off.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494


                                183

CATHERINE WILLS - DIRECT

1   A.   Tie it like this and then wherever the knot stops, you

2   hold it down like that -- well, it depends if you have a razor

3   blade or scissors, and you cut it right after the knot.

4   Q.   And which did you have, a razor blade or scissors?

5   A.   It depends.  Sometimes we would use a razor blade;

6   sometimes we use scissors.

7   Q.   All right.  Now, was it important where the knot was?

8   A.   Yes.

9   Q.   Why was it important where the knot was?

10  A.   So they can pull it so they could get it out.

11  Q.   Well, what were you told about the knot?

12  A.   That it had to be cut like right after.

13  Q.   And who told you that?

14  A.   Well, Tracy and Keshia.

15  Q.   All right.  And if you didn't do that right, what

16  happened?

17  A.   You'd get in trouble.

18  Q.   Now, how many bags of dope would you bag, approximately?

19  A.   It depends -- well, I don't know.  It depends how much he

20  had.

21  Q.   And what's the most amount that you saw?

22  A.   Like, I don't know because I never put it on scales or

23  nothing, but...

24  Q.   Well, did -- were there scales in the apartment?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

184

CATHERINE WILLS - DIRECT

1    Q.    And what did the scales look like?

2    A.    One was a little flip up that looks like a little data

3    thing and then one was just a regular big scale.

4    Q.    I'm going to show you what's been marked for

5    identification purposes as Government's Exhibits 57C and 57F.

6          First, do you recognize Government's Exhibit 57C?

7    A.    Yes.

8    Q.    And how do you recognize it?

9    A.    It's one of the scales that was in the house.

10   Q.    And who would use these scales?

11   A.    Tracy.

12   Q.    Now, was there another -- do you know another name for

13   scales?

14   A.    Yeah.  They're called eyes.

15   Q.    And do you know why they're called eyes?

16   A.    So you can see how much -- because it shows you how much

17   you put on there.

18   Q.    I'm also going to show you what's been introduced into

19   evidence as Government's Exhibit 57F.  Do you recognize

20   Government's Exhibit 57F?

21   A.    Yes.

22   Q.    How do you recognize that?

23   A.    It's one of the scales that was in the house.

24   Q.    Now, do these scales, were they just in Hanover Landing

25   or did they go somewhere else?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1610

CATHERINE WILLS - DIRECT

1    A.    They went somewhere else.

2    Q.    And where did you all go after Hanover Landing?

3    A.    To Waterford Lakes.

4    Q.    I'm going to show you what's been marked as Government's

5    Exhibit 12C.  Do you recognize Government's Exhibit 12C?

6    A.    Yes.

7    Q.    And how do you recognize it?

8    A.    It's Waterford Lakes.

9    Q.    Now, do you recall when you moved to Waterford Lakes?

10   A.    It was -- it was like maybe a couple of days after --

11   after Hilari got beat.

12   Q.    I'm going to show you what's also been introduced into

13   evidence as Government's Exhibit 12E.  Do you see a name at

14   the top -- names at the top of Government's Exhibit 12E?

15   A.    Yes.

16   Q.    Do you recognize those names?

17   A.    Yes.

18   Q.    How do you recognize those names?

19   A.    Because it's Tracy's mother's name and Keshia.

20   Q.    Now, does that say Keshia?

21   A.    No.

22   Q.    What does it say?

23   A.    It says Allison Walker, but that was Keshia's name.

24   Q.    And how did she have that name?

25   A.    Because she had a fake ID.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

186

CATHERINE WILLS - DIRECT

1  Q.  I'm sorry?

2  A.  She had a fake ID.

3  Q.  Now, I'm going to show you what's been marked for

4  identification purposes only as Government's Exhibit 49G.  Do

5  you recognize Government's Exhibit 49G?

6  A.  Yes.

7  Q.  And how do you recognize it?

8  A.  It looks like one of Tracy's scales.

9           MS. MARSTON:  At this time the government moves into

10  evidence Government's Exhibit 49G.

11           THE COURT:  Any objection?

12           MR. CULLER:  No.

13           THE COURT:  Let it be admitted.

14           (Government's Exhibit Number 49G was received into

15  evidence.)

16           MS. MARSTON:  Your Honor, may I approach the

17  witness?

18           THE COURT:  You may.

19  Q.  What do you notice on the top of where the scales --

20  where something gets placed?

21  A.  It looks like it has some on it.

22  Q.  All right.  What does it look like it has on it?

23  A.  It might be baking soda or it might be powder.

24  Q.  And why might it be baking soda?

25  A.  Because you can use baking soda to cut it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

187

1612

CATHERINE WILLS - DIRECT

1  Q.   All right.  Tell the jury what cut is.

2  A.   You put a little cut on it and you make more money.

3  Q.   Now, you mentioned that the name Ila Aguilar was Tracy's

4  mother.  Did you also know her to go by some other names?

5  A.   Yes.

6  Q.   What names did you know her to go by?

7  A.   Wendy.

8  Q.   I'm going to show you what's already been introduced into

9  evidence as Government's Exhibit 85E.  Do you recognize

10 Government's Exhibit 85E?

11 A.   Yes.

12 Q.   How do you recognize it?

13 A.   That's Tracy's mother.

14 Q.   Now, do you recall when you first met Tracy's mother?

15 A.   Like, I don't remember the first time I talked to her,

16 but I seen her when we was in Hanover Landing.

17 Q.   Okay.  What was the reason that you started talking to

18 her?

19 A.   Because I was supposed to go work for her service.

20 Q.   And what was her service?

21 A.   I guess you'd call it an escort service.

22 Q.   Now, who said you were supposed to go work for her

23 service?

24 A.   Well, Keshia is the one who told me, like -- told me

25 about it and everything.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

188

CATHERINE WILLS - DIRECT

1   Q.   And what did Keshia tell you about the service?

2   A.   That you would get paid more so you'd get better stuff if

3   you worked there.

4   Q.   And how would you get paid more for the service?

5   A.   Because you got paid more because you were there for

6   longer, so...

7   Q.   Paid more than what?

8   A.   Paid more than doing the Mexicans.

9   Q.   So at some point did you sort of graduate from doing the

10  Mexicans to working for the service?

11  A.   Yes.

12  Q.   And who did you give your money to when you worked for

13  the service?

14  A.   Tracy.

15  Q.   Do you recall the name of the service?

16  A.   It was called One Enterprise.

17  Q.   Now, I'm going to show you what's already been introduced

18  into evidence as Government's Exhibit 57R.  Do you recognize

19  Government's Exhibit 57R?

20  A.   Yes.

21  Q.   How do you recognize it?

22  A.   Because it's one of Tracy's mother's business cards.

23  Q.   Now, did you know the service to go by any other names?

24  A.   It was called like -- I heard it was called like Fantasia

25  at one time, something.


Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   I'm going to show you what's been already introduced into

2   evidence as Government's Exhibit 57P.  Do you recognize

3   Government's Exhibit 57P?

4   A.   The business card, yes.

5   Q.   Now, do you recognize what's underneath the business

6   card?

7   A.   No.

8   Q.   Did you ever use what's underneath the business card?

9   A.   No.

10  Q.   So when you went on the service, tell us how it worked.

11  A.   Well, when you walked in there, you called the office and

12  you got the person's ID and everything and told the office.

13  And then she would say, okay, whatever.  You hang up the phone

14  and then whatever they wanted to do, you did.  You collect the

15  money first.

16  Q.   Now, when you say whatever they wanted to do you did,

17  what did that include?

18  A.   Having sex, back massages.  Whatever they wanted.

19  Q.   Now, who drove you on your calls when you went with the

20  service, Fantasia or One Enterprise?

21  A.   I think Tracy drove me a couple times, but Keshia drove

22  me and then Nick drove me like after we moved in together.

23  Q.   Okay.  Now, do you see somebody in the courtroom that you

24  know as Nick?

25  A.   Yes.

CATHERINE WILLS - DIRECT

1    Q.    And can you please tell me where he's sitting and what

2    he's wearing.

3    A.    He's the second person sitting over there.

4    Q.    Now, I'm having a hard time when you say second person.

5    Where is the second person from?

6    A.    Right there.  He has on like, I think it's like a gray

7    shirt or blue, something like that.

8    Q.    And what else?

9    A.    And it's like -- it looks blue or gray, something.

10   Q.    Okay.  Anything else that he's wearing?

11   A.    Has a tie on, it looks like it has dots on it or

12   something.  Stripes.

13          MS. MARSTON:  Your Honor, may the record reflect

14   she's identified defendant Nicholas Ragin.

15          THE COURT:  It may.

16   Q.    Now, you also said Nick drove you after you moved in

17   together.

18   A.    Uh-huh.

19   Q.    When did you move in with Nick?

20   A.    Because me and Keshia was fighting, whatever, so I had to

21   leave.

22   Q.    And where did you go when you and Keshia were fighting?

23   A.    I left for a couple of days and went back to my friend's

24   house, but then I came back.

25   Q.    Where was your friend's house?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  A.   On Idlewild Apartments.

2  Q.   So the same friend you had gone to --

3  A.   Yes.

4  Q.   -- in the very beginning.

5       Now, who made you leave when you went to your friend's

6  house?

7  A.   Tracy.

8            MR. CULLER:  Objection, form of the question.

9            THE COURT:  Sustained.

10  Q.   Why did you have to leave?

11  A.   Because me and Keshia were arguing, you know.  We didn't

12  get along.

13  Q.   And so who said you had to leave?

14  A.   Tracy told me to leave, but I know it was Keshia that

15  wanted me to leave.

16  Q.   And when you left, then you said you came back.

17  A.   Yes.

18  Q.   And what happened when you came back?

19  A.   I moved in to -- I couldn't stay with Tracy anymore

20  because Keshia didn't want me there, so I moved in to another

21  apartment.

22  Q.   And who paid for that apartment?

23  A.   Tracy did.

24  Q.   And where was that apartment?

25  A.   In Sailboat Bay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1    Q.    Now, I'm going to show you what's been marked as

2    Government's Exhibit 13 -- 13C.  Do you recognize Government's

3    Exhibit 13C?

4    A.    Yes.

5    Q.    How do you recognize it?

6    A.    It's Sailboat Bay.

7    Q.    Now, do you know who got the apartment at Sailboat Bay,

8    who the lease was in?

9         MR. CULLER:  Objection, asked and answered.

10        THE COURT:  Overruled.

11   Q.    Do you know what name the lease was in at Sailboat Bay?

12   A.    I think it was in Keshia's name.

13   Q.    And would that be Keshia's real name?

14   A.    No.

15   Q.    What name would that be?

16   A.    Allison Walker.

17   Q.    I'm going to show you what's already been introduced into

18   evidence as Government's Exhibit 13D.  Do you see Government's

19   Exhibit 13D?

20   A.    Yes.

21   Q.    And what name do you see at the top of the Sailboat Bay

22   Apartments sheet there?

23   A.    Allison Walker.

24   Q.    And what signature do you see at the bottom of that page?

25   A.    Allison Walker.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   Now, after this apartment was gotten, who lived there?

2   A.   Me and Nick.

3   Q.   And what was the purpose of having Nick live there with

4   you?

5   A.   Because -- I don't know.  I guess to watch me or

6   whatever.

7   Q.   And why were you being watched?

8   A.   Well, not to watch me, but -- so I wouldn't leave, I

9   guess.

10  Q.   Now, at that point did you still get to see Tracy

11  sometimes?

12  A.   Yeah, he came over sometimes.

13  Q.   Now, at some point did you help Tracy actually transport

14  the drugs?

15  A.   Yes.

16  Q.   All right.  And tell the jury about that.

17  A.   Well, I held it in my pants so he can bring it to where

18  he had to go.

19  Q.   And why did you have to hold it in your pants?

20  A.   In case we got pulled over, where I put it they couldn't

21  feel it.

22  Q.   And who was with you when you did that?

23  A.   Keshia was with me most of the time.

24  Q.   And who directed you to put it in your pants?

25  A.   Tracy.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

194

CATHERINE WILLS - DIRECT

1  Q.  And where were you taking the drugs?

2  A.  To Little Mexico.

3  Q.  And why were you taking drugs to Little Mexico?

4  A.  Because D worked over there.

5  Q.  Now, did you know anybody else to live in Little Mexico?

6  A.  David.

7  Q.  I'm sorry?

8  A.  I said David.

9  Q.  And when did you know David to live in Little Mexico?

10  A.  I don't know around what time it was, but I -- he stayed

11  over there.

12  Q.  Well, was there a point where David actually stayed in an

13  apartment with you all?

14  A.  Yes.

15  Q.  When was that?

16  A.  It was when we moved in to Waterford Lakes.

17  Q.  And where had you been right before Waterford Lakes?

18  A.  Hanover Landing.

19  Q.  Now, was there an incident at the apartments where you

20  were asked to go in the back of the apartment, you and

21  Courtney?

22  A.  Not that I remember.  I don't know.

23  Q.  Well, was there an incident where you were told to flush

24  drugs down the toilet?

25          MR. CULLER:  Objection, leading.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

195

CATHERINE WILLS - DIRECT

1          THE COURT:  Overruled.

2   A.    Yes.

3   Q.    All right.  Tell us about that.

4   A.    That was when we was in Hanover Landing, like after I

5   first got there.

6   Q.    And what happened?

7   A.    That was after Hilari had got beat, he told us to keep it

8   near the toilet; and he said that if the police kicked in the

9   door, to flush it.

10  Q.    Now, who all was there when this happened?

11  A.    Just me and Courtney.

12  Q.    And who was outside?

13  A.    I guess -- I don't know -- I guess David was because

14  after the police left --

15          MR. CULLER:  Objection.

16  A.    -- David knocked on the door.

17          THE COURT:  Overruled.

18  Q.    And why did David knock on the door?

19  A.    To tell us to leave.

20          MR. ADOLF:  Objection, Judge, calls for speculation.

21          THE COURT:  Sustained.

22  Q.    Do you know why David knocked on the door?

23  A.    No, I didn't --

24  Q.    Well --

25  A.    I didn't even know who he was at first.


            Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   And later you realized that was David?

2   A.   Yes.

3   Q.   And when he came to the door, what did he tell you?

4   A.   To leave.  To go.

5   Q.   And why did he tell you to leave?

6            MR. ADOLF:  Objection, Judge.  Same objection.

7            THE COURT:  Sustained.

8   Q.   Why were you asked to leave?

9   A.   Because Hilari had took out a -- what's it called --

10  assault on a female warrant against Tracy.

11  Q.   And why was that causing problems?

12  A.   Because Tracy was going to get locked up for it, so...

13  Q.   Now, why were you going to flush the dope down the

14  toilet?

15  A.   So it wouldn't be seen in the house so they wouldn't have

16  nothing to say if they came in there.

17  Q.   And who were you worried about they being?

18  A.   The police.

19  Q.   And after that where did you move to?

20  A.   After we moved from Hanover Landing?  To Waterford Lakes.

21  Q.   Now, how often did you go to Little Mexico?

22  A.   Maybe a couple times a week.

23  Q.   And for how many months?

24  A.   I have no idea.

25  Q.   And when you went, what did you take with you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

197

CATHERINE WILLS - DIRECT

1   A.   We took Tracy's dope.

2   Q.   And do you know how much dope you were taking with you?

3   A.   No.

4   Q.   Do you know how many bags you would sometimes take?

5   A.   Sometimes two.

6   Q.   And why would you take two?

7   A.   Because one went to D and then one went to David.

8   Q.   And when you had two bags of dope, could you tell a

9   difference in the size?

10  A.   Yes.

11  Q.   And tell the jury about that.

12  A.   Like, D's bag was smaller and David's was bigger.

13  Q.   Now, when you took the dope, did you get anything in

14  exchange to take back to Tracy?

15  A.   Money.

16  Q.   And who would give you the money?

17  A.   D or David.  Well, David didn't never give me no money,

18  but -- because Keshia always went in there.

19  Q.   So you didn't actually go into David's apartment.

20  A.   No.

21  Q.   And why weren't you allowed to go into David's apartment?

22       MR. ADOLF:  Objection, speculation.

23       THE COURT:  Sustained.

24  Q.   Do you know why you weren't allowed to go into David's

25  apartment?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.   Because Keshia used to do little stupid stuff just to get

2  on my nerves.

3  Q.   I'm going to show you what's already been introduced into

4  evidence as Government's Exhibits 11F, 11G, and 11J.  Do you

5  recognize those three photographs?

6  A.   Yes.

7  Q.   And how do you recognize those?

8  A.   Little Mexico.

9  Q.   Now, did you also have another reason for going over to

10 Little Mexico at some point in time?

11 A.   No.

12 Q.   Well, at some point in time, were you taking care of some

13 dogs?

14 A.   Oh, well, yeah, Hobo.

15 Q.   And tell us about Hobo.

16 A.   He was Tracy's dog.

17 Q.   And was there another dog as well?

18 A.   Yeah.

19 Q.   And what was the name of that dog?

20 A.   Diamond.

21 Q.   And did you like the dogs?

22 A.   Yeah.

23 Q.   And why were they at Little Mexico?

24 A.   Because they had to get out of the apartment at Waterford

25 Lakes because we wasn't supposed to have pets over there.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1    Q.    And what kind of dogs were they?

2    A.    Pits.

3    Q.    And so when you would go over to Little Mexico, what

4    would you do with the dogs?

5    A.    Walk the dogs, feed them.

6    Q.    Now, did you know there to also be a storage unit?

7    A.    Yes.

8    Q.    And did you ever go to the storage unit?

9    A.    Yes, one time.

10   Q.    And who did you go with?

11   A.    Tracy.

12   Q.    I'm going to show you what's been marked as Government's

13   Exhibit 36D.  I'm doing D, as in David.  It's only been marked

14   for identification purposes at this point.

15         Do you recognize Government's Exhibit 36D?

16   A.    Yes.

17   Q.    And how do you recognize it?

18   A.    It's the storage unit.

19   Q.    Now, why did you go to the storage unit?

20   A.    I just went because I was with Tracy, so he had to go

21   there.

22   Q.    And did you know -- do you know what you all did at the

23   storage unit?

24   A.    He got like -- like couches and stuff out of there.

25   Q.    Now, at the time that you went to the storage unit, was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

200

CATHERINE WILLS - DIRECT

1  there anything stored in there that you sometimes played with?

2  A.    Some bikes.

3  Q.    I'm going to show you --

4           MS. MARSTON:  At this time the government would move

5  into evidence Government's Exhibit 36D.

6           THE COURT:  Any objection?

7           MR. CULLER:  No.

8           THE COURT:  Let it be admitted.

9           (Government's Exhibit Number 36D was received into

10 evidence.)

11 Q.    Now, I'm going to show you what's been marked for

12 identification purposes as -- let's make it 36G.

13 Q.    Do you recognize what you see in Government's Exhibit

14 36G?

15 A.    Yes.

16 Q.    And how do you recognize it?

17 A.    The bikes we played with.

18 Q.    And do you recognize those bikes?

19 A.    Yes.

20 Q.    How do you recognize those bikes?

21 A.    Because we played with them.  Like we rode them around.

22 Q.    Now, there's also a name written underneath that.  Do you

23 recognize the name?

24 A.    Yes.

25 Q.    How do you recognize that name?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   A.   It was the name on the ID that was in that house.

2   Q.   In what house?

3   A.   In the apartment we was at.

4   Q.   And who used that ID?

5   A.   Tracy.

6        MS. MARSTON:  At this time the government moves into

7   evidence 36G.

8        THE COURT:  Any objection?

9        MR. CULLER:  No.

10       THE COURT:  Let it be admitted.

11       (Government's Exhibit Number 36G was received into

12   evidence.)

13  Q.   Now, do you recognize the name -- I mean, can you tell

14  the jury what that name is that you knew Tracy to have an ID

15  for?

16  A.   Lionel Anthony.

17  Q.   Now, did you have some names that you went by?

18  A.   Yes.

19  Q.   What were some of those names?

20  A.   Janet and Little Bit.

21  Q.   And how much -- did you have another name other than

22  Little Bit?

23  A.   No.

24  Q.   I'm sorry?

25  A.   Yeah, Janet.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  Q.   And did you have a name that had a color in it?

2  A.   What, Little Red?

3  Q.   Did you go by that name sometimes?

4  A.   Yeah.

5  Q.   And what was the stage name that you used or what was the

6  name that you used when you went out on calls for the service?

7  A.   Janet.

8  Q.   Now, when you were -- you mentioned that you delivered to

9  two people in Little Mexico, David and somebody else.   What

10  did you know the other person to go by?

11  A.   D.

12  Q.   I'm going to show you what's been marked and previously

13  introduced into evidence as Government's Exhibit 85D.  Do you

14  recognize Government's Exhibit 85D?

15  A.   Yes.

16  Q.   And how do you recognize it?

17  A.   It's D.

18  Q.   And what did he do?

19  A.   He worked for Tracy.

20  Q.   Now, when you would go over to Little Mexico and see

21  David, who was David with?

22  A.   His girl.

23  Q.   And who was that?

24  A.   Well, they called her PomPom but her name was Crystal.

25  Q.   I'm going to show you what's been introduce in evidence

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   as Government's Exhibit 85L.  Do you recognize 85L?

2   A.   Yes.

3   Q.   And how do you recognize it?

4   A.   It's Crystal.

5   Q.   Now, why did you first start working for the service with

6   Ila?

7   A.   To get some bond money for Tracy.

8   Q.   And why did you need to get bond money for Tracy?

9   A.   Because he had got locked up.

10  Q.   And who asked you to do that?

11  A.   Ila.

12  Q.   And who would you give the money to when you made it at

13  that point when Tracy was locked up?

14  A.   I gave it to her.

15  Q.   And when Tracy got out, did you continue working for the

16  service sometimes?

17  A.   Yeah, once in a while, but for the most part, no.

18  Q.   And when you did work for the service, who did you give

19  the money to?

20  A.   Tracy -- well, it depends who took me.

21  Q.   Okay.  If Tracy took you, who did you give the money to?

22  A.   Tracy.

23  Q.   And who else would take you sometimes?

24  A.   Nick.

25  Q.   And who did you give the money to then?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   A.   I gave him his driver's fee, but I kept the rest and gave

2   it to Tracy when I got home.

3   Q.   And do you know what Tracy did with the money that you

4   made for the service?

5   A.   Bought us stuff.

6   Q.   And do you know if any of the money went to his mother?

7   A.   Well, yeah, we had to pay the office.

8   Q.   How much did his mother get?

9   A.   I don't know exactly.

10  Q.   Well, how do you know she got money?

11  A.   Because we went up there.

12  Q.   Where did you go up to?

13  A.   To the office.

14  Q.   And do you recall where the office was located?

15  A.   Yes.

16  Q.   Where was that?

17  A.   I think it's North Tryon.

18  Q.   I'm going to show you, beginning with 16A -- I believe

19  that's already been introduced into evidence.  Do you

20  recognize Government's Exhibit 16A?

21  A.   Yes.

22  Q.   How do you recognize it?

23  A.   It's the sign for the office.

24  Q.   I'm also going to show you what's already been introduced

25  into evidence as Government's Exhibit 16B.  Do you recognize

Cheryl A. Nuccio, RMR-CRR (704)350-7494

205

1630

CATHERINE WILLS - DIRECT

1    16B?

2    A.    Yes.

3    Q.    How do you recognize that?

4    A.    It's the office.

5    Q.    And when you say the office, what office are you talking

6    about?

7    A.    Ila's office.

8    Q.    Now, I'm also going to show you what's been marked for

9    identification purposes only as Government's Exhibits 16E,

10   16G, and 16H.  Do you recognize those three photographs?

11   A.    Yes.

12   Q.    How do you recognize those three photographs?

13   A.    It's Ila's office.

14   Q.    And when would you go there?

15   A.    To drop off money.

16         MS. MARSTON:  At this time the government moves into

17   evidence 16E, G, and H.

18         THE COURT:  Any objection?

19         MR. CULLER:  No.

20         THE COURT:  Let them be admitted.

21         (Government's Exhibits Numbers 16E, 16G, and 16H

22   were received into evidence.)

23   Q.    All right.  Tell the jury what 16E is.

24   A.    It's the door.  Like, when you walked in, there was

25   another door after.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   16G.

2   A.   It's the -- it's Ila's office.  I think that was the

3   second room.

4   Q.   16H.

5   A.   That's the first room when you first walk in the door.

6   Q.   Now, was there a time that you knew where Ila lived?

7   A.   Yes.

8   Q.   And where was that?

9   A.   Off of Sugar Creek.

10  Q.   And how did you know that?

11  A.   Because at one time I stayed there.

12  Q.   And do you recall when that was?

13  A.   Yeah, when Tracy had got locked up.

14  Q.   And do you recall the name of the road the house was on?

15  A.   I think it was called Greenlefe something.  Greenlefe

16  Drive or...

17  Q.   I'm going to show you what's been marked as Government's

18  Exhibit 15C.  Do you recognize Government's Exhibit 15C?

19  A.   Yes.

20  Q.   How do you recognize it?

21  A.   It's Ila's house.

22  Q.   Now, before you moved in to Ila's house, were you living

23  at a different apartment?

24  A.   Well, we moved in Hanover Landing a second time.

25  Q.   Now, do you recall why you moved in to Hanover Landing?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  A.  I don't know.  Something happened somewhere and we moved

2  back over there.

3  Q.  All right.  Where were you right before you moved into

4  Hanover Landing the second time?

5  A.  I think we was in court right before that.

6  Q.  All right.  Where were you living?

7  A.  Oh, in Sailboat Bay.

8  Q.  And who at that point were you living at Sailboat Bay

9  with?

10  A.  Nick.

11  Q.  And how did you learn that you were going to move to

12  Hanover Landing?

13  A.  Because he got a phone call that said that we had to

14  leave, so we left.

15  Q.  And how did you pack?

16  A.  We just took our clothes and put them in the trunk of the

17  car and left.

18  Q.  And when you got to Hanover Landing, who was living with

19  you there?

20  A.  D and then some girl named Donna.

21  Q.  Now, do you know why D was now living with you at Hanover

22  Landing?

23  A.  No.

24  Q.  Do you know whose apartment the Hanover Landing apartment

25  was in?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   A.   I think it was in his name.

2   Q.   Whose name?

3   A.   D's name.

4   Q.   Who was paying for the apartment?

5   A.   I don't -- I guess he was.

6            MR. CULLER:  Objection.

7            THE COURT:  Overruled.

8   Q.   I'm going to show you what's been marked as Government's

9   Exhibit 85K.  Do you recognize the photograph you see in 85K?

10  A.   Yes.

11  Q.   And how do you recognize it?

12  A.   It's Donna.

13  Q.   And what was Donna doing at the Hanover Landing apartment

14  with you?

15  A.   She had came and stayed with us.

16  Q.   And who had directed her to come and stay with you?

17  A.   I guess Tracy did because she was there after -- when I

18  left -- well, had to leave, she was there when I got back.

19  Q.   And what was she doing for a living at this point?

20  A.   She was working in Little Mexico and then she came and

21  stayed with Tracy.

22  Q.   And when she came and stayed with Tracy, what was she

23  doing for a living?

24  A.   Working for Tracy's mama service.

25  Q.   I'm also going to show you what's already been introduced

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  into evidence as Government's Exhibit 85T.  Do you recognize

2  Government's Exhibit 85T?

3  A.   Yes.

4  Q.   How do you recognize that?

5  A.   His name is Jamaica.

6  Q.   And who was Jamaica?

7  A.   One of Tracy's friends.

8  Q.   And how did you know Jamaica?

9  A.   Because his girl used to do my hair.

10 Q.   Who would take you to get your hair done?

11 A.   Tracy.

12 Q.   Now, I'm also going to show you 85C.  It's already been

13 introduced into evidence as Government's Exhibit 85C.  Do you

14 recognize 85C?

15 A.   I think -- I think her name was Kelly.

16 Q.   And where did you know her from?

17 A.   Little Mexico.

18 Q.   Now, did you know something to happen to a girl named

19 Kelly?

20 A.   I heard that she got --

21          MR. CULLER:  Objection.

22 A.   -- beat up.

23          THE COURT:  Sustained.

24 Q.   Well, who did you hear it from?

25 A.   From Nick.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  Q.   And what did Nick tell you about Kelly?

2  A.   That he was just saying that she got beat up.

3  Q.   Did he say who beat her up?

4  A.   No.

5  Q.   I'm sorry?

6  A.   Not really.  He was just talking about it like, you know,

7  bragging about it, or whatever.

8  Q.   Well, how was he bragging about it?

9  A.   Like saying, yeah, she got her ass whipped.

10  Q.   Do you know who whipped her ass?

11  A.   The way he was talking about it, it probably was Nick.

12            MR. CULLER:  Objection.

13            THE COURT:  Sustained.  Disregard the last answer of

14  the witness.

15  Q.   Also going to show you 85P.  Do you recognize 85P?

16  A.   No.

17            MS. MARSTON:    Your Honor, may I approach the clerk

18  for a moment?

19            THE COURT:  You may.

20            (Counsel and the clerk conferred.)

21  BY MS. MARSTON:

22  Q.   I'm going to show you what's been marked for

23  identification purposes only as Government's Exhibit 58A.  Do

24  you recognize Government's Exhibit 58A?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.   And how do you recognize it?

2   A.   Because it was a list of numbers -- well, it was in his

3   phone and I wrote them down on a piece of paper.

4   Q.   Who wrote these numbers?

5   A.   Me.

6   Q.   And why did you write these numbers?

7   A.   Because Tracy told me to write them down on a piece of

8   paper so he could put them in another phone.

9   Q.   Why did he need them written on a piece of paper?

10  A.   So he could put them in another phone.

11  Q.   And I'm sorry, what were you -- what was the purpose of

12  doing these numbers?

13  A.   So he could put them in another phone.

14  Q.   And why did he need to change phones?

15  A.   Because -- because his phone -- because he had to change

16  his number because his phone probably could have been tapped

17  and they were probably listening to what he was talking about

18  on the phone.

19  Q.   Who's they?

20  A.   The police.

21  Q.   Now, do you notice the name down here underneath Neil?

22  A.   Yes.

23  Q.   Who was this Nick?

24  A.   I don't know.

25  Q.   Now, I'm going to show you what --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1          MS. MARSTON:  Oh, at this time the government moves

2    into evidence Government's Exhibit 58A.

3          THE COURT:  Any objection?

4          MR. CULLER:  No.

5          THE COURT:  Let it be admitted.

6          (Government's Exhibit Number 58A was received into

7    evidence.)

8    Q.   I'm also going to show you what's been marked for

9    identification purposes only as Government's Exhibit 45B.  Do

10   you recognize anything in Government's Exhibit 45B?

11   A.   Yeah, Keshia's coloring book.

12   Q.   How do you recognize that?

13   A.   Because she used to color in it like 24/7.

14         MS. MARSTON:  Your Honor, at this time the

15   government proposes introducing Government's Exhibit 45B as

16   I've shown it on the screen there.

17         THE COURT:  Any objection?

18         MR. CULLER:  Is that what was just identified as

19   Keshia's gun?

20         MS. MARSTON:  Coloring book.

21         THE COURT:  No, coloring book.

22         MR. CULLER:  Oh, coloring book, I'm sorry.  Can I

23   see the exhibit.

24         (Government's Exhibit Number 45B was tendered to

25   defense counsel.)


          Cheryl A. Nuccio, RMR-CRR (704)350-7494



                              213

CATHERINE WILLS - DIRECT

1        (Counsel conferred.)

2        MS. MARSTON:  Do you need to see what I'm doing?

3        MR. MACKEY:  (Negative nod.)

4        MS. MARSTON:  Any objection?

5        MR. CULLER:  No, not to that.

6        MS. MARSTON:  At this time I'm introducing half of

7   Government's Exhibit 45B.  The right half.

8        THE COURT:  Let it be admitted.

9        (Partial Government's Exhibit Number 45B was

10  received into evidence.)

11  BY MS. MARSTON:

12  Q.   When would you see Keshia with a coloring book?

13  A.   When she was in her room.

14  Q.   Now, I'm going to show you some pages in Government's

15  Exhibit 61B.  Beginning with the first page of Government's

16  Exhibit 61B, do you recognize any portion of that page?

17  A.   Yes.

18  Q.   And how do you recognize it?

19  A.   Because it's Tracy's handwriting.

20  Q.   What part of this is Tracy's handwriting?

21  A.   The neat one on the left side.

22  Q.   I'm sorry, you're going to have to speak into that

23  microphone.

24  A.   The neat one on the left side and this one right here

25  (indicating).

Cheryl A. Nuccio, RMR-CRR (704)350-7494

214

CATHERINE WILLS - DIRECT

1   Q.   Why don't you touch the screen and mark the part that's

2   Tracy's handwriting.

3          (Witness complied.)

4   Q.   How did you know Tracy's handwriting?

5   A.   Because when he was locked up, he wrote me letters like

6   every day.

7          MS. MARSTON:  Your Honor, at this time I would

8   introduce the first page of Government's Exhibit 61B.

9          THE COURT:  Any objection?

10         MR. CULLER:  No.

11         THE COURT:  Let it be admitted.

12         (The first page of Government's Exhibit Number 61B

13   was received into evidence.)

14   Q.   Now, do you know what those numbers were for on this

15   page?

16   A.   Yeah, to keep count.

17   Q.   Keep count of what?

18   A.   How much money he had; how much money he owed.

19   Q.   And how was he making his money?

20   A.   Because we were making his money and because he was

21   selling his dope.

22   Q.   And when you say we were making his money, what do you

23   mean by that?

24   A.   Like me and Keshia and all of us when we worked for the

25   service and when we went to go do Mexicans.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494


                                215

CATHERINE WILLS - DIRECT

1   Q.   Now, I'm going to flip to the fifth page.  And you're

2   going to have to clear the screen of that arrow if you would

3   press the bottom right corner.

4            (Witness complied.)

5   Q.   Now, again, do you see any part of this fifth page that

6   is handwriting you recognize?

7   A.   Yes, this right here (indicating).

8   Q.   And how do you recognize that handwriting?

9   A.   Because on the second line where it says rent, that's how

10  Tracy makes his E's.

11           MS. MARSTON:  At this time the government moves into

12  evidence the fifth page of 61B.

13           THE COURT:  Any objection?

14           MR. CULLER:  Does that mean that all the other

15  writing she doesn't recognize?

16           THE WITNESS:  This -- the other handwriting is not

17  his handwriting.

18           THE COURT:  Hang on a second.

19           MR. CULLER:  Can we voir dire on that issue before

20  the whole exhibit is introduced?

21           THE COURT:  No.  I'll let you cross on that, but

22  we're not going to voir dire on it.

23           MR. CULLER:  Object for the record, then.

24           THE COURT:  All right.  Let it be admitted.

25           (The fifth page of Government's Exhibit Number 61B

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   was received into evidence.)

2   Q.   Are there any other letters on that page that you

3   recognize other than that one top corner?

4   A.   This right here (indicating).

5   Q.   And how do you -- what letter there do you recognize?

6   A.   The G because he makes the little hoops on it.

7        MS. MARSTON:  At this time the government moves into

8   evidence the fifth page.

9        THE COURT:  You already did, didn't you?

10       MS. MARSTON:  Oh, I'm sorry, I didn't hear that.

11  Q.   All right.  And what -- do you know what that G stands

12  for?

13  A.   Yes.

14  Q.   What?

15  A.   Grams.

16  Q.   And why is there a measurement of 7 grams there?

17  A.   I guess for Tracy to keep count.

18  Q.   And what number do you see next to that?

19  A.   Three-fifty.

20  Q.   And what would the three-fifty mean?

21  A.   I guess it costs $350.

22       MR. CULLER:  Objection.

23       THE COURT:  Sustained.

24       MR. CULLER:  Move to strike.

25       THE COURT:  Jury may disregard the testimony about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  what the witness guessed.

2  Q.   Do you know how much different amounts of drugs were

3  being sold for?

4  A.   Yes.  Not none of the weight.

5  Q.   All right.  Well, what were the amounts that you knew

6  drugs were being sold for?

7  A.   Nicks, dimes, and dubs.

8  Q.   All right.  How much is a nick?

9  A.   Five.

10  Q.   And how much weight is a nick?

11        MR. CULLER:  She just said she didn't know by

12  weight.

13        THE COURT:  If that's an objection, it's overruled.

14        MR. CULLER:  Objection.

15        THE WITNESS:  But that's not weight.  That's

16  breakdown.  Weight is when you do like eight balls and stuff

17  like that.

18  Q.   Okay.  What's an eight ball?

19  A.   It's more than that.

20  Q.   How much is an eight ball?

21  A.   I don't know how much it weighs on the scale, but...

22  Q.   Well, approximately how much do you know an eight ball to

23  be?

24  A.   I have no idea.

25  Q.   How much does an eight ball cost?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

218

CATHERINE WILLS - DIRECT

1   A.   I don't know.  But I've seen them before, like, so I

2   know.

3   Q.   Where did you see an eight ball?

4   A.   Not with him.

5   Q.   Excuse me?

6   A.   Not with Tracy.

7   Q.   Well, who have you seen an eight ball with?

8   A.   Somebody else.

9   Q.   And what's that person's name?

10  A.   I can't tell you that.

11  Q.   Do you know the person's name?

12  A.   It wasn't -- it has nothing to do with this.

13  Q.   Show us with your hand how much an eight ball is.

14  A.   Might be about that much bagged up (indicating).

15  Q.   And what are you bagging up when you're bagging up an

16  eight ball?

17  A.   Dope.

18  Q.   What kind of dope?

19  A.   Hard.

20  Q.   And what's hard?

21  A.   Crack.

22  Q.   Now, you mentioned that you knew with Tracy that you were

23  bagging up dope in certain amounts, right?

24  A.   Uh-huh.

25  Q.   What amounts did you know?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1  A.  Nicks, dimes, and dubs.

2  Q.  All right.  Let's start with nicks.  What's a nick?

3  A.  Nick is .1 and it goes for $5.

4  Q.  All right.  What's a dime?

5  A.  No, a dime is .1 because that's half a -- that's two

6  nicks.  So, yeah, a dime is .1 and a dub is .2.

7  Q.  So let's go back to a nick.  What's a nick?

8  A.  Nick is half of a dime.

9  Q.  Do you know how much a nick goes for?

10  A.  $5.

11  Q.  How much does a dime go for?

12  A.  Ten.

13  Q.  How much does a dub go for?

14  A.  Twenty.

15  Q.  And do you know how much an eight ball would go for?

16  A.  No.

17  Q.  Now, I'm going to direct your attention to the 17th page

18  of 61B.

19      Can you clear your screen, please, at the bottom

20  right-hand corner.

21          (Witness complied.)

22  Q.  Now, do you recognize anything on this page?

23  A.  Yes.

24  Q.  And how do you recognize what you see on this page?

25  A.  Because it's Tracy's handwriting.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   Q.    The entire page?

2   A.    No.

3   Q.    What parts of it do you recognize?

4   A.    This right here (indicating).

5   Q.    Do you recognize any other part?

6   A.    I can't really -- well, this right here, but that's part

7   of that (indicating).

8   Q.    All right.

9           MS. MARSTON:   At this time the government moves in

10  the 17th page of 61B.

11          THE COURT:   Any objection?

12          MR. CULLER:   No.

13          THE COURT:   Let it be admitted.

14          (The 17th page of Government's Exhibit Number 61B

15  was received into evidence.)

16  Q.    And again, what do these numbers mean to you?

17  A.    That's how much the light bill and the phone bill and all

18  that stuff is.

19  Q.    Now, do you see the reference to hotel?

20  A.    Yes.

21  Q.    What was the need for a hotel?

22  A.    I don't know.

23  Q.    Do you see the reference to rent?

24  A.    Yes.

25  Q.    And what was the rent for?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   A.   I guess it's for one of the apartments.

2   Q.   Did you know him to be paying rent on more than one

3   apartment?

4   A.   Huh?

5   Q.   Did you know him to be paying rent on more than one

6   apartment?

7   A.   Yes.

8   Q.   Now, I'm going to direct your attention to the last page

9   in Government's Exhibit 61B.  Do you -- you need to clear the

10  screen again.

11          (Witness complied.)

12  Q.   Do you recognize anything on this last page of

13  Government's Exhibit 61B?

14  A.   These look like Tracy's E's.

15  Q.   Okay.  You need to touch the screen.

16  A.   Right -- right there where it says Neil.

17  Q.   Now, do you recognize any other names that you see on

18  that page?

19  A.   David.  And D.

20  Q.   And who's B?

21  A.   No, not B, D.

22  Q.   Oh, all right.  Who did you know to be D?

23  A.   D.

24  Q.   Who did you know to be Neil?

25  A.   Tracy's uncle, I guess it was.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1    Q.    And did you ever meet Neil?

2    A.    Yes.

3    Q.    When did you meet Neil?

4    A.    He came and stayed in the apartment.  He came up there to

5    visit or something.

6    Q.    And where did he come from?

7    A.    I have no idea.

8    Q.    And did you know anybody who went by B?

9    A.    No.

10   Q.    I'm sorry?

11   A.    No.

12   Q.    And did you know anyone who went by David?

13   A.    Yes.

14   Q.    Who?

15   A.    David.

16   Q.    And how about Lou?

17   A.    No.

18         MS. MARSTON:  At this time the government moves in

19   the last page of Government's Exhibit 61B.

20         THE COURT:  Any objection?

21         MR. CULLER:  No.

22         THE COURT:  Let it be admitted.

23         (The last page of Government's Exhibit 61B was

24   received into evidence.)

25   Q.    And do you know what the purpose of these numbers is?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1   A.   I guess that's how much they owe.

2           MR. CULLER:  Objection.

3           THE COURT:  Sustained.

4   Q.   Did you ever see Tracy Howard write down these numbers?

5   A.   Uh-huh.

6   Q.   And when would he do that?

7   A.   Like in his room where we weren't bothering him.

8   Q.   And why -- did he tell you why he was doing that?

9   A.   No.

10   Q.   Now, I'm also going to show you some loose pages that

11   were stuffed into Government's Exhibit 61B.  Starting with --

12   do you recognize anything on this envelope that was stuck in

13   Government's Exhibit 61B?

14   A.   Yeah, this handwriting up there (indicating).

15   Q.   Okay.  Clear the screen or did you -- did you already

16   clear the screen?

17   A.   No.

18   Q.   Okay.  Now go ahead and mark it.

19   A.   This handwriting right here (indicating).

20   Q.   All right.  And again, do you recognize some of the names

21   that you see written up there?

22   A.   David.

23           MS. MARSTON:  At this time the government moves into

24   evidence Government's Exhibit -- this envelope that was in

25   Government's Exhibit 61B.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1          THE COURT:  Let it be admitted.

2          (The envelope in Government's Exhibit 61B was

3  received into evidence.)

4  Q.    Do you recognize anybody else in the courtroom that you

5  know from Little Mexico?

6  A.    No.

7  Q.    I'm going to show you what's been previously introduced

8  into evidence as Government's Exhibit 85I.  Do you recognize

9  Government's Exhibit 85I?

10  A.    Yes.

11  Q.    How do you recognize it?

12  A.    His name is Puerto Rico.

13  Q.    And where did you know him from?

14  A.    Little Mexico.

15  Q.    And what did you know Puerto Rico to do?

16  A.    I don't know.  I just seen him over there.  Knew his

17  name.

18  Q.    Did you ever see any guns when you were living at the

19  apartments?

20  A.    Yes.

21  Q.    When did you see guns?

22  A.    When we moved to Waterford Lakes.

23  Q.    And --

24  A.    And --

25  Q.    I'm sorry.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

225

1  A.   When we moved to Waterford Lakes and then when I stayed

2  in Hanover Landing with Nick and D.

3  Q.   All right.  What kind of guns did you see?

4  A.   I seen one handgun, I don't know what kind it was, at

5  Waterford Lakes, but it got stolen.

6  Q.   And what kind of gun did you see at Hanover Landing?

7  A.   I seen two, a .38 and I think one was a .40.

8  Q.   Whose guns were they?

9  A.   Nick's.

10  Q.   Did you ever see Tracy with a gun?

11  A.   Yes.

12  Q.   And what kind of gun did you see Tracy with?

13  A.   A handgun.

14  Q.   And do you recall which of those handguns you saw him

15  with?

16  A.   The one with the pearl handle.

17  Q.   And when did you see him with the one with the pearl

18  handle?

19  A.   He was putting it up.

20  Q.   And where was he putting it up?

21  A.   Where?

22  Q.   Where.

23  A.   Putting it in some little box and then put it in his

24  closet.

25        MS. MARSTON:  Your Honor, if I can have a moment.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - DIRECT

1          THE COURT:  You may.

2          (Counsel and the agent conferred.)

3    BY MS. MARSTON:

4    Q.   Do you know how old Keshia was?

5    A.   Yes.

6    Q.   How old was Keshia?

7    A.   I know she turned 18 in August.  Well, one August when I

8    was there.

9    Q.   Now, you mentioned that Nick would drive you sometimes on

10   your calls.  Do you recall that?

11   A.   Yes.

12   Q.   Did you know Nick to do anything else other than drive

13   you?

14   A.   Yes.

15   Q.   What else did he do?

16   A.   He was selling dope.

17   Q.   And whose dope was he selling?

18   A.   I don't know.

19   Q.   I'm sorry?

20   A.   I don't know.  I guess it was -- I'm saying I guess it

21   was Tracy's because --

22          MR. CULLER:  Objection.

23          MS. MARSTON:  Well --

24          THE COURT:  Sustained as to what the witness

25   guessed.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

227

CATHERINE WILLS - DIRECT

1   Q.   Were you ever with Nick when he got his dope?

2   A.   No.  I seen it in the house.

3   Q.   All right.  And when you saw it in the house, what was he

4   doing with it?

5   A.   Bagging it up.

6   Q.   Now, was he ever around when you were helping Tracy bag

7   the dope?

8   A.   Not that I remember.

9   Q.   And how much would you have to pay Nick when he drove

10  you?

11  A.   $20.

12  Q.   And why did you have to pay him $20?

13  A.   Because he got a driver's fee.

14  Q.   And then where did the rest of your money go?

15  A.   It went to Tracy.

16  Q.   Now, was there a time that Courtney got beat up?

17  A.   Yes.

18  Q.   When was that?

19  A.   When we didn't -- it was a while after I first got there

20  when we was in Hanover Landing.

21  Q.   And what happened?

22  A.   She had messed around with Little B.

23  Q.   And who was Little B?

24  A.   The dude I met in Han -- in Idlewild Apartments.

25  Q.   Well, what happened then?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1653

CATHERINE WILLS - DIRECT

1    A.    She got beat.

2    Q.    By who?

3    A.    Tracy.

4    Q.    And do you recall how she got beat?

5    A.    With a towel.

6    Q.    Now, when you were at Hanover Landing the second time --

7    A.    Uh-huh.

8    Q.    -- do you recall approximately when that was, what time

9    of year it was?

10   A.    No.

11   Q.    Well, was it near the time that you got -- when you were

12   using that social security card?

13   A.    Yes.

14   Q.    And do you recall when that was?

15   A.    (No response.)

16   Q.    Do you recall what season it was?

17   A.    No.  I guess it was fall because it was --

18         MR. CULLER:  Objection.

19   A.    -- kind of cold outside.

20         THE COURT:  Overruled.

21   Q.    Now, when you were living at the Hanover Landing

22   apartment, was there any piece of equipment in that apartment?

23   A.    Yes.

24   Q.    What was it?

25   A.    Some little food saver vacuum thing.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

229

CATHERINE WILLS - DIRECT

1   Q.   Well, what's this food saver vacuum thing?

2   A.   I don't know.  It's some little thing and, like, sucks

3   air out of stuff.

4   Q.   What does it suck air out of?

5   A.   Like some little plastic things it comes with, some

6   little bags.

7   Q.   And why was that needed in that apartment?

8   A.   I guess he had it for food.

9            MR. CULLER:  Objection.

10           THE COURT:  Sustained.

11  Q.   What were you placing in bags?

12  A.   Huh?

13  Q.   What were you placing in plastic bags?

14  A.   The small ones?

15  Q.   Yes.

16  A.   Dope.

17  Q.   And before the dope got placed in the smaller bag, what

18  was the larger quantity in?

19  A.   I never seen it like that.

20  Q.   Well, how did you see the dope before you bagged it?

21  A.   It was in -- it was in powder.  He was cooking it, so it

22  was already in the thing.

23  Q.   It was already in what?

24  A.   In a thing, a Pyrex.

25  Q.   It was already in a Pyrex jar?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

230

CATHERINE WILLS - DIRECT

1    A.    No -- yeah.

2    Q.    All right.  Why was Pyrex used?

3    A.    I don't know.  That's what they used.

4    Q.    Well, what did you see when you saw it in the Pyrex?

5    A.    He was cooking it up.

6    Q.    And how would he go about cooking it up?

7    A.    Put it in there, you put water in there, you put baking

8    in there, swirl it around, use a fork.  Then you drop some ice

9    in it and then it floats to the top.

10   Q.    And then what happened?

11   A.    And it hardens up.  You take it out and dry it out.

12   Q.    And what happens after you dry it out?

13   A.    You cut it up and bag it up.

14   Q.    How do you cut it up?

15   A.    With a razor blade.

16   Q.    And how do you use a razor blade?

17   A.    How do you use it?

18   Q.    Uh-huh.

19   A.    You just like chop it, like cut it up, and you put it on

20   the eyes.

21   Q.    Why are you in the courtroom today?

22   A.    Am I?  Because I got subpoenaed to come.

23   Q.    And did you want to come to the courtroom today?

24   A.    No.

25   Q.    Why not?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1   A.   Because.

2   Q.   Because why?

3   A.   Because I love Tracy.

4   Q.   And do you still love Tracy today?

5   A.   Yes, I do.

6        MS. MARSTON:  No further questions.

7        THE COURT:  I think we ought to take our morning

8   break before you begin your cross, Mr. Culler.

9        Members of the jury, we're going to take our morning

10  break at this time.  I'd ask you to be ready to come back into

11  court at 11:35.  Thank you.

12       (Brief recess at 11:20 a.m.)

13       THE COURT:  We ready for the jury?

14       (No response.)

15       THE COURT:  Call the jury.

16       (Jury entered the courtroom.)

17       THE COURT:  Mr. Culler, you may begin.

18       MR. CULLER:  Thank you, Your Honor.

19                    CATHERINE WILLS

20                    CROSS EXAMINATION

21  BY MR. CULLER:

22  Q.   Ma'am, your last name is Wills; is that right?

23  A.   Yes.

24  Q.   Is it W-i-l-l-s?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

232

CATHERINE WILLS - CROSS

1  Q.   And you also use the name Cathy Spruil; is that right?

2  A.   Yes.

3  Q.   And what other names have you used other than Cathy

4  Spruil?

5  A.   Barbara Bradford.

6  Q.   Any others?  Other than nicknames.  I know Little Red and

7  Little Bit.

8  A.   No.

9  Q.   Now, I heard you say that you came here from New York

10  City; is that right?

11  A.   Not the city, but New York.

12  Q.   And did you come here by yourself?

13  A.   No.

14  Q.   Who did you come here with?

15  A.   My grandparents.

16  Q.   Any other members of your family come with you?

17  A.   Yeah, all my brothers and sisters.

18  Q.   And so this was kind of a family move, then, right?

19  A.   Uh-huh.

20  Q.   And you actually started going to school here in this

21  area, right?

22  A.   Yes.

23  Q.   And finished the eleventh grade in this area?

24  A.   I didn't never finish.

25  Q.   Is it in eleventh grade that you ran away?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

233

1658

CATHERINE WILLS - CROSS

1  A.   Yes.

2  Q.   And --

3  A.   Wait.  Yeah, I think it was.

4  Q.   I'm sorry?

5  A.   I think it was the eleventh grade.

6  Q.   And when you ran away at first, were you kind of on the

7  streets or did you --

8  A.   Yes.

9  Q.   -- have a place to go?

10  A.   No.

11  Q.   So you were living out on the streets for a while?

12  A.   Well, I wasn't out like on the streets.  I had somewhere

13  to go, but it was only for a few days until I could find

14  somewhere to go.

15  Q.   And where was it?

16  A.   Huh?

17  Q.   Where did you go at first?

18  A.   At first?  Well, at first I went to this girl named

19  Barbara's house, my best friend, and then --

20  Q.   Is that Barbara Bradford?

21  A.   Yes.

22  Q.   So you were using her name sometimes, right?

23  A.   I used it then so they didn't know who I was.

24  Q.   And -- all right.  So you went to her, what, apartment?

25  A.   Uh-huh.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

234

CATHERINE WILLS - CROSS

1  Q.  Or house?

2  A.  Her apartment.

3  Q.  Is that at Idlewild?

4  A.  Uh-huh.

5  Q.  And how long did you stay with her?

6  A.  It was maybe -- it was a couple of days.

7  Q.  And after you left her, where did you go?

8  A.  Well, I had met these dudes.  That's where I went.

9  Q.  And what dudes were they?

10  A.  Some guys I know from school.

11  Q.  I'm sorry?

12  A.  Some guys I know from school.

13  Q.  So they were your age?

14  A.  Yes.

15  Q.  And so you went to live with them?

16  A.  No, I didn't go live with them.  I was just there, like

17  over there.

18  Q.  Well, what's that mean, there?

19  A.  Like I was over there just hanging out.

20  Q.  And hanging out at their house?

21  A.  Yes.

22  Q.  So with their parents?

23  A.  No.

24  Q.  They had their own place?

25  A.  No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

235

CATHERINE WILLS - CROSS

1  Q.   Well, whose place was it you were hanging --

2  A.   It was their parents' place, but they weren't there.

3  Q.   And so this was just a one day deal.

4  A.   Yeah, and this was -- this is -- I think this is the

5  night when I first -- this is the first night I stayed with

6  Tracy.

7  Q.   The first time you stayed with Tracy you were at these

8  dudes' house first?

9  A.   Yeah, I was at this guy's house and something happened

10 and I asked him to come get me.

11 Q.   You asked Tracy to come get you?

12 A.   Yes.

13 Q.   Well, let's back up a minute.  I heard you say that when

14 you first ran away, first place you went to was

15 Ms. Bradford's --

16 A.   Yes.

17 Q.   -- apartment, right?

18 A.   Uh-huh.

19 Q.   And then you said you left there after a couple days; is

20 that right?

21 A.   I didn't leave like -- I was there.  I was hanging out

22 over there, but I wasn't supposed to be staying there, so --

23 because her mom didn't know I had ran away.  Her mom just

24 thought I was over there.  So I was looking for somewhere to

25 go and I met these dudes, whatever, and something happened and

CATHERINE WILLS - CROSS

1    I asked Tracy to come get me.

2    Q.    Now, when you went to Ms. Bradford's apartment, you had

3    not met Tracy yet, right?

4    A.    No.  I met him a couple days after I was there.

5    Q.    And are you saying that you were introduced to Tracy

6    while you were staying with Barbara?

7    A.    Yes.

8    Q.    And who do you say introduced you to Tracy?

9    A.    This dude named Little B.

10   Q.    All right.  Little B.

11   A.    Uh-huh.

12   Q.    That's the picture that you identified; is that right?

13   A.    Yeah.

14   Q.    Let me ask you, you didn't say anything about Little B

15   being involved in this drug stuff, right?

16   A.    No.

17   Q.    Little B wasn't around --

18   A.    No.

19   Q.    -- when all this drug stuff was happening, right?

20   A.    No, he had got locked up.

21   Q.    As far as you know, Little B wasn't part --

22   A.    No.

23   Q.    -- of this drug activity.

24   A.    No.

25   Q.    How long were you a runaway?  For what period of time?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1  A.  Like the whole time?  Like how long --

2  Q.  How long were you...

3  A.  Maybe six months.  Well, you mean when I first met Tracy?

4  Q.  I just want to know from the point that you ran away --

5  A.  Uh-huh.

6  Q.  -- how long was it before you were either reunited with

7  your grandparents or you became emancipated, you formally got

8  your own place?

9  A.  It was six months.

10  Q.  It was six months?

11  A.  Uh-huh.

12  Q.  And during that six month period, you lived with Barbara

13  Bradford --

14  A.  Uh-huh.

15  Q.  -- for just a few days, right?

16  A.  Yes.

17  Q.  And then you met these dudes.

18  A.  Uh-huh.

19  Q.  And you said something happened.

20  A.  Yeah.

21  Q.  Okay.  Was this something happened between you and these

22  guys?

23  A.  Yes.

24  Q.  Why was it necessary to call Tracy at that point?

25  A.  Because I didn't know anybody else.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

238

CATHERINE WILLS - CROSS

1  Q.  Well, you could have called your grandparents.

2  A.  I didn't want to go home.

3  Q.  Now, at this point you had never been a prostitute

4  before?

5  A.  No.

6  Q.  You had been a prostitute before.

7  A.  Huh?

8  Q.  Had you ever been a prostitute before when you met these

9  dudes?

10 A.  Well, I did it like a couple times before, but...

11 Q.  I'm sorry, a couple times what?

12 A.  Like I did it a couple of times, like a few times.

13 Q.  Before you met Tracy.

14 A.  Yes.

15 Q.  Okay.  So is it fair to say there was a period of time

16 after you ran away that you needed money.

17 A.  Yes.

18 Q.  And you decided to become a prostitute to earn money.

19 A.  Yes.

20 Q.  Was there any other way you were earning money?  Did you

21 get a job, a legitimate job?

22 A.  No, because I would have to use my name, my real name

23 because you got to show an ID and all that, so I would have to

24 use my real name and then they would find me.  Eventually they

25 would find me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

239

CATHERINE WILLS - CROSS

1   Q.   And fair to say it was important to you not to be found.

2   A.   Yes.

3   Q.   Okay.  And so when you were -- started as a prostitute,

4   were you -- well, where were you living at that point, with

5   Ms. Bradford or --

6   A.   No, I was at home, but, like, I used to run away all the

7   time, so...

8   Q.   Okay.  Is it -- was there a period of time when you

9   joined the Crips?

10  A.   Yes.

11  Q.   Was that while you were running away or was this after

12  you met Tracy?

13  A.   It was like when I moved down here when I first started

14  going to school.

15  Q.   Tell the jury who the Crips are.

16  A.   It's a gang.

17  Q.   And are girls -- or women members of the gang or...

18  A.   Yeah.  Yeah, there's some.

19  Q.   Yes, ma'am.  Do you have to get tattoos or --

20  A.   Well, I didn't have a chance of doing that because I

21  left.

22  Q.   So when you were with the Crips, is that when you were

23  actually living with your grandparents?

24  A.   Yeah, I was living with her, but, like, I would run away

25  like maybe once every two weeks.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

240

1665

CATHERINE WILLS - CROSS

1  Q.   And when you ran away, you would stay with the Crips

2  guys?

3  A.   Yeah.

4  Q.   Is that when you first started as a prostitute?

5  A.   Yes.

6  Q.   All right.  Have you ever taken any medication?

7  A.   Yes.

8  Q.   What medication have you had?

9  A.   Depakote and Celexa.

10  Q.   What about Effexor?

11  A.   I don't even know what that is.

12  Q.   Okay.  What were those medications for, if you know?

13  A.   They say I have bipolar tendencies and depression.

14  Q.   When you say they say, who are you referring to?

15  A.   Like my doctor.  Whatever you call him.

16  Q.   You don't agree with that?

17  A.   No.

18  Q.   Do you know what it means to be bipolar?

19  A.   Like you're happy one minute, crying the next, mad, then

20  you're happy again.

21  Q.   Are you like that?

22  A.   Sometimes, but not the way they saying it to extreme.

23  Q.   Did you keep taking your medication or did that stop at

24  some point?

25  A.   I just stopped.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

241

CATHERINE WILLS - CROSS

1   Q.   When did you stop taking that?

2   A.   Like, I was supposed to be taking it when I was living

3   with my grandparents, but I wasn't.

4   Q.   Have you had any treatment for any mental health issues

5   since the time that you left your grandparents'?

6   A.   Since I left there?

7   Q.   Since you left your grandparents'.

8   A.   No.

9   Q.   Have you ever gone back to live with your grandparents?

10  A.   Yes.

11  Q.   When did you go back?

12  A.   When I had to leave Tracy's mother's house.

13  Q.   And other than that time, was there -- have you been back

14  for any lengthy period of time?

15  A.   Yeah, I was there for a couple of weeks.

16  Q.   Well, I mean, have you stayed there, like, making it your

17  residence for, like, a couple of months or...

18  A.   I think I did after -- when I knew -- when everybody got

19  locked up and I had nowhere else to go, I did go back home for

20  a while, but I don't know how long it was.

21  Q.   Are you living at home now?

22  A.   No.

23  Q.   Are you living with friends now?

24  A.   No.

25  Q.   Who are you staying with now?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

242

CATHERINE WILLS - CROSS

1  A.  I was staying with my -- I had a boyfriend, I was staying

2  with him, but we broke up.

3  Q.  And so where are you staying now?

4  A.  I'm staying in my apartment by myself.

5  Q.  So you have your own place now.

6  A.  Yes.

7  Q.  Are you working?

8  A.  No.

9  Q.  Do you have a way to earn income, then?

10  A.  No.  I'm fixing to lose my apartment now.

11  Q.  Well, have you -- I take it there was a point in time

12  when you were unable to continue dating Tracy, right?

13  A.  Huh?

14  Q.  You and Tracy --

15  A.  Yeah, once --

16  Q.  -- were unable to continue dating, correct?

17  A.  Like, I talked to him every day when he was locked up.

18  Q.  I'm saying, you didn't continue -- you weren't able to

19  continue your relationship, right?

20  A.  No.

21  Q.  Okay.  And so that -- at some point you got a boyfriend,

22  right?

23  A.  Yes.

24  Q.  During that time after you discontinued your relationship

25  with Tracy, have you prostituted at all?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

243

1   A.   No.

2   Q.   Okay.  So you haven't gone back to that life-style.

3   A.   No.

4   Q.   Have you had any legitimate job since you left Tracy?

5   A.   Yeah, when I was staying with his mother, I had two jobs.

6   Q.   And what were they?

7   A.   I was working at Bojangles and KFC.

8   Q.   That was when you were staying with --

9   A.   His mom.

10  Q.   -- Tracy's mother?

11  A.   Uh-huh.

12  Q.   All right.  You said that you called for Tracy.  That was

13  just right after you met him for the first time, right?

14  A.   Yeah, he called me one time, but my friend, she ain't let

15  me talk to him.  She just hung up the phone.

16  Q.   Ms. Bradford?

17  A.   Yes.

18  Q.   And -- but the second time you called him, right?

19  A.   Yes.

20  Q.   So he had given you his number.

21  A.   Uh-huh.

22  Q.   And when he came and picked you up, what did you say you

23  wanted to do?

24  A.   I need a place to go.  I had nowhere to go.  I needed a

25  place to go.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1669

CATHERINE WILLS - CROSS

1   Q.   So you asked Tracy to take you to his home?

2   A.   Well, I asked him to find me somewhere to go because I

3   didn't have nowhere to go.

4   Q.   And did he do that?

5   A.   Yes.

6   Q.   Where did he take you?

7   A.   To his apartment.

8   Q.   And was that your choice to go there?

9   A.   Yes.

10  Q.   And during this period of time that you were with Tracy,

11  did you ever want to leave?

12  A.   No.

13  Q.   If you had wanted to leave, would you have been able to?

14  A.   Yes.  He asked us -- he asked us almost every day.  He

15  was like if you don't want to be here, leave.  Nobody wanted

16  to leave.

17  Q.   When you're saying nobody wanted to leave, are you

18  referring to Keshia and --

19  A.   Courtney.

20  Q.   -- Courtney and Hilari until she --

21  A.   Yeah, until she left.

22  Q.   Okay.  Now, there were -- there were some of you at times

23  were dancing.  Did anyone ever dance while you were staying

24  there?  Like at a -- like the Uptown Cabaret or some of those

25  places?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

245

CATHERINE WILLS - CROSS

1    A.    Yeah.

2    Q.    Who actually did some exotic dancing?

3    A.    Keshia.

4    Q.    Did she use that fake ID to get that job, if you know?

5    A.    I think she did.  Yeah, she did because they ain't know

6    her real name.  She was underage so she couldn't use her real

7    name.

8    Q.    Do you know whether Hilari was ever dancing?

9    A.    I didn't know Hilari like that.  Like, she left when I

10   got there.

11          MR. CULLER:  May I approach, Your Honor?

12          THE COURT:  You may.

13   Q.    Ms. Wills, first I'm going so show you what was -- you

14   identified as Government's Exhibit 58A.  That's your writing,

15   right?

16   A.    Yes.

17   Q.    Do you see a number for David Howard?

18   A.    No.

19   Q.    Look on the back.

20   A.    No.

21   Q.    Now, do you know if -- who these Nicks are?

22   A.    No.

23   Q.    Did you know -- or do you know -- you identified Nicholas

24   Ragin or Nick over there, right?

25   A.    Uh-huh.

CATHERINE WILLS - CROSS

1   Q.   Do you know whether these numbers are his numbers?

2   A.   No, I don't know.

3   Q.   You don't know one way or the other?

4   A.   Huh-uh.

5   Q.   I'm going to show you what has been marked as

6   Government's Exhibit Number 3 for identification.

7               THE COURT:  Is that TH3?

8               MR. CULLER:  Thank you.

9               THE COURT:  I'm just trying to --

10              MR. CULLER:  It is, Your Honor.  I'm sorry, I should

11  have done that.  TH Number 3 for identification.

12  Q.   And I'm going to show you all the pages.  Do you

13  recognize those photographs?

14  A.   Yes.

15  Q.   Do you know who that -- is that one person?  Are they all

16  pictures of one person?

17  A.   Yes.  That's Donna.

18  Q.   That's Donnie?

19  A.   Donna.

20  Q.   Donna.

21  A.   Yeah.

22  Q.   So you knew her as Donna?

23  A.   Uh-huh.

24              MR. CULLER:  Your Honor, if I can approach one more

25  time, I'm sorry.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1          THE COURT:  You may.

2    Q.   Now, you -- you were shown Government's Exhibit 61B.  You

3    were shown pages out of there, do you remember that?  These

4    are the numbers.

5    A.   Yeah.

6    Q.   You said you could recognize some of the writing.

7    A.   Uh-huh.

8    Q.   Now, this is in evidence now.  Do you see this writing

9    here?

10   A.   Yes.

11   Q.   I don't know what page --

12          MS. MARSTON:  The pages that are in evidence have

13   the purple sticky on the bottom.

14   Q.   Well, let me just do it this way.  Do you recognize the

15   writing on this page?

16   A.   Yes.

17   Q.   And I'm -- it's the page immediately after the page

18   that's torn down at the bottom.  And whose writing is that?

19   A.   Keshia's.

20   Q.   Okay.  Oh, and you also said that you knew Mr. Howard's

21   writing.  If you would, this is 25A.  I'm going to show you

22   these pages, particularly page number 2.  Do you recognize any

23   of that writing as Mr. Howard's?

24   A.   The only letters I recognize in that handwriting is the

25   E.  That's how I knew it was his.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1   Q.   Right.  So on this page you don't recognize this

2   handwriting.

3   A.   No.

4   Q.   On this page, do you recognize this handwriting?

5   A.   No.

6   Q.   On this page, do you recognize this handwriting?

7   A.   No.

8   Q.   Let's see.  And there, do you recognize that handwriting?

9   A.   No.

10  Q.   All right.  That was 25A.

11       Now, let me show you 25B.  Any of the handwriting you

12  recognize?

13  A.   No, because I don't see any E.

14  Q.   Well, remember you also said the G?

15  A.   With the little circle thing at the bottom.

16  Q.   Do you -- just do you see anything on here that you

17  recognize?

18  A.   No.

19  Q.   Next page?

20  A.   No.

21  Q.   Next page?

22  A.   That G right there.

23  Q.   Okay.  So where it says business card and then there's an

24  R-E-G?

25  A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1    Q.    You recognize that.

2    A.    The G, yeah.

3    Q.    Okay.  But not the other writing.

4    A.    No.

5    Q.    Okay.  On this page?

6    A.    No.

7    Q.    And the last page?

8    A.    No.

9    Q.    Oh, where were you when you wrote those numbers for

10   Mr. Howard's phone?

11   A.    I don't -- I don't know.  Probably at the house.

12   Q.    Well, you mean --

13   A.    I know we were staying in Waterford Lakes, but I don't

14   know where we was at.

15   Q.    Well -- okay.  So at that time you were staying at

16   Waterford Lakes.

17   A.    Yes.

18   Q.    Okay.

19   Q.    Do you remember that you were asked to identify some

20   scales and you talked about using cut?

21   A.    Uh-huh.

22   Q.    Now, cut is something that you use with powder cocaine,

23   right?

24   A.    Yeah.

25   Q.    You can't mix cut into crack cocaine --

1675

CATHERINE WILLS - CROSS

1   A.   Not any --

2   Q.   -- because it's already hard, right?

3   A.   Yeah.

4   Q.   And you said there were times where cut was used.

5   A.   No, I don't think he --

6   Q.   So you don't --

7   A.   I said what was on the scale.

8   Q.   I see.

9   A.   I said it could have been baking soda which is used for

10  cutting.

11  Q.   You had also talked about using those plastic baggies and

12  you said you had seen that done before you met Tracy.

13  A.   Yeah.

14  Q.   Who was it that you had seen done that?

15  A.   The dudes I was with.

16  Q.   Oh, so the two guys that you were with that one day, you

17  saw them bagging up cocaine?

18  A.   Yeah.

19  Q.   And did they ask you to help them with that?

20  A.   No.  I wouldn't have helped them anyway.

21  Q.   Something about being with them bothered you?

22  A.   Yes.

23  Q.   And as a result of that, you left, right?

24  A.   Yes.

25       MR. CULLER:  Your Honor, I think that's all I have.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

251

CATHERINE WILLS - CROSS

1          THE COURT:  Any cross?

2          MR. ADOLF:  Yes, Your Honor.

3                    CROSS EXAMINATION

4   BY MR. ADOLF:

5   Q.   Ms. Wills, good morning.  My name is Peter Adolf.  I'm

6   here representing David Howard.  I'm just going to ask you a

7   few questions.  I know it's been a long morning for you.  I'll

8   try to be quick, okay?

9   A.   Uh-huh.

10  Q.   If I ask you anything that doesn't make sense or is

11  unclear, just let me know; I'll try to straighten that out,

12  okay?

13  A.   Uh-huh.

14  Q.   I understand you told us earlier that you really didn't

15  want to be here today --

16  A.   No.

17  Q.   -- is that fair to say?

18       And the reason you're here is because --

19  A.   Because I want everybody to leave me alone.

20  Q.   I understand that they made you come down here under

21  subpoena; is that right?

22  A.   Uh-huh.

23  Q.   Now, you were -- I guess it was last week you were

24  talking to an investigator that came to see you?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1    Q.    A guy on crutches?

2    A.    Uh-huh.

3    Q.    Do you remember him?  Named Drew.  And I understand that

4    today isn't the first time that the government folks made you

5    come downtown --

6    A.    No.

7    Q.    -- is that right?

8          Now -- and I understand that you met with them before in

9    their office, right?

10   A.    Yes.

11   Q.    Is that something you wanted to do or not?

12   A.    Well, I thought I had to.  Like, I don't know the law.

13   They told me I didn't have to, but that's going to -- you

14   know, if I don't come up and talk to him, that's going to look

15   bad on my part.

16   Q.    Did you -- did you tell Drew that they had threatened

17   you?

18   A.    Well, not -- they didn't say it to me.  They told my

19   grandma something about -- that's why I -- you know, something

20   about me getting a felony for something, I don't know.

21   Q.    Do you remember exactly what you were thinking when you

22   came down here about what your grandmother told you?

23   A.    What I was thinking.  I don't want to get locked up.

24   Q.    So were you under the impression that you were going to

25   get locked up --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

253

CATHERINE WILLS - CROSS

1   A.   Yes.

2   Q.   -- if you didn't come meet with them first?

3   A.   Yes.

4   Q.   Not just come to court, but meet with them first.

5   A.   Well, yeah, eventually.  I knew that if you don't talk to

6   them, if you don't tell them what they want to know, they

7   going to lock you up for it.

8   Q.   I understand.  And when you came down and talked to them

9   in their building --

10  A.   Uh-huh.

11  Q.   -- they took you upstairs to their office; is that right?

12  A.   Yeah, they took me to some little room with a big table.

13  Q.   And who was there in that room with you?

14  A.   It was Maxfield, some -- I don't know his name, some

15  other guy.  He be with Karen all the time.  I think it was him

16  (indicating).

17  Q.   Did anyone -- they told you that they wanted to ask you

18  questions, right?

19  A.   Yes.

20  Q.   Did they take notes while they were doing that?

21  A.   Yes.

22  Q.   Which one -- do you remember which one of them were

23  taking notes?

24  A.   It was Karen.

25  Q.   Okay.  Did anybody offer to put the whole thing on tape

Cheryl A. Nuccio, RMR-CRR (704)350-7494

254

CATHERINE WILLS - CROSS

1   if you wanted to do that?

2   A.   I don't remember.

3   Q.   Okay.  Now, do you remember that when you talked to drew

4   last week --

5   A.   Uh-huh.

6   Q.   -- you told him that you never actually saw Tracy give

7   any drugs to David or anything like that; isn't that true?

8   A.   No, I never actually seen them like exchange, no.

9   Q.   Right.  You told him as far as you know, there was

10  nothing --

11  A.   Yeah.

12  Q.   -- no drugs getting exchanged between the two of them; is

13  that right?

14  A.   Uh-huh.

15  Q.   And in fact, this isn't the first time that you talked to

16  the police, right?  You've talked to them before.

17  A.   Yes.

18  Q.   Back, in fact, in 2004 when supposedly all this was going

19  on, weren't you interviewed by those two gentlemen sitting in

20  the first row and second row --

21  A.   Yes.

22  Q.   -- over there?

23       And they took you down to the police station, right?

24  A.   Uh-huh.

25  Q.   And they asked you -- they told you what they were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - CROSS

1   investigating.

2   A.    Uh-huh.

3   Q.    And wanted to know whatever it was that you knew, right?

4   A.    Yes.

5   Q.    And you told them that you knew Little B --

6   A.    Uh-huh.

7   Q.    -- right?

8         And you told them about Tracy; isn't that true?

9   A.    Yeah.

10  Q.    And you told them about how you all were staying with

11  Tracy and Keshia and Hilari at Hanover Landing, right?

12  A.    That I was staying with them, yeah.

13  Q.    Yeah.

14  A.    And who all was staying there, yes.

15  Q.    And you told them about Nick Ragin, right?

16  A.    I guess, I don't know.  I don't remember back that far.

17  Q.    Okay.  Would it refresh your recollection, do you think,

18  if I showed you the report that they wrote on that day and the

19  things you said if you took a look at it?

20  A.    Yes.

21             MR. ADOLF:  May I approach, Your Honor?

22             THE COURT:  You may.

23  Q.    I'm showing you what's been marked DH2.  Could you read

24  this last paragraph to yourself, not out loud.  Just take a

25  look at it.  Take your time with it.  You can hang on to it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

256

CATHERINE WILLS - CROSS

1   And just starting there and just -- yeah, just starting there

2   and read to the bottom of this paragraph there.  And let me

3   know when you're done, all right?  Thanks.

4           (Witness complied.)

5   A.   Okay.  I'm finished.

6   Q.   Okay.  You said you remember that when you talked to

7   them --

8           MS. MARSTON:  Can we take the exhibit back if she's

9   just using that to refresh her recollection?

10          THE COURT:  She may need to use it again.

11   Overruled.

12   Q.   Do you recall that you told them about how -- that you

13   had met Nick Ragin and you met Eugene Lewis.  Do you remember

14   that?

15   A.   Uh-huh.

16          MS. MARSTON:  Objection, Your Honor.  She's still

17   looking at the exhibit as she's talking.

18          THE COURT:  Ask her the foundational questions.

19          MR. ADOLF:  Okay.

20   Q.   Now that you've read that, do you remember that whole

21   conversation?

22   A.   A little bit, yeah.

23   Q.   Okay.  Do you remember the things that were written on

24   that paper there, does that strike you as being correct?

25   A.   That -- I remember saying that I knew Tracy and Keshia

Cheryl A. Nuccio, RMR-CRR (704)350-7494

257

CATHERINE WILLS - CROSS

1    and all them, but I don't remember saying nothing about no

2    Rick and the rest of them.

3    Q.   You don't remember any of that?

4    A.   I said that I knew his mother.  I don't remember.

5    Q.   Okay.  Now, just to be clear, you never had any kind of

6    personal relationship, romantic anything with David, right?

7    A.   No.

8    Q.   You didn't even know him like that; is that fair to say?

9    A.   Yeah.

10   Q.   Right.  I mean --

11   A.   Okay.  Okay.  I'm lying.  I did fuck him one -- well,

12   sleep with him one time.

13   Q.   Okay.  But that was it, right?

14   A.   Yeah.

15   Q.   And that wasn't something that he forced you to do or --

16   A.   No.

17   Q.   -- anything like that.

18        Okay.  But as far as you know, as you sit here today, you

19   don't have any like deep --

20   A.   Huh?

21   Q.   You don't have any kind of deep feelings --

22   A.   No.

23   Q.   -- for David or anything like that.

24        Okay.  And back when you were interviewed in 2004, you

25   didn't even say word one about David, right?  You didn't

            Cheryl A. Nuccio, RMR-CRR (704)350-7494


                                258

CATHERINE WILLS - CROSS

1  mention him; is that true?

2  A.   No.

3  Q.   And when you talked to the investigator with the crutches

4  last week --

5  A.   Uh-huh.

6  Q.   -- you said that there were no drug dealings between

7  David and Tracy as far as you know; is that right?

8  A.   Yeah.

9  Q.   And then the prosecutors forced you to come down here --

10         MS. MARSTON:  Objection.

11  Q.   -- with that --

12         THE COURT:  Sustained.

13  Q.   -- subpoena; is that right?

14         MS. MARSTON:  Objection.

15         THE COURT:  Sustained.

16         MR. ADOLF:  I have nothing further, Judge.  Thank

17  you.

18         THE COURT:  Mr. Mackey, any cross?

19         MR. MACKEY:  Just briefly, Your Honor.

20                    CROSS EXAMINATION

21  BY MR. MACKEY:

22  Q.   Now, earlier you stated -- Ms. Wills, earlier you stated

23  that you came down here because you just wanted everybody to

24  leave you alone.

25  A.   Yes.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494


                            259

CATHERINE WILLS - CROSS

1   Q.    Who are you referring to?

2   A.    I'm talking about the police, the DA, whatever you want

3   to call them.  The police period.  I done left this alone and

4   everything and then they just knocked on my door and brought

5   it all back up again.

6   Q.    Now, you stated that -- earlier isn't it true that you

7   stated Nick was a driver?

8   A.    Uh-huh.

9   Q.    And isn't it true that Nick was driving for Ila's

10  service?

11  A.    Yes.

12  Q.    Now, when he was driving, isn't it true that he told you

13  the reason he needed a job?

14  A.    I'm saying, like, I don't remember every single

15  conversation I had back then.

16  Q.    Do you remember him saying he needed to earn money to

17  support his child?

18  A.    Oh, yeah, I knew he -- that's what he was using it for

19  because he brought his little girl over to the house.

20  Q.    And when he drove you, he was always respectful and kind.

21  Would you categorize his demeanor as kind?

22  A.    He was.  He was straight.  He was like my brother.  I

23  used to call him my brother.

24  Q.    Okay.  So you weren't afraid of him at all.

25  A.    No.


              Cheryl A. Nuccio, RMR-CRR (704)350-7494



                                260

CATHERINE WILLS - REDIRECT

1   Q.   Beg your pardon?

2   A.   No.

3   Q.   Okay.  And you never saw him beat anybody either, did

4   you?

5   A.   I never seen him, no.

6   Q.   Okay.

7            MR. MACKEY:  No further questions, Your Honor.

8            THE COURT:  Mr. Brown?

9            MR. BROWN:  No questions, Your Honor.

10           THE COURT:  Any redirect?

11           MS. MARSTON:  Yes, Your Honor.

12                        REDIRECT EXAMINATION

13  BY MS. MARSTON:

14  Q.   Ms. Wills, were you ever forced to come to my office?

15  A.   No, I wasn't forced, but I thought if I didn't go down

16  there, you were going -- I thought if I didn't go down there,

17  that because of what I knew and because I know that somebody

18  told y'all everything so y'all know everything, that y'all

19  going to try to put that on me.  So that's why I came down

20  here.  That's why I went to your office.

21  Q.   Now, did you actually contact an attorney at one point

22  after you talked to us?

23  A.   Yes.

24  Q.   And did I talk to that attorney?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - REDIRECT

1  Q.   And did you then talk to that attorney?

2  A.   I don't think I ever called him again.

3  Q.   Well, were you told --

4  A.   I went down there.

5  Q.   -- that you weren't a target of a federal investigation?

6       MR. ADOLF:  Objection, Judge.

7       THE COURT:  Sustained.

8  Q.   Did you get any information from your attorney after I

9  talked to them?

10 A.   No.

11 Q.   But you didn't feel the need to contact your attorney any

12 more after that?

13 A.   I didn't have the money to do it.

14 Q.   Now, last week when you met -- is it with Drew?  Is that

15 who you met with?

16 A.   Yes.

17 Q.   Did he offer to put whatever you said to him on tape?

18 A.   No.

19 Q.   And why didn't you tell him everything you had told me?

20 A.   What?  Because.

21 Q.   Why?

22 A.   Because he wasn't the police, that's why.  That's

23 different.  A lawyer is different from the police.

24 Q.   And you saw --

25 A.   A lawyer is not going to get you locked up.  Well, he's

CATHERINE WILLS - REDIRECT

1   not a lawyer, but he's an investigator.  That's what he said.

2   Q.   And why weren't you concerned about telling him

3   everything you had told me?

4   A.   Because I didn't come down here to have anything to do

5   with David and them.

6   Q.   And who else did Drew contact after he contacted you?

7   A.   I think I called you.

8   Q.   Well, who else did he call about you?

9   A.   He called my grandma.  That's how he got my cell phone.

10        MR. ADOLF:  Objection to knowledge, Judge.  No

11   foundation.

12        THE COURT:  If she knows.

13   Q.   Do you know how he got your cell phone number?

14   A.   Yeah, my grandmother gave it to him.

15   Q.   Now, when you worked at Bojangles and KFC --

16   A.   Uh-huh.

17   Q.   -- what was Tracy's mother doing?

18   A.   That's when -- that was after she had got back out of

19   jail.

20   Q.   And what was she doing for a living at that time?

21   A.   She was working at some forklift place.

22   Q.   And was the escort service up and running?

23   A.   No.  Everybody was caught, no.

24   Q.   Now, on -- you mentioned -- why did Nick live with you at

25   Sailboat Bay?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - REDIRECT

1  A.   I guess it was -- I don't know.  I guess just to watch me

2  to see what I be doing.

3  Q.   And why did you --

4        MR. MACKEY:  Objection, Your Honor.

5  Q.   -- need to be watched?

6        THE COURT:  Pardon?

7        MR. MACKEY:  Object to the knowledge.

8        THE COURT:  Sustained as to what the witness

9  guessed.

10 Q.   Do you know why Nick was asked to live with you?

11 A.   No.

12 Q.   Did you want Nick to live with you?

13 A.   I didn't care.  I had nowhere to go.  I didn't care.

14 Q.   Well, who did you really want to live with at that point

15 in time?

16 A.   Tracy.

17 Q.   So did you want to be living with Nick?

18 A.   Well, I didn't care.  It's not that I didn't want to be

19 there, but I wanted to be with Tracy.  That's what I wanted.

20 Q.   In October when you -- you know the statement that I

21 guess you still have up there with you.

22 A.   Yeah.

23 Q.   Was that the night that you were -- that you actually

24 ended up being arrested on that secured custody order?

25 A.   Yes.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - REDIRECT

1   Q.   Who did you call that night?

2   A.   Tracy's mother.

3   Q.   And why did you call her?

4   A.   Because I wanted to leave.  They said I can leave at

5   first and then they lied and then that's when they said they

6   knew who I was the whole time.

7   Q.   Now, did you call your grandmother?

8   A.   I don't know.  I think they did.  I don't know.

9   Q.   But did you -- did you call your grandmother when you had

10  gotten the chance to use the telephone?

11  A.   Yes, I did.

12  Q.   And then you called Ila.

13  A.   No.  I think -- I called Ila -- I think I called Ila

14  before that to tell her because at first they said I could

15  leave and then he -- Fish walked out the room and then when he

16  came back, he was talking about I had an unsecured custody

17  order.  Then I called my grandmother and asked her why she put

18  it out on me.

19  Q.   So at first before they knew about the secured custody

20  order, what name did they think you were then?

21  A.   I don't know.

22  Q.   Well, what name had you given them?

23  A.   I gave them two different names.

24  Q.   And were either of those your real name?

25  A.   Yes, one was at one time, but it's not anymore.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

265

CATHERINE WILLS - REDIRECT

1    Q.   Well, what was the name that was your real name at one

2    time?

3    A.   Cathy Spruil.  That's my father's last name.

4    Q.   Are you known in Charlotte as Helen Spruil?

5    A.   Catherine Spruil?

6    Q.   Helen.

7    A.   Helen, no.

8    Q.   What name did you give?

9    A.   Catherine Spruil.

10   Q.   Have you ever been arrested under that name?

11   A.   No.

12   Q.   So was the secured custody order under that name?

13   A.   No, I think it was under my last name -- I used my other

14   last name because I knew that if I -- if they got in contact

15   with my grandmother, they would know my real last name.

16   Q.   And you didn't want them to figure out --

17   A.   No.

18   Q.   -- your real name that night?

19   A.   No.

20            MR. ADOLF:  Objection to leading.

21            THE COURT:  Overruled.

22            (Counsel and the agent conferred.)

23   BY MS. MARSTON:

24   Q.   On cross examination you talked about how you never saw

25   David with drugs; is that right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - REDIRECT

1   A.   Yes.

2   Q.   How do you know David got drugs?

3           MR. ADOLF:  Objection, Judge.  Assumes facts not in

4   evidence.

5           THE COURT:  Overruled.

6   Q.   Go ahead.

7   A.   Because practically everybody who was in Little Mexico

8   did.

9   Q.   No, how do you personally know that David got drugs from

10  Tracy?

11  A.   I didn't know if he did or not.  They just went over

12  there, so I assumed.

13  Q.   Who's they?

14  A.   Like Tracy went over there like a couple of times, but

15  Keshia would go -- bring me over there all the time.

16  Q.   All right.  And when did you go with Keshia?

17  A.   Lots of times.

18  Q.   And what were you carrying when you went with Keshia?

19  A.   I was carrying Tracy's dope.

20  Q.   And where did that dope go once you got into Little

21  Mexico?

22  A.   Some of it went to D; and I don't know, I gave it to

23  Keshia so I guess it went to David.

24  Q.   And where did Keshia go with it?

25          MR. ADOLF:  Objection, Judge.  The witness hasn't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - RECROSS

1   finished her answer.

2          THE COURT:  Did you finish your answer?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  Ask your next question.

5   Q.   Where did Keshia go with the dope?

6   A.   To David's apartment.

7          MS. MARSTON:  No further questions.

8          MR. CULLER:  May I ask a few in response to the new

9   matters?

10          THE COURT:  If it's new.

11          MR. CULLER:  I think it is, Your Honor.

12                     RECROSS EXAMINATION

13   BY MR. CULLER:

14   Q.   Ma'am, with respect to the use of that last name,

15   Catherine Spruil.

16   A.   Uh-huh.

17   Q.   Now, have you -- did you use that name after this

18   incident where you were interviewed?

19          MS. MARSTON:  Objection, this has been on direct

20   examination, Your Honor.

21          THE COURT:  Overruled.

22   A.   Not that I remember.

23   Q.   So the last time you used that name was when Detective

24   Fish interviewed you about --

25   A.   Yes.


        Cheryl A. Nuccio, RMR-CRR (704)350-7494

CATHERINE WILLS - RECROSS

1   Q.   -- the secured custody order.

2        Well, you talked about on cross examination with -- for

3   counsel for Mr. Howard, Mr. Adolf, you talked about that you

4   had been approached about meeting with the U.S. attorney.  Do

5   you remember that?

6   A.   Uh-huh.

7   Q.   And you also indicated that there was some question about

8   some charges being brought against you; is that right?

9   A.   Yes.  And that's why I met with them to see what they

10  were talking about.

11  Q.   Did someone from law enforcement bring out the question

12  of charges?

13  A.   No, I didn't hear.  My grandmother told me that.

14  Q.   Okay.  Someone represented that to your grandmother.

15  A.   Yeah.  She said -- I guess they called her or came over

16  there.  I don't know which one they did.  But she called me

17  right away and told me.

18  Q.   And do you remember whether they said anything about a

19  carjacking --

20  A.   Yeah, they did.

21  Q.   -- that you were being investigated about?

22  A.   Uh-huh.

23  Q.   And as part of coming down here, do you understand that

24  you will not be prosecuted for any felonies?

25  A.   No.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494


                            269

CATHERINE WILLS - RECROSS

1  Q.    Have they said that they will not prosecute you --

2  A.    Yes.

3  Q.    -- in any cases?

4        You're no longer going to be a target, right?

5  A.    I guess, I don't know.

6             MR. CULLER:  That's all.

7             MR. ADOLF:  Nothing, Your Honor.

8             THE COURT:  Any objection to this witness being

9  excused?

10            MR. ADOLF:  No, Your Honor.

11            MR. MACKEY:  Your Honor, I have some more questions.

12            THE COURT:  All right.  If it's new, Mr. Mackey.

13            MR. MACKEY:  It is, Your Honor, I believe.

14                      RECROSS EXAMINATION

15 BY MR. MACKEY:

16 Q.    Ms. Wills, Nicholas Ragin never held you against your

17 will, did he?

18 A.    No.

19 Q.    Beg your pardon?

20 A.    No.

21 Q.    And you were free to come and go as you liked, weren't

22 you?

23 A.    Yeah.

24            MR. MACKEY:  Okay.  No further questions, Your

25 Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

270

1           THE COURT:  Any objection to this witness being

2    excused?

3           MS. MARSTON:  Can I have one question, Your Honor?

4           THE COURT:  I don't think so.

5           MS. MARSTON:  No objection.

6           MR. CULLER:  No.

7           THE COURT:  You may step down and be excused.

8           (Witness stepped down.)

9           THE COURT:  Call your next witness.

10          MR. RANDALL:  At this time the United States calls

11   Walter Abernethy to the stand.

12                       WALTER ABERNETHY,

13   being first duly sworn, was examined and testified as follows:

14                       DIRECT EXAMINATION

15   BY MR. RANDALL:

16   Q.   Good afternoon, sir.  Would you please state your full

17   name to the jury.

18   A.   My name is Walter Abernethy.

19   Q.   Spell your last name, please.

20   A.   A-b-e-r-n-e-t-h-y.

21   Q.   Mr. Abernethy, where are you currently employed?

22   A.   I'm employed with the City of Charlotte.

23   Q.   And what are your responsibilities, in what capacity are

24   you employed?

25   A.   I'm the city's code enforcement manager.  We're

Cheryl A. Nuccio, RMR-CRR (704)350-7494

271

EUGENE LEWIS - DIRECT

```
 1              THE COURT:  Anything else?
 2              MR. CULLER:  No, sir.
 3              THE COURT:  All right.  Let's call the jury.
 4              (Jury entered the courtroom.)
 5              THE COURT:  Good afternoon.
 6              THE JURY:  Good afternoon.
 7              THE COURT:  Ms. Marston, would you call your next
 8   witness.
 9              MS. MARSTON:  United States calls Eugene Lewis.
10                      EUGENE WILLIAM LEWIS,
11   being first duly sworn, was examined and testified as follows:
12                      DIRECT EXAMINATION
13   BY MS. MARSTON:
14   Q.   Sir, please state your name to the jury.
15   A.   Eugene William Lewis.
16   Q.   And do you go by another name on the street?
17   A.   D.
18   Q.   What is your age?
19   A.   Twenty-six.
20   Q.   And where are you from?
21   A.   Newark, New Jersey.
22   Q.   And how much school have you completed?
23   A.   Highest grade I completed was eighth.
24   Q.   Now, where are you currently residing?
25   A.   In Charlotte, North Carolina.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

272

EUGENE LEWIS - DIRECT

1   Q.   And specifically where?

2   A.   5852 Monroe Road.

3   Q.   Well, where have you been staying most recently?

4   A.   Place called Little Mexico before then.

5   Q.   I mean, like --

6   A.   Oh, now?

7   Q.   Right now.

8   A.   In the Mecklenburg County Jail.

9   Q.   Okay.  And how long have you been in the Mecklenburg

10  County Jail?

11  A.   For about maybe 16 months.

12  Q.   And why are you in the Mecklenburg County Jail?

13  A.   For this current charge, conspiracy to sell and

14  distribute crack cocaine.

15  Q.   I'm going to show you what's been marked for

16  identification purposes only as Government's Exhibit 95A.  Do

17  you recognize Government's Exhibit 95A?

18  A.   Yes.

19  Q.   And are these the charges that you're talking about why

20  you're in jail right now?

21  A.   Yes.

22  Q.   Now, have you actually entered into a plea agreement on

23  those charges?

24  A.   Yes.

25  Q.   I'm going to show you what's been marked for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  identification purposes as Government's Exhibit 95C.  And you

2  can pull up that screen if you need to adjust that to see.

3           (Witness complied.)

4  Q.   And specifically, I'm going to direct your attention to

5  the last page of Government's Exhibit 95C.  Do you recognize

6  your signature on that page?

7  A.   Yes, ma'am.

8  Q.   And do you see your attorney's signature on that page?

9  A.   Yes, ma'am.

10 Q.   Did you go over this document with your attorney before

11 signing it?

12 A.   Yes.

13 Q.   And what did you plead guilty to?

14 A.   To count one of the indictment.

15 Q.   Was that the drug conspiracy count --

16 A.   Conspiracy --

17 Q.   -- of your indictment?

18 A.   -- to sell and distribute more than 50 grams of crack

19 cocaine but less than 150.

20 Q.   I'm going to direct your attention to the second page of

21 your plea agreement.  Did you actually agree to a certain

22 amount of drugs being reasonably foreseeable to you?

23 A.   Yes, I did.

24 Q.   And what was that range that you agreed to in your plea

25 agreement?

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   A.   More than 50 grams and less than a hundred 50 grams of
2   crack cocaine.
3   Q.   Now, I'm also going to direct your attention to the
4   bottom of the fifth page of your plea agreement.  Do you see
5   the assistance to the government provision?
6   A.   Yes, I do.
7   Q.   And what is your understanding of the assistance to the
8   government provision in your plea agreement?
9   A.   That I will provide truthful information as required by
10  the United States government.
11  Q.   Now, prior to entering into that plea agreement, did you
12  actually agree to cooperate with law enforcement?
13  A.   Yes, I did.
14  Q.   I'm going to show you what's been marked as Government's
15  Exhibit 95B.  Do you recognize Government's Exhibit 95B?
16  A.   Yes, ma'am.
17  Q.   And what was your understanding of this agreement
18  requiring truthful disclosure?
19  A.   That according to whatever -- whatever information that I
20  gave them was -- wouldn't be used against me as long as I was
21  cooperating.
22  Q.   Wouldn't be used directly against you?
23  A.   Yes, ma'am.
24  Q.   And did you enter into that agreement after discussing it
25  with your attorney?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

275

EUGENE LEWIS - DIRECT

1  A.   Yes, ma'am.

2  Q.   Have any promises been made to you in exchange for your

3  testimony?

4  A.   No, ma'am.

5  Q.   Now, you mentioned that you grew up in Newark, New

6  Jersey, I believe you said.

7  A.   Yes, ma'am.

8  Q.   When did you come to North Carolina?

9  A.   When I was about 18.

10  Q.   And why did you come here?

11  A.   It was just -- I was living in the streets and, you know,

12  selling drugs and robbing people and just a lot of confusion

13  and things weren't getting any better, so I had an opportunity

14  to leave and go somewhere new and I took it.

15  Q.   And what made you come to Charlotte?

16  A.   Friend of mine just asked me to leave, to get away from

17  it all.  Told me I could come stay with him, so I did.

18  Q.   And what happened after you arrived here?

19  A.   I stayed here for about a year and then my friend got

20  sick.  He went to Chicago to be with his family and I stayed.

21  And I lived with my aunt for a little while working as a

22  banquet server.

23  Q.   At some point did you go to Chicago with your friend

24  again?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

276

EUGENE LEWIS - DIRECT

1  Q.   And then what happened?

2  A.   I met my -- I went to school, to job corp there.  A

3  little while later I met my wife and we got married and I went

4  to the military.

5  Q.   And what branch of the military were you involved with?

6  A.   The army.

7  Q.   And how long were you in the army?

8  A.   For about eight months.

9  Q.   And do you recall when you first joined the army?

10  A.   Yes.

11  Q.   When was that?

12  A.   Around March of 2002.

13  Q.   And why were you only in the army for about eight months?

14  A.   I came out because of asthma.

15  Q.   And what happened at that point in time?

16  A.   Right before I came out, my mother passed away so

17  after -- after I came out, I took my wife and kids -- and my

18  son and moved to North Carolina.

19  Q.   Now, do you recall where you were living when you first

20  moved to North Carolina?

21  A.   Yes.

22  Q.   Where was that?

23  A.   5905 Farm Pond Lane.

24  Q.   And while you were living there, what happened?

25  A.   Me and my wife -- my marriage just kind of fell apart.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  You know, we had problems with our marriage, you know.  We

2  were young, didn't know how to communicate, so we separated.

3  Got into a domestic dispute and she left.

4  Q.   And what happened when she left?

5  A.   I -- when I finally got out of jail, I was back on the

6  streets again.

7  Q.   And do you remember approximately when this was?

8  A.   (No response.)

9  Q.   If I showed you a report regarding that domestic dispute,

10  would that help refresh your memory as to when it was?

11  A.   Yes, ma'am.

12  Q.   Show you what I'm going to mark for identification

13  purposes as Government's Exhibit 146.

14          MS. MARSTON:  Your Honor, may I approach?

15          THE COURT:  You may.

16  Q.   I'm going to ask that you look over that document there

17  and see if it helps refresh your memory as to approximately

18  when this was.

19  A.   Yes.

20  Q.   Looking over that report, did it help refresh your

21  memory?

22  A.   Yes, November 2003.

23  Q.   So in November of 2003 when you got out of jail after

24  that domestic incident, what happened?

25  A.   Me and my wife started communicating a little bit again.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

278

EUGENE LEWIS - DIRECT

1   We were still having problems.  She -- we started to try

2   marriage counseling and it didn't work.  And when the marriage

3   counseling went bad, I kind of went on a binge.  I started

4   drinking, smoking weed real heavy and went back to crack

5   cocaine -- well, not crack but cocaine.

6   Q.   Now, you said you went back, what do you mean you went

7   back?

8   A.   I had tried it before and I remembered the feeling it

9   gave me, so I was chasing that feeling again for a moment.

10  Q.   And describe for the jury what that feeling is that you

11  were chasing.

12  A.   It made me numb.  It made me not feel anything, feel any

13  emotions.

14  Q.   Now, where were you getting your cocaine at that point in

15  time?

16  A.   A man named John Gore.

17  Q.   I'm going to show you what I believe has only been marked

18  for identification purposes as Government's Exhibit 85Y.

19        MS. MARSTON:  For identification only; is that

20  correct?

21        THE CLERK:  It's not in.

22  Q.   Do you recognize Government's Exhibit 85Y?

23  A.   Yes.

24  Q.   And how do you recognize it?

25  A.   It's John Gore.

EUGENE LEWIS - DIRECT

1          MS. MARSTON:  At this time the government moves into
2  evidence Government's Exhibit 85Y.
3          THE COURT:  Any objection?
4          MR. CULLER:  No.
5          THE COURT:  Let it be admitted.
6          (Government's Exhibit Number 85Y was received into
7  evidence.)
8  Q.   Now, do you recall where he was living?
9  A.   In, I think it's Sharon Oaks Apartments on Sharon Amity.
10         MR. CULLER:  I'm sorry, what apartment?  I
11 apologize.
12         THE WITNESS:  Sharon Oaks, if I'm not mistaken.
13 Q.   Now, at some point did you meet somebody through
14 Mr. Gore?
15 A.   Yes.
16 Q.   Who did you meet?
17 A.   Tracy Holmes -- Tracy Howard.
18 Q.   Do you see somebody in the courtroom that you know as
19 Tracy Howard?
20 A.   Yes.
21 Q.   Can you please describe what chair he is sitting in and
22 what he's wearing.
23         MR. CULLER:  Your Honor, we stipulate he knows him,
24 Mr. Howard.
25         THE COURT:  Very well.  Defendant stipulated that he

Cheryl A. Nuccio, RMR-CRR (704)350-7494


280

EUGENE LEWIS - DIRECT

1   knows the defendant.  So next question.

2   Q.   Who did you first meet defendant Tracy Howard with?

3   A.   When I was with John, he came to the house and purchased

4   some stuff, some cocaine.

5   Q.   Now, when you're saying cocaine, are you talking about

6   powder or crack?

7   A.   Powder.

8   Q.   And how much did you notice -- how much did you know

9   defendant Tracy Howard to be purchasing at that time?

10          MR. CULLER:  I apologize, I thought he said Mr. Gore

11   purchased something.  I must have misunderstood.

12          THE WITNESS:  No, Tracy --

13          THE COURT:  Wait --

14          MR. CULLER:  I just object to the form at this

15   point.

16          THE COURT:  All right.  Overruled.

17   Q.   You can go ahead and answer.

18   A.   I'm not sure exactly how much he had purchased at that

19   time.  I just know it was a larger amount than I was getting.

20   Q.   Well, how much --

21          MR. CULLER:  Objection, speculation.

22          THE COURT:  Overruled.

23   Q.   How much were you getting at that point in time?

24   A.   I was only buying 3-1/2 grams or --

25   Q.   Well, what --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  A.   -- 2 grams at a time.

2  Q.   Is 3-1/2 grams of powder cocaine known as something else

3  on the streets?

4  A.   Eight ball or a half eight.  It's 2 and -- about a

5  half -- a gram and a half or 2 grams.

6  Q.   Now, what happened after you started seeing defendant

7  Tracy Howard at John Gore's house?

8  A.   After a while John didn't want to serve me because I

9  wasn't buying a lot and John used powder, too, so --

10        MR. CULLER:  Your Honor, just for the record, object

11  to any statements by Mr. Gore.  I don't believe there's been

12  any indication that that gentleman is involved in this matter.

13        THE COURT:  Well --

14        MR. CULLER:  For purposes of 801(d)(2)(E).

15        THE COURT:  I'll sustain the objection.

16  Q.   Explain what happened next between you and defendant

17  Tracy Howard.

18  A.   After a while I started getting my cocaine from Tracy.

19  Q.   And why were you getting your cocaine from Tracy?

20  A.   John asked -- John hooked me up with him to get it from

21  him.

22        MR. CULLER:  Objection.

23        THE COURT:  Overruled.

24  Q.   And what do you mean hooked you up with him?

25  A.   He would send me to Tracy to get it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

282

EUGENE LEWIS - DIRECT

1  Q.   Now, where would you go to get your cocaine from Tracy?

2  A.   I'd either see him at John's house or I'd meet him on

3  South Boulevard --

4  Q.   Was there --

5  A.   -- at the gas station there near where he lived.

6  Q.   Now, when you would meet defendant Tracy Howard, was he

7  by himself?

8  A.   Sometimes.  Sometimes he was with his girlfriend and

9  Cathy.

10 Q.   So --

11 A.   Keshia and Cathy.

12 Q.   I'm going to show you what's been previously identified

13 as Government's Exhibit 85A.  Do you recognize Government's

14 Exhibit 85A?

15 A.   Yes.

16 Q.   How do you recognize it?

17 A.   That's Cathy.

18 Q.   I'm going to show you Government's Exhibit 85G.  Do you

19 recognize Government's Exhibit 85G?

20 A.   Yes.

21 Q.   And how do you recognize that?

22 A.   It's Keshia.

23 Q.   What quantities were you purchasing from defendant Tracy

24 Howard?

25 A.   Just an eight ball maybe once a week, sometimes twice.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

283

EUGENE LEWIS - DIRECT

1    Q.    And what were you doing with that eight ball?

2    A.    I would sell enough to buy some more and use the rest.

3    Q.    Now, the times you were purchasing an eight ball, were

4    you purchasing cocaine powder or crack?

5    A.    Powder.

6    Q.    And were you using powder cocaine?

7    A.    Yes.

8    Q.    Now, at some point did your relationship with Tracy

9    Howard change from you just being a customer of his?

10   A.    Yes.  At some point he had on -- I asked John if -- he

11   told John he was looking for somebody to --

12              MR. CULLER:  Objection.

13   A.    -- run a spot --

14              THE COURT:  Hang on a second.

15              Overruled.

16   Q.    You can continue.

17   A.    He told John he was looking for someone to run a crack

18   spot for him and he asked John if I would be interested or to

19   ask me if I would be interested.  John asked me --

20              MR. CULLER:  Objection.

21   A.    -- and I told him yes.

22   Q.    And what kind of spot was this going to be?

23   A.    A crack spot.

24   Q.    And explain to the jury what a crack spot is.

25   A.    It was a house in a certain area.  I didn't know at the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

284

2071

EUGENE LEWIS - DIRECT

1    time yet, but it was in Little Mexico.  A spot in Little -- a

2    house in Little Mexico where people would just come to buy

3    crack all day, all night pretty much.

4    Q.    Now, do you know why defendant Tracy Howard wanted to set

5    you up at this crack spot?

6    A.    At that spot, no.

7            MR. CULLER:  Objection unless he knows from personal

8    knowledge.

9            THE COURT:  Sustained as to form.

10   Q.    Did you learn why defendant Tracy Howard wanted to set

11   you up?

12   A.    Yes.

13   Q.    And what did you learn?

14   A.    He was working with his -- his brother was running that

15   area for him.  He was supplying his brother at that area and

16   him and his brother fell out over something.  They had a

17   disagreement.  And he needed somebody else to run the area.

18   He had some other guy doing it, but he was using crack cocaine

19   so he ended up running off with the money.  So Tracy was

20   looking for somebody else now and he called me.

21   Q.    Now, do you see his brother in the courtroom?

22   A.    Yes.

23   Q.    Can you please describe where he's sitting and what he's

24   wearing.

25   A.    He's the fourth person from the right at the defendant's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   area.  From my right.  And he's wearing like a beige shirt.

2           MS. MARSTON:  Your Honor, may the record reflect he

3   has identified defendant David Howard.

4           THE COURT:  It will.

5   Q.  Now, approximately when were you -- when did you learn

6   about this assignment in Little Mexico?

7   A.  Around -- somewhere around the end of June or the middle

8   of June.  Somewhere in that area.

9   Q.  Of what year?

10  A.  Of 2004.

11  Q.  Did you agree to do this?

12  A.  Yes.

13  Q.  Why?

14  A.  I was really kind of desperate.  I needed -- I was

15  homeless at the time and what I was doing was kind of dead

16  end, you know.

17  Q.  Well, what did you get in exchange for this assignment?

18  A.  He told me he would pay me $500 a week --

19  Q.  And who --

20  A.  -- to sell crack.

21  Q.  And who was he?

22  A.  Tracy.

23  Q.  I'm going to show you what's been marked as Government's

24  Exhibit 11F.  Do you recognize 11F?

25  A.  Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   Q.   How do you recognize it?

2   A.   It's the apartment where the customers would come to make

3   transactions.

4   Q.   Well, can you touch the screen which will make a mark

5   appear and tell us which apartment you're talking about.

6   A.   This one (indicating).

7   Q.   And explain to the jury what -- who was paying for that

8   apartment?

9   A.   Tracy Howard.

10  Q.   And what happened in that apartment?

11  A.   There was -- there's a hole in the wall in that apartment

12  and one in the wall on the other side -- the apartment on the

13  other side, and customers would come to that apartment and

14  knock on the wall and tell me what they want and then they

15  would slide the money through the hole and I'd slide them

16  whatever they wanted back.

17  Q.   Now, do you know who created that hole in the wall?

18  A.   Yes.

19  Q.   Who created the hole in the wall?

20  A.   The one that I was serving them through was created by

21  Tracy Howard.

22  Q.   Was there more than one hole in the wall?

23  A.   Yes.

24  Q.   I'm going to show you Government's Exhibits 11A, 11B,

25  11D, and 11E.  Do you recognize those four photographs?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   A.   Yes.

2   Q.   And how do you recognize them?

3   A.   The holes in both sides of the wall.

4   Q.   Now, who directed you to use the hole in the wall?

5   A.   Tracy Howard.

6   Q.   Now, do you know who lived in this apartment before Tracy

7   Howard rented it?

8   A.   Yes.

9   Q.   Who?

10  A.   Crystal stayed in it and another guy named Tim.

11  Q.   Now, do you know --

12  A.   Oh, Ted, pardon me.

13  Q.   Do you know who lived in it prior to Crystal and Ted?

14  A.   From what I was told, David --

15       MR. ADOLF:  Objection, Judge.

16  A.   -- lived there --

17       THE COURT:  Sustained.  The jury is to disregard the

18  last answer of the witness.

19  Q.   Well, who told you?

20  A.   About the person that lived there before?

21  Q.   Yes.

22  A.   Crystal, David's girlfriend.

23  Q.   When did Crystal tell you that?

24  A.   After I had been in Little Mexico for about maybe three

25  weeks or so.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  Q.   I'm going to show you what's been marked as Government's

2  Exhibit 85L.

3  Q.   Do you recognize Government's Exhibit 85L?

4  A.   That's Crystal.

5  Q.   And what did she tell you about that apartment?

6        MR. CULLER:  Objection.

7        MR. ADOLF:  Objection.

8        THE COURT:  Sustained.

9        MS. MARSTON:  Your Honor, it's a co-conspirator

10  statement.

11        MR. ADOLF:  May we?

12        THE COURT:  I'll meet counsel at side-bar.

13        (Side-bar conference as follows:)

14        THE COURT:  How is it in furtherance of a conspiracy

15  if a statement is made to him three weeks after he moved in

16  about a tenant two tenants before?

17        MS. MARSTON:  It's in furtherance of the drug

18  conspiracy that was going on in Little Mexico.

19        THE COURT:  How --

20        MS. MARSTON:  I can ask him why he was told that.

21        THE COURT:  Well, at this point I don't have any

22  evidence that it's in furtherance of a conspiracy.  So unless

23  you can lay that foundation, it's a hearsay statement.

24        MS. MARSTON:  Okay.

25        (End of side-bar conference.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1                    DIRECT EXAMINATION (Cont'd.)

2    BY MS. MARSTON:

3    Q.   Now, how often were you using the hole in the wall?

4    A.   As far as how many times a day?

5    Q.   Yes.

6    A.   Man, so much I really -- I really couldn't calculate a

7    number of times.  I mean, I could calculate how much money

8    would come through.

9    Q.   Well, how much money came through?

10   A.   As far as -- on a daily basis anywhere from 800 to 2,000

11   dollars.

12   Q.   And what would you do with the money once you collected

13   it?

14   A.   Well, Tracy would send me packages of 700 or 500 dollar

15   packages; and every time I got down to the last hundred

16   dollars worth of cocaine -- well, crack, he would -- I would

17   call him and he would come pick up the money and send more

18   dope.

19   Q.   Now, how did you have a cell phone?

20   A.   Tracy -- first I had my own and it broke and then Tracy

21   provided me with one.

22   Q.   Now, who would come and deliver the crack to you?

23   A.   Either Tracy himself or he'd send Keshia and Cathy.

24   Q.   And how often would you either see Tracy or Keshia and

25   Cathy during the course of a week?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

290

EUGENE LEWIS - DIRECT

1   A.   At least twice a day.

2   Q.   And who would you give the money to?

3   A.   Whoever came to pick up -- whoever came to drop off the

4   crack.

5   Q.   Now, how long did you stay out in Little Mexico?

6   A.   Until maybe the end of August or early September.

7   Q.   Of what year?

8   A.   2004.

9   Q.   Now, during the course of that, did you always stay at

10  that apartment that I showed you in that photograph?

11  A.   No.

12  Q.   Where did you move to?

13  A.   The apartment like right across -- right in front of the

14  entrance, and then another apartment next to -- about two

15  apartments down from the first one.

16  Q.   Now, why did you move to different apartments?

17  A.   Police.  Really just -- the area kept getting -- like the

18  first apartment got hot because someone got arrested in the

19  dropoff apartment.  And then the second apartment got hot

20  because of drug trafficking.

21  Q.   Now, when you say the dropoff apartment, what do you mean

22  by that?

23  A.   The apartment where customers would go to buy crack.

24  Q.   And can you describe what that apartment looked like.

25  A.   It was an apartment -- the first apartment that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  showed me that I touched the screen on.

2  Q.   And what did it look like inside?

3  A.   It didn't have any furniture or anything inside of it.

4  It just had a stove, a bathroom, another single room, empty

5  closet.  Really, that's it.  And it was real filthy.

6  Q.   And what about your apartment?

7  A.   It had a TV, an air mattress, a desk, a kitchen table,

8  stove, and bathroom.

9  Q.   Now, where would you keep the crack when you weren't

10  serving it through the hole?

11  A.   In a stash box in the wall, wall sockets.  We would pull

12  out the wall sockets and put it into the boxes and screw them

13  back on.  Later on we used the drainage -- the drainage

14  overflow in the bathtub of the apartment that wasn't being

15  used.

16  Q.   What do you mean the apartment that wasn't being used?

17  A.   The one that people used to come to to pick up or buy --

18  make purchases at.

19  Q.   So you actually hid crack in that apartment.

20  A.   Yes.

21  Q.   And did you have any other hiding places?

22  A.   Yes.

23  Q.   What other hiding places did you have for the crack?

24  A.   When -- in one apartment I used the -- I forget how you

25  would describe it.  The curtains, in the seams of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

292

2079

EUGENE LEWIS - DIRECT

1  curtains.  I would -- there was a hole in one of the seams and
2  we stashed it -- stick the crack through the seams and ruffle
3  the curtain back up so it would look normal.
4      Another spot was in an electricity -- electrical box
5  behind the building with a lock on it.
6  Q.    Now, did the police ever find the crack that you hid in
7  those hiding places?
8  A.    No.
9  Q.    Did they search those hiding places?
10 A.    No.
11 Q.    Did they sometimes search the apartment or search you?
12 A.    Yes.
13 Q.    Now, at some point during the course of this, did Tracy
14 ever stay with you?
15 A.    When I first started over in Little Mexico he did.  He
16 stayed a day sometimes.
17 Q.    And why?
18 A.    Just to make sure -- well, supposedly, he said it was to
19 show me how to do everything.  But from my opinion, it was to
20 make sure he could trust me, you know.  Make sure I would do
21 things right.
22 Q.    Now, when you moved from that first apartment to the
23 second, did anyone go with you?
24 A.    No.  It was someone else's apartment already and Tracy
25 just paid the rent for her.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

293

EUGENE LEWIS - DIRECT

1   Q.   And whose apartment was it already?

2   A.   Kelly Roland.

3   Q.   And do you know a person named Kelly Roland?

4   A.   Yes.

5   Q.   Who is Kelly Roland?

6   A.   She's the woman that got beat in Little Mexico.

7   Q.   Now, were you a part of the reason she got beat?

8   A.   Yes.

9   Q.   Who beat her?

10  A.   Nick.

11  Q.   And do you see a person in the courtroom that you know as

12  Nick?

13  A.   Yes.

14  Q.   Can you please describe where he is sitting and what he's

15  wearing.

16  A.   He's the sixth person from my right at the defense table.

17  He's wearing a tie and a button-up shirt.

18       MS. MARSTON:   Your Honor, may the record reflect

19  that he has identified defendant Nicholas Ragin.

20       THE COURT:   It may.

21  Q.   Now, why did Kelly get beat by Nick?

22  A.   When I was staying there, she -- after a while she

23  started complaining because I wouldn't give her crack on

24  credit and I wouldn't give her free crack.

25  Q.   Let me stop you there.  What do you mean crack on credit?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

294

EUGENE LEWIS - DIRECT

1  A.   When -- I just -- I give it to her and she'd pay me back

2  later whenever she started, you know, going out and making

3  tricks and -- well, going out and prostituting --

4  Q.   All right.

5  A.   -- and bringing back money.

6  Q.   So once you got in an argument over this crack on credit,

7  what happened?

8  A.   Little while later she had gotten arrested in the area,

9  and, like, the day she -- the day after she got arrested, me

10  and another woman, Crystal Staton, moved in to that apartment

11  and put her -- got her put out by the landlord.

12  Q.   And what happened when she came back?

13  A.   She got into an argument -- we got into an argument over

14  her getting her furniture and stuff, so I let her get her

15  furniture and everything out of the apartment and she held a

16  little grudge against, you know, us -- me and Tracy for the

17  fact that, you know, we put her out of the apartment and

18  didn't want to deal with her anymore.  And one day she -- she

19  had some guys in the apartment who had serviced somebody --

20          MR. CULLER:  Objection, hearsay.

21          THE COURT:  Sustained.

22          MS. MARSTON:  Your Honor, it's not offered for the

23  truth of the matter.  It's offered to show what happened next.

24          MR. CULLER:  Objection.

25          THE COURT:  Well, I'll allow it for that purpose and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    instruct the jury that whatever Kelly Roland said is not

2    offered for the truth of the matter and you should not

3    consider it for such, but you may consider it to show what

4    this witness did next, if it does.

5    A.    She had somebody in her apartment who was selling crack.

6    Q.    And how do you know that?

7    A.    One of the girls in the area had told me they bought some

8    crack from her house.

9              MR. CULLER:  Objection.

10             THE COURT:  Same instruction with respect to that.

11   Q.    Now, what did you do based on learning that she had some

12   guys in her apartment selling crack?

13   A.    I went to talk to her and ask the guys if they were

14   selling crack in the house.

15             MR. CULLER:  Objection.

16             THE COURT:  Overruled.

17   Q.    And once you got your information, what did you do?

18   A.    When I --

19   Q.    Who did you go to?

20   A.    When I got there, she -- she didn't -- she cussed me out.

21   So I called Tracy and told him what happened.

22   Q.    Now, why did you feel the need to call Tracy and tell him

23   about these guys in her apartment?

24   A.    Because he gave me instructions to call him and let him

25   know if anybody had came to the area and tried to set up or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

296

EUGENE LEWIS - DIRECT

1  sell crack.

2  Q.   Well, why did he give you those instructions?

3  A.   Because he didn't want anybody else coming in selling

4  crack.

5  Q.   So based on you telling Tracy about this situation with

6  Kelly, what happened next?

7  A.   He told me he'd take care of it.  And later on that day

8  he came there and he had talked to Kelly outside.  While he

9  was talking to Kelly, Nick was on the side of the building.

10 When he walked away from Kelly, Nick came out from the side of

11 the building and started beating her.

12 Q.   I'm going to show you what's been marked for

13 identification purposes as Government's Exhibit 92A.

14             MR. CULLER:  Your Honor, can we approach?

15             THE COURT:  If you're going to show the witness an

16 exhibit, show it to counsel first.

17             MS. MARSTON:  It's on the screen, Your Honor, but...

18             THE COURT:  Oh, yeah, good point.

19             MR. CULLER:  May we have a side-bar?

20             THE COURT:  You may.

21             (Side-bar conference as follows:)

22             THE COURT:  Let me see it.

23             This hasn't been offered at this time.  It's being

24 shown to the witness.

25             MR. CULLER:  I realize that.  I just want to make

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   sure I got in before it got shown to the witness.

2        Your Honor, we would object to the use of

3   photographs of this woman who's beaten badly.  This is

4   designed to get an emotional response from the jury.  It

5   doesn't have any probative value other than for that purpose.

6   They know that she was beaten.  They know the purpose of the

7   beating.  Showing the pictures just aggravates that event.

8        MS. MARSTON:  Your Honor, I believe this does have

9   probative value.  There's been extended testimony, extended

10  cross examination of witnesses by Mr. Culler and others as to

11  these beatings, how bad they were or how bad they weren't,

12  whether there were photographs, whether officers were there at

13  the hospital, and so forth, on a variety of witnesses

14  throughout the course of this trial.

15       In this case we happen to have the photograph that

16  shows the beating and I think the government should be

17  entitled to show this beating which was in furtherance of the

18  drug conspiracy.

19       THE COURT:  I'll grant the objection and I don't

20  think there's been any cross examination concerning the

21  severity of this beating -- this particular beating, and I'll

22  sustain the objection on 403 grounds at this time.  And you

23  can reopen your request.  If at any time during cross you

24  think a door has been opened for that, I'll hear you at that

25  time.  But at this time I'm sustaining the objection.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

298

EUGENE LEWIS - DIRECT

1              MS. MARSTON:  Do I at least get to ask the witness

2    since he objected before I even got the witness to identify

3    the photograph and then I won't offer it as evidence at this

4    time?

5              THE COURT:  No.

6              MS. MARSTON:   I haven't gotten to ask the witness if

7    he even recognizes the photograph.

8              MR. CULLER:  (Inaudible.)

9              THE COURT:  Wait a second.  I don't see any purpose

10   in asking any further questions if I'm not going to allow the

11   admission of this photograph.

12             MS. MARSTON:  Okay.

13             (End of side-bar conference.)

14                  DIRECT EXAMINATION (Cont'd.)

15   BY MS. MARSTON:

16   Q.   Were you there for the beating?

17   A.   Yes.

18   Q.   What happened?

19   A.   When Tracy came in the house -- he told me before he

20   walked over to Kelly, he told me to go to the other side of

21   the complex, you know, so I wouldn't be directly involved in

22   what was going on.  And then he walked over to Kelly's house.

23   He called her outside and pulled her in front of the -- into

24   the parking lot and they talked for a little while.  And I

25   could see that she was still kind of hysterical from, you

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    know, her body language.  And when he walked away from her,

2    Nick came out from the side of the building and started

3    punching and stomping her and kicking her.

4    Q.   And what happened after that?

5    A.   They carried -- they carried Kelly, a couple little

6    people from the area carried Kelly into another apartment

7    after Tracy had left and the ambulance came and got her from

8    there.

9    Q.   When did you first meet Nick?

10   A.   Through -- when I was with John one time.  Nick used to

11   go to get cocaine from John.  And his girlfriend stayed

12   downstairs from John.  So a lot of times, like, when I'd be

13   hanging out at John's house drinking and snorting cocaine, I

14   would see Nick come by.

15   Q.   And do you know when you started seeing Nick with Tracy?

16   A.   When Tracy hired Nick to be a driver.

17   Q.   And why did he hire Nick to be a driver?

18   A.   He said he had too much stuff to do and he needed more

19   people to, you know, help him out.  Transport the girls to

20   their calls and to drop off packages to people that was buying

21   weight and to me.

22   Q.   Well, first of all, tell the jury what you mean by

23   packages.

24   A.   Anything -- like large amounts of cocaine or just

25   anything, you know, any type of sales.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    Q.    Well, what do you mean when you say weight?

2    A.    From ounces to half ounces to quarter keys or half -- big

3    eights or, you know, whatever.

4    Q.    And what kind of drugs was -- did you know defendant

5    Tracy Howard to be dealing with at this point in time?

6    A.    Crack and cocaine.

7    Q.    And when you said he hired Nick to be a driver for the

8    girls, what did you know -- who did you know the girls to be?

9    A.    Cathy and Keshia.

10   Q.    And what were those girls doing?

11   A.    Going on calls.

12   Q.    Do you know what Nick did with the packages that Tracy

13   gave him?

14   A.    The ones -- only the ones that he brought to me.

15   Q.    And how often did Nick bring you packages?

16   A.    Usually he would bring them like twice a day.

17   Q.    And is that the times that Tracy did not come himself or

18   send the girls?

19   A.    Yes.  Sometimes they would come together.

20   Q.    Now, on a typical Saturday night, how much crack would

21   you sell in Little Mexico?

22   A.    At least --

23   Q.    Approximately money wise.

24   A.    At least 2,000 or 1500 at the least.

25   Q.    What quantities were you selling this amount of crack in?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

301

2088

EUGENE LEWIS - DIRECT

1    A.    It started off as twenties which was .4 of a gram.

2    Q.    Now, why were those twenties .4?

3    A.    A normal twenty would be .2.  Tracy said a .4 would bring

4    in more customers and would move it faster.

5    Q.    And then what did it go to?

6    A.    And then we started selling dimes at .2 of a gram.

7    Q.    Now, were you ever selling anything other than crack in

8    Little Mexico?

9    A.    No.  Yes.

10   Q.    So --

11   A.    Sometimes I sell, like, cigarettes or something.  Just

12   novelty stuff to -- extra chump change, but nothing else

13   illegal.

14   Q.    The packages that were brought to you either by Tracy or

15   Nick or the girls, what did those packages contain?

16   A.    They were either $500 worth of cocaine or $700.

17   Sometimes he would bring me packages like a thousand dollars

18   or more if it was a real busy time and he wasn't going to have

19   enough time to drop me off some more any time soon.

20   Q.    Well, you just used the word cocaine.  What are you

21   talking about --

22   A.    Crack.

23   Q.    -- when you use the word --

24   A.    Crack cocaine.

25   Q.    What do you call something -- what do you call cocaine

Cheryl A. Nuccio, RMR-CRR (704)350-7494

302

EUGENE LEWIS - DIRECT

1   that's not crack?

2   A.   Powder.

3   Q.   Now, when you got the crack in those packages, was it

4   already broken down?

5   A.   Yes.

6   Q.   Explain to the jury what that means.

7   A.   Everything was bagged up into small baggies, small rocks,

8   separated.  And it would be a big bag with ten bags in it.

9   And then they would be separated from each other and they

10  would be packaged into a bigger bag.  So if I had $700 worth,

11  I'd have seven $100 bags and inside the $100 bags would be ten

12  $10 bags.

13  Q.   Now, do you see somebody else in the courtroom that you

14  know from Little Mexico?

15  A.   Yes.

16  Q.   And who is that?

17  A.   Oscar.

18  Q.   And did you know Oscar to go by another name?

19  A.   Puerto Rico.

20  Q.   And can you please tell me where he's sitting and what

21  he's wearing.

22  A.   Sitting three people from the left at the defendant's

23  table.

24       MS. MARSTON:  Your Honor, at this time may the

25  record reflect that Eugene Lewis has identified defendant

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   Oscar Sanchez.

2            THE COURT:  It may.

3   Q.    Now, how did you know defendant Sanchez?

4   A.    He was one of the maintenance men and he was one of

5   Tracy's main runners.

6   Q.    Now, what do you mean by a runner?

7   A.    He came and purchased grams at a time, usually maybe

8   four -- three, four, maybe five times a night and he had a lot

9   of customers that would come to his house, sit there and smoke

10  and have, you know, trick with the prostitutes.  And Tracy

11  paid his rent, you know, for him to come and work for -- with

12  him, you know, and not go anywhere else to buy his dope.

13  Q.    Now, why did Tracy need Oscar if he had you?

14  A.    At first it was to keep me from being, you know,

15  mainline, to be noticed, you know what I'm saying, he put

16  Oscar there.  Oscar was on the frontline.  Oscar went out and

17  he communicated with the customers because most of them spoke

18  Spanish that he worked with and Oscar spoke Spanish, so he had

19  more communication skills with the people in the area.

20  Q.    And when you're talking about a runner, were you

21  considered a runner?

22  A.    No.

23  Q.    Why weren't you considered a runner?

24  A.    Because I wasn't actually out trying, you know, to find

25  people that smoke crack.  I just stayed in one spot and, you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2091

EUGENE LEWIS - DIRECT

1   know, passed it on hand to hand.

2   Q.   So who did you use as your runner when you were selling

3   Tracy's crack.

4   A.   Oscar.

5   Q.   And how often would you give Oscar crack to sell as he

6   was acting as a runner?

7   A.   Maybe three or four, maybe five times a day sometimes.

8   Q.   And how many rocks were you supplying to him each time he

9   would come to you?

10   A.   He wouldn't get bags like the ones I was getting.  His

11   rocks would be whole rocks cut down into grams and he would

12   cut them up himself and, you know, sell them at his own -- his

13   own weight standard, you know.

14   Q.   I'm going to show you what's already been entered --

15          MS. MARSTON:  May I approach?

16          THE COURT:  You may.

17   Q.   What's already been introduced into evidence as

18   Government's Exhibit 37C -- A.  Do you see what's in 37A?

19   A.   Yes.

20   Q.   Do you recognize what's in there?

21   A.   Yes.

22   Q.   How do you recognize that?

23   A.   It's crack cocaine.

24   Q.   Now, can you describe that crack to the jury, please.

25   A.   It's cut up.  Some of them look like what would be dime

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  rocks and some of them look like what would be twenty rocks.

2  Q.    Is this similar to what you would give Oscar Sanchez when

3  he was working as a runner when you were selling Tracy's

4  crack?

5  A.    Yes.

6  Q.    How many times a day would you give him rocks like this?

7  A.    Maybe three or four, sometimes five times a day.

8  Q.    Now, did you have any guns out there in Little Mexico?

9  A.    Yes.

10  Q.    Why?

11  A.    At first Tracy didn't want to give me any, but I kept

12  complaining to him because, you know, there's a lot of traffic

13  coming through, a lot of people coming through that, you know,

14  possibly could rob me or, you know, anything of that nature,

15  any type of harm.  So I kept asking him, you know, bring me

16  some, you know, guns or something.  Bring me a gun or

17  something, you know.  And eventually he brought me a .357.

18  Q.    And after you got that .357, where did you keep it?

19  A.    Sometimes I would keep it in -- taped to a board or

20  strapped to a board underneath -- in a closet, like a low

21  laying shelf, and sometimes I would keep it in a hole in the

22  wall in the kitchen.

23  Q.    And did you know anybody else out in Little Mexico to

24  have guns?

25  A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

306

EUGENE LEWIS - DIRECT

1  Q.   Who did you know to have guns?

2  A.   David.  And when I first moved out there, Oscar had one.

3  Q.   Now, what kind of gun did you see David with?

4  A.   A .40 cal.  And a 9 millimeter Ruger.

5  Q.   Excuse me?

6  A.   And a 9 millimeter Ruger.

7  Q.   And when did you see him with that?

8  A.   One time there was an incident where there was a bunch of

9  Mexicans getting real loud and rowdy and fighting and going

10 crazy, and I saw David come out of his house and he walked

11 across the lawn with a .40 cal in his hand and I was outside

12 and I had the .357 in mine, you know, just in case, you know,

13 guns started going off.  It was right in front of the house

14 where I was staying at.

15      And another time I was in the car with David and he had

16 the 9 millimeter laying on the -- on the armrest.

17 Q.   Now, what was David doing out in Little Mexico?

18 A.   Selling dope.

19 Q.   And where was he living at that point in time?

20 A.   Right maybe about six houses -- six apartments away from

21 the one I was staying in across the lawn.

22 Q.   And who was he living with?

23 A.   Crystal.

24 Q.   Now, again, you used that word dope.  What do you mean

25 when you say dope?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    A.    Crack.  Crack, powder.  Either/or really.

2    Q.    Well, what did you know David to sell?

3    A.    Both.

4    Q.    And how do you know that?

5    A.    I bought powder from him to use and I saw -- I've seen

6    him sell crack to other people in the area.

7    Q.    Now, did Tracy have any problems with David selling crack

8    out there?

9    A.    No.

10   Q.    Was there a point in time where you actually had to use a

11   gun out in Little Mexico?

12   A.    Yes.

13   Q.    Tell us about that.

14   A.    One night, it was two guys, they came through and they

15   were -- they were selling dope right in front of the apartment

16   I was in.  And I called Tracy and I let him know what was

17   going on.  So he came with Nick and he had a couple of guns

18   with him.  He had some guns with him.  And me and Tracy walked

19   outside to approach the guys; and when we approached them, you

20   know, Tracy told them they couldn't be around there.  They

21   couldn't sell over there because this spot was taken.  And the

22   dudes, you know, they was asking him, well, can't we talk

23   about it?  He said, no, you have to leave right now.  So they

24   started walking away and he told them y'all need to run.  And

25   when they wouldn't run, he -- when they wouldn't, you know,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  run fast enough, he started shooting at them.  And he told me

2  to go around the other side of the building to cut them off,

3  you know.  And when I got to the side of the building, I

4  looked up the -- up at the driveway and they were shooting

5  back at each other, so it was like a little shoot-out and I

6  was ducked on the side of the building, you know.  And I saw

7  the guy turn around and he ran off and then that was -- that

8  was it for that moment.

9  Q.   Well, what happened after that moment?

10 A.   Tracy gave me the gun that he had.  It had like two

11 bullets left in it.  And Nick had a gun.  He left Nick with me

12 with his gun that Tracy left.

13 Q.   Why did Tracy leave?

14 A.   I'm not sure exactly.

15 Q.   Well, what happened after Tracy left then?

16 A.   Later on, maybe like an hour or so later, some more guys

17 came that looked like the dudes that, you know, was there the

18 first time.  I'm not sure if it was them.  And Nick saw them

19 out the window and he ran out the house and he just started

20 shooting at them.  And when he ran out the house, I ran out

21 behind him and I shot off the couple of bullets that was in

22 the gun that Tracy gave me.

23      Then a few hours -- about an hour later, Tracy came and

24 picked up Nick and they was supposed to bring back some

25 bullets later on that morning.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

                            309

EUGENE LEWIS - DIRECT

1    Q.    Did you ever get bullets later that morning?

2    A.    No.

3    Q.    Do you know why?

4    A.    They got stopped in the parking lot with the bullets in

5    the car.

6    Q.    Now, did you ever meet Tracy's mother?

7    A.    Yes.

8    Q.    Who was that?

9    A.    Ila.

10   Q.    And how did you know Ila?

11   A.    I met her maybe four times throughout the whole thing.

12   The first time she was picking up some money and she had told

13   me to leave Little Mexico because of a domestic dispute that

14   Tracy had with Keshia and they thought Keshia was going to

15   send the police to Little Mexico, so she came and picked up

16   the money I had and the dope I had and she dropped me off

17   somewhere.

18   Q.    I'm going to show you what's already been introduced into

19   evidence as Government's Exhibit 85E.  Do you recognize

20   Government's Exhibit 85E?

21   A.    Yes.

22   Q.    How do you recognize it?

23   A.    It's Ila.

24   Q.    Now, where did you go after she told you you probably

25   ought to leave Little Mexico?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

310

EUGENE LEWIS - DIRECT

1   A.   I went to my aunt's house off Harris Boulevard.

2   Q.   And what happened after you went to your aunt's house?

3   A.   I just stayed there for the day and I went back later on.

4   Q.   Now, at some point did you have to leave Little Mexico

5   again?

6   A.   Yes.

7   Q.   And where did you go at that point?

8   A.   I went to an apartment they had in Sailboat Bay.

9   Q.   Who's they?

10  A.   Tracy and Nick.

11  Q.   I'm going to show you what's been marked and introduced

12  into evidence as Government's Exhibit 13C.  Do you recognize

13  Government's Exhibit 13C?

14  A.   Yes.

15  Q.   How do you recognize it?

16  A.   Sailboat Bay Apartments.

17  Q.   Now, who was staying at the Sailboat Bay apartment?

18  A.   Tracy, Nick, Cathy, and Crystal.

19  Q.   Which Crystal?

20  A.   Donna.

21  Q.   Now, how did you you know this Crystal named Donna?

22  A.   At first she was one of the girls that prostituted over

23  in Little Mexico.  And then Tracy picked her up to work the

24  escort service with Donna.

25  Q.   I'm going to show you what's already been introduced into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  evidence as Government's Exhibit 85K.  Do you recognize

2  Government's Exhibit 85K?

3  A.    Yes.

4  Q.    And how do you recognize it?

5  A.    That's Donna.

6  Q.    Now, how long did you stay at Sailboat Bay?

7  A.    Just that night.

8  Q.    And then where did you go?

9  A.    I went back to Little Mexico.

10  Q.    Now, at some point did you have to leave Little Mexico

11  again?

12  A.    Yes.

13  Q.    And was that after your encounter with law enforcement?

14  A.    Yes.

15  Q.    Tell us about what they found on you when you got stopped

16  by law enforcement.

17  A.    It was about maybe a gram and a half or 2 grams of crack

18  cocaine.

19  Q.    And --

20  A.    And $280.

21  Q.    -- did you go to jail?

22  A.    Yes.

23  Q.    And after that, what happened?

24  A.    And then investigators came to see me about all of this.

25  Q.    And what happened after you got visited by investigators?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1  A.  That's when I cooperated with all -- with the case.

2  Q.  Now, at that point did defendant Tracy Howard know that

3  you were cooperating?

4  A.  No, but he had suspicions.

5  Q.  Where was -- where were you staying at that point in

6  time?

7  A.  Hanover Landing.

8  Q.  And whose name was that Hanover Landing apartment in?

9  A.  The apartment's name -- the apartment was in my name, but

10 it was paid for by Tracy Howard.

11 Q.  The crack that you got stopped with in September of 2004,

12 where did that come from?

13 A.  David Howard.

14 Q.  And why did it come from David?

15 A.  At the time Tracy was in jail and David came and picked

16 me up in Little Mexico and he told me he talked to his brother

17 and that his brother said it was okay for me to work for

18 David.  So David gave me 7 grams and told me to bring him back

19 $300.

20 Q.  And did you bring him back the money?

21 A.  No, I got arrested.

22 Q.  So after you got arrested and agreed to work with law

23 enforcement, where were you staying?

24 A.  In Hanover Landing.

25 Q.  And do you remember the address or apartment number?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

313

EUGENE LEWIS - DIRECT

```
 1   A.   If I'm not mistaken, it's 5852, Apartment A1.
 2   Q.   Now, you said that apartment was in your name.  Who paid
 3   for the rent?
 4   A.   David -- I mean Tracy Howard, pardon me.
 5   Q.   I'm going to show you what's already been introduced into
 6   evidence as Government's Exhibit 14A.  Do you recognize
 7   Government's Exhibit 14A?
 8   A.   Yes.
 9   Q.   How do you recognize it?
10   A.   Hanover Landing Apartments.
11   Q.   I'm also going to show you what's been introduced into
12   evidence as Government's Exhibit 14J.  Do you recognize
13   Government's Exhibit 14J?
14   A.   Yes.  It's the employment verification form.
15   Q.   Now, who completed this employment verification form for
16   you?
17   A.   Person named Denise Davis.
18   Q.   Do you know who Denise Davis is?
19   A.   No.
20   Q.   Do you know what One Enterprise is?
21   A.   Yes.
22   Q.   What's One Enterprise?
23   A.   It's the name of Ila's escort service.
24   Q.   And what position did you supposedly have for this escort
25   service?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   A.   According to the form, I was a driver.

2   Q.   Did you ever?

3   A.   No.

4   Q.   I'm also going to direct your attention to another page

5   of Government's Exhibit 14J.  Do you recognize your signature

6   at the bottom of this application?

7   A.   Yes.

8   Q.   And again, did you fill in the information under

9   employment history?

10  A.   Yes.

11  Q.   And who gave you that information to fill in?

12  A.   Tracy.

13  Q.   Now, what's the name Wendy Smith?

14  A.   I don't know.

15  Q.   Did you know --

16  A.   That's the name he told me to put down on the

17  application.

18  Q.   And did you know anybody who went by the name Wendy?

19  A.   No.

20  Q.   And approximately when did you get this apartment in your

21  name?

22  A.   In --

23  Q.   Or fill out the application for it?

24  A.   In September 2004.

25  Q.   Now, who lived in this apartment?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

315

EUGENE LEWIS - DIRECT

1   A.    Tracy -- at first Tracy, Nick, and Keshia -- not Keshia,

2   Donna, and -- and Little Bit.

3   Q.    Now, who did you -- what did you know Little Bit's name

4   to be?

5   A.    Cathy.

6   Q.    Is Government's Exhibit 85A also who you knew as Little

7   Bit?

8   A.    Yes.

9   Q.    Did she have any other street names?

10  A.    Little Red.

11  Q.    Did you know how old Little Bit or Little Red was?

12  A.    Not at the time.

13  Q.    Now, while you were at Hanover Landing, did you give law

14  enforcement consent to search your apartment?

15  A.    Yes.

16  Q.    And were items seized during that consent search?

17  A.    Yes.

18  Q.    I'm first going to show you what's been marked for

19  identification purposes as Government's Exhibit 57A.  Do you

20  recognize Government's Exhibit 57A?

21  A.    Yes.

22  Q.    And is that your signature down there at the bottom of

23  Government's Exhibit 57A?

24  A.    Yes.

25          MS. MARSTON:  Your Honor, at this time the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

316

EUGENE LEWIS - DIRECT

1  government moves into evidence Government's Exhibit 57A.

2          THE COURT:  Any objection?

3          MR. CULLER:  No.

4          THE COURT:  Let it be admitted.

5          (Government's Exhibit Number 57A was received into

6  evidence.)

7  Q.   Now, before we start going over some of the evidence that

8  was seized, was there a piece of equipment in the apartment

9  that was not seized during this consent search on

10  October 11th, 2004?

11 A.   Yes.

12 Q.   And what was that?

13 A.   Food saver.

14 Q.   And can you tell -- explain to the jury what a food saver

15 is.

16 A.   A food saver is a piece of equipment used to reseal food

17 after it's been opened.

18 Q.   Were you resealing food in that apartment?

19 A.   No.

20 Q.   What was the food saver doing in that apartment?

21 A.   To the best of my knowledge --

22          MR. CULLER:  Objection unless he knows.

23          THE COURT:  Overruled.

24 Q.   You can go ahead.

25 A.   To the best of my knowledge, when you make -- when you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

317

2104

EUGENE LEWIS - DIRECT

1   cut crack -- or when you cut cocaine -- and cutting cocaine is
2   basically when you mix it with different powders to make it
3   stretch out to make more of the substance.  When you cut
4   cocaine and it becomes powdery again and you want to make it
5   hard again, you put it into the plastic and reseal it and put
6   it in the freezer and it freezes it back into a solid form.
7   Q.    And when does the food saver come into play in the
8   description you just gave?
9   A.    The food saver would seal it airtight.
10  Q.    Why is it important to seal it airtight?
11  A.    If not, it won't re -- it won't get hard again.
12  Q.    Now, I'm going to show you what's been marked as
13  Government's Exhibit 57W.  Do you recognize Government's
14  Exhibit 57W?
15  A.    Yes.
16  Q.    And how do you recognize it?
17  A.    It's one of the papers or rental order that was found in
18  the apartment.
19  Q.    Do you recognize the signature at the bottom of the
20  paper?
21  A.    Yes.
22  Q.    And whose signature is that?
23  A.    Nick Ragin's.
24  Q.    And do you know what he was purchasing for the apartment?
25  A.    Big screen TV.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1          MS. MARSTON:  At this time the government moves into

2   evidence Government's Exhibit 57W.

3          THE COURT:  Any objection?

4          MR. CULLER:  No.

5          THE COURT:  Let it be admitted.

6          (Government's Exhibit Number 57W was received into

7   evidence.)

8   Q.   And approximately what was the date of this rental order?

9   A.   October 7, 2004.

10  Q.   I'm also going to show you what's already been introduced

11  into evidence as Government's Exhibit 57U.  Do you recognize

12  Government's Exhibit 57U?

13  A.   Yes.

14  Q.   And how do you recognize it?

15  A.   A drawing that was found in the apartment.

16  Q.   Do you know who made this drawing?

17  A.   Donna.

18  Q.   And does Donna also go by the name Crystal?

19  A.   Yes, ma'am.

20  Q.   I'm also going to show you Government's Exhibit 57 --

21  what's been marked for identification purposes as Government's

22  Exhibit 57M.  Do you recognize Government's Exhibit 57M?

23  A.   Yes.

24  Q.   And how do you recognize it?

25  A.   Piece of paper that was found in the apartment.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

319

EUGENE LEWIS - DIRECT

1    Q.    And do you recognize the name at the top of this piece of

2    paper?

3    A.    Yes.

4    Q.    And do you recognize the address underneath the name?

5    A.    No.

6    Q.    You've never been to that location before?

7    A.    No.

8          MS. MARSTON:  At this time the government moves into

9    evidence Government's Exhibit 57M.

10          THE COURT:  Any objection?

11          MR. ADOLF:  Objection to the relevance, Judge.

12    Foundation.

13          THE COURT:  Overruled.

14          (Government's Exhibit Number 57M was received into

15    evidence.)

16    Q.    Whose name is on Government's Exhibit 57M?

17    A.    David Howard.

18    Q.    And what is the address that you've never been to?

19    A.    5300 Greenlefe Village Road.

20    Q.    I'm also going to show you what's been marked for

21    identification purposes as Government's Exhibit 57K.  Do you

22    recognize Government's Exhibit 57K?

23    A.    Yes.

24    Q.    Now, is this for the apartment that you had in your name?

25    A.    No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    Q.    Where was -- where was this piece of paper?

2    A.    Found in the apartment.

3    Q.    Who else had -- who had paper in the apartment?

4    A.    Tracy.

5    Q.    Who else?

6    A.    Nick.

7    Q.    And who else?

8    A.    Cathy, Ila, and Crystal.

9              MS. MARSTON:  Government moves into evidence

10   Government's Exhibit 57K.

11             THE COURT:  Any objection?

12             MR. CULLER:  No.

13             THE COURT:  Let it be admitted.

14             (Government's Exhibit Number 57K was received into

15   evidence.)

16   Q.    I'm going to show you what's been marked for

17   identification purposes as Government's Exhibit 57N and 57O.

18   Starting with 57N.  Do you recognize Government's Exhibit 57N?

19   A.    Yes.

20   Q.    And how do you recognize it?

21   A.    A receipt that was found in a bag in the apartment.

22   Q.    And whose name do you recognize -- whose signature do you

23   recognize on that piece of paper?

24   A.    Nicholas Ragin.

25             MS. MARSTON:  At this time the government moves into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   evidence Government's Exhibit 57N.

2           THE COURT:  Any objection?

3           MR. CULLER:  No.

4           THE COURT:  Let it be admitted.

5           (Government's Exhibit Number 57N was received into

6   evidence.)

7   Q.   I'm also going to show you what's been marked for

8   identification purposes Government's Exhibit 57O.  Do you

9   recognize any of the writing on Government's Exhibit 57O?

10  A.   Yes.

11  Q.   Let me turn it over.  Do you recognize handwriting on

12  both sides of those pages?

13  A.   Some of it.

14  Q.   All right.  What do you recognize on this side?

15  A.   Phone numbers.  777-952...

16  Q.   How do you recognize that writing?

17  A.   That looks like Nick's handwriting.

18  Q.   And on this page?

19  A.   Yes.

20  Q.   What do you recognize on this page?

21  A.   777-4947.

22  Q.   And again, how do you recognize that handwriting?

23  A.   Looks like Nick's handwriting.

24          MR. MACKEY:  Objection, Your Honor.

25          THE COURT:  Basis?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2109

EUGENE LEWIS - DIRECT

1          MR. MACKEY:  He's not been qualified as an expert.

2          THE COURT:  Overruled.

3          MS. MARSTON:  At this time the government moves into

4   evidence Government's Exhibit 57O.

5          THE COURT:  Any objection?

6          MR. CULLER:  No.

7          THE COURT:  Let it be admitted.

8          (Government's Exhibit Number 57O was received into

9   evidence.)

10  Q.    Do you recognize that telephone number?

11  A.    777-4947?

12  Q.    Yes.

13  A.    If I'm not mistaken, that's Tracy's phone number.

14  Q.    I'm going to show you what's been marked for

15  identification purposes as Government's Exhibit 57E.  Do you

16  recognize Government's Exhibit 57E?

17  A.    Yes.

18  Q.    How do you recognize it?

19  A.    The phone number on the paper is the phone that Tracy

20  gave me.

21         MS. MARSTON:  At this time the government moves into

22  evidence Government's Exhibit 57E.

23         THE COURT:  Any objection?

24         MR. CULLER:  No.

25         THE COURT:  Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

323

2110

EUGENE LEWIS - DIRECT

1            (Government's Exhibit Number 57E was received into

2    evidence.)

3    Q.    I'm going to show you what's been marked for

4    identification purposes Government's Exhibit 57D.  Do you

5    recognize Government's Exhibit 57D?

6    A.    Yes.

7    Q.    And how do you recognize it?

8    A.    A receipt for gold teeth.

9    Q.    Who did you know to have gold teeth?

10   A.    Tracy Howard.

11            MS. MARSTON:  At this time the government moves into

12   evidence Government's Exhibit 57D.

13            THE COURT:  Any objection?

14            MR. CULLER:  No.

15            THE COURT:  Let it be admitted.

16            (Government's Exhibit Number 57D was received into

17   evidence.)

18   Q.    What name is crossed out on the bottom of Government's

19   Exhibit 57D?

20   A.    Tracy.

21   Q.    And what name is written beside it?

22   A.    Bobby.

23   Q.    I'm going to show you what's been marked for

24   identification purposes as Government's Exhibit 57G.  Do you

25   recognize Government's Exhibit 57G?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

324

EUGENE LEWIS - DIRECT

1   A.   Yes.

2   Q.   And how -- do you recognize the name at the bottom of it?

3   A.   Yes, Tracy Howard.

4   Q.   Now, is that the apartment that you had in your name?

5   A.   No.

6        MS. MARSTON:  At this time the government moves into

7   evidence Government's Exhibit 57G.

8        THE COURT:  Any objection?

9        MR. CULLER:  No.

10       THE COURT:  Let it be admitted.

11       (Government's Exhibit Number 57G was received into

12   evidence.)

13  Q.   What's the time frame of this Duke Power bill?

14  A.   March 8th, 2004.

15  Q.   And what apartment number was this Duke Power bill for?

16  A.   5850, Apartment Number C2.

17  Q.   I'm going to show you what's been marked for

18  identification purposes as Government's Exhibit 57I.  Direct

19  your attention to the top of Government's Exhibit 57I.  Do you

20  recognize the name at the top of that exhibit?

21  A.   Yes.

22  Q.   And how do you recognize that name?

23  A.   Keshia Burris.

24  Q.   And do you recognize the address underneath her name?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2112

EUGENE LEWIS - DIRECT

1   Q.   How do you recognize that address?

2   A.   7606 Waterford Lake Drive.

3   Q.   And what do you know about that address?

4   A.   That's the address off of South Boulevard where I would

5   go to the gas station and meet Tracy.

6   Q.   That's near where you first met Tracy before you were

7   placed in Little Mexico?

8   A.   No, that's where I would pick up eight balls or half

9   eights when I would go get cocaine from him.

10  Q.   Is that while you were at Little Mexico or prior to --

11  A.   Prior to being there.

12          MS. MARSTON:  At this time the government moves into

13  evidence Government's Exhibit 57I.

14          THE COURT:  Any objection?

15          MR. CULLER:  No.

16          THE COURT:  Let it be admitted.

17          (Government's Exhibit Number 57I was received into

18  evidence.)

19  Q.   What car was being taken care of at Precision Auto Care?

20  A.   1985 Buick LaSabre.

21  Q.   I'm going to show you what's been marked for

22  identification purposes Government's Exhibit 57J.  Direct your

23  attention to the top of that page.  Do you recognize the name

24  and address at the top of 57J?

25  A.   Yes.  Keshia Burris, 7606 Waterford Lake Drive.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1          MS. MARSTON:  At this time the government moves into
2    evidence 57J.
3          THE COURT:  Any objection?
4          MR. CULLER:  No.
5          THE COURT:  Let it be admitted.
6          (Government's Exhibit Number 57J was received into
7    evidence.)
8    Q.   And what car is being serviced on this particular date at
9    Precision Auto Care?
10   A.   '98 Honda Civic.
11   Q.   Did you ever see either that Buick or this Honda?
12   A.   Yes.
13   Q.   When would you see those vehicles?
14   A.   Tracy -- those were Tracy's cars.
15   Q.   I believe this is already in evidence, Government's
16   Exhibit 57P.  Showing you Government's Exhibit 57P.  Do you
17   recognize Government's Exhibit 57P?
18   A.   Yes.
19   Q.   And how do you recognize it?
20   A.   Sales slip from the apartment, from the bag in the
21   apartment.
22   Q.   Now, was there more than one sales slip in the bag in the
23   apartment?
24   A.   Yes.
25   Q.   Approximately how many sales slips like this were in a

2114

EUGENE LEWIS - DIRECT

1    bag in the apartment at Hanover Landing when you were staying

2    there?

3    A.    Two.

4    Q.    I'm going to show you what's already been introduced into

5    evidence as Government's Exhibit 57Q.  Is this the other sales

6    slip that you recall being there?

7    A.    Yes.

8    Q.    And what did you know both Fantasia and Discreet Delight

9    to be?

10   A.    Escort services.

11   Q.    I'm also going to show you what's already been introduced

12   into evidence as Government's Exhibit 57R.  Do you recognize

13   that?

14   A.    Yes.

15   Q.    How do you recognize that?

16   A.    It's a card from One Enterprise.

17   Q.    And why did you see this card?

18   A.    It was in the apartment.

19   Q.    I'm also going to show you what's already been introduced

20   into evidence as Government's Exhibit 57C.  Do you recognize

21   Government's Exhibit 57C?

22   A.    Yes.

23   Q.    How do you recognize that?

24   A.    It's an electronic scale.

25   Q.    And did you ever see this electronic --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    A.    The operator's manual.

2    Q.    I'm sorry.  Did you ever see this scale other than the

3    warranty manual?

4    A.    No.

5    Q.    Did you ever have a need for a scale when you were

6    selling?

7    A.    Yes.

8    Q.    Defendant Tracy -- and what kind of scale did you have?

9    A.    It was a smaller foldup scale.  It -- it was a digital

10   scale that Tracy would drop off sometimes.  If he didn't have

11   time to package everything up, he'd send me enough to make the

12   $500 package and I would cut it up and use the scale to weigh

13   it out.

14   Q.    And how would you -- what would you use to cut it up?

15   A.    A razor or a toothpick or needle or something.

16   Q.    I'm going to show you Government's Exhibit 57F.  Do you

17   recognize 57F?

18   A.    Yes.

19   Q.    How do you recognize it?

20   A.    The package for the type of scale that he would give me

21   to use.

22            MS. MARSTON:  Your Honor, may I approach?

23            THE COURT:  You may.

24            MS. MARSTON:  Is 49G in evidence, please?

25            THE CLERK:  Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1    Q.    I'm going to show you what's already been introduced into

2    evidence as Government's Exhibit 49G.  Do you recognize

3    Government's Exhibit 49G?

4    A.    Yes.

5    Q.    Does it look like the scale you were sometimes given to

6    use?

7    A.    Yes.

8    Q.    I'm going to open up 49G.  Can you tell the jury based on

9    your experience in packaging dope using a scale like this what

10   that looks to be.

11   A.    Residue.

12   Q.    Residue from what?

13   A.    Crack cocaine or cocaine.  Whatever was on the scale.

14   Q.    I'm also going to show you what's been marked for

15   identification purposes as Government's Exhibit 57H.  Do you

16   recognize Government's Exhibit 57H?

17   A.    Yes.

18   Q.    Now, do you recognize the name on Government's Exhibit

19   57H?

20   A.    No.

21   Q.    Have you ever heard of that -- have you ever met a person

22   named Lionel Anthony?

23   A.    No.

24   Q.    And how do you recognize this piece of paper?

25   A.    It was a stub that was found in the apartment.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1          MS. MARSTON:  At this time the government moves into
2     evidence Government's Exhibit 57H.
3          THE COURT:  Any objection?
4          MR. CULLER:  No.
5          THE COURT:  Let it be admitted.
6          (Government's Exhibit Number 57H was received into
7     evidence.)
8     Q.   Now, I'm also going to show you what's been marked for
9     identification purposes as Government's Exhibit 57B.  Do you
10    recognize Government's Exhibit 57B?
11    A.   Yes, a key tag for a Jaguar sedan.
12    Q.   Now, did you know anyone to be driving a Jaguar at this
13    point in time?
14    A.   Not at that point in time, but I knew that David owned
15    one before.
16         MS. MARSTON:  At this time the government moves into
17    evidence Government's Exhibit 57B.
18         MR. ADOLF:  Your Honor, objection to the basis of
19    his knowledge of what David owned.  There was no foundation
20    laid for that.
21         THE COURT:  I'll overrule that.  With respect to the
22    exhibit, is there an objection to the introduction of the
23    exhibit?
24         MR. ADOLF:  No.
25         THE COURT:  Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1              (Government's Exhibit Number 57B was received into

2    evidence.)

3    Q.    Now, while you were out at Little Mexico, did you ever

4    have anybody as a lookout?

5    A.    Yes.

6    Q.    Can you explain to the jury what a lookout is.

7    A.    Person that keeps his eyes open for the police or people

8    that might come to rob you or something of that nature.

9    Q.    And what do lookouts do?

10   A.    Sit in the spot and watch whatever area you told them to.

11   Q.    And what did they use to help with that?

12   A.    Sometimes -- after a while we started using two-way

13   radios.

14              MS. MARSTON:  Your Honor, may I approach?

15              THE COURT:  You may.

16   Q.    I'm going to show you what's been marked for

17   identification purposes as Government's Exhibit 43T.  Do you

18   recognize what's in 43T?

19   A.    Yes.

20   Q.    Do those look like the two-way radios that you used at

21   one point in time?

22   A.    Yes.

23              MS. MARSTON:  At this time the government moves into

24   evidence Government's Exhibit 43T.

25              THE COURT:  Any objection?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1          MR. CULLER:  No.

2          THE COURT:  Let it be admitted.

3          (Government's Exhibit Number 43T was received into

4  evidence.)

5  Q.    Now, can you explain to the jury how you would use or how

6  your lookout would use these two-way radios.

7  A.    We wouldn't talk on them too much.  We would just click

8  it and it would beep on the other side to let you know that

9  you were being called.  And if it was the police coming into

10 the -- into the complex, then you would beep it two times and

11 repeatedly until I answered back and then you would stop

12 transmission.

13 Q.    And why did you use that signal method instead of just

14 talking?

15 A.    Because sometimes they would scan -- you know, police

16 scan the radios or their radios just to hear any frequencies

17 open.

18 Q.    Now, you mentioned there was a point in time that you saw

19 Oscar with a gun.  When did you see Oscar with a gun?

20 A.    When I first moved in Little Mexico.  I didn't see him

21 with a gun; he told me he had one.

22 Q.    Well, why did he tell you he had a gun?

23 A.    He just told me he kept one --

24        MR. BROWN:  Objection.  That calls for speculation.

25        THE COURT:  Sustained.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

333

EUGENE LEWIS - DIRECT

1  Q.  What did defendant Oscar tell you about the gun?

2  A.  Told me that he kept it stashed inside of his own

3  mattress in a hole in his mattress.

4  Q.  And why was he giving you this information?

5  A.  I don't know.  Not for any reason in particular.  Just

6  talking, I guess.

7  Q.  Now, did you have an incident with a BB gun?

8  A.  Yes.

9  Q.  Tell us about that.

10 A.  In Hanover Landing we were -- I was there watching over

11 the girls, Cathy and Crystal, and Nick had left for a little

12 while.  And I was playing with the BB gun, shooting at birds

13 and dogs and stuff.  And a Mexican guy was walking into his

14 apartment and Cathy told me -- she dared me to hit him, and I

15 hit him with the BB gun in the ass.

16 Q.  And did you get in trouble for that?

17 A.  Almost.

18 Q.  Well, what do you mean by almost?

19 A.  The police took the gun and they were going to arrest me,

20 but they didn't.

21 Q.  I'm going to show you what's already been introduced into

22 evidence as Government's Exhibit 127.  Do you recognize the

23 title in Government's Exhibit 127, or the author?

24 A.  Yes.

25 Q.  How do you recognize the title or author?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   A.    It's Pimp written by Iceberg Slim.

2   Q.    And how do you know that book?

3   A.    I found it in -- in a first aid kit in the apartment

4   after Tray and everybody moved out.

5   Q.    Now, you just said Tray.  Who did you just call Tray?

6   A.    Tracy.

7   Q.    Have you ever read this book?

8   A.    Some of it.

9   Q.    You said you were watching over the girls at the

10  apartment.  What did you mean by that?

11  A.    Well, Nick said he had to go pick up something, so he

12  left me with the girls and he told me to keep an eye on them

13  so they don't do anything stupid --

14  Q.    Well --

15  A.    -- while he was gone.

16  Q.    -- what does that mean?

17  A.    Like run away or, you know, do something that they were

18  told not to do.  Anything of that nature.

19  Q.    Did you do that?

20  A.    Yes.

21  Q.    And what was Nick supposed to be doing with the girls

22  when he was around?

23  A.    The same thing, watching the girls.

24          MR. MACKEY:  Objection, calls for speculation.

25          THE COURT:  Overruled.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - DIRECT

1   Q.   And who was he watching the girls for?

2   A.   Tracy.

3   Q.   Now, have you had any contact with Nicholas Ragin since

4   you've been in jail?

5   A.   He tried to write me once -- he did write me once and

6   that was -- I never wrote him back.

7   Q.   Well, what did he ask you -- what did he write to you?

8   A.   It was a letter with a fictitious address, return address

9   on it.  And it was basically saying that, you know, we all

10  need to be quiet and don't cooperate and just, if we all be

11  quiet, then we won't -- y'all don't have any evidence on us

12  and nobody will go to jail except for Tracy.

13  Q.   What did he specifically ask you to do in that letter?

14  A.   He was trying to ask me to take back my statement.

15  Q.   You'd already given a statement to law enforcement at

16  that point in time?

17  A.   Yes.

18  Q.   Now, prior to coming to court today, you met with

19  detectives in reference to those statements you'd already

20  given; is that correct?

21  A.   Yes.

22  Q.   And you actually have met with me a couple of times.

23  A.   Yes.

24  Q.   At one point in time, did you not tell me the complete

25  truth?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2123

EUGENE LEWIS - DIRECT

1  A.   Yes.

2  Q.   And what was that about?

3  A.   The shoot-out.

4  Q.   And why did you hold back on the shoot-out?

5  A.   I was afraid I would be further enhanced as far as

6  sentencing.

7  Q.   About what?

8  A.   Being involved with guns.

9  Q.   Why did you decide to tell me about your involvement in

10 that shoot-out?

11 A.   I talked to my lawyer and he -- he advised me it would be

12 better for me to tell the whole truth rather than to hold

13 anything back.

14          MS. MARSTON:  Your Honor, if I may have a moment?

15          THE COURT:  You may.

16          (Counsel and the agent conferred.)

17          MS. MARSTON:  Your Honor, can I have a moment to

18 talk to counsel?

19          THE COURT:  You may.

20          (Counsel conferred.)

21          MS. MARSTON:  Your Honor, I don't know if this would

22 work with the court's schedule, but if the court would be

23 willing, if we could have a brief break for the afternoon

24 right now so counsel and I can address an issue with you.

25          THE COURT:  That would be fine.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

337

EUGENE LEWIS - DIRECT

1          Members of the jury, we'll take our afternoon break
2     at this time.  I'd ask you to be ready to come back into court
3     at 3:45.
4          (Jury exited the courtroom.)
5          THE COURT:  You mean with counsel, right?
6          MS. MARSTON:  I don't know whether he has any issues
7     about something we've previously addressed with you.
8          THE COURT:  What I'm trying to figure out is whether
9     we need to be in session to resolve that or not.
10         MR. CULLER:  If I can find out first --
11         THE COURT:  Why don't we do this.  Let's recess
12     until 3:45.  If there's something to take up at that point in
13     time, we can take it up then.
14         MS. MARSTON:  Yes, Your Honor.
15         MR. CULLER:  Yes, sir.
16         (Brief recess at 3:32 p.m.)
17         THE COURT:  Anything we need to take up before the
18     jury comes back?
19         MS. MARSTON:  No, Your Honor.
20         MR. CULLER:  No.
21         THE COURT:  Let's call the jury.
22         (Jury entered the courtroom.)
23         THE COURT:  Ms. Marston, you may continue.
24         MS. MARSTON:  No further questions.
25         THE COURT:  Any cross?

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MR. CULLER:  Yes, sir.  Thank you.

2                      EUGENE LEWIS

3                   CROSS EXAMINATION

4    BY MR. CULLER:

5    Q.   Sir, is your name Eugene Lewis; is that right?

6    A.   Yes, sir.

7    Q.   Sir, if I could, I'd like to get a few dates straight

8    with you, if I could.

9    A.   Yes, sir.

10   Q.   Let me just check with you.  You said that you grew up in

11   New Jersey; is that right, sir?

12   A.   Yes, sir.

13   Q.   You got through the eighth grade; is that correct?

14   A.   Yes, sir.

15   Q.   And you came to North Carolina when you were 18 years of

16   age?

17   A.   Yes, sir.

18   Q.   What year would that be, sir?

19   A.   '98.  The end of '98.

20   Q.   And I think you said that you were living in the streets

21   at that time; is that right?

22   A.   Yes.

23   Q.   When you first came to North Carolina, right?

24   A.   When I was in North Carolina, I wasn't.  When I was in

25   New Jersey, I was.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Q.    Oh, I'm sorry.  I must have somehow gotten that mixed up.

2    I thought you said you were 18 and came to North Carolina.

3    Then you were living in the streets and you needed to get out,

4    so you lived with your aunt.

5    A.    No.

6    Q.    Do you remember saying that?

7    A.    What I said was when I was in New Jersey, I was living in

8    the streets and selling drugs and robbing people and I had an

9    opportunity to leave New Jersey, so I came to North Carolina

10   to stay with a friend of mine.

11   Q.    I apologize.  And then when you were living in the

12   streets, were you less than 18 years of age?

13   A.    Yes.

14   Q.    What time frame were you living in the streets?

15   A.    Since I was about 17.

16   Q.    For about a year, two years.

17   A.    Yes.

18   Q.    And you were selling crack, marijuana, acid, whatever you

19   could get your hands on?

20   A.    Whatever I could get my hands on, basically.

21   Q.    Fair to say you pretty well knew the business before you

22   ever came to North Carolina, right?

23   A.    Yes.

24   Q.    All right.  Then there was -- you went to Chicago at some

25   point, I heard you say, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   Yes.

2   Q.   And then you got into the army?

3   A.   Yes.

4   Q.   Sir, did you tell them about your drug dealing and your

5   drug usage?

6   A.   I told them that I used drugs before when I went in the

7   military.

8   Q.   So you told the army everything.

9   A.   Yes.

10  Q.   Told them you were a drug dealer.  Told the army you were

11  a drug dealer.

12  A.   They didn't ask if I was a drug dealer.

13  Q.   You didn't tell them that, of course --

14  A.   No, I didn't.

15  Q.   -- right?

16  A.   It wasn't necessary.

17  Q.   It wasn't in your interest to tell them.

18  A.   If they asked, I would have told them, but they never

19  asked.

20  Q.   Then I think you said it was March of 2002 your asthma is

21  what ended your army career.

22  A.   March of 2002 is when I went into the army.

23  Q.   I apologize.  How long were you -- you were in there for

24  eight months; is that right?

25  A.   About -- I left around November of 2002.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Q.    So from March to November 2002; is that right, sir?

2    A.    Yes.

3    Q.    And it was asthma that caused you to leave; is that

4    right?

5    A.    Yes.

6    Q.    Then when you finished your time in the army, you came

7    back to North Carolina?

8    A.    I went to New Jersey where my family was.

9    Q.    How long did you stay in Jersey?

10   A.    For a few weeks.

11   Q.    Where did you go from Jersey?

12   A.    To North Carolina.

13   Q.    And was that back to the friend that you knew down here?

14   A.    No, I moved down here with my wife and my son.

15   Q.    I'm sorry, that's right.  You had married by then.  I

16   forgot, I apologize.

17   A.    Yes.

18   Q.    What was your wife's name?

19   A.    Felicia.

20   Q.    Did she take your last name?

21   A.    No.

22   Q.    What was her last name?

23   A.    Clinkscales.

24   Q.    You might need to spell that.

25   A.    C-l-i-n-k-s-c-a-l-e-s.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Q.    And you had one child by her.

2    A.    At that time, yes.

3    Q.    Have you had more children --

4    A.    Yes.

5    Q.    -- with her?

6          How many children do you have with her?

7    A.    Two.

8    Q.    And what are their first names and ages, please?

9    A.    XXXXX and XXXXX.

10   Q.    How old is the first child?

11   A.    He's three now.

12   Q.    And how old is the second child?

13   A.    Two years old.

14   Q.    Then the first child was born in 2003; is that right?

15   Have I gotten my addition correct?

16   A.    Yes.

17   Q.    Then 2003 you were still with your wife, right?

18   A.    No, the first child was born in 2002.

19   Q.    I'm sorry.  Well, the second child was born in 2003,

20   then.

21   A.    Yes.

22   Q.    So in 2003 you were still with your wife.

23   A.    Yes, when my child was born.

24   Q.    And then there was a point following that that you and

25   your wife split; is that right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

343

EUGENE LEWIS - CROSS

1   A.   Yes.

2   Q.   It was at least -- it was after November 18, 2003, right?

3   A.   Yes.

4   Q.   And that's when you say you went on a binge; is that

5   correct?

6   A.   Yes.

7   Q.   Was the binge in 2003 or was it -- did you make it to the

8   new year before you went on the binge?

9   A.   It was after the new year.

10  Q.   So you're still with your wife until 2004, right?

11  A.   Some -- we were trying -- we were already separated, but

12  we were trying to work out our marriage through counseling --

13  Q.   Well --

14  A.   -- at the time.  We separated after the domestic violence

15  dispute in November.

16  Q.   Okay.  But you said you didn't start to binge until after

17  the first of the year, right?

18  A.   That was -- yes.

19  Q.   All right.

20  A.   After the marriage counseling was off.

21  Q.   And so that would be in 2004, correct?

22  A.   Yes.

23  Q.   And the binge consisted of you starting to drink a lot

24  and starting to use cocaine, right?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   Because you said you liked the way it made you feel.

2   A.   Yes.

3   Q.   I mean, you liked being numb at that point in your life,

4   right?

5   A.   I didn't want to feel what I was feeling, yes.

6   Q.   And were you working during that time?

7   A.   On and off, yes.

8   Q.   What job were you working in 2004?

9   A.   I was working for a company called Creative Contracting

10  Solutions.  They did landscaping, home improvement, painting,

11  things of that nature.

12  Q.   Was that full-time work?

13  A.   No, just odd jobs under the table.

14  Q.   In other words, you were just getting paid cash.

15  A.   Yes.

16  Q.   Weren't reporting tax, of course.

17  A.   Yes.

18  Q.   And in between working and avoiding the tax man, you were

19  doing your binging, right?

20  A.   Pretty much, sir.

21  Q.   Okay.  And then you said that there was a point in there

22  where you come to know Mr. Gore; is that correct?

23  A.   Yes.  I had met him before then, actually, one time at my

24  apartment before I had tried cocaine for the first time and he

25  had give me his phone number when I met him at his

Cheryl A. Nuccio, RMR-CRR (704)350-7494

345

EUGENE LEWIS - CROSS

1   apartment -- at my apartment.  And when I wanted cocaine that
2   time after, you know, when I started to go on cocaine, I had
3   his phone number and I knew where to get it from, so that's
4   where I looked -- that's where I called.
5   Q.   So that is, we know, sometime after January of 2004,
6   right?
7   A.   Yes.
8   Q.   Oh, you mentioned -- I heard you say something about
9   there was a -- there was a time when you started -- when you
10  started working for my client, I believe you said that David
11  Howard and Tracy Howard had a falling out before you started
12  working for Tracy Howard.  Is that what I heard you say?
13  A.   Yes.
14  Q.   Now, let me -- when you say a falling out, does that mean
15  they weren't together or they weren't being -- they didn't
16  have brotherly love, let's say; is that fair to say?
17  A.   Fair to say.
18  Q.   They weren't seeing each other every day; is that right?
19  A.   Basically.
20  Q.   They weren't speaking to each other; is that right?
21  A.   Yes.
22  Q.   And there was some real bad feelings; is that correct?
23  A.   Yes.
24  Q.   I mean, you were right there, weren't you?  At that point
25  you were right in the middle of it, weren't you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   I wasn't in the middle of it, but I was there.

2   Q.   I mean, you were -- you knew these people pretty well,

3   correct?

4   A.   I didn't know his brother.  I knew Tracy.

5   Q.   Well, from you knowing Tracy, you knew that he was not

6   happy with his brother; fair to say?

7   A.   Fair to say.

8   Q.   And he made it clear he was not talking with his brother,

9   right?

10  A.   Yes.

11  Q.   And that was before -- the falling out was before you

12  decided to work for Tracy, right?

13  A.   Yes.

14  Q.   $500 a day, right?

15  A.   Yes.

16  Q.   Right?

17  A.   $500 a week, sir.

18  Q.   A week, excuse me.  Apologize, that's correct.  $500 a

19  week was what he was paying you, correct?

20  A.   Yes.

21  Q.   $2,000 a month.

22  A.   Yes.

23  Q.   Twenty-four grand a year.

24  A.   If it would have lasted a year.

25  Q.   All tax free money, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   Yes.

2   Q.   Now, you also told us about a time in, I believe it was

3   September 21st, 2004, when you were caught by our fine officer

4   Darrin White --

5           MS. MARSTON:  Objection.

6           THE COURT:  Sustained.

7   Q.   Excuse me, by Officer White with an ounce and a half --

8   excuse me, 1-1/2 to 2 grams of crack; is that right?

9   A.   Yes.

10  Q.   Wasn't ounces, it was grams, right?

11  A.   Yes.

12  Q.   And you also had $208 cash on your person.

13  A.   Yes.

14  Q.   That was September 21, 2004; is that right?

15  A.   Yes.

16  Q.   And you said that Mr. Tracy Howard was in jail at that

17  time, right?

18  A.   Yes, he was.

19  Q.   And so he wasn't available to you at that point to get

20  drugs from, right?  If he's in jail.

21  A.   Yes.

22  Q.   And you explained to the jury how you were able to go

23  through Mr. Tracy and get to David Howard, right?

24  A.   Actually, what happened was David told me that he

25  contacted Tracy while he was in jail and Tracy gave David

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  permission to use me as a worker for him.

2  Q.   I see.

3  A.   At the time I still had some of Tracy's crack cocaine on

4  me, but I was -- I had sold most of it, so the crack that I

5  had -- the money that I had from Tracy, David took me to Tracy

6  mother's job to drop off the money to her.

7  Q.   Now, isn't there just one little problem with that

8  because what you told us was you didn't start working for

9  Tracy until after he and his brother weren't speaking to each

10 other.  Do you remember telling the jury that just a minute

11 ago?

12 A.   Yes.

13 Q.   Well, how is it possible for this transaction to occur?

14 A.   David lied to me, basically.

15 Q.   And you believed him?

16 A.   Yes.

17 Q.   David Howard comes up to you out of the blue.

18 A.   I knew David from Little Mexico so we kind of -- we

19 talked all the time, you know.

20 Q.   You just said a moment ago you didn't know David.

21 A.   No --

22 Q.   You just told the jury --

23 A.   -- I didn't know David when I met his brother.  I met

24 David in Little Mexico.

25 Q.   You just said I don't know David; I know Tracy.  That's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   what you said.

2   A.   No, sir.

3   Q.   Is it fair to say, sir, that now for what you told us to

4   be plausible and believable, we have to believe that David

5   Howard came to you right after -- right before you got

6   arrested and out of nowhere just comes up with this plan that

7   he's working with his brother now and he's going to -- he's

8   going to take care of his brother by using you; is that right?

9   A.   That wasn't his plan, sir.

10  Q.   Well, he came to you and offered his -- offered drugs to

11  you just out of nowhere, right?  You hadn't been dealing with

12  him, correct?

13  A.   Correct.

14  Q.   And you're just sitting there doing your thing.  You said

15  you already had drugs of Tracy's left with you, right?

16  A.   Yes.

17  Q.   You didn't need to buy anything from him.

18  A.   No.

19  Q.   Is it fair to say, sir, for this story to make any sense,

20  basically, we have to believe that this would just come out of

21  left field and that Mr. Howard would do this, Mr. David Howard

22  would do this without absolutely no reason whatsoever with

23  them not talking to each other.

24  A.   Apparently David knew that I was good at what I did and

25  he knew that I didn't come up short on money and he knew that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

350

EUGENE LEWIS - CROSS

1    I didn't, you know, run off with other people's money, so he

2    probably just wanted me to work for him because he saw it was

3    a good investment.

4            MR. ADOLF:  Move to strike.

5    A.    And he knew that his brother would be in jail for a

6    little while.

7            MR. ADOLF:  Move to strike that whole answer as just

8    pure speculation.

9            THE COURT:  Sustained.

10           MR. ADOLF:  Thank you.

11   Q.    All right.  So -- well, let me, if I could, sir, bring

12   your attention back to September 21st, what we were just

13   talking about.  Now, on that date you were -- you were taken

14   into custody by Officer White, right?

15   A.    Yes.

16   Q.    And you were charged with possession with intent to sell

17   and deliver cocaine, right?

18   A.    Yes.

19   Q.    And also, you were charged with second degree trespass.

20   A.    Yes.

21   Q.    And you were on Little Mexico property.

22   A.    Yes.

23   Q.    You had already been banned from Little Mexico.

24   A.    Not to my knowledge, no.

25   Q.    Well, for you to be guilty of second degree trespassing,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

351

EUGENE LEWIS - CROSS

1  don't they have to serve you with some notice?

2  A.   Sir, I wasn't found guilty.

3  Q.   I'm sorry.  And -- well, do you know how it was that the

4  officer came to understand that you were banned from the

5  property?

6  A.   No, sir.

7  Q.   Did the officer explain to you anything about that?

8  A.   No, sir.

9  Q.   Or why he was charging you with that offense?

10  A.   No, sir.

11  Q.   Did you ask him about it?

12  A.   No, sir.

13  Q.   Well, fair to say that by the time you got down to the

14  jail, you had already started asking for an opportunity to

15  meet with some agents, some investigators, right?

16  A.   No, sir.  The officer told me that some people wanted to

17  come see me and they would be coming to speak with me soon.

18  Q.   You know agent -- or I think it might be Detective

19  Maxfield with the violent crimes task force?

20  A.   Yes, sir.

21  Q.   I think it's Scott Maxfield; is that right?

22  A.   I'm not sure, sir.

23  Q.   You know who that is, though, right?

24  A.   Yes, sir.

25  Q.   Is he in the courtroom right now?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   Yes, sir.

2   Q.   And if his report indicates that -- that you indicated to

3   Officer White that you wanted to speak to the investigators,

4   if you said that to Officer White while he was bringing you

5   into the jail, that's what the report reflects, would that

6   mean they were wrong in the report?

7   A.   No, sir.  When I was put into the police car to be

8   brought to the jail, Officer White indicated that some people

9   wanted to speak to me.  When I got to the jail, I told him

10  that I wanted to speak to them and I asked him when would they

11  be coming to speak to me.

12  Q.   Then by your version it would be -- it would be Officer

13  White's idea to start with; is that right?

14  A.   Yes.

15  Q.   In any event, by -- let's see.  By the 22nd of

16  September -- excuse me, by the 23rd of September, Detective

17  Fish and Detective or Officer Maxfield were down there to meet

18  with you; is that right?

19  A.   Yes, sir.

20  Q.   And you were at the jail, right?

21  A.   Yes.

22  Q.   Now, they came in and you went in a -- kind of a larger

23  room where you could talk, right?

24  A.   Yes, sir.

25  Q.   And was it just the two of them or were there other

Cheryl A. Nuccio, RMR-CRR (704)350-7494

353

EUGENE LEWIS - CROSS

1  people there?

2  A.   Just the two of them.

3  Q.   Now, at that point you didn't have a nonattribution

4  agreement, right?

5  A.   No, sir.

6  Q.   You didn't have a plea agreement, right?

7  A.   No, sir.

8  Q.   Basically, you were just flying blind at that point,

9  correct?

10  A.   At that point I wanted to get some of this behind me.

11  Q.   Sure.

12  A.   All of it, really.  I was starting to have a conscience

13  in a sense.

14  Q.   And you wanted to just basically come clean and tell them

15  what you knew, right?

16  A.   Yes.

17  Q.   And of course, the -- you know, the officers told you,

18  they said, now, sir, you need to be truthful with us.

19  A.   Yes.

20  Q.   It's very important you tell us everything you know and

21  be as honest as you can, right?

22  A.   Yes.

23  Q.   And they told you that if you weren't honest with them,

24  that they were not going to be able to help you in your case,

25  right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  A.   Yes.

2  Q.   But they said if you were honest with them, they talked

3  about maybe they could work on your bond, right?

4  A.   No.

5  Q.   They didn't say anything about working on your bond for

6  you?

7  A.   No, sir.

8  Q.   Well, did they say they could try to provide the

9  information or let the prosecutors know that you had been

10 cooperative?

11 A.   Yes.

12 Q.   Is that what they said?  And they told you about how that

13 could be helpful to you, right?

14 A.   Said it possibly could, but there was no promise.

15 Q.   Sure.  But basically, they explained to you what the

16 process was, correct?

17 A.   Yes.

18 Q.   And you understood that if you were helpful to them, then

19 you could help yourself possibly, right?

20 A.   It was possible but not promised.

21 Q.   Well, they made it clear to you that if you didn't say

22 anything or didn't give up anybody, you were getting no help

23 from them.

24         MS. MARSTON:  Objection, asked and answered.

25         THE COURT:  Overruled.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   Right?

2   A.   Actually, it was more like if I didn't help them, then

3   there was -- I wasn't being charged with anything so there was

4   no need to be helped, in other words.  But they said any

5   information that I gave is voluntary and that it would help me

6   further on down the line.

7   Q.   You weren't being charged with anything?

8   A.   No.

9   Q.   Then they had you in the jail just for --

10  A.   No, I wasn't being charged by the U.S. government with

11  anything.  I was being charged with a state charge and they

12  couldn't help me with that case.

13  Q.   Oh.  And you didn't have any expectation you were going

14  to be charged in federal court?

15  A.   No.

16  Q.   You are charged in federal court, right?

17  A.   Yes, sir.

18  Q.   With a federal drug conspiracy; is that right?

19  A.   Yes, sir.

20  Q.   Do you know what a conspiracy is?

21  A.   Yes, sir.

22  Q.   What do you think it is?

23  A.   When you -- when you and -- when more than one person,

24  two, maybe three people are in agreement to do something

25  illegal.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  Q.   And how did you figure that out?

2       MS. MARSTON:  Objection.

3       THE COURT:  Sustained.

4  Q.   Well, let me ask it this way.  When did you learn this

5  information?

6       MS. MARSTON:  Objection.

7       THE COURT:  Sustained.

8  Q.   Where were you when you learned this information?

9       MS. MARSTON:  Objection.

10       THE COURT:  Sustained.  It's not relevant.  Move on,

11  counsel.

12  Q.   Now, you were in -- you're in the room with the

13  detectives and the first thing they start talking to you about

14  is like where you started from.  They wanted to start from the

15  beginning, right?

16  A.   Yes.

17  Q.   Kind of like we started, talking about the beginning,

18  correct?

19  A.   Yes, sir.

20  Q.   And they talked to you about -- you start telling them

21  about you were in New Jersey and, you know, that you were

22  in -- you moved to Charlotte when you were 18, right?

23  A.   Yes, sir.

24  Q.   And then you told them that you were experiencing

25  relationship problems in 2004 and as a result of that, you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

357

EUGENE LEWIS - CROSS

1  started using drugs; is that right?

2  A.   Yes, sir.

3  Q.   And you didn't -- you didn't go into detail with them

4  about your marriage --

5  A.   No, sir.

6  Q.   -- and any of that sort of thing.  You didn't go into

7  that with them, right?

8  A.   No, sir.

9  Q.   And you told them that in March or April of 2004, you met

10 Tracy Howard.

11 A.   Yes, sir.

12 Q.   Do you recall telling them that you knew he was a drug

13 dealer and that's why you approached him about buying drugs

14 from him?

15 A.   Yes, something of that nature.

16 Q.   Well, that's a lie, isn't it?

17 A.   No, sir.

18 Q.   Didn't you tell the jury this morning about John Gore?

19 A.   Yes, that's how I met him.

20 Q.   You told the officers that you knew that Mr. Howard was a

21 drug dealer and you just went and approached him and got drugs

22 from him and that's how you met him.

23 A.   No, sir.  I don't recall that.

24 Q.   If the report says that, that's wrong, right?

25 A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  Q.    So you lied to the officers.

2  A.    No, sir.

3  Q.    Did you -- let's do it this way.  You told the jury about

4  John Gore, right?

5  A.    Yes, sir.

6  Q.    John Gore was Mr. Howard's supplier, at least at one

7  time; is that correct?

8  A.    Yes, sir.

9  Q.    John Gore is a guy that you hung out with and partied and

10 used cocaine with, right?

11 A.    Yes, sir.

12 Q.    So he is a -- we got a picture of him.  We know who John

13 Gore is, right?

14 A.    Yes, sir.

15 Q.    You can identify him, right?

16 A.    Yes, sir.

17 Q.    You never said one word about John Gore to these

18 officers, right?

19 A.    No, sir.

20 Q.    Not one word.

21 A.    At the time I was afraid of John Gore so I didn't speak

22 about him.

23 Q.    Now, they told you to be honest and truthful and tell

24 everything you know, right?

25 A.    Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

359

EUGENE LEWIS - CROSS

1    Q.    And the most important thing is the key kingpin and you

2    don't even give them their name -- his name, right?

3    A.    Right, sir.

4    Q.    And at that time you felt it was in your interest to keep

5    quiet about that, so you did, right?

6    A.    I was afraid to speak about it so I didn't speak about

7    it, sir.

8    Q.    And -- excuse me.  Were you finished?  Sorry, were you

9    finished?

10   A.    Yes, sir.

11   Q.    And so you made up a story --

12   A.    No, sir.

13   Q.    Let me finish and then you can tell me I got it wrong,

14   okay.  Let me finish.

15         You made up a story about -- let's see, a fella named --

16   let me get it right -- Jay.

17   A.    Which is John Gore.

18   Q.    Yeah, you said Tracy Howard's cocaine supplier was a guy

19   he knew only as Jay.

20   A.    Yes, sir.

21   Q.    Right?

22         And you described a black male wearing braids and you

23   said he drove a Ford Mustang, right?

24   A.    Yes, sir.

25   Q.    Then you said that you would go through Nick to get to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Jay, right?

2    A.    I don't recall that, sir.

3    Q.    If it says in here, in this report --

4          THE COURT:    Counsel, I'm going to stop you there.

5    You can refresh his recollection with the report, but you

6    can't say what the report says.

7          MR. CULLER:    May I approach?

8          THE COURT:    You may.

9    Q.    Sir, if you would, just take a look at -- I'm sorry, let

10   me get you in the right place here.    Right here.    This one

11   sentence.    Just read it to yourself.    I tell you what, just

12   read that paragraph there because we're going to be talking

13   about it.

14         (Witness complied.)

15   Q.    Okay.    Are you finished?    This paragraph right here.    Are

16   you finished?

17   A.    Yes.

18   Q.    Okay.    All right.    Now, is it correct, sir, that -- or

19   did that refresh your recollection as to the words you used to

20   talk about Nick and Jay?

21   A.    Actually, at that time I wasn't even speaking about Nick,

22   so that might have been an error by the person that was

23   writing the notes.

24   Q.    Then -- okay.    It's an error.    Who were you speaking of?

25   A.    I was only talking about John and Tracy at that time.


          Cheryl A. Nuccio, RMR-CRR (704)350-7494



                              361

EUGENE LEWIS - CROSS

1   Q.   Well, this is talking about you could go through someone

2   to get in touch with Jay, right?

3   A.   I went through Jay to get in touch with Tracy.  I didn't

4   go through anyone to get in touch with Jay.  I already knew

5   where he was.

6   Q.   You always knew where John Gore was?

7   A.   Yes.

8   Q.   Well, it sounds like John Gore is the little guy.

9   A.   Excuse me?

10  Q.   It sounds like John Gore is the little guy.  If you don't

11  know where Tracy is but you know where John Gore is, sounds

12  like John Gore is the little guy and Tracy is the big guy.

13  A.   I didn't really know them to that nature.  I didn't know

14  Tracy to that nature at that time.  That's when I first

15  started buying small amounts of cocaine from Tracy.

16  Q.   Okay.  So this is, let's see, you say March, April,

17  and -- over what period of time are you like sort of getting

18  to know Tracy Howard and getting to know John Gore because you

19  don't really know either one of them, right?

20  A.   Around March.  Maybe end of February, March is when I

21  started actually hanging out with John.  Around -- around May

22  is probably when I start buying cocaine from Tracy.  But

23  before then I would see him at John's house buying cocaine.

24  On occasion I saw him cooking cocaine in John's house that he

25  had bought.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   Right.  Okay.  So you started buying from Tracy in May

2   2004?

3   A.   Yes.

4   Q.   All right.  So when do you move in?

5   A.   To Little Mexico?

6   Q.   Right.  Your 500 bucks a day guy -- or a week guy, sorry.

7   A.   Around the end of June.

8   Q.   So by July 1 you're in Little Mexico.

9   A.   Yes, sir.

10  Q.   July, August.  Two months.

11  A.   Yes, sir.

12  Q.   By September 16th he's in jail.

13  A.   Yes, sir.

14  Q.   We're talking about two months of you being Mr. Hole in

15  the Wall, right?

16  A.   Some of it was in that apartment and some of it wasn't.

17  Q.   Well, did I hear you say that you were there available

18  24/7?

19  A.   Yes, sir.

20  Q.   How long were you Mr. 24/7?

21  A.   For the entire two months.

22  Q.   All right.  So -- make sure we understand.  So from the

23  point that you become Tracy Howard's hole-in-the-wall man --

24  A.   Yes.

25  Q.   -- to the point that the hole-in-the-wall game ends --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    hole-in-the-wall game ends in September; is that right?

2    A.   Yes.

3    Q.   Okay.  So we go from July to September.  And all that

4    time you're staying, living --

5    A.   In Little Mexico.

6    Q.   -- in the hole in the wall, right?

7    A.   In between a couple of different apartments.  I changed

8    apartments three times.

9    Q.   And so in the two months, there's three moves?

10   A.   Yes, sir.

11   Q.   Actually, there's five moves, aren't there, because

12   there's two moves just in Little Mexico, right?  You say.

13   A.   That's where I lived, where I was at.  The other ones

14   were with Tracy and Nick and the girls.  I didn't move with

15   them.

16   Q.   Then you didn't live in these other apartments.

17   A.   Not until after all of this was over.  I lived in Hanover

18   Landing after everything was -- everything stopped after Tracy

19   moved out of the apartment in Hanover Landing.  I lived there

20   for maybe a few weeks and then we got indicted.

21   Q.   And then is it fair to say, sir, that all of your drug

22   activity that you're talking about that's conspiracy activity

23   had to be from between July and September of 2004; is that

24   right?

25   A.   Around the end of June to September of 2004.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

364

2151

EUGENE LEWIS - CROSS

1   Q.   Okay.  End of June.

2   A.   Yes.

3   Q.   Maybe three months at the most.

4   A.   Yes.

5   Q.   And all of that activity, you say, happened in Little

6   Mexico, right?

7   A.   Yes.

8   Q.   And so as far as these other apartments are concerned, I

9   mean, it's nice to know and it's helpful, I guess, but it

10  doesn't really tell us anything about drug activity because as

11  far as you know, it's going on right there in Little Mexico,

12  right?

13  A.   I mean, as far as drugs being stored in other apartments

14  and things of that nature, nah, I don't -- I'm not involved

15  with that.

16  Q.   Let me stop you a moment and ask you, did you have a

17  vehicle?

18  A.   Excuse me?

19  Q.   Did you have a car?

20  A.   Not my own.

21  Q.   So you did not have a car, right?

22  A.   No.

23  Q.   Then for you to get to Hanover Landing and for you to get

24  to Sailboat Bay, for you to get wherever you're talking about,

25  somebody has to drive you there, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  A.   Yes.

2  Q.   Who is your driver?

3  A.   Sometimes I would pay a crackhead to give me a ride or

4  sometimes Tracy would send Nick to pick me up and give me a

5  ride.  On two occasions -- no, on one occasion his mother came

6  and gave me a ride.  And other times I might catch the bus if

7  I had to go somewhere.

8  Q.   Well, it makes the bus driver a dealer, doesn't it?

9  A.   No, sir.

10          MS. MARSTON:  Objection.

11          THE COURT:  Sustained.

12  Q.   Well, let me stop you a minute and go back to this.  You

13  say that you're in this Little Mexico place and you're getting

14  rides from people to go to all these apartments.  Well, if

15  you're riding out and going somewhere, who's sitting in the

16  apartment with the hole in the wall?

17  A.   It's empty, sir.

18  Q.   And so you're not in there 24/7.

19  A.   When I'm available I'm there 24/7, unless something

20  happens.

21  Q.   But you're not available all the time, right?

22  A.   Yes.

23  Q.   Okay.  I mean, you're a human being.  You've got to sleep

24  some, right?

25  A.   Yes.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Q.    And you got to eat some, right?

2    A.    Yes.

3    Q.    Okay.  So you're not in there 24/7.

4    A.    I mean, unless I was going to get a haircut, going to buy

5    something to eat or unless there was a lot of police activity

6    in the area, I was there.

7    Q.    Then --

8    A.    So most -- just about most of the time I was in Little

9    Mexico.

10   Q.    Right.  So you're not in these apartments, these other

11   apartments a bunch of times.  You just happened to be in there

12   maybe one or two times in all this time.

13   A.    Which apartments are you speaking of, sir?

14   Q.    Before you move out of -- you know, in the three months

15   that we're talking about, okay.

16   A.    Yes.

17   Q.    Right.  You said three months is when this conspiracy

18   activity was taking place, right?

19   A.    The part I was involved in, yes, sir.

20   Q.    Yes, sir, three months, right.  You said all of it was

21   happening in Little Mexico, right?

22   A.    Yes, sir.

23   Q.    And if you're in Little Mexico doing the drug dealing,

24   your travels to these apartments during that three month

25   period, that didn't really have anything to do with what's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

367

EUGENE LEWIS - CROSS

1   going on at Little Mexico, does it?

2   A.   Sometimes, sir.  Actually, every time that I went to one

3   of the other apartments, it was because of a problem in Little

4   Mexico, sir.

5   Q.   Well, because there's a problem in Little Mexico doesn't

6   mean there's a drug deal in Sailboat Bay, though, is what I'm

7   saying, right?

8   A.   I've never indicated a drug deal in Sailboat Bay, sir.

9   Q.   Very well.  So all of this happened at Little Mexico,

10   right?

11   A.   Yes, sir.

12   Q.   Okay.  Now, in Little Mexico you were in three different

13   apartments; is that correct?

14   A.   Yes, sir.

15   Q.   And --

16   A.   Four, actually, sir.

17   Q.   I'm sorry?

18   A.   Four, actually.

19   Q.   Four apartments in three months, right?

20   A.   Yes, sir.

21   Q.   All of which you say Tracy Howard paid for, correct?

22   A.   Yes, sir.

23   Q.   Paid you $500 a week, correct?

24   A.   Yes, sir.

25   Q.   And then you say he was -- he was bringing how much --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  how much -- you said dope, crack, cocaine, whatever, how much

2  narcotic was he bringing to you, say, on a weekly basis?

3  A.   (No response.)

4  Q.   Say in money terms.  You've been doing it in money.  Say

5  in money terms.

6  A.   At least 5 to 8,000 dollars a week.

7  Q.   So 5 to 8,000 dollars a week worth of --

8  A.   On the low end.

9  Q.   Okay.  On the low end.

10  A.   On the high end maybe about 13 to 15,000.

11  Q.   And so you go from smoking, you know, a couple of crack

12  rocks with John Gore on the porch swing --

13  A.   No, sir.

14  Q.   -- to -- let me finish my question -- to handling from 7

15  to 12,000 dollars in good old American currency on a weekly

16  basis in a matter of a couple of weeks?

17  A.   No, sir.

18  Q.   Is that correct?

19  A.   At the time I didn't smoke crack when I was with John

20  Gore.  I snorted cocaine.

21  Q.   So -- I'm sorry.  Snorting cocaine with John Gore two

22  weeks before and two weeks later you're handling thousands of

23  dollars in a hole in the wall in a dirty, messy, nasty place

24  that nobody wants to live in, right?

25  A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   That's what you say happened.

2   A.   Yes, sir.

3   Q.   Do you recall telling the officers when you met with them

4   that you were turning over 14 to 15,000 dollars every week?

5   A.   Yes, sir.

6   Q.   Is that the correct amount, 14 to 15,000, not five to

7   eight on the low end, but it's 14 to 15,000 a week?

8   A.   Just an estimate, sir.  It's not exact.

9   Q.   Sure, I understand that.  But you're the one -- as we

10  hear it, you're there 24/7, right?

11  A.   Yes, sir.

12  Q.   You're the one they're giving the money to, right?

13  A.   Excuse me?

14  Q.   You're the one that the money is being handed to to get

15  the drugs, right?

16  A.   Yes, sir.

17  Q.   And -- I thought I heard you say that you would -- you're

18  on one side of the wall and somebody unknown is on the other

19  side, right?

20  A.   Yes, sir.

21  Q.   You don't give them the drugs first, do you?

22  A.   No, sir.

23  Q.   They have to put the money through the hole, right?

24  A.   Yes, sir.

25  Q.   And they will say dos or, you know, whatever, or two or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

370

EUGENE LEWIS - CROSS

1   something -- or a dime, right?

2   A.   Yes, sir.

3   Q.   What's dime in Spanish?

4   A.   Diaz, but people didn't come to me -- the Spanish people

5   didn't come to me when I was behind the wall.  I didn't get

6   too many people that didn't speak English.

7   Q.   You didn't deal with Hispanic people?

8   A.   They didn't come to me directly.  A lot of times the

9   Hispanic people will go to like prostitutes in the area and

10  get them to come to me or they would go to Oscar and Oscar

11  would come and he would buy from me and he would sell to them.

12  Q.   Well, I'm sure counsel will handle that part of the case.

13          MS. MARSTON:  Objection.

14          THE COURT:  Sustained.

15          MR. CULLER:  Apologize, Your Honor.

16  Q.   Let me stick to what we were just talking about.  Now,

17  this -- this hole-in-the-wall deal, to get to 14 to 15,000

18  dollars a week, you're getting -- a dime is $10, right?

19  A.   Yes, sir.

20  Q.   A twenty -- or excuse me, a dub is 20, right?

21  A.   Yes, sir.

22  Q.   Okay.  And a nickel is $5?

23  A.   We didn't sell nickels, sir.

24  Q.   Did not sell nickels.

25  A.   No, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   So tens, twenties, and what -- anything else?

2   A.   Grams, sir.

3   Q.   Grams.  How much is a gram?

4   A.   A gram is -- in cash wise?  $50, sir.

5   Q.   You had to think about that or...

6   A.   No, sir, I was wondering if you were speaking as far as

7   weight or cash, but never mind.

8   Q.   Did you take checks?

9   A.   No, sir.

10  Q.   Credit cards?

11  A.   No, sir.

12  Q.   So it's a cash business, is it not?

13  A.   Yes, sir.

14  Q.   So they handed -- they would hand you $10 or, say, $20

15  and they'd want two rocks, right?

16  A.   Yes, sir.

17  Q.   Or $20 for a twenty -- .2 rock, correct?  One rock that

18  weighed that much, right?

19  A.   No, sir.

20  Q.   So $20 is two rocks.

21  A.   $20 would get them .4 in weight.

22  Q.   Oh, I'm sorry, right.  He had the special dealski, right,

23  you were saying?

24  A.   Yes, sir.

25  Q.   Where he was giving away crack, is what you're saying,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

372

EUGENE LEWIS - CROSS

1  right?

2  A.   I guess you could say it like that, sir.

3  Q.   Well, do you say it like that?

4  A.   Yes, sir.  He was buying it -- I guess his prices that he

5  was getting it for, he could afford to do that.

6  Q.   Well, what was John selling it for?

7  A.   I'm not sure, sir.  That was between him and John.

8  Q.   Well, John's your bosom buddy.  You're over there hanging

9  out with him --

10        MS. MARSTON:  Objection.

11  Q.   -- snorting up crack -- or snorting cocaine, right?

12        THE COURT:  Overruled.

13  A.   That's not my business, though, sir.

14  Q.   Come on, I mean, you don't ask, hey --

15        THE COURT:  I'll sustain that on argumentative

16  grounds.

17  Q.   You did not ask him at any time --

18  A.   No, sir.

19  Q.   -- what the prices were.

20  A.   No, sir.

21  Q.   Not at all.

22        All right.  Well, do you have an idea how many dimes you

23  have to sell to get to $14,000 in a week?  Have you figured

24  that out?

25  A.   About 1400, sir.  Well, 140, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

373

EUGENE LEWIS - CROSS

1   Q.   Well, say 140.

2   A.   Yes, sir.

3   Q.   That's actually 1400.  You were right the first time.

4   A.   1400.

5   Q.   1400.  Do you have any idea how many people you're

6   talking about?

7   A.   Actually, the area was so fast paced, it was so much

8   traffic coming through there, I mean, 14 -- 1400 dimes to move

9   in a week wouldn't even seem like much if you just saw the

10  area.  That's not even to speak of other people that were

11  selling crack in the area.

12  Q.   Sir, you're talking about 20 percent of the city of

13  Charlotte is crackheads.

14  A.   No, sir.  I'm talking about the traffic that came through

15  that area.

16  Q.   Well, there must have been a lot of cars backed up down

17  the street to get that kind of traffic in that little hole in

18  the wall, right?

19  A.   No, sir.

20  Q.   Isn't what you really said, sir, is you talked about

21  maybe $1,400 in a week.

22  A.   Excuse me, sir?

23  Q.   It was never 14,000.  It was $1,400 at most in a week and

24  usually $500 at -- on most occasions, right?

25  A.   Actually, that was -- that was a daily scale.  That's how

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    much would come through in a day.

2    Q.    Was what, I'm sorry?

3    A.    Maybe 800 to 1,400 dollars a day.

4    Q.    All right.  Well, let's see.  So that now changes it to,

5    we'll take the average, say, a thousand dollars a day.  So now

6    we're down to 7,000 a week.  So you cut your numbers in half.

7    A.    Not necessarily, sir.  Some weeks were better than

8    others.

9    Q.    So you're sticking with your numbers.

10   A.    Yes, sir.

11   Q.    Okay.  Would you agree that there was -- there was a law

12   enforcement presence in Little Mexico?

13   A.    Yes, sir.

14   Q.    I mean, you had to be concerned about police in your

15   business, right?

16   A.    Yes, sir.

17   Q.    And secrecy is a critical element of your game, right?

18   A.    Yes, sir.

19   Q.    And trust is also a pretty important element, isn't it?

20   A.    Somewhat, sir.

21   Q.    Well, I mean, you've got to trust the people you're

22   dealing with, don't you?

23   A.    No, sir.

24   Q.    No?

25   A.    Trust no one but yourself.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

375

EUGENE LEWIS - CROSS

1  Q.   Okay.  You don't think Tracy Howard had to trust you?

2  A.   No, sir.

3  Q.   Well, in any event, you -- one thing that you talked

4  about with Ms. Marston was the plea agreement that you signed.

5  A.   Yes, sir.

6  Q.   And you also signed something called a -- what's called a

7  nonattribution agreement, right?

8       Oh, before I do that, have you ever -- I'm just going to

9  show you, have you ever seen this handwritten document?  Can

10 you see it from here or do I need to approach?

11 A.   I can't see it from here.

12          MR. CULLER:  May I approach, Your Honor?

13          THE COURT:  You may.

14 Q.   Sir, let me show you what's been -- well, I haven't

15 marked this because I'm not sure I'm even going to use it.

16          THE COURT:  Well, let's go ahead and mark it.

17          MR. CULLER:  I'll mark it -- I'll do it right now,

18 Your Honor.  It will be TH Number 4.  I apologize, Your Honor.

19          THE COURT:  No problem.

20 Q.   Sir, showing you what's been marked as TH Number 4.  And

21 I think probably just looking at the first page, have you seen

22 this handwriting before or seen this page?

23 A.   Yes, sir.

24 Q.   Well, then, let's keep going.

25 A.   Yes, sir.  Yes, sir.  Yes, sir.  Yes, sir.  Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Yes, sir.

2    Q.    That's all.  You have seen that before.  Do you know what

3    they are, what those pages are?

4    A.    Just handwritten notes from an interview.

5    Q.    And there actually were two interviews; is that correct?

6    A.    Yes, sir.

7    Q.    One on the 23rd and one on the 28th, maybe; is that

8    right?

9    A.    I'm not sure, sir.

10   Q.    But two times --

11   A.    Sounds correct.

12   Q.    -- in September, right?

13   A.    Yes, sir.

14   Q.    And it was the same investigators that came both times,

15   right?

16   A.    Yes, sir.

17   Q.    And one of the officers, I think Detective Fish, was

18   actually writing out notes as y'all were talking, correct?

19   A.    Yes, sir.

20   Q.    And you had a chance to see them at some point; is that

21   right?

22   A.    Not -- I didn't read the notes, sir, no.

23   Q.    I mean, you saw that he was writing.

24   A.    But I saw them while he was writing them.  That's how I'm

25   familiar with them.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.    That's all I needed to know.  You haven't gone through

2   them and read them to yourself.

3   A.    No, sir.

4   Q.    Okay.  Have you ever -- did you ever read through your --

5   strike that.  Excuse me.

6         Did you ever read through the report that was generated

7   based on those notes?

8   A.    No, sir.

9   Q.    Now, anyway, I was talking about the plea agreement, sir,

10  and -- the one where you agreed that the drug quantity that

11  was reasonably foreseeable to you was between 50 grams and

12  150 grams.

13  A.    Yes, sir.

14  Q.    You would agree that you cannot get $14,000 from

15  50 grams, right?

16  A.    No, sir.

17  Q.    Now, this says that you signed your agreement back on

18  April 13th, about almost a year -- one day from a year, right?

19  A.    Yes, sir.

20  Q.    And that your attorney signed on here, too, right?

21  A.    Yes, sir.

22  Q.    And of course, you talked with your attorney about this

23  agreement before you signed it.  Of course, right?

24  A.    Yes, sir.

25  Q.    And you also had signed before that a nonattribution

Cheryl A. Nuccio, RMR-CRR (704)350-7494

378

EUGENE LEWIS - CROSS

1   agreement, right?

2   A.   Yes, sir.

3   Q.   And that was the agreement that basically granted you

4   immunity from prosecution for anything that you talked about

5   except for crimes of violence, correct?

6   A.   Yes, sir.

7   Q.   I was just checking to see where my -- or I can't put my

8   hands on my copy.

9            THE COURT:  Counsel, are you characterizing that

10  agreement accurately?

11           MR. CULLER:  Sorry.  The nonattribution agreement?

12           THE COURT:  Yes.

13           MR. CULLER:  I don't -- I didn't mean to say it

14  inaccurately.  If I did, Your Honor, I apologize.

15           THE COURT:  Let's have a side-bar.

16           MR. CULLER:  Oh, I...

17           (Side-bar conference as follows:)

18           THE COURT:  I interjected that question because I

19  read it differently on the screen and this is the second time

20  an attorney in this trial has characterized that letter

21  different from what I read and I have a Rule 611

22  responsibility to question.  That's why I interrupted and I

23  want to make sure, especially with lay witnesses, that if

24  we're interpreting legal documents, that we do it accurately.

25           MR. CULLER:  Absolutely.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1            THE COURT:  All right.

2            MR. CULLER:  It was my fault.

3            (End of side-bar conference.)

4            MR. CULLER:  Your Honor, I -- may we just briefly

5    address --

6            THE COURT:  You may.

7            MR. CULLER:  I don't want to make the same mistake

8    twice, I apologize.

9            (Side-bar conference as follows:)

10            MR. CULLER:  Is it because I didn't call it that?

11            THE COURT:  No, no, no, you referred to it as

12    transactional immunity.  When I read that letter --

13            MR. CULLER:  Use immunity.

14            THE COURT:  I believe the question was and you've

15    been granted immunity for everything except for crimes of

16    violence, and transactional immunity is a completely different

17    concept than use immunity and this witness shouldn't be

18    confused with --

19            MR. CULLER:  I understand now.  I didn't intend to

20    do that.  I don't actually think that quickly, Your Honor.  I

21    didn't even put that together.  So it wasn't intended at all.

22            THE COURT:  Very well.

23            MR. CULLER:  But I apologize.

24            THE COURT:  Thank you.

25            (End of side-bar conference.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

```
 1                    CROSS EXAMINATION (Cont'd.)
 2   BY MR. CULLER:
 3   Q.    Sir, I am holding your agreement requiring truthful
 4   disclosure and this particular copy is not signed by you.  Do
 5   you think you signed one of these at one point?
 6   A.    Yes, sir.
 7   Q.    Okay.  I just -- I wonder, the date that the prosecutor
 8   signed was December 8th of 2004.  Do you think you signed some
 9   time thereafter or shortly thereafter?
10   A.    Yes, sir.
11   Q.    Thank you.
12              MR. CULLER:  That was 95B for the record, Your
13   Honor.
14   Q.    And so from December or so of 2004, then you had that
15   agreement with the government.  Did you meet with them at all
16   from December until -- meet with the agents or anybody from
17   December until April when you signed the plea agreement?
18   A.    No, sir.
19   Q.    And there actually was another plea agreement filed; is
20   that right?
21   A.    I'm not sure, sir.
22   Q.    Do you remember a revised plea agreement in your case?
23   A.    Yes, sir.
24   Q.    Do you remember what the revision was?  Did it have to do
25   with anything about drug quantity or anything like that?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  A.   It put a cap on the drug quantity.

2  Q.   And so that was not in your original agreement.

3  A.   No, sir.

4  Q.   And I take it you and your attorney negotiated that after

5  signing the original agreement; is that right?

6  A.   My attorney brought it to my attention, sir, yes.

7  Q.   Yes, sir, I understand.  And so that was part of the

8  agreement that you had with the government, fair to say?

9  A.   Yes, sir.

10  Q.   And in return for that cap, as you say, from the

11  government --

12  A.   Yes, sir.

13  Q.   -- you were to do what?  What was your part of the deal?

14  A.   It wasn't a deal for putting the cap on the agreement.

15  Coop -- I was willing to cooperate with the government as a

16  part of signing my plea period.

17  Q.   Yes, sir.  And you understand that by cooperating with

18  the government, what can happen?

19  A.   I can possibly be assisted when it comes down to being

20  sentenced, but that's not promised.

21  Q.   Now, you have another woman in your life now, don't you?

22  A.   Excuse me, sir?

23  Q.   You have another woman in your life now, don't you?

24  A.   No, sir.

25  Q.   You haven't talked on the phone recently to a woman named

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    Crystal?

2    A.    No, sir, not recently.

3    Q.    Well, in the -- say in the last few weeks or months?

4    A.    No, sir.

5    Q.    Okay.  Have you talked on the phone to a female about

6    your future together?

7    A.    My wife, sir.

8    Q.    Oh, that's your wife.

9    A.    Yes, sir.

10   Q.    I'm sorry.  I got the impression that you -- that you had

11   divorced your wife; is that not true?

12   A.    I'm not divorced yet, sir.  I'm still legally married.

13   Q.    And so your first wife -- or your wife, excuse me, I'm

14   sorry, your wife has stayed with you all this time.

15   A.    No, sir.  We've been separated for about the last two

16   years or so.

17   Q.    Have you been talking to someone from the jail over the

18   phone and talking about that you need her, that you love her?

19   A.    In what time period, sir?

20   Q.    Since you've been in the jail.

21   A.    I was talking to Crystal Staton when I first got

22   arrested, but then I stopped communicating with her.

23   Q.    So it was Crystal Staton that you were talking to; is

24   that correct?

25   A.    When I first got arrested, yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  Q.    And you say you've quit talking to her.  Is that by your

2  choice?

3  A.    Yes, sir.

4  Q.    Okay.  Is that because she didn't -- well, strike that.

5  I won't ask that.

6       Anyway, all right.  Well, let's go back to your

7  agreement.  I was talking to you about the part of your

8  agreement where you have to cooperate or you can cooperate and

9  if you do so, there's a possibility your sentence could be

10 reduced, right?

11 A.    Possibly, sir.

12 Q.    And the person that makes the decision about whether or

13 not you have cooperated is who?

14 A.    The judge, sir.

15 Q.    Is it correct that the U.S. Attorney's Office has to make

16 the first motion?

17 A.    Yes, sir.

18 Q.    Okay.  So the first part of the equation as far as your

19 cooperation, the government has to agree that you have

20 provided substantial assistance before you can get --

21 A.    Yes, sir.

22 Q.    -- a reduced sentence; is that right?

23 A.    Yes, sir.

24          MR. CULLER:  Excuse me.

25          (Counsel and defendant conferred.)

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    BY MR. CULLER:

2    Q.   Let me direct your attention to something that you talked

3    about.  You mentioned that one of the apartments when you

4    were -- someone drove you over and you were able to go and see

5    that food saver --

6    A.   Yes, sir.

7    Q.   -- device.

8         Who drove you over that time, do you remember?

9    A.   Officer Fish and Officer Maxfield.

10   Q.   Oh, you took them over there after you had gotten in

11   trouble?

12   A.   That was after I went back to the apartment.

13   Q.   Right.  Okay.  But they drove you there.

14   A.   That day, yes.

15   Q.   Okay.

16   A.   They picked me up and drove me over there.

17   Q.   And did you take them in and show them the food server?

18   A.   I allowed them to search and they found the food saver.

19   Q.   It was hidden?

20   A.   It was in a cabinet --

21   Q.   Okay.  It wasn't hidden.

22   A.   -- in the kitchen.

23   Q.   So it wasn't out like it was being used.

24   A.   No, sir.

25   Q.   In any event, you talked about how you -- cocaine would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

385

1   be put in plastic bags; is that right?

2   A.   Yes, sir.

3   Q.   And then you put them in that vacuum thing and it would

4   suck all the air out, right?

5   A.   Yes, sir.

6   Q.   And make it -- make the package kind of hard.

7   A.   Yes, sir.

8   Q.   Now, you're talking about powder cocaine, aren't you?

9   A.   Yes, sir.

10   Q.   Okay.  So this is how you make powder cocaine hard, and

11   then you put it in the -- put it in the freezer and then it

12   really gets hard, right?

13   A.   Yes, sir.

14   Q.   Okay.  And that would be like a ball kind of size, right?

15   A.   Yes, sir.

16   Q.   It would look like a ball, right?

17   A.   Yes, or a small rock.

18   Q.   Right, just like you're showing.  Go ahead and show the

19   jury what you're talking about.

20   A.   It would make it like a rock (indicating).

21   Q.   Yeah.  And it would be powder cocaine, but it looked like

22   a rock.

23   A.   Yes, sir.

24   Q.   Okay.

25   Q.   In a plastic baggie thing, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    A.    Yes, sir.

2              MR. CULLER:  Excuse me.

3              (Counsel and defendant conferred.)

4              MR. CULLER:  Your Honor, I apologize.  Just one

5    moment.  Thank you, sir.

6              (Counsel and defendant conferred.)

7    BY MR. CULLER:

8    Q.    Do you recall that there was an apartment in Little

9    Mexico that had dogs in it?

10   A.    Yes, sir.

11   Q.    Do you recall what kind of dogs were in that apartment?

12   A.    Two pit bulls, sir.

13   Q.    And do you know whose dogs those were?

14   A.    Tracy's, sir.

15   Q.    And how long were they there?

16   A.    For about maybe a month and a half.

17   Q.    Okay.  And do you know who took them away from there?

18   A.    Tracy took them.

19   Q.    Okay.  When you came out -- sorry.

20         After Mr. Howard was in custody on September 16th, did I

21   understand at that point you had -- you had gotten an

22   apartment away from 301 Eastway, away from Little Mexico?

23   A.    No, sir.  Before -- while I was still in Little Mexico,

24   Tracy had the problem with the apartment in Sailboat Bay, the

25   domestic dispute.  And shortly afterwards he said he needed

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2174

EUGENE LEWIS - CROSS

1  another apartment and he wanted me to get one -- he wanted me

2  to find a girl to put it in her name, but we were having

3  issues with finding a girl to put it in her name.  So he asked

4  me if I could put it in my name, and we put the apartment in

5  Hanover Landing in my name.

6  Q.    And are you saying that was before he actually went into

7  custody; is that right?

8  A.    Yes, sir.

9  Q.    And did you move in to that apartment before he went into

10 custody?

11 A.    No, sir.

12 Q.    All right.  Then by the time he went into custody, did

13 you then move in shortly thereafter?

14 A.    After he had been released, sir.

15 Q.    So when you are arrested by Officer White on

16 September 21st, you're still living in Little Mexico at that

17 time?

18 A.    Yes, sir.

19 Q.    Was there ever a time after September 21 when you were

20 arrested that you lived in Hanover Landing?

21 A.    Yes, sir.

22 Q.    And for how long did you live there?

23 A.    Maybe a week and a half, two weeks, and then I got

24 indicted on this charge.

25 Q.    Yes, sir.  And you've been -- you haven't been out since

Cheryl A. Nuccio, RMR-CRR (704)350-7494

388

EUGENE LEWIS - CROSS

1  then, right?

2  A.    No, sir, not -- I was -- I was issued a bond after --

3  around the end of April, but the bond was under a stipulation

4  that I go into a treatment program or halfway house and the

5  jail had released me by mistake.  They weren't supposed to

6  release me because I didn't have a bed in the halfway house,

7  and I was told to turn myself in.  So the same day I got

8  released, I turned myself in.

9  Q.    Okay.

10          MR. CULLER:  Your Honor, if I can have just one more

11  moment.  Thank you.

12          THE COURT:  You may.

13          (Counsel and defendant conferred.)

14  BY MR. CULLER:

15  Q.    Did you know a fella named Alex Howard?

16  A.    No, sir.

17          MR. CULLER:  Your Honor, that's all.  Thank you.

18          THE COURT:  Mr. Adolf, do you have any cross?

19          MR. CULLER:  I do, Judge.

20                        CROSS EXAMINATION

21  BY MR. ADOLF:

22  Q.    Mr. Lewis, you said that when you began buying cocaine,

23  you were buying an eight ball at a time.

24  A.    Sometimes an eight ball.  Sometimes a half eight ball.

25  Q.    And that was just for your own personal use, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

389

EUGENE LEWIS - CROSS

1   A.    Personal use.  Sometimes -- well, either -- both,
2   actually:  To sell and to use.
3   Q.    So what you would do is you would get an eight ball and
4   you'd sell a little bit of it in order to just pay for it,
5   basically, and then use what was left.
6   A.    Yes, sell enough to re-up.  Enough to have a little
7   change in my pocket and then use what was left.
8   Q.    And an eight ball -- the reason it's called an eight ball
9   is because it's an eighth of an ounce; is that right?
10  A.    Yes, sir.
11  Q.    That's 3-1/2 grams, right?
12  A.    Yes, sir.
13  Q.    And you said you were buying that a couple times a week?
14  A.    Yes, sir.
15  Q.    The prosecutor asked you some questions about Kelly
16  Roland and when she was beaten up.
17  A.    Yes, sir.
18  Q.    Do you recall that?
19  A.    Yes, sir.
20  Q.    And you said there was some folks out there who were
21  staying in Little Mexico who helped her out and, in fact, got
22  her, I think you said -- got her into an apartment and kept
23  her there until the ambulance came; is that right?
24  A.    Yes, sir.
25  Q.    Wasn't one of those people David Howard, in fact, sir?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  A.   I'm not sure, sir.

2  Q.   You don't recall who those folks were?

3  A.   No, sir.

4  Q.   Now, you told -- you told us that when you talked to the

5  detectives and again when you talked to even the prosecutor,

6  you never said anything about this shoot-out that you were

7  involved in; is that right?

8  A.   I spoke about it limitedly, sir.

9  Q.   But you didn't let them know exactly how guilty you were

10 in that whole situation; is that right?

11 A.   No, sir, not until later on.

12 Q.   And the reason was because you were aware that having

13 guns is treated very seriously by the federal government,

14 right?

15 A.   Yes, sir.

16 Q.   And you knew that using them made the charge even more

17 serious; isn't that right?

18 A.   Yes, sir.

19 Q.   Now, you told us about when you got arrested on

20 September 21st, 2004, right?

21 A.   Yes, sir.

22 Q.   And it was Officer Darrin White that arrested you, right?

23 A.   Yes, sir.

24 Q.   And he told you what the deal was which was that if you

25 could get him somebody who's higher up the chain than you,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  then you could get helped out, correct?

2  A.   No, sir.

3  Q.   He never mentioned anything like that to you?

4  A.   No, sir.

5  Q.   Well, didn't you tell him after you two spoke that you

6  had information about Tracy Howard supplying cocaine to you?

7  A.   I don't -- I don't recall actually telling him that, sir,

8  no.

9  Q.   Would it refresh your recollection if I showed you what

10 counsel showed you earlier, the report that the detectives

11 over there wrote about that date?

12 A.   Yes, sir.

13         MR. CULLER:  May I approach the witness, Your Honor?

14         THE COURT:  You may.

15 Q.   If you could just read the first two sentences to

16 yourself.

17         (Witness complied.)

18 A.   Yes, sir.

19 Q.   Do you now recall that, in fact, you told Officer White

20 that you had information about Tracy Howard supplying cocaine

21 to you and that you wanted to talk to a detective about it?

22 A.   Yes, sir.

23 Q.   And a couple of days later, those detectives that you

24 were looking to talk to showed up; isn't that right?

25 A.   Yes, sir.

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   And you knew at that point that you needed to do whatever

2   you needed to do to possibly help yourself, right?

3   A.   No, sir.

4   Q.   No?

5   A.   No.

6   Q.   They let you know that what -- if you gave them

7   information, that might be of some benefit to you in the

8   future, right?

9   A.   Not exactly.  They told me that if I helped them -- if I

10  spoke to them and told them what was -- what happened, that

11  they may be able -- it may help me and they may not be able to

12  do anything for me at all.  It depends on the whole situation

13  and everything that happens.

14  Q.   They might not be able to do anything for you but they

15  might be able to do something for you, right?

16  A.   Yes, sir, it's possible.

17  Q.   But that depended on you being truthful with them, right?

18  A.   Yes, sir.

19  Q.   And telling them as much information you could tell them

20  in as much detail as you could tell them, right?

21  A.   Yes, sir.

22  Q.   That was a precondition of anything that they might or

23  might not do for you in the future, right?

24  A.   Yes, sir.

25  Q.   Now, I gather you don't recall every word that was said

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   back and forth to you --

2   A.    No, sir.

3   Q.    -- in that first interview, right?

4         Well, do you recall telling them that you grew up in

5   Newark, New Jersey, and you moved to Charlotte when you were

6   18 in 1998?

7   A.    Yes, sir.

8   Q.    Do you recall telling them that at that time when you

9   were arrested in September 2004, that you were working for a

10  Ronald Carson --

11  A.    Yes, sir.

12  Q.    -- a contractor?

13        And you gave them the phone number, correct?

14  A.    Yes, sir.

15  Q.    You -- told them that you first hooked up with Tracy --

16             MS. MARSTON:  Objection, Your Honor.  He's reading

17  from the report.

18             THE COURT:  Overruled.

19             MR. ADOLF:  Thank you, Your Honor.

20  Q.    You told them that you first hooked up with Tracy Howard

21  in April 2004, right?

22  A.    I told them that I first started buying cocaine from

23  Tracy Howard around that time, yes.

24  Q.    Right.  Well, the language that you used at the time was

25  that you hooked up with Tracy in April 2004, right?

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   Yes.

2   Q.   And that he would supply you with coke for personal use

3   at the time; is that right?

4   A.   Personal use and to sell, sir, yes.

5   Q.   Well, you didn't say that, did you?

6   A.   (No response.)

7   Q.   You didn't say that at the time, did you?

8   A.   I'm not exactly sure what I actually said, but...

9   Q.   Would it help you recall if I showed you the notes that

10  you previously took a look at and identified?

11  A.   Yes.

12          MR. ADOLF:  Judge, I'm not aware that those were

13  actually marked, but I've marked them as DH10, if I may show

14  that to the witness.

15          THE COURT:  Very well.  You may.

16          THE CLERK:  You already have a 10, Mr. Adolf.

17          MR. ADOLF:  Oh, I do?

18          I'm sorry, Judge.  I lost count.  I'll make that

19  DH11.  I apologize.

20  Q.   Mr. Culler showed you a document earlier that you, I

21  believe, identified as being the notes that detectives were

22  taking when they spoke to you that time, do you recall that?

23  A.   Yes.

24  Q.   And this is another copy of those same notes, is that

25  fair to say?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    A.    Yes.

2    Q.    Now, if you could just read the second paragraph to

3    yourself.  Take your time.  Tell me when you're done.

4          (Witness complied.)

5    Q.    Do you now recall that you told them that you were buying

6    1 gram about two to three times a week for personal use, sir?

7    A.    That's what the report says, but that's not what I recall

8    telling them, sir.

9    Q.    So you recall that the notes are wrong.

10   A.    Possibly, sir.

11   Q.    Well, you also told them that Tracy asked you if you

12   wanted to work for him and that -- put you in the apartment at

13   301 Eastway.  There was a hole in the wall.  You told them all

14   that, right?

15   A.    Yes, sir.

16   Q.    Told them you were selling tens and twenties and grams,

17   right?

18   A.    Yes, sir.

19   Q.    Got paid $500 a week, right?

20   A.    Yes, sir.

21   Q.    And you told them that he would pay another junkie to

22   watch over the other apartment; is that right?

23   A.    Yes, sir.

24   Q.    And you gave them the name of, I believe it's Chris.

25   A.    Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2183

EUGENE LEWIS - CROSS

1    Q.   Talked about how he resupplied you, right?

2    A.   Yes, sir.

3    Q.   That you were there 24/7.

4    A.   Yes, sir.

5    Q.   Right?

6         This went on for six weeks.  You told them that, right?

7    A.   Something to that nature, sir.

8    Q.   You told them that was around the time that you went from

9    snorting to smoking crack, right?

10   A.   Yes, sir.

11   Q.   You told them about another apartment in the same complex

12   that Tracy was renting; is that right?

13   A.   Yes, sir.

14   Q.   And you told them about how you watched over Kelly in the

15   apartment.

16   A.   Yes, sir.

17   Q.   There were other street dealers, right?

18   A.   Excuse me?

19   Q.   There were other street dealers that were involved,

20   right?

21   A.   Yes, sir.

22   Q.   And in fact, you listed for them a bunch of people who

23   you were also aware were working for Tracy, right?

24   A.   I'm not sure, sir.

25   Q.   Well, you told them about Oscar or Puerto Rico, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

397

EUGENE LEWIS - CROSS

1   A.   Yes, sir.

2   Q.   Told them about Nick, right?

3   A.   Yes, sir.

4   Q.   Told them that Keshia was working for Tracy and Ila in

5   the mother's escort service, right?

6   A.   Yes, sir.

7   Q.   And you also told them who the folks were who used to

8   come by and resupply you from time to time, right?

9   A.   Yes, sir.

10  Q.   You said that twice Ila had done that.

11  A.   Yes, sir.

12  Q.   You said that Keshia did that about two or three times a

13  week, right?

14  A.   Yes, sir.

15  Q.   Well, actually, you told them that Keshia and Little Red,

16  between them, were coming by about two to three times a week,

17  right?

18  A.   Sometimes both of them would come; sometimes Keshia would

19  be by herself.

20  Q.   Right.  You told them that; is that right?

21  A.   Yes, sir.

22  Q.   Told them about Nick coming over there about five to ten

23  times.

24  A.   Yes, sir.

25  Q.   Right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1          MS. MARSTON:  Objection, Your Honor.  The rule of

2    completeness, can he go ahead and talk about all parts of this

3    report?

4          THE COURT:  Overruled.

5          MR. ADOLF:  I can do that, Judge.  I don't know what

6    parts I've missed.

7          THE COURT:  Overruled.  I'm not interested in any

8    counsel reading a report.  Counsel can ask him if he told --

9    what he told the agents.

10         MR. ADOLF:  I understand.

11         THE COURT:  Very well.

12   Q.   Well, sir, isn't it true -- well, you gave them some

13   pretty good information; isn't that right?

14   A.   Yes, sir.

15   Q.   And that was your intention was to tell them everything

16   you knew, right?

17   A.   Yes, sir.

18   Q.   You did not say one word that first day about David

19   Howard, did you?

20         MS. MARSTON:  Objection.

21         THE COURT:  Overruled.

22   A.   I don't recall, sir.

23   Q.   Would it help your recollection if you could look through

24   those notes from that day?

25   A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1          MR. ADOLF:  I'm sorry, Judge, did I ask to approach

2    the witness?

3          THE COURT:  I don't know if you did or not, but you

4    may.

5          MR. ADOLF:  Thank you.

6    Q.   Showing you what's been previously marked as DH11.  You

7    just identified it.  I'd ask you to review those first three

8    pages --

9    A.   Yes, sir.

10   Q.   -- if you could.  Read through it, take your time; and

11   when you're satisfied that you've read it all, let me know,

12   all right?

13   A.   Yes, sir.

14   Q.   Thank you.

15         (Witness complied.)

16   A.   I'm finished, sir.

17         MR. ADOLF:  May I approach again, Your Honor?

18         THE COURT:  You may.

19   Q.   Isn't it true, sir, that that first day you did not say

20   one word about David Howard?

21   A.   Actually, he's mentioned twice in the report, sir.

22   Q.   And what is that?

23         THE COURT:  Well, whether he's mentioned in the

24   report or not is not an appropriate question so I'd ask you to

25   rephrase your question.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

400

EUGENE LEWIS - CROSS

1  A.  Yes, I did speak about David Howard twice that first day,
2  sir.
3  Q.  Okay.  Now, sir, I gather that you're referring to a
4  place in the notes that you just read where you saw David
5  Howard's name mentioned; is that right?
6  A.  Yes, sir, where I said that the first -- the first part
7  where I mentioned that him and Tracy had an argument,
8  disagreement and they fell out.  And the second time is when I
9  mentioned that I would buy cocaine from David once in a while.
10 Q.  Sir, I understand what you told them the second time you
11 spoke to them.  I'm still talking about the first time.
12 A.  Yes, sir, that's the -- I mentioned them in terms to how
13 I saw them in the report, sir.
14 Q.  Well, sir, isn't it true that -- let me back up.  I just
15 asked you to review the first three pages, the notes from that
16 first meeting, right?
17 A.  I'm not sure, sir.
18 Q.  So what you're saying is you read all these notes just
19 now; is that right?
20 A.  Yes, sir, I looked through it all.
21 Q.  Okay.  Well, isn't it true, sir, then, in the first
22 meeting, the notes of which are the first three pages I showed
23 you, there is no mention of David Howard because you did not
24 say anything about David Howard; isn't that true?
25 A.  Yes.  I wasn't asked anything about David Howard the

EUGENE LEWIS - CROSS

1  first meeting.

2  Q.   Well, let's see.  Were you asked --

3  A.   So I didn't mention him, no.

4  Q.   So you're saying that they asked you about Ila?

5  A.   Yes.

6  Q.   And they asked you about Oscar?

7  A.   No.

8  Q.   That was something you came up with on your own, right?

9  A.   That was information that was important pertaining to me,

10 yes.

11 Q.   Right.  And so --

12 A.   Me and David didn't really have too many times together.

13 I didn't deal with David until like the end of everything that

14 happened.  And at some point I would see him and buy cocaine

15 from him or I'd see him selling, you know, crack to other

16 people, but we weren't into any business transactions until

17 when Tracy got locked up.

18 Q.   Well, sir, the first time that you spoke to the police,

19 you didn't mention David at all, right?

20 A.   No.

21 Q.   Now, at some point the police decided they were going to

22 come back and talk to you again several days later, right?

23 A.   Yes.

24 Q.   And you were aware that was because they wanted to know

25 if you had any additional information, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    A.    Yes.

2    Q.    And you knew that the more information you provided them,

3    the more use you were going to be to them, right?

4    A.    Actually, on the first day we didn't finish the whole

5    interview.  We only spoke for maybe an hour or so and I had to

6    leave and they had to leave.  So they came back to finish the

7    interview.

8    Q.    But after talking to them for an hour and describing

9    everything that you've told us you've described, David Howard

10   never came up, right?

11   A.    No, sir.

12   Q.    Ila Howard came up, right?

13   A.    If I'm not mistaken, yes, sir.

14   Q.    Tracy came up?

15   A.    Yes, sir.

16   Q.    Oscar?

17   A.    Yes.

18   Q.    Keshia?

19   A.    Yes, sir.

20   Q.    Nick?

21   A.    Yes, sir.

22   Q.    Even Little Red --

23   A.    Yes, sir.

24   Q.    -- was part of that conversation, right?

25         And you talked about Little Mexico in that conversation,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

403

EUGENE LEWIS - CROSS

1   right?

2   A.   Yes.

3   Q.   And what all was going on with the drug dealing in Little

4   Mexico, right?

5   A.   With me, sir, yes.

6   Q.   With the hole in the wall, right?

7   A.   Yes.

8   Q.   All the money, the people coming and going, right?

9   A.   Yes.

10  Q.   Including that crackhead named Chris who was guarding the

11  other apartment.  That all came up, right?

12  A.   The lookout, yes, sir.

13  Q.   Nothing about David Howard, right?

14  A.   No, sir.

15  Q.   Now, they came back several days later and that was

16  because they wanted more information, right?

17  A.   Yes, sir.

18  Q.   And so you told them about Donna and you told them about

19  Crystal; is that correct?

20  A.   Yes, sir.

21  Q.   And you told them about Jay.

22  A.   Yes, sir.

23  Q.   And that Jay is Tracy's supplier, right?

24  A.   Yes, sir.

25  Q.   And you told them -- now, you did mention David the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

404

1  second time, right?

2  A.  Yes, sir.

3  Q.  And this time it was that David and Tracy had gotten into

4  an argument over a storage unit, right?

5  A.  Yes, sir.

6  Q.  Nothing about any dealings between David and Tracy as far

7  as drugs were concerned, right?  You didn't tell them anything

8  about that.

9  A.  No, sir.

10  Q.  Now, you just told us a minute ago in response to one of

11  my questions that David sold -- that you bought both powder

12  cocaine and crack cocaine from David, right?

13  A.  No, I bought powder cocaine from David.  I just -- I've

14  seen him sell crack to other people in the area.

15  Q.  You're aware of the difference, right?

16  A.  Yes, sir.

17  Q.  Well, isn't it true that the only things that you said

18  about David all these times you were talking to all these

19  police officers was, number one, that you had heard that there

20  was a fight between him and his brother, right?

21  A.  I was -- I wasn't -- I wasn't within the exact area when

22  they fought, but I was there when they fought, yeah.

23  Q.  Okay.  So you knew about this fight.

24  A.  Yes.

25  Q.  And you said -- you told them that you would sometimes

Cheryl A. Nuccio, RMR-CRR (704)350-7494

405

EUGENE LEWIS - CROSS

1  purchase powder cocaine from David Howard, right?

2  A.   Yes.

3  Q.   That's all you had to say about him, right?

4  A.   Yes.

5  Q.   You didn't say anything about drug sales going on between

6  David and Tracy, right?

7  A.   Not at that time, no.

8  Q.   And you didn't say a word about any guns that you had any

9  knowledge of David having anything to do with; isn't that fair

10  to say, sir?

11  A.   No.

12  Q.   No?

13  A.   Oh, yeah.

14  Q.   Yes.

15  A.   Yes, sir.

16        MR. ADOLF:  Nothing further, Your Honor.  Thank you.

17        THE COURT:  Mr. Mackey.

18        MR. MACKEY:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20  BY MR. MACKEY:

21  Q.   Mr. Lewis, you stated earlier that you sold dope in New

22  Jersey; isn't that correct?

23  A.   Yes, when I was young.

24  Q.   Okay.  And then you sold dope when you moved to North

25  Carolina; isn't that correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   Yes, sir.

2   Q.   And you -- you stated on direct that you -- your -- you

3   have a strong belief that you can't trust anybody; isn't that

4   correct?

5   A.   Yes.  When you're dealing with something of that nature,

6   yes.

7   Q.   Okay.  So you would never trust a crack addict, would

8   you?

9   A.   No, sir.

10  Q.   Okay.  What about a dope dealer, would you trust a dope

11  dealer?

12  A.   No, sir.

13  Q.   Okay.  You're a dope dealer, aren't you?

14  A.   I was, sir, yes.

15  Q.   During that time that you're talking about you were,

16  weren't you?

17  A.   Yes, sir.

18  Q.   And you've shot at rival dope dealers, haven't you?

19  A.   Yes, sir, I've shot at people, fought people, yes.

20  Q.   And you've shot people before, haven't you?

21  A.   No, sir.

22  Q.   And you stated on direct that you guarded prostitutes.

23  A.   Yes, sir.

24  Q.   And shot a man with a BB gun, too, didn't you?

25  A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   And you smoked up the dope that you got that you were
2   supposed to sell, didn't you?
3   A.   No, sir.
4   Q.   You smoked dope with Kelly when you were supposed to be
5   selling dope, weren't you -- didn't you?
6   A.   I had money of my own, sir.  I've never smoked up
7   anyone's dope and not paid them for their money -- for their
8   work, sir.
9   Q.   Okay.  But you've told people that in the past, though,
10  haven't you?
11  A.   Excuse me?
12  Q.   You've told people in the past that you smoked the dope
13  that you were supposed to sell.
14  A.   Yes, sir.
15  Q.   But that was a lie, right?
16  A.   No, sir.
17  Q.   But so you did.
18  A.   Yes, but I paid for it.
19  Q.   Okay.  Now I'm confused.
20  A.   The dope that I was supposed to sell I smoked, but I
21  still paid for it so...
22  Q.   Oh, so you paid for it afterwards.
23  A.   Yes.
24  Q.   But you were supposed to sell it.
25  A.   Yes, sir.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494


                             408

EUGENE LEWIS - CROSS

1  Q.   Okay.  And Kelly smoked that dope with you, didn't she?

2  A.   Sometimes, sir.

3  Q.   Beg your pardon?

4  A.   Sometimes, sir.

5  Q.   And you've lied to the police, haven't you?

6  A.   Yes, sir.

7  Q.   And you lied to the army, didn't you?

8  A.   No, sir.

9  Q.   You didn't lie to the army?

10  A.   No, sir.

11  Q.   I thought earlier you stated that you lied about selling

12  dope?

13  A.   They never asked me about selling dope.  I didn't answer

14  questions about selling dope and I didn't implicate that I

15  sold dope.

16  Q.   They didn't ask you if you committed any crimes?

17  A.   They asked me if I been found guilty of any crimes, yes,

18  sir.

19  Q.   Oh, okay.  So they didn't want to know if you committed

20  any; they just wanted to know if you had been guilty of any.

21  A.   Yes, sir.

22  Q.   I see.  So you've lied to the jury today, haven't you?

23  A.   How so, sir?

24  Q.   That's a question.

25  A.   I don't understand the question.


                Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   You've lied today while on the stand to this jury,

2   haven't you?

3   A.   No, sir.

4   Q.   You haven't?

5   A.   No, sir.

6   Q.   Okay.  Well, explain this to me.  You stated on direct

7   that you stayed in Little Mexico 24 hours a day, seven days a

8   week; isn't that true?

9   A.   24/7 is a term of speaking, sir.

10  Q.   24/7, what does that refer to?

11  A.   In other words, it's like saying all the time.

12  Q.   All the time.

13  A.   Yes.

14  Q.   But that's not true, is it?

15  A.   It's not --

16  Q.   That's not true, is it?

17           MS. MARSTON:  Objection, argumentative.

18           THE COURT:  Sustained.

19  Q.   You did not stay in Little Mexico 24/7, did you?

20  A.   No, sir.

21  Q.   All right.  But that is what you stated earlier, isn't

22  it?

23  A.   Yes, sir.

24  Q.   All right.  You also stated that you were in Little

25  Mexico for about three months, isn't that what you stated on

Cheryl A. Nuccio, RMR-CRR (704)350-7494

410

EUGENE LEWIS - CROSS

1   the stand today?

2   A.   Just about, sir.

3   Q.   Okay.  But now, previously you told the police that it

4   was about six weeks; isn't that true?

5   A.   No, sir.

6   Q.   That's not what you stated before?

7   A.   Not that I recall, sir.

8   Q.   Okay.  If I showed you the notes from an interview that

9   you gave to the police, would that refresh your memory?

10  A.   Yes, sir.

11          MR. MACKEY:  May I approach, Your Honor?

12          THE COURT:  You may.

13  Q.   I'm going to show you what's marked as Defendant's

14  Exhibit NR1.  Now, you tell me if you recognize this.

15          THE COURT:  Well, the question is whether it

16  refreshes his recollection.

17          MR. MACKEY:  Exactly, Your Honor.

18  Q.   You tell me if this -- I'm going to show you a section of

19  this document and you tell me if this refreshes your memory at

20  all.  If you would read this to yourself.  Just this first

21  paragraph.

22          (Witness complied.)

23  A.   Finished, sir.

24  Q.   All right.  Does that refresh your memory?

25  A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   All right.

2   Q.   So you told the police previously that it was for six

3   weeks previously, didn't you?

4   A.   Actually, sir, if you look deeper into the report, what I

5   was saying was that I was in the apartment with the hole in

6   the wall for about six weeks and then after that I started

7   coming out and making hand-to-hand transactions; but I never

8   said that I left Little Mexico, sir.

9   Q.   So you're saying that the statements that you made

10   previously were true; is that correct?

11   A.   They may not have been totally accurate, but, yes, they

12   were true, sir.

13   Q.   So is there a difference between accurate and false?

14   A.   Yes, sir.

15   Q.   Okay.  So you were just being inaccurate when you made

16   the statements previously to the police.

17   A.   No, sir, I never said that.

18   Q.   Okay.  Now, earlier the -- Mr. Culler refreshed your

19   memory as to who your contact was to the drug supplier Jay.

20   Do you remember that?

21   A.   Yes, sir.

22   Q.   And you stated that it was not Nicholas Ragin, didn't

23   you?

24   A.   Yes, sir.

25   Q.   Is that true?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

412

EUGENE LEWIS - CROSS

1    A.   Yes, sir.

2    Q.   Okay.  But you stated in the past that it was Nicholas

3    Ragin, didn't you?

4    A.   Actually, sir, that may have been a misinterpretation of

5    what I was saying during the interview.

6    Q.   Okay.  I see.  I see.

7    A.   I didn't directly say that --

8         THE COURT:  Well, wait a minute.  Let him finish his

9    answer.  Go ahead.

10   A.   I don't recall saying that Nicholas Ragin was my contact

11   for John when I was being interviewed.

12   Q.   So are you saying that the notes that I'm reading from

13   and that I showed you as Exhibit -- Defendant's Exhibit NR1

14   are inaccurate?

15   A.   They may be, sir, yes.

16   Q.   If they stated that you said Nicholas Ragin was your

17   contact, would that be inaccurate?

18   A.   Yes, sir.

19   Q.   Okay.  You also stated that Nicholas Ragin -- on the

20   stand today you told the jury that Nicholas Ragin would bring

21   you dope two times a day; isn't that what you stated?

22   A.   Yes, sir.

23   Q.   Okay.  But in the report you didn't state that, did you?

24   A.   I'm not sure, sir.

25   Q.   Would it refresh your memory if I showed you the notes

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   again?

2   A.   Yes, sir.

3           MR. MACKEY:  May I approach, Your Honor?

4           THE COURT:  Yes.

5           Mr. Mackey, the question is not whether it's in the

6   report, but whether it refreshes his recollection as to what

7   he told the officers on that day.

8           MR. MACKEY:  Yes, Your Honor.

9   Q.   All right.  I'm going to ask you to read this exhibit,

10  Defendant's Exhibit NR1.  If you would read this to yourself

11  and tell me if that refreshes your memory as to what you

12  stated that day.

13          (Witness complied.)

14  A.   Okay, sir.

15  Q.   Does that refresh your recollection?

16  A.   Yes, sir.

17  Q.   All right.  So you didn't state previously in this

18  interview that he brought you dope two times a day, did you?

19  A.   In the actual interview what I said was maybe five to ten

20  times a week Nick would come see me.  Sometimes it was two to

21  three times a day, to be more accurate, on a daily basis.

22  Sometimes it was only once a day.  It just depended on how

23  often I needed crack.

24  Q.   Are you finished?

25  A.   Or I needed to re-up.  Yes, sir.

EUGENE LEWIS - CROSS

1    Q.   Now, that's not what it stated, is it?

2    A.   The report?

3    Q.   Yes.

4    A.   The report says five to ten times a week, sir.

5         THE COURT:  Counsel, it's not what the report

6    stated.  It's what he told the officer.  I wish you would ask

7    the question correctly.

8    Q.   So you didn't tell the officers that, did you?

9    A.   Yes, sir.

10   Q.   Yes what?

11   A.   That is what I told them, sir.

12   Q.   That he brought you dope five or ten times.

13   A.   A week.

14   Q.   Okay.  So if it says something different from that, you

15   would contend that it's inaccurate, wouldn't you?

16   A.   If it did say something different from that, sir.

17   Q.   Okay.  Now, you drove a Lincoln, didn't you?

18   A.   I didn't drive a Lincoln.  I bought one from one of the

19   crackheads in the area for like a half a gram and I gave the

20   car away.  I didn't have a license or anything.

21   Q.   So let me make sure I understand this correctly.  You

22   bought the Lincoln for some dope?

23   A.   Yes, sir.

24   Q.   But you never drove the Lincoln.

25   A.   No, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

415

 1   Q.    How did you get it from where you bought it back to your

 2   place?

 3   A.    I didn't have a place, sir.

 4   Q.    Well, you said you stayed in Little Mexico.

 5   A.    It was brought to me in Little Mexico.

 6   Q.    So if people saw you -- if people said that they saw you

 7   driving the Lincoln, they would be lying.

 8   A.    I mean, I might have started it up and drove it up and

 9   down the driveway to keep it running, but I never drove it

10   anywhere in particular.

11   Q.    You drove the Lincoln sometimes, that's true.

12   A.    Yeah, just to keep it running, you know, up and down the

13   driveway.  Start it up, move it.

14   Q.    So in other words, you just told another lie to the jury

15   when you said you never drove the Lincoln.

16           MS. MARSTON:  Objection.

17           THE COURT:  Sustained.

18   Q.    Now, you stated that you were a runner; isn't that

19   correct?

20   A.    No, sir.

21   Q.    Oh, that's right, you were not a runner.  You were a

22   manager; isn't that correct?

23   A.    A worker, perhaps.

24   Q.    Now, what is higher, the worker or the runner?

25   A.    The worker, I guess.

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   So the worker oversees the runner.

2   A.   Yes, sir.

3   Q.   Okay.

4   A.   If it was a chain of command to establish, I guess you

5   could say so.

6   Q.   Okay.  So have you ever had a job that wasn't selling

7   dope?

8   A.   Yes, sir.

9   Q.   And were you over other people or were they over you?

10  A.   I've been placed in management positions before.

11  Q.   And as a manager, did you oversee other people?

12  A.   Yes, sir.

13  Q.   Similar to the way the worker oversees the runner.

14  A.   Somewhat.

15  Q.   Okay.  So the worker would be a manager.

16  A.   You can call it that.

17  Q.   Okay.  And you said that Nicholas Ragin was hired by Ila

18  to drive; isn't that correct?

19  A.   No, Nicholas Ragin was hired by Tracy to drive.

20  Q.   Have you ever said that Nicholas Ragin was hired by Ila

21  to drive?

22  A.   No, not that I recall, sir.

23  Q.   So if other people testified that Nicholas Ragin was

24  hired by Ila to drive, would they have been lying?

25  A.   I'm not sure, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   So you don't know who hired Nicholas Ragin.

2   A.   According to what I know, Tracy hired Nicholas Ragin.

3   Whatever other people were told, I'm not held accountable for

4   that, sir.  I do not know.

5   Q.   So now, tell me exactly how did Tracy hire Nicholas?

6   Where were you when he hired him?

7   A.   I was still in Little Mexico.

8   Q.   So Nicholas Ragin came to Little Mexico and got hired by

9   Tracy?

10  A.   No, I don't know where they were when they established

11  their agreement, sir.

12  Q.   So you don't know who hired Nicholas, do you?

13  A.   According to what I was told, I know who --

14  Q.   But you don't know yourself who hired him, do you?

15  A.   I didn't see any --

16       MS. MARSTON:  Objection, asked and answered.

17       THE COURT:  Overruled.

18  A.   I didn't see any contract signed or anything, so I don't

19  know.

20  Q.   Okay.  So you -- all right.

21       Also, you stated that Nicholas Ragin would bring dope to

22  Little Mexico and drop it off.

23  A.   Yes, sir.

24  Q.   But previously you stated that Tracy, Keshia, and Ila

25  would bring the dope; isn't that correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

418

EUGENE LEWIS - CROSS

1    A.    On occasion.

2    Q.    And you never mentioned that Nick would bring any dope to

3    Little Mexico, did you --

4    A.    Yes, I did, sir.

5    Q.    -- until today.

6          Today was the first time, correct?

7    A.    No, sir.

8    Q.    But you didn't say that in your first contact with the

9    police, did you?

10   A.    I don't recall, sir.

11   Q.    Okay.  And you gave the money to the person that dropped

12   off the dope?

13   A.    Yes, sir.

14   Q.    And you never gave any money to Nicholas Ragin, did you?

15   A.    Yes, sir, I have.

16   Q.    And you stated today that you and Tracy shot at some

17   rivals; isn't that correct?

18   A.    Me, Tracy, and Nick, sir, yes.

19   Q.    Well, no, today you said that Tracy and Nick showed up.

20   Nick stayed at the apartment and you and Tracy went and

21   confronted the rivals; isn't that what you stated today?

22   A.    If you would allow me to.  The first time when --

23   Q.    The question is --

24          MS. MARSTON:  Objection.

25   Q.    -- isn't that what you stated today --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1        THE COURT:  Wait a second.

2   A.   I'd like to answer the question, sir.

3        THE COURT:  Mr. Mackey, you interrupted the witness.

4   Let him finish his answer and then ask another question.

5   A.   The first -- when Tracy and Nick first arrived, me and

6   Tracy approached -- first Tracy and Nick walked into the

7   apartment.  They had guns.  All right.  Tracy gave me a gun.

8   Nick and Tracy had a gun.  When we went outside, we approached

9   the guys that were out there and Tracy told them that they had

10  to leave because the spot was taken.  They -- one of the guys

11  said, Well, can't we talk about it?  And Tracy showed them the

12  gun and said, No, we can't talk.  You got to leave right now.

13  So he told the guy to walk off.  The guy started walking.

14  Tracy told him he needed to run.  He started jogging real

15  slow.  Tracy started shooting at him.  When the guy got to the

16  top of the entrance, he started returning fire.  I was on the

17  side of the building at that time.  I was watching from around

18  the side of the building because he told me to run around the

19  other side of the building and cut them off.

20       After the guy left, we went into the apartment and he

21  left me there with Nick, and Tracy drove off.  When -- about

22  an hour later some other guys came that resembled the same

23  dudes that was there the first time, and I told -- no -- I

24  told Nick they were out there.  Nick looked out the window and

25  saw them and he ran after the guys and started shooting at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

420

2207

EUGENE LEWIS - CROSS

1    them.  He just ran out the house and starting shooting and I

2    ran out behind him and I fired off the rest of the bullets

3    that was in the gun I had.

4    Q.    Are you finished?

5    A.    Yes, sir.

6    Q.    Okay.  Now, isn't it true that when you were first asked

7    about that, that you stated that Tracy and Nick showed up and

8    started shooting at the rivals?

9    A.    I'm not sure exactly --

10    Q.    Well, isn't it true --

11    A.    -- what I said, but it was something of that nature.  I'm

12    not sure if it was exactly that, but --

13    Q.    I'm sorry, I can't hear you.

14    A.    I'm not sure if it was exactly that, but it was something

15    to that nature, yes.

16    Q.    But it was something that was false, correct?

17    A.    It wasn't completely correct, no.

18    Q.    Okay.  Because you admitted today --

19    A.    That I lied --

20    Q.    Right.

21    A.    -- about that situation, yes.

22    Q.    Now, you also stated that Nicholas Ragin lived at Hanover

23    Landing.  Is that what you stated?

24    A.    Yes, sir.

25    Q.    Now, previously when asked about it, you stated that he

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   spent the night there sometimes; isn't that correct?

2   A.   Not that I recall, sir.

3   Q.   So you don't remember too much, do you?

4   A.   The interviews were over a year ago, sir.  I don't

5   remember verbatim every word that I said.

6   Q.   I see.  So was your memory refreshed before coming to

7   testify?

8   A.   No, sir.

9   Q.   Nobody talked to you at all before you came in here.

10  A.   They -- I was spoken to about what I remembered and what

11  happened.  But it wasn't like -- they didn't show me the

12  transcripts of the interview or anything and tell me this is

13  what you have to say, no.

14  Q.   Well, did they tell you what they were going to ask you

15  about?

16  A.   Yes.

17  Q.   And did you know all the answers?

18  A.   I answered the questions to the best of my knowledge,

19  sir.

20  Q.   And did they refresh your memory on the ones you couldn't

21  remember?

22  A.   On dates and times and things of that nature, yes.

23  Q.   Okay.  So there again, you're misleading this jury by

24  saying no one refreshed your memory before testifying today,

25  aren't you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   A.   I wasn't given complete knowledge of everything that's in

2   the reports, sir.  In other words, that's what I'm saying.

3   Q.   Now, you identified a receipt from Burlington Coat

4   Factory.  Do you remember doing that?

5   A.   Yes, sir.

6   Q.   And what was that a receipt for?

7   A.   I'm not sure, sir.  It was faded out.  I just know it was

8   in a bag of paperwork that was found in the apartment.

9   Q.   And did you find this paperwork?

10  A.   The police spotted the paperwork in the apartment when

11  they were searching.

12  Q.   And then they brought it to you.

13  A.   They showed it to me.  I identified it and they took it

14  out of the apartment.

15  Q.   Okay.  So you were in the apartment when they found it?

16  A.   With them when they found it, yes, sir.

17  Q.   And when they showed it to you, did you hold it?

18  A.   No, sir.

19  Q.   They held it for you?

20  A.   I looked at the papers that was in -- it was spread out.

21  I looked through the papers that were in the bag and then gave

22  it back.

23  Q.   So how long did you look at the receipt?

24  A.   A few seconds.

25  Q.   A few seconds.  And you have no idea what it was a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

423

EUGENE LEWIS - CROSS

 1   receipt for?

 2   A.   No, sir.  I wasn't there when it was received or

 3   anything.

 4   Q.   It wasn't for dope or anything like that, was it?

 5   A.   I don't think people would make receipts for dope, sir,

 6   no.

 7   Q.   But you don't know what it was for, do you?

 8   A.   No, sir.

 9   Q.   All right.  Do you have any -- any belief that he was

10   purchasing something illegal from Burlington Coat Factory?

11   A.   I don't think Burlington Coat Factory sells anything

12   illegal, sir.

13   Q.   So that receipt really doesn't mean anything, does it?

14          MS. MARSTON:  Objection.

15          THE COURT:  Sustained.

16   Q.   You talked about two-way radios.

17   A.   Yes, sir.

18   Q.   Nicholas Ragin never talked to you on a two-way radio,

19   did he?

20   A.   No, sir.  He wasn't in Little Mexico, sir.

21   Q.   Okay.  Now, after you smoked the dope that you was

22   supposed to sell, the dope that you and Kelly smoked, you got

23   in trouble for that, didn't you?

24   A.   Yeah, after a while Tracy found out I was smoking.

25   Q.   Okay.  And so he was upset, I take it?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1    A.   Yes, sir.

2    Q.   All right.  Was he upset with you?

3    A.   Yes, sir.

4    Q.   Was he upset with Kelly?

5    A.   No, sir.

6    Q.   He wasn't upset with Kelly?

7    A.   No, sir.

8    Q.   Just you.

9    A.   Yes, sir.

10   Q.   So what kind of trouble did you get into?

11   A.   He just stopped trusting me with crack like that.

12   Q.   And that's because you can't trust dope dealers, right?

13   A.   Can't trust crackheads either, sir.

14   Q.   Can't trust dope heads or crack -- crackheads or dope

15   dealers.  And you're both of those, aren't you?

16   A.   I have been, sir.

17   Q.   Now, when you were smoking crack, didn't it affect your

18   perception?

19   A.   Yes, sir.

20   Q.   Okay.

21   A.   Drugs normally do.

22   Q.   Okay.  So it's possible that you -- you couldn't remember

23   things that went on while you were high on crack, isn't it?

24   A.   At times.

25   Q.   Okay.  And it's possible that you remember things

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

                                   425

EUGENE LEWIS - CROSS

1   different from how they occurred, isn't it?

2   A.   No, sir, I remember what I remember.

3   Q.   So it's not possible for you to remember things

4   differently from the way they occurred.

5         MS. MARSTON:  Objection, asked and answered.

6         THE COURT:  Sustained.

7   Q.   Isn't it true that you don't know who beat up Kelly?

8   A.   No, sir, that's not true.

9   Q.   An isn't it true that you weren't there when Kelly got

10  beat up?

11  A.   That's not true either, sir.

12        MR. MACKEY:  No further questions, Your Honor.

13        THE COURT:  Mr. Brown.

14        MR. BROWN:  Thank you, Your Honor.

15                      CROSS EXAMINATION

16  BY MR. BROWN:

17  Q.   Mr. Lewis, you stated that one shouldn't trust a drug

18  dealer or drug user, correct?

19  A.   Yes, sir.

20  Q.   Then why should this jury trust you?

21  A.   Sir --

22        MS. MARSTON:  Objection.

23        THE COURT:  Sustained.

24  Q.   You're facing a lot of time on this charge, correct?

25  A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   Q.   And you're not here because your conscience got the best

2   of you, are you?

3   A.   Yes, sir, I am.

4   Q.   So you called up the U.S. attorney and said my conscience

5   is killing me; I've got to come tell everything I know?

6   A.   Actually, that's why I asked to speak to the officers.

7   Q.   Because your conscience got the best of you?

8   A.   It was an actual incident that kind of made me realize

9   what I was doing, yes.

10  Q.   And so, now, did this conscience -- did your conscience

11  get the best of you before or after you lied to those officers

12  about that shoot-out?

13  A.   Before, sir.

14  Q.   Okay.  So your conscience got the best of you; but after

15  your conscience got the best of you, you went back to lying.

16  A.   Sir, fear still exists.

17  Q.   Okay.  So you're stating to the jury that your -- that

18  fear will make you lie?

19  A.   Fear can make you do just about anything, sir.

20  Q.   And you fear getting every bit of the sentence that

21  you're facing, don't you?

22  A.   Not anymore, sir.

23  Q.   Is that because you now feel that you're going to get it

24  reduced?

25  A.   No, sir.  Sir, I feel like I should be held responsible

EUGENE LEWIS - CROSS

1   for everything that I did when I was out there.  I feel

2   responsible for everything that I did while I was out there.

3   And whatever comes behind it, I'm willing to accept that for

4   my actions.

5   Q.   And do you know what a -- have you heard the term 5K1.1?

6   A.   Yes, sir, I've heard the term.

7   Q.   How could one who is a layman be so sophisticated in the

8   areas of law?

9        MS. MARSTON:  Objection.

10  A.   Excuse me, sir?

11       THE COURT:  Sustained.

12  Q.   Could you explain to the jury what your understanding of

13  a 5K1.1 is.

14  A.   It's a motion that the U.S. attorney can file to get the

15  judge to go under the guideline, if I'm not mistaken.  I'm not

16  completely...

17  Q.   So in other words, you come and you tell some stuff on

18  some people and then they'll cut your sentence, right?

19  A.   No, sir.

20  Q.   And the more you tell, the more your sentence gets cut,

21  right?

22       MS. MARSTON:  Objection.

23  A.   No, sir.

24       THE COURT:  Overruled.

25  Q.   Now, you were asked by the U.S. attorney if you ever saw

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1   anyone -- if you ever saw anyone with guns, correct?

2   A.   Yes, sir.

3   Q.   And you answered that U.S. attorney yes, you saw David

4   and Oscar with guns; is that correct?

5   A.   I don't recall saying that, sir.

6   Q.   What do you recall saying?

7   A.   I do recall saying that I saw David with guns.  I don't

8   recall saying that I physically saw Oscar with a gun, sir.

9   Q.   Okay.  You do understand that Oscar isn't even charged

10  with having a gun, correct?

11        MS. MARSTON:  Objection.

12        THE COURT:  Sustained.

13  Q.   So Oscar just ran up to you one day and said, hey, guy, I

14  got myself a gun.

15  A.   No, sir.

16  Q.   Now, you stated that you were working Little Mexico for

17  about two months, correct?

18  A.   Some -- somewhere around there.

19  Q.   And you stated that -- well, do you understand that this

20  conspiracy is alleged to have happened between 2001 and 2004?

21  A.   I understand that, sir.

22  Q.   And you went to Little Mexico in April of 2004, correct?

23  A.   Yes, sir.

24  Q.   And out of all of this time that conspiracy is alleged to

25  have happened, you came in at the tail end and became a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 manager in two months?

2 A.   You can say that, sir.

3 Q.   And you were dealing 14,000 to 15,000 dollars per week.

4 That's what you told Mr. Culler, wasn't it?

5 A.   Roughly.

6 Q.   Now, you got in trouble because -- well, strike that.

7      That ends up being about $2,000 per day, doesn't it?

8 A.   On a good week, yes, sir.

9 Q.   Now, you got in trouble for smoking up a day's worth of

10 dope, didn't you?

11 A.   No, sir.

12 Q.   Did you not get in trouble with Tracy for allegedly

13 smoking the dope that was fronted to you that same day?

14 A.   I didn't smoke all the dope, sir.  I came up short, sir.

15 Q.   So you weren't trusted, correct?

16 A.   Yes, sir.

17 Q.   Because you weren't honest, correct?

18 A.   Correct, sir.

19 Q.   Now, you stated that you dealt with very few Hispanic

20 people, correct?

21 A.   Correct.

22 Q.   And you told the prosecutor that the Hispanics would go

23 get prostitutes and the prostitutes would come buy from you,

24 correct?

25 A.   Sometimes.  Sometimes they would get Oscar and he would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - CROSS

1  buy from me.

2  Q.   Now -- and you stated later that Oscar sometimes would

3  come to you to get something to sell them, correct?

4  A.   Yes, sir.

5  Q.   But when you first started talking about Oscar, you

6  stated that Oscar was a runner for Tracy, not you, didn't you?

7  A.   He was a runner for Tracy.  Tracy is the one that told

8  him to come to me, sir.

9  Q.   So now, instead of him being a runner for Tracy, he's a

10 runner from Tracy but through you, correct?

11 A.   Yes, sir.

12 Q.   But you didn't state that at first, right?  You're adding

13 that as you go along, correct?

14 A.   I'm not sure on how it was stated verbatim, sir, but that

15 was the point, sir.

16 Q.   Do you know who Elizabeth White is?

17 A.   No, sir.

18 Q.   Well, if Tracy allegedly had one of his girlfriends

19 translating for him in Little Mexico, what would he need

20 someone else to pay to do it for?

21 A.   I don't understand the question, sir.

22 Q.   You didn't hear Elizabeth White's testimony earlier this

23 week, did you?

24 A.   No, sir.

25 Q.   And you didn't hear that -- her statement she was the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

431

EUGENE LEWIS - CROSS

1   translator, did you?

2              MS. MARSTON:  Objection.

3              THE COURT:  Sustained.

4   Q.   Well, if Tracy allegedly had a translator that did it for

5   free, he wouldn't need to pay anybody to do that, would he?

6   A.   Sir, Oscar's role wasn't necessarily a translator.  Oscar

7   just had a lot of clientele and a lot of people --

8   Q.   But you stated --

9              MS. MARSTON:  Objection.  He hasn't finished his

10  answer.

11             MR. BROWN:  I'm sorry, Your Honor.

12  A.   A lot of people went to Oscar's house to turn tricks with

13  the prostitutes and to sit down and smoke crack and Tracy knew

14  that, so he paid Oscar's rent and Oscar would get his crack

15  from him and no one else.

16  Q.   He wouldn't get it from you.

17  A.   My crack was Tracy's crack, sir.

18  Q.   And do you think you testified good enough to get that

19  sentence reduced?

20             MS. MARSTON:  Objection.

21             THE COURT:  Sustained.  Mr. Brown --

22             MR. BROWN:  Nothing further, Your Honor.

23             THE COURT:  Any redirect?

24             MS. MARSTON:  Just a moment, Your Honor.

25             (Counsel and the agent conferred.)

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - REDIRECT

1           MS. MARSTON:  Just a few questions, Your Honor.

2                      REDIRECT EXAMINATION

3    BY MS. MARSTON:

4    Q.    I'm going to show you what I'm going to mark as

5    Government's Exhibits 147 and 148 for identification purposes.

6           MS. MARSTON:  Your Honor, may I approach?

7           THE COURT:  You may.

8    Q.    Looking first at 148, does this look about like -- does

9    this look like another copy of those notes that you were shown

10   on cross examination at various times?

11   A.    Yes, ma'am.

12   Q.    Now, did you make these notes?

13   A.    No, ma'am.

14   Q.    Are these notes a summary of the information that you

15   were providing?

16   A.    Yes, ma'am.

17           MR. ADOLF:  Objection, Judge.  No basis for his

18   knowledge.

19           THE COURT:  Sustained.

20   Q.    Do you know what these notes are?

21   A.    Yes, ma'am.

22   Q.    When were these notes taken?

23   A.    The first day we interviewed with -- the first day I

24   interviewed with Officer Fish and Officer Maxwell.

25   Q.    And why were they taking notes?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

2220

EUGENE LEWIS - REDIRECT

1   A.   Because they didn't --

2        MR. ADOLF:  Objection, speculation, Judge.

3        THE COURT:  Sustained.

4   Q.   I'm also going to show you Government's Exhibit 147.  Did

5   you also see this on cross examination?

6        MR. ADOLF:  Judge, I'm sorry, I'm not sure what's

7   being referred to at this point.  Is that premarked?

8        (Government's Exhibit Number 147 was tendered to

9   defense counsel.)

10  Q.   I'm also showing you what I've marked for identification

11  purposes 147.  Were you also shown this by one of the defense

12  counsel on cross examination?

13  A.   Yes, ma'am.

14  Q.   Now, do you know what the purpose of this document is?

15  A.   It's a more official report, ma'am.

16  Q.   A more official report of those same interviews that you

17  gave to Detectives Fish and Maxfield?

18  A.   Yes, ma'am.

19  Q.   Now, do you remember everything that you told them on

20  that particular day?

21  A.   Not everything verbatim, no, ma'am.

22  Q.   Do you remember talking about defendant David Howard at

23  one of those two interviews?

24  A.   Yes, ma'am.

25  Q.   And do you remember exactly what you said to them about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - REDIRECT

1  defendant David Howard?

2  A.   Not verbatim, no, ma'am.

3  Q.   If you looked over this report, might it help refresh

4  your memory as to what you told them?

5  A.   Yes, ma'am.

6  Q.   I'm directing your attention to page 2.  If you would

7  just read the paragraph that's marked there to yourself.

8         THE COURT:  Page 2 of what exhibit?

9         MS. MARSTON:  147, Your Honor.

10        (Witness complied.)

11  A.   Yes, ma'am.

12  Q.   Does that help refresh your memory?

13  A.   Yes, ma'am.

14  Q.   Now, just so the jury understands, are either of these

15  two, 147 or 148, your exact words?

16  A.   No, ma'am.

17  Q.   Did you make up either of these two reports?

18  A.   No, ma'am.

19  Q.   Is what you just read to refresh your memory, is that a

20  fair and accurate reflection of what you told the officers

21  that day?

22  A.   Yes, ma'am.

23  Q.   What did you say about defendant David Howard?

24        MR. ADOLF:  Objection, asked and answered.

25        THE COURT:  Overruled.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

435

EUGENE LEWIS - REDIRECT

1  Q.   Go ahead.

2  A.   I told them that I had seen David in Little Mexico.  I

3  didn't deal with him directly as far as business transactions.

4  I knew that him and Tracy -- Tracy used to sell him -- well,

5  supply him with cocaine in Little Mexico and then they fell

6  out so Tracy stopped working with his brother and they were

7  really at the point of fighting.  They were almost hating each

8  other.

9  Q.   And what had they fell out over?

10  A.   From what I knew, something about a storage unit.  I

11  didn't know the whole story at the time.

12  Q.   Now, was there a time that you got picked up by defendant

13  David Howard?

14  A.   Yes, ma'am.

15  Q.   And where did he take you?

16  A.   We drove to Ila's job.

17  Q.   I'm going to show --

18       MR. ADOLF:  Objection, asked and answered, Judge.

19  Q.   I'm going to show --

20       THE COURT:  Well, hang on a second.

21       MS. MARSTON:  I haven't asked the question.

22       THE COURT:  Well, there's an objection to the last

23  question --

24       MS. MARSTON:  Oh.

25       THE COURT:  -- I'm trying to deal with.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

436

EUGENE LEWIS - REDIRECT

1      Was this dealt with in cross examination?

2           MS. MARSTON:  Yes, Your Honor.

3           THE COURT:  What is this responsive to?

4           MS. MARSTON:  He talked about the fact that he --

5  Mr. Adolf asked him about the time he got picked up or --

6  either Mr. Adolf or Mr. Culler talked about when he got picked

7  up by David and taken to Ila Howard's business, and I'd like

8  to show him a photograph of where he went.

9           THE COURT:  All right.

10          MR. ADOLF:  Judge, I'd ask for an offer of proof

11 because I have no recollection of saying any such thing.

12          THE COURT:  I'm going to permit the question.

13 Q.   I'm going to show you what's already been introduced into

14 evidence as Government's Exhibit 16B.  Do you recognize

15 Government's Exhibit 16B?

16 A.   Yes, ma'am.

17 Q.   And how do you recognize that photograph?

18 A.   The office building where David -- where Ila's business

19 was.

20 Q.   And who took you there?

21 A.   David Howard.

22 Q.   What did you mean by 24/7 when you mentioned it to the

23 officers or even here today to the jury?

24 A.   Basically, what I was trying to express to them was that

25 whenever someone wanted something from me, as long as I was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

437

1  there, I was available.  As long as I was on the grounds of

2  Little Mexico, they could come to me whether I was awake or

3  asleep and they could knock on that wall and most of the time

4  I would serve them unless I was so tired from being awake all

5  the time that I couldn't wake up when they were knocking on

6  the wall.

7  Q.   And what do you mean when you say serve someone?

8  A.   Give -- sell them crack, basically.

9  Q.   And who asked you to be available 24/7?

10 A.   Tracy.

11 Q.   And how do you know who hired Nick?

12 A.   Because Tracy told me so.

13          MR. CULLER:  Objection.

14          THE COURT:  Overruled.

15 Q.   And what did Tracy tell you?

16 A.   That he hired Nick to drive.

17 Q.   How do you know who beat up Kelly?

18 A.   I saw it.

19          MS. MARSTON:  No further questions.

20          MR. ADOLF:  Your Honor, may I have one question in

21 light of counsel's questions?

22          THE COURT:  One question.

23          MR. ADOLF:  One question.

24          THE COURT:  You may.

25                    RECROSS EXAMINATION

Cheryl A. Nuccio, RMR-CRR (704)350-7494

EUGENE LEWIS - RECROSS

1   BY MR. ADOLF:

2   Q.    Mr. Lewis, at any time when you were speaking to either

3   the police or the prosecutors in September of 2004 or just

4   recently before you testified, did anyone either offer or ask

5   or attempt to either videotape or audiotape anything you were

6   saying?

7   A.    No, sir, not to my recollection.

8              MR. ADOLF:  Nothing further, Your Honor.

9              THE COURT:  This witness may step down.

10             (Witness stepped down.)

11             THE COURT:  Members of the jury, we're going to take

12  our evening break at this time.  Remind you not to talk about

13  the case.  I would also ask you not to watch any of the local

14  news programs, listen to any of the local radio news or read

15  any of the local papers.  It's very important that you not be

16  exposed to anything touching on this case outside of court and

17  what you hear by way of evidence in this courtroom.  Now, as

18  an abundance of caution, knowing that it's an inconvenience to

19  you and restrictive, but also knowing how important it is to

20  the process, I would ask you to follow those instructions of

21  the court.

22             And so at this time, we'll take our evening break.

23  I would ask you to be back in the jury deliberation room at

24  9:15 ready to come out into court at 9:30.  Thank you very

25  much.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

```
 1            THE COURT:  Any objection to this witness being
 2  excused?
 3            MR. CULLER:  No.
 4            THE COURT:  You may step down and be excused.
 5            (Witness stepped down.)
 6            THE COURT:  Call your next witness.
 7            MS. MARSTON:  United States calls Angenita Davis.
 8                      ANGENITA DENISE DAVIS,
 9  being first duly sworn, was examined and testified as follows:
10                      DIRECT EXAMINATION
11  BY MS. MARSTON:
12  Q.   Please state your name for the jury.
13  A.   Angenita Denise Davis.
14  Q.   And Ms. Davis, where do you live?
15  A.   XXXXX Wayland Trail, Charlotte, North Carolina 28 --
16  28215.
17  Q.   And are you originally from Charlotte?
18  A.   Yes.
19  Q.   And what are you currently doing for a living?
20  A.   I work for Prime Flight Aviation at Charlotte Douglas
21  Airport.
22  Q.   Now, prior to working with that particular company, did
23  you work for an organization called One Enterprise?
24  A.   Yes.
25  Q.   Did you also know it to go by some other names?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

440

ANGENITA DAVIS - DIRECT

1   A.   Yes.

2   Q.   What other names did you know it to go by?

3   A.   Fantasia, Cute and Classy, Star's Lingerie.

4   Q.   Did you ever hear the name Fantasia or Discreet Delight?

5   A.   I said Fantasia.

6   Q.   Oh, I'm sorry.  And Discreet Delight?

7   A.   Yes.

8   Q.   Now, who was running that -- who was running all of those

9   different names that have been mentioned?

10   A.   A lady by the name of Ila Little.

11   Q.   And how did you meet Ila Little?

12   A.   I met her through a mutual friend.

13   Q.   And who was that mutual friend?

14   A.   Jenny Luckey.

15   Q.   And when you met her through Ms. Luckey, what came about?

16   A.   The first time I met her we just had general

17   conversation.  She was there to see Ms. Luckey.  She was at

18   Ms. Luckey's home.

19       The second time I met her, Ms. Luckey had told me that

20   she was looking for someone to work in her office; and me and

21   her -- me and Ms. Little, we discussed it and she offered me a

22   position in her company.

23   Q.   Now, I'm going to show you what's already been introduced

24   into evidence as Government's Exhibit 85E.  Do you recognize

25   Government's Exhibit 85E?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

441

ANGENITA DAVIS - DIRECT

1    You can pull that screen up, too, if you need to see

2    better.

3    A.   Yes.

4    Q.   How do you recognize 85E?

5    A.   That's Ila Little.

6    Q.   Now, did you know her before you met her at Ms. Luckey's

7    house?

8    A.   No.

9    Q.   Now, I'm going to show you what's been marked as

10   Government's Exhibit 80C.

11        MS. MARSTON:   If I may approach, Your Honor?

12        THE COURT:   You may.

13   Q.   I'm going to show you what's been marked as Government's

14   Exhibit 80C.  Do you recognize the name at the top of

15   Government's Exhibit 80C?

16   A.   Yes.

17   Q.   And how do you recognize that name?

18   A.   It is my name.

19   Q.   Okay.  And then looking inside, is that your application

20   for employment?

21   A.   It is.

22   Q.   And was that your driver's license at the time?

23   A.   Yes.

24   Q.   Your social security card?

25   A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

442

ANGENITA DAVIS - DIRECT

1    Q.    Now, I'm also directing your attention to this page.

2    What is this page?

3    A.    It's my resume.

4    Q.    And did you provide that to Ila when you talked to her?

5    A.    Yes.

6    Q.    And do you recognize this folder in general?

7    A.    Yes.

8    Q.    And how do you recognize that?

9    A.    It was a folder that she kept in her office along with

10   everyone else that she employed.

11   Q.    All right.  And once -- did you begin working for her

12   after you gave her your resume?

13   A.    Yes.

14   Q.    And what was your job description for her?

15   A.    I was her office manager.

16   Q.    And did you keep files like this in the regular course of

17   your duties and responsibilities as an office manager?

18   A.    Yes.

19            MS. MARSTON:  At this time the government moves into

20   evidence 80C.

21            THE COURT:  Any objection?

22            MR. CULLER:  No.

23            THE COURT:  Let it be admitted.

24            (Government's Exhibit Number 80C was received into

25   evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

443

2337

ANGENITA DAVIS - DIRECT

1  Q.   Now, what did you know the business to be?

2  A.   It was an escort service.

3  Q.   And were there other people that worked for the escort

4  service?

5  A.   Yes.

6  Q.   And were there files kept for those other people that

7  worked for the service?

8  A.   Yes.

9  Q.   And are those files that you also helped keep in the

10 office in your role as office manager?

11 A.   Yes.

12 Q.   Now, did there come a time where you were asked to remove

13 those files?

14 A.   Yes.

15 Q.   Tell the jury about that.

16 A.   Ila called me one night and she told me that she wanted

17 me to go to the office the next day and to take all of the

18 files from the office that contained, she called them her

19 girls' information.

20 Q.   Now, approximately when was this?

21 A.   This was in October.

22 Q.   Of what --

23 A.   Of 2004.

24 Q.   Now, did you do what she asked you to do?

25 A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

444

ANGENITA DAVIS - DIRECT

1  Q.   And what happened then?

2  A.   After she told me to remove the files, I checked her

3  voicemail, which was something that I did on a daily basis,

4  and I overheard an investigator or detective.

5        MR. CULLER:  Well, objection.

6        THE COURT:  Overruled.

7  Q.   You can continue.

8  A.   I overheard -- it was a message on there from a detective

9  or a federal officer or someone saying that she needed to turn

10 herself in, that he did not want to have to look for her.  And

11 after I heard that, then I just kind of like put two and two

12 together and I knew something was wrong, so I took the files

13 from my house to my brother's house.

14 Q.   Now, why did you move the files from your house to your

15 brother's house after hearing that message?

16 A.   I took them from my house to my brother's house because I

17 pretty much knew that eventually the police, or whoever was

18 looking for her, would probably come to my house and I did not

19 want to have them in my possession at the time that they came

20 there.

21 Q.   Now, did you have an encounter with law enforcement?

22 A.   Yes, I did.

23 Q.   And what were you going to do when you had that encounter

24 with law enforcement?

25        MR. CULLER:  Well, objection what she was going to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

445

1   do.

2              THE COURT:   Overruled.

3   Q.   You can answer.

4   A.   I went to the office after that to open the office as I

5   normally do; and when I got there, there were federal people

6   everywhere.   So I immediately just turned around to leave.

7   Q.   And do you know whether or not they were executing a

8   search warrant?

9   A.   They were.

10  Q.   And what -- approximately what time did you arrive to

11  open the office up as you normally did?

12  A.   On this particular day, it was -- I'm not really sure

13  what time it was.   It could -- it may have been around 11:00

14  or 12:00 that day.

15  Q.   And when you arrived and you started to walk away, were

16  you then approached by law enforcement?

17  A.   Yes.

18  Q.   And did you talk to law enforcement briefly?

19  A.   At first I did not.   I still proceeded to leave.   And one

20  of the officers followed me out and told me that I really, you

21  know, needed to talk to him or whatever, so I did.

22  Q.   And when you first talked to law enforcement, did you

23  tell them about the files that you had taken from the office?

24  A.   No, I did not.

25  Q.   Had -- were they asking specifically about whether or not

Cheryl A. Nuccio, RMR-CRR (704)350-7494

446

ANGENITA DAVIS - DIRECT

1   you had taken any files?

2   A.   No.

3   Q.   How did it come up about the missing files?

4   A.   After they had conducted their search, I'm assuming they

5   knew that the files were missing.  They called me back on my

6   cell phone because at the time that I talked to them, I did

7   give them my cell phone number.  They called me back and told

8   me that they knew that some -- well, they didn't tell me.

9   They just said that they wanted to talk to me again and they

10  asked me to come back to the office, and I did.

11  Q.   And when you came back to the office, what did you tell

12  them then?

13  A.   They told me that they knew that some of the files were

14  missing.  They repeatedly asked me did I have the files.  I

15  told them no, I did not.  And, you know, eventually I just

16  told them yes because I just wanted to get it over with so I

17  told them yes, I did have the files.  They asked me could --

18  would I give them to them and I told them yes, that they could

19  have the files.  And I called my brother and told him that I

20  was coming to get the files.  At the time the officer who I

21  was speaking with told me that, you know, he needed to go with

22  me to get the files, so I rode with them to my brother's house

23  and gave them the files.

24  Q.   Now, at the time you arrived at your brother's house, how

25  were the files packaged?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

447

ANGENITA DAVIS - DIRECT

1   A.   He had them outside on his patio.  He had put some of

2   them in a bag and he just had them sitting out on the patio.

3   Q.   Now, when you say in a bag, what kind of bag are you

4   talking about?

5   A.   Like a trash bag.

6        MS. MARSTON:  Your Honor, I'm going to need some

7   assistance, but if we can approach with some files to show

8   her.

9        THE COURT:  You may.

10       (Pause.)

11       THE COURT:  Would counsel approach at side-bar.

12       MS. MARSTON:  Yes.

13       (Side-bar conference as follows:)

14       THE COURT:  We are really starting to waste jury

15   time.  Why couldn't this have been done before the witness

16   took the stand?

17       MS. MARSTON:  Your Honor, the boxes have been out

18   every day.  Defense counsel has been welcome to look at these

19   boxes.  And I also provided all of this as part of discovery

20   and so I didn't realize they were going to need to look

21   through everything this much.

22       THE COURT:  How long is it going to take for you to

23   review the documents?

24       MR. ADOLF:  Judge, a lot of it I have seen before,

25   but it's never been in a form -- it was just -- it was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

448

ANGENITA DAVIS - DIRECT

1  provided --

2          THE COURT:  I'm not --

3          MR. ADOLF:  I think just a couple minutes, if that.

4          THE COURT:  We need to start moving this along.

5          MR. ADOLF:  Yes, sir.

6          THE COURT:  We had a BellSouth witness that should

7  have taken about five minutes to give relevant information.

8  She was up there about a half hour, 45 minutes.  We're now

9  wasting the jury's time while people look through boxes.  We

10 need to put this evidence on in a more efficient fashion and

11 so I'm admonishing you to do that.  I'm going to ask counsel

12 to review these documents as quickly as you can.  Let me know

13 when you're ready.

14         MS. MARSTON:  Your Honor, I'm going to introduce all

15 of the boxes that have been laying out here the entire two

16 weeks so at lunch time counsel can look through those boxes

17 and see that all -- everything has been turned over in

18 discovery.

19         THE COURT:  I'd like to make use of this 25 minutes

20 efficiently and then if you'd finish your review over

21 lunchtime.

22         MR. CULLER:  Yes, sir.  I just want the court to

23 know, I would be happy to stipulate to the admission of a lot

24 of these records, but I haven't gotten -- I don't think I've

25 seen a stipulation.  Did you send me one?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

449

ANGENITA DAVIS - DIRECT

1            MS. MARSTON:  I talked to Mr. Adolf and he told

2    me --

3            THE COURT:  Let's not waste any more time.

4            MR. CULLER:  I just wanted the court to know that.

5            MS. MARSTON:  (Inaudible.)

6            THE COURT:  Finish your review and let me know.  Let

7    counsel know if you're going to stipulate.

8            (End of side-bar conference.)

9            (Pause.)

10           MR. CULLER:  Your Honor, I think we're in agreement

11   that we're not going to object to admission of those documents

12   that are in those two boxes.

13           THE COURT:  Well --

14           MR. CULLER:  So they're welcome to do whatever they

15   want to do with them.  No objection to their admission.

16           THE COURT:  Very well.

17           MS. MARSTON:  The first box is labeled Government's

18   Exhibit 79 and the second box is labeled Government's Exhibit

19   80.

20           (Government's Exhibits Numbers 79 and 80 were

21   received into evidence.)

22                    DIRECT EXAMINATION (Cont'd.)

23   BY MS. MARSTON:

24   Q.   I'm going to direct your attention to the label on top of

25   Government's Exhibit 79.  Do you recognize the address on that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1    label?

2    A.    Yes.

3    Q.    And what address is that?

4    A.    It's my brother's.

5    Q.    And is this also the same address on Government's Exhibit

6    80?

7    A.    Yes.

8    Q.    And are these the files that you removed at Ila's

9    request?

10    A.    Yes.

11    Q.    Now, directing your attention first to this box 80.  Are

12    these what you referenced as the girls' files in this box 80

13    as well as some other information?

14    A.    Yes.

15    Q.    Now, are all the girls' files in this box?

16    A.    All of the ones that were in the office.

17    Q.    Okay.  Was there also a locked file cabinet in the

18    office?

19    A.    Yes.

20    Q.    And what information was kept in the locked file cabinet?

21    A.    She kept information in there that she didn't want anyone

22    else to see.

23         MR. CULLER:  Well, objection, speculation.

24         THE COURT:  Overruled.

25    Q.    Did you have access to the locked file cabinet?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

451

ANGENITA DAVIS - DIRECT

1  A.   No.

2  Q.   Now, in this box here, can you tell the jury what this

3  binder is that's in Government's Exhibit 79.

4  A.   It's her appointment done book.  Whenever the girls went

5  out on dates or appointments or whatever, she recorded it in

6  those books -- or I did.

7  Q.   And then this black binder, what is in this black binder?

8  A.   That's a list of her -- of the people who called --

9  Q.   The customers?

10 A.   -- for dates.

11      The customers, clients.

12 Q.   And this binder with the pink header.

13 A.   Payroll.  The payroll checks and stubs.

14 Q.   Now, why was there payroll being completed?

15 A.   She did payroll for me as an employee and she also did

16 payroll for some of the girls who went out on dates and they

17 were paid by credit cards.

18 Q.   And why did the girls when they got paid by credit card

19 need to get a payroll check?

20 A.   I guess that was her way of -- because whenever they pay

21 it with credit cards, they weren't paid with cash so they had

22 to, you know, they had to get a check.

23 Q.   Now, I'm showing you what's been marked as 79A that was

24 already part of Government's Exhibit 79.  Do you recognize

25 this pink composition book?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1   A.   Yes.

2   Q.   And how do you recognize it?

3   A.   It was the book that I kept notes for the monthly

4   meetings that we had.

5   Q.   And what were these monthly meetings?

6   A.   The meetings was -- it was a month -- every month she had

7   a meeting with her girls and we would just have the meeting

8   and she would discuss different things with them.

9   Q.   Now, at these monthly meetings, did all the girls attend?

10  A.   No.

11  Q.   Why not?

12  A.   I'm not really sure why all the girls did not attend.

13  Q.   What girls did you know not to attend the monthly

14  meetings?

15  A.   The girls that worked for Tracy.

16  Q.   All right.  And do you see somebody in the courtroom that

17  you know as Tracy?

18  A.   Yes.

19  Q.   And can you please tell me where he's sitting and what

20  he's wearing.

21  A.   He's sitting right there beside the guy in the beige

22  suit.  Looks like he -- he has on a blue shirt.

23  Q.   And what number seat is he?

24       MR. CULLER:  We stipulate --

25  A.   Second one.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

453

2347

ANGENITA DAVIS - DIRECT

1          MR. CULLER:  -- she's identified Mr. Howard.

2    A.   The second one.

3    Q.   All right.  Now, did you also know the other son David?

4    A.   I never met David, but I know of him.

5    Q.   How did you know of him?

6          MR. ADOLF:  Objection, Judge.  Calls for hearsay.

7          THE COURT:  Sustained at this point.

8    Q.   Well, did you ever talk to David on the telephone?

9    A.   No, I never spoke with David.

10   Q.   Who told you about David?

11         MR. ADOLF:  Objection, hearsay.

12         THE COURT:  Overruled.

13   A.   I knew of David through --

14         THE COURT:  No --

15   A.   -- Ila.

16         THE COURT:  Listen to the question asked of you and

17   answer the -- answer that question.

18         Go ahead and ask your question again.

19   Q.   Who told you about David?

20   A.   I knew Ila had sons.  I mean, it was just general

21   knowledge.  But I knew --

22   Q.   What did you know -- what did Ila tell you about David?

23         MR. ADOLF:  Objection, Judge.  Same objection.

24         THE COURT:  Basis?

25         MR. ADOLF:  Hearsay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

454

ANGENITA DAVIS - DIRECT

1           THE COURT:  Overruled.

2    Q.    You can answer that question.

3    A.    I knew that David had girls that worked for him as well

4    through her service.

5           MR. ADOLF:  Move to strike, Judge.  Basis of

6    knowledge and hearsay.

7           THE COURT:  I'll overrule that.

8    Q.    Now, did David's girls attend the meetings?

9    A.    No.

10   Q.    Why didn't Tracy or David's girls attend the monthly

11   meetings?

12          MR. CULLER:  Objection.

13          MR. ADOLF:  Objection.

14          MR. CULLER:  Unless she knows of her own personal

15   knowledge.

16          THE COURT:  I'll sustain the objection as to form.

17   Q.    Do you know why David and Tracy's girl did not attend the

18   meetings?

19          MR. ADOLF:  Objection to the compound nature of the

20   question, Judge.  She has personal knowledge of some girls,

21   not others.

22          THE COURT:  I'll sustain it as to form.

23          MR. ADOLF:  Thank you.

24   Q.    How do you know why David and Tracy's girls did not

25   attend the meetings?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

455

ANGENITA DAVIS - DIRECT

1           MR. CULLER:  Objection to the form.

2           THE COURT:  Overruled.

3    A.   How do I know?

4    Q.   Yes.

5    A.   I don't understand what you're asking me.

6    Q.   Did you have any contact with David or Tracy's girls?

7    A.   No.

8           MR. CULLER:  Objection to David and Tracy's girls.

9           THE COURT:  Overruled.

10   A.   I knew that David and Tracy had girls that worked through

11   the service because of the way that the files were kept, the

12   information of who went out on the dates and who did not.

13   Q.   Okay.  What about the files told you that there were

14   girls that were working for David and Tracy?

15          MR. CULLER:  Objection.

16          THE COURT:  Overruled.

17   A.   Beside the name of the girl, either David's name would be

18   there or Tracy's name would be there.

19   Q.   And why was that?

20   A.   That was so she could distinguish who went on what date

21   with who and how much money was supposed to go to David and I

22   guess how much money was supposed to go to Tracy.

23          MR. CULLER:  Objection.

24          MR. ADOLF:  Objection, move to strike based on

25   guesses.  Basis of knowledge.


              Cheryl A. Nuccio, RMR-CRR (704)350-7494



                              456

ANGENITA DAVIS - DIRECT

1            THE COURT:  Overruled.

2    Q.   Now, were you also in charge of the money at the office

3    at times?

4    A.   Yes.

5    Q.   And what would you do with the money?

6    A.   Sometimes she asked me to deposit the money.

7    Q.   And where did you deposit the money?

8    A.   She had an account at First Citizens Bank.

9    Q.   Now, who was responsible for contacting the girls for the

10   monthly meetings?

11   A.   I was.

12   Q.   And did you contact David or Tracy's girls for the

13   monthly meetings?

14   A.   Once I contacted Tracy.  At the time I did not know that

15   they were actually his girls.  I called the number for two of

16   the girls.  It was the same number.  He called back.  He

17   asked -- at the time that I called and spoke with him, he was

18   asking me -- you know, he just said, Well, they're not

19   available right now.  And then he called back and said, you

20   know, What do you want with the girls?  Anything you have to

21   tell -- you know, anything that you have to say to them, you

22   can tell me.

23   Q.   And then what happened?

24   A.   The conversation wasn't too pleasant.  He, you know, he

25   just insisted that I tell him what I wanted with them.  And I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

457

ANGENITA DAVIS - DIRECT

1   told him that I couldn't do that because I was instructed if I
2   called someone, that if I did not speak with that person, I
3   could not, you know, give any information to whoever I was
4   speaking to.  I had to speak with the girl.
5   Q.    What did you do after that conversation?
6   A.    Ila -- I spoke with Ila.  Ila told me, you know, do not
7   call for those girls anymore.  They will not be attending the
8   meetings.  And that was it.
9   Q.    Now, did you actually attend the meetings?
10  A.    Yes, I did.
11  Q.    And did you record sort of the minutes of the meetings in
12  this composition book?
13  A.    Yes.
14  Q.    And I'm going to direct your attention to the first page
15  of this book.  What monthly meeting are you recording here?
16  A.    August 25th, 2004.
17  Q.    And where did the meeting take place?
18  A.    Shoney's Restaurant on North Tryon.
19  Q.    I'm going to direct your attention to the page right
20  here.  What does it talk about here?  Starting...
21  A.    Bonding:  The company will pay for -- the company paid
22  for the girls to be bonded out.
23  Q.    Why did the company pay for the girls to be bonded out?
24  A.    I don't know why she said she would pay for that.
25  Q.    Well, why would the girls need to be bonded out?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

458

ANGENITA DAVIS - DIRECT

1           MR. CULLER:  Objection.

2           THE COURT:  If she knows.

3    A.   If they were caught having sex, if it was like a set up,

4    you know, if they were caught, then she would bond them out.

5    Q.   And what do you mean by a set up?

6    A.   If they went out on a call and they had sex with a person

7    which it was, you know, supposedly they were not supposed to

8    have sex, but if they did have sex and they were caught, if it

9    was a police officer or whatever, then -- and they went to

10   jail, she would bond them out.

11   Q.   Okay.  Now, were the girls having sex -- sexual

12   intercourse on these calls?

13          MR. CULLER:  Well, objection unless she knows

14   personally.

15          THE COURT:  Overruled.

16   A.   I never personally went out on any calls so I don't know

17   if they were having sex or not.  It was rumored that they were

18   having sex, but...

19          MR. CULLER:  Objection to rumor.

20          THE COURT:  Sustained.

21   Q.   I'm going to direct your attention to the paragraph here

22   about race week.  What was the purpose of writing notes about

23   race week?

24   A.   The week of the race she wanted everyone to work extended

25   hours.  That was one of her busiest weeks so she said that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

459

ANGENITA DAVIS - DIRECT

1    everybody had to work and that they would work extended hours.
2    Q.   Now, there's a reference here on the first page to Wendy
3    will not drive anymore.  Who was Wendy?
4    A.   Wendy was Ila.
5    Q.   And why did she go by that name?
6    A.   Because she didn't want them to know her real name.
7    Q.   Did she use any other names around you?
8    A.   She used Wendy, Pumpkin, Star.
9    Q.   Now, I'm going to direct your attention to what's already
10   been introduced into evidence as Government's Exhibit 80D.  Do
11   you recognize 80D?
12   A.   Yes.
13   Q.   And how do you recognize it?
14   A.   It was a file that she had.
15   Q.   Okay.  And do you know who Tabitha Johnson is?
16   A.   No.
17   Q.   Do you know who wrote "Terminated, never will work
18   again?"
19   A.   Ila.
20   Q.   I'm also going to show you Government's Exhibits 80A and
21   80B.  Do you recognize the names on Government's Exhibits 80A
22   and 80B?
23   A.   Yes.
24   Q.   And how do you recognize those two names?
25   A.   They were girls that came from Florida who worked for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

460

ANGENITA DAVIS - DIRECT

1   her.

2   Q.   Now, why did she have girls coming from Florida?

3   A.   She said that she wanted an assortment of girls.  She

4   wanted girls with different backgrounds, different races.

5   Q.   And what did you do for these girls once they arrived

6   here?

7   A.   I took down their information, took pictures of them.

8   Q.   And did Ila provide them with anything?

9   A.   She provided them both with cell phones.

10  Q.   I'm also going to show -- now, you mentioned credit

11  cards, was there actually a machine that the girls used when

12  they used the credit cards?

13  A.   Yes.

14  Q.   And who would give them this machine to use?

15  A.   It was kept in the office.

16  Q.   So whoever was there at night taking the calls, whenever

17  the girls had to go out on a call and they knew that the

18  person would pay with a credit card, then whoever was in the

19  office would give the girl the machine to use.

20  Q.   I'm going to show you what's going to be marked for

21  identification purposes as Government's Exhibit 150.  Do you

22  recognize Government's Exhibit 150?

23  A.   Yes.

24  Q.   And how do you recognize it?

25  A.   It's kept in the office for the girls to use.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

461

ANGENITA DAVIS - DIRECT

1          MS. MARSTON:  At this time the government moves into
2    evidence Government's Exhibit 150.
3          THE COURT:  Any objection?
4          MR. CULLER:  No.
5          THE COURT:  Let it be admitted.
6          (Government's Exhibit Number 150 was received into
7    evidence.)
8    Q.   Now, you mentioned that both David and Tracy had girls
9    that worked for the service.  Did you have files for those
10   girls?
11   A.   There was some files there, yes.
12   Q.   But are those files part of the exhibits that we've
13   previously showed to you right there?
14   A.   No.
15   Q.   And do you know where those files are?
16   A.   No.
17   Q.   Who kept those files?
18   A.   I'm assuming Ila did.
19          MR. CULLER:  Objection.
20   A.   She's the only person that had --
21          THE COURT:  Sustained.
22   Q.   Well, did you keep the files for those girls?
23   A.   No.
24   Q.   Did you have to ever give information that was supposed
25   to go into those files to anyone?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

462

ANGENITA DAVIS - DIRECT

1  A.   No.   Sometimes when I did some of the work for recording

2  the dates that the girls went on, sometimes I would record it

3  on the computer.

4  Q.   I'm going to show you what's been marked for

5  identification purposes as Government's Exhibit 82K.  Do you

6  recognize Government's Exhibit 82K?

7  A.   Yes.

8  Q.   And how do you recognize it?

9  A.   It's a recording of the shows that the girls went on or

10 the dates that the girls went on and how much money they were

11 paid.

12 Q.   And is this the type of documentation that you would keep

13 for each girl when they went on a call?

14 A.   Yes.

15 Q.   And do you see the reference in the upper left-hand

16 corner?

17 A.   Yes.

18 Q.   Is that how Ila would keep track of either Tracy or

19 David's girls that you were referring to earlier?

20 A.   Yes.

21       MS. MARSTON:   At this time the government moves into

22 evidence Government's Exhibit 82K.

23       THE COURT:   Any objection?

24       MR. CULLER:   No.

25       THE COURT:   Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1          (Government's Exhibit Number 82K was received into

2    evidence.)

3    Q.   What name is on the first page of Government's Exhibit

4    82K?

5    A.   Candy/David.

6    Q.   And when does this document show that Candy was working

7    for the service through David?

8    A.   Between the months of January, February, and March of

9    2004.

10   Q.   Now, the next page.  What name do you see at the top of

11   the next page?

12   A.   Cathy-Carrie/Tracy.

13   Q.   Now, why does it say Cathy-Carrie?

14   A.   Because she went by two different names.

15   Q.   And did the girls sometimes do that?

16   A.   Yes.

17   Q.   Why?

18   A.   They just did it for different reasons.  I mean -- they

19   just didn't want to use their own name so they just used --

20   they made up different names.

21   Q.   And what time frame is Cathy-Carrie working for Ila

22   through Tracy?

23          MR. CULLER:  Objection.

24          THE COURT:  Sustained.

25   Q.   What time frame is this documentation for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

464

ANGENITA DAVIS - DIRECT

1   Cathy-Carrie/Tracy?

2   A.   April, May, June of 2004.

3   Q.   And approximately what is the total that this girl made

4   during the course of that time?

5   A.   2,000 --

6   Q.   Can you see that okay?

7   A.   Uh-huh.  2,875 -- I mean and, yeah, $7,500.

8   Q.   And what is the next page?

9   A.   Cyshann-David.

10  Q.   And what is the time frame?

11  A.   January, February, and March of 2004.

12  Q.   And the next page.

13  A.   Destiny-Jasmine/David.

14  Q.   And was there a girl that went by both names Destiny and

15  Jasmine?

16  A.   Yes.

17  Q.   And what is the time frame?

18  A.   January, February, March.

19  Q.   Of what year?

20  A.   2004.

21  Q.   The next page.

22  A.   Jade/Tracy.

23  Q.   And the time frame?

24  A.   January, February, March of 2004.

25  Q.   And does this actually continue for a number of entries?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

465

ANGENITA DAVIS - DIRECT

```
 1   A.   Yes.

 2   Q.   What's the total?

 3   A.   $5,525.

 4   Q.   Does actually the same girl continue on or for the months

 5   April, May, and June?

 6   A.   Yes.

 7   Q.   And what's the total for those months?

 8   A.   $2,600.

 9   Q.   The next girl.  Is it -- I'm sorry, I can zoom in.

10   A.   Missy-Michelle/Tracy.

11   Q.   And the time frame?

12   A.   January, February, and March of 2004.

13   Q.   And the amount?

14   A.   $3,365.

15   Q.   And is also the same -- oh, this is a duplicate page, I

16   take it.

17        The next girl?

18   A.   Selena/Tracy.

19   Q.   Now, did you ever meet a girl that went by the name

20   Selena?

21   A.   I didn't have a lot of contact with the girls.  I don't

22   recall meeting her.

23   Q.   Okay.  And what time frame is this?

24   A.   January, February, and March 2004.

25   Q.   And what is the total for Selena?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

466

ANGENITA DAVIS - DIRECT

1   A.   $6,860.

2   Q.   And the final -- this final page.

3   A.   Tracy/Tracy/Janet.

4   Q.   The time frame?

5   A.   April, May, June 2004.

6   Q.   And the total here?

7   A.   $475.

8   Q.   Now, were there ever certificates of appreciation given

9   out?

10  A.   Yes.

11  Q.   And what was the purpose of that?

12  A.   She would give out certificates for the girls who went on

13  the most calls, who made the most money.

14  Q.   I'm going to show you what's been marked for

15  identification purposes as Government's Exhibit 82A.  Do you

16  recognize Government's Exhibit 82A?

17  A.   Yes.

18       MS. MARSTON:  Oh, I'm sorry, it's already been

19  introduced into evidence.

20  Q.   Now, did you know anybody who went by that name?

21  A.   I had very limited contact with the girls and they all

22  went by so many different names.  It's hard to, you know...

23  Q.   Well, did you know anybody with the last name of Burris?

24  A.   I think so.  I'm not really sure.

25  Q.   I'm going to show you what's been marked for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

467

ANGENITA DAVIS - DIRECT

1    identification purposes as Government's Exhibit 82E for

2    identification purposes.  Do you recognize what you see in

3    Government's Exhibit 82E?

4    A.   It's a description of one of the girls.

5    Q.   Now, where were these descriptions kept?

6    A.   They were kept in a book, in a binder.

7    Q.   And what was the purpose of keeping them in a binder?

8    A.   Whenever a client or a customer would call the service,

9    they used the book as a way of describing the girls to the

10   client.

11   Q.   Now, on the bottom of this particular one, what does it

12   say?

13   A.   Don't send her on a dance show.

14   Q.   And why was that put down there?

15   A.   She didn't want to do any dance shows.  She didn't want

16   to strip, do any -- because that's what they normally did on a

17   dance show.

18   Q.   So what would be the purpose of this girl going on a

19   call?

20           MR. CULLER:  Objection.

21           THE COURT:  If she knows.

22   Q.   Do you know?

23   A.   No, I don't know why she would go on a call.

24   Q.   I'm going to show you what's been marked for

25   identification purposes as Government's Exhibit 82C.  Do you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

468

ANGENITA DAVIS - DIRECT

1   recognize 82C?

2   A.   It was a deposit slip for the credit cards for the

3   contractors which was the girls.

4   Q.   And who kept track of these?

5   A.   Ila would keep track of the credit card deposits and

6   receipts.

7   Q.   And once Ila kept track of it, what were you instructed

8   to do?

9   A.   She -- she had a list of files that after she did

10   whatever she needed to do to whatever paperwork, then I would

11   file the paperwork away and she would have a list of folders

12   that had each thing listed on it, whatever it was that she

13   wanted me to do.

14   Q.   And you kept those folders in some sort of alphabetical

15   sequence?

16   A.   The credit cards, they were kept monthly, from month to

17   month.

18   Q.   Okay.  And how were they kept monthly?

19   A.   I would file them away.

20          MS. MARSTON:  At this time the government moves into

21   evidence 82C.

22          THE COURT:  Any objection?

23          MR. CULLER:  No.

24          THE COURT:  Let it be admitted.

25          (Government's Exhibit Number 82C was received into

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

                                469

1   evidence.)

2   Q.   Now, were you aware of whether the yearly sales were kept

3   in some sort of spreadsheet form?

4   A.   They were.

5   Q.   And how were you aware of this?

6   A.   Because I did the spreadsheet.

7   Q.   Now, were you aware if there was more than one

8   spreadsheet?

9   A.   Yes.

10   Q.   And why was there more than one?

11   A.   There was more than one because she wanted to have a

12   record of how much money she really made and how much money

13   that she was going to claim on her taxes.

14           MR. CULLER:  Objection, Your Honor.

15           THE COURT:  Basis?

16           MR. CULLER:  Relevance.  Why does --

17           THE COURT:  Overruled.

18           MR. CULLER:  I mean, that...

19           MS. MARSTON:  Your Honor, I don't know if this would

20   be a good time for a break, but I do need to show the rest of

21   the files to counsel which I can do during the lunch break.

22           THE COURT:  Very well.  This is a good time to take

23   a break.

24           Members of the jury, we'll take our lunch break at

25   this time and I would ask you to be back ready to come back

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1   into court at 2 o'clock.  Thank you.

2                (Lunch recess at 1:02 p.m.)

3   THURSDAY AFTERNOON, APRIL 13, 2006

4                THE COURT:  Good afternoon, everyone.

5                MR. CULLER:  Good afternoon.

6                MS. MARSTON:  Good afternoon.

7                THE COURT:  Are we ready for the jury?

8                MS. MARSTON:  Yes, Your Honor.

9                MR. CULLER:  Yes, sir.

10               THE COURT:  Call the jury.

11               (Jury entered the courtroom.)

12               THE COURT:  Ms. Marston, you may continue.

13               MS. MARSTON:  Yes, Your Honor.  I believe the

14  parties are willing to stipulate to the entry of these boxes

15  on the floor.  Correct?

16               THE COURT:  Very well.

17               MS. MARSTON:  So at this time the government would

18  move into evidence Government's Exhibits 149, 71, 73, 75, and

19  77.

20               THE COURT:  Any objection?

21               MR. CULLER:  No.

22               THE COURT:  Let those exhibits be admitted.

23               (Government's Exhibits Numbers 71, 73, 75, 77, and

24  149 were received into evidence.)

25                    ANGENITA DENISE DAVIS


               Cheryl A. Nuccio, RMR-CRR (704)350-7494



                            471

ANGENITA DAVIS - DIRECT

1                        DIRECT EXAMINATION (Cont'd.)

2    BY MS. MARSTON:

3    Q.    Now, Ms. Davis, before we broke for lunch, we were

4    talking about the spreadsheet.  I'm going to show you what's

5    been marked for identification purposes as Government's

6    Exhibit 83.  And do you recognize Government's Exhibit 83?

7    A.    Yes.

8    Q.    And is this actually the document that you had in your

9    possession that you provided to the government?

10   A.    Yes.

11   Q.    And why did you have this document in your possession?

12   A.    It was jut one of the things that I did on my computer at

13   home.

14            MS. MARSTON:   At this time the government moves into

15   evidence Government's Exhibit 83.

16            THE COURT:  Any objection?

17            MR. CULLER:  No.

18            THE COURT:  Let it be admitted.

19            (Government's Exhibit Number 83 was received into

20   evidence.)

21   Q.    Now, you said you did this on your computer at home.  Why

22   were you doing this on your computer at home?

23   A.    No particular reason other than it was -- I did this at

24   her office also; but one day I was working on it and I didn't

25   finish it while I was at work, so I just finished it at home.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

472

ANGENITA DAVIS - DIRECT

1  Q.   And this is the yearly sales for what?

2  A.   For 2004.

3  Q.   Well, for what month?

4  A.   Well, this is for her business, One Enterprise.

5  Q.   And what year time frame does it cover?

6  A.   September -- from September of 2003 to September of 2004.

7  Q.   And what was the yearly total at the bottom?

8  A.   $396,190.

9  Q.   And each month, is that listed below each month here --

10 A.   Yes.

11 Q.   -- what the monthly totals are?

12 A.   Yes.

13 Q.   I'm also going to show you what's been previously

14 introduced into evidence as Government's Exhibit 67.  Do you

15 recognize that?

16 A.   Yes.

17 Q.   How do you recognize that?

18 A.   It was the business card for One Enterprise.

19 Q.   I'm also going to show you what's been marked for

20 identification purposes as Government's Exhibit 82L.

21 Actually, this has already been introduced -- no, I'm sorry,

22 82L.  Do you recognize Government's Exhibit 82L?

23 A.   Yes.

24 Q.   And how do you recognize it?

25 A.   It was the -- another form that I worked on.  It was the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

473

2367

ANGENITA DAVIS - DIRECT

1   contractors' total sales.

2   Q.   And is this for the year that you were working with the

3   company in 2004?

4   A.   I'm not sure.

5   Q.   Do you recall working on this document?

6   A.   I do.

7   Q.   Do you recall -- were you working for the business in

8   more than just 2004?

9   A.   No.

10          MS. MARSTON:   At this time the government moves into

11   evidence 82L.

12          THE COURT:   Any objection?

13          MR. CULLER:   No.

14          THE COURT:   Let it be admitted.

15          (Government's Exhibit Number 82L was received into

16   evidence.)

17   Q.   What were the totals for April, May, and June?

18   A.   $48,191.

19   Q.   And July, August, September?

20   A.   33,385.

21   Q.   I'm also going to show you two documents that have been

22   marked for identification purposes.  First is Government's

23   Exhibit 82I and the second is 82J.  Do you recognize

24   Government's Exhibit 82I -- I'm sorry, I'll make that zoom go

25   back out.  And then I'm going to show you 82J.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

474

ANGENITA DAVIS - DIRECT

1       Do you recognize those two documents?

2   A.   I do recognize those two documents, but I did not work on

3   these documents.

4   Q.   All right.  Well, how do you recognize those two

5   documents?

6   A.   They were her business expense sheets.

7   Q.   And when you say her, who are you referring to?

8   A.   Ila Little.

9        MS. MARSTON:  At this time the government moves into

10  evidence 82I and 82J.

11       THE COURT:  Any objection?

12       (No response.)

13       THE COURT:  Let them be admitted.

14       (Government's Exhibits Numbers 82I and 82J were

15  received into evidence.)

16  Q.   I is for what year?

17  A.   2003.

18  Q.   And J is for what year?

19  A.   2004.

20  Q.   And do you know why there's a reference to car rental?

21  A.   Yes.  Ila -- she often rented cars for herself and for

22  her drivers.

23  Q.   And do you know any of her drivers?

24  A.   Yes.

25  Q.   Who do you know to be a driver?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

475

1   A.   I knew Jenny Luckey to be a driver and Jermaine.  I

2   didn't know his last name.

3   Q.   And did you ever meet Jermaine?

4   A.   Once, yes.

5   Q.   And do you see anybody in this courtroom that you know by

6   that name?

7   A.   Yes.

8   Q.   Can you please point out who you knew to be Jermaine.

9   A.   The gentleman right over here sitting in the second seat

10  (indicating).

11  Q.   And what is he wearing?

12  A.   The fourth seat, I'm sorry.

13  Q.   Are you saying the fourth seat from what direction?

14  A.   From this direction (indicating).

15        MS. MARSTON:  Your Honor, may the record reflect

16  that she has identified the defendant Nicholas Ragin that she

17  knew as Jermaine.

18        THE COURT:  Can you tell me what he's wearing?

19        THE WITNESS:  He looks to have on a blue shirt.

20        THE COURT:  And when you say from this direction,

21  you mean your left or your right?

22        THE WITNESS:  From this side (indicating).

23        THE COURT:  You're pointing with your left hand.

24        THE WITNESS:  I'm sorry.

25        THE COURT:  The record will reflect she's identified

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1   Nicholas Ragin.

2   Q.   Now, what was your occasion for meeting him?

3   A.   He visited the office one day when I was working.

4   Q.   Do you recall what time of year that was?

5   A.   It was later in the year.  Maybe like a month before

6   the -- a month before the office was closed.

7   Q.   Now, what was the occasion for him to come visit the

8   office?

9   A.   He came to speak with Ila.

10  Q.   And did you hear any part of that conversation?

11  A.   Yes.

12  Q.   Can you tell the jury the part of the conversation you

13  heard.

14  A.   They were talking about Tracy being arrested and they

15  were talking about another female that had been arrested.

16  They were concerned about David.  They were also speaking

17  about him.  They were concerned about him snitching, as they

18  put it, or, I guess, telling it on whoever, either one of

19  them.  He was also discussing some girls that was staying with

20  him at the time.

21  Q.   Now, do you know where he was staying with those girls at

22  the time?

23  A.   No.

24  Q.   And did you ever have any conversations with him about

25  those girls?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

477

ANGENITA DAVIS - DIRECT

1   A.   No.

2   Q.   Did you ever accept any telephone calls from defendant

3   Tracy Howard?

4   A.   Yes.

5   Q.   And who -- when you accepted those telephone calls, who

6   were you asked to connect to that telephone call?

7   A.   He never gave me a name.  He just gave me a number and I

8   would dial the number, place the phone down.

9   Q.   And do you recall that number?

10  A.   No.  I called different numbers for him.

11  Q.   Now --

12          MS. MARSTON:  Your Honor, may I approach?

13          THE COURT:  You may.

14  Q.   I'm going to show you what's been marked for

15  identification purposes as Government's Exhibit 82S.  And I

16  believe this is a different form of a previous exhibit that

17  we've seen; is that correct?

18  A.   Yes.

19  Q.   And do you recognize this Exhibit 82S?

20  A.   Yes.

21  Q.   And what is 82S?

22  A.   Client files.

23  Q.   All right.  And was this actually kept on the computer

24  database?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

478

ANGENITA DAVIS - DIRECT

1  Q.   Now, I want to direct --

2        MS. MARSTON:  At this time the government moves into

3  evidence 82S.

4        THE COURT:  Any objection?

5        MR. CULLER:  No.

6        THE COURT:  Let it be admitted.

7        (Government's Exhibit Number 82S was received into

8  evidence.)

9  Q.   I want to direct your attention to a particular line here

10  on page 5 of this document.  Do you see where it says, "Do not

11  service.  Model booked.  Police."

12  A.   Yes.

13  Q.   And what was the purpose of having that notation in the

14  system?

15  A.   Whoever the client was that called at the time, they

16  obviously assumed that he was -- that person was the police so

17  they would not service them.  There was a list that they had

18  of clients that was on the do not call -- do not service list.

19  Q.   And who kept track of that list?

20  A.   Whoever would take the calls at night, and Ila would keep

21  track of them.  I would -- once -- they would write the names

22  down.  Then I would put it on the list.

23  Q.   And who did answer the calls at night?

24  A.   There were different girls who came in who answered the

25  phones.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

479

ANGENITA DAVIS - DIRECT

1   Q.   Do you recall any of their names?

2   A.   There was a girl Amanda Dykes and another girl that I can

3   recall.  Her name was O'Shanna Doeman.

4   Q.   I'm also going to show you what's been marked for

5   identification purposes as Government's Exhibit 81E.  Do you

6   recognize Government's Exhibit 81E?

7   A.   Yes.

8   Q.   And how do you recognize it?

9   A.   It was her -- it was -- she would give this to her

10  contractors which was the girls.  If they ever went out on a

11  call and she could not collect the money from them, then they

12  were instructed to deposit the money into this account.

13         MS. MARSTON:  At this time the government moves into

14  evidence 81E.

15         THE COURT:  Any objection?

16         MR. CULLER:  No.

17         THE COURT:  Let it be admitted.

18         (Government's Exhibit Number 81E was received into

19  evidence.)

20  Q.   I'm also going to show you what's been marked for

21  identification purposes as Government's Exhibit 81D.  Do you

22  recognize Government's Exhibit 81D?

23  A.   Yes.

24  Q.   And how do you recognize that?

25  A.   This was posted in the office for the office numbers.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1   Q.   And are there more than one telephone number to access
2   the office and get -- for a customer to call?
3   A.   There was one main number, but there were cell phones
4   that was also used and those cell phones would be forwarded to
5   the one number.
6        MS. MARSTON:  At this time the government moves into
7   evidence 81D.
8        THE COURT:  Any objection?
9        MR. CULLER:  No.
10       THE COURT:  Let it be admitted.
11       (Government's Exhibit Number 81D was received into
12   evidence.)
13   Q.   Now, when you worked at the office, do you recall which
14   suite number you worked in?
15   A.   (No response.)
16   Q.   Did you ever move?
17   A.   Not -- she -- there was one -- she had two offices in the
18   building.  When she moved the first time, I was not working
19   there.
20   Q.   I'm going to show you what's already been introduced into
21   evidence as Government's Exhibit 16B.  Do you recognize 16B?
22   A.   Yes.
23   Q.   How do you recognize it?
24   A.   This is the office building that the office was in.
25   Q.   And is that the office building where you approached and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

481

ANGENITA DAVIS - DIRECT

1   ran into law enforcement that day in October 2004?

2   A.   Yes.

3   Q.   I'm going to show you what's already been introduced into

4   evidence as Government's Exhibit 16N.  Do you recognize

5   Government's Exhibit 16N?

6   A.   Yes.

7   Q.   And how do you recognize that?

8   A.   It's the inside of the office.

9   Q.   I'm going to show you what's already been introduced into

10  evidence as Government's Exhibit 16 -- well, 16P for

11  identification purposes only, Government's Exhibit 16P.  Do

12  you recognize Government's Exhibit 16P?

13  A.   Yes.

14  Q.   And how do you recognize it?

15  A.   This is the inside of Wendy's's office -- well, Ila's

16  office.

17  Q.   And you just -- did you call her Wendy or Ila?

18  A.   I called her Wendy.

19          MS. MARSTON:  Oh, at this time the government moves

20  into evidence 16P.

21          THE COURT:  Any objection?

22          MR. CULLER:  No.

23          THE COURT:  Let it be admitted.

24          (Government's Exhibit Number 16P was received into

25  evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

482

ANGENITA DAVIS - DIRECT

1    Q.    Now, I believe this has already been introduced,

2    Government's Exhibit 16E.  Do you recognize 16E?

3    A.    Yes.

4    Q.    How do you recognize that?

5    A.    That was where the office...

6    Q.    And already introduced into evidence 16F, for

7    identification purposes only 16F.  Do you recognize 16F?

8    A.    Yes.

9    Q.    How do you recognize that?

10   A.    This was the door to the inside of the office.

11          MS. MARSTON:  At this time the government moves into

12   evidence 16F.

13          THE COURT:  Any objection?

14          MR. CULLER:  No.

15          THE COURT:  Let it be admitted.

16          (Government's Exhibit Number 16F was received into

17   evidence.)

18   Q.    I'm going to show you what's already been introduced into

19   evidence as Government's Exhibit 16H.  Do you recognize

20   Government's Exhibit 16H?

21   A.    Yes.

22   Q.    And how do you recognize it?

23   A.    It's the inside of the front office.

24   Q.    Now, is this where you worked?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

483

2377

ANGENITA DAVIS - DIRECT

1   Q.   Is that the computer that you used?

2   A.   Yes.

3   Q.   Now, I'm also going to show you what's been marked for

4   identification purposes as 16I.  It's already introduced.

5   Now, do you recognize 16I?

6   A.   Yes.

7   Q.   And how do you recognize it?

8   A.   Same office.  Front of the office where I worked.

9   Q.   Now, in any of these photographs, do you see that locked

10  file cabinet that you were talking about earlier?

11  A.   No.

12  Q.   Do you know where -- which office it was kept in?

13  A.   It was kept in Ila's office.

14  Q.   I'm going to show you what's been marked for

15  identification purposes as Government's Exhibit 16O, already

16  introduced.  Is that Ila's office?

17  A.   Yes.

18  Q.   And where would the locked file cabinet have been?

19  A.   It would have been over by the fax machine.

20  Q.   Now, I'm also going to show you what's been marked for

21  identification purposes as Government's Exhibit, first, 16K.

22  Do you recognize Government's Exhibit 16K?

23  A.   Yes.

24  Q.   And how do you recognize it?

25  A.   This is the front of the office.  She kept the yellow

Cheryl A. Nuccio, RMR-CRR (704)350-7494

484

ANGENITA DAVIS - DIRECT

1   books.

2   Q.   And were you aware whether there were any yellow books

3   for any other states?

4   A.   Yes.

5   Q.   What other states did she have yellow books for?

6   A.   She had yellow -- she had -- she was placing an ad in the

7   Florida Yellow Book.

8         MS. MARSTON:   At this time the government moves into

9   evidence Government's Exhibit 16K.

10        THE COURT:   Any objection?

11        MR. CULLER:   No.

12        THE COURT:   Let it be admitted.

13        (Government's Exhibit Number 16K was received into

14   evidence.)

15   Q.   And I'm also going to show you what's been marked

16   Government's Exhibit 16M.   Do you recognize Government's

17   Exhibit 16M?

18   A.   Yes.

19   Q.   And how do you recognize it?

20   A.   It's the Naples Yellow Book.

21   Q.   And is that where she was placing her ad?

22   A.   Yes.

23   Q.   Were you there the day that she was working on that ad?

24   A.   I was there, yes.

25   Q.   And what do you recall about that particular day?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

485

ANGENITA DAVIS - DIRECT

1   A.   I was there and not actually while she was working on the

2   ad, but I was there when the ad was paid for.

3   Q.   And how do you know the ad was paid for?

4   A.   Because I wrote the check for the ad.

5        MS. MARSTON:  Your Honor, at this time the

6   government moves into evidence 16M.

7        THE COURT:  Let it be admitted.

8        (Government's Exhibit Number 16M was received into

9   evidence.)

10        MS. MARSTON:  If I may approach.

11   Q.   I'm going to show you what's previously been identified

12   as Government's Exhibit 70.  Do you recognize Government's

13   Exhibit 70?

14   A.   Yes.

15   Q.   And in fact, is some of this your handwriting in

16   Government's Exhibit 70?

17   A.   Yes.

18   Q.   And why is that?

19   A.   Because I would pay some of the -- I would write out the

20   checks for some of the advertising and some of the other bills

21   for the office.

22   Q.   And which account is this?

23   A.   It's Fantasia, First Citizens bank account.

24   Q.   And this is also the same bank account that you sometimes

25   made deposits in?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

486

ANGENITA DAVIS - DIRECT

1  A.   Yes.

2        MS. MARSTON:  At this time the government moves into

3  evidence Government's Exhibit 70.

4        THE COURT:  Any objection?

5        MR. CULLER:  No.

6        THE COURT:  Let it be admitted.

7        (Government's Exhibit Number 70 was received into

8  evidence.)

9  Q.   Now, I want to direct your attention to check number

10  1093.  Do you recall check number 1093?

11  A.   Yes.

12  Q.   And how do you recall it?

13  A.   I wrote the check.

14  Q.   Okay.  And who did you write the check to?

15  A.   I wrote it to the Yellow Book U.S.A for the Naples

16  Florida ad.

17  Q.   Now, going back to check 1013.  Who is that for?

18  A.   Danielle Newkirk.

19  Q.   And what was the purpose of her getting paid?

20  A.   Danielle used to work in the office also.

21  Q.   And --

22  A.   She was also one of the contractors.

23  Q.   And check 1014, who is that payable to?

24  A.   David Howard.

25  Q.   Now, do you know what that was for?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:04-cr-00271-RJC   Document 410 (Court only)   Filed 10/05/07   Page 154 of 256

ANGENITA DAVIS - DIRECT

1   A.   No.

2   Q.   There's no reference on the for line?

3   A.   No.

4   Q.   Check number 1022.

5   A.   Tabitha Johnson.

6   Q.   And what does the for line say for her?

7   A.   Commission.

8   Q.   Now, who worked on commission?

9   A.   Some of the girls who did -- who answered the phone

10  worked commission.

11  Q.   Now, why was it considered commission if they answered

12  the phones?

13  A.   Because they were paid a certain amount per call.

14  Q.   Per call they booked?

15  A.   Per call that they booked.

16  Q.   But they weren't actually going out on the calls, were

17  they?

18  A.   No.  Well, some of them did.

19  Q.   So some of them did both?

20  A.   Some of them did both.

21  Q.   But when they went out on the calls, that's not

22  considered commission.

23  A.   Well, they would get commission for the call and then

24  they would also get paid whatever the fee was.

25  Q.   The fee on the call?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

488

ANGENITA DAVIS - DIRECT

1  A.   Right.

2  Q.   Okay.  So the commission refers to actually taking the

3  telephone call, answering the telephone call, and placing a

4  girl on the call.

5  A.   Right.

6  Q.   And then when a girl went out on the call, how would the

7  money get back to the girl?

8  A.   The girl who --

9  Q.   Who actually went out on the call.

10  A.   Who actually went.  She would collect the money when she

11  was there on the call.

12  Q.   And then what would happen to that money?

13  A.   She would bring her half back to the office or either she

14  would deposit it.

15  Q.   Now, do you know how it worked for either Tracy or

16  David's girls?

17  A.   No.

18  Q.   And are you aware of what areas the girls went on calls

19  for?

20  A.   Yes.

21  Q.   What areas?

22  A.   They went as far as Catawba County and as far as Rock

23  Hill, South Carolina.

24  Q.   Now, looking at check 1085.  Who's that check directed

25  to?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

489

ANGENITA DAVIS - DIRECT

1    A.    That was a check made out to me.

2    Q.    And what was the purpose of that check?

3    A.    It was a payroll check.

4    Q.    Now, I'm also going to show you what's already been

5    introduced as part of 73.  Do you recall this method of

6    filing?

7    A.    Yes.

8    Q.    And what was this method of filing?

9    A.    This was her -- what she would use for her tax purposes.

10   Q.    Okay.

11         MS. MARSTON:  And I'm actually, just for

12   identification purposes for the record, Your Honor, I'm going

13   to label this particular envelope as 74B, but it is already

14   introduced into evidence as part of the box.

15         THE COURT:  Very well.

16   Q.    Now, I notice on the outside of the envelope it says

17   food, supply, gas, and props.  What were props?

18   A.    Props were clothing that she bought or anything that she

19   bought for the business or for the girls.

20   Q.    Well, I'm going to direct your attention to the first

21   receipt here.  What's the first receipt here?

22   A.    It's a receipt from Wal-Mart.

23   Q.    And can you please tell the jury what some of the items

24   were that were purchased for the business as props.

25   A.    Lace cami, lace tight, Trojan lube, condoms, mouthwash.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - DIRECT

1  Q.   Now, why were condoms or Trojan lube needed for the

2  business?

3          MR. CULLER:  If she knows.

4  Q.   Do you know?

5  A.   No.

6  Q.   I'm also going to show you what has already been

7  introduced into evidence, but I'm going to mark it for the

8  record as 76C, Your Honor.  Do you recognize these stamps?

9  A.   Yes.

10  Q.   And what were these stamps used for?

11  A.   They were used for the girls.  Sometimes they took them

12  out with them depending on which company they were

13  representing.  Once they did their credit card calls or, you

14  know, just whatever, they would stamp the receipt.

15  Q.   And can you tell the jury what these three companies were

16  that you had stamps for.

17  A.   Discreet Delight, One Enterprise, and Fantasia.

18  Q.   Now, were all three of these companies located in the

19  same business?

20  A.   Yes.

21  Q.   And did you keep any separate records for any of the

22  three?

23  A.   No.  Everything was listed under One Enterprise.

24  Q.   I'm also going to show you what's already been introduced

25  into evidence as part of Government's Exhibit 77, but I've

Cheryl A. Nuccio, RMR-CRR (704)350-7494

491

ANGENITA DAVIS - DIRECT

1   marked it for identification purposes as 78A.  Do you

2   recognize Government's Exhibit 78A?

3   A.   No.

4   Q.   Well, do you recognize any names on Government's Exhibit

5   78A?

6   A.   Yes.

7   Q.   And what names do you recognize?

8   A.   Ila Aguilar and Allison Walker.

9   Q.   How do you know the name Allison Walker?

10   A.   She was a contractor for Ila.

11   Q.   Well, when you say contractor, what do you mean?

12   A.   She was one of her girls.

13   Q.   And did you know who she was?

14   A.   No.  I didn't really know the girls by their real names,

15   you know, I just knew them by whatever their...

16   Q.   Did you ever meet a girl named Allison Walker?

17   A.   I may have, I don't know.  I can't recall.

18   Q.   Now, I'm also going to show you what's a part of

19   Government's Exhibit 75.  Do you recognize this folder that's

20   labeled -- it was part of Government's Exhibit 75?

21   A.   Yes.

22   Q.   And what is it labeled?

23   A.   Creative Loafing Ad.

24   Q.   And whose handwriting is that?

25   A.   Ila's.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

492

ANGENITA DAVIS - DIRECT

1   Q.   And what was the purpose of having a file labeled

2   Creative Loafing Ad?

3   A.   That was where she kept a record of the different ads

4   that she placed in Creative Loafing.

5   Q.   I'm going to show you what's already been introduced into

6   evidence as Government's Exhibit 14J.  Do you know what 14J

7   is?

8   A.   Yes.

9   Q.   What is it?

10  A.   It was employment verification from an apartment complex.

11  Q.   And what was the purpose of doing that employment

12  verification?

13  A.   The person was trying to get an apartment.

14  Q.   Well --

15  A.   And Ila was verifying his employment.

16  Q.   Did you know a person by the name of Eugene Lewis?

17  A.   No.

18  Q.   Were you aware whether Eugene Lewis worked as a driver

19  for One Enterprise?

20  A.   I had never --

21          MR. CULLER:  She said she didn't know Eugene Lewis.

22          THE COURT:  Overruled.

23  Q.   You can answer my question.

24  A.   I was just told to fax this -- I was given this

25  information by Ila.  She told me to fax it back -- to write

Cheryl A. Nuccio, RMR-CRR (704)350-7494

493

ANGENITA DAVIS - CROSS

1   everything on here and fax it back to the company.

2   Q.   And do you recall how many times you did an employment

3   verification like this?  Approximately.

4   A.   Approximately three or four times.

5   Q.   Do you remember the different apartment complexes that

6   you sent these employment verifications to?

7   A.   No.

8              MS. MARSTON:  No further questions.

9              THE COURT:  Mr. Culler, any cross?

10             MR. CULLER:  Yes, sir.  Can I have just a moment.

11   I've got to go through the boxes.

12             THE COURT:  You may.

13             MR. CULLER:  Thank you.

14             (Pause.)

15             MR. CULLER:  Your Honor, may I start right here

16   while I'm up here?

17             THE COURT:  You may.

18             MR. CULLER:  Thank you.

19                  CROSS EXAMINATION

20   BY MR. CULLER:

21   Q.   Ma'am, we've never met before, have we?

22   A.   No.

23   Q.   Your name is Ms. Davis; is that right?

24   A.   Yes.

25   Q.   Okay.  I just want to start out, just pull out this one

Cheryl A. Nuccio, RMR-CRR (704)350-7494

494

1   marked as Government's Exhibit 80A, a young woman by the name

2   of Kianna as noted here.  Did you ever meet Kianna?

3   A.   Kianna, yes.

4   Q.   Do you know where she is now?

5   A.   No.

6   Q.   When you say you met her, did you meet her at one of

7   these meetings or did you see her coming by the office on a

8   regular basis?

9   A.   She came to the office and I did her paperwork.

10  Q.   Yes, ma'am.  So you met her at the office.

11  A.   Yes.

12  Q.   Did you also meet her at some of the meetings?

13  A.   No.

14  Q.   How many times did you see her at the office?  Just the

15  one time or a number of times?

16  A.   Approximately three or four times.

17  Q.   Three or four times.  Was it common for the women to come

18  by the office?

19  A.   No, not during the hours that I worked there.

20  Q.   And you worked from what hours?

21  A.   9:00 to 5:00.

22  Q.   Okay.  Were you working Monday through Friday?

23  A.   Friday, uh-huh.

24  Q.   So just regular working hours --

25  A.   Right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:04-cr-00271-RJC   Document 410 (Court only)   Filed 10/05/07   Page 162 of 256

1   Q.   -- for the most part, right?

2   A.   Uh-huh.

3   Q.   And did you help Kianna with her employment application?

4   Is that what you did with her?

5   A.   She filled out everything and I gave her the paperwork

6   for everything that she needed to fill out.  And I also took

7   her picture.

8   Q.   All right.  And she came up from Florida; is that right?

9   A.   Yes.

10  Q.   Were there a lot of young women that came up from Florida

11  to work for Ila?  Ms. Little.

12  A.   I was aware of two.

13  Q.   Two.  Okay.  Now, did those -- those women, do they get

14  like tax documentation from the business, do you know?

15  A.   No, they didn't.

16  Q.   And so they kept their money after they went out and did

17  a job, right?  They would keep their part of the money and

18  then they would pay the rest back to the company; is that

19  right?

20  A.   Yes.

21  Q.   Okay.  Just -- did you know Danielle Combs?

22  A.   No.

23  Q.   This is not the same Danielle you were talking about a

24  minute ago, right?

25  A.   Not that I know of.  Like I said before, the girls went

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Appeal: 14-7245   Doc: 56   Filed: 10/15/2015   Pg: 501 of 795

Case 3:04-cr-00271-RJC   Document 410 (Court only)   Filed 10/05/07   Page 163 of 256

ANGENITA DAVIS - CROSS

1   by different names.

2   Q.   Right.  Well, this particular girl went by the -- I guess

3   stage name of Diamond; is that right?

4   A.   Right.

5   Q.   It's got listed on here that she was terminated at some

6   point.  Do you see that?

7   A.   Yes.

8   Q.   Is that your handwriting there?

9   A.   Yes, it is.

10  Q.   Now, did you actually participate in her being

11  terminated?

12  A.   No.

13  Q.   Okay.  Those decisions were made by Ila; is that right?

14  A.   All decisions was made by Ila.

15  Q.   Was there anybody else involved in the business decisions

16  that you knew of?  Like a secretary of the corporation or vice

17  president of the corporation or anything like that?

18  A.   No.

19  Q.   All right.  This other name, Tabitha Johnson.

20  A.   Uh-huh.

21  Q.   This has got terminated written on it.  That is not -- or

22  actually, it's not spelled right, but I think this says

23  intended to be terminated and never will work again, right?

24  A.   Right.

25  Q.   Is that your handwriting?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

497

ANGENITA DAVIS - CROSS

1  A.   No.

2  Q.   Do you recognize that handwriting?

3  A.   It's Ila's handwriting.

4  Q.   And this is for Tabitha Johnson, right?

5  A.   Right.

6  Q.   Did you ever meet Tabitha?

7  A.   Like I said before, a lot of the girls I did not know

8  them by their legal name.  I knew most of them by their stage

9  names.  When I called them for the meetings or whatever, I

10 would call them using their stage name.

11 Q.   Look at that picture.  Do you recognize that female?

12 A.   Not by that picture, no.

13 Q.   Now, I take it, then, you don't know why she was

14 terminated.

15 A.   No.

16 Q.   Or have any recollection of that, right?

17 A.   No.

18 Q.   You had mentioned that you knew that Ms. Little was using

19 some rent a cars -- rental cars; is that right?

20 A.   Yes.

21 Q.   You said that she would use them and some of her drivers

22 would use them; is that correct?

23 A.   Yes.

24 Q.   You mentioned someone who was driving for her and I

25 didn't catch the name.  Who was that person?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

498

ANGENITA DAVIS - CROSS

1   A.   Jenny Luckey and Jermaine.

2   Q.   That's right.  That's Ms. Luckey?

3   A.   Yes.

4   Q.   She was also a contractor; is that correct?

5   A.   No.

6   Q.   No?

7   A.   No.

8   Q.   Did you know anyone else who was driving for Ms. Little?

9   A.   Just Jermaine.

10  Q.   Okay.  There's a -- well, you had mentioned this

11  Government's Exhibit 79A, the composition book.  It's all in

12  your writing; is that right?

13  A.   Yes.

14  Q.   And these are notes that you took for meetings held?

15  A.   Yes.

16  Q.   And meetings would be held on, what, on a monthly basis

17  or...

18  A.   Yes.

19  Q.   Was that pretty consistent that meetings were held on a

20  monthly basis?

21  A.   Yes.

22  Q.   And what was the -- what would you say the purpose of the

23  meetings were or was?

24  A.   The purpose of the meetings, she would get the girls

25  together and discuss some of the issues that had taken place

Cheryl A. Nuccio, RMR-CRR (704)350-7494

499

ANGENITA DAVIS - CROSS

1  during the month.  It was just regular company meetings.

2  Q.  Sure.

3  A.  She would discuss, you know, whatever she felt was

4  necessary.  She meaning Ila.

5  Q.  Did any men attend these meetings?

6  A.  No.  There was a contractor, her husband attended the

7  meeting with her once.

8  Q.  Any other -- any men not relation -- in relationships

9  with the women that you know?

10  A.  No.

11  Q.  You said that -- did I hear you say that Tracy's girls

12  did not attend the meetings?

13  A.  Right.

14  Q.  In fact, you mentioned something about there was a call

15  one time where you heard -- you were talking to Mr. Tracy

16  Howard; is that right?

17  A.  Yes.

18  Q.  Now, had you met Mr. Tracy Howard personally?

19  A.  I met him once at the office.

20  Q.  And you talked to him on the phone other times than this

21  occasion.

22  A.  Yes.

23  Q.  But you remember this particular call.

24  A.  Yes.

25  Q.  And during this call, I think at the end you said that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

500

ANGENITA DAVIS - CROSS

1  Ila said, you know, you don't have to talk to him about the
2  meetings or anything like that, right?
3  A.   No.   What I said is she told me not to call Tracy's girls
4  anymore because he did not want me to call the girls.
5  Q.   Okay.
6  A.   Because they would not be attending the meetings.   And he
7  pretty much stated the same thing on the phone when I spoke
8  with him.
9  Q.   Okay.   In here you talked about the company's policy for
10  bonding out persons.   And there's actually a part in here
11  about what the company policy was with respect to drug
12  violations, right?
13  A.   Right.
14  Q.   And what was the policy?
15  A.   No drugs were allowed.
16  Q.   Right.   And what would happen --
17  A.   Drug use.
18  Q.   What would happen if you were arrested for drug use?
19  A.   She would not bond you out.
20  Q.   By the way, did you ever see those company rules that...
21  A.   Yes.
22  Q.   Is it correct that one of the company rules pertained to,
23  I'm just going to say prostitution or sex, for sex calls; is
24  that right?
25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

501

ANGENITA DAVIS - CROSS

1  Q.   And is that something that was discussed at the meetings?

2  A.   No.

3  Q.   Is it correct that you did not ever go on any of these

4  calls, right?  Personally.

5  A.   Right, that is correct.

6  Q.   You can't say whether a particular call to South -- to

7  Rock Hill, South Carolina, or Ft. Mill, South Carolina, was a

8  call for a sexual encounter or was a call for dancing or was a

9  call for, you know, just actually being someone there to

10  escort a person or whatever, right?  You don't know.

11  A.   I don't know because I never went out on the calls.

12  Q.   To your knowledge, were any of the girls arrested for

13  alleged prostitution activities in South Carolina?

14  A.   Not to my knowledge, no.

15  Q.   Do you know if any of the girls were arrested for

16  prostitution activities in North Carolina?

17  A.   No.

18  Q.   Did this -- this composition book that has notes for

19  monthly meetings, it just has notes for two meetings, August

20  and September 2004.  Did you discontinue using this particular

21  book or did you stop taking notes or what?

22  A.   There was -- I just started using that book for those

23  months.  There was other documentation of the monthly meetings

24  in another book.

25  Q.   And you haven't seen that book --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

502

ANGENITA DAVIS - CROSS

1   A.   No.

2   Q.   -- since you've been up here?

3   A.   No.

4   Q.   After you were initially -- after you were, say,

5   interviewed by the police officials that were doing the

6   search, okay.  You know, the ones that followed -- or had you

7   come back and you met with them and then you went to your --

8   was it your brother's house?

9   A.   Yes.

10  Q.   And you turned over the boxes, right?  You talked about

11  that.

12  A.   Yes.

13  Q.   Is that the last time that you saw anyone associated with

14  law enforcement until today?

15  A.   No.

16  Q.   How many times have you seen, you know, law enforcement

17  people from the time that you turned the boxes over to them

18  till today?

19  A.   I had not been in touch with anyone until about two weeks

20  ago and since then I have seen them twice.

21  Q.   And when you say them, are you referring to Ms. Marston

22  here and others?

23  A.   I met Ms. Marston two weeks ago.

24  Q.   And did you -- have you talked with her on two different

25  occasions?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

503

ANGENITA DAVIS - CROSS

1   A.   Yes.

2   Q.   Basically went over what you were going to talk about in

3   court, right?  What you talked about so far.

4   A.   Yes.

5   Q.   And went over some of the material in these boxes.

6   A.   Yes.

7   Q.   Now, were you -- were you ever investigated for any --

8   A.   No.

9   Q.   -- role with respect to this --

10   A.   No.

11   Q.   -- investigation?

12   A.   No, sir.

13   Q.   And of course, you never did anything illegal, right?

14   A.   That is correct.

15   Q.   Okay.  You certainly had no knowledge that you were

16   involved in a prostitution ring, right?

17   A.   No, I did not.

18   Q.   And if you thought you were working for a prostitution

19   ring, you sure would have gotten out of that job, right?

20   A.   At the time that I worked for Ila, I was under the

21   impression that everything was legitimate.

22   Q.   That's my point.  While you were working there, if it had

23   come to your attention that you were working for a

24   prostitution ring, you'd have gotten out of that job, wouldn't

25   you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

504

ANGENITA DAVIS - CROSS

1  A.   I will say this.  I wasn't aware of what anybody else was

2  doing.  I was -- there were rumors that there was prostitution

3  going on, but I did not know that for a fact --

4  Q.   Ma'am --

5  A.   -- so I continued to work there.

6  Q.   Ma'am --

7  A.   If I had known that for a fact that it was a prostitution

8  ring, yes, I would have quit.

9  Q.   Thank you for answering my question.

10  A.   You're welcome.

11       MR. CULLER:  Excuse me, Your Honor, if I can have

12  just a moment.

13       (Counsel and defendant conferred.)

14       MR. CULLER:  I think that's all, Your Honor.  Thank

15  you.

16       THE COURT:  Mr. Adolf.

17               CROSS EXAMINATION

18  BY MR. ADOLF:

19  Q.   Good afternoon, ma'am.

20  A.   Good afternoon.

21  Q.   You talked earlier about when you started working for

22  Ila.  Do you recall when that was, ma'am?

23  A.   It was either in the last part of April or early part of

24  May.

25  Q.   So that was right around May 1st of 2004, give or take a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

505

ANGENITA DAVIS - CROSS

1  week or so.  Somewhere in that range.

2  A.   Yes.

3  Q.   Now, the prosecutor showed you some records that had the

4  name -- computerized records that had the name David somewhere

5  on them, on top.

6  A.   Yes.

7  Q.   Do you recall that?

8  A.   Yes.

9  Q.   And there was also dates on that earlier that year; is

10 that right?

11 A.   That's correct.

12 Q.   So you didn't have anything to do with the creation of

13 those records, right?

14 A.   No, those records were already on file.  Some of them

15 were already on file at the time that I came.

16 Q.   Right.  And so you have no idea when those were entered

17 or when they were -- or who entered them or any of the

18 circumstances around how that happened; is that right?

19 A.   Ila told me that she created the spreadsheets and that

20 she worked on them herself.  After I started working for her,

21 then she instructed me to work on them.

22 Q.   Okay.  But as for any of the spreadsheets that were for,

23 say, January, February, March, all -- you don't have any

24 personal knowledge from your own eyes and ears as far as how

25 those were created, right?

         Cheryl A. Nuccio, RMR-CRR (704)350-7494

ANGENITA DAVIS - CROSS

1   A.   Right.

2   Q.   Now, when calls would come in for people interested in

3   the service, right, that's how the service worked, right?

4   A.   Yes.

5   Q.   And you would answer those calls from time to time.

6   A.   No, I never answered any of the calls.  I worked 9:00 to

7   5:00.  The calls did not come in during the daytime.

8   Q.   Never any calls came in during the day?

9   A.   No, not to the office.

10  Q.   Do you know where they came in to?

11  A.   They came on the cell phones.

12  Q.   On which cell phones, I'm sorry.

13  A.   There were different cell phones that were used for the

14  business and Ila usually kept those cell phones with her

15  during the daytime and she would take the calls during the

16  day.  No calls were ever placed to the office.

17  Q.   Okay.  So the people calling in for service, those calls

18  didn't go to the office phones at all.

19  A.   Not during the daytime.  At night the calls would be

20  transferred to the phone in the office and a person would come

21  in to the office at night and take those calls.

22  Q.   Okay.  Now, you said something about how you had -- I

23  gather you didn't have a lot of contact with the girls or the

24  women who were working while you were in the office, right?

25  A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

507

ANGENITA DAVIS - CROSS

1   Q.   Although you did have contact with a few of them.

2   A.   A few of them, yes.

3   Q.   And you saw some at meetings.

4   A.   Yes.

5   Q.   And in fact, you took attendance at the meetings, right?

6   A.   Right.

7   Q.   Did you personally know any of the women there who went

8   by the name of Crystal?

9   A.   No.

10   Q.   What about Destiny?

11   A.   I can recall someone that worked by the name of Destiny,

12   but like I said before, the girls used different names all the

13   time.  So when you're hearing 60 or 70 different names, you

14   know, they all really just started to blend into one.

15   Q.   I understand.  And did you have also the problem

16   sometimes different girls would use the same name since they

17   were sort of using different names a lot?

18   A.   I was aware that some of them did use the same name, but

19   Ila would instruct them not to do that.

20   Q.   Right, but that would come up from time to time in any

21   event, right?

22   A.   Sometimes, yes.

23   Q.   What about anyone named Candy, is that a fairly common

24   name?

25   A.   I was only aware of one girl named Candy or one person

Cheryl A. Nuccio, RMR-CRR (704)350-7494

508

ANGENITA DAVIS - CROSS

1    named Candy.  I don't recall meeting her.

2    Q.    Okay.  So you never personally met anyone named Candy

3    that was working there.

4    A.    No.

5    Q.    You mentioned something about how basically Ila kept two

6    sets of books.

7    A.    Yes.

8    Q.    And the purpose of that was so that you would have one

9    for tax purposes; is that -- I think that's what you said.

10   A.    Yes.

11   Q.    And then she had another one that actually was the true

12   reflection of what the business -- what money was really

13   coming in and going out, where it was going, and things of

14   that nature, right?

15   A.    Right.

16   Q.    Now -- and Ila was in control of all these books, right?

17   A.    Me and Ila both worked on those books.

18   Q.    Right.  Well -- but you didn't have any control as to how

19   she would label a particular expense for tax purposes or

20   anything else, right?

21   A.    No.

22   Q.    Now -- and she was billing many different items to the

23   business; is that right?  All kinds of different things.

24   A.    She billed mostly food, props, that kind of stuff.  Gas.

25   Q.    Now, I notice in those records there, there are also

Cheryl A. Nuccio, RMR-CRR (704)350-7494

509

ANGENITA DAVIS - CROSS

1   receipts for rental cars; is that right?

2   A.   Yes.

3   Q.   Now, I think you told us some of those were for drivers.

4   A.   Yes.

5   Q.   Some of them were also for Ila herself, right?

6   A.   Yes.

7   Q.   And those were vehicles that she might be using for her

8   own personal use, right?

9   A.   Yes.

10   Q.   So part of what she was doing -- I'm not saying that you

11   were necessarily aware of this at the time.  I'm just asking

12   that being familiar with the records and the way she was

13   operating, is it fair to say that there was some expenses of

14   hers that were actually personal expenses?

15   A.   Well, Ila used to drive some of the girls herself.

16   Q.   Right.  But she wasn't -- every time she got in one of

17   her own -- a car -- vehicle of her own, a rental car of her

18   own, she wasn't driving the girls every time she got in the

19   car, right?

20   A.   I wouldn't have any knowledge of that.  I don't know.

21   Q.   Well, is it fair to say based on your knowledge of the

22   records, the two sets of books and so forth, that one of the

23   things Ila would do is she would charge things as being

24   business expenses for tax purposes in that set of books that

25   might be, at least in part, for her own personal use; is that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

510

ANGENITA DAVIS - CROSS

1    fair to say?

2    A.   I wouldn't know that.  I don't know.

3         MR. ADOLF:  I'm sorry, Your Honor, if I can just

4    have a moment?

5         THE COURT:  You may.

6         (Pause.)

7    BY MR. ADOLF:

8    Q.   You said something about payroll checks being issued to

9    some of the women that worked there; is that right?

10   A.   Yes.

11   Q.   And that was because there were situations where they got

12   paid by -- well, let me back up.  There was some situations

13   where they were paid in cash and the portion that was due them

14   they would just keep and turn in the rest, right, when it was

15   cash?

16   A.   When it was cash, yes.

17   Q.   But they couldn't do that when it was a credit card,

18   right?

19   A.   Right.

20   Q.   So in that case, a check would have to be issued, right?

21   A.   Right.

22   Q.   Now, for those purposes on the payroll, they would have

23   to -- there would have to be a check -- well, let me rephrase

24   that.

25        If one of the women received a check from the business,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

511

ANGENITA DAVIS - CROSS

1    she would then have to either deposit that check, cash that

2    check or something of that nature in order to get that money;

3    is that right?

4    A.    Correct.

5    Q.    So that check couldn't be issued in a made up name like,

6    you know, Destiny or something like that, right?

7    A.    No.

8    Q.    That would have to be a check that matched up with some

9    sort of either actual name or identification that the young

10   lady had so that she could get that money; is that right?

11   A.    Right.

12   Q.    And if she didn't have any kind of valid identification,

13   then it would be difficult for her to cash that check, right?

14   A.    It would be if the check was wrote out -- was made out to

15   her, yes.

16              MR. ADOLF:  I have nothing further, Your Honor.

17   Thank you.

18              THE COURT:  Mr. Mackey.

19              MR. MACKEY:   Thank you, Your Honor.

20                        CROSS EXAMINATION

21   BY MR. MACKEY:

22   Q.    Ms. Davis, you stated that you recognize my client from

23   where?

24   A.    I met him at the office.

25   Q.    All right.  At the office.  And you said he was a driver

Cheryl A. Nuccio, RMR-CRR (704)350-7494

512

ANGENITA DAVIS - CROSS

1  for Ila; isn't that correct?

2  A.   Yes.

3  Q.   All right.  Now, you stated that he began driving for Ila

4  in the latter part of the year.  Is that your testimony?

5  A.   That's when I met him.

6  Q.   Okay.

7  A.   I don't know how long he drove for her.

8  Q.   But you said about a month before the business stopped;

9  isn't that correct?

10  A.   That's when I met him.

11  Q.   Okay.  And when did the business stop?

12  A.   The business closed in October.

13  Q.   Okay.  Now, are you sure you only saw him there one time?

14  A.   I can only recall once.

15  Q.   Okay.

16  A.   Where I had contact with him where I was formally

17  introduced to him.

18  Q.   All right.  So -- and that was during the time when

19  you -- when he came in, he had a conversation with Ila.

20  A.   That is correct.

21  Q.   Okay.  Did the drivers usually come by the office during

22  the day?

23  A.   No, they did not.

24  Q.   Because they worked at night, didn't they?

25  A.   They did work at night.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

513

ANGENITA DAVIS - CROSS

1   Q.   Okay.  So now, when he was there during the day talking

2   to Ila, how far away was that conversation from where you

3   worked?

4   A.   He was right in the same office with me.  He was not

5   inside of her office.

6   Q.   So he was inside of her office.

7   A.   He was inside the office, the front office where I

8   worked.

9   Q.   Okay.  And how far away from your work station was that?

10  A.   He was standing practically beside me.  The space is not

11  that big.

12  Q.   And now, did he stay in the office after Ila left?

13  A.   No.

14  Q.   Okay.  Now, can you see him okay?  Do you need to put

15  your glasses back on?

16  A.   No, I can see him.

17  Q.   And you're positive that he didn't stay in the office

18  after Ila left.

19  A.   Not that I can recall, no, he did not.

20  Q.   Isn't it true that after Ila left, that you had sex with

21  my client in the office?

22          MS. MARSTON:   Objection.

23  A.   No, that is --

24          THE COURT:   Overruled.

25  A.   I was pregnant at the time that I worked for Ila.  Very

Cheryl A. Nuccio, RMR-CRR (704)350-7494

514

ANGENITA DAVIS - REDIRECT

1  pregnant.

2  Q.   And isn't it true that it was a second occasion that you

3  had sex in that office with my client?

4  A.   I have never had sex with your client.  Never.  Ever.

5          MR. MACKEY:  No further questions, Your Honor.

6          THE COURT:  Mr. Brown.

7          MR. BROWN:  No questions, Your Honor.

8          THE COURT:  Any redirect?

9          MS. MARSTON:  Very briefly.

10                    REDIRECT EXAMINATION

11  BY MS. MARSTON:

12  Q.   The Government's Exhibit 83, that spreadsheet that you've

13  had at your house, do you recall seeing that?

14  A.   I'm sorry, could you repeat that.

15  Q.   I'm sorry.  Sort of get back on track here.  Government's

16  Exhibit 83.  Do you recall seeing this before?

17  A.   I think I turned it off.

18       Okay.  Yes.

19  Q.   That's the spreadsheet that you had worked on for Ila at

20  your house; is that correct?

21  A.   Yes.

22  Q.   Is that an accurate spreadsheet?

23  A.   It is.

24  Q.   How did the girls primarily get paid?  In what form?

25  A.   Cash.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

DAN DECKER - DIRECT

1          MS. MARSTON:  No further questions.

2          THE COURT:  Any objection to this witness being

3   excused?

4          MR. CULLER:  No.

5          THE COURT:  You may step down and be excused.

6          (Witness stepped down.)

7          THE COURT:  Call your next witness.

8          MS. MARSTON:  United States calls Officer Dan

9   Decker.

10                     DAN DECKER,

11   being first duly sworn, was examined and testified as follows:

12                  DIRECT EXAMINATION

13   BY MS. MARSTON:

14   Q.   Can you please state your name to the jury.

15   A.   Officer Dan Decker, Charlotte-Mecklenburg Police

16   Department.

17   Q.   And Officer Decker, how long have you been with the

18   Charlotte-Mecklenburg Police Department?

19   A.   Since July of 2000.

20   Q.   And what are your responsibilities with the police

21   department?

22   A.   Right now I'm on the street crimes task force.  We

23   investigate violent criminals and drug complaints.

24   Q.   And what division are you with?

25   A.   Street crimes task force is a citywide task force.


          Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   to take our morning break at this time.  Remind you not to

2   talk about the case.  Keep an open mind until the end of the

3   case.  And I'll ask you to be ready to come back into court at

4   11:35.

5           (Jury exited the courtroom.)

6           THE COURT:  Ms. Marston, I'd ask you to have your

7   next witness in court at 11:35 and ready.

8           MS. MARSTON:  Yes, sir.

9           (Brief recess at 11:17 a.m.)

10          THE COURT:  Are we ready for the jury?

11          MS. MARSTON:  Your Honor, I made a request and I

12  believe my witness is probably outside that door.

13          THE COURT:  Call the jury.

14          (Jury entered the courtroom.)

15          THE COURT:  Call your next witness.

16          MS. MARSTON:  United States calls Keshia Burris.

17                    KESHIA BURRIS,

18  being first duly sworn, was examined and testified as follows:

19                  DIRECT EXAMINATION

20  BY MS. MARSTON:

21  Q.   Please state your name to the jury.

22  A.   Keshia Burris.

23  Q.   Ms. Burris, how old are you?

24  A.   Nineteen.

25  Q.   And how much school did you complete?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   Eighth grade.

2   Q.   Where are you currently residing?

3   A.   In jail central.

4   Q.   And why are you in jail central?

5   A.   Because I have been charged with conspiracy and a gun.

6   Q.   What kind of conspiracy were you charged in?

7   A.   To distribute cocaine.

8   Q.   I'm going to show you what's been marked for

9   identification purposes only as Government's Exhibit 98A.  Do

10  you recognize your name at the top of Government's Exhibit

11  98A?

12  A.   Yes.

13  Q.   Now, I'm going to direct your attention to page 6 of

14  Government's Exhibit 98A.  Is that the conspiracy that you're

15  talking about?

16  A.   Yes.

17  Q.   Now, did you also have some additional charges in

18  Government's Exhibit 98A?

19  A.   Yes.

20  Q.   And do you recall what those additional charges are?

21  A.   It was a fictitious ID and the gun.

22       MR. BROWN:  Your Honor, I can't hear.

23       THE COURT:  Can you bend that microphone a little

24  closer to your mouth and speak into it.

25       (Witness complied.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

518

KESHIA BURRIS - DIRECT

1   Q.   Now, did you enter into a plea agreement with the United

2   States?

3   A.   Yes.

4   Q.   I'm going to show you what's been marked for

5   identification purposes as Government's Exhibit 98B.  Do you

6   recognize Government's Exhibit -- and you can move that screen

7   up towards you if it's easier to see and then push it back

8   down when you need to.

9          (Witness complied.)

10  A.   Yes.

11  Q.   What did you plead guilty to?

12  A.   To conspiracy.

13  Q.   Specifically to count thirteen?

14  A.   Yes.

15  Q.   And directing your attention to the second page -- well,

16  actually, let me direct your attention to the last page of

17  this Government's Exhibit 98B.  Do you recognize your

18  signature on the last page?

19  A.   Yes.

20  Q.   And who else's signature do you also recognize?

21  A.   My lawyer.

22  Q.   And did you go over this with your lawyer prior to

23  entering into it and signing it?

24  A.   Yes.

25  Q.   Now, I'm going to direct your attention to page 2.  Did

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  you agree to a certain amount of cocaine base that was

2  reasonably foreseeable to you?

3  A.   Yes.

4  Q.   What amount was that?

5  A.   It was...

6  Q.   I direct your attention --

7  A.   I don't see it.

8  Q.   -- to paragraph 7A.  Does that help refresh your memory

9  as to the amount of cocaine base?

10 A.   Yeah.

11 Q.   And what was that amount that you agreed?

12 A.   50 grams.

13 Q.   Or more?

14 A.   Yes.

15 Q.   Now, I'm also going to direct your attention to the

16 bottom of page 5 where it begins with assistance to the

17 government.  Did you go over those provisions with your

18 attorney before entering into this plea agreement?

19 A.   Yes.

20 Q.   And what was your understanding of the assistance to the

21 government provisions?

22 A.   To tell the truth.

23 Q.   And what might happen in exchange for you telling the

24 truth?

25 A.   That some of my charges will be dropped.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

520

1    Q.    Now, have some of your charges already been dropped or

2    agreed to be dismissed at a later date because of the plea

3    agreement that you entered into?

4    A.    Yes.

5    Q.    And have any promises been made to you that anything

6    additional is going to happen?

7    A.    No.

8    Q.    What do you hope happens?

9    A.    That I get lesser time.

10    Q.    Now, at some point were you actually not in custody

11    regarding these charges?

12    A.    (No response.)

13    Q.    At some point in time were you not in jail even though

14    you had these charges pending?

15    A.    Yes.

16    Q.    And can you tell the jury what you were on at that point

17    in time.

18    A.    I was on house arrest.

19    Q.    And what conditions of your house arrest did you also

20    have?

21    A.    I had an ankle bracelet and I could only go out to get a

22    job or go to school.

23    Q.    Now, did there come a point in time where you violated

24    those conditions?

25    A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

521

KESHIA BURRIS - DIRECT

1   Q.    And what did you do?

2   A.    I cut the bracelet off and ran.

3   Q.    And were you later found?

4   A.    Yes.

5   Q.    And have you now been in custody since that time you were

6   found?

7   A.    Yes.

8   Q.    I'm going to show you what's been marked for

9   identification purposes as Government's Exhibit 98F.  Do you

10  recognize that as a copy of the violation report completed by

11  your probation officer?

12  A.    Yes.

13  Q.    Now, when you were released, had you agreed to be

14  debriefed by law enforcement?

15  A.    Yes.

16  Q.    And had your attorney requested an agreement to provide

17  truthful disclosure from the government?

18  A.    Yes.

19  Q.    And I am going to show you what's been marked as

20  Government's Exhibit 98C for identification purposes.  Do you

21  recognize your attorney's name on Government's Exhibit 98C?

22  A.    Yes.

23  Q.    Then I'm going to turn to the second page.  Do you

24  recognize your signature on that page?

25  A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   Q.   And who else's signature do you also recognize?

2   A.   My lawyer's.

3   Q.   Now, what was your understanding of this agreement 98C?

4   A.   To what?

5   Q.   What was your understanding of what that agreement

6   requiring truthful disclosure was providing to you?

7   A.   To tell the truth.

8   Q.   But what in exchange -- by signing that agreement, how

9   were you protected?

10  A.   What do you mean?

11  Q.   What was your understanding of how you were protected by

12  giving this to the U.S. Attorney's Office?  What did the U.S.

13  Attorney's Office agree wouldn't happen to the things you

14  told?

15  A.   That they can't hold it against me.

16  Q.   Now, do you recall any conversation with your lawyer

17  regarding if you confessed to any violent crimes?

18  A.   Yes, we talked about it.

19  Q.   Well, what did you talk about?

20  A.   That it couldn't be -- that if I told them anything about

21  violent crimes, that he would have to say something.

22  Q.   Who's he?

23  A.   My lawyer.  Or the detectives.

24  Q.   And do you know whether or not that document I just

25  showed you spells out that understanding that you have?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

523

KESHIA BURRIS - DIRECT

1  A.   No, it does not.

2  Q.   Now, while you've been in custody, you've also gone

3  through an evaluation; is that correct?

4  A.   Yes.

5  Q.   And do you know what the results of that evaluation are?

6  A.   Yes.

7  Q.   What have you been diagnosed having?

8  A.   It was two things.  I don't remember what it was, but I

9  was diagnosed with two things.

10  Q.   Did one of them involve a chemical dependency?

11  A.   Yes.

12  Q.   And what did the evaluation determine you were chemically

13  dependent on?

14  A.   Drugs and alcohol.

15  Q.   And did it say specifically what kind of drugs?

16  A.   Said weed.

17  Q.   Now, are you currently taking something, some medication?

18  A.   Yes.

19  Q.   What medication are you taking?

20  A.   Remeron.

21  Q.   And do you know why you're taking that medication?

22  A.   To -- because for stressed out and to help me sleep.

23  Q.   And is the stress related to the second thing that you

24  were diagnosed with?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   Now, has there ever been any other time in your life that

2  you've been prescribed certain medication to take?

3  A.   Yes, when I was younger.

4  Q.   And will you tell the jury about that.

5  A.   I was placed on Paxil and Clonidine.

6  Q.   And do you remember why you were placed on those two

7  medications?

8  A.   Because I was depressed because I couldn't be with my

9  family.

10 Q.   Now, when approximately was this?

11 A.   Around maybe 12 years old.

12 Q.   And why weren't you able to be with your family when you

13 were 12 years old?

14 A.   Because DSS took me from my mom when I was ten.

15 Q.   And approximately how long were you in DSS custody?

16 A.   From ten to 16.

17 Q.   And while you were in DSS custody, did you run away?

18 A.   Yes.

19 Q.   Approximately how many times did you run away from DSS

20 custody?

21 A.   Over 30 times.

22 Q.   Now, have you also tried other drugs in your life?

23 A.   Yes.

24 Q.   What else have you tried?

25 A.   I've tried crack, weed, powder, X, and alcohol.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

525

KESHIA BURRIS - DIRECT

1   Q.   Now, when you say X, what are you referring to?

2   A.   X pill.

3   Q.   Now, I want to go back to the summer of 2002.  Were you

4   in DSS custody back then?

5   A.   Yes.

6   Q.   And can you tell the jury what happened during the course

7   of that summer while you were in DSS custody.

8   A.   In 2002?

9   Q.   Yes.

10  A.   A friend of mine, me and her had ran away from a group

11  home and -- me and her had ran away.  We went to her sister's

12  house.  And while I was over there, I -- her sister had

13  called -- Shenita Lindsay had called on the phone and asked

14  her sister what she was doing.

15            MR. CULLER:  Object to the hearsay.

16            THE COURT:  Sustained.

17            MS. MARSTON:  Your Honor, it's not offered for the

18  truth.  It's only offered to show what she did next.

19            THE COURT:  Members of the jury, I'll permit it for

20  the limited purpose to explain, if it does, what this witness

21  did next, but you're not to take the hearsay testimony for the

22  truth of the matter asserted.

23            You may continue.

24  Q.   What happened after that telephone conversation with

25  somebody named Shenita Lindsay?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

526

KESHIA BURRIS - DIRECT

1   A.   I ended up at Tracy's mother's house.

2   Q.   Now, before you got to Tracy's mother's house, what

3   happened?

4   A.   I was talking to Shenita Lindsay on the phone.

5   Q.   And then what happened after you talked to her on the

6   phone?

7   A.   They come to pick me up.

8   Q.   Who came to pick you up?

9   A.   Tracy Howard and Shenita Lindsay.

10  Q.   Now, did you know Shenita Lindsay to go by another name?

11  A.   Honey.

12  Q.   I'm going to show you what's already been introduced into

13  evidence, first, Government's Exhibit 116C.  Do you recognize

14  Government's Exhibit 116C?

15  A.   Yes.

16  Q.   And how do you recognize it?

17  A.   That's Shenita Lindsay.

18  Q.   And you also knew her as what?

19  A.   Honey.

20  Q.   Now, I'm also going to show you the other part of 116C.

21  Is that her name at the top of Government's Exhibit 116C?

22  A.   Yes.

23  Q.   Now, do you see somebody in the courtroom that you know

24  as Tracy who you met that day with Honey?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

527

KESHIA BURRIS - DIRECT

1   Q.   Can you please describe where he's sitting and what he's

2   wearing.

3   A.   He has a white shirt and he's sitting to the left.

4   Q.   Okay.  What number seat is he in?

5   A.   The second one.

6        MS. MARSTON:  Your Honor, may the record reflect she

7   has identified the defendant Tracy Howard.

8        THE COURT:  It may.

9   Q.   Now, what happened after Honey and Tracy picked you up?

10  A.   We went back to the house.  I took a shower and we went

11  to bed.

12  Q.   And where was that house located?

13  A.   Greenlefe.

14  Q.   I'm going to show you what's already been introduced into

15  evidence as Government's Exhibit 15C.  Do you recognize

16  Government's Exhibit 15C?

17  A.   Yes.

18  Q.   And how do you recognize it?

19  A.   That's his mother's house.

20  Q.   Now, did you meet his mother?

21  A.   Yes.

22  Q.   I'm going to show you what's already been introduced into

23  evidence as Government's Exhibit 85E.  Do you recognize

24  Government's Exhibit 85E?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2573

KESHIA BURRIS - DIRECT

1   Q.   Yes?

2   A.   Yes.

3   Q.   How do you recognize it?

4   A.   That's Ila.

5   Q.   Did you ever know her to go by any other names?

6   A.   Later on, yes.

7   Q.   And what names later on did you know her to go by?

8   A.   Wendy and Star.

9   Q.   Now, was there anybody else at the house when you arrived

10  there after meeting Honey and Tracy?

11  A.   Destiny and Tabitha.

12  Q.   I'm first going to show you what's already been

13  introduced into evidence as Government's Exhibit 85R.  Do you

14  recognize Government's Exhibit 85R?

15  A.   Yes.

16  Q.   And how do you recognize it?

17  A.   It's Tabitha.

18  Q.   Now, did she stay at the house the entire time you stayed

19  there?

20  A.   No.

21  Q.   I'm also going to show you what's already been introduced

22  into evidence as Government's Exhibit 116B.  Do you recognize

23  the photograph you see there on Government's Exhibit 116B?

24  A.   Yes.

25  Q.   And who do you recognize that to be?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

529

KESHIA BURRIS - DIRECT

1  A.   Destiny.

2  Q.   Now, do you actually recognize where Destiny is standing

3  in that photograph?

4  A.   In Northpark -- North Pointe.

5  Q.   Do you also recognize the dress that Destiny has on?

6  A.   Yes.

7  Q.   And how do you recognize that dress?

8  A.   It was mine at one time.

9  Q.   Now, you mentioned that you spent -- you took a shower

10  and you spent the night.  What happened the next day after you

11  woke up?

12  A.   Me and Tracy had talked.

13  Q.   Well, why did you have a conversation with Tracy?

14  A.   To tell what's going on and what I was going to be doing

15  when I stayed there.

16  Q.   What were you told you'd be doing if you stayed there.

17  A.   Prostitution.

18  Q.   Now, how old were you at this point in time?

19  A.   I was 15 or 16.

20  Q.   When actually is your birthday?

21  A.   August 1st.

22  Q.   And so you were 15 going on 16 at that point in time?

23  A.   Yes.

24  Q.   Did you tell anybody how old you were?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

530

KESHIA BURRIS - DIRECT

1    Q.    Who did you tell?

2    A.    Tracy.

3    Q.    Did you tell anybody else how old you were?

4    A.    Honey knew.

5    Q.    And how old did you tell them that you were?

6    A.    I was 15.

7    Q.    Now, once you did that, what was this conversation about

8    what you would be doing?

9    A.    That he would take care of me.  He would take care of the

10   clothes and the food and the housing as long as I go out on

11   the weekends to prostitute.

12   Q.    Now, where were you going to go out on the weekends?

13   A.    North Pointe and the Park.

14   Q.    I'm going to show you what's been marked for

15   identification purposes, actually already introduced into

16   evidence as Government's Exhibits 1D, 1E, and 1B.  Do you

17   recognize those three photographs?

18   A.    Yes.  North Pointe.

19   Q.    I'm also going to show you what's already been introduced

20   into evidence as Government's Exhibit 4C.  Do you recognize

21   4C?

22   A.    Yes.

23   Q.    How do you recognize 4C?

24   A.    The Park.

25   Q.    Now, after you were told you were going to go to these

Cheryl A. Nuccio, RMR-CRR (704)350-7494

531

KESHIA BURRIS - DIRECT

1  apartments to prostitute, what else were you told about how

2  this would happen?

3  A.   How it worked?

4  Q.   Yes.

5  A.   We would go to the apartments.  He would drive around

6  first to make sure there was no police there.  We'll go park.

7  He will go in the house.  He would tell me and Honey to come

8  in.  He would collect $30.  He would give us a condom.  Then

9  we would have to go upstairs, have intercourse, then come back

10 down.

11 Q.   Now, during the course of that time, approximately how

12 many men would you do on an evening?

13 A.   In a night?

14 Q.   Yes.

15 A.   At least seven or eight.

16 Q.   Now, why did he drive around to make sure there were no

17 police there?

18 A.   Because he was banned.

19 Q.   And what were you asked to do while he was driving

20 around?

21 A.   Duck down.

22 Q.   And who told you to duck down?

23 A.   Tracy.

24 Q.   Now, did you -- did Ila know what you were doing while

25 you were living at her house?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

532

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And how did she know?

3   A.   Because I had intercourse with her boyfriend's brother.

4   Q.   And where did her boyfriend's brother live?

5   A.   I think it was the Park.  I'm pretty sure it was the

6   Park.

7   Q.   And was that part of when you were taken out with

8   defendant Tracy Howard to have prostitution?

9   A.   Yes.

10  Q.   And I'm going to show you what's been marked for

11  identification purposes only as Government's Exhibit 85Z.  Do

12  you recognize the photograph you see in Government's Exhibit

13  85Z?

14  A.   Yes.

15  Q.   And how do you recognize that photograph?

16  A.   It's Carlos.

17  Q.   And who is Carlos?

18  A.   Ila's husband.

19       MS. MARSTON:  At this time the government moves into

20  evidence Government's Exhibit 85Z.

21       THE COURT:  Any objection?

22       MR. CULLER:  No.

23       THE COURT:  Let it be admitted.

24       (Government's Exhibit Number 85Z was received into

25  evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

533

KESHIA BURRIS - DIRECT

1  Q.   Now, were there times when he stayed at 5300 Greenlefe?

2  A.   Sometimes he would spend the night.

3  Q.   Now, during the course of this time, how many -- do you

4  remember approximately how many times you went out on the

5  weekends?

6  A.   Every night.

7  Q.   And what else were you doing during the day during the

8  week?

9  A.   I was working at Family Dollar with his mother.

10 Q.   Now, were you getting a paycheck from Family Dollar?

11 A.   No.

12 Q.   Who would take you to Family Dollar?

13 A.   Tracy would.

14 Q.   And did anyone else go with you and Tracy to Family

15 Dollar?

16 A.   Sometimes Destiny or Honey will go with us.

17 Q.   Do you know whether or not they were getting paid by

18 Family Dollar?

19 A.   No.

20 Q.   Now, what was happening to the money that was being

21 collected while you were out at either North Pointe or the

22 Park?

23 A.   Tracy took it.

24 Q.   And did you ever get to keep any of that money?

25 A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

534

KESHIA BURRIS - DIRECT

1   Q.   Now, while you were out there at North Pointe or the
2   Park, did you also run into another one of Tracy's brothers?
3   A.   Yes, Alex.
4   Q.   And who was with Alex at that time?
5   A.   Donna and Wendy.
6   Q.   I'm going to show you what's already been introduced into
7   evidence as Government's Exhibit 85K.  Do you recognize
8   Government's Exhibit 85K?
9   A.   Yeah, that's Donna.
10  Q.   Now, did you know her real name?
11  A.   Crystal Chumley.
12  Q.   Now, when she was with Alex, what was she doing?
13  A.   Prostituting.
14  Q.   Did there come a point in time where you ran into Donna
15  again and not with Alex?
16  A.   Yes, it was later on.
17  Q.   And at that point in time, who was she with?
18  A.   She was with David.
19  Q.   Now, do you see somebody in the courtroom that you know
20  as David?
21  A.   Yes.
22  Q.   Can you please describe what he's wearing and where he's
23  sitting.
24  A.   He has a tan shirt on and he's sitting in the corner
25  beside his lawyer to the left.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

535

KESHIA BURRIS - DIRECT

1          MS. MARSTON:  Your Honor, may the record reflect he

2    has identified defendant David Howard -- she has.

3          THE COURT:  It may.

4    Q.   Now, did you know David to go by any other names?

5    A.   Little or Duck.

6    Q.   Now, did there come a point in time in 2002 when you left

7    defendant Tracy Howard and went to stay with Alex?

8    A.   Yeah, it was later on, yes.

9    Q.   And do you recall what happened while you stayed with

10   Alex?

11   A.   I got arrested.

12   Q.   And why did you get arrested?

13   A.   For harboring a fugitive and obstructing justice.

14   Q.   And who was the fugitive that you were harboring at that

15   point in time?

16   A.   Tracy was -- I mean Alex was.

17   Q.   And did you end up going to jail for a period of time

18   after that incident with Alex?

19   A.   Yes.

20   Q.   And what happened after you got out?

21   A.   When I got out, I went to go stay with my father.

22   Q.   Okay.  And after you stayed with your father, was there a

23   point in time that you went back to defendant Tracy Howard?

24   A.   Yes.

25   Q.   And who was defendant Tracy Howard with at that time?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  A.   Stephanie.

2  Q.   Who was Stephanie?

3  A.   His girlfriend.

4  Q.   Did you know her to go by any other names?

5  A.   Amber.

6  Q.   And do you know what her real name is?

7  A.   No.

8  Q.   What did Stephanie do for a living at that point in time,

9  or Amber, whatever name you knew her by?

10 A.   She ran an escort service.

11 Q.   Now, how long did you stay with defendant Tracy Howard

12 and Stephanie, also known as Amber?

13 A.   At least a month or two.

14 Q.   And what happened -- what made you leave that location?

15 A.   Tracy got -- he went to prison.

16 Q.   And after he went to prison, where did you go?

17 A.   I went to my father's house.

18 Q.   And while you were at your father's house, what happened

19 next regarding the Howard family?

20 A.   Later on I had stole a car and I had seen Ila, David, and

21 Carlos on Sugar Creek.

22 Q.   Now, at that point in time, had you ever met David

23 before?

24 A.   No.

25 Q.   And so is this some time in 2003?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

537

KESHIA BURRIS - DIRECT

1   A.   Yeah, around about that time.

2   Q.   And when you met -- when you met Ila, Carlos, and David

3   at the convenience store on Sugar Creek, what happened?

4            MR. ADOLF:   Objection, facts not in evidence.

5            THE COURT:   Sustained.   Rephrase.

6   Q.   Who did you meet at the store?

7   A.   David --

8            MR. ADOLF:   Same objection, facts not in evidence.

9   A.   -- and his mother.

10           THE COURT:   Sustained.

11  Q.   Where were you when you ran into Ila, David, and Carlos?

12  A.   On Sugar Creek.

13  Q.   Okay.   And what location were you at on Sugar Creek?

14  A.   At the store.

15  Q.   And while you were at the store, what happened?

16  A.   I met them and I told her that I'd come over later.

17  Q.   You told who?

18  A.   Ila.

19  Q.   And did you do that?

20  A.   Yes.

21  Q.   And what happened when you went over later?

22  A.   When I got there it was only David there.

23  Q.   And what happened then?

24  A.   And I went in.   We talked a little bit and then I had

25  left.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

538

KESHIA BURRIS - DIRECT

1    Q.    Well, what did you and David talk about?

2    A.    He just asked me how I was doing.  How old I was.  And

3    then he said that he wanted to meet up with me later.

4    Q.    And why did he want to meet up with you later?

5          MR. ADOLF:  Objection to speculation.

6          THE COURT:  Sustained as to form.

7    Q.    Do you know why he wanted to meet up with you later?

8    A.    Yeah.

9    Q.    Why did he want to meet up with you later?

10   A.    Because he wanted me to prostitute for him.

11   Q.    Did you agree to meet up with him later?

12   A.    Yes.

13   Q.    And what happened next?

14   A.    The next time I meet up with him, I met him at the store

15   up the street from my dad's house.

16   Q.    Now, how did you come to meet him at that store up the

17   street from your dad's house?

18   A.    He called.

19   Q.    And what did he call?

20   A.    He called my father's number.

21   Q.    And when he called your father's number, what did he say

22   to you?

23   A.    He told me to meet him at the store.

24   Q.    And did he tell you anything else?

25   A.    He said just get my stuff and meet him at the store.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

539

KESHIA BURRIS - DIRECT

1  Q.   And did you get your stuff and meet him at the store?

2  A.   Yes.

3  Q.   What happened when you met him at the store?

4  A.   Tracy was in the car.

5  Q.   And what happened next?

6  A.   We left from there to go to Guesthouse Suites on Freedom.

7  Q.   I'm going to show you what's already been introduced into

8  evidence as Government's Exhibit 24B.  Do you recognize

9  Government's Exhibit 24B?

10  A.   Yes.

11  Q.   And how do you recognize it?

12  A.   It's Guesthouse Suites.

13  Q.   Now, was there anybody else at the Guesthouse Suites

14  other than you, defendant David Howard, and defendant Tracy

15  Howard?

16  A.   Yes.

17            MR. CULLER:  Objection, facts not in evidence.

18            THE COURT:  Overruled.

19  Q.   Who else was there?

20  A.   Donna.

21  Q.   Now, is that the Donna we've previously identified as

22  Crystal Chumley?

23  A.   No.

24  Q.   I am going to show you what's been marked for

25  identification purposes only as Government's Exhibit 85AA.  Do

Cheryl A. Nuccio, RMR-CRR (704)350-7494

540

KESHIA BURRIS - DIRECT

1   you recognize the photograph I'm showing you there?

2   A.   Yes.

3   Q.   And how do you recognize that photograph?

4   A.   She was the one that was living with us at the time.

5   Q.   And living where?

6   A.   At Guesthouse Suites.

7   Q.   And who was us?

8   A.   Tracy, Donna, David, and me.

9          MS. MARSTON:  At this time the government moves into

10  evidence 85AA.

11         THE COURT:  Any objection?

12         (No response.)

13         THE COURT:  Let it be admitted.

14         (Government's Exhibit Number 85AA was received into

15  evidence.)

16  Q.   Now, did you know her real name other than Donna?

17  A.   No.

18  Q.   Now, what were you all doing at the Guest Suites Hotel?

19  A.   We had --

20  Q.   What were you doing for a living?

21  A.   We was doing Mexicans on the weekends.  We would go out

22  on the weekends and we would do calls at night.

23  Q.   Okay.  And when you say you were doing calls at night,

24  what are you referring to?

25  A.   Escort service.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

541

KESHIA BURRIS - DIRECT

1   Q.   And what was the escort service that you were working for

2   at that point in time?

3   A.   His mother's.

4   Q.   And do you recall what the name of it was then?

5   A.   Fantasia and Discreet Delight.

6   Q.   You said his mother, who do you mean by that?

7   A.   Ila.

8   Q.   Well, whose mother is it?

9   A.   Tracy.

10   Q.   Anybody else's mother?

11   A.   David and Alex.

12   Q.   Now, how were you getting the calls to go out on at

13   night?

14   A.   Ila would call Tracy and let him know that we had a call.

15   Q.   And who was driving you on these calls?

16   A.   Either Tracy or David.

17   Q.   Now, at some point in time, was there a visit by law

18   enforcement at that hotel?

19   A.   Yes, later on it was.

20   Q.   And approximately how long do you recall staying there

21   before that visit?

22   A.   Maybe a month.

23   Q.   And when -- what happened when law enforcement came to

24   the hotel room?

25   A.   They came in the room.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

542

KESHIA BURRIS - DIRECT

1   Q.   Well, before law enforcement came into the room, what

2   happened through the peephole?

3   A.   They knocked on the door --

4            MR. CULLER:  Object to the form.

5            THE COURT:  Overruled.

6   Q.   You can go ahead and answer the question.

7   A.   They knocked on the door.  Tracy looked out the peephole.

8   David --

9   Q.   What did he say after he looked out the peephole?

10  A.   The police.

11  Q.   And then what happened?

12  A.   And then Tracy went -- I mean, David went off the balcony

13  and then he let him in.

14  Q.   All right.  Where did David go out of?

15  A.   The balcony.

16  Q.   Why did David leave?

17  A.   Because there was a gun, weed, and everything in the room

18  and he didn't want to be charged with it because he was on

19  probation.

20  Q.   Now, I'm going to show you Government's Exhibit 25D.

21  It's already been introduced into evidence.  I'm going to ask

22  you to look at the screen there as I go through.

23       Now, do you recognize the items that are listed on that

24  property report?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.    And do you recall those items being found in the hotel

2  room that night?

3  A.    Yes.

4  Q.    And specifically looking at this item here where it says

5  the gun, what do you recall about the gun?

6  A.    There was a gun in the room.

7  Q.    When had you seen the gun in the room prior to when law

8  enforcement seized it?

9  A.    Either when we went out to do Mexicans or when they would

10 do the weed and stuff.

11 Q.    All right.  When you say they, who are you talking about?

12 A.    David and Tracy.

13 Q.    And why would they get the gun out when they were doing

14 the weed?  What were they doing with the weed?

15 A.    They was weighing it.

16 Q.    And how were they weighing it?

17 A.    With a scale.

18 Q.    Now, I'm also going to refer your attention to the scales

19 that are listed on the bottom.  Are those the scales that

20 you're talking about were used?

21 A.    Yes.

22 Q.    And were those scales seized by law enforcement that

23 night?

24 A.    Yes, they were.

25 Q.    I am going to show you what's also been introduced into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

544

KESHIA BURRIS - DIRECT

1   evidence.

2            MS. MARSTON:  If I can have a moment, Your Honor.

3            THE COURT:  You may.

4            (Pause.)

5   BY MS. MARSTON:

6   Q.   As Government's Exhibit 57C.  Do you recognize

7   Government's Exhibit 57C?

8   A.   Yes.

9   Q.   And how do you recognize it?

10  A.   That's the scale.

11  Q.   Now, after that scale was seized, did you also see that

12  same scale again somewhere else?

13  A.   Later on, yes.

14  Q.   Now, I'm also going to show you Government's Exhibit 25B.

15  It's already been introduced into evidence.  I'm going to flip

16  through these pages.  Do you recognize these slips of paper?

17  A.   Yes.

18  Q.   How do you recognize these slips of paper?

19  A.   It's the paper that Donna wrote down the calls that we

20  was supposed to do or we did.

21  Q.   And looking specifically at that particular page in

22  Government's Exhibit 25B, the fourth page, do you recognize

23  your name on that page?

24  A.   Yes.

25  Q.   And why is your name written beside that particular --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

545

KESHIA BURRIS - DIRECT

1   that particular slip of paper?

2   A.   Because that's the call I did or I was supposed to go to.

3   Q.   Now, I'm also going to ask you to look at Government's

4   Exhibit 25A.  Now, do you recall seeing this notebook in the

5   hotel room?

6   A.   No.

7   Q.   Do you recognize this handwriting as anyone's?

8   A.   No.

9   Q.   Do you recognize any of the names on this particular

10  page?

11  A.   Yes.

12  Q.   Who do you recognize?

13  A.   Neil.

14  Q.   Who's Neil?

15  A.   Their uncle.

16  Q.   Whose uncle?

17  A.   Tracy and David's uncle.

18  Q.   I'm also going to direct your attention to what's already

19  been introduced into evidence as Government's Exhibit 25C.  Do

20  you recognize the cards you see there on the front of 25 --

21          MS. MARSTON:  Is 25C in evidence?

22          THE CLERK:  (Affirmative nod.)

23          MS. MARSTON:  Okay.

24  Q.   Do you recognize the cards you see on the front of 25C?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

546

KESHIA BURRIS - DIRECT

1  Q.   And how do you recognize those two cards?

2  A.   It's the card to the room and David's ID.

3  Q.   Now, did you agree to go down with law enforcement that

4  night and talk to them?

5  A.   Yes.

6  Q.   And do you recall what you said to law enforcement that

7  night?

8  A.   I can't recall.  I don't remember what I said.

9  Q.   Do you know what law enforcement did after they talked to

10  you?

11  A.   Yes, they took me to my father's house.

12  Q.   And at some point in time, did you end up back with David

13  and Tracy Howard?

14  A.   Yes.

15  Q.   And when was that?

16  A.   I think it -- it was like that week or the next week.

17  Q.   All right.  And how did you end up getting back with

18  them?

19  A.   Tracy came to get me.

20  Q.   And where were you taken at that point in time?

21  A.   To Greenlefe, his mother's house.  Ila's house.

22  Q.   Back to the place you had previously stayed in 2002?

23  A.   Yes.

24  Q.   Now, when you got there, who was living at Greenlefe

25  then?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

547

KESHIA BURRIS - DIRECT

1  A.   It was just me, David, Tracy, and his mother.

2  Q.   Did there come a point in time where somebody else joined

3  you at Greenlefe?

4  A.   Yes.

5  Q.   Who was that?

6  A.   Donna, known as Crystal Chumley.

7  Q.   And that is the previous exhibit that we looked at; is

8  that correct?

9  A.   Yes.

10 Q.   Government's Exhibit 85K.

11 A.   Yes.

12 Q.   Now, how did it come about that Donna, also known as

13 Crystal Chumley, ended up at 5300 Greenlefe?

14 A.   Me, Tracy, and David was going to Sugar Creek to get

15 something to eat and then Tracy seen her on the side of the

16 road walking.  He told David that he can get her because --

17 Q.   What does he mean he can get her?

18 A.   Because his brother had her before.  That he could

19 prostitute her.

20 Q.   All right.  Well, what happened after Tracy told David

21 that he could get her?

22 A.   Tracy dropped him off at the corner and we went behind

23 the store, behind a motel and parked and waited until David

24 came back there with Donna.

25 Q.   And did David come back there with Donna?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

548

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   What happened when he came back there with Donna?

3   A.   When Donna seen Tracy, she didn't want to get in the car.

4   Q.   So what happened then?

5   A.   So they put her in the car.

6   Q.   How did they put her in the car?

7   A.   They grabbed her arm and put her in the car.

8   Q.   And after they put her in the car, what happened?

9   A.   Then we went to go get something to eat.  We went back to

10  Greenlefe Village and David talked to Donna that night.

11  Q.   Now, do you know what David said to Donna?

12  A.   No, I don't.

13  Q.   And prior to David talking to Donna, did Donna want to

14  stay there?

15  A.   No.

16  Q.   And after David talked to Donna, did Donna change her

17  mind?

18  A.   Yeah.

19  Q.   And what did Donna start doing after David talked to

20  Donna?

21  A.   Prostitution and the escort service.

22  Q.   Okay.  Now, when you were going out on the escort

23  service, what were you doing?

24  A.   Having intercourse.

25  Q.   Okay.  Well, do you not consider that prostitution?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

549

KESHIA BURRIS - DIRECT

1  A.   Yes.

2  Q.   Well, when you said prostitution, what were you actually

3  referring to then?

4  A.   The Mexicans.

5  Q.   So when were you still doing the Mexicans?

6  A.   At this point.

7  Q.   At what -- when would you go on calls for the escort

8  service and when would you do the Mexicans?

9  A.   I would do the Mexicans Friday, Saturday, and Sunday; and

10  if we had a call, then we'd just do it later on that night or

11  during the week.

12  Q.   Now, what was the difference between going out and doing

13  the Mexicans and going on calls for the service to you?  Which

14  did you prefer?

15  A.   Neither, but if I had a choice, I would do the calls.

16  Q.   And why?

17  A.   Because you have a -- you really have a choice when you

18  go.

19  Q.   And what do you mean you had a choice?

20  A.   What you would do.

21  Q.   Okay.  And explain that to the jury.

22  A.   You can have intercourse, you can talk to them, you

23  can -- there was a kit that you had, I'm saying.

24  Q.   Well, what was the kit?

25  A.   It was blindfolds, a whip, and some handcuffs.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

550

KESHIA BURRIS - DIRECT

1   Q.   Now, when you say you had a choice, if the person on the
2   call wanted to have sex, did you have sex with them?
3   A.   Yeah.
4   Q.   And were you allowed to say no, I don't want to have
5   sexual intercourse with you?
6   A.   No, but you could prolong it.
7   Q.   All right.  What do you mean you could prolong it?
8   A.   You can talk to them and when that hour is up, you have
9   to leave.
10  Q.   And where were you going on these calls?
11  A.   In North Carolina and South Carolina.
12  Q.   And who would drive you on the calls for the service?
13  A.   Tracy or Ila would.
14  Q.   And did anyone else ever drive you?
15  A.   David took me a few times.
16  Q.   Anyone else?
17  A.   No, not at that time.
18  Q.   At some point in time, did other people drive you on the
19  calls?
20  A.   Yes.
21  Q.   And who do you recall driving you on calls at other
22  points in time?
23  A.   Tracy, his mama, David, and his cousin Lionel.
24  Q.   All right.  Now, at this point in time, what was Donna
25  also doing at the same time that you're doing the Mexicans and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

551

KESHIA BURRIS - DIRECT

1  doing the calls?

2  A.   What is she doing?  She's doing the same thing I'm doing.

3  Q.   And do you sometimes go together on these calls or doing

4  the Mexicans?

5  A.   We went together doing the Mexicans.  Doing the calls,

6  sometimes we had a call together.

7  Q.   Now, when you -- explain to the jury what happened to the

8  money that you collected on the calls.

9  A.   I would put it in Tracy's hand.

10  Q.   And what about Donna?

11  A.   She would put it in David's hand.

12  Q.   And then what happened to that money?

13  A.   They would give half of it to their mom and they would

14  keep the other half.

15  Q.   Now, were you with them when they sometimes gave half of

16  it to their mother?

17  A.   No.

18  Q.   And did you ever -- did you ever give half of the money

19  to the mother and give the other half to Tracy?

20  A.   No, he said he wanted to give it to her.

21  Q.   Now, at that point in time, what was the name of the

22  service?

23  A.   Fantasia and Discreet Delight.

24  Q.   Now, have you ever heard of the name Mistress?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

552

KESHIA BURRIS - DIRECT

1  Q.   What is Mistress?

2  A.   Escort service that Tracy and David put together.

3  Q.   And how long do you recall Mistress being up and running?

4  A.   Maybe for about two months.  Not long.

5  Q.   Now, did you go on calls -- at the same time you were

6  going on calls for Fantasia and Discreet Delight, were you

7  also going on calls for Mistress?

8  A.   A few times.

9  Q.   Now, why do you say only a few times?

10 A.   Because it wasn't -- it wasn't -- there wasn't a lot of

11 service as it was in his -- in Ila's.

12 Q.   And what was the problem with some of the calls that came

13 in to Mistress?

14 A.   There was a lot of police calls.

15 Q.   And how do you know there were a lot of police calls?

16 A.   Because when they call you, they just -- they don't care

17 what -- they don't want a specific person.  They just tell you

18 anybody.

19 Q.   Well, explain to the jury what you mean by they don't

20 want a specific person.  How was it different when calls were

21 placed to Ila's service?

22       MR. ADOLF:  Judge, I object to this entire line of

23 questioning as speculation.

24       THE COURT:  Overruled.

25 Q.   You can answer that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

553

KESHIA BURRIS - DIRECT

1  A.   When they would call for Ila's service, they would call
2  and say I want a blond haired or whatever.  When they would
3  call for Mistress, they would say I just want anybody.  It
4  doesn't matter.
5  Q.   I'm going to show you what's been marked as Government's
6  Exhibit 65C.  It's already introduced into evidence.  Do you
7  recognize the date on the outside of Government's Exhibit 65C?
8  A.   October 2003.
9  Q.   Now, was that at the point in time that you were living
10  at 5300 Greenlefe?
11  A.   Yes.
12  Q.   I'm going to direct your attention to the inside page of
13  Government's Exhibit 65C.  Do you recognize those two ads you
14  see at the top?
15  A.   Yes.
16  Q.   And how do you recognize those two advertisements?
17  A.   They're both Ila's.
18  Q.   And did you work for both of those services?
19  A.   Yes, I did.
20  Q.   Now, did you have to say tonight I work for Fantasia or
21  tonight I work for Discreet Delight?  Did you have to
22  distinguish?
23  A.   No.  Whenever I got a call, I had to go.
24  Q.   And it didn't matter whether it was Fantasia or Discreet
25  Delight the telephone call came into?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

554

KESHIA BURRIS - DIRECT

1  A.   No.

2  Q.   Where did the money go either way if you went out on one

3  of those calls?

4  A.   To Tracy.

5  Q.   And then where did the money go for Tracy after that?

6  A.   He would save it.

7  Q.   And where did half of that money go?

8  A.   When he bought weed or crack.

9  Q.   Well, when you came back from a call and you turned your

10  money over to defendant Tracy Howard, what did he have to give

11  back to either Fantasia or Discreet Delight?

12  A.   He had to give half of the driving fee.

13  Q.   Okay.  And how much were you charging on calls when you

14  went out at that point in time?

15  A.   It was $200.

16  Q.   And who would he give that half to?

17  A.   His mother Ila.

18  Q.   And was Donna also working for Fantasia or Discreet

19  Delight?

20  A.   Yes.

21  Q.   And who was she giving her money to?

22  A.   David.

23        MR. CULLER:  Objection, asked and answered.

24        THE COURT:  Sustained.

25  Q.   Now, I'm also going to move your attention to the back of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1    that same page.  Do you recognize that ad at the top of the

2    page?

3    A.    Yes.

4    Q.    And do you recognize that telephone number?

5    A.    Yes.

6    Q.    And how do you recognize that telephone number?

7    A.    That was the phone that Tracy and David was using at the

8    time.

9    Q.    And was it your understanding that the ad where it

10   said -- why does it say brand new company?

11   A.    Because they had just -- they had just done it.

12   Q.    Now, did there come a point in time where there became a

13   disagreement between David and Tracy?

14   A.    Yes.

15   Q.    And what was that over?

16   A.    Donna.

17   Q.    And what happened to Donna?

18   A.    Tracy had misplaced his dope and his money and he blamed

19   it on me and Donna.

20   Q.    Okay.  When you say dope, what are you talking about?

21   A.    Crack.

22   Q.    And had you seen crack at that point in time at 5300

23   Greenlefe?

24   A.    Every now and then I seen it, yes.

25   Q.    And when would you see it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

556

KESHIA BURRIS - DIRECT

1   A.   When it was in the ashtray.

2   Q.   And what did you see happening to the crack when it was

3   in the ashtray?

4   A.   It was in a bag.

5   Q.   And did you -- who did you see around that crack?

6   A.   Tracy and David.

7   Q.   And what were Tracy and David doing with the crack when

8   you saw it in the ashtray?

9   A.   It was just sitting there.

10   Q.   Did you or Donna have any involvement with the crack at

11   that point in time?

12   A.   No, not then.

13   Q.   And do you recall what David and Tracy were doing with

14   the crack in the ashtray?

15          MR. ADOLF:   Objection, asked and answered.

16          THE COURT:   Overruled.

17   Q.   At that point in time?

18   A.   No.

19   Q.   Now, what happened when he misplaced his crack?

20   A.   He blamed me and Donna for taking it.

21   Q.   And then what happened?

22   A.   And then he told us that we had a certain amount of time

23   to find it and if we don't find it, then he was going -- he

24   was going to beat us up.

25   Q.   And what happened?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

```
 1   A.   And he hit Donna in the face.
 2   Q.   And what happened when he hit Donna in the face?
 3   A.   He split her eyebrow.
 4   Q.   And then what happened?
 5   A.   He made us both get in the shower and we took a shower
 6   and then he went to go look for it and he found it.  He
 7   misplaced it and he found it.
 8   Q.   And what happened then?
 9   A.   Then we got dressed and then we had left.
10   Q.   And did you end up going to the hospital with Donna?
11   A.   Yes.
12   Q.   And did David end up coming to the hospital?
13   A.   Yes.
14   Q.   And why -- what happened between Tracy and David after
15   Donna was taken to the hospital?
16   A.   They got in a confrontation.
17   Q.   And what ended up as a result of that?
18   A.   Tracy gave him the Jaguar, some money and some dope, and
19   he kept the other car and he stayed at the house at Greenlefe.
20   Q.   Okay.  And why did he give him the Jaguar, some money and
21   the dope after he hit Donna?
22   A.   Because Donna couldn't work for a while.
23   Q.   And why couldn't she work?
24   A.   Because her face was messed up.
25   Q.   And when you say work, what do you mean?
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   Prostituting.

2   Q.   Now, did David and Donna come back to 5300 Greenlefe

3   after that visit to the hospital?

4   A.   No.

5   Q.   Do you know where they went after that?

6   A.   No, I do not.

7   Q.   And how much longer did you stay at 5300 Greenlefe with

8   defendant Tracy Howard?

9   A.   Not long.

10  Q.   What did -- where did you move to next?

11  A.   Overhan -- Hanover Landing.

12  Q.   Now, do you know who got the apartment at Hanover

13  Landing?

14  A.   Lionel Anthony.

15  Q.   Who was paying for the apartment?

16  A.   Tracy was.

17  Q.   I'm going to show you what has already been introduced

18  into evidence as Government's Exhibit 85P.  Do you recognize

19  Government's Exhibit 85P?

20  A.   Yes.

21  Q.   And how do you recognize it?

22  A.   Lionel Anthony, his cousin.

23  Q.   Now, why was the apartment in his name if defendant Tracy

24  Howard was paying for it?

25  A.   Because Tracy had too many charges; he couldn't get it in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   his name.

2   Q.    And do you know whether he also had an ID with Lionel

3   Anthony's name on it?

4   A.    Yes, he did.

5   Q.    And were you with him when he used that ID at times?

6   A.    Sometimes I was.

7   Q.    Now, I'm also going to show you what's been marked as

8   Government -- and introduced into evidence as 14F.  Do you

9   recognize the apartment that you see in 14F?

10  A.    Yes, that's Hanover Landing.

11  Q.    Now, who else moved in to this apartment other than you,

12  defendant Tracy Howard and Lionel?

13  A.    Davia.

14  Q.    And who was Davia?

15  A.    Some -- his friend Allen and Jason had introduced him to

16  her.

17  Q.    Now, who are Allen and Jason?

18  A.    Two of his friend guys.

19  Q.    I'm going to show you what's already been introduced into

20  evidence as Government's Exhibit 85U.  Do you recognize 85U?

21  A.    Yes.

22  Q.    And what is 85U?

23  A.    Davia.

24  Q.    And approximately -- did you know how old Davia was?

25  A.    She said she was 16.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

560

KESHIA BURRIS - DIRECT

1   Q.   And who did she say that to?

2   A.   Me and Tracy.

3   Q.   Now, what happened after you and Davia and Tracy and

4   Lionel started living at Hanover Landing?

5   A.   We did the same thing.  We went out to Mexicans and we

6   did calls.

7   Q.   Now, was Tracy Howard doing anything else to make a

8   living while you were at Hanover Landing?

9   A.   He was selling weed.

10  Q.   And at some point in time did he move on from selling

11  weed to something else?

12  A.   Yes.

13            MR. CULLER:  Object to the form.

14            THE COURT:  Overruled.

15  Q.   And what was that?

16  A.   Crack.

17  Q.   Now, did you see the crack at Hanover Landing?

18  A.   Yes.

19  Q.   Where would you see it?

20  A.   Either on a table or in their room.

21  Q.   And do you remember approximately how much crack you

22  would see when you would see it?  If you can reference a size,

23  I don't know.

24  A.   Maybe like that big (indicating).

25  Q.   And are you making a circle with your thumb and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

561

KESHIA BURRIS - DIRECT

1   forefinger?

2   A.   Yes.

3   Q.   Now, what -- when you saw -- did you ever go to pick up

4   the crack from anywhere?

5   A.   Yes, from his friend John.

6   Q.   And what did you consider John?

7   A.   It was a friend of Tracy's.

8   Q.   Well, did you have a description for what you called

9   John?

10   A.   Yes.

11   Q.   What did you call him?

12   A.   That's -- oh, that's what I knew him as.

13   Q.   You knew him as John?

14   A.   Yes.

15   Q.   I'm going to show you Government's Exhibit 85Y.  Do you

16   recognize Government's Exhibit 85Y?

17   A.   Yes.

18   Q.   And how do you recognize Government's Exhibit 85Y?

19   A.   John.

20   Q.   And where did you go to see John?

21   A.   Sometimes Tracy would meet him somewhere.

22   Q.   And what did he pick up from John when he met him

23   somewhere?

24   A.   Crack.

25   Q.   And do you recall how he went about picking up crack from

Cheryl A. Nuccio, RMR-CRR (704)350-7494

562

KESHIA BURRIS - DIRECT

1   John?

2   A.   He would give John the money because the guy that John

3   was getting it from didn't want to -- he wanted to give it to

4   John to give it to Tracy.

5   Q.   And so what's John considered then?

6   A.   The middle man.

7   Q.   Now, was defendant Tracy Howard ever picking up powder?

8   A.   Yes.

9   Q.   And what would he do with the powder after he picked it

10  up?

11  A.   He would cook it up.

12  Q.   And do you recall how he went about cooking it up?

13  A.   Somewhat, yes.

14  Q.   Were you sometimes around when he cooked it up?

15  A.   Yes, sometimes.

16  Q.   And do you remember one particular time when you were

17  asked to wear something over your head when he was cooking?

18  A.   When I was pregnant.

19  Q.   And why were you asked to wear something over your head?

20  A.   So it didn't get in my face.

21  Q.   And explain the way that you know defendant Tracy Howard

22  to cook up crack.

23  A.   He would get a measuring cup and a pot.  Put the boiling

24  water in it.  Put the crack and the stuff and the baking soda

25  and mix it up.  Put a little bit of water in it.  Put it on

Cheryl A. Nuccio, RMR-CRR (704)350-7494

563

KESHIA BURRIS - DIRECT

1   the stove.  Wait until it got hot.  Stir it with a knife.  And

2   then he'll take it out, put it on a plate.  See if it was

3   okay.  Then he would put -- let it dry and then cut it up.

4   Q.   Now, how would he cut it?

5   A.   With a razor blade.

6   Q.   Now, at some point in time, were you asked to assist

7   defendant Tracy Howard in bagging the crack?

8   A.   Yes, I was.

9   Q.   Was anybody else asked to assist?

10   A.   Not at that time.  Later on there was.

11   Q.   Okay.  And who later on helped?

12   A.   Cathy and Courtney.

13   Q.   Now, when did Cathy and -- well, where did Cathy -- which

14   apartment did Cathy and Courtney come to?

15   A.   Hanover Landing.

16   Q.   And before they got there, was another girl also living

17   at Hanover Landing with you?

18   A.   Yes, Hilari.

19   Q.   I'm going to show you what's been marked for -- already

20   introduced into evidence as Government's Exhibit 85S.  Do you

21   recognize Government's Exhibit 85S?

22   A.   Yes.

23   Q.   How do you recognize it?

24   A.   Hilari.

25   Q.   And what was Hilari doing living with you all at Hanover

Cheryl A. Nuccio, RMR-CRR (704)350-7494

564

KESHIA BURRIS - DIRECT

1  Landing?

2  A.   Well, Tracy met her at the strip club as he says and he

3  had talked to her.  I wasn't there when he talked to her.  But

4  he got her an apartment over there and she started working for

5  his mother's escort service.

6  Q.   Now, you said he got her an apartment over there.  Well,

7  did she stay in that apartment?

8  A.   No.

9  Q.   What happened to that apartment?

10  A.   She didn't stay over there.  She stayed in our apartment

11  most of the time.

12  Q.   Now, did you ever go out on calls with Hilari?

13  A.   I've drove with her, yes.

14  Q.   And did she ever drive you on calls?

15  A.   Yes, she did.

16  Q.   And why did she drive you sometimes?

17  A.   Because either Tracy had something to do or we had a call

18  together.

19  Q.   Now, I'm also going to show you what's been introduced as

20  Government's Exhibit 85A.  Do you recognize 85A?

21  A.   Yes.

22  Q.   How do you recognize that?

23  A.   Cathy.

24  Q.   And when did Cathy arrive?

25  A.   A little after Hilari left.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

565

KESHIA BURRIS - DIRECT

1  Q.  I'm also going to show you 85V.  Do you recognize 85V?

2  A.  Yes.

3  Q.  And how do you recognize 85V?

4  A.  It's Courtney.

5  Q.  And when did Courtney arrive?

6  A.  Around the same time that Cathy did.

7  Q.  And how old did Courtney -- did you know how old Courtney

8  was?

9  A.  No, I did not.

10  Q.  And did you know how old Cathy was?

11  A.  No.

12  Q.  Did she tell you how old she was?

13  A.  She said --

14        MR. CULLER:  Well, objection.

15  A.  -- she was 17.

16        THE COURT:  Overruled.

17  Q.  And how about Courtney, did she give you an age for how

18  old she was?

19  A.  Sixteen.

20  Q.  Now, you mentioned that Cathy also helped with the

21  bagging of crack.  Explain how you guys would get involved

22  with the bagging of crack.

23  A.  Either Tracy was in a hurry or he didn't feel like doing

24  it so he would make us do it.

25  Q.  And what did he make you do?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

566

KESHIA BURRIS - DIRECT

1  A.   He would cut the dope up and he would tell us to put it
2  in a baggie.
3  Q.   And explain to the jury how you would put it in a baggie.
4  A.   You put the dope inside of the bag in the corner.  You
5  tie it up, and then cut it with a razor blade and put it in a
6  stack.
7  Q.   All right.  Now, why were you putting it in a stack?
8  A.   Stacks of ten.
9  Q.   And why were you putting it in stacks of ten?
10  A.   (No response.)
11  Q.   Who told you to put it in stacks of ten?
12  A.   Tracy did.
13  Q.   And what happened after you made stacks of ten?
14  A.   He would put it in a baggie.
15  Q.   And what would he put in a baggie?
16  A.   The dope, the crack.
17  Q.   And how many stacks would he put in the bigger baggie?
18  A.   Ten.
19  Q.   And each -- how many stacks of ten did you make?
20  A.   At least four or five.
21       MS. MARSTON:  Your Honor, may I approach?
22       THE COURT:  You may.
23  Q.   I'm going to show you what I'm going to mark as
24  Government's Exhibit 156.  Do you recognize what Government's
25  Exhibit 156 is?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

567

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And what is it?

3   A.   A baggie.

4   Q.   And is this the same -- similar to the baggies that you

5   were using to make those stacks of ten?

6   A.   It's the same kind, yes.

7   Q.   And can you show the jury how you would package the crack

8   to make those stacks of ten.

9   A.   Yes.  You put it in the corner and then cut it right

10  there.

11  Q.   And who instructed you where to cut it?

12  A.   Tracy did.

13  Q.   And why was it important as to where you cut it?

14  A.   So you wouldn't cut the dope.

15  Q.   Now, how often were you requested to help bag the crack

16  into stacks of ten?

17  A.   At least twice a week.

18  Q.   And did this occur both at Hanover Landing and at another

19  apartment that you moved to?

20  A.   Yes.

21  Q.   And what was the other apartment that you moved to?

22  A.   Waterford Lakes.

23  Q.   Now, prior to moving to Waterford Lakes, what happened at

24  Hanover Landing?

25            MR. CULLER:  Object to the form.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Overruled.

2    Q.   You can answer.

3    A.   I was at a call at the time and Hilari called me and told

4    me --

5          MR. CULLER:  Objection.

6          THE COURT:  Overruled.

7    Q.   You can go ahead.

8    A.   Told me Tracy was in the bed with somebody and Tracy

9    overheard her.  He beat her up and told her to call me and she

10   called me crying saying that she was sorry, that she didn't

11   mean it.

12   Q.   Then what happened the next day?

13   A.   He told me -- I had woke up that morning.  Tracy had to

14   go out for something, I don't recall what it was.  He told me

15   to watch Hilari, make sure she didn't go anywhere.

16   Q.   Now, what was Hilari's condition that morning?

17   A.   She was bad.  She was bruised.

18   Q.   And what happened when you were told by Tracy to watch

19   her, make sure she didn't go anywhere?

20   A.   I went to the bathroom and she went outside to walk her

21   dog and she left.

22   Q.   And what happened when Tracy got back and found that

23   Hilari was gone?

24   A.   He was mad at me.

25   Q.   Now, after that did you have another occasion to see

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1    Hilari?

2    A.   Yes, I did.

3    Q.   And when was that?

4    A.   When Tracy had to go to court for her.

5    Q.   Now, who all went to court for Hilari?

6    A.   Me, Tracy, and David.

7    Q.   And why did David go with you?

8    A.   So he can see where they lived.  So he can follow Hilari

9    and their family.

10   Q.   And who instructed him to follow Hilari and her family?

11   A.   Tracy.

12   Q.   Now, after that happened where did you all move to?

13   A.   Waterford Lakes.

14   Q.   And how did you get the apartment at Waterford Lakes?

15   A.   Me and his mother got it.

16   Q.   And his mother being who?

17   A.   Ila.

18   Q.   Now, did you use your name to get that apartment, Keshia

19   Burris?

20   A.   No, I used my fake ID.

21   Q.   And what name was your fake ID in?

22   A.   Allison Walkers.

23   Q.   I am first going to show you what I believe is already

24   introduced into evidence as Government's Exhibit 12C.  Do you

25   recognize Government's Exhibit 12C?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

570

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And how do you recognize it?

3   A.   That was Waterford Lakes we were staying at at the time.

4   Q.   Now, I'm also going to show you what's been marked as

5   Government's Exhibit 12E for identification purposes.  Do you

6   recognize the first page of 12E?

7   A.   Yes.

8   Q.   And how do you recognize this?

9   A.   It was me and Ila's lease agreement.

10  Q.   And are your initials -- I know it's very faint, but can

11  you see your initials at the bottom of that page?

12  A.   Yes, at one side, yes.

13  Q.   Why are you using AW?

14  A.   For Allison Walkers.

15  Q.   And did you also initial the next page?

16  A.   Yes.

17  Q.   And I'm going to flip through a few pages here.  Do you

18  recognize your initials on all of these pages?

19  A.   Yes, I do.

20  Q.   Do you recognize your signature at the back of that page?

21  A.   Yes.

22  Q.   Now, did you and Ila both have to fill out an application

23  in order to get this apartment?

24  A.   Yes.

25  Q.   I'm going to direct your attention to this part of 12E.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

571

KESHIA BURRIS - DIRECT

1   Do you recognize the name at the top?

2   A.   Yes.

3   Q.   And whose name is that?

4   A.   Ila.

5   Q.   And do you recognize what address she put down as her

6   present address?

7   A.   Greenlefe Village.

8   Q.   And do you recognize what she put down as the reason for

9   moving and needing this apartment at Waterford Lakes?

10  A.   She needed a home to place foster kids.

11  Q.   And why did she put down she needed a home to place

12  foster kids?

13  A.   Because there was young kids there.

14          MS. MARSTON:  At this time the government moves into

15  evidence Government's Exhibit 12E.

16          THE COURT:  Any objection?

17          (No response.)

18          THE COURT:  Let it be admitted.

19          (Government's Exhibit Number 12E was received into

20  evidence.)

21  Q.   What did Ila also put down as her present employer?

22  A.   Harris-Teeter.

23  Q.   Well, present employer.

24  A.   One Enterprise.

25  Q.   And what is listed next to Harris-Teeter?  How is the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

572

1  description, if you can see it?  Maybe I need to zoom in for

2  you, I'm sorry.

3       Why did she put down Harris-Teeter?  What description is

4  it next to?

5  A.   Previous employer.

6  Q.   Now, I'm also going to direct your attention back to that

7  first page.  How much was the monthly rent at this apartment

8  at Waterford Lakes?

9  A.   1,025.

10  Q.   And who was paying the 1,025 each month?

11  A.   Tracy was.

12  Q.   Now, who moved to Waterford Lakes?

13  A.   It was me, David, Tracy, Courtney, and Cathy.

14  Q.   Now, at some point did David leave the Waterford Lakes

15  apartment?

16  A.   Yes, he stayed there maybe two nights, and he didn't

17  really stay there a lot.

18  Q.   Now, prior to David joining you all at the Waterford

19  Lakes Apartments, did there come a point in time where you

20  knew where he had been staying prior to moving in with you and

21  Tracy and Courtney and Cathy?

22       MR. ADOLF:  Objection to the form of the question.

23       THE COURT:  Overruled.

24  A.   Yes.  He was staying at -- he was staying in a house

25  then.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

573

2618

KESHIA BURRIS - DIRECT

1  Q.   Okay.  How did you learn that he was staying at a house?

2  A.   Because one night the Jaguar got stolen.

3  Q.   And what happened when you heard the Jaguar had gotten

4  stolen?

5  A.   Tracy -- his -- Ila had called Tracy and let him know

6  what went on, what happened.

7  Q.   And then what did Tracy do?

8  A.   And he had left and he had met his mom somewhere.

9  Q.   Now, who was with him when he left and met his mom?

10  A.   Just me and him.

11       MR. ADOLF:  Objection to knowledge, Judge.

12       THE COURT:  If she knows.

13  Q.   Can you answer that question again.  Who was with Tracy

14  when he met his mom?

15  A.   Me and Tracy.

16  Q.   Okay.  So when you were with Tracy when he went to meet

17  his mom, what happened next?

18  A.   He dropped me off and told me and his mother to go back

19  and get the gun and Lionel Anthony.

20  Q.   Now, where did he drop you off and instruct you and his

21  mother to go back and get the gun with Lionel Anthony?

22  A.   We was on Sugar Creek and he told us to go back to

23  Hanover Landing on Monroe Road.

24  Q.   And what gun was he referencing you to get with Lionel

25  Anthony?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

574

1    A.   He told me to tell Lionel to get it.  I don't know where

2    it was at.

3    Q.   And do you know where the gun was at that point in time?

4    A.   On his safe.

5    Q.   Now, after -- did you do that?

6    A.   Yeah.

7    Q.   What happened after Ila and you went back and got the gun

8    and Lionel Anthony?

9    A.   They met up together.

10   Q.   Who's they?

11   A.   Tracy and Lionel.

12   Q.   And then what did you do?

13   A.   Me and Ila had went down to where David and Crystal Welsh

14   was on Sugar Creek where the wreck was.

15   Q.   Now, you just said Crystal Welsh.  Who was Crystal Welsh?

16   A.   I'm assuming his girlfriend at the time.

17             MR. CULLER:  Objection.

18             THE COURT:  Sustained.

19   Q.   What did you know Crystal Welsh to be doing at the time

20   that you saw her there?

21             MR. ADOLF:  Objection to basis of knowledge, Judge.

22             THE COURT:  If she knows.

23   Q.   If you know.

24   A.   Doing calls at the time.

25   Q.   And did you sometimes do calls with her?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

575

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And was she giving her money to Tracy?

3   A.   No.

4   Q.   Who was she giving her money to?

5   A.   I wasn't there, I don't know.

6   Q.   Well, who brought her to wherever the call was?

7   A.   David did.

8   Q.   I'm going to show you what's already been introduced into

9   evidence as Government's Exhibit 85L.  I'm sorry, the zoom --

10  I need to...

11       Do you recognize 85L?

12  A.   Yes.

13  Q.   And how do you recognize it?

14  A.   It's Crystal.

15  Q.   All right.  After you saw David and Crystal Welsh in the

16  Jaguar, what did you and Ila do next?

17  A.   We had sat there until she knew what was going on and

18  then we had left.

19  Q.   And then where did you go?

20  A.   We went back to Monroe Road and she dropped me off.

21  Q.   So this was when you were staying at Hanover Landing?

22  A.   Yeah.

23  Q.   Now, at some point did you get back with Tracy later that

24  evening?

25  A.   He had met -- he had came back to the house maybe a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

576

KESHIA BURRIS - DIRECT

1    little later.

2    Q.   And then what did you and Tracy do?

3    A.   We had went by David's house to ride by.

4    Q.   And why did you ride by David's house?

5    A.   Checking on the house.

6    Q.   Now, do you know who else was living at that house with

7    David?

8    A.   I've seen Candy and Crystal Welsh and Donna with him.

9    Q.   I am going to show you what's already been introduced

10   into evidence as Government's Exhibit 86.  Do you recognize

11   Government's Exhibit 86?

12   A.   Yes.

13   Q.   And how do you recognize 86?

14   A.   Candy.

15   Q.   Now, what did you know Candy to be doing at this point in

16   time?

17   A.   I don't know.

18   Q.   And when you said Donna, are you again referring to

19   Government's Exhibit 85K?

20   A.   Yes.

21   Q.   And what did you know her to be doing at this point in

22   time?

23   A.   I don't know.

24   Q.   Well, what did you know her to be previously doing?

25   A.   Prostituting.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

577

KESHIA BURRIS - DIRECT

1    Q.    And who was she working for at that point in time?

2    A.    Ila.

3    Q.    And who else?

4    A.    David.

5                MR. ADOLF:  Objection, asked and answered, Judge.

6                THE COURT:  Overruled.

7    Q.    Now, once David left Waterford Lakes Apartments, where

8    did he go?

9    A.    He went to Little Mexico.

10   Q.    And did you ever see him come back to Waterford Lakes

11   Apartments after he went to Little Mexico?

12   A.    Yes, a little later.

13   Q.    And how often would you see him come back to visit the

14   Waterford Lakes apartment?

15   A.    A few times he would bring his dog over there and he

16   would play games with Tracy.

17   Q.    And did you ever see him come over for any other

18   occasion --

19   A.    No.

20   Q.    -- other than playing games or playing with his dog?

21   A.    Not then.

22   Q.    Okay.  When did you see it?

23   A.    When we went to Waterford Lakes.

24   Q.    Okay.  So what you were previously talking about, I

25   guess, is Hanover Landing?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

578

KESHIA BURRIS - DIRECT

1  A.   Hanover Landing, yes.

2  Q.   All right.  Now, Waterford Lakes, when he came what

3  happened?

4  A.   He would come, him and Crystal Welsh would stop by and

5  they would stand at the door and Tracy would go in the back

6  and then he would come back in the front and give David

7  something.

8  Q.   Now, how did you see him give David something?

9  A.   He would handshake.

10  Q.   And what got said after the handshake?

11  A.   He said call me when you need some more.

12  Q.   And what did defendant Tracy Howard keep in the back room

13  where he went to get whatever he gave in that handshake?

14  A.   Crack.

15  Q.   Now, did there come a point in time where you actually

16  went out to Little Mexico?

17  A.   To what?

18  Q.   To Little Mexico.

19  A.   Have I went out there?

20  Q.   Yes.

21  A.   Yes.

22  Q.   And why would you go out there?

23  A.   Either to go drop off a package for D or go drop

24  something off to David.

25  Q.   And why were you asked to drop packages off for either a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

579

KESHIA BURRIS - DIRECT

1  person you knew as D or David?

2  A.   Because Tracy didn't feel like going or he was asleep.

3  Q.   And what were in the packages that you were dropping off?

4  A.   Crack.

5  Q.   And how often were you dropping off packages?

6  A.   I say maybe three times a week maybe.

7  Q.   Now, you said that Tracy was asleep.  Did you mind going

8  in the middle of the night?

9  A.   Yeah, I didn't want to go.

10  Q.   All right.  But once you got there, what would you do?

11  A.   I would smoke a cigarette.

12  Q.   And who would give you the cigarette to smoke?

13  A.   David.

14  Q.   And why was that -- why did you do that at Little Mexico?

15  A.   Because Tracy wouldn't let me smoke.

16  Q.   Now, did you actually get an apartment in your name out

17  there?

18  A.   Yes, in Allison Walkers.

19  Q.   Did you complete any paperwork?

20  A.   No.

21  Q.   Explain to the jury why you didn't have to complete any

22  paperwork out there at Little Mexico.

23  A.   He just told -- me and Tracy was in the office.  He told

24  us how much it was.  I showed him the ID.  He wrote something

25  down and he gave us the keys to the apartment.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

580

KESHIA BURRIS - DIRECT

1    Q.    And who is he that you're talking about?

2    A.    The guy that owned the place.

3    Q.    And do you recall how many apartments Tracy got out at

4    Little Mexico?

5    A.    He had three.

6    Q.    This is during the course of the summer of 2004?

7    A.    Yes.

8    Q.    I'm going to show you what's already been introduced into

9    evidence as Government's Exhibit 11F.  Do you recognize

10   Government's Exhibit 11F?

11   A.    Yes.

12   Q.    How do you recognize it?

13   A.    The first one is the first one we got and the second one

14   is the one D had moved in.

15   Q.    Okay.  And I'm also going to show you what's been

16   introduced into evidence as Government's Exhibit 85D.  Do you

17   recognize Government's Exhibit 85D?

18   A.    Yes.

19   Q.    And how do you recognize it?

20   A.    That's D.

21   Q.    Now, who introduced D --

22   A.    John.

23   Q.    -- to defendant Tracy Howard?

24   A.    John did.

25   Q.    And is that the previous John that you described as the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   middle man?

2   A.   Yes.

3   Q.   And did he introduce anybody else --

4   A.   Yes.

5   Q.   -- to defendant Tracy Howard?

6   A.   Nick.

7   Q.   And do you see somebody in the courtroom that you know as

8   Nick?

9   A.   Yes.

10  Q.   Can you please describe what he's wearing and where he's

11  sitting.

12  A.   He's sitting to the left side.  He's got a blue shirt on.

13  Q.   And can you tell me what seat he is from the left-hand

14  side over.  What number seat?

15  A.   The fifth one.  Yeah, the fifth one.

16       MS. MARSTON:  Your Honor, at this time may the

17  record reflect that she has identified defendant Nicholas

18  Ragin.

19       THE COURT:  It may.

20  Q.   Now, why -- once defendant Nicholas Ragin was introduced

21  to defendant Tracy Howard, how often would you see him?

22  A.   Not much because that's when we had got an apartment in

23  Sailboat Bay.

24  Q.   Well, prior to getting that apartment, what occasion did

25  you have to see Nicholas Ragin?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

582

KESHIA BURRIS - DIRECT

1          MR. CULLER:  Object to form.

2          THE COURT:  Overruled.

3    A.   Tracy told me to drop him off something at Nations Ford

4    Road.

5    Q.   And where on Nations Ford Road did you go?

6    A.   It was the old Red Roof Inn which is Motel 6, I think,

7    now.

8    Q.   And what did you drop off at the old Red Roof Inn?

9    A.   Some dope.  Crack.

10   Q.   And when you say dope, what are you referring to?

11   A.   It's crack.

12   Q.   And do you know how much you dropped off that day?

13   A.   No.

14   Q.   Did you get anything in exchange?

15   A.   Money.

16   Q.   Do you remember how much money you got?

17   A.   No.

18   Q.   Now, what -- once D was introduced to defendant Tracy

19   Howard, where did D go and live?

20   A.   He went to Little Mexico to sell dope for Tracy.

21   Q.   And while he was there, do you know how he was serving

22   that dope?

23   A.   Either through the wall or he would give it to the

24   person.

25   Q.   And were you sometimes present when he actually served

Cheryl A. Nuccio, RMR-CRR (704)350-7494

583

KESHIA BURRIS - DIRECT

1    dope to a person either through the wall or giving it to a

2    person?

3    A.    I was one time when he did it through the wall.

4    Q.    I am going to show you what's I think already introduced

5    into evidence as Government's Exhibits 11A and 11B.

6          THE CLERK:   Yes.

7    Q.    11A and 11B.  Do you recognize those two photographs?

8    A.    Yes.

9    Q.    And how do you recognize them?

10   A.    That's the hole that was -- they put the stuff through.

11   Q.    Now, you mentioned that there was a point in time where

12   you got an additional apartment.  What was the name of that

13   apartment?

14   A.    Sailboat Bay.

15   Q.    Now, why did you end up getting another apartment at

16   Sailboat Bay?

17   A.    Because I had left Tracy.  Me -- well, me and Courtney

18   left Tracy.

19   Q.    All right.  And what happened when you and Courtney left

20   Tracy?

21   A.    We had went to go stay with a guy that I knew from the

22   escort service.

23   Q.    And what happened next?

24   A.    We had stayed there a few days and I called Tracy and

25   then we had talked and I told him that I didn't want Cathy

Cheryl A. Nuccio, RMR-CRR (704)350-7494

584

KESHIA BURRIS - DIRECT

1   there.

2   Q.   And why didn't you want Cathy there?

3   A.   Because I didn't like her.

4   Q.   Well, what was the problem between you and Cathy?  What

5   did you guys fight over?

6   A.   Tracy.

7   Q.   And when you told Tracy that you didn't want Cathy there,

8   what happened next?

9   A.   And then he cussed me out, but then he was like okay.

10  And then I went back.

11  Q.   And what about Courtney?

12  A.   She didn't go back.

13  Q.   And when you went back, what happened?

14  A.   Later -- it was either that day or the next day he had

15  dropped her off at Barbara's house.

16  Q.   And do you know where Barbara's house was?

17  A.   Somewhere on Monroe Road.

18  Q.   And after he dropped her off, then what did he do?

19  A.   Then we had went back to the house.

20  Q.   Then when did you get the apartment at Sailboat Bay?

21  A.   It was a little after that.

22  Q.   And why was there a need to get the apartment at Sailboat

23  Bay?

24  A.   Because he got Donna, known as Crystal Chumley, and Cathy

25  came back.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

585

KESHIA BURRIS - DIRECT

1  Q.  And who was staying at the apartment at Sailboat Bay?

2  A.  Nick, Crystal Chumley, and Cathy.

3  Q.  Now, who got the apartment in their name at Sailboat Bay?

4  A.  I did.

5  Q.  And did you use Keshia Burris?

6  A.  No.

7  Q.  What name did you use?

8  A.  Allison Walkers.

9  Q.  Who was paying the rent in Sailboat Bay?

10  A.  Tracy was.

11  Q.  First going to show you what's already been introduced

12  into evidence as Government's Exhibit 13C.  Do you recognize

13  Government's Exhibit 13C?

14  A.  Yes.

15  Q.  How do you recognize it?

16  A.  That's Sailboat Bay.

17  Q.  I'm also going to show what I believe is already

18  introduced into evidence as Government's Exhibit 13D.

19          THE CLERK:  (Affirmative nod.)

20  Q.  Do you recognize the name right there on 13D?

21  A.  Yes.

22  Q.  And what name is that?

23  A.  Walkers.

24  Q.  And is this the apartment that you got in your name that

25  Tracy was paying for?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

586

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And how much rent a month was this apartment?

3   A.   Six-fifty.

4   Q.   Now, I'm going to direct your attention -- do you

5   recognize your name at the top of this application page?

6   A.   Yes.

7   Q.   And do you recognize your signature at the bottom?

8   A.   Yes.

9   Q.   What did you put down for your employment history?

10  A.   Dancing.

11  Q.   Well, what name and what companies?

12  A.   My name, Allison Walkers.

13  Q.   I'm sorry, who did you write down that you were dancing

14  for?

15  A.   Wendy Parker.

16  Q.   And what was the name of Wendy's business?

17  A.   One Enterprise.

18  Q.   And who else did you put down as somebody that you danced

19  for?

20  A.   Uptown Cabaret.

21  Q.   What were you really doing for Uptown Cabaret?

22  A.   Dancing.

23  Q.   And what were you really doing for One Enterprise?

24  A.   Intercourse.

25  Q.   The calls that you were having sexual intercourse on?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

587

KESHIA BURRIS - DIRECT

1    A.    Yes.

2    Q.    Now, once Nick and Cathy and Donna, also known as Crystal

3    Chumley, moved into the Sailboat Bay apartment, what happened?

4    A.    They stayed over there and then at night they would go

5    out on Nations Ford Road.

6    Q.    And who would take them out on Nations Ford Road?

7    A.    Nick would.

8    Q.    And did you also know something else that Nick was doing

9    at that point in time?

10   A.    No.

11   Q.    Did you later learn something else that Nick had also

12   been doing at that point in time?

13            MR. MACKEY:  Objection, asked and answered.

14            THE COURT:  Overruled.

15   A.    Yes.

16   Q.    And what did you learn that Nick was also doing?

17   A.    He was transporting people to go to the escort service

18   for calls.

19   Q.    And calls for which service?

20   A.    His mother's.  Ila's.

21   Q.    Okay.  Is Ila Nick's mother?

22   A.    No.

23   Q.    And who told you that?

24   A.    I heard it through somebody.

25   Q.    Well, did Nick ever tell you that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

588

KESHIA BURRIS - DIRECT

1   A.   No.

2   Q.   Who did you hear it through?

3   A.   Tracy.  He's told me through a letter.

4   Q.   Who told you through a letter?

5   A.   Nick.

6   Q.   So Nick also told you that was what also he was doing?

7   A.   Through a letter, yes.

8           MR. MACKEY:  Objection.

9           THE COURT:  Basis?

10          MR. MACKEY:  Hearsay, Your Honor.

11          THE COURT:  Overruled.

12  Q.   Now, did you also write Nick some letters?

13  A.   Yes.

14  Q.   In fact, did you also write David and Tracy some letters?

15  A.   Yes.

16  Q.   And approximately how many letters have you written

17  defendants Nicholas Ragin, David Howard, and Tracy Howard, if

18  you know?

19  A.   I've wrote David maybe four letters.  I've wrote Tracy

20  when I have -- when we had first got locked up.  I wrote him

21  maybe six.  Nick, maybe eight.

22  Q.   And who initiated these -- this letter writing?

23  A.   Who initiated it?

24  Q.   Who initiated the letter exchange between you and

25  Nicholas Ragin, you or Nicholas Ragin?  Who wrote the first

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   letter?

2   A.   I -- I did I think.

3   Q.   Who wrote the first letter between you and defendant

4   David Howard?

5   A.   David.

6   Q.   And who wrote the first letter between you and defendant

7   Tracy Howard?

8   A.   I can't remember.

9   Q.   Now, what was the purpose of you and defendant Nicholas

10  Ragin exchanging letters?

11  A.   We was supposed to be talking.

12  Q.   I'm sorry?

13  A.   We was supposed to be talking.

14  Q.   What do you mean we were supposed to be talking?

15  A.   Relationship.

16  Q.   And did -- at that point in time, had you entered into

17  your plea agreement with the United States?

18  A.   Not yet.

19  Q.   And did you and Nicholas Ragin talk about the case?

20  A.   Yeah, he wanted me to testify for him.

21  Q.   And what did you want him to do for you?

22  A.   Testify for me.

23  Q.   And when you say that you wanted him to testify for you

24  and that you were going to testify for him, were you going to

25  tell the truth about him?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   No.

2   Q.   And what are you doing today?

3   A.   Testifying.

4   Q.   And is this part of the agreement that you made with

5   defendant Nicholas Ragin?

6   A.   No.

7   Q.   Now, while you were with defendant Tracy Howard, did

8   there come a point in time where you actually drove both

9   defendant Tracy Howard and Nicholas Ragin to Little Mexico?

10  A.   Did I drive?

11  Q.   Or did you -- yes, that you were instructed to drive them

12  over there.

13  A.   Tracy drove over there, but when --

14  Q.   Well, what happened when you got over there?

15  A.   There was some confrontation between D and Kelly.

16  Q.   And who is Kelly?

17  A.   A girl that -- a female that's over there in Little

18  Mexico that Tracy was paying for her apartment.

19  Q.   Now, why was Tracy paying for people's apartments other

20  than the three that you knew about?

21  A.   So he could sell crack out of it.

22  Q.   And is there somebody else in the courtroom that you

23  recognize that he was paying for an apartment of?

24  A.   Oscar.

25  Q.   And did you know another name that Oscar went by?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

591

KESHIA BURRIS - DIRECT

1   A.   Puerto Rico.

2   Q.   And can you please describe where Oscar that you also

3   knew as Puerto Rico is sitting and what he's wearing.

4   A.   He's wearing a black T-shirt and he's in the third chair.

5        MS. MARSTON:   Your Honor, may the record reflect

6   that she has identified the defendant Oscar Sanchez.

7        THE COURT:   It may.

8   Q.   And why was he paying for Oscar's apartment?

9   A.   So he can sell dope out of it.

10  Q.   Now, I'm going back and I'm going to show you what's been

11  introduced -- actually, I'm going to show you 85C.  I'm not

12  sure if it's been introduced at this point.  It has.  Do you

13  recognize Government's Exhibit 85C?

14  A.   Yes.

15  Q.   And how do you recognize it?

16  A.   That's Kelly.

17  Q.   All right.  What happened when you knew about this

18  confrontation between Kelly and D?

19  A.   Tracy was telling Nick that -- Tracy told Nick that he

20  was tired of her and she was causing so much trouble.  And

21  when we had got there, Nick -- he -- he beat her up and then

22  Tracy told me whenever he got in the car to leave and to meet

23  him at Captain D's.

24  Q.   And so who were you supposed to drive -- who was supposed

25  to get in the car and then you were supposed to leave?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

592

KESHIA BURRIS - DIRECT

1   A.   Nick.

2   Q.   And what was the condition of Nick when he got back in

3   the car after beating up Kelly?

4   A.   His hand was broke -- his finger was broke.

5   Q.   Did you actually see the beating?

6   A.   No.

7   Q.   Why not?

8   A.   I didn't want to see it.

9   Q.   Now, did there come a point in time when you had an

10   encounter with defendant Tracy Howard?

11   A.   Yes.

12   Q.   And what happened?

13   A.   I didn't want --

14          MR. CULLER:  Object to the narrative form, Your

15   Honor.

16          THE COURT:  Overruled.

17   A.   I didn't want to go on a call and he got mad.

18   Q.   All right.  Why didn't you want to go on a call?

19   A.   I was tired of it.

20   Q.   And who was the call for?

21   A.   Ila.

22   Q.   And what happened after you told him you didn't want to

23   go on the call?

24   A.   He said I was going anyway.

25   Q.   And then what happened?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

593

KESHIA BURRIS - DIRECT

1  A.   So I got dressed and I had left.  And I guess he got mad

2  because I didn't give him a hug before I left so I walked out

3  and he came behind me and he cussed me out.  He was like, You

4  need to stop that.  He said, You don't need to be acting like

5  that.  He said, If I ask you to do something, you need to do

6  it.

7  Q.   Then what happened?

8  A.   So I went downstairs and I was about to get in the car

9  and he was like, You know what, just come here.  So I went

10  back upstairs.  And that's when he started hitting me.

11  Q.   And how did he hit you?

12  A.   With his fist.

13  Q.   And then what happened?

14  A.   And then a few days later I had called my mom and told

15  her to come pick up the cats.  I told Tracy that I told her to

16  come pick up the cats.  And really, I was going to leave with

17  her.  And Tracy had to go with Cathy to go get her hair done

18  and Nick and Donna was upstairs.  And I told my mama to come

19  over there and pick the cats up so I can leave.

20  Q.   And then what happened when your mom got there?

21  A.   I put the cats in the car and me and my mom left.

22  Q.   And where did you go?

23  A.   I went to her house.

24  Q.   And what happened after you got to your mom's house?

25  A.   It was the next day that I had came over there to get my

Cheryl A. Nuccio, RMR-CRR (704)350-7494

594

KESHIA BURRIS - DIRECT

1    stuff.  That's all I wanted was my stuff.

2    Q.    And at some point did you take out a warrant?

3    A.    Yes, I did.

4    Q.    And why did you do that?

5    A.    Because he hit me.

6    Q.    Now, had you been hit before, before this particular

7    time?

8    A.    Oh, yeah.

9    Q.    Well, had you taken out any warrants before?

10   A.    No.

11   Q.    Why not?

12   A.    I don't know.

13   Q.    Approximately how many times had you been hit before?

14   A.    A lot.  I've stopped counting.

15   Q.    And what would be the times that you'd get hit?

16   A.    When I didn't do something he wanted me to do or I didn't

17   feel like going on a call or it was something.

18   Q.    Now, after you got hit, were you sometimes given

19   something to make up for that hitting?

20   A.    He would give me something.

21   Q.    All right.  Tell me some of the things that you were

22   given during the course of your time with defendant Tracy

23   Howard.

24   A.    Either jewelry, clothes or something.

25   Q.    And how come you hadn't left before this time that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

595

1    called your mom to come get the cats?

2    A.    Because I loved him.

3    Q.    Do you actually still have feelings for him even today?

4    A.    Yeah.

5    Q.    Now, once you took out the warrant, did you agree to meet

6    with law enforcement?

7    A.    Yes.

8    Q.    And do you recall who you met with?

9    A.    Grimsley.

10    Q.    And when you met with Detective Grimsley, where were you

11    staying at that point in time?

12    A.    I was staying with my mom.

13    Q.    And who did you talk about in that first meeting with

14    Detective Grimsley?

15    A.    Tracy.

16    Q.    And did you tell the whole truth in that interview?

17    A.    I don't think so.

18    Q.    Did you tell everything you know about -- you knew about

19    at that point in time?

20    A.    No.

21    Q.    And why not?

22    A.    I don't know.

23    Q.    Did you actually agree at the end of that interview to

24    meet with Detective Grimsley again?

25    A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And did you?

2  A.   No, I didn't.

3  Q.   Did you actually allow Detective Grimsley to do a search

4  of one of the apartments that were in your name?

5  A.   Yes.

6  Q.   And which apartment was that?

7  A.   Waterford Lakes.

8  Q.   And did you actually go over with him to the Waterford

9  Lakes Apartments?

10 A.   Yes.  After he had went in maybe like 15 minutes before I

11 got there.  Me and my mama had went over there.

12       MS. MARSTON:  Your Honor, I know it's five minutes

13 before our break, but I am going to be introducing some

14 property through this witness.  It is going to take some

15 amount of time.  I didn't know if this might be an appropriate

16 time for our break.

17       THE COURT:  Very well.  I think it might be.

18       Members of the jury, we'll take our lunch break at

19 this time, and I would ask you to be ready to come back into

20 court at 2 o'clock.

21       (Lunch recess at 12:53 p.m.)

22 MONDAY AFTERNOON, APRIL 17, 2006

23       THE COURT:  Do we have all our jurors back?

24       CSO:  Yes.

25       THE COURT:  Is everybody ready for the jury?


              Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1          MR. CULLER:  Yes.

2          THE COURT:  Call the jury.

3          MR. ADOLF:  Judge, just one brief thing.  I don't

4    know if we need to deal with it now before Detective Grimsley

5    testifies, but I was just given a copy of my client's

6    statement that the government wants to -- that there are going

7    to be *Bruton* redactions and I want to have some argument on

8    that before --

9          THE COURT:  Very well.  We'll do that before.  When

10   do you anticipate Officer Grimsley testifying?

11         MS. MARSTON:  Depending -- after Keshia Burris.  We

12   have one witness in between the -- two, actually.

13         THE COURT:  All right.  We'll take that up before he

14   testifies.

15         MR. ADOLF:  Thank you, Your Honor.

16         THE COURT:  Call the jury.

17         (Jury entered the courtroom.)

18         THE COURT:  Ms. Marston, you may continue.

19                   KESHIA BURRIS

20              DIRECT EXAMINATION (Cont'd.)

21   BY MS. MARSTON:

22   Q.   Ms. Burris, before we took the break, we were about to go

23   into the consent search you gave for the Waterford Lakes

24   Apartments.  Do you remember that?

25   A.   Yes.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494


                              598

KESHIA BURRIS - DIRECT

1  Q.    Okay.  Before I do that, I want to go back to 2003 when

2  you ran into David and Ila and Carlos on Sugar Creek.  Do you

3  recall talking about that?

4  A.    Uh-huh.

5  Q.    And do you recall, when you got to 5300 Greenlefe, who

6  was at 5300 Greenlefe?

7  A.    It was just David.

8  Q.    And did you tell David how old you were at that time?

9  A.    No.

10  Q.    And at some point in time did you tell David how old you

11  were?

12  A.    When we had got the room at Guesthouse Suites.

13  Q.    And how old were you in the summer of 2003?

14  A.    Seventeen.

15  Q.    Now, going back to the consent search, did Detective

16  Grimsley arrive at the Waterford Lakes Apartments?

17  A.    Yes.

18  Q.    And did he do a search of that apartment based on your

19  consent?

20  A.    Yes.

21  Q.    And certain items were seized from that apartment?

22  A.    Yes.

23  Q.    And do you recall a large item that was seized from that

24  apartment?

25  A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   Q.   What was that?

2   A.   His safe.

3   Q.   I'm going to show you what has been marked for

4   identification purposes -- is there an exhibit sticker on

5   that -- as Government's Exhibit 43W.

6        MS. MARSTON:  Would you just roll it right here and

7   see if she recognizes it.

8   Q.   Do you recognize Government's Exhibit 43W?  You can stand

9   up.

10  A.   Yes.

11  Q.   And is this the safe that you allowed the officers to

12  take from the Waterford Lakes Apartments that day?

13  A.   Yes.

14        MS. MARSTON:  At this time the government moves into

15  evidence 43W.

16        THE COURT:  Any objection?

17        MR. CULLER:  No.

18        THE COURT:  Let it be admitted.

19        (Government's Exhibit Number 43W was received into

20  evidence.)

21  Q.   What was the purpose of having this safe at the Waterford

22  Lakes Apartments?

23        MR. CULLER:  Objection.

24        THE COURT:  Overruled.

25  Q.   What was the safe used for at the Waterford Lakes

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2645

KESHIA BURRIS - DIRECT

1   Apartments?

2   A.   To keep his money and his gun in.

3   Q.   And who are you talking about when you say he?

4   A.   Tracy.

5   Q.   And were you ever -- were you ever allowed to go into the

6   safe yourself?

7   A.   Huh-uh.

8   Q.   And did you have the key or the combination for the safe?

9   A.   No.

10  Q.   Were you sometimes with him when he opened the safe?

11  A.   No.

12       MR. CULLER:  Move to strike her testimony unless she

13  has some basis for knowledge.

14       THE COURT:  Overruled.

15       MS. MARSTON:  Your Honor, if I may approach?

16       THE COURT:  You may.

17  Q.   I'm going to start by showing you what's been marked and

18  I believe already introduced into evidence as Government's

19  Exhibit 43T.

20       THE CLERK:  Yes.

21  Q.   Do you recognize Government's Exhibit 43T?

22  A.   Yes.

23  Q.   And how do you recognize it?

24  A.   Those are the Walkmans that Nick, Tracy, Cathy, and Donna

25  used on Nations Ford.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

601

KESHIA BURRIS - DIRECT

1  Q.   Now, you said Walkmans, is that what you meant?  Are

2  these Walkmans?

3  A.   Yeah.

4  Q.   Okay.  What do you mean by Walkman?

5  A.   Radio.

6  Q.   And how do these work?

7  A.   You tell the person whenever somebody is coming.

8  Q.   And what was Nick, Cathy, and Donna using these for?

9  A.   To tell each other whenever somebody had to bring

10  somebody to the room.

11  Q.   And why would somebody be bringing somebody to the room?

12  A.   To have intercourse.

13  Q.   Who was collecting the money when Donna or Cathy were

14  using those?

15  A.   I was --

16  Q.   If you know?

17  A.   I don't know.

18  Q.   Okay.  I'm also going to show you two things that are

19  marked as Government's Exhibit 43E and Government's Exhibit

20  43D.  Do you recognize those two items?

21  A.   Yes.

22  Q.   And how do you recognize those?

23  A.   The baggies and the knife that was in Waterford Lakes.

24  Q.   What were the baggies used for?

25  A.   To put crack in.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   Q.   And what was this knife used for?

2   A.   I don't know.

3   Q.   Did you ever see this knife being used?

4   A.   Huh-uh.

5        MS. MARSTON:  At this time the government moves into

6   evidence Government's Exhibits 43E and 43D.

7        THE COURT:  Any objection?

8        MR. CULLER:  Which is E and --

9        MS. MARSTON:  E are the baggies and D is the knife.

10       THE COURT:  Your Honor, she wasn't able to identify

11  the knife.

12       THE COURT:  I'll move admission of Government's

13  Exhibit 43D and deny admission of E.

14       MS. MARSTON:  E is the baggies, though, Your Honor.

15       THE COURT:  Reverse them.  43E comes in and D stays

16  out.

17       (Government's Exhibit Number 43E was received into

18  evidence.)

19  Q.   I'm also going to show you what's been marked for

20  identification purposes as Government's Exhibit 43B.  Do you

21  recognize Government's Exhibit 43B?

22  A.   Yes.

23  Q.   And where would you see this?

24  A.   In the bathroom.

25  Q.   And whose was it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494


603

KESHIA BURRIS - DIRECT

1   A.   Tracy's.

2   Q.   And what is Government's Exhibit 43B?

3   A.   Bullets.

4        MS. MARSTON:  At this time the government moves into

5   admission Government's Exhibit 43B.

6        THE COURT:  Any objection?

7        MR. CULLER:  No.

8        THE COURT:  Let it be admitted.

9        (Government's Exhibit Number 43B was received into

10  evidence.)

11  Q.   I'm going to show you what's also, I believe, already

12  introduced into evidence as Government's Exhibit 43J.  Do you

13  recognize Government's Exhibit 43J?

14  A.   Yes.

15  Q.   And how do you recognize it?

16  A.   Razor blades.

17  Q.   And where were these razor blades kept?

18  A.   In the bathroom in the drawer.

19  Q.   And what was the purpose of having these razor blades in

20  the bathroom in the drawer?

21  A.   To cut the crack up with.

22  Q.   Did you ever use the razor blades?

23  A.   Once in a while, yes.

24  Q.   And why would you use it once in a while?

25  A.   To cut it up.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

604

KESHIA BURRIS - DIRECT

1   Q.   And when you were cutting it up, why were you cutting it
2   up?
3   A.   To bag it.
4   Q.   I'm also going to show you what's been marked as
5   Government's Exhibit 43S.  I ask that you look into
6   Government's Exhibit 43S.  Do you recognize what's inside
7   Government's Exhibit 43S?
8   A.   Yes.
9   Q.   Where were these found?
10  A.   In the apartment.
11  Q.   And why were these in the apartment?
12  A.   For Cathy and Donna.
13  Q.   And why did Cathy and Donna need to use Government's
14  Exhibit 43S?
15  A.   When they went out on Nations Ford to have intercourse.
16  Q.   And who gave them what's in Government's Exhibit 43S?
17  A.   Tracy.
18  Q.   And what is Government's Exhibit 43S?
19  A.   Condoms.
20        MS. MARSTON:  At this time the government moves into
21  evidence Government's Exhibit 43S.
22        THE COURT:  Any objection?
23        MR. CULLER:  No.
24        THE COURT:  Let it be admitted.
25        (Government's Exhibit Number 43S was received into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

605

KESHIA BURRIS - DIRECT

1   evidence.)

2   Q.   I'm also going to show you what's been marked for

3   identification purposes as Government's Exhibit 58A.  I don't

4   believe it's in -- maybe -- it might be in evidence already.

5   58A.

6            THE CLERK:  Yes.

7            MS. MARSTON:  It is.

8   Q.   Okay.  Well, first, do you recognize any of the

9   handwriting on the front and back of 58A?

10  A.   Yes.

11  Q.   And how do you recognize the handwriting?

12  A.   The front is Cathy's and the back is my handwriting.

13  Q.   And what was the purpose of creating this document 58A?

14  A.   To put the numbers in another phone.

15  Q.   And whose -- whose phone are you talking about?

16  A.   Tracy's.

17  Q.   And who was supposed to write down the numbers to put the

18  numbers in another phone?

19  A.   Me and Cathy was.

20  Q.   I'm also going to show you what's been marked for

21  identification purposes only as Government's Exhibit 60A and

22  then 60B.  Do you recognize 60A and 60B?  Starting with A.

23  A.   Yes.

24  Q.   And how do you recognize 60A?

25  A.   It's the phone that I purchased from Cricket.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494


                              606

2651

KESHIA BURRIS - DIRECT

1   Q.   How do you recognize the telephone number?

2   A.   It was -- where's it at?  That was Tracy's phone that I

3   had got for him.

4   Q.   And you recognize that by the telephone number?

5   A.   Yes.

6   Q.   And what name did you use to purchase this phone?

7   A.   Allison Walkers.

8   Q.   At this time the government moves into evidence 60A.

9        THE COURT:  Any objection?

10       MR. CULLER:  No.

11       THE COURT:  Let it be admitted.

12       (Government's Exhibit Number 60A was received into

13   evidence.)

14   Q.   In looking at this page, can you tell the jury what the

15   telephone number is?

16   A.   (704)777-9997.

17   Q.   Now, looking at 60B do you recognize any of the

18   handwriting on Government's Exhibit 60B and 60C?  I'm sorry,

19   there's two pages attached here.

20   A.   Yes.

21   Q.   And how do you recognize that handwriting?

22   A.   It's Tracy's.

23   Q.   Now, specifically looking at Government's Exhibit 60C.

24   Do you recognize some of the names on that exhibit?

25   A.   Yes, two of them.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

607

KESHIA BURRIS - DIRECT

1   Q.   What two names do you recognize?

2   A.   Jamaica and Mike.

3   Q.   And on the back, do you recognize the handwriting on the

4   back of 60C?

5   A.   Yes.

6   Q.   And how do you recognize that handwriting?

7   A.   It's Tracy's.

8             MS. MARSTON:  At this time the government moves into

9   evidence 60B and 60C.

10            THE COURT:  Any objection?

11            (No response.)

12            THE COURT:  Let it be admitted.

13            MR. CULLER:  Can I see it, Your Honor, real quick?

14            THE COURT:  All right.  Very well.  I'll withhold

15   ruling.

16            (Government's Exhibits Numbers 60B and 60C were

17   tendered to defense counsel.)

18            MR. CULLER:  Oh, yeah.  Okay.  No objection.

19            THE COURT:  Let them be admitted.

20            (Government's Exhibits Numbers 60B and 60C were

21   received into evidence.)

22   Q.   Now, you just mentioned Jamaica.  Who was Jamaica?

23   A.   A friend of Tracy's.

24   Q.   And when would you see Jamaica?

25   A.   When did I see him?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

608

KESHIA BURRIS - DIRECT

1  Q.   Yes.

2  A.   When we would go over to his house.

3  Q.   And why would you go over to his house?

4  A.   Either to get our hair braided or for Tracy to drop

5  something off for Jamaica.

6  Q.   And do you know what Tracy was dropping off?

7  A.   Yes.

8  Q.   What?

9  A.   Crack.

10  Q.   I'm going to show you what's already been introduced into

11  evidence as Government's Exhibit 85T.  Do you recognize

12  Government's Exhibit 85T?

13  A.   Yes.

14  Q.   And how do you recognize it?

15  A.   It's Jamaica.

16  Q.   Now, going back to Government's Exhibit 60B.  Is that --

17  where do you see the reference to Jamaica's name?

18  A.   The third one down.

19  Q.   And what number is next to it?

20  A.   Nine hundred.

21  Q.   And do you know why that number is next to Jamaica's

22  name?

23  A.   Either he owed Jamaica or he had to get money from

24  Jamaica.

25  Q.   Okay.  The rest of these I'm going to show you, but I'm

Cheryl A. Nuccio, RMR-CRR (704)350-7494

609

KESHIA BURRIS - DIRECT

1    going to do it from the screen with the monitor.

2         Beginning with Government's Exhibits 59A, B, and C for

3    identification purposes.  Do you recognize Government's

4    Exhibits 59A, 59B --

5    A.    Yes.

6    Q.    -- and 59C?

7    A.    Yes.

8    Q.    Were these photographs kept at the Waterford Lakes

9    apartment?

10   A.    When I was there, no, it wasn't.

11   Q.    Well, were these photographs seized from the Waterford

12   Lakes apartment by the officers when you gave them consent to

13   search?

14   A.    Yes.

15   Q.    And do you recognize these photographs?

16   A.    Yes.

17   Q.    How do you recognize them?

18   A.    They're Ila's -- her office.

19        MS. MARSTON:  At this time the government moves into

20   evidence 59A, B, and C.

21        THE COURT:  Any objection?

22        MR. CULLER:  No.

23        THE COURT:  Let them be admitted.

24        (Government's Exhibits Numbers 59A, 59B, and 59C

25   were received into evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

610

KESHIA BURRIS - DIRECT

1   Q.   Now, did you -- when you say Ila's office, what did you

2   know about Ila's office?

3   A.   That's where either girls come to get their call or

4   whenever they're finished, they'll drop the money off.

5   Q.   Did you ever go to Ila's office?

6   A.   Yes.

7   Q.   And how many different locations did you go to for Ila's

8   office?

9   A.   She had two offices in that building.

10   Q.   In the same building?

11   A.   Yes.

12   Q.   I'm going to show you what's already been introduced into

13   evidence as Government's Exhibit 16B.  Do you recognize

14   Government's Exhibit 16B?

15   A.   Yes.

16   Q.   And how do you recognize it?

17   A.   That's the building.

18   Q.   Who would you go to this building with?

19   A.   Either Tracy or Ila.

20   Q.   Did you ever go with any other girls?

21   A.   I've went by myself with Courtney a few times.

22   Q.   I'm also going to show you what's introduced into

23   evidence as Government's Exhibit 16E.  Do you recognize 16E?

24   A.   Yes.

25   Q.   And Government's Exhibit 16F.  Do you recognize 16F?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

611

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   And how do you recognize both E and F?

3   A.   Those were her offices.

4   Q.   The entryway to the office?

5   A.   Yes.

6   Q.   I'm also going to show you 16H which has already been

7   introduced into evidence.  Do you recognize that?

8   A.   Yes.

9   Q.   And how do you recognize that?

10  A.   That's the last office she had.

11  Q.   Now, I'm first going to show you what's been marked for

12  identification purposes as Government's Exhibit 61A.  Do you

13  recognize Government's 61A, paper that was seized from the

14  Waterford Lakes apartment?

15  A.   Yes.

16  Q.   How do you recognize it?

17  A.   It's David Howard's.

18  Q.   Why was this paper still at the Waterford Lakes

19  apartment?

20  A.   Because he still had some of his clothes and paperwork

21  there.  He never came and got them.

22         MS. MARSTON:  At this time the government moves into

23  evidence Government's Exhibit 61A.

24         THE COURT:  Any objection?

25         (No response.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

612

2657

KESHIA BURRIS - DIRECT

1          THE COURT:  Let it be admitted.

2          (Government's Exhibit Number 61A was received into

3    evidence.)

4    Q.    Now, did you ever visit a storage unit?

5    A.    Yes, once.

6    Q.    And who did you go to the storage unit with?

7    A.    With Tracy and David.

8    Q.    And what happened when you went to the storage unit with

9    Tracy and David?

10   A.    I rode one of the little bikes that we had.

11   Q.    And what did you do on those little bikes there at the

12   storage unit?

13   A.    I rode around while they was around the storage unit.

14   Q.    And what were David and Tracy doing -- when you left on

15   that bike, did you first see them doing something before you

16   left to ride around on the bike?

17   A.    David was getting money and some dope out of the drawer.

18   Q.    Now, when you say dope, what kind of dope are you talking

19   about?

20   A.    Crack.

21   Q.    And why was he getting it out of the drawer?

22   A.    I don't know.  He put it on top.  I left before that.

23   Q.    And who was there with him while he was doing this?

24   A.    Tracy.

25   Q.    I'm also going to show you what's already been introduced

Cheryl A. Nuccio, RMR-CRR (704)350-7494

613

KESHIA BURRIS - DIRECT

1   into evidence as Government's Exhibit -- I thought it was

2   marked separately as 36G, but maybe it's not.

3           MS. MARSTON:  Is 36G a separate exhibit?

4           THE CLERK:  (Negative nod.)

5   Q.   All right.  Well, it's already been introduced into

6   evidence as part of --

7           THE CLERK:  Yes.

8   Q.   -- Government's Exhibit 36A.  Do you recognize what you

9   see in Government's Exhibit 36A?

10  A.   Yes.

11  Q.   How do you recognize it?

12  A.   That's the storage unit and that's the bikes that I was

13  talking about.

14  Q.   Now, did you ride those bikes anywhere else?

15  A.   Around Little Mexico.

16  Q.   And who else would ride those bikes around Little Mexico?

17  A.   Tracy and Crystal Welsh.

18  Q.   Now, going back to Government's Exhibit what's been

19  marked for identification purposes 61B.  I think parts of this

20  is already introduced into evidence, but for safety reasons

21  I'm going to just say it's been identified.  Do you recognize

22  the outside of Government's Exhibit 61B?

23  A.   Yes.

24  Q.   And where was this notebook kept?

25  A.   In the room.  On top of the counter in the bathroom.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

614

KESHIA BURRIS - DIRECT

1    Q.   And who would use this notebook?

2    A.   Tracy.

3    Q.   And did you ever use this notebook?

4    A.   Yes.

5    Q.   And did you write some notes in this notebook?

6    A.   Yes.

7    Q.   Now, there's a slight smile on your face.  What did you

8    use this notebook for?

9    A.   I wrote something in there for Cathy.

10   Q.   And was this when you and Cathy were having your issues

11   over defendant Tracy Howard?

12   A.   Yes.

13             MS. MARSTON:  At this time the government moves into

14   evidence 61B.

15             THE COURT:  Any objection?

16             MR. CULLER:  I think most of it is already in

17   anyway.  No objection.

18             THE COURT:  Let it be admitted.

19             (Government's Exhibit Number 61B was received into

20   evidence.)

21   Q.   Now, do you recognize the handwriting on the first page?

22   A.   Yes.

23   Q.   Whose handwriting?

24   A.   Tracy.

25   Q.   And what was the point of writing down the numbers?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  A.   Either money he was saving or money that he needed to

2  get.

3  Q.   The next page, whose handwriting?

4  A.   Tracy's.

5  Q.   Next page?

6  A.   Tracy's.

7  Q.   Do you recognize the handwriting on this page?

8  A.   Tracy's.

9  Q.   How about on this page?

10  A.   Tracy's.

11  Q.   Now, the reference here to 3.5 G, what does that mean?

12  A.   Crack.

13  Q.   And how do you know that?

14  A.   3.5 grams.

15  Q.   And what about car, rent, bills, what's the reference up

16  there for?

17  A.   That's how much he needed for it.

18  Q.   And on this page, whose handwriting do you recognize?

19  A.   Tracy's.

20  Q.   And what was the purpose of the amounts next to certain

21  numbers?

22  A.   That's how -- that's how much money he needed that month.

23  Q.   Do you recognize the handwriting on this page?

24  A.   Tracy's.

25  Q.   What does got/need mean?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   That's what he had; that's what he needed.

2   Q.   What does 910 profit mean?

3   A.   I don't know.

4   Q.   Do you recognize the handwriting on this page?

5   A.   Yes.

6   Q.   And what does 800 and then O-z mean?

7   A.   I don't know.

8   Q.   Do you know what the abbreviation for ounce is?

9   A.   Yes.

10              MR. CULLER:  Objection.

11              THE COURT:  Overruled.

12   Q.   What's the abbreviation for ounce?

13   A.   O-z.

14              MR. CULLER:  Objection.

15              THE COURT:  Overruled.

16   Q.   And down here where it says 28 G, what does that mean?

17   A.   28 grams.

18   Q.   Do you know how much an ounce would sell for?

19   A.   No.

20   Q.   Now, is this the page that you were talking about

21   earlier?

22   A.   Yes.

23   Q.   And why did you write up this page?

24   A.   To give it -- so Cathy could see it.

25   Q.   Do you recognize the handwriting on this page?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   Yes.

2   Q.   Whose handwriting is it?

3   A.   Tracy's.

4   Q.   Do you recognize the handwriting on this page?

5   A.   Yes.

6   Q.   Whose handwriting is it?

7   A.   Tracy's.

8   Q.   Now, why does it have a number next to hotel?

9   A.   Because the money that he needed for the hotel on Nations

10  Ford.

11  Q.   And who was working out of that hotel room on Nations

12  Ford?

13  A.   Cathy and Donna.

14  Q.   And who was watching over them?

15  A.   Nick.

16  Q.   I'm going to direct your attention to the back of this

17  book.  Do you recognize the handwriting on this page?

18  A.   Yes.

19  Q.   How do you recognize it?

20  A.   Tracy's.

21  Q.   Do you recognize the name David there?

22  A.   Yes.

23  Q.   And how do you recognize that name?

24  A.   It's David.

25  Q.   His brother?

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   Yeah.

2           MR. ADOLF:  Objection, speculation, Judge.

3           THE COURT:  Overruled.

4   Q.   I'm also going to direct your attention to the envelope

5   stuck in the back of the notebook.  Do you recognize the

6   handwriting on that envelope?

7   A.   Yes.

8   Q.   And again, do you recognize any of the names at the top?

9   A.   Yes.

10  Q.   What do you recognize?

11  A.   David.

12  Q.   Now, I'm also going to show you some other paperwork.

13  First I'm going to show you what's been marked for

14  identification purposes as Government's Exhibit 126B.  Do you

15  recognize 126B?

16  A.   Yes.

17  Q.   In fact, have you already seen one of these books earlier

18  in your testimony today?

19  A.   Yes.

20  Q.   And did you mention that another one of these was

21  purchased after that initial warrant -- after the initial

22  scale was seized?

23  A.   Yes.

24  Q.   And do you know where that was purchased from?

25  A.   Infinity's End on Independence.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And how do you know that?

2  A.   Because I was there when they got it.

3        MS. MARSTON:  At this time the government moves to

4  introduce Government's Exhibit 126B.

5        THE COURT:  Any objection?

6        MR. CULLER:  No.

7        THE COURT:  Let it be admitted.

8        (Government's Exhibit Number 126B was received into

9  evidence.)

10  Q.   Now, I'm also going to show you what's already been

11  introduced into evidence as Government's Exhibit 78J.  Do you

12  recognize the names in 78J?

13  A.   Yes.

14  Q.   And do you recognize the handwriting?

15  A.   Yes.

16  Q.   Whose handwriting is this?

17  A.   Hilari's.

18  Q.   And why was Hilari keeping track of both you and her?

19  A.   To see how much money we made.

20  Q.   And who was this piece of paper supposed to go to?

21  A.   Ila.

22  Q.   I'm also going to show you what's been marked for

23  identification purposes as Government's Exhibit 126A.  Do you

24  recognize 126A and the handwriting on that page?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

620

KESHIA BURRIS - DIRECT

1  Q.   And how do you recognize it?

2  A.   It's Tracy's.

3        MS. MARSTON:  At this time the government moves into

4  evidence 126A.

5        THE COURT:  Any objection?

6        MR. CULLER:  No.

7        THE COURT:  Let it be admitted.

8        (Government's Exhibit Number 126A was received into

9  evidence.)

10 Q.   Now, what name do you see at the top left corner of this

11 page?

12 A.   David.

13 Q.   And what amount is next to him?

14 A.   Fifteen hundred.

15 Q.   Now, at the bottom of the page, what name do you see?

16 A.   Dre.

17 Q.   Did you know anybody by Dre?

18 A.   No.

19 Q.   And what number do you see next to Dre?

20 A.   Nine-ninety.

21 Q.   I'm also going to show you what's been marked for

22 identification purposes as Government's Exhibit 126C.  Do you

23 recognize 126C?

24 A.   Yes.

25 Q.   And how do you recognize it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

621

KESHIA BURRIS - DIRECT

1  A.   The names.

2  Q.   And the handwriting?

3  A.   Uh-huh.

4  Q.   Whose handwriting is it?

5  A.   Tracy's.

6         MS. MARSTON:  At this time the government moves into

7  evidence 126C.

8         THE COURT:  Any objection?

9         MR. CULLER:  No.

10        THE COURT:  Let it be admitted.

11        (Government's Exhibit Number 126C was received into

12  evidence.)

13  Q.   Now, do you recognize the names on that napkin?

14  A.   Yes.

15  Q.   Whose names are those?

16  A.   Allen, Twin, and Jason.

17  Q.   All right.  Who's Allen?

18  A.   A friend of Tracy's.

19  Q.   And who's Jason?

20  A.   A friend of Tracy's.

21  Q.   And did they have anything to do with bringing a girl to

22  defendant Tracy Howard?

23  A.   Yes.

24  Q.   Who did they bring to him?

25  A.   Davia.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

622

KESHIA BURRIS - DIRECT

1  Q.   And who's Twin?

2  A.   His cousin.

3  Q.   And what was his cousin's name.

4  A.   Lionel Anthony.

5  Q.   And what is written next to Twin's name?

6  A.   Weed.

7  Q.   And what was that for?

8  A.   I don't know.

9  Q.   I'm also going to show you what's been marked for

10  identification purposes as Government's Exhibit 126D.  At the

11  same time I'm going to show you 126DD.  Do you recognize those

12  two exhibits?

13  A.   Yes.

14  Q.   And was this paperwork found at the Waterford Lakes

15  apartment?

16  A.   Yes.

17  Q.   Now, why was 26D and 26DD at the Waterford Lakes

18  apartment?

19  A.   So whenever we had to do a credit card call, we didn't

20  have to go get it from her; we already had it.

21       MS. MARSTON:  At this time the government moves into

22  evidence 126D and 126DD.

23       THE COURT:  Any objection?

24       MR. CULLER:  No.

25       THE COURT:  Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

623

KESHIA BURRIS - DIRECT

1          (Government's Exhibits Numbers 126D and 126DD were

2    received into evidence.)

3    Q.    Now, what was the point of having the business card

4    attached to the credit card slip?

5    A.    So you can give the person the card.

6    Q.    And what was the purpose of filling out this last piece

7    of paper on 126D?

8    A.    I don't know.

9    Q.    Did you ever fill it out?

10   A.    Huh-uh.

11   Q.    And looking at the bigger paper that's attached to 126DD,

12   do you recognize that piece of paper?

13   A.    Yes.

14   Q.    Did you ever fill out that piece of paper?

15   A.    Yes.

16   Q.    And what was the purpose of that?

17   A.    To write down the person's information.

18   Q.    How did you get paid if you did a -- or how did you get

19   money if you did a credit card transaction?

20   A.    We would give it to his mom and she would give it to

21   Tracy.

22   Q.    And do you know in what form she would give it to Tracy?

23   A.    I don't know.

24   Q.    Did you ever see Tracy cash any checks?

25   A.    Huh-uh.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

624

KESHIA BURRIS - DIRECT

1   Q.   I'm also going to show you what's been marked as

2   Government's Exhibit 126E.  Do you recognize 126E?

3   A.   Yes.

4   Q.   And how do you recognize it?

5   A.   The cable bill for Waterford Lakes.

6        MS. MARSTON:  At this time the government moves into

7   evidence 126E.

8        THE COURT:  Any objection?

9        MR. CULLER:  No.

10       THE COURT:  Let it be admitted.

11       (Government's Exhibit Number 126E was received into

12   evidence.)

13   Q.   I'm also going to show you what's been marked for

14   identification purposes as 126F.  Do you recognize 126F?

15   A.   Yes.

16   Q.   And how do you recognize this document?

17   A.   It's Lionel Anthony's car insurance.

18   Q.   Did Lionel Anthony have car insurance?

19   A.   No.

20   Q.   Who had car insurance in the name Lionel Anthony?

21   A.   Tracy.

22   Q.   And who kept this documentation?

23   A.   Tracy.

24       MS. MARSTON:  Government moves into evidence 126F.

25       THE COURT:  Any objection?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

```
1              MR. CULLER:  No.

2              THE COURT:  Let it be admitted.

3              (Government's Exhibit Number 126F was received into

4    evidence.)

5    Q.   Was Lionel Anthony given a car to use?

6    A.   Yes.

7    Q.   And who gave him a car to use?

8    A.   Tracy.

9    Q.   And what kind of car did Tracy give him to use?

10   A.   It was a gold car.  I don't know what -- I don't know

11   what type it was.

12   Q.   I'm going to show you what's been marked as Government's

13   Exhibits 126G and H.  First, do you recognize G, and second,

14   do you -- I'm sorry, G and I.  Do you recognize I?

15   A.   Yes.

16   Q.   And how do you recognize these two documents?

17   A.   Hanover Landing.

18   Q.   And who was paying the rent at Hanover Landing?

19   A.   Tracy.

20   Q.   But whose name was the Hanover Landing apartment in?

21   A.   Lionel Anthony.

22             MS. MARSTON:  At this time the government moves into

23   evidence 126G and I.

24             THE COURT:  Any objection?

25             MR. CULLER:  No objection.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1         THE COURT:  Let it be admitted.

2         (Government's Exhibits Numbers 126G and 126I were

3    received into evidence.)

4    Q.   How much was the rent at Hanover Landing once a month?

5    A.   Five-twenty-five.

6    Q.   I'm going to show you what's been marked for

7    identification purposes as 126H.  Do you recognize the

8    signatures at the bottom of 126H?

9    A.   Yes.

10   Q.   What two signatures do you recognize?

11   A.   Tracy and David.

12   Q.   Now, were you there when this document was completed?

13   A.   Yes.

14   Q.   And what was the purpose of completing this document,

15   what were they purchasing?

16   A.   A Jaguar.

17        MS. MARSTON:  At this time the government moves into

18   evidence Government's Exhibit 126H.

19        THE COURT:  Any objection?

20        MR. CULLER:  No.

21        THE COURT:  Let it be admitted.

22        (Government's Exhibit Number 126H was received into

23   evidence.)

24   Q.   Now, I direct your attention to here.  How much cash is

25   marked in this document as being put down?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

627

KESHIA BURRIS - DIRECT

1   A.   Eight thousand.

2   Q.   And what car is marked as being in the trade-in?

3   A.   A Saturn.

4   Q.   And is this the same Jaguar you've previously testified

5   about regarding the whole time you learned where defendant

6   David Howard was living?

7   A.   Yes.

8   Q.   I'm also going to show you what's been marked for

9   identification purposes as Government's Exhibit 126K.  Do you

10  recognize 126K?

11  A.   Yes.

12  Q.   And how do you recognize it?

13  A.   It's a bank deposit.

14  Q.   And what was the purpose of having 126K?

15  A.   To -- somebody deposited some money.

16  Q.   Did you ever do that?

17  A.   No.

18  Q.   Were you ever with Tracy when he did it?

19  A.   No.

20  Q.   Who did you know to make the deposits into the First

21  Citizens account?

22  A.   Hilari.

23  Q.   And did you know anybody else?

24  A.   No.

25  Q.   I'm also going to show you --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

628

KESHIA BURRIS - DIRECT

1          MS. MARSTON:  Oh, I'm sorry.  At this time the

2  government moves into evidence Government's Exhibit 126K.

3          THE COURT:  Any objection?

4          MR. CULLER:  No.

5          THE COURT:  Let it be admitted.

6          (Government's Exhibit Number 126K was received into

7  evidence.)

8  Q.   I'm also going to show you what I've marked as 126J.

9  However, it's misidentified on the exhibit list just for Madam

10  Clerk.

11      Do you recognize the handwriting you see on 126J?

12  A.   Yes.

13  Q.   And how do you recognize it?

14  A.   It's Tracy's.

15  Q.   Now, do you recognize any of the names that have been

16  crossed out there?

17  A.   Huh-uh.  I can't see them.

18          MS. MARSTON:  Your Honor, may I approach?

19          THE COURT:  You may.

20  A.   Yes.

21  Q.   Which names do you recognize?

22  A.   Big's and Jason.

23          MS. MARSTON:  At this time the government moves into

24  evidence 126J.

25          THE COURT:  Any objection?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1          MR. CULLER:  No.

2          THE COURT:  Let it be admitted.

3          (Government's Exhibit Number 126J was received into

4    evidence.)

5    Q.   Is Jason the person you previously referred to?

6    A.   Yes.

7    Q.   Did you ever meet Big?

8    A.   Yes, once or twice.

9    Q.   Who is Big?

10   A.   One of Tracy's friend guys.  He sold him a car.

11   Q.   Do you know what kind of car he sold him?

12   A.   A Cadillac.

13   Q.   I'm going to show you what's been marked for

14   identification purposes Government's Exhibit 62I.  Do you

15   recognize 62I?

16   A.   Yes.

17   Q.   And how do you recognize it?

18   A.   Phone numbers from Tracy's phone.

19   Q.   And is this similar to the previous exhibit that we saw

20   with your handwriting on it?

21   A.   Yes, but this is not my handwriting.

22   Q.   Do you know whose handwriting this is?

23   A.   No.

24   Q.   Do you recognize the telephone numbers?

25   A.   Some of them, yes.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1          MS. MARSTON:  At this time the government moves into

2    evidence 62I.

3          MR. CULLER:  Objection.  She can't identify it.

4          THE COURT:  Overruled.

5          (Government's Exhibit Number 62I was received into

6    evidence.)

7    Q.   What would be the reason for crossing out the numbers?

8          MR. ADOLF:  Objection to speculation.

9          THE COURT:  Sustained.

10   Q.   Do you know the reason for crossing out the numbers?

11   A.   Because those are the numbers we already put in the other

12   phone.

13   Q.   And were you actually responsible for putting numbers

14   into the phones at times?

15   A.   Yes.

16   Q.   And who else was responsible for doing that?

17   A.   Cathy.

18   Q.   I'm also going to show you what's been marked for

19   identification purposes as Government's Exhibit 62J -- G, I'm

20   sorry.  I make that mistake a lot.

21   Q.   Do you recognize Government's Exhibit 62G?

22   A.   Yes.

23   Q.   And how do you recognize it?

24   A.   It's David's paperwork.

25   Q.   And was that in that room at the Waterford Lakes

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  apartment?

2  A.   Yes.

3        MS. MARSTON:  At this time the government moves into

4  evidence 62G.

5        THE COURT:  Any objection?

6        (No response.)

7        THE COURT:  Let it be admitted.

8        (Government's Exhibit Number 62G was received into

9  evidence.)

10  Q.   I'm also going to show you what's been marked for

11  identification purposes as Government's Exhibit 62E.  Do you

12  recognize Government's Exhibit 62E?

13  A.   Yes.

14  Q.   And is this part of the paperwork that was also at

15  Waterford Lakes?

16  A.   Yes.

17  Q.   And whose paperwork is this?

18  A.   David's.

19        MS. MARSTON:  At this time the government moves into

20  evidence 62E.

21        THE COURT:  Any objection?

22        (No response.)

23        THE COURT:  Let it be admitted.

24        (Government's Exhibit Number 62E was received into

25  evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And what car was this for?

2  A.   The Lincoln.

3  Q.   Did you know defendant David Howard to drive a Lincoln at

4  one point in time?

5  A.   Yes.

6  Q.   I'm also going to show you what's been marked for

7  identification purposes as 62D.  Do you recognize 62D?

8  A.   Yes.

9  Q.   And what is Government's Exhibit 62D?

10  A.   Storage unit.

11  Q.   And do you recognize the security code that was used for

12  the storage unit?

13  A.   Yes.

14  Q.   And how do you recognize that security code?

15  A.   It was Tracy and David's old phone number.

16       MS. MARSTON:  At this time the government moves into

17  evidence Government's Exhibit 62D.

18       THE COURT:  Any objection?

19       (No response.)

20       THE COURT:  Let it be admitted.

21       (Government's Exhibit Number 62D was received into

22  evidence.)

23  Q.   And what else was that telephone number used for?

24  A.   The Mistress escort service.

25  Q.   I'm going to show you what's been marked for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  identification purposes as Government's Exhibit 62B.  Do you

2  recognize Government's Exhibit 62B?

3  A.   Uh-huh.  Yes.

4  Q.   How do you recognize it?

5  A.   Duke Power bill for Waterford Lakes.

6  Q.   And who was paying the Duke Power bill at Waterford

7  Lakes?

8  A.   Tracy.

9       MS. MARSTON:  At this time the government moves into

10  evidence 62B.

11       THE COURT:  Any objection?

12       MR. CULLER:  No.

13       THE COURT:  Let it be admitted.

14       (Government's Exhibit Number 62B was received into

15  evidence.)

16  Q.   What month was this Duke Power bill due?

17  A.   8/9/04.

18  Q.   I'm also going to show you what's been marked for

19  identification purposes as Government's Exhibit 62A.  Do you

20  recognize the names at the bottom of Government's Exhibit 62A?

21  A.   Yes.

22  Q.   And how do you recognize those names?

23  A.   Tracy and David.

24  Q.   And which car is this document for?

25  A.   Jaguar.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1          MS. MARSTON:  At this time the government moves into

2    evidence 62A.

3          THE COURT:  Any objection?

4          MR. CULLER:  No.

5          THE COURT:  Let it be admitted.

6          (Government's Exhibit Number 62A was received into

7    evidence.)

8    Q.   Now, after you allowed the detectives to do the consent

9    search of that apartment, were you supposed to meet with them

10   again?

11   A.   Yes.

12   Q.   And did you?

13   A.   No.

14   Q.   What, in fact, did you end up doing after you allowed

15   that consent search of Waterford Lakes?

16   A.   I got back with Tracy.

17   Q.   And explain to the jury how you got back with him.

18   A.   Me and my mama went to court one day.  I was supposed to

19   be pressing charges on Tracy, and I dropped them and I left.

20   And my mama's car had got towed so I had to call his friend

21   Jamaica and he came got us.  He dropped my mama off and I was

22   with them all that day.  And then later on that night, Tracy

23   had came by.  And Jamaica usually looks out the window before

24   he opens the door so I can go in the back room, and he didn't

25   and he opened the door and Tracy was there.  And he told me to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

635

KESHIA BURRIS - DIRECT

1   go to the back room.

2   Q.   Who told you to go to the back room?

3   A.   Jamaica.

4   Q.   And then what happened?

5   A.   And I got behind his girlfriend -- Jamaica's girlfriend.

6   I sat behind her and Tracy was calling somebody on the phone

7   telling them to bring the gun.  And he started yelling at me,

8   telling me that I put the cops on him and everything.

9   Q.   And then what happened?

10  A.   And then he told me that he's not going to touch me.  He

11  said, Just get up, he said, wash your face, he said, and let's

12  go.  He said, If you -- he said, you try to run, he said, I'm

13  going to hurt you.  So I got in the car and we had left.  We

14  talked.  Then we went to Hanover Landing which was where they

15  were staying.

16  Q.   Who was staying at Hanover Landing at that point in time?

17  A.   Nick, Cathy, Donna, and Tracy.

18  Q.   And then what happened?

19  A.   He wanted to go get his ID and then we went to go get a

20  motel room.

21  Q.   And where did you get a hotel room?

22  A.   Somewhere on South Tryon.

23  Q.   And what happened after that hotel room?

24  A.   We stayed there for like a week and then we had moved to

25  one on Tyvola.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

636

KESHIA BURRIS - DIRECT

1  Q.   Now, were you also trying to get an apartment at North

2  Pointe at this same time frame?

3  A.   Yes.

4  Q.   I'm going to show you what's been marked as Government's

5  Exhibit 1H for identification purposes.  Do you recognize the

6  name on Government's Exhibit 1H?

7  A.   Yes.

8  Q.   And what name is that?

9  A.   Allison Walkers.

10 Q.   And what was the purpose of trying to get an apartment in

11 Allison Walkers -- in that name Allison Walkers at the North

12 Pointe Apartments?

13 A.   So we could have another apartment.

14 Q.   Did you ever succeed in getting that apartment?

15 A.   No.

16 Q.   In fact, what happened with that apartment?

17 A.   It got -- they wouldn't let us do it.

18 Q.   Do you know why they wouldn't let you do it?

19 A.   Because I had -- about Sailboat Bay and Waterford Lakes.

20 Q.   And does the top document on 1H tell you approximately

21 when you were turned down on the Waterford Lakes Apartments?

22 A.   Yes.

23 Q.   And when were you turned down?

24 A.   9/15/04.

25          MS. MARSTON:  At this time the government moves into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2682

KESHIA BURRIS - DIRECT

1   evidence 1H.

2              THE COURT:  Any objection?

3              MR. CULLER:  No.

4              THE COURT:  Let it be admitted.

5              (Government's Exhibit Number 1H was received into

6   evidence.)

7   Q.   Now, you mentioned you ended up at a hotel off of Tyvola.

8   Do you recall the name of that hotel?

9   A.   Guest Suites.

10  Q.   What is that hotel near?  What club?

11  A.   Oh, Gentlemen's Club.

12  Q.   I'm going to show you what's been marked for

13  identification purposes as Government's Exhibit 46A.  Do you

14  recognize Government's Exhibit 46A?

15  A.   Yes.

16  Q.   Do you recognize the signature under guest one, 46A?

17  A.   Yes.

18  Q.   How do you recognize that signature?

19  A.   Tracy.

20  Q.   And do you actually recognize the signature that's

21  crossed out there?

22  A.   Yes.

23  Q.   And whose signature is crossed out there?

24  A.   I can't see it.

25              MS. MARSTON:  Your Honor, may I approach?


            Cheryl A. Nuccio, RMR-CRR (704)350-7494



                              638

KESHIA BURRIS - DIRECT

1          THE COURT:  You may.

2     A.   Tracy Howard's.

3     Q.   Can you see it?

4     A.   Yeah.

5     Q.   And whose signature is crossed out there?

6     A.   Tracy Howard.

7     Q.   Now, is this when you were staying -- when you were

8     staying off of Tyvola?

9     A.   Yes.

10    Q.   And what is the name of this hotel?

11    A.   Studio Plus.

12         MS. MARSTON:  At this time the government moves into

13    evidence 46A.

14         THE COURT:  Any objection?

15         MR. CULLER:  No.

16         THE COURT:  Let it be admitted.

17         (Government's Exhibit Number 46A was received into

18    evidence.)

19    Q.   Now, where it says Keshia Burris, is that your

20    handwriting there?

21    A.   No.

22    Q.   Do you recognize that handwriting?

23    A.   Yes.

24    Q.   Whose handwriting is it?

25    A.   Tracy's.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1    Q.    And why was he putting you down as an additional guest at

2    this hotel?

3    A.    Because I was staying there with him.

4    Q.    Now, while you were at the Studio Plus Hotel, what

5    happened?

6    A.    I had got off of work one night and Tracy came to get me.

7    We had went back to the room.  We was there maybe five

8    minutes.  And then he bagged some stuff up.

9    Q.    When you say he bagged some --

10   A.    Crack.

11   Q.    -- stuff up --

12   A.    Crack.  And then we had left.  And right when we had

13   pulled out, they had stopped us.

14   Q.    Who's they?

15   A.    The police and the detectives.

16   Q.    And was there a detective there that you recognized?

17   A.    Yes.

18   Q.    And who was that?

19   A.    Grimsley.

20   Q.    And when you got stopped by the police, what did Tracy

21   tell you to do?

22   A.    Put the dope inside me.

23   Q.    And did you do that?

24   A.    Uh-huh.  Yes.

25   Q.    Was that -- was that -- what kind of dope was it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   A.   Crack.

2   Q.   Was that crack ever found?

3   A.   No.

4   Q.   What did you do with it?

5   A.   Flushed it.

6   Q.   Where did you flush it?

7   A.   In jail.

8   Q.   Now, when you got stopped, did you end up talking to

9   Detective Grimsley?

10  A.   No.  Yeah, later on that night I did.

11  Q.   Okay.  Well, before -- when you got stopped by the

12  police --

13  A.   Uh-huh.

14  Q.   -- did you talk to Detective Grimsley right there at the

15  scene where you were stopped?

16  A.   No.

17  Q.   Did you give Detective Grimsley consent to search the

18  hotel room?

19  A.   I told him that it was not in my name, but I don't have

20  no problem with him searching it, yes.

21  Q.   And did you tell him that your belongings were in the

22  hotel?

23  A.   Yes.

24  Q.   And other than your belongings, what other item did you

25  have in that hotel that was important to you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

641

KESHIA BURRIS - DIRECT

1  A.   My cats.

2  Q.   And after -- did you give him a key card to use for that

3  hotel room?

4  A.   They told me to open it.

5  Q.   And where did you get that key card from?

6  A.   In the car.

7  Q.   And was there a key card for the hotel room in the car

8  you had been driving in?

9  A.   Yes.

10  Q.   And did you actually drive with an officer from the car

11  back to the hotel room?

12  A.   The officer drove me to the motel, yes.

13  Q.   And when you got to the hotel, did you use that key card

14  to open your room?

15  A.   Yes.

16  Q.   And once the room was opened, you allowed the officers to

17  search it?

18  A.   Yes.

19          MR. CULLER:  Objection.  That's not what she said.

20          THE COURT:  Overruled.

21  Q.   You can answer that question.

22  A.   I told them that it's not my room, you know, but they

23  could search it.  It doesn't matter.  But I said he needs to

24  ask Tracy because it's in his name.  He was telling me that my

25  name was on the guest list so I had permission to open the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

642

KESHIA BURRIS - DIRECT

1   door.

2   Q.   All right.  Well, had you put your name on the guest

3   list?

4   A.   No.

5   Q.   Are you surprised that your name was on the guest list?

6   A.   Yeah.

7   Q.   Because -- why were you surprised?

8   A.   Because I didn't sign it.

9   Q.   Well, but who added you to the guest list?

10  A.   Tracy.

11          MR. CULLER:  Objection.  She doesn't know.

12          THE COURT:  Overruled.

13  Q.   And who were you with in that hotel room?

14  A.   Tracy.

15  Q.   I'm going to show you some photographs beginning with

16  Government's Exhibit 45Q.  Do you recognize 45Q?

17  A.   Yes.

18  Q.   And how do you recognize it?

19  A.   It's the bedroom.

20  Q.   And who was sleeping in this bed?

21  A.   Me and Tracy.

22          MS. MARSTON:  Government moves to introduce 45Q.

23          THE COURT:  Any objection?

24          (No response.)

25          THE COURT:  Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

643

KESHIA BURRIS - DIRECT

1          MR. CULLER:  Only our -- our outstanding objection

2    which for the record we make again at this point.

3          THE COURT:  Very well.  Overruled.

4          (Government's Exhibit Number 45Q was received into

5    evidence.)

6    Q.   Now, I'm also going to show you what's been marked for

7    identification purposes as Government's Exhibit 45L.  Do you

8    recognize Government's Exhibit 45L?

9    A.   Yes.

10   Q.   And how do you recognize it?

11   A.   It's the living room.

12   Q.   And do you recognize an item beside the sofa there in the

13   living room?

14   A.   Yes.

15   Q.   And how do you recognize that item?

16   A.   Cat box.

17   Q.   And whose cats were in this hotel room?

18   A.   Mine.

19          MS. MARSTON:  Government moves into evidence 45L.

20          THE COURT:  Any objection?

21          MR. CULLER:  If I may have a continuing objection,

22   that's all.

23          THE COURT:  You may and it's overruled.  Let it be

24   admitted.

25          (Government's Exhibit Number 45L was received into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

644

KESHIA BURRIS - DIRECT

1  evidence.)

2  Q.   Now, are these the same cats you had taken to your mom's

3  house when you had left Tracy?

4  A.   Yes.

5  Q.   I'm also going to show you what's been marked for

6  identification purposes as Government's Exhibit 45J.  Do you

7  recognize 45J?

8  A.   Yes.

9  Q.   And how do you recognize it?

10 A.   Tracy's ID and the tattoo place.

11 Q.   And how do you recognize the tattoo place?

12 A.   Because that's where I got my tattoo.

13 Q.   And what does your tattoo say?

14 A.   Tracy.

15 Q.   And who paid for that tattoo?

16 A.   Tracy.

17         MS. MARSTON:  At this time the government moves into

18 evidence Government's Exhibit 45J.

19         THE COURT:  Any objection -- or let it be admitted.

20         (Government's Exhibit Number 45J was received into

21 evidence.)

22 Q.   Do you know anyone else who got a tattoo with the name

23 Tracy on it?

24 A.   Stephanie.

25 Q.   And what other name did she go by?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

645

KESHIA BURRIS - DIRECT

1  A.    Amber.

2  Q.    I'm also going to show you two photographs, first 45C and

3  then 45D.  Beginning with 45C and then looking at 45D.  Do you

4  recognize those two photographs?

5  A.    Yes.

6  Q.    And how do you recognize those two photographs?

7  A.    My stuff.

8  Q.    And when you say your stuff, what are you talking about?

9  A.    My hygiene supplies.

10        MS. MARSTON:  At this time the government moves into

11  evidence 45C and D.

12        THE COURT:  Let it be admitted.

13        (Government's Exhibits Numbers 45C and 45D were

14  received into evidence.)

15  Q.    Now, is 45D a closer up of 45C?

16  A.    Yes.

17  Q.    And looking at 45D, what's being pointed out in that

18  picture?

19  A.    Baggies.

20  Q.    And what -- why were these baggies there on the dresser

21  with your makeup?

22  A.    Because it's ones that he put there or I put there.

23  Q.    And what are these baggies used for?

24  A.    Crack.

25  Q.    I'm also going to show you three photographs marked as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

646

KESHIA BURRIS - DIRECT

1    Government's Exhibits 45F, 45E, and 45G.  Do you recognize

2    those three photographs?

3    A.    Yes.

4    Q.    And how do you recognize those three photographs?

5    A.    It's the crack and the razor blade and the scale.

6    Q.    All right.  Beginning --

7              MS. MARSTON:  At this time the government moves into

8    evidence 45E, F, and G.

9              THE COURT:  Let them be admitted.

10             (Government's Exhibits Numbers 45E, 45F, and 45G

11   were received into evidence.)

12   Q.    Starting with E, what do you recognize in Government 45E?

13   A.    Scale, the razor blade, and shake.

14   Q.    And did you say shake?

15   A.    Yes.

16   Q.    What's shake?

17   A.    The leftovers from the crack.

18   Q.    Okay.  And where do you see shake?  If you can touch the

19   screen, it will make a dot.

20   A.    Right there (indicating).

21   Q.    I'm sorry, did you touch the screen?

22   A.    Uh-huh.

23   Q.    Can you touch it again.

24   A.    Right there (indicating).

25   Q.    And then is that a closer up of 45F?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

647

KESHIA BURRIS - DIRECT

1    A.    Yes.

2    Q.    And again, what's being pointed out?

3    A.    The shake.

4    Q.    Now, if you touch the bottom right-hand corner of that

5    screen, it will clear it.

6          (Witness complied.)

7    Q.    Now, does shake sometimes add up to a certain amount?

8    A.    Yes.

9    Q.    And what amount have you seen shake add up to?

10   A.    I don't know.

11   Q.    And what's the razor blade used for?

12   A.    To cut the crack up with.

13   Q.    And then I'm showing you Government's Exhibit 45G.

14   What's 45G being pointed out next to the Papa John's Pizza?

15   A.    A bag of crack.

16         MS. MARSTON:  If I may approach?

17         THE COURT:  You may.

18   Q.    I'm going to show you what's been marked for

19   identification purposes as Government's Exhibit 49G.

20   Actually, it's probably already introduced into evidence.  Do

21   you recognize Government's Exhibit 49G?

22   A.    Yes.

23   Q.    I'm also going to show you Government's Exhibit 49E.  Do

24   you recognize what's in 49E?

25   A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And then finally, I'm going to show you at this point

2  what's been marked as Government's Exhibit 49F.  Do you

3  recognize 49F?

4  A.   Yes.

5  Q.   And are these the items that were seized from that hotel

6  room that we just looked in those photographs?

7  A.   Yes.

8       MS. MARSTON:  At this time the government moves into

9  evidence 49G, 49E, and 49F.

10      THE COURT:  Any objection?

11      (No response.)

12      THE COURT:  Let them be admitted.

13      (Government's Exhibits Numbers 49E, 49F, and 49G

14  were received into evidence.)

15  Q.   Starting with 49G.  What was the purpose of 49G?

16  A.   To weigh the crack.

17  Q.   49F.  What was the purpose of these?

18  A.   To bag it up with.

19  Q.   Now, what's happened?

20  A.   That's where you cut it.

21  Q.   And is that what you explained earlier when you actually

22  made -- is that what you explained earlier was happening when

23  you actually made a bag?

24  A.   Yes.

25  Q.   And so when you cut that off or pull it, it ends up this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   part of the bag remains?

2   A.   Yes.

3   Q.   What do you usually do with this part of the bag?

4   A.   Use the other corner.

5            THE COURT:  Counsel, how much longer do you have

6   with this witness?

7            MS. MARSTON:  Ten minutes.

8            THE COURT:  We're going to take a break at this

9   time.  We're going to take a short afternoon break at this

10  time.

11           Members of the jury, if you can be ready to come

12  back in the courtroom at 3:10.

13           (Brief recess at 3 o'clock p.m.)

14           (Jury not present.)

15           THE COURT:  Are we ready for the jury?

16           MS. MARSTON:  Your Honor, if I actually could hand

17  up -- I have given to counsel that we have made further

18  inquiry into the request that the court ordered me to do this

19  morning regarding the missing videotape.  I have an original

20  letter that I'd like to hand up to the court for the court to

21  have for its record.  I've given copies to counsel.  This is

22  from Sergeant Scheimrife -- I hope I pronounce her name

23  correctly -- with the Charlotte-Mecklenburg Police Department

24  and it documents exactly what course of action has been taken

25  to locate this.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

650

KESHIA BURRIS - DIRECT

1          Furthermore, if the court would like to hear from
2     Captain Voorhees, Captain Voorhees can come to testify before
3     the court.
4          THE COURT:  Very well, I'll take a look at that
5     letter.
6          (The document was tendered to the court.)
7          THE COURT:  Are we ready for the jury at this time?
8          MS. MARSTON:  Yes, Your Honor.
9          MR. CULLER:  Yes.
10         THE COURT:  Call the jury.
11         (Jury entered the courtroom.)
12         THE COURT:  Ms. Marston, you may continue.
13                    KESHIA BURRIS
14              DIRECT EXAMINATION (Cont'd.)
15    BY MS. MARSTON:
16    Q.  Ms. Burris, prior to our afternoon break, we had been
17    looking at the baggies as well as the scale and the razor
18    blade.  Do you recall that?
19    A.  Yes.
20    Q.  And the scale and the razor blade can be seen in
21    Government's Exhibit 45E; is that correct?
22    A.  Yes.
23    Q.  And then again in 45F you see the razor blade as well as
24    what you said is shake?
25    A.  Yes.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And then 45G.  What's in 45G?

2  A.   Bottle of crack in the corner.

3  Q.   A bottle?

4  A.   A thing of crack in the corner.

5  Q.   Now, I'm going to show you what's been marked for

6  identification purposes as Government's Exhibit 45N.  Do you

7  recognize Government's Exhibit 45N?

8  A.   Yes.

9  Q.   And how do you recognize it?

10  A.   Baggies.

11  Q.   And are those more of the same baggies we've been talking

12  about?

13  A.   Yes.

14       MS. MARSTON:  Your Honor, if I may approach?

15       THE COURT:  You may.

16  Q.   I'm also going to show you what's been marked as 49D as

17  in David.  Do you recognize 49D?

18  A.   Yes.

19  Q.   And is that the same that you see in the photograph?

20  A.   Yes.

21       MS. MARSTON:  At this time the government moves into

22  evidence 49D as well as 45N; is that correct?

23       THE WITNESS.  Yes.

24       THE CLERK:  (Affirmative nod.)

25       THE COURT:  Let them be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

652

KESHIA BURRIS - DIRECT

1          (Government's Exhibits Numbers 45N and 49D were

2   received into evidence.)

3   Q.   Now, I'm also going to show you some items that have been

4   marked for identification purposes first as Government's

5   Exhibit 49CC, 49C, and 49D.  Do you recognize those three

6   items that you see on your screen?

7   A.   Yes.

8   Q.   And were those items seized from the hotel room that day?

9   A.   Yes, they were.

10          MS. MARSTON:  At this time the government moves into

11   evidence 49C, 49CC, and 49B.

12          THE COURT:  Let them be admitted.

13          (Government's Exhibits Numbers 49B, 49C, and 49CC

14   were received into evidence.)

15   Q.   Now, in particular, looking at this bottom driver's

16   license here.  What name is it?

17   A.   Allison Walkers.

18   Q.   And is that the license that you were using?

19   A.   Yes.

20   Q.   And what is this top license for?

21   A.   Tracy Howard.

22   Q.   And what address is he using on the Tracy Howard?

23   A.   Waterford Lakes.

24   Q.   And then 49B, who's that check made out to?

25   A.   Tracy Howard.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

653

KESHIA BURRIS - DIRECT

1    Q.   Now, I'm also going to show you what's been marked for

2    identification purposes as Government's Exhibit 45K.  Do you

3    recognize Government's Exhibit 45K?

4    A.   Yes.

5    Q.   And how do you recognize it?

6    A.   My stuff that was on the dresser.

7    Q.   You recognize what?

8    A.   The stuff that was on the table.

9    Q.   And who purchased the shoes and the bag for you?

10   A.   Tracy did for my birthday.

11   Q.   And where did he purchase those items for you from?

12   A.   I think it was Carolina Place Mall.  I'm not sure.

13           MS. MARSTON:  At this time the government moves into

14   evidence 45K.

15           THE COURT:  Let them be admitted.

16           (Government's Exhibit Number 45K was received into

17   evidence.)

18   Q.   I'm also going to show you what's been marked for

19   identification purposes first as 45I, 45H, and 45T.  Do you

20   recognize those three photographs?

21   A.   Yes.

22   Q.   And how do you recognize those?

23   A.   It's me, the closet, and Tracy's shoe.

24           MS. MARSTON:  At this time the government moves into

25   evidence 45I, 45H, and 45T.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

654

KESHIA BURRIS - DIRECT

1        THE COURT:  Let them be admitted.

2        (Government's Exhibits Numbers 45H, 45I, and 45T

3   were received into evidence.)

4   Q.   And what is 45T?

5   A.   Me, money in his shoe, and the closet.

6   Q.   Now, what else is hanging in the closet?

7   A.   My clothes.

8   Q.   Now, I'm going to show you two photographs that have been

9   marked first Government's Exhibits 45A and 45B for

10  identification.  Do you recognize 45A and 45B?

11  A.   Yes.

12  Q.   And how do you recognize those two items?

13  A.   The nightstand.

14  Q.   And do you recognize some of the items inside the

15  nightstand?

16  A.   Yes.

17        MS. MARSTON:  At this time the government moves into

18  evidence 45A and B.

19        THE COURT:  Let them be admitted.

20        (Government's Exhibits Numbers 45A and 45B were

21  received into evidence.)

22  Q.   Now, 45A and 45B.  Is 45B a closer up of 45A?

23  A.   Yes, it is.

24  Q.   And tell us what was in the nightstand at the Studio Plus

25  Hotel.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

655

KESHIA BURRIS - DIRECT

1  A.   Tracy's gun, his check, and my coloring book.

2  Q.   And why did you have a coloring book?

3  A.   I like to color.

4       MS. MARSTON:  If I may approach?

5       THE COURT:  You may.

6  Q.   I'm going to show you what's been marked as Government's

7  Exhibits 48A, 48P, and C.  Do you recognize these items?

8  A.   Yes.

9  Q.   Why was this gun in the nightstand at your hotel room?

10 A.   Because Tracy put it there.

11 Q.   And why did Tracy have a gun with him, if you know?

12 A.   I don't know.

13 Q.   Well, had you seen guns around Tracy before?

14 A.   Yes.

15 Q.   And when did you see guns around him before?

16 A.   At Waterford Lakes.

17 Q.   And why were there guns at Waterford Lakes?

18 A.   Because he bought them from a friend of his.

19 Q.   And when would he carry the guns?

20 A.   Either when he goes to Little Mexico.

21 Q.   And what was he taking to Little Mexico when he took the

22 guns there?

23 A.   Crack.

24 Q.   Were you ever responsible for carrying Government's

25 Exhibit 48A?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

656

KESHIA BURRIS - DIRECT

1  A.   No.

2  Q.   And do you recognize what 48B and C are?

3  A.   Yes.

4  Q.   What is B and C?

5  A.   Bullets.

6  Q.   And what's B?

7  A.   The clip.

8  Q.   Now, I'm also going to show you what's been marked as

9  Government's Exhibit 50A.  Do you recognize what's in

10 Government's Exhibit 50A?

11 A.   Yes.

12 Q.   And how do you recognize it?

13 A.   The cell phones that I had.

14 Q.   They're both your cell phones?

15 A.   No, one of them is mine, one of them was Tracy's, but

16 they was both in Allison Walkers' name.

17 Q.   And you actually got them put in your names.

18 A.   Yes.

19 Q.   Your name, sorry.

20       MS. MARSTON:  At this time the government moves into

21 evidence Government's Exhibits 48A, B, and C, and 50A.

22       THE COURT:  Let them be admitted.

23       (Government's Exhibits Numbers 48A, 48B, 48C, and

24 50A were received into evidence.)

25 Q.   Now, I'm also going to show you on the screen what's been

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2702

KESHIA BURRIS - DIRECT

1   marked for identification purposes as Government's Exhibit

2   50B.  Do you recognize the telephone numbers in Government's

3   Exhibit 50B?

4   A.   Yes.

5   Q.   And how do you recognize that?

6   A.   The numbers that was in Tracy's cell phone.

7   Q.   And are these some of the numbers that you would have to

8   put in the phone when he got a new phone?

9   A.   Yes.

10  Q.   And then switching to page -- the next page, do you

11  recognize the telephone numbers on the second page here?

12  A.   Yes.

13  Q.   And how do you recognize these numbers?

14  A.   That was my phone.

15  Q.   And the third page, how do you recognize the numbers

16  there?

17  A.   They were on my phone.

18        MS. MARSTON:  At this time the government moves into

19  evidence 50B.

20        THE COURT:  Let it be admitted.

21        (Government's Exhibit Number 50B was received into

22  evidence.)

23  Q.   Now, what name is the second name listed up there?

24  A.   Jamaica.

25  Q.   And what name is the first B name?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

658

KESHIA BURRIS - DIRECT

1   A.   Big.

2   Q.   Now, following the search of the Studio Plus Hotel, what

3   happened to you?

4   A.   They -- we went down to the station and they talked to me

5   and they told me what I was being charged with.

6   Q.   Were you surprised that you were being charged that

7   night?

8   A.   Yeah, a little bit, yeah.

9   Q.   And were you -- what type of mood were you in when you

10  got down to the law enforcement center?

11          MR. CULLER:  Objection.

12          THE COURT:  Overruled.

13  A.   I wasn't happy.

14  Q.   Why weren't you happy?

15  A.   Because I was getting brought into it.

16  Q.   And why did you think you weren't going to get brought

17  into it?

18  A.   Because I told them about it before.

19  Q.   And what else had you done that night that made you think

20  you weren't going to get arrested?

21  A.   When, that night?  I talked to them.

22  Q.   But before talking to them, what did you allow them to do

23  at the hotel room?

24  A.   Oh, I let them search it.

25  Q.   I'm going to show you what's been marked for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1    identification purposes as Government's Exhibit 53.  Were you

2    read your Miranda rights when you were brought down to the law

3    enforcement center?

4    A.    Yes.

5    Q.    And did you complete a form with Detective Grimsley?

6    A.    Yes.

7    Q.    I'm going to show you what's been marked as Government's

8    Exhibit 53.  Do you recognize your signature at the bottom of

9    Government's Exhibit 53?

10   A.    Yes.

11   Q.    And how do you recognize it?

12   A.    It's my signature.

13   Q.    Now, once you were read your Miranda rights, did you

14   agree to talk to law enforcement that night?

15   A.    Yes.

16   Q.    And did you actually give a taped statement to law

17   enforcement that night?

18   A.    Yes.

19   Q.    Have you had the opportunity prior to coming to court

20   today to review your taped statement?

21   A.    Yes.

22   Q.    Is that taped statement accurate?

23   A.    No, it isn't.

24   Q.    What's not accurate about it?

25   A.    The females, and I didn't tell them everything about what

Cheryl A. Nuccio, RMR-CRR (704)350-7494

660

1    happened.

2    Q.   Now, when you say the females, what are you referring to?

3    A.   Davia and Cathy and Courtney.

4    Q.   And why isn't that part accurate?

5    A.   I lied and said that they was older than that.  And I

6    told them that they wasn't prostituting.

7    Q.   And when you say you didn't tell them everything, why

8    didn't you tell them everything that night?

9    A.   I don't know.

10   Q.   And why didn't you tell the truth that night?

11            MR. ADOLF:  Objection, asked and answered.

12            THE COURT:  Overruled.

13   A.   Because I didn't want him to get in trouble then.

14   Q.   Well, when you say you didn't want him to get in trouble

15   then, when had you wanted him to get in trouble?

16   A.   After I got into all this.

17   Q.   Well, when prior to September 16th had you wanted

18   defendant Tracy Howard to get into trouble?

19   A.   When I took a restraining order out on him.

20   Q.   So the previous time you had talked to law enforcement,

21   had you been more accurate with what you said?

22            MR. CULLER:  Objection.

23            THE COURT:  Overruled.

24   A.   Yes.

25   Q.   I'm going to show you what's already been introduced into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

661

KESHIA BURRIS - DIRECT

1  evidence as Government's Exhibit 127.  Do you recognize the

2  title in Government's Exhibit 127?

3  A.   Yes.

4  Q.   And how do you recognize it?

5  A.   Tracy had one at one time.

6  Q.   Have you ever read this book?

7  A.   No.

8  Q.   Do you remember an incident when defendant Tracy Howard

9  purchased an item at a gun store?

10  A.   He had Hilari do it for him.

11  Q.   Well, tell us about that.

12  A.   I was sitting in the car, but I know he said that he

13  wanted a gun --

14          MR. CULLER:  Objection if she was in the car.

15          THE COURT:  Overruled.

16  Q.   Go ahead.

17  A.   He couldn't get it because he was a felon so he had her

18  get it for him.

19          MR. CULLER:  Objection.

20          THE COURT:  Overruled.

21  Q.   And so who went into the store?

22  A.   Tracy, Hilari, and me; and then after that I went back in

23  the car.

24  Q.   Do you recall if anybody else was also there that day?

25  A.   Cathy -- it was either Cathy or Davia, I don't remember.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

662

KESHIA BURRIS - DIRECT

1   Q.   Now, at some point in the summer of 2004, was there a
2   disagreement between defendant Tracy Howard and David Howard?
3            MR. ADOLF:  Objection, speculation.  Basis of
4   knowledge.
5            MR. CULLER:  Asked and answered.
6            THE COURT:  Overruled.
7   A.   Yes.
8   Q.   And do you recall how long that lasted?
9   A.   Not long.
10  Q.   And when David and Tracy would get in disagreements, did
11  that happen at different times throughout your time of knowing
12  defendant Tracy Howard?
13  A.   It's happened maybe like three times, yes.
14  Q.   And how do they get over it?
15           MR. ADOLF:  Objection, Judge.  Speculation and vague
16  as to time.
17           THE COURT:  Sustained.
18  Q.   Have you been around defendant Tracy Howard when he's had
19  some of these disagreements?
20  A.   Yes.
21  Q.   And are you aware of how long they last for?
22           MR. CULLER:  Objection.
23           MR. ADOLF:  Object.
24           THE COURT:  Overruled.
25  A.   Maybe two, three weeks.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1  Q.   And what happens after it's over?

2  A.   They start talking on the phone.

3        MR. ADOLF:  Objection, Judge.

4        THE COURT:  Overruled.

5  Q.   You can answer that question.

6  A.   They start talking on the phone.

7  Q.   Was there ever a problem with Crystal Welsh?

8        MR. CULLER:  Object to the form.

9        THE COURT:  Overruled.

10  A.  (No response.)

11  Q.   Do you recall if there was ever a problem with Crystal

12  Welsh between defendants David and Tracy?

13  A.   With the Jaguar, yes.

14  Q.   What name did you go by when you went out on calls?

15  A.   Selena.

16  Q.   And why did you use the name Selena?

17  A.   Because I couldn't use my real name.

18  Q.   And did most of the girls that went out on calls use

19  names like that?

20  A.   Yes.

21  Q.   I'm going to show you what's already been introduced as

22  part of Government's Exhibit 82K.  And I ask that you look at

23  the top left corner of Government's Exhibit 82K.  Do you

24  recognize the name written there, typed there?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - DIRECT

1   Q.   And what name is that?

2   A.   Selena and Tracy.

3   Q.   And why -- do you know why your name is put next to

4   Selena?  Only if you know.

5   A.   No.

6   Q.   Have you ever seen this document before?

7   A.   No.

8   Q.   Were you working for the service, Ila's service through

9   defendant Tracy Howard in January 2004?

10              MR. CULLER:  Object to the form.

11              THE COURT:  Overruled.

12              MR. CULLER:  Object to the leading.

13              THE COURT:  Overruled.

14   A.   Yes.

15   Q.   And then continuing in April of 2004?

16   A.   Yes.

17   Q.   And in May 2004?

18   A.   Yes.

19              MS. MARSTON:  If I can have a moment, Your Honor.

20              THE COURT:  You may.

21              (Counsel and the agent conferred.)

22              MS. MARSTON:  Nothing further.

23              THE COURT:  Any cross?

24              MR. CULLER:  Yes, sir.

25                        CROSS EXAMINATION

              Cheryl A. Nuccio, RMR-CRR (704)350-7494


                                665

KESHIA BURRIS - CROSS

1   BY MR. CULLER:

2   Q.   Ms. Burris, you indicated that you ran away from home a

3   number of times when you were younger; is that right?

4   A.   From DSS custody, yes.

5   Q.   And did you say that you were -- you were running away

6   from DSS custody because you missed your family?

7   A.   Because I wanted to be with my family, yes.

8   Q.   You wanted to be with your family?

9   A.   Yes.

10  Q.   Isn't that why you were in DSS custody?

11  A.   No.  My brother was acting up and that's why they put us

12  in DSS custody.

13  Q.   Isn't it because your mother was beating you pretty

14  severely?

15  A.   No.

16  Q.   You didn't tell that --

17  A.   Huh-uh.

18  Q.   -- to the -- to juvenile authorities?

19  A.   Huh-uh.

20  Q.   Did you tell juvenile authorities that your brother was

21  abusing alcohol and had serious substance abuse problems?

22  A.   Yes.

23  Q.   And isn't that why you were taken away from your mother?

24  A.   Yes.

25  Q.   Okay.  Then fair to say, you did not want to go back to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1    your mother's?

2    A.    I didn't want to be taken from my mother.

3    Q.    Is your mom in the courtroom?

4    A.    Yeah.  She just stepped out.

5    Q.    Is your father here?

6    A.    No, he's not.

7    Q.    Now, you were actually hospitalized, was it four separate

8    times for your mental issues?

9    A.    A few times, yes, when I was younger.

10   Q.    And those were weeks at a time you would be in the

11   hospital, right?

12   A.    Yes.

13   Q.    And you were getting psychological, psychiatric care.

14   A.    Yes, because I was on the run and they diagnosed me with

15   depression.

16   Q.    Do you disagree with that?

17   A.    No, I don't.

18   Q.    Now, are you still depressed now?

19   A.    No.  I'm taking medication for that right now.

20   Q.    You do know the prevailing diagnosis was post-traumatic

21   stress disorder?

22   A.    Yes.

23   Q.    Not depression.

24   A.    Yes.

25   Q.    And were you suffering from that because of what your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

667

KESHIA BURRIS - CROSS

1  mother was doing to you?

2  A.   No.  It was just my past period.

3  Q.   Do you see where the doctors were saying that any time

4  that anything inappropriate would happen, you would run?

5  A.   Uh-huh.

6  Q.   You did something wrong and you would just run?

7  A.   I didn't want to be there.

8  Q.   My question was when you would do something wrong, lie or

9  steal or, you know, do something that you shouldn't have been

10 doing, you would run from that problem.

11 A.   And where are you talking about?  In foster care?

12 Q.   Well, my question, ma'am, is were you not facing up to

13 your problems back then?

14 A.   No, I wasn't.

15 Q.   And then at some point you met up with a girl named

16 Catherine Stiles; isn't that true?

17 Q.   Cathy.

18 A.   That's when I was with Tracy.  He met her and he brought

19 her to the house.

20 Q.   Well, do you recall -- do you remember you told the jury

21 about when you stole that car?

22 A.   Uh-huh.

23 Q.   Wasn't that when you were prostituting?

24 A.   After I left Tracy.

25 Q.   I see.  So after you left Mr. Howard --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

668

KESHIA BURRIS - CROSS

1  A.   Uh-huh.

2  Q.   -- you kept prostituting on your own.

3  A.   No.  When I left him, I didn't do it anymore.

4  Q.   Didn't you and Ms. Stiles get this fella to pull over by

5  telling him that you would -- you would -- you'd have a good

6  time with him?

7  A.   No, we did not.  We stole his car, yes; but no, I didn't

8  tell him that.

9  Q.   Well, he just happened to pull over at an ATM machine --

10  A.   No --

11  Q.   -- with the two of you in the car.

12  A.   No, he stopped at a liquor store.

13  Q.   If the police report reflects that he stopped at an ATM

14  machine, you would disagree with that?

15  A.   Which was right beside the liquor store, yes.

16  Q.   Then he went to an ATM machine; is that correct?

17  A.   Yes.

18  Q.   And he did that because the two of you suggested that if

19  he got some money, y'all could have a good time together,

20  right?

21  A.   No, because he was going to get liquor from the liquor

22  store.

23  Q.   Well, in any event, when he got out, you stole the car,

24  right?

25  A.   When he went in the store, I stole it, yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

669

KESHIA BURRIS - CROSS

1   Q.   Were you the one who was driving?

2   A.   Yes.

3   Q.   Did you have a license?

4   A.   No, I didn't.

5   Q.   Was that the first time you had driven a car?

6   A.   No, it wasn't.

7   Q.   You'd stolen other cars?

8   A.   Yes.

9   Q.   Now -- well, you talked about being driven to various

10  places on calls.  Do you remember talking about that?

11  A.   Uh-huh.

12  Q.   Let me make sure that I understand correctly.  When you

13  say that you were on a call -- why don't you put that

14  little -- the screen down, if you would.  You can push it

15  down.

16          (Witness complied.)

17  Q.   Thanks.

18          Now, when you went on a call, that was an escort service

19  related event; is that right?

20  A.   Yes.

21  Q.   That would mean that someone would call in for a girl.

22  A.   Yes.

23  Q.   And they would call in to the escort service; is that

24  right?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

670

KESHIA BURRIS - CROSS

1   Q.   And that would be one of the escort services operated by
2   Ila Howard; is that right -- or Ila Little; is that right?
3   A.   Yes.
4   Q.   And then you would get a call on your cell phone.
5   A.   No, she would call Tracy and let him know that we had a
6   call and he would tell us to get dressed.
7   Q.   Did you have a cell phone?
8   A.   Yes, I did.
9   Q.   Did Ms. Little or Ms. Howard, did she have the number for
10  your cell phone?
11  A.   Yes.
12  Q.   All right.  In any event, you say that Ms. Little would
13  call Tracy to make arrangements for you; is that right?
14  A.   Uh-huh, yes.
15  Q.   Then you wouldn't know where you were going.
16  A.   She would come -- she would call Tracy and let him know
17  where I was going.  Either he would take me or Hilari will
18  take me or she'll let me know where I'm going and I would
19  drive.
20  Q.   My question is you would not know where you were going.
21  A.   Tracy would tell me, yes.
22  Q.   He would tell you that you're going to a hotel or he
23  would tell you that you're going to an address.  Did he tell
24  you you were going to a house or what?
25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

671

KESHIA BURRIS - CROSS

1  Q.   He'd say we're going to a house.

2  A.   If he's driving, he wouldn't tell me where we're going.

3  We're just going on a call.  That's all he would say.

4  Q.   My question is did you ever know the address where you

5  were going?

6  A.   Sometimes, yes, I did.

7  Q.   Okay.  When would you know the address?

8  A.   When I drove myself or I drove somebody else.

9  Q.   And how could you drive if you didn't have a license?

10  A.   I drove anyway.

11  Q.   Whose car did you drive?

12  A.   Tracy's.

13  Q.   Which car?

14  A.   The one -- the Honda or the LaSabre Buick.

15  Q.   And of course, you drove that car, I take it, where you

16  knew the area or not?  Did you drive just wherever?

17  A.   Wherever the call is.

18  Q.   Okay.  Now, when you would go on a call, that would mean

19  you could go to a person's house, right?

20  A.   A house or a motel.

21  Q.   And can you tell us what motels you went to in South

22  Carolina.

23  A.   I can't recall the name of it, but yes, I have went to

24  some.

25  Q.   You can't tell us one that you went to?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

672

KESHIA BURRIS - CROSS

1   A.   I don't know -- it's been a while so I don't know the

2   name of it, but I know I have been a few times.

3   Q.   How many times do you say that you drove to South

4   Carolina?

5   A.   A few times.  I know I did -- I was at a car dealership

6   one time and then I was at a motel.

7   Q.   Well, you've never said to anyone ever that you went to

8   South Carolina on a call ever in your life until today, right?

9   A.   No, that's not true.

10  Q.   Have you ever said that in a statement where you've been

11  recorded?

12  A.   No.  I have it on paper, though.

13  Q.   On what paper do you say you have it?

14  A.   On some paperwork.  Because I seen -- it was -- it wasn't

15  recorded but somebody had wrote it down.

16  Q.   So you've seen some -- you've seen some papers that

17  you've reviewed?

18  A.   Yes.

19  Q.   Were they handwritten?

20  A.   No.

21  Q.   You're saying they were typed out?

22  A.   Yes.

23  Q.   And you're saying that these -- these -- this paper that

24  you reviewed said that you went to South Carolina.

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

673

KESHIA BURRIS - CROSS

1  Q.   Okay.

2  A.   Different areas.

3  Q.   Oh, it said different areas.

4  A.   South Carolina, North Carolina.

5  Q.   Okay.  But you can't tell us where you went in South

6  Carolina.  You just know you went there.

7  A.   I went right there off Carowinds Boulevard by the

8  fireworks place.  I done went to motels out there.  I can't

9  pinpoint where it was at, but I know I have been out there

10  because I have drove out there.

11  Q.   You know Carowinds Boulevard, part of that is in North

12  Carolina?

13  A.   It was a little farther than that.

14  Q.   Do you actually know you were in South Carolina or you

15  think you were?

16  A.   I know I was in South Carolina.

17  Q.   How?

18       MS. MARSTON:  Objection, asked and answered.

19       THE COURT:  Overruled.

20  Q.   How do you know?

21  A.   Because I was in South Carolina.

22  Q.   How do you know that?

23  A.   Because when she called me she said this call is in South

24  Carolina.

25  Q.   Well --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   And then I drove so I know where I was going.  I called

2   my mama a couple times and asked her for the directions.

3   Q.   Can you say I crossed the state line and I saw the state

4   line sign?

5   A.   Yeah.

6   Q.   Okay.  Where did you cross the state line, on what road?

7   A.   I can't pinpoint it.  I don't -- I don't remember.

8   Q.   Well, you seem to recall going more than one time.

9   A.   I've did a lot of calls also.  A lot of calls.

10  Q.   Well, are you sure that you went to South Carolina?

11  A.   Yes.

12  Q.   Or is it possible --

13          MS. MARSTON:  Objection, asked and answered.

14          THE COURT:  Sustained.

15  Q.   Well, let me ask a different question.  Tell us some of

16  the hotels you went to in North Carolina.

17  A.   I went to the Westin.

18  Q.   On calls?

19  A.   I went to the Westin.  I went to Red Roof.  I went to

20  Motel 6.

21  Q.   Why is it you can remember those hotels, but you can't

22  remember a hotel in South Carolina?

23  A.   Because those were -- that was like -- I always went to

24  hotels in here around Charlotte.  It wasn't that much out of

25  South Carolina, but I know I have went out of South Carolina

Cheryl A. Nuccio, RMR-CRR (704)350-7494

675

KESHIA BURRIS - CROSS

1   to go to a few of them.

2   Q.   Wouldn't that have made it unique if you don't go there

3   that often?

4   A.   No.

5   Q.   Who drove you to South Carolina specifically?

6   A.   I would or Ila would drive me.

7   Q.   But Mr. Howard didn't never take you to South Carolina?

8   A.   I don't recall, no.

9   Q.   Does that mean you don't recall him doing that; is that

10  what you're saying?

11  A.   I don't remember him doing it.

12  Q.   Okay.  Now, you said at the end of your direct

13  examination, you said that -- hang on a second.  Oh, I'm

14  sorry, I'm on the wrong page, excuse me.

15       You said that you used the name Selena because you

16  couldn't use your real name, right?

17  A.   Yes.

18  Q.   All right.  Now, the name Selena was on Ila Howard's

19  records, right?

20  A.   Yes.

21  Q.   Okay.  So you used that name with calls for Ms. Howard,

22  right?

23  A.   For Ila, yes.

24  Q.   All right.  Now, if you were working for Tracy's service,

25  you didn't need to use that name, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

676

1  A.   I used it in any service.  I didn't do many calls for

2  their service, but when I did go I used Selena.

3  Q.   Is it fair to say you were working for Mr. Howard before

4  you ever started doing calls?

5  A.   No, I was doing them with Ila before that.

6  Q.   I'm sorry, so you started working for Ila's escort

7  service --

8  A.   Yes.

9  Q.   -- is what you're saying.

10      Before Tracy ever started taking you to Mexico -- Little

11  Mexico and all that stuff.

12  A.   No, I was doing Mexicans before I did the escort service.

13  Q.   That was my -- I'm sorry, I didn't make myself clear.

14  You were working for Mr. Howard doing Mexicans before you ever

15  were associated with Ms. Howard, right?

16  A.   With the escort service, yes.

17  Q.   And she had her escort service on her own, didn't she?

18  A.   Yes, she did.

19  Q.   And she was operating -- did anyone have control over

20  that other than her?

21  A.   No.

22  Q.   Would it be fair to say that when Ila needed a certain

23  type of girl, she would call Tracy, like certain height,

24  certain weight, certain skin color or whatever?

25  A.   If Tracy had that girl, then, yes, she would call him.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

677

KESHIA BURRIS - CROSS

1    Q.   Okay.  She had her own girls she could use, right?

2    A.   Yes, she did.

3    Q.   She made the same thing either way, right?  She made the

4    hundred bucks either way, didn't she?

5    A.   Yeah.

6    Q.   Because a hundred bucks, if you -- if it was one of Ila's

7    girls, the girl kept the hundred bucks, right?

8    A.   I don't know how that went.

9    Q.   Well, you didn't keep any money.

10   A.   No, I didn't.

11   Q.   And you say Ila got half of the money and Tracy got half,

12   right?

13   A.   I put it in Tracy's hand and Tracy dealt with that with

14   his mama.  I didn't deal with that.

15   Q.   Well, if Ila was getting a hundred bucks dealing with

16   Tracy, then -- well, strike that.

17        Ila could have been getting a hundred bucks because you

18   were getting nothing, right?  You don't know?

19   A.   I don't know what she was getting.  I don't know.

20   Q.   Then how do you know she was getting anything?

21   A.   Because she got half of the money.  That's her call.

22   That's her service.  You're not just going to go to a call,

23   get two hundred bucks and she ain't going to make no money off

24   of it.

25   Q.   So she was making her cut, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   Exactly.

2   Q.   Then fair to say she was basically using Mr. Howard as a

3   source for girls.

4   A.   Tracy let her know that he could use us when she --

5   whenever she needed us.

6   Q.   She was using -- she was electing to use some of his

7   girls, right?

8   A.   Yeah.

9   Q.   Okay.  But as far as the control of the service itself,

10  that was all Ila, wasn't it?

11  A.   Yes.

12  Q.   Do you recall being interviewed on the day that you --

13  well, start over.

14       You were initially, the first time you were interviewed

15  was on July 29th of 2004, right?  When -- do you remember you

16  talked about it with -- either 2003 or 2004.  It may have been

17  2003.  July 29, 2003.  Do you remember that?

18  A.   (No response.)

19  Q.   Do you remember you talked about it with Ms. Marston when

20  she asked you about it?  Do you remember?

21  A.   Uh-huh.

22  Q.   Do you remember the two officers took you to your dad's

23  house?

24  A.   Yeah.

25  Q.   You remember they interviewed you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

679

KESHIA BURRIS - CROSS

1    A.    Yes.

2    Q.    And have you seen that interview?

3    A.    Yes, I have.

4    Q.    And you can't hear it, can you?

5    A.    No, not really.

6    Q.    Right.  They played the video for you, didn't they?

7    A.    Half of it.

8    Q.    And you couldn't hear anything, could you?

9    A.    Not really.

10   Q.    And there is a small report.  You've seen that, right?

11   A.    Yes, I did.

12   Q.    And it basically just says that you pretty much lied if

13   what you're saying today is true, right?  You didn't tell them

14   that you were prostituting yourself, right?

15   A.    Back then I didn't -- I lied because they wanted to know

16   the information about Tracy and I wasn't willing to give it

17   up.

18   Q.    Then on September 2nd, 2004, when you took out assault

19   warrants against Mr. Howard, right?

20   A.    Uh-huh.

21   Q.    They interviewed you that day.

22   A.    Yes, they did.

23   Q.    And that is on a tape, right?  There's not a report that

24   you can read; there's just a tape recording of it, right?

25   A.    (No response.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

680

KESHIA BURRIS - CROSS

1   Q.   You haven't listened to that?

2   A.   No, I haven't.

3   Q.   They did interview you on September 2nd, didn't they?

4   A.   (No response.)

5   Q.   Do you remember the first time you met Grimsley, the

6   blond detective?

7   A.   Okay, yeah, he recorded me.  We was at my mom's house.

8   Q.   And have you listened to that?

9   A.   Yes.

10  Q.   And just -- so you're familiar with that interview,

11  right?

12  A.   Yes.

13  Q.   Now, is it correct that during that interview, you told

14  them that Mr. Howard was prostituting two girls?

15  A.   Yes.

16  Q.   And you told them that the Tracy that was doing that is

17  the same Tracy you had tattooed on your arm, right?  They

18  could see the tattoo.

19  A.   Yes.

20  Q.   Which arm is it on?

21  A.   It's on my left arm.

22  Q.   Left arm, sorry.  Where is it on your arm?

23  A.   It's right here (indicating).

24  Q.   Up under your -- up high?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1    Q.    Okay.  So you had on a short sleeved shirt or a shirt
2    that would expose that part of your arm, right?
3    A.    Probably so.
4    Q.    They could see that.
5    A.    Yes.
6    Q.    And you told them that you'd known Mr. Howard for about
7    three years since you were about 14 years old.  Is that what
8    you told them?
9    A.    I've known him since I was 15.
10   Q.    So if you told them that you were 14, that would be
11   wrong?
12   A.    Yes, that's wrong.
13   Q.    But you didn't intend to lie there; you just made a
14   mistake.
15   A.    Probably so.  I don't -- it was around when I was 15,
16   yeah.
17   Q.    You told them that your relationship had been bad.  I
18   think you said ain't going right or words to that effect.
19   Does that sound right?
20   A.    Yes.
21   Q.    And you told them, though, that he was a good person.
22   A.    Uh-huh.
23   Q.    And he'd been your boyfriend for about a year.
24   A.    Yes.
25   Q.    And then you told him that he -- the two girls he was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

682

2727

KESHIA BURRIS - CROSS

1  using or prostituting were Cathy who was 17 years of age and

2  Crystal Chumley who was 23 or 24; is that right?

3  A.    Yes.

4  Q.    And you told him about how he would get a room on Nations

5  Ford; is that right?

6  A.    Yes.

7  Q.    Now, this is all true from what you say today, right?  Or

8  did you lie about that?

9  A.    No, that's true.

10  Q.    Then what you told the jury isn't quite accurate.  Some

11  of what you told them September 2nd is correct.

12  A.    Back then when I was talking about Tracy, everything that

13  I said was not accurate.

14  Q.    What you --

15  A.    When I had -- a lot of the interviews I did not tell the

16  truth, no, I did not.

17  Q.    But not all of it is a lie, right?

18  A.    Not all of it, no, but some of it is.

19  Q.    What made you look good is what you lied about -- I mean,

20  you made yourself look good in these interviews, didn't you?

21  A.    No, not really.

22  Q.    Did you tell them you were prostituting yourself?

23  A.    No.

24  Q.    Did you tell them you were dealing drugs every day?

25  A.    No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

683

KESHIA BURRIS - CROSS

1    Q.    Did you tell them you were smoking crack and using pot

2    and addicted to pot and all that stuff?

3    A.    I mentioned that, yes, I did.

4    Q.    You mentioned it or you told them everything?

5    A.    I've mentioned it to them, yes.

6    Q.    You told them just enough to get by, right?

7    A.    But the interview was not about me; it was about Tracy.

8    Q.    Well, the interview on September 17th was about Tracy,

9    wasn't it?

10    A.    Yes.

11    Q.    You lied then, you say, right?

12    A.    September 17th?

13    Q.    Yeah, two weeks later.  When you were arrested.

14    A.    Uh-huh.

15    Q.    You lied then, right?

16    A.    Somewhat, yeah.

17    Q.    Fair to say, just to make sure we know, basically, what

18    you say is you have lied when it's been helpful to you in your

19    former statements except today you're telling the truth,

20    right?

21           MS. MARSTON:  Objection.

22           THE COURT:  Overruled.

23    A.    Back then when I told on Tracy, I told them what he did.

24    I told them that he sell drugs.  I told them how he did it.  I

25    told them about Nations Ford.  Only thing that I lied about

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   was the females, the underaged females which said they was 16,

2   but they was 14 and 15.

3   Q.   Did you tell them about your relationship with David

4   Howard?

5   A.   No.  I didn't have a relationship with David Howard.

6   Q.   You haven't been getting letters from him at the jail;

7   haven't been mailing him letters?

8   A.   Yes, we have been writing.  I've wrote Tracy, too.

9   Q.   And you did have a sexual encounter with David Howard,

10  right?

11  A.   At one time, yes.

12  Q.   He has asked you to marry him, hasn't he?

13  A.   Yes.

14  Q.   And you did indicate you would consider it, didn't you?

15  A.   I said yes.

16  Q.   And are you -- are you pregnant right now?

17  A.   No.

18  Q.   And you talk a good bit in those letters about your

19  future together, don't you?

20  A.   Uh-huh.

21  Q.   You've got plans for your future, don't you?

22  A.   Yeah, I do.

23  Q.   You got plans once you get out of this and get out of

24  prison, right?

25  A.   Of course.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

685

KESHIA BURRIS - CROSS

1    Q.   Right.  And part of your plans, a lot of it has to do

2    with what Ms. Marston is going to do for you, correct?

3              MS. MARSTON:  Objection.

4              THE COURT:  Sustained.

5    Q.   Do you understand you have signed a plea agreement that

6    gives you a chance to get your sentence reduced?

7    A.   It's not -- it's a possibility.  It's not guaranteed.

8    Q.   Right.  If you -- who makes the motion?

9    A.   Karen does.

10   Q.   And y'all know each other so well now you call her Karen,

11   right?

12             MS. MARSTON:  Objection.

13             THE COURT:  Sustained.

14   Q.   Well, how many interviews have you had with Ms. Marston?

15   A.   Like three or four, I think.

16   Q.   And all of them were for a number of hours?

17   A.   Yes.

18   Q.   Y'all spent about, what, a good eight to ten hours

19   getting ready for this day.

20   A.   No, it was maybe five or six.

21   Q.   Five or six hours.

22   A.   Yes.

23   Q.   And she had a lot of papers and documents for you to look

24   over when you talked about the case, right?

25   A.   She was telling me what I said back then and we was going

Cheryl A. Nuccio, RMR-CRR (704)350-7494

2731

KESHIA BURRIS - CROSS

1    over from when I was -- when I first met Tracy till now.

2    Q.   And she talked about what kind of questions that the

3    lawyers would ask you.

4    A.   No.

5    Q.   She didn't tell you what kinds of things you might want

6    to be prepared for?

7    A.   No.

8    Q.   In any event, part of what Ms. Marston talked to you

9    about was your plea agreement, right?

10   A.   Yes.

11   Q.   And she went over with you the provisions in your

12   agreement, didn't she?

13   A.   Yes.

14   Q.   And she explained to you that there weren't any promises

15   in the agreement, right?

16   A.   Exactly.

17   Q.   And the only thing you're required to do is to tell the

18   truth, right?

19   A.   Yes.

20   Q.   And if you tell the truth, then you can get your sentence

21   reduced, right?

22   A.   Possibly.  It's not guaranteed.

23   Q.   But the way that you do that is by testifying, right?

24   A.   Yes.

25             MS. MARSTON:  Objection, asked and answered.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

1           THE COURT:  Overruled.

2    Q.   Right?

3    A.   Yes.

4    Q.   And you've been talking with your jail cohorts about your

5    upcoming testimony for months now, haven't you?

6    A.   No, I have not.

7    Q.   You've been sending letters talking about coming to court

8    and dealing with the feds and what was going to happen, right?

9    A.   No, I have not.

10   Q.   You've also been sending some letters to Mr. Howard, to

11   Tracy Howard, right?

12   A.   When I first got locked up I did.

13   Q.   You stopped sending him letters once you decided to

14   cooperate, right?

15   A.   It was before then.

16   Q.   Well, you had decided you were going to cooperate before

17   then, hadn't you?

18   A.   It was after I stopped writing him.

19   Q.   Pardon?

20   A.   After I stopped writing him.

21   Q.   Did you -- Mr. Howard did not know how old Cathy was,

22   right?  Tracy Howard.

23   A.   He told me that he spoke to her grandmother and said she

24   was 16 or 17 years old.

25   Q.   He told you that when?

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   When we were staying at Waterford Lakes.

2   Q.   Then why did you write to him and tell him, oh, by the

3   way, Cathy was 16 years old when you were with her?

4   A.   Because I found that out since I been locked up.

5   Q.   Why would you need to tell him that, though, if you knew

6   he already knew that?

7   A.   He didn't know that.  She was younger than that.

8   Q.   Wait.  He didn't know that she was 16.

9   A.   He called her grandmother and said that she was like 16

10  or 17 years old, which was a lie.  And I was telling him in

11  the letter, she's younger than that even though, you know, he

12  probably knew that.

13  Q.   Right.  Well -- so as far as you know, though, he thought

14  she was 16 or 17, is what you're saying.

15  A.   Yeah.

16  Q.   Okay.  Would you agree that you've had a good deal of

17  experience with runaways?  Over the years you've gotten to

18  know some runaways, right?

19  A.   Just being with Tracy, yes.

20  Q.   Well, I mean, you have gotten to know runaways, correct?

21  A.   The ones that's been with Tracy, yes.

22  Q.   Well, you were a runaway, right?

23  A.   Yes.

24  Q.   And you knew people that went to your group home that

25  were runaways, didn't you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

689

KESHIA BURRIS - CROSS

1   A.   Yes.

2   Q.   And so fair to say, without knowing Tracy, you had

3   experience with runaway kids, right?

4   A.   Yes.

5   Q.   And you know that a lot of these kids will lie because

6   they don't want you to know about their age, right?

7   A.   Uh-huh.

8   Q.   And they don't want to go to whatever their home

9   situation is because they don't like it, right?

10  A.   I don't know.

11  Q.   Well, I mean, in your experience, isn't that true a lot

12  of the time?

13  A.   I don't know because when I run away, I run away with

14  that person.  I leave them.

15  Q.   You run away from that group home, right?

16  A.   Yes.

17  Q.   But you didn't run away from Mr. Howard.

18  A.   I left him a few -- quite a few times.

19  Q.   But you always went back.

20  A.   Yes.

21  Q.   That was your choice, wasn't it?

22  A.   Yeah.

23  Q.   Would you agree that -- well, strike that.

24       Do you recall that during your September 2nd interview,

25  you didn't tell anyone about going out to Little Mexico,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

690

KESHIA BURRIS - CROSS

1   anybody went out there, right?  You didn't tell them anything
2   about Little Mexico back then.
3   A.    I mentioned it one time, but I don't know which time I
4   did.  I mentioned it, though.
5   Q.    Well, you talked about Honey on September 2nd.  You told
6   them about Shenita.
7   A.    Okay.
8   Q.    And you told them about the Allison Walkers name, right?
9   Because they had some of the rental agreements, didn't they?
10  A.    (No response.)
11  Q.    On September 2nd didn't they have some of the lease
12  agreements?
13  A.    I can't remember.  I don't know.
14  Q.    Is it possible that when you talked about Little Mexico,
15  you were telling them about that there were two apartments in
16  Little Mexico?
17  A.    Yes.
18  Q.    Okay.  And then you started telling them -- because they
19  were asking about his apartments and then you started telling
20  them about Sailboat Bay and about Hanover Landing, et cetera,
21  right?
22  A.    Yes.
23  Q.    And you were explaining when you were talking to them,
24  you were explaining to them why you were using a fake name.
25  A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   Q.   And you said that you had gotten that ID.

2   A.   Tracy got it for me, yes.

3   Q.   Well, but you may have said back then that you got it for

4   yourself.

5   A.   No, Tracy got that for me.  I never said --

6   Q.   You told them that?

7   A.   I never said that I did.

8   Q.   Okay.  Then you told them about Davia.  Is it Davia or

9   Davia?

10  A.   Davia.

11  Q.   Davia.  You told them about Davia, right?

12  A.   Yes.

13  Q.   She was one of the girls, wasn't she?

14  A.   Yes.

15  Q.   You told them about that back on September 2nd, right?

16  A.   Yeah.

17  Q.   And you told them about Hilari, didn't you?

18  A.   Hilari wasn't even in the picture then, I don't think.

19  Q.   September 2nd, 2004.  That was two weeks before you got

20  arrested.

21  A.   Okay, yeah.

22  Q.   Hilari had been out of the picture for quite some time,

23  hadn't she?

24  A.   Yes.

25  Q.   Hilari was there like just a few weeks and then she was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

692

2737

KESHIA BURRIS - CROSS

1  gone, correct?

2  A.   No, Hilari was there at least two or three months until

3  that incident happened.

4  Q.   And do you recall telling them that Ms. Howard did not

5  know about Tracy Howard's prostitution activities?

6  A.   She knew about it.

7  Q.   Well, let me ask you about that.  Now, you said that

8  Ms. Howard operated her own escort service, right?

9  A.   Yes.

10  Q.   And is it correct that on these escort calls, that there

11  were legal things that could be done on these calls, correct?

12  I mean, there were times where you would just dance for

13  customers, right?

14  A.   Yeah, sometimes, yes.

15  Q.   And there were some customers that wanted the kit, right?

16  A.   Yes.

17  Q.   Which was like being a dominatrix, I guess.

18  A.   Yes.

19  Q.   Would that necessarily involve a sexual encounter?

20  A.   No.

21  Q.   And so there were occasions that you may not actually be

22  required to perform sex; is that correct?

23  A.   That was very rarely, yes.

24  Q.   Well, didn't you say that you could prolong it?  You

25  could only be there an hour, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   Uh-huh.

2   Q.   And so if you could like --

3   A.   Prolong it.

4   Q.   -- extend it out --

5   A.   Uh-huh.

6   Q.   -- you could perhaps avoid the sexual encounter --

7   A.   Yes.

8   Q.   -- is that what you're saying?

9        You might have to dance, but you could just do that.

10  A.   Do something, yes.

11  Q.   Well, fair to say that you would get tipped better if you

12  provided sexual favors, right?

13  A.   Yes.

14  Q.   And so you had a desire, an incentive to make more money,

15  didn't you?

16  A.   Not really.

17  Q.   No?

18  A.   No.

19  Q.   You participated in the call service because somebody

20  forced you to do that.

21  A.   No, I did what I had to do and then I went home, because

22  I didn't want to go anyway.

23  Q.   Well --

24  A.   But at the time I did what I had to do.

25  Q.   That's because you wanted to live with Tracy Howard,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

694

KESHIA BURRIS - CROSS

1   right?

2   A.   Yeah.

3   Q.   And he made it clear to you that if -- that you had to

4   help support, right?

5   A.   Yeah.

6   Q.   And so that was your job, wasn't it?

7   A.   Yeah.

8   Q.   Okay.  But that was your job for Tracy Howard, right?

9   A.   Yeah.

10  Q.   That wasn't your job for Ila Howard, was it?

11  A.   What do you mean?

12  Q.   You weren't working for Ila Howard, were you?

13  A.   I was working for her; I did calls for her.

14  Q.   Right.  But you weren't working for her.  She didn't tell

15  you what to do, did she?

16  A.   No.

17  Q.   She didn't tell you where to go, did she?  Tracy did,

18  right?

19  A.   Yeah.

20  Q.   Isn't that what you said?

21  A.   Yes.

22  Q.   Tracy had control over what you did, didn't he?

23  A.   Yes.

24  Q.   David Howard certainly didn't have any control over what

25  you did, did he?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

695

KESHIA BURRIS - CROSS

1   A.   No.

2   Q.   He had no interest in what you did at all, right?

3   A.   No.

4   Q.   In any event, fair to say that some of the girls elected,

5   based on your knowledge, some of the girls elected to provide

6   sexual favors because they would get a better tip; is that

7   fair to say?

8   A.   I doubt that.  I really doubt that.

9   Q.   You don't know that one way or the other?

10  A.   I don't know, but I doubt it.

11  Q.   Well, when you say you doubt it, do you know that from

12  someone telling you that or are you just guessing?

13  A.   From the other girls that were staying with us?

14  Q.   Right.  I'm just asking.  Do you know?

15  A.   We didn't want to go anyway.

16  Q.   Okay.  That would be true for Crystal Chumley?

17  A.   Yes.  I don't know about her.

18       MR. CULLER:  May I approach, Your Honor?

19       THE COURT:  You may.

20  Q.   Show you what's been marked as Defense Exhibit Number 3

21  for identification.  I'm going to let you look at these pages

22  real quick.  Do you recognize those photographs?

23  A.   Huh-uh.  I know her, but I don't -- yeah.

24  Q.   You don't know who that is?

25  A.   Yeah, Crystal Chumley.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

696

KESHIA BURRIS - CROSS

1    Q.   Oh, I'm -- do you -- right, I'm just asking you do you

2    recognize --

3    A.   Yes.

4    Q.   -- the person in those photographs?

5    A.   Yeah.

6    Q.   Okay.

7    Q.   Have you seen Crystal Chumley appear different on a

8    number of different occasions -- number of occasions?

9    A.   I've only seen her when she was staying with us or when

10   she was in Little Mexico.

11   Q.   And did she always look the same?

12   A.   She looked rough when she was out there.

13   Q.   Well, I guess what I'm asking is did she wear her hair

14   the same all the time, one color all the time you knew her?

15   A.   It was different colors.

16   Q.   So she changed her appearance a lot, right?

17   A.   It was different colors.

18   Q.   Then it was different colors all the time?

19        MS. MARSTON:  Objection, asked and answered.

20        THE COURT:  Sustained.

21   Q.   You talked about -- or you made a hand depiction or you

22   showed how big the ball of cocaine was that you saw Mr. Howard

23   purchase --

24   A.   Uh-huh.

25   Q.   -- or get.  Do you remember?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

697

KESHIA BURRIS - CROSS

1   A.   Yes.

2   Q.   Would you show us that again.

3   A.   About maybe that big (indicating).

4   Q.   And you're saying it was a ball?

5   A.   I don't know how much it was, but it was that big.

6   Q.   No, no, I mean was it shaped like a circle?

7   A.   Yes.

8   Q.   And --

9   A.   Kind of, sort of, yeah.

10   Q.   And did you actually feel it?

11   A.   No.

12   Q.   Do you know whether it was hard or soft?

13   A.   It was powder.

14   Q.   It was powder.

15   A.   Yeah.

16   Q.   And was it in plastic?

17   A.   It was in baggies.  It was in a baggie.

18   Q.   Oh, when did you start working at Uptown Cabaret?

19   A.   When we -- a little after -- a few months after we moved

20   to Waterford Lakes.

21   Q.   Was that something controlled by Tracy Howard?

22   A.   No, it was something I wanted to do.

23   Q.   And so you had the freedom to go work there.

24   A.   Yes.

25   Q.   Did you work there on weekends?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   I worked every night.

2   Q.   Then you couldn't be going to Little Mexico then, right?

3   A.   No, I stopped doing Mexicans.  I was doing calls off and

4   on, but I wasn't doing it like I used to.

5   Q.   So when did you actually start at Uptown Cabaret, what

6   year or month?

7   A.   I don't know exactly, but we were at Waterford Lakes

8   then.  So it was a little after my birth -- a little after my

9   birthday because we had --

10  Q.   September of 2003?

11  A.   Sometime after my birthday.

12  Q.   Well, your birthday is August, right?

13  A.   Uh-huh.

14  Q.   Well, was it September?

15  A.   It may have been.  I don't know exactly when.

16  Q.   Fair to say from September 2003 to the present, you

17  stopped going to Little Mexico, right?

18  A.   I stopped going to Mexico like --

19  Q.   Isn't that what you just said?

20        MS. MARSTON:  Objection.

21  A.   No.

22        THE COURT:  Let the witness finish her answer.

23  A.   When I was -- at Hanover Landing, like maybe a few months

24  after that.  Because I started doing more calls.

25  Q.   Okay.  You said that when you started working at Uptown

Cheryl A. Nuccio, RMR-CRR (704)350-7494

699

KESHIA BURRIS - CROSS

1   Cabaret --

2   A.    Uh-huh.

3   Q.    -- you had stopped going to Little Mexico.

4   A.    I stopped going to calls.   Stopped going to calls.

5   Q.    So you kept going to Little Mexico even though you were

6   working seven days a week?

7   A.    No.

8   Q.    Okay.  You stopped going to Little Mexico once you

9   started working at Uptown Cabaret, right?

10  A.    I stopped doing the Mexicans like maybe a month or two

11  after we moved in to Hanover Landing and I started doing more

12  calls because he seen I was doing more calls than anything.

13  And he said that he didn't want me out there anymore so he let

14  me do calls.

15        And then when we moved to Waterford Lakes, I was doing

16  calls and he wanted me -- you know, I told him I wanted to

17  work at the club.  So I went there.

18  Q.    Does that mean that you stopped going to Little Mexico

19  once you started working at Uptown Cabaret?

20  A.    No.  I stopped Mexicans when I went to the escort

21  service.

22  Q.    Then if you were working seven days a week; isn't that

23  what you just said?

24  A.    That's after I stopped doing calls.

25  Q.    Well, then when you were still doing calls but you were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

700

KESHIA BURRIS - CROSS

1  working at Uptown Cabaret, how many days a week were you

2  working at Uptown Cabaret?

3  A.   I stopped doing calls and I just worked at the club every

4  day.

5  Q.   When do you say you started working at the club every

6  day?

7  A.   When I first started, I started working every day.

8  Q.   And so that would have been --

9  A.   Around --

10  Q.   -- right after your birthday?

11  A.   Around September because I remember he had bought me

12  something.

13  Q.   And did I understand you to say that when you were going

14  to Little Mexico for Mr. Howard, you were going on the

15  weekends, right?

16  A.   That was during the week, too.  Wasn't just on weekends.

17  Q.   Do you recall testifying differently on direct

18  examination?

19          MS. MARSTON:  Objection.

20          THE COURT:  Overruled.

21  Q.   A couple of different times you said the same thing.  You

22  don't remember that?

23  A.   What are you saying?

24  Q.   Do you recall telling the jury on direct examination that

25  you went to Little Mexico on the weekends and during the week

Cheryl A. Nuccio, RMR-CRR (704)350-7494

701

KESHIA BURRIS - CROSS

1   you did calls?

2   A.   I did Mexicans on the weekend, yeah, and then calls

3   during the week.

4   Q.   And calls means the escort service; is that right?

5   A.   Yes, that's right.

6   Q.   Or was it the other way around?  I don't want to get you

7   confused.

8   A.   Mexicans is North Pointe and the Park.  I never went to

9   Little Mexico and did anything.

10  Q.   Okay.  So Mexicans was on the weekends or was during the

11  week?

12  A.   It's on the weekends.

13  Q.   All right.  Do you recall talking about your plans to get

14  into a halfway house when you met with them on September 2nd?

15  A.   A what?

16  Q.   Do you recall talking about getting into a halfway house?

17  A.   No.

18  Q.   You don't recall talking about that during your

19  interview?

20  A.   No.

21  Q.   Do you know what a halfway house is?

22  A.   Yes.

23  Q.   That's not prison, right?

24  A.   No.

25  Q.   Now, you talked about when -- on September 16th when

Cheryl A. Nuccio, RMR-CRR (704)350-7494

702

KESHIA BURRIS - CROSS

1    they -- when Detective Grimsley went to the hotel room.

2    A.    Uh-huh.

3    Q.    Did you say that they took you to that room?

4    A.    Yes.

5    Q.    And did I hear you say that they had you open the door?

6    A.    Yes.

7    Q.    Now, was this your idea to open the door?

8    A.    I told them, like I told you earlier, that it was not my

9    room.  But if my name was on it, hey, then I'm going to open

10   the room because I'm not hiding nothing from anybody.  And

11   I --

12   Q.    Did you -- I'm sorry.

13   A.    -- told them that the room was in Tracy's name.  So they

14   went over there to Tracy and then they came back to me and

15   said it was okay.  So the police officer got in the car and

16   drove down there.  I got the key.  We went up there.  They

17   told me to unlock the door.  And then I went to go get my cats

18   and that's when they started searching and that's when they

19   found everything.

20   Q.    They told you it was okay for you to open the door?

21   A.    Yes.  Because I told them if my name is on there, yes,

22   I'm going to open it.

23   Q.    Okay.  Well, did they tell you that Tracy had said it was

24   okay?

25   A.    Yeah.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494


                                   703

KESHIA BURRIS - CROSS

1    Q.    Okay.  And based on what they represented to you, did you
2    then give them consent?
3    A.    Yes.
4    Q.    And did you have a key on your person at that point?
5    A.    There was two keys in the car.  I had one, yes.  It was
6    in there.
7    Q.    Then I take it you walked from wherever the car was where
8    y'all were stopped, you walked from there to the room?
9    A.    No.  The police officer drove the car down there.  The
10   car that me and Tracy got stopped in, she drove me down there.
11   Q.    And then when they got to -- when you got to the door,
12   what did you do?
13   A.    I opened it.
14           MS. MARSTON:  Objection, asked and answered.
15           THE COURT:  Sustained.
16   Q.    Now, once -- after they had completed their search, they
17   told you they were going to charge you, right?
18   A.    They told -- they handcuffed me and said they were going
19   to take me down to the station where Tracy was at.
20   Q.    They didn't tell you in the room they were charging you?
21   A.    They told me they was taking me downtown.  And then when
22   I got to the police station, they said I was being charged.
23   Then we went in the room and talked.
24   Q.    And did you tell them right at that moment that you had
25   nothing to do with the drugs?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

704

KESHIA BURRIS - CROSS

1  A.   Yeah.

2  Q.   And that you didn't know the drugs were in there?

3  A.   Yeah.

4  Q.   And that wasn't -- that really wasn't your room?

5  A.   Yeah.

6  Q.   And some of that was true, right?

7  A.   No, because I knew about it.

8  Q.   Well --

9  A.   It wasn't my room.  My name was on it.  I don't know how

10 it got on there, but I knew the stuff was in there, yes.

11 Q.   So that part was a lie.

12 A.   Yes.

13 Q.   And you told them that because you didn't want to get in

14 trouble, right?

15 A.   I didn't want -- we was back together so I didn't want me

16 or him getting in trouble.

17 Q.   Well, you -- well, you admitted -- you were telling them

18 it was Tracy's dope, right?

19 A.   I said it wasn't mine, so it had to be his.

20 Q.   You certainly weren't taking responsibility for it, were

21 you?

22 A.   No, I wasn't.  It wasn't mine.

23 Q.   And if they had believed you, you wouldn't be sitting

24 here right now, right?

25 A.   If I told them that it was in there, I wouldn't be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

705

KESHIA BURRIS - CROSS

1   sitting here, yes.

2   Q.   No, if you had -- if what you represented to them, they

3   had believed that story, you wouldn't be here right now.

4   A.   I doubt that.

5   Q.   Fair to say you basically deflected all blame that night,

6   fair to say?

7   A.   I said it was Tracy's, yeah.

8   Q.   But you didn't -- you didn't acknowledge any

9   responsibility for any wrongdoing, right?

10  A.   I knew about it.

11  Q.   I'm saying that night, okay, when you were with the

12  detectives.

13  A.   Uh-huh.

14  Q.   Let's start over.  When you -- when you first -- when

15  they sat you down for the interview, they told you, they said,

16  look, you're being charged with very serious crimes.

17  A.   Uh-huh.

18  Q.   And you've got a chance -- they told you you could get on

19  the bus, right?

20  A.   No.

21  Q.   They didn't tell you that?

22  A.   They said I was going to jail regardless.

23  Q.   Did they tell you, though, that you needed to be truthful

24  with them?

25  A.   Yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   And it was important for -- you know, to tell them

2  everything you knew, right?

3  A.   Yeah.

4  Q.   And you understood how important it was, right?

5  A.   Yeah, but I didn't -- I didn't -- some of it I didn't

6  tell the truth.

7  Q.   And every time you've been interviewed by the police,

8  they've told you how important it is to be truthful, right?

9  A.   Yes.

10  Q.   And you've known that when you were telling them a story,

11  that you were hurting somebody else, right?

12  A.   But I wasn't lying.  Only thing I said it was Tracy and

13  it was Tracys's.  Only thing I lied about was the females.

14  And only thing I said was they was dancing at the club.  I

15  didn't say he was prostituting them and I didn't say he was

16  prostituting me.  So that's what I had lied about.  But I did

17  not lie about the drugs.  I knew about it, yes.  I lied about

18  that.  But it was his; it was not mine.

19  Q.   Well, you just said -- you told them that he was not

20  pimping them.  Do you remember that?

21  A.   (No response.)

22  Q.   Remember they asked you on September 2nd, they said,

23  Isn't he a pimp?  You said, No, he's not a pimp.

24  A.   They wasn't my friends.

25  Q.   I'm just -- they asked you specifically whether he was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

707

KESHIA BURRIS - CROSS

1    pimping them.

2    A.    Uh-huh.

3    Q.    And you said, No, he's not pimping them.  He takes care

4    of them.  Do you remember that?

5    A.    No.

6    Q.    You don't remember them asking you whether he was pimping

7    them?

8    A.    No, I don't.

9    Q.    So your recollection you have never been asked that.

10   A.    I've been asked that, yeah.

11   Q.    Isn't it true you've told folks before that he was not a

12   pimp?

13   A.    When they first came to see me, yes.

14   Q.    And you understood that -- well, strike that.

15         MR. CULLER:  Your Honor, if I may, I've covered a

16   lot of stuff.  Give me a moment, please.

17         THE COURT:  You may.

18         (Pause.)

19   BY MR. CULLER:

20   Q.    Oh, do you recall telling them a number of times that he

21   doesn't bring the drugs around me?

22   A.    Yeah, I said that.

23   Q.    That you would be away from the drugs?

24   A.    I said that.

25   Q.    Was that true at one time?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1  A.   At one --

2  Q.   It was, wasn't it?

3  A.   At one time it was.

4  Q.   For a long time it was true.

5  A.   No, at the beginning it was.  At the end, no, he brought

6  it around me and I took it.

7  Q.   That was when you were using?

8  A.   When I was with him I never used.  I used before I met

9  him.

10  Q.   Because he wouldn't let you use, right?

11  A.   I didn't want to.

12  Q.   Do you recall telling him that, quote, it has nothing to

13  do with me, end quote?  And that -- I'm going to -- this is a

14  quote.  That you were getting charged out the ass, end quote?

15  A.   Uh-huh.

16  Q.   And telling him that you were being up front with him.

17  A.   Yeah.

18  Q.   And telling him the truth.

19  A.   Yeah.

20  Q.   Is it fair to say you were -- you were dating Mr. Howard

21  for at least a year?

22  A.   Supposedly, yes.

23  Q.   Well, say it this way.  Y'all were intimate for a year,

24  right?

25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

709

KESHIA BURRIS - CROSS

1  Q.   And that was something -- that was your choice, right?

2  A.   Yes.

3  Q.   And then while you were intimate with him, you also were

4  intimate with Mr. Howard, David Howard.

5  A.   On his birthday, yes.

6  Q.   But you didn't tell Tracy Howard about that, right?

7  A.   I wrote him and told him.

8  Q.   Well, let's -- at the time you were keeping that from

9  him; is that fair to say?

10  A.   Yeah.

11  Q.   Do you recall that in these interviews, that you've been

12  asked a number of times where does Mr. Howard get his drugs

13  from?

14  A.   Uh-huh.

15  Q.   And every time you said, I don't know where he gets the

16  drugs from.  Right?

17  A.   Uh-huh.

18  Q.   I promise you I don't know anything about that.  You've

19  said that a bunch of times, haven't you?

20  A.   Yeah.  In the beginning I did, yes.

21  Q.   Well, you said that just -- the last time you were

22  interviewed of record you said that, didn't you?

23  A.   (No response.)

24  Q.   Last time you were in a recorded interview, you said

25  that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   I probably did, yeah.

2   Q.   Only time you said something different is since you've

3   been in this courtroom and when you met with Ms. Marston,

4   right?

5   A.   That is not true.

6   Q.   You saying you've been in other interviews where you've

7   said something different?

8   A.   Yes.

9   Q.   Were those recorded interviews?

10  A.   No, they was written down.

11  Q.   Oh, I apologize.  You're right.  It was one -- I

12  apologize.  You're talking about the third one on

13  November 29th, 2004, right?

14  A.   I had just got out on bond.  It was around Thanksgiving.

15  Q.   Yeah.  That was right before you fled.

16  A.   Yes.

17  Q.   Then, of course, you told the court that you were going

18  to abide by the terms of your release, right?

19  A.   Yes.

20  Q.   You promised you were going to stay at home, right?

21  A.   Yes.

22  Q.   And you promised you would abide by the electronic

23  monitoring, right?

24  A.   Yes.

25  Q.   And you knew you weren't supposed to leave the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

711

KESHIA BURRIS - CROSS

1   jurisdiction, right?

2   A.   Yes.

3   Q.   And you took the electronic monitoring device off your

4   leg, didn't you?

5   A.   Yes.

6   Q.   And told your mom that you were going to New York.

7   A.   Yes.

8   Q.   And did you get to New York?

9   A.   No.

10   Q.   How far did you get?

11   A.   I went to my father's house.

12   Q.   So you lied to your mom.

13   A.   Yeah.

14   Q.   Did you tell your dad you were on the lamb?

15   A.   When I got there he knew I was on the run.

16   Q.   And did your dad lie for you?

17   A.   He didn't -- when I got there, he let me stay maybe a few

18   days and then I left.  He didn't -- because he didn't want the

19   cops coming over there.

20   Q.   He didn't call the police and tell them, right?

21   A.   He probably did.  I don't doubt it.

22   Q.   Well, did he call while you were there?

23   A.   No.

24   Q.   And had he signed as third-party custodian?

25   A.   What do you mean?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

712

KESHIA BURRIS - CROSS

```
 1   Q.   Had he signed as someone who would tell the police if you
 2   fled on your bond?
 3             MS. MARSTON:  Objection, beyond the scope.
 4             THE COURT:  Irrelevant.  Sustained.
 5   Q.   Do you know a fella by the name of Eugene Hardesty?
 6   A.   I know him as D.
 7   Q.   And you know a young woman by the name of Elizabeth
 8   White?
 9   A.   Yes.
10   Q.   You and Elizabeth White have hung out some, haven't you?
11   A.   No.  I used to go to her house with a friend of mine.
12   Q.   That's not hanging out some?
13   A.   I wasn't hanging out with her.  I was in the back.
14   Q.   Was that when y'all were prostituting together?
15   A.   No, that's when I started smoking.
16   Q.   Did you go with her when she would do her prostitution
17   runs?
18   A.   No, I would not.
19   Q.   Don't you take out her girls?
20   A.   No.  I introduced her to somebody, yeah, but I never --
21   Q.   Who was that?
22   A.   I don't -- I don't remember her name.  It was a female
23   that I introduced her to.
24   Q.   It was a minor child, wasn't it?
25   A.   She was 17, yeah.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   Q.   That's what she told you?

2   A.   Yeah, that's what she told me, yeah.

3   Q.   Do you know if she turned out to be a minor?

4   A.   No, I didn't know that.  I left.

5   Q.   In any event, is it correct that Eugene is a dealer?

6   A.   Yes.

7   Q.   And you've seen him selling nickels, dimes, twenties,

8   right?

9   A.   He gave it to my friend, yes.

10   Q.   And you told -- you talked about Hardesty during this

11   November interview, right?

12   A.   I think I did, I can't remember.

13   Q.   Is it correct that you in the November 29th interview,

14   you told Detective or Agent Maxfield over here that you and

15   Tracy started the prostitution business together?

16   A.   Yes.

17   Q.   Is that true?

18   A.   He started.  I did it for him, yeah.  I went out for him.

19   Q.   But it says that you two agreed to start a prostitution

20   business together.  Do you agree with that?

21   A.   Yeah.

22   Q.   And did you tell the agent that Ila Howard was running

23   her own escort service and that you would be working for her

24   on three days, then working for Tracy on the weekends?

25   A.   I would work for her during the week and Tracy on the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

714

KESHIA BURRIS - CROSS

1   weekends, the Mexicans.

2   Q.   You've reviewed this interview before you testified

3   today, right?

4   A.   What is that?

5   Q.   The November 29th, 2004 interview.  You reviewed this

6   before you testified, didn't you?

7   A.   I don't remember.

8   Q.   Did you review one that had a part in it that talked

9   about you being a dominatrix?

10  A.   I read my plea agreement and then the other one.  I

11  don't...

12  Q.   You don't remember that?

13  A.   No.  It happened, but I don't remember reading it.

14  Q.   And do you recall there's a part where they asked about

15  David Howard, that you started talking about David Howard, do

16  you remember that?

17  A.   (No response.)

18  Q.   The part of the interview where they asked about that.

19  Did you start talking about David Howard?

20  A.   Yeah.

21  Q.   And do you recall telling them that David and Tracy got

22  in a big argument and never really spoke since?

23  A.   No.  They got in an argument, yeah, over Donna when he

24  hit her.

25  Q.   If the report reflects that's what you said, would you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

715

KESHIA BURRIS - CROSS

1  disagree with that?

2         THE COURT:  That's an improper question, counsel.

3         MR. CULLER:  I'm sorry.

4         THE COURT:  I'll sustain it.  That's an improper

5  question.

6  Q.   Would it refresh your recollection to review what the

7  report said you said?

8  A.   What did you say?

9  Q.   Would it refresh your recollection as to what you said if

10 you review the report?

11        THE COURT:  She hasn't said she needs her

12 recollection refreshed.

13 Q.   Do you remember exactly what you said?

14 A.   Somewhat, yeah.

15 Q.   Okay.  What did you say?

16 A.   I've had a lot of interviews, you know, so pinpointing

17 one is kind of hard.

18 Q.   Would it help you to pinpoint one if you got to review

19 this one?

20        THE COURT:  Pinpoint what, counsel?

21 Q.   What you said about David and Tracy Howard together.

22 A.   If I said it, yeah.

23 Q.   Are you saying it would help you to remember or you don't

24 need to?

25        MS. MARSTON:  Objection, asked and answered.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

716

KESHIA BURRIS - CROSS

1          THE COURT:  Sustained.

2          MR. CULLER:  Your Honor, I can't tell by her answer

3   whether she meant she needed to review it or not.

4          THE COURT:  Well, ask a clear permissible question.

5   Q.   Would it assist you to remember exactly what you said on

6   November 29th, 2004, about David and Tracy Howard to review

7   the report from that day?

8          THE COURT:  About David and Tracy Howard about what?

9   Q.   About them getting into a big argument and what happened

10  thereafter.

11  A.   They did get in an argument.

12  Q.   And what happened thereafter?

13  A.   They have spoken.  They -- maybe two or three weeks they

14  wasn't talking because of what happened.  And later on they

15  did speak and they got in another argument and they didn't

16  speak for a while, and then they started speaking.

17  Q.   Have you ever told agents before, quote, you will do

18  anything to get your ass out of trouble, end quote?

19  A.   I sure did.

20         MR. CULLER:  That's all.

21         THE COURT:  Mr. Adolf, any cross?

22         MR. ADOLF:  Yes, Your Honor.

23                     CROSS EXAMINATION

24  BY MR. ADOLF:

25  Q.   Ms. Burris, when the prosecutor was asking you questions,

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   one of the things you talked about was an incident you had

2   talked about where you were staying at the Guest Suites

3   Hotel --

4   A.   Yes.

5   Q.   -- I guess it was.

6        And you've told the jury that the police knocked on the

7   door that day, right?

8   A.   Yes, that's true.

9   Q.   And when the police came in, there was you and Tracy

10  there and one other female; is that right?

11  A.   Donna and David.

12  Q.   Well, not when the police knocked on the door, right?

13  A.   David went -- David left.

14  Q.   All right.  What you testified to on -- when the

15  prosecutor was asking you questions --

16  A.   Uh-huh.

17  Q.   -- was that when the police came in, all they saw was you

18  and Donna, not Crystal Chumley but a different Donna, and

19  Tracy, right?

20  A.   Uh-huh.

21  Q.   And you told us that David was there.

22  A.   Uh-huh.

23  Q.   But that he had jumped over a rail.

24  A.   Uh-huh.

25  Q.   And escaped unnoticed.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

718

KESHIA BURRIS - CROSS

1   A.    Yeah.

2   Q.    And that was because he didn't want to get caught where

3   there was a gun.

4   A.    He was on probation.

5   Q.    Right.

6   A.    Yes.

7   Q.    So what you're saying is that Tracy didn't have a problem

8   getting caught with a gun?

9   A.    He didn't leave.

10  Q.    So he hadn't -- what you're saying is he saw the police

11  coming, said it's the police and then just stayed there to get

12  arrested with the gun.  That's what you're telling us.

13  A.    He didn't go no where.  He was in the room when he opened

14  the door.  And me and Donna was in there.  So unfortunately,

15  yes.

16  Q.    All right.  Maybe I'm not being clear with my question.

17  You're telling us that Tracy saw that it was the police,

18  right?

19  A.    When he looked out the peephole, yes.

20        MS. MARSTON:  Objection, asked and answered.

21        THE COURT:  Sustained.

22  Q.    And he said something about police being there which then

23  David took that information and ran away; is that right?

24  A.    Yes.

25  Q.    But Tracy stayed right there.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1  A.   Yes.

2  Q.   Tracy apparently didn't care about being in the room and

3  getting caught with a gun?

4          MS. MARSTON:  Objection, asked and answered.

5          THE COURT:  Sustained as to what Tracy cared.

6  Q.   Did Tracy try to escape?

7  A.   No.

8  Q.   Now, later that day you were taken down to the police

9  station, right?

10 A.   Yes.

11 Q.   And you were interviewed by the police at that time on

12 video; is that right?

13 A.   Yes.

14 Q.   Now, you were in a relationship with Tracy at that time,

15 right?

16 A.   Yes.

17 Q.   So you knew that if you said anything that implicated

18 Tracy, that made him look guilty, that was going to impact on

19 your relationship, right?

20 A.   Basically, yes.

21 Q.   But you did it anyway, right?

22 A.   I lied.

23 Q.   Well, when you say you lied, do you recall exactly what

24 you lied about?

25 A.   I don't recall -- I don't remember, but I know that when

Cheryl A. Nuccio, RMR-CRR (704)350-7494


720

KESHIA BURRIS - CROSS

1   we had first met when we was down there -- because I remember

2   they took Tracy to jail and they took me and the other female,

3   Donna, to the police station.

4   Q.   Right.  Now, just to be clear, you were in a relationship

5   with Tracy at that time, right?

6           MS. MARSTON:  Objection, asked and answered.

7           THE COURT:  Sustained.

8   Q.   You weren't in any kind of relationship with David at

9   that time, right?

10  A.   No.

11  Q.   But you didn't have any problem that night telling the

12  police that you were involved in prostitution with Tracy,

13  right?

14  A.   That I went on calls?

15  Q.   Well, you also told them that you couldn't go anywhere

16  without Tracy coming with you; isn't that right?

17  A.   That's true.

18  Q.   And you told them that you were scared to leave because

19  you had seen Tracy beat your friend Honey; isn't that right?

20  A.   Yes.

21  Q.   You told them that Tracy would take you, Honey, and

22  another female to apartments where Mexicans lived and ask if

23  they wanted business.  You told them all that, right?

24  A.   Me and Honey, yes.

25  Q.   And another girl, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

721

KESHIA BURRIS - CROSS

1  A.  She was bleeding at the time, so I don't...

2  Q.  Well, I'm just asking what you told the police that

3  night.

4  A.  Yes.

5  Q.  And in fact, you told them exactly what got charged, $40

6  for you and $30 for the other girls, right?

7  A.  (No response.)

8  Q.  Isn't that what you told them that night?

9  A.  What did you say?

10  Q.  That he was charging $40 for a -- if one of the Mexicans

11  you talked about, $40 to be with you versus $30 to be with the

12  other girls, one of the other girls, right?

13  A.  It was 30 for all of us.

14  Q.  Well, but at the time you told the police it was $10

15  extra for you because you were younger; isn't that right?

16  A.  I don't recall that.

17  Q.  Would it help you if you took a look at the report they

18  wrote that night?

19  A.  I don't remember saying that.

20  Q.  Well, what I'm asking you is if it's -- I understand that

21  you don't remember saying that.  Would it help you remember

22  one way or the other what you said if you took a look at that

23  report?

24       MS. MARSTON:  Objection, asked and answered.

25       THE COURT:  Overruled.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1  Q.   You can answer.  Would it help?

2  A.   I believe what you're saying, but I don't remember saying

3  it.

4  Q.   Okay.  I'm sorry, I'm a little unclear on what you meant

5  by that answer.  Do you mean that --

6  A.   I don't need to see it.

7  Q.   Okay.  So would you agree with me that you did in fact

8  tell them that it was $10 more for you than for the other

9  girls since you were younger?

10 A.   I probably did.

11 Q.   And you told them also that the first chance you got to

12 leave Tracy, you left and you left with Honey and went to a

13 hotel room that Honey's sister had gotten.

14 A.   Yes.

15 Q.   And you told them that Tracy then assaulted you when he

16 caught you; isn't that right?

17 A.   Yes.

18 Q.   You even talked about how Tracy beat Honey with a belt at

19 one point; is that true?

20 A.   Yes.

21 Q.   And then you told them about how Thursday, Friday, and

22 Saturday nights you were going out for Tracy and then you

23 never saw any of the money.  You told them all that; isn't

24 that right?

25 A.   Friday, Saturday, and Sunday he took us out.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

723

KESHIA BURRIS - CROSS

1  Q.   Right.  At that time I think you told us you were in a
2  relationship with Tracy, right?
3  A.   Supposedly.
4  Q.   Well, you weren't in any relationship with David, right?
5  A.   No.
6  Q.   But you didn't have any problem telling them all that --
7  all that information about Tracy, right?
8  A.   No.
9  Q.   Because it was true, right?
10 A.   Yeah.
11 Q.   There was not a single word that you told them about
12 David being involved in any of this, did you?
13 A.   I don't recall, no.
14 Q.   Would it help you recall one way or the other if you took
15 a look at that report?
16 A.   Yeah.
17          MR. ADOLF:  May I approach, Your Honor?
18          THE COURT:  You may.
19          MR. ADOLF:  This will be 16.
20 Q.   Ma'am, I'm showing you what's been marked as Defendant's
21 DH16.  Do me a favor and just read that to yourself and let me
22 know when you're done.
23 A.   All right.
24          (Witness complied.)
25 A.   All right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494


724

KESHIA BURRIS - CROSS

1          MR. ADOLF:  If I can approach again, Your Honor?

2          THE COURT:  You may.

3   Q.   Does that help you recall that conversation a little

4   better, ma'am?

5   A.   Yeah, a little bit.

6   Q.   You didn't say anything about David being involved in any

7   of that, did you?

8   A.   No.

9   Q.   In fact, what you're telling us now is that just a couple

10  hours earlier David had been in that room with you and had

11  escaped.

12  A.   Uh-huh.

13  Q.   But you didn't tell the police a word about any of that,

14  right?

15  A.   No, I didn't.

16  Q.   You talked to the police again, I guess it was about a

17  year later, September 2nd, 2004; isn't that right?

18  A.   September what?

19  Q.   September 2nd.  I think you've been talking about that

20  incident already.

21  A.   Yes.

22  Q.   And they interviewed you on tape; isn't that right?

23  A.   Yes.

24  Q.   And you knew at that time that you needed to give the

25  police information, right?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1    A.    Yes.

2    Q.    Because you were concerned that that might hurt you

3    legally if you didn't give them that information, right?

4    A.    Yes.

5    Q.    And you didn't say anything about David Howard being

6    involved in any of this at that time, did you?

7    A.    I don't recall, no.

8    Q.    You don't recall telling them anything about David; is

9    that right?

10   A.    At one of the meetings, I did tell them about him.

11   Q.    Not that one; isn't that right?

12   A.    I don't think so.

13   Q.    Now, you had an opportunity to be interviewed by the

14   police again, I guess it was about two weeks later, and that

15   was September 17th, 2004; is that right?

16   A.    Yes.

17   Q.    That was the time we've been talking about here where

18   there was this whole business about consent and the card key

19   at the motel room, your cats were in there and all that.

20   A.    Yes.

21   Q.    And you told us when you got to the police station you

22   found out what was going on, you were angry because, I believe

23   what you testified to on direct examination was that you

24   thought that because of all you had done for the police that

25   day as far as letting them into the apartment and cooperating,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

726

KESHIA BURRIS - CROSS

1    that you weren't going to get charged.

2    A.    Exactly.

3    Q.    And then turned out they were charging you anyway, right?

4    A.    Yes.

5    Q.    And then I guess what you told us was that you lied on

6    that day because you didn't want Tracy to get in trouble;

7    isn't that right?

8    A.    Yeah.

9    Q.    Well, you knew at that point that -- well, you were still

10   in the relationship with Tracy at that point; isn't that

11   right?

12   A.    Yes.

13   Q.    And even though you were in that relationship, you still

14   knew from what you understood from the police that what you

15   needed to do was give them information, right?

16   A.    Yes.

17   Q.    And that was because you had already cooperated somewhat

18   and that hadn't worked.  You'd gotten charged anyway.

19   A.    Yes.

20   Q.    And what you were led to believe was that you needed to

21   give more information if you were going to help yourself; is

22   that fair to say?

23   A.    You can say that, yeah.

24   Q.    And so even though you were in this relationship with

25   Tracy, you still gave them information about him; isn't that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   right?

2   A.   A little after that, yeah.

3   Q.   I'm talking about the day of -- this whole thing happened

4   with the cats --

5   A.   Okay.

6   Q.   -- and all that, right?

7   A.   Yes.

8   Q.   You told them that he was dealing drugs, right?

9   A.   Yes.

10  Q.   You told them that he was cooking up the crack himself.

11  A.   Yes.

12  Q.   You told them about who was selling for him, right?

13  A.   Yes.

14  Q.   You told them about Little B.  You told them about Nick;

15  isn't that right?

16  A.   Told them about who?

17  Q.   About Little B and Nick.  You mentioned them, right?

18  A.   Doing what?

19  Q.   As far as selling crack for Tracy.

20  A.   No.

21  Q.   You didn't say that on --

22  A.   I didn't say Little B.

23  Q.   You said Nick, though?

24  A.   Yeah.

25  Q.   Were you aware that Little B was selling for Tracy?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

728

KESHIA BURRIS - CROSS

1   A.   No.

2   Q.   Are you aware as you sit here today one way or the other?

3   A.   That what?

4   Q.   Are you aware one way or the other whether this person

5   named Little B was selling crack for Tracy?

6   A.   I don't know.

7   Q.   But you told them about Nick.

8   A.   Yeah.

9   Q.   You even told them the amounts that you believed he was

10  selling.  You told them how often he was resupplying folks;

11  isn't that right?

12  A.   Yes.

13  Q.   And you told them about Tracy working prostitutes, right?

14  A.   Yes.

15  Q.   You told them how Nick was helping him.

16  A.   Yes.

17  Q.   And in all that, you did not say anything about David

18  Howard being involved in any of it; is that fair to say?

19  A.   That's true.

20  Q.   Now, you did say at the end of that interview you told

21  them I will do anything to get my ass out of trouble if I can.

22  To get his ass out of trouble, too, you know what I'm saying.

23  Anything.  That's the words you used, right?

24  A.   Yes.

25  Q.   And you were talking about trying to help yourself and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   trying to help Tracy, right?

2   A.   Yes.

3   Q.   Nothing about David, right?

4   A.   (No response.)

5   Q.   Right?

6   A.   No.

7   Q.   You were charged along with Tracy and David and everyone

8   else here; is that right?

9   A.   I don't know when they came in, but it was just me and

10  Tracy down there.

11  Q.   But when you ended up getting indicted in federal court,

12  everybody was together, right?

13  A.   Yes.

14  Q.   And you didn't plead guilty immediately; isn't that

15  right?

16  A.   No.

17  Q.   That happened the same day the trial started; isn't that

18  right?

19  A.   No, it was that Saturday.

20  Q.   Well, when you came in to court.

21  A.   Yeah, I pleaded, yeah.

22  Q.   Now, before that, you had -- you had talked to your

23  lawyer about pleading guilty, right?

24  A.   Off and on.

25  Q.   And you talked about what other options you had; isn't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

730

KESHIA BURRIS - CROSS

1    that right?

2    A.    Trial.

3    Q.    Well, one of them was that you were going to try to plead

4    insanity, wasn't it?

5            MS. MARSTON:  Objection.

6            THE COURT:  Sustained.

7    A.    No.

8            THE COURT:  You don't have to answer that question.

9    Q.    Were you sent for some psychological testing while you

10   were in custody?

11   A.    Yes.

12   Q.    And one of the things they were trying to figure out was

13   if you had mental problems or not, right?

14   A.    Yes.

15   Q.    And isn't it true that the doctors decided that you were

16   faking it?

17   A.    I don't know.

18   Q.    Did anyone ever speak to you about the fact that the

19   doctors had written an evaluation where they said that you

20   were exaggerating your symptoms trying to appear like you were

21   crazier than you really are?

22   A.    I don't recall that.

23           MS. MARSTON:  Objection to the form.

24           THE COURT:  Sustained.  Sustained as to form.

25   Q.    Did you ever find out that you had been evaluated and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

731

KESHIA BURRIS - CROSS

1    that the doctors had decided that you were faking it?

2    A.    No.

3    Q.    No one ever told you anything like that?

4    A.    No.

5    Q.    Now, in all those interviews that I just talked about,

6    the day you were brought down to the station after the Guest

7    Suites incident, September 2nd, 2004, and then again

8    September 17th, 2004, you talked with the police all those

9    times, right?

10   A.    Yes.

11   Q.    Never said anything about David hunting down Hilari

12   Levine or anything like that, right?

13   A.    Yeah, when he went to court with Tracy.

14   Q.    What I'm saying is those three times you talked to the

15   police, you never told them anything about that, right?

16   A.    I don't recall, no.

17   Q.    You never said anything about David getting drugs from

18   Tracy, right, in all those conversations that you and I just

19   talked about?

20   A.    I don't recall, no.

21   Q.    Well, there was nothing at all about David in those three

22   conversations, was there?

23   A.    Not that I recall.

24   Q.    Now, you said something about how you and David had

25   written to each other and sort of had a little pen pal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

732

KESHIA BURRIS - CROSS

1   relationship more recently, right?

2   A.   Yes.

3   Q.   But none of that was going on back when those three

4   interviews happened; isn't that fair to say?

5   A.   No.

6   Q.   No, it's not fair to say or it is?

7   A.   It is.

8             (Counsel and defendant conferred.)

9             MR. ADOLF:  Nothing further, Your Honor.

10            THE COURT:  Mr. Mackey.

11                       CROSS EXAMINATION

12  BY MR. MACKEY:

13  Q.   Ms. Burris, do you remember talking to the police the day

14  that you were arrested and them talking to you about a --

15  quote, get on the bus?

16  A.   When?  When they first --

17  Q.   Yeah, when they had you at the police station when they

18  were talking to you.

19  A.   Uh-huh.

20  Q.   Do you remember them bringing up, saying something to you

21  about you can get on the bus, a quote like that?

22  A.   Yes.

23  Q.   Okay.  Now, earlier when Mr. Culler asked you about that,

24  you said you didn't; and that wasn't true, was it?

25  A.   He -- he did ask me that statement, yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1  Q.   But you said that didn't happen, and that was not true,

2  was it?

3  A.   I didn't understand his question, then.

4  Q.   Okay.  So you've lied in the past, haven't you?

5  A.   Yes, in the past, yes.

6  Q.   And you've lied to your mother; isn't that correct?

7  A.   Yes.

8  Q.   And you've lied to the police; isn't that correct?

9  A.   When we first got locked up, yes, I did.

10  Q.   Okay.  And you've lied to this jury today; isn't that

11  correct?

12          MS. MARSTON:  Objection.

13          THE COURT:  Sustained.

14  Q.   Isn't it fair to say that you lie when it benefits you?

15  A.   No.

16  Q.   Okay.  Now, you stated today that you lied to the police

17  because you didn't want to get in trouble.  Isn't that what

18  you said?

19  A.   When I first got locked up, I said that me and Tracy, you

20  know, I had nothing involved in it.  That's when I first got

21  locked up.  When we did like the first maybe three or four

22  meetings, I said I had nothing to do with it, yes, I did, and

23  I lied, yes, I did.

24  Q.   Okay.  But that wasn't my question.  We know you lied.

25  A.   Okay.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494


                              734

KESHIA BURRIS - CROSS

1   Q.   The question is that you stated earlier today the reason
2   you lied was because you didn't want to get in trouble; isn't
3   that correct?
4   A.   Yeah.
5   Q.   Okay.  And in the past when you lied, it was because you
6   didn't want to get in trouble; isn't that correct?
7   A.   Yeah.
8   Q.   Okay.  And when you were interviewed -- when you were
9   interviewed that day that the police took you down to the
10  station and they talked to you about getting on the bus, they
11  told you that they could help you out, didn't they?
12  A.   They said they would try.
13  Q.   Okay.  And they specifically stated that they could make
14  these charges disappear or something, didn't they?
15  A.   They said they would try.
16  Q.   To make these charges disappear.
17  A.   Yes.
18  Q.   Okay.  Now, you stated today that you had written some
19  letters to Nicholas Ragin; isn't that correct?
20  A.   Yes, that's true.
21  Q.   But you stated that you wrote about eight letters, didn't
22  you?  Isn't that what you said?
23  A.   I said around about eight.
24  Q.   But in fact, it was closer to 20 letters, wasn't it?
25  A.   I don't remember.  I've wrote him a lot, though, yes, I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

735

KESHIA BURRIS - CROSS

1    have.

2    Q.   Okay.  And you stated the reason for writing those

3    letters was to get him to testify for you and for him to get

4    you to testify for him.  Isn't that what you stated?

5    A.   That's what he brought to my attention.  I didn't bring

6    it to his attention.

7    Q.   Oh, is that a fact?

8    A.   Yes, sir.

9    Q.   So how many times did you write to Nicholas before he

10   would respond to your letters?

11   A.   When we was in court, he wrote me.

12   Q.   No, I mean in jail.  Isn't it true that you wrote him

13   numerous letters and got no response?  Isn't that true?

14   A.   That's not true.

15   Q.   Isn't it true that you had jail personnel, jail security

16   guards contact him for you because he didn't respond to your

17   letters?  Isn't that true?

18   A.   Yes.  One time, yes.

19   Q.   Okay.  But you just now stated that it wasn't true that

20   he wouldn't respond to your letters, so which -- which one is

21   it?

22   A.   He was -- he was writing me, yes, he was.

23   Q.   So why did you have to have a jail guard contact him

24   because he wouldn't write to you?

25   A.   He was writing to me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

736

KESHIA BURRIS - CROSS

1  Q.  So why did you have to have a jail guard contact him?

2  A.  Because I wanted her to ask him something.

3  Q.  Do you remember what was in the letters that you wrote?

4  A.  That I wanted to be with him.  It was a lot of stuff.

5  Q.  So -- and isn't it true that in the letters you were

6  trying to get him to testify on your behalf?

7  A.  He brought it to my attention.  I said if I testify for

8  you, can you testify for me?  So yes, I did say that.

9  Q.  Are you sure about that?

10        MS. MARSTON:  Objection, asked and answered.

11        THE COURT:  Sustained.

12 Q.  Well, we'll come back to that a little later.

13        MR. MACKEY:  One second, Your Honor.

14        (Pause.)

15 BY MR. MACKEY:

16 Q.  Now, you stated earlier that Nicholas broke his finger;

17 is that what you said?

18 A.  Yes.

19 Q.  Okay.  Which hospital did he go to?

20 A.  He didn't go to a hospital.

21 Q.  Who diagnosed it being a broken finger?

22 A.  He said it was broken when he got in the car.

23 Q.  So in other words, did you ever see him with a cast?

24 A.  No, I didn't.

25 Q.  Did you ever hear about him going to the hospital?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   A.   I went by what he said --

2   Q.   No, the --

3   A.   -- when he got in the car.

4   Q.   -- question was --

5        MS. MARSTON:  Objection, asked and answered.

6   Q.   -- did you ever hear about him going to the hospital?

7   A.   No.

8   Q.   Okay.  You also stated that when you went on calls, that

9   the purpose of the calls was for prostitution.  Isn't that

10  what you stated earlier?

11  A.   That and dancing, yes.

12  Q.   So that and dancing.

13  A.   Yes.

14  Q.   Okay.  So now, when you went on the calls, who were you

15  working for?

16  A.   Ila.

17  Q.   Ila.  Okay.  And you would dance?

18  A.   And intercourse most of the time.

19  Q.   Most of the time intercourse.

20  A.   Yes.

21  Q.   Now, did you -- were the drivers in the room with you?

22  A.   No.

23  Q.   Okay.  Now, did you tell Nicholas Ragin that most of the

24  time you just danced?

25  A.   At one time, yeah, I did.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

738

KESHIA BURRIS - CROSS

1   Q.   You did say that.  That was a lie, right?

2   A.   Yeah.

3   Q.   Okay.  Did you write a letter to Nicholas stating that he

4   needs to testify against Tracy for his daughter?

5   A.   Yeah.

6   Q.   Now, and did you also write a letter to Nicholas Ragin

7   stating that he needs to testify against Tracy because you and

8   him didn't have anything to do with this?

9   A.   Yes, I did.

10   Q.   Okay.  So it was you trying to get Nicholas Ragin to

11   testify, wasn't it?

12   A.   No, he wrote me and I have the letter.  He wrote me and

13   asked me if I would testify for him and I said yeah.

14   Q.   Can I see the letter?

15   A.   My lawyer has it.  I don't know where it's at.

16   Q.   Did you know you were going to testify in this case?

17   A.   No, I didn't.

18   Q.   You did not know that you were going to testify in this

19   case?

20   A.   At that time, no, I did not.

21   Q.   No, I'm talking about today.

22   A.   Oh, yeah.

23   Q.   Yesterday.

24   A.   Yeah.

25   Q.   The numerous times that you met with the government?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:04-cr-00271-RJC   Document 411 (Court only)   Filed 10/19/07   Page 301 of 338

KESHIA BURRIS - CROSS

1   A.   Yeah.

2   Q.   Didn't you -- wouldn't you think it would be important

3   for you to bring the letter?

4   A.   I sent my letters to my lawyer.

5   Q.   The question was don't you think it would be important to

6   have this letter that you're saying exists?

7   A.   Yes.

8           MS. MARSTON:  Objection, asked and answered.

9           THE COURT:  Sustained.

10  Q.   Now, isn't it true the government told you that if you

11  cooperate and testify, that you'll most likely get no jail

12  time?

13  A.   That's not true.

14          MS. MARSTON:  Objection.

15          THE COURT:  Overruled.  You may answer that

16  question.

17  A.   That's not true.

18  Q.   But you've told people that they've said that, haven't

19  you?

20  A.   No, I have not.

21  Q.   Isn't it true that you've just said that today over the

22  lunch break?

23  A.   No, I did not.

24          MR. MACKEY:  One moment, Your Honor.

25          (Counsel and defendant conferred.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494


740

KESHIA BURRIS - CROSS

1  BY MR. MACKEY:

2  Q.  Let me take your attention back to my earlier question

3  where you stated the reason -- and you correct me if I'm

4  wrong, but you stated that the reason you had the guard

5  contact Nicholas Ragin was not because he wouldn't return your

6  letters; isn't that correct?

7  A.  Yes.

8  Q.  Okay.  Do you remember writing a letter where you were

9  upset that he wouldn't return your -- write back to you?

10  A.  Yes.

11  Q.  You do.

12  A.  Yes.

13  Q.  Okay.  And in that letter you referred to that officer

14  that you had talk to him?

15  A.  Yes.

16  Q.  So that wasn't true just a few moments ago when you said

17  that's not the reason you had the officer talk to him, was it?

18  A.  No, I asked her to ask him something.

19  Q.  And what did you ask her to ask him?

20  A.  About visitation.  It had nothing to do with the letters.

21  Q.  So do you remember what the officer reported back to you?

22  A.  No.

23  Q.  You don't remember?

24     Did she report back to you about visitation?

25  A.  No.  She didn't say nothing to me because the sergeant

Cheryl A. Nuccio, RMR-CRR (704)350-7494

741

KESHIA BURRIS - CROSS

1  came in.

2  Q.   She didn't say anything to you about talking to Nicholas

3  Ragin?

4  A.   No.  When she got off the phone.

5  Q.   So if you wrote that in a letter, how would you explain

6  that?

7  A.   That I was lying to Nick.

8  Q.   So you were lying to Nick, also.

9  A.   Uh-huh.

10 Q.   So you would agree with the statement by earlier

11 witnesses that drug dealers can't be trusted, wouldn't you?

12 A.   Yeah.

13 Q.   And also the statement by earlier witnesses that drug

14 addicts can't be trusted, wouldn't you?

15          MS. MARSTON:  Objection.

16          THE COURT:  Sustained as to what other witnesses

17 said.

18 Q.   You would agree that drug addicts can't be trusted,

19 wouldn't you?

20 A.   True.

21 Q.   And you've testified today that you've dealt drugs; isn't

22 that true?

23 A.   Yes.

24 Q.   And that you've used drugs; isn't that true?

25 A.   Yes, when I was younger, yeah.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1    Q.   Okay.  Now, do you remember writing a letter where you

2    told Nicholas Ragin that if he takes the stand for you, you'll

3    take the stand for him?

4    A.   Yeah, I did say that.

5    Q.   Okay.  Now, so it wasn't true earlier when you stated

6    that he was trying to get you to testify, is it?

7    A.   I said that he wrote me and asked me to testify and I

8    wrote him back:  I'll testify for you if you testify for me,

9    and I did say that.

10   Q.   Now, you stated that you started writing him, isn't

11   that -- wasn't that your testimony?

12   A.   Yeah.

13   Q.   And you wrote him on several occasions asking him to

14   testify against Tracy; isn't that true?

15   A.   Yes.

16   Q.   And you expect this jury to believe now that he was

17   writing you.

18        MS. MARSTON:  Objection.

19        THE COURT:  Sustained.

20   Q.   Now, you stated a little while ago, I think, when

21   Mr. Culler was asking you some questions that drugs was the

22   only thing you lied about.  That was not true, was it?

23   A.   That what?

24   Q.   Drugs -- this is a quote from you today.  Drugs are the

25   only thing I lied about.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

743

KESHIA BURRIS - CROSS

1    A.   And the girls.

2    Q.   Okay.  The quote of drugs are the only thing I lied

3    about, that's not true, is it?

4              MS. MARSTON:  Objection.

5              THE COURT:  Sustained.

6    Q.   You also testified about a Lincoln.  Do you remember

7    testifying about a Lincoln?

8    A.   Yeah.

9    Q.   Well, you don't sound sure.  Do you remember testifying

10   about a Lincoln?

11   A.   David's Lincoln.

12   Q.   Okay.  Now, did you know of anybody else to drive a

13   Lincoln?

14   A.   When I first met Nick, he had -- I don't know what kind

15   of car it was, though.

16   Q.   Okay.  Do you know a guy named Eugene Lewis?

17   A.   Yeah.

18   Q.   Isn't it true that he drove a Lincoln?

19   A.   I don't know what he drove.

20   Q.   Okay.  Now, you said that some interviews were written

21   down that you gave with the police department or the

22   government.  Do you remember saying that?

23   A.   Yes.

24   Q.   Who wrote those interviews down?

25   A.   When I was out on house arrest, the detectives wrote them

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1   down.

2   Q.   The detective wrote them down.

3   A.   Uh-huh.

4   Q.   Okay.   Which detective would that be?

5   A.   Fish and his partner.

6   Q.   Who is his partner?

7   A.   I don't know his name.

8   Q.   Is he in the courtroom?

9   A.   Yes.

10  Q.   What does he look like?

11  A.   He's got glasses on the second row.

12  Q.   Okay.   Is that Detective Maxfield?

13  A.   Yeah.

14  Q.   Okay.   I think that's his name.

15       Now, do you remember writing a letter to Nicholas saying

16  that these charges that you and he are being charged with are

17  bullshit?

18  A.   Yeah, I said that.

19  Q.   Okay.   That wasn't a lie, was it?

20  A.   No.

21  Q.   And do you remember writing in those letters how bad

22  Tracy treated you?

23  A.   Yes.

24  Q.   And do you remember telling Nicholas that because of the

25  way he treated you, that you was -- you were going to testify

Cheryl A. Nuccio, RMR-CRR (704)350-7494

745

KESHIA BURRIS - CROSS

1    against him?

2    A.   Yes.

3    Q.   Okay.  So you had some ill feelings toward Tracy, didn't

4    you?

5    A.   Yeah.

6    Q.   Oh, one other thing.  When did you meet Nicholas?

7    A.   When I took a package to him on Nations Ford Road.

8    Q.   As far as what -- was this in 2003, 2002?

9    A.   I don't know when it was.  But we were staying at

10   Waterford Lakes.

11   Q.   Okay.  Now, what's -- do you -- you seem to know --

12   remember a lot of stuff today.  So how is it that you can

13   remember all that other stuff, but you can't remember a time

14   period when you met Nicholas Ragin?

15        MS. MARSTON:  Objection, asked and answered.

16        THE COURT:  Overruled.

17   A.   I'm saying it was when we was at Waterford Lakes.  I

18   don't know around about what time it was.

19   Q.   That wasn't my question.

20   A.   What was your question?

21   Q.   The question was since you remember so many other details

22   today --

23   A.   Uh-huh.

24   Q.   -- how is it that you cannot remember the time period

25   that you met Nicholas Ragin?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494


                              746

KESHIA BURRIS - CROSS

1           MS. MARSTON:  Objection, asked and answered.

2           THE COURT:  Overruled.

3   A.  I didn't say -- I'm saying what I've said today.  I don't

4   know round about what time, you know, how old I was, what

5   year, cold, hot.  But I know when I met him.  We was at

6   Waterford Lakes.  And I had just met him because Tracy told me

7   to go meet him on North -- South -- Nations Ford.

8   Q.  Was that 2002?  Was that 2003?  When was that?

9           MS. MARSTON:  Objection, asked and answered.

10          THE COURT:  Sustained.

11          MR. MACKEY:  No further questions, Your Honor.

12          THE COURT:  Mr. Brown.

13                      CROSS EXAMINATION

14  BY MR. BROWN:

15  Q.  Ms. Burris, when you were talking to the U.S. attorney,

16  Ms. Marston, you stated that Tracy rented three apartments in

17  Little Mexico.  Do you remember stating that?

18  A.  Yes.

19  Q.  And you stated that two of those apartments were for

20  Eugene Lewis -- or you called him D, correct?

21  A.  Yes.

22  Q.  And you stated that the third apartment was for Sanchez.

23  Do you remember testifying about that?

24  A.  Yes.

25  Q.  Are you sure that two of those apartments were for D?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - CROSS

1  A.   One of them was Kelly's apartment, one was Sanchez, and
2  one was the one that my dogs were staying in which was where D
3  was staying at.
4  Q.   So D had two of those?
5  A.   He was going -- when -- every time I seen him, he was
6  always at Kelly's house.
7  Q.   All right.  Now, on -- but you stayed at -- you did state
8  that two of those were for D and one was for Sanchez earlier,
9  correct?
10 A.   Yes.
11 Q.   All right.  Now, on September the 2nd when you were
12 interviewed, you only stated that Tracy rented two apartments,
13 those for D, correct.  Do you remember that?
14 A.   Yeah.
15 Q.   And in that interview, you didn't state that he rented
16 three apartments, did you?
17 A.   No, I don't think I did.
18 Q.   Now, when did you finally come up with this third
19 apartment that was rented?  Was that before or after you told
20 the officer you would do anything to save your behind?
21 A.   That was -- it might have been after.  I don't remember.
22 Q.   In fact, on the same interview in September, according to
23 you, Puerto Rico was a Mexican female who was a prostitute and
24 30 years old; isn't that correct?
25 A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

748

KESHIA BURRIS - CROSS

1    Q.   Now, if I showed you what you stated in that interview,

2    would it help you remember?

3    A.   Yeah, because I don't remember saying that.

4              MR. BROWN:  May I approach, Your Honor?

5              THE COURT:  You may.

6              MR. BROWN:  Thank you.

7    A.   I don't remember saying that.

8    Q.   So are you saying that the officer who wrote this down --

9              THE COURT:  Counsel, that's --

10             MR. BROWN:  I'm sorry.

11             THE COURT:  -- an impermissible question.

12             MR. BROWN:  I'm sorry.

13             THE COURT:  Ask her if she said something, refresh

14   her recollection, but you're not going to ask her about what

15   the officer wrote down.

16             MR. BROWN:  I understand, Your Honor.

17   Q.   So Ms. Burris, you do not remember telling the officer

18   that Puerto Rico was a Mexican prostitute?

19   A.   No, I do not remember that.

20   Q.   And do you have any reason to know why the officer would

21   write that?

22   A.   Maybe they overheard it, but I don't remember saying

23   that.

24   Q.   Maybe they overheard it from whom?

25             MS. MARSTON:  Objection.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

749

2794

KESHIA BURRIS - CROSS

1           THE COURT:  Sustained.

2    Q.   In fact, you did not mention the name Oscar Sanchez in

3    any parts of that September 2nd interview, did you?

4    A.   No, I did not.

5    Q.   Now, you weren't -- you didn't write Oscar Sanchez any

6    letters in prison, did you?

7    A.   No, I did not.

8    Q.   You never were intimate with him or anything, were you?

9    A.   No.

10   Q.   And you had no reason on September the 2nd to want to

11   protect him, did you?

12   A.   No.  What was your question?

13   Q.   And you had no reason to want to protect him on

14   September 2nd during that interview, did you?

15   A.   No.

16   Q.   And two years after that interview you finally come to

17   court and talk about some third apartment, correct?

18   A.   Yes.

19   Q.   Now, you interviewed with Officer Grimsley as well, did

20   you not?

21   A.   Yes.

22   Q.   And he told you that if you scratched his back, he would

23   scratch yours; isn't that right?

24   A.   Yes.

25   Q.   And he also stated that if you helped him out, he would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

750

KESHIA BURRIS - CROSS

1   probably have these charges disappear; isn't that correct?

2   A.   He said he was going to try.

3   Q.   And after he told you that, is that when you came up with

4   this phony third apartment?

5   A.   No.

6            MS. MARSTON:  Objection.

7            THE COURT:  Sustained.

8            MR. BROWN:  May I have a moment, Your Honor?

9            THE COURT:  You may.

10           (Counsel and defendant conferred.)

11           MR. BROWN:  I don't have any further questions, Your

12  Honor.  Thank you.

13           THE COURT:  Any redirect?

14           MS. MARSTON:  Yes, Your Honor, but can I have a

15  brief side-bar?

16           THE COURT:  You may.

17           (Side-bar conference as follows:)

18           MS. MARSTON:  Your Honor, I just wanted to note for

19  the record, it came to my attention as Mr. Mackey was cross

20  examining Ms. Burris and talking about letters, I don't have

21  any of the letters that he may have in his possession, but I

22  thought I had turned over all the letters and I realized when

23  we were searching that I still had a packet of some of Nick

24  Ragin's letters that we just received.  We got letters

25  yesterday and today from her mother.  And I just wanted to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

751

KESHIA BURRIS - CROSS

1  give counsel these letters in case there was anything -- these

2  are, I guess, three additional letters that are from Nick

3  Mackey to Keshia Burris.

4        And I do have redirect --

5        MR. MACKEY:  From who to who?

6        MS. MARSTON:  From defendant Nicholas Ragin to

7  Keshia Burris.  There's three additional letters.  I already

8  turned over some and I thought I turned these over and I

9  realized I hadn't.

10       THE COURT:  Well, I'll give you a chance to review

11  those letters and then if we need to recall this witness, I'll

12  hear from you at that time.

13       MR. MACKEY:  I would just state that that just goes

14  along with what Mr. Adolf had been --

15       MR. ADOLF:  You're getting on his bus?

16       MR. MACKEY:  Yeah, for the record.

17       THE COURT:  All right.

18       MR. ADOLF:  I understand Your Honor's position, but

19  for the record I would move to strike the witness's testimony

20  based on *Jencks*.

21       THE COURT:  Those are Nicholas Ragin letters.

22       MR. ADOLF:  To Keshia, okay, I'm sorry.

23       MS. MARSTON:  Let me also state for the record that

24  these records were not in the government's possession before

25  yesterday and today.  They were in Nancy Burris's possession.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Appeal: 14-7245   Doc: 56   Filed: 10/15/2015   Pg: 758 of 795

KESHIA BURRIS - REDIRECT

```
 1                THE COURT:  Very well.

 2                MR. MACKEY:  Weren't these all jail letters?

 3                MS. MARSTON:  Yeah, the same jail letters I think

 4     you probably have.

 5                THE COURT:  This side-bar has gone way too long.

 6     You've disclosed.  You've provided discovery.  Are you

 7     ready -- something new?

 8                MS. MARSTON:  Yes.

 9                THE COURT:  Very limited.

10                (End of side-bar conference.)

11                       REDIRECT EXAMINATION

12     BY MS. MARSTON:

13     Q.   Ms. Burris, on cross examination you talked a lot about

14     the escort service.  Who did you say ran the escort service?

15     A.   Ila.

16     Q.   And how would you get put on call for the escort service?

17     A.   She would call Tracy.

18     Q.   And who got the money when you went on those calls?

19     A.   Tracy.

20     Q.   Why were there times you didn't want to go on the calls?

21     A.   Because I was tired.  I didn't want to go.

22     Q.   And what happened if you didn't want to go on the calls?

23     A.   He would get mad at me.

24                THE COURT:  Counsel, this is not new.  If there's

25     something new you wish to ask the witness about, you may do
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:04-cr-00271-RJC   Document 411 (Court only)   Filed 10/19/07   Page 315 of 338

KESHIA BURRIS - REDIRECT

1    so.  She's already testified to this.

2    Q.   What happened to your tip money?

3    A.   I gave it to Tracy.

4    Q.   Why did you say during the course of one of those

5    interviews that he was not a pimp?

6    A.   Because I didn't want him to get in trouble.

7    Q.   There was some talk about a Eugene Hardisty.  Do you also

8    know a Eugene Lewis?

9    A.   Yes.

10   Q.   And tell us which one you knew by D, Eugene Hardisty or

11   Eugene Lewis?

12   A.   The one that was staying in Little Mexico.

13   Q.   When you were asked to look over the report that

14   Mr. Adolf showed you from July 29th, 2003, do you recall being

15   shown that report to look over from the Guest Suites incident?

16   A.   Yes.

17   Q.   Why didn't you mention David Howard during the course of

18   your talk with law enforcement that night?

19           MR. ADOLF:  Objection, asked and answered.

20           THE COURT:  Overruled.

21   A.   Because I was worried about Tracy at the time.

22   Q.   Do you know what David did with the Guest Suites Hotel

23   room the next day?

24   A.   No.

25   Q.   Do you know what happened to the property that was in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

754

KESHIA BURRIS - REDIRECT

1  that hotel room that you were staying in with David and Tracy

2  Howard?

3  A.   It got stolen.

4  Q.   And do you know what happened after it got stolen?

5  A.   I don't know.

6  Q.   On cross examination you were asked about a specific time

7  frame of when you met Nicholas Ragin.  Do you recall that

8  questioning?

9  A.   Yes.

10  Q.   And what did you say -- where were you living at the

11  time?

12  A.   Waterford Lakes.

13         THE COURT:  Counsel, that's not new.  She testified

14  several times that it occurred when they were living at

15  Waterford Lakes Apartments.

16         MS. MARSTON:  Yes, Your Honor.  I was just going to

17  ask if I could refresh her memory as to the time frame she was

18  living at Waterford Lakes by showing her the lease agreement.

19         THE COURT:  You may do so.

20  Q.   Would it help refresh your memory of the exact time frame

21  that you were living at Waterford Lakes if you saw that lease

22  agreement?

23  A.   Yes.

24  Q.   I'm going to show you what's already been introduced into

25  evidence as Government's Exhibit 12E.  When -- what year did

Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - REDIRECT

1  that lease start?

2  A.    '05.  No, April 20th.

3  Q.    Of what year?

4  A.    '04.

5  Q.    And what year were you working at the Uptown Cabaret?

6  A.    It was around my birthday.

7  Q.    Of that same year?

8  A.    Yes.

9  Q.    And when's your birthday?

10 A.    August 1st.

11            MS. MARSTON:  No further questions.

12            THE COURT:  Any objection to this witness being

13 excused?

14            MR. CULLER:  Your Honor, we want her subject to

15 recall.

16            THE COURT:  Right.  Right.  I stand corrected.

17            MR. MACKEY:  And also, Your Honor, I would have a

18 brief recross.

19            THE COURT:  On something new?

20            MR. MACKEY:  Well, what's on the redirect.  What was

21 brought out on redirect.

22            THE COURT:  Very limited.

23            MR. MACKEY:  Thank you, Your Honor.  It is limited.

24                      RECROSS EXAMINATION

25 BY MR. MACKEY:

           Cheryl A. Nuccio, RMR-CRR (704)350-7494

KESHIA BURRIS - RECROSS

1    Q.    What did you say the date was on that lease?

2    A.    April 20th, '04.

3    Q.    And did you -- was that your lease?

4    A.    Yes, it was me and his mom Ila's.

5    Q.    So now, if -- if someone stated that --

6          THE COURT:  Counsel, you're not going to ask her

7    about other testimony.

8          MR. MACKEY:  No, Your Honor.

9    Q.    How long after you moved into that -- you moved into that

10   apartment did you meet Nicholas Ragin?

11   A.    Maybe at the most three months.

12   Q.    Three months?

13   A.    Maybe around three months.

14   Q.    So April 20th, where would that put you?  What time of

15   year would that put you in?

16         MS. MARSTON:  Objection, beyond the scope.

17         MR. MACKEY:  That's exactly the scope.

18         THE COURT:  Rephrase your -- or reask your question.

19   Q.    The question is if you stated on the redirect when

20   Ms. Marston asked you the date of that lease and your answer

21   was April 20th, you just now told me you met Mr. Ragin about

22   three months after that.  What time of year would that be?

23   A.    I said around three months.  It's not exactly three

24   months.  It was around three months.  Maybe two months.  I

25   don't remember.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

757

KESHIA BURRIS - RECROSS

1    Q.    Could have been four months?

2    A.    No.

3    Q.    What would three months be from April?

4    A.    July.

5              MR. MACKEY:  No further questions, Your Honor.

6              THE COURT:  All right.  You may step down.

7              (Witness stepped down.)

8              THE COURT:  Call your next witness.

9              MS. MARSTON:  United States calls Special Agent John

10   Rich -- actually, prior to that I'd like to read the

11   stipulations, Your Honor.

12             THE COURT:  You may.

13             MS. MARSTON:  Your Honor, United States of America

14   versus Tracy Howard, et al, docket number 3:04-cr-271, the

15   following stipulations have been entered into between the

16   United States, defendant Tracy Howard, and defendant David

17   Howard.

18             The first one:  That defendant David Howard is a

19   convicted felon.  He was convicted on July 22nd, 1998, of a

20   crime punishable by imprisonment of a term exceeding one year;

21   and at the time of the offense charged in the indictment, did

22   not have that conviction expunged or set aside and he had not

23   been pardoned or had his civil rights restored.

24             Two, that defendant Tracy Howard is a convicted

25   felon.  He was convicted on January 6th, 2003, of a crime

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - DIRECT

```
 1              MS. MARSTON:  That's fine.  Okay.

 2              (End of side-bar conference.)

 3              THE COURT:  Are we ready for the jury at this time?

 4              MS. MARSTON:  Yes, Your Honor.

 5              MR. CULLER:  Yes.

 6              THE COURT:  Call the jury.

 7              (Jury entered the courtroom.)

 8              THE COURT:  Good morning, members of the jury.

 9              THE JURY:  Good morning.

10              THE COURT:  Ms. Marston, call your next witness.

11              MS. MARSTON:  At this time the United States calls

12    Agent Tadeo.

13                        TERRELL A. TADEO,

14    being first duly sworn, was examined and testified as follows:

15                        DIRECT EXAMINATION

16    BY MS. MARSTON:

17    Q.   Please state your name for the the record.

18    A.   It's Terrell A. Tadeo.

19    Q.   And sir, what do you do for a living?

20    A.   I'm an ATF agent.

21    Q.   And can you explain what ATF stands for.

22    A.   Alcohol, Tobacco, Firearms and Explosives.  We generally

23    go by ATF.

24    Q.   And how long have you been an ATF agent?

25    A.   About 15 years.
```

Cheryl A. Nuccio, RMR-CRR (704)350-7494

759

TERRELL TADEO - DIRECT

1  Q.   Can you tell us what some of your duties and
2  responsibilities are as an agent for ATF.
3  A.   Yes.  I investigate primarily violations of the federal
4  firearms laws.  That includes multi-defendant, complex, armed
5  drug conspiracies as well as racketeering and money laundering
6  organizations as well as arson for profit and explosives
7  violations.
8  Q.   During the course of your career, approximately how many
9  investigations have you been involved in?
10  A.   I probably have been involved in the prosecution of
11  approximately, conservatively, four hundred defendants
12  federally, and again that many that were left as state cases.
13  Q.   Now, you've obviously -- were you the case agent assigned
14  to the case that's been presented here over the past couple of
15  weeks?
16  A.   Yes, ma'am.
17  Q.   And during the course of that, did you have the
18  opportunity to interview defendant Nicholas Ragin?
19  A.   I did.
20  Q.   Can you tell the jury about how that came about.
21  A.   Yes, ma'am.  As a culmination of the investigation, there
22  were arrest warrants issued for the various defendants in the
23  case and Nicholas Ragin was one of those defendants.
24  Q.   And at the time he was arrested, what did you do?
25  A.   He was arrested and placed in an interview room at the

TERRELL TADEO - DIRECT

1   law enforcement center, the police department.  Myself and

2   Detective Fish entered the room in an attempt to interview

3   him.

4   Q.   And what did you do prior to interviewing him?

5   A.   Actually, we stepped into the room and at that time he

6   had essentially a spontaneous utterance and stated that he

7   wanted to say something.  I allowed him to continue and he

8   stated that he was involved in an illegal association.  That

9   he knows what conspiracy is.  That he was involved in

10   prostitution and stopped because he knew it was illegal.

11   Q.   At that point after he uttered that to you, what did you

12   do?

13   A.   I told him that that was -- that was fine, that we would

14   get to that, but that because he was under arrest, it was my

15   duty to advise him of his Miranda rights.

16   Q.   Now, how do you go about advising a defendant of his

17   Miranda rights?

18   A.   I have done it the same way for 15 years.  I carry a card

19   in my credentials, my wallet, essentially, and I read from

20   that card.

21   Q.   Do you ever complete a written Miranda form?

22   A.   No, ma'am.  I've been very consistent with the way I do

23   Miranda warnings.  I've done it the same way for 15 years.  I

24   have never done a written consent.  I always read from the

25   card.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

761

TERRELL TADEO - DIRECT

1  Q.   And how about tape recorded interviews?

2  A.   Again, I've been very consistent with my investigative

3  techniques.   I have never ever recorded a statement from a

4  defendant.

5  Q.   Now, after you read him the Miranda warnings from the

6  card that you keep in your wallet, what happened next?

7  A.   He waived his Miranda rights and consented to be

8  interviewed by myself and one of my partners, Detective Fish.

9  Q.   What did he tell you about the prostitution business at

10 that point?

11 A.   He stated he'd been involved in the prostitution business

12 with Ila for about two months.   He stated that Ila had

13 approximately 12 girls working for her as prostitutes.   That

14 the name of her prostitution business operating under the

15 guise of an escort service was One Enterprise.   He stated that

16 he worked for Ila as a driver for the prostitutes and made $20

17 each time he drove a girl to a client.   He stated that Ila --

18 the prostitutes charged $200 an hour if the client had a

19 credit card, and $250 an hour if the client was paying cash.

20      Can I continue?

21 Q.   Did he tell you anything about a credit card -- more

22 about those credit card transactions?

23 A.   Yes.   He stated that most of the time the prostitutes

24 would take a credit card machine with them when they went to

25 the calls.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - DIRECT

1   Q.   What did he tell you about when he would actually be
2   involved with taking girls to the calls?
3   A.   He stated that he would drive 15 to 17 times on Friday
4   and Saturday nights; and that during the weekdays it would be
5   more like seven or eight times.  And that he would generally
6   run the girls to their clients between 7:00 p.m. and go to as
7   long as 11:00 a.m. in the morning.
8   Q.   What did he say about the -- how long had he been
9   involved with this prostitution?
10  A.   He had stated that he was involved with it for about two
11  months.
12  Q.   And what did he say about the course of business during
13  those two months?
14  A.   He stated that they had an office on North Tryon and that
15  had filing cabinets, computers, et cetera.
16  Q.   And did he say how business was during the two months
17  that he was working with this service?
18  A.   Yes.  He indicated that it was steady and very busy.
19  Q.   And what did he say in terms of the payments and how that
20  was distributed once a girl did go on a call?
21  A.   From interviewing him, it was my understanding that the
22  girl would get to keep a hundred dollars for the call.  She
23  would have to pay her driver out of that hundred dollars and
24  that the driver himself would be paid $20 per call.
25  Q.   And where did the rest of the money go?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

763

TERRELL TADEO - DIRECT

1    A.   It would go to Ila.

2    Q.   And what did he say about Ila working underaged girls?

3    A.   He stated that Ila admitted to him that she had underaged

4    girls working for her as prostitutes.

5    Q.   Did he talk about where these prostitutes came to

6    actually work for the service -- came from?

7    A.   Yes, ma'am.  He stated that a lot of the prostitutes came

8    from Florida and that he had, in fact, picked some of the

9    prostitutes up from Florida at the airport and returned them

10   to the airport when they were done working here and were

11   allowed to depart North Carolina back to Florida.

12   Q.   What did he say about the Florida women?

13   A.   That a lot of them were Cuban women.

14   Q.   Did he talk about his involvement with any of the

15   prostitutes in terms of any additional payment that he

16   received other than the $20?

17   A.   Yes, ma'am.  He told us that on one occasion he was paid

18   a hundred dollars to beat up one of the prostitutes as

19   punishment for something she had done wrong.

20   Q.   Did he say when he had last been to the office location

21   for One Enterprise?

22   A.   It was approximately a week before we interviewed him,

23   that date being October 20th, 2004.

24   Q.   What did he tell you about Ila and her knowledge of

25   either dope and guns?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

764

TERRELL TADEO - DIRECT

1  A.   He stated that Ila would, in fact, hold drugs and guns in

2  a shed at her Greenlefe address.  He also stated that Ila

3  would sometimes pick up drug money.

4  Q.   And did he have any knowledge of a source of drugs?

5  A.   Yes.  He named several sources.

6  Q.   And who did he name?

7  A.   He named as some of the sources an individual named John

8  who lived in -- and he described them living in the same

9  apartment complex as he did.  He named Carlos known to us as

10  the --

11  Q.   Well, who did he know it as?  Who --

12  A.   I believe he stated that it was Ila's boyfriend or

13  husband Carlos.

14  Q.   And did he name any other suppliers?

15  A.   He named a white male named Dave that he worked with.  He

16  worked actually with Dave's wife.  He also named Lester Norman

17  as a source of cocaine.  He also named an individual he only

18  knew a street name for and that was Black.

19  Q.   Now, what did he tell you about who was the owner of the

20  apartments out in Little Mexico?

21  A.   He stated that the owner of the apartments in Little

22  Mexico was a guy he knew as Cliff.

23  Q.   And what did he know about Cliff?

24  A.   That Cliff was being paid not to say anything about the

25  illegal activities occurring in Little Mexico.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - DIRECT

1  Q.   And did he actually talk about his involvement with the
2  use of firearms?  Not Cliff.  Did defendant Nicholas Ragin
3  talk about his own involvement with the use of firearms?
4  A.   He did.
5  Q.   And what did he say about that?
6  A.   He said there were two occasions where he and Eugene used
7  firearms to force people off their drug territory, in both
8  Little Mexico and the North Pointe Apartments.  He stated that
9  the North Pointe incident was in September 2004.
10  Q.   Did he specify when the Little Mexico incident was?
11  A.   Generally it would have also been September.
12  Q.   Now, did he talk about Keshia Burris at all or another
13  person named Donna?
14  A.   Yes.
15  Q.   And what did he say about them?
16  A.   He said that something the investigators should look into
17  is that it seemed to him that when there was a problem with
18  one of the prostitutes, they would go off with Keshia Burris
19  and never return.  He stated that one of the prostitutes,
20  Donna, talked to one of the girls and convinced her she should
21  leave and not prostitute anymore.  In fact, that girl did
22  leave.
23  Q.   Okay.  And are you aware of what Nicholas Ragin's middle
24  name is?
25  A.   Jermaine.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

766

TERRELL TADEO - DIRECT

1  Q.   Now, have you actually received a letter or seen a copy

2  of a letter that Nicholas Ragin has written?

3  A.   I have.

4  Q.   And can you tell the jury about that.

5  A.   It's been a while since I really reviewed it, but...

6  Q.   Would you like to refresh your memory by seeing a copy of

7  it?

8  A.   I think I -- sure, I'll take a look at it.

9        MS. MARSTON:  Your Honor, may I approach?

10       THE COURT:  You may.

11 Q.   I'm going to show you what's been marked for

12 identification purposes as Government's Exhibit 161.

13 A.   Okay.  Thank you.

14 Q.   Does that help refresh your memory of that letter?

15 A.   Yes, ma'am.

16 Q.   Is that letter actually connected to a separate

17 investigation you are also the case agent on?

18 A.   That's correct.

19 Q.   And can you tell the jury what the purpose of that letter

20 was.

21 A.   Basically, the letter alleges that I approached Nicholas

22 Ragin along with his attorney and --

23       MR. ADOLF:  Objection to the best evidence, Your

24 Honor, at this point, Judge.  He's testifying to recollection

25 of a document when the document is the best evidence.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

767

TERRELL TADEO - DIRECT

1          THE COURT:  Overruled.

2   A.    Essentially, that I approached him in the presence of his

3   attorney and he alleges I attempted to inappropriately have

4   him provide evidence against another defendant in a separate

5   case that he was actually unaware of.

6   Q.    And did you do that?

7   A.    Absolutely not.

8   Q.    Now, I wanted to direct your attention back to the One

9   Enterprise office location.  Did you have the opportunity to

10  go to that office location?

11  A.    Yes, ma'am.

12  Q.    And what was the purpose of that?

13  A.    On October 25th, 2004, I prepared a federal search

14  warrant for that location, being 5736 203B North Tryon, and we

15  did in fact that date serve a federal search warrant on that

16  location.

17  Q.    And has some of the evidence that was seized during the

18  course of that search warrant been introduced into evidence

19  during the course of this trial?

20  A.    Yes, ma'am.

21  Q.    And specifically, what happened during the course of the

22  execution of that search warrant regarding an employee?

23  A.    During the search of that location, it was -- it became

24  apparent that some of the files were missing.  Denise Davis, I

25  believe -- she's testified in this trial.  Angenita is her

Cheryl A. Nuccio, RMR-CRR (704)350-7494

768

TERRELL TADEO - DIRECT

1  name, but I think she goes by Denise Davis.  She stopped by

2  the office.  Further investigation indicated that she had

3  removed the files.  We contacted her again that day.  She came

4  back to the location.  She admitted that she had removed the

5  files and that she would be willing to surrender those to law

6  enforcement.  As a result of that conversation with her, we

7  proceeded to Pineville and did, in fact, retrieve the files

8  that she had removed from the office.

9  Q.   Now, during the course of your investigation, were you

10 able to determine various dates beginning first with Tracy

11 Howard being released or being admitted back into prison

12 during the course of the time frame of this conspiracy?

13 A.   Yeah, I have seen a document with those dates on it.

14 Q.   Would it help refresh your memory if you saw that

15 document again --

16 A.   Yes, ma'am.

17 Q.   -- as to what those dates are?

18     I'm going to show you what's been marked for

19 identification purposes Government's Exhibit 162.

20          MS. MARSTON:  If I may approach, Your Honor?

21          THE COURT:  You may.

22 Q.   Does that document help refresh your memory?

23     In 2001 can you tell when defendant Tracy Howard first

24 left prison.

25 A.   In 2001 he first left prison on February 23rd of that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - CROSS

1   same year, 2001.

2   Q.   And then later that year, was there a time that he went

3   back in?

4   A.   He was admitted again in -- on October 3rd, 2001.

5   Q.   And when did he get out after that?

6   A.   He was released March 22nd, 2002.

7   Q.   And then was there again another entry back into?

8   A.   He was again admitted January 10th, 2003.

9   Q.   And when is he released from that?

10  A.   July 5th, 2003.

11  Q.   And were you able to obtain a release date for defendant

12  David Howard?

13  A.   He was released March 25th, 2003.

14          MS. MARSTON:  No further questions.

15          THE COURT:  Any cross?

16                  CROSS EXAMINATION

17  BY MR. CULLER:

18  Q.   Does that mean that David Howard was in custody all of

19  2001 and all of 2002 up until March 25, 2003?

20  A.   I'm looking at the document.  It indicates he was in

21  prison from August 3rd, 1998 --

22  Q.   I don't want -- I just asked all of 2001 --

23          MR. ADOLF:  Object.  Move to strike, Judge, based on

24  the prior ruling.

25  A.   Yes, all of --

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - CROSS

1          THE COURT:  Hang on a second.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Do you wish to be heard on that?

4          MR. ADOLF:  Yes.

5          (Side-bar conference as follows:)

6          MR. ADOLF:  For the record, Judge, I thought Your

7     Honor's ruling was that he was going to be limited to the

8     release date because of --

9          THE COURT:  Right.

10         MR. ADOLF:  -- the length of the sentence coming in

11    through that information.  I mean, the cat is out of the bag

12    as far as the jury is concerned, but I guess for the record

13    I'd move to strike that.

14         THE COURT:  He was talking about Tracy Howard,

15    right?

16         MR. ADOLF:  No, at the end he talked about David

17    Howard.

18         MR. CULLER:  2001 --

19         THE COURT:  Well, I'll sustain the objection.  And

20    do you wish for me to give the jury a limiting instruction or

21    just let it go?

22         MR. ADOLF:  I'd ask for a limiting instruction.

23    That it's not to be used for any purpose other than chronology

24    and it's not to imply that he has -- I'm not sure exactly how

25    to phrase it.

               Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - CROSS

1          THE COURT:  I'll say it any way you want me to say
2    it.
3          MR. ADOLF:  That it's not to be used as evidence of
4    bad character.
5          THE COURT:  Very well.
6          (End of side-bar conference.)
7          THE COURT:  Members of the jury, you've heard
8    testimony from this witness with respect to certain times in
9    which some -- one defendant or another went into or out of
10   prison.  You are to consider this evidence for a very limited
11   purpose and that is for the purpose of establishing
12   chronology.  None of these defendants are on trial for
13   anything other than what's charged in the indictment.  And
14   you're not to consider the fact that one defendant or another
15   went into or out of prison at any particular time as any
16   evidence of bad character or for any other purpose other than
17   to establish the chronology of events.  And so you're
18   instructed to receive this evidence for that very limited
19   purpose.
20         THE COURT:  Mr. Culler, you may continue.
21         MR. CULLER:  No more questions.
22         THE COURT:  Mr. Adolf.
23                   CROSS EXAMINATION
24   BY MR. ADOLF:
25   Q.   Agent Tadeo, you were just discussing your interview with

Cheryl A. Nuccio, RMR-CRR (704)350-7494

772

TERRELL TADEO - CROSS

1    Nicholas Ragin; is that right?

2    A.   Yes, sir.

3    Q.   Isn't it true, sir, that at no time in that interview or

4    in the letter you talked about or anything did he ever mention

5    David Howard?

6    A.   In the interview with Nicholas Ragin, no.

7    Q.   Now, you had an opportunity -- you discussed things that

8    he told you about Ila Howard and about how the business

9    worked; is that right?

10   A.   That's correct.

11   Q.   And you had an opportunity to verify that information

12   with Ila Howard herself; isn't that right?

13   A.   That's correct.

14   Q.   You interviewed her on a number of occasions; is that

15   correct?

16   A.   Yes.

17   Q.   And that was pursuant to her plea agreement with the

18   government, right?

19   A.   That's correct.

20   Q.   In fact, you interviewed her on three occasions?

21        MS. MARSTON:  Objection, beyond the scope.

22        THE COURT:  Sustained.

23   Q.   Isn't it true, sir, that she also never said that David

24   Howard did anything wrong --

25        MS. MARSTON:  Objection.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

773

TERRELL TADEO - CROSS

1            THE COURT:  Sustained.

2  Q.   Now, just to be clear.  At the time that this alleged

3  conspiracy started in 2001 and through 2002, David Howard was

4  in fact in prison; is that right?

5  A.   He was in prison for --

6  Q.   For the years I'm talking about.

7  A.   Ask the specific years, please.

8  Q.   2001 and 2002.

9  A.   That's correct.

10           MR. ADOLF:  Nothing further, Your Honor.  Thank you.

11           THE COURT:  Mr. Mackey.

12           MR. MACKEY:  Thank you, Your Honor.

13                     CROSS EXAMINATION

14  BY MR. MACKEY:

15  Q.   Special Agent Tadeo, how is it that you were able to

16  recall everything from this interview so clearly this morning?

17  A.   I refreshed my memory from an interview that I prepared.

18  Q.   And how did you refresh your memory?

19  A.   With the notes from that interview.

20  Q.   Did you read the notes while on the stand?

21  A.   I did review them, yes.

22  Q.   And you read from them; isn't that correct?

23  A.   I used them to assist in my testimony.

24  Q.   And you read directly from them after each question was

25  asked; isn't that correct?


           Cheryl A. Nuccio, RMR-CRR (704)350-7494



                          774

1   A.   I don't think I was reading verbatim, but I was glancing

2   at the summary of the notes I made that day.

3   Q.   Okay.  Well, let's see.  You were asked about a

4   spontaneous utterance that Nicholas Ragin was supposed to have

5   said; isn't that correct?

6   A.   Yes, sir.

7   Q.   And what did you say that utterance was?

8   A.   He stated that he was involved in an illegal association.

9   That he knew what conspiracy was.  That he was involved in

10  prostitution and stopped because he knew it was illegal.

11  Q.   And that's not what you stated earlier, is it?  Wasn't

12  your exact words on direct, quote, I associated with Tracy in

13  an illegal way --

14          MS. MARSTON:  Objection.

15          THE COURT:  Sustained.  Mr. Mackey.

16          Members of the jury, I informed you at the beginning

17  of the trial that a lawyer's questions are not evidence in a

18  case unless adopted by the witness.  And I informed you at

19  another part of the trial that if an objection is sustained,

20  that you are to -- if the objection is sustained you're not to

21  consider the question.  And if a witness answers a question, I

22  instructed you to disregard it and you are to disregard it.

23  And I am instructing you at this point to disregard the

24  question -- the last question of Mr. Mackey.

25          MR. CULLER:  May we have a side-bar briefly, Your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

775

TERRELL TADEO - CROSS

1    Honor?

2              THE COURT:  You may.

3              (Side-bar conference as follows:)

4              MR. CULLER:  I'm going to move for mistrial again,

5    Your Honor.  That's the second time now.

6              THE COURT:  Well, you misquoted the testimony and

7    the way you did it puts in jeopardy the whole trial and I will

8    not tolerate it.

9              MR. MACKEY:  I guess I'm not sure how I misquoted --

10             THE COURT:  You mentioned Tracy Howard.  This

11   witness never mentioned Tracy Howard's name and you've

12   jeopardized this entire trial and I'm not going to let it

13   happen again.

14             MR. MACKEY:  Well, Your Honor, that was a mistake.

15   It was my impression that he read this question -- this

16   sentence.

17             THE COURT:  Well, he didn't.  You listen to the

18   testimony and if you're going to refer to testimony, you

19   better do it accurately.

20             MR. MACKEY:  I apologize.  I was under the

21   impression that he read that verbatim because when I heard the

22   testimony, I looked --

23             THE COURT:  Whether you were under the impression or

24   not, you were wrong.  You created serious problems with this

25   trial and I'm not going to tolerate it anymore.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

2880

TERRELL TADEO - CROSS

1        MR. MACKEY:  Yes, Your Honor.

2        THE COURT:  I'm going to overrule your motion for a

3   mistrial at this time, but I'm going to remind all counsel

4   that the court's instruction in this case is very clear and

5   any counsel who crosses that line does it at their peril.  I

6   shouldn't -- y'all are very experienced lawyers.  I shouldn't

7   have to do this.  I don't want another violation of this to

8   occur.

9        MR. MACKEY:  That's my mistake, Your Honor.  That's

10  just my mistake.

11       THE COURT:  Very well.

12       MS. MARSTON:  For the record, that's why I allowed

13  him to take his notes up there so there would be no problems

14  with what he wasn't supposed to say.

15       MR. CULLER:  One other thing.  Your Honor, he said

16  that -- I thought I heard him say that Mr. Tracy Howard got

17  out of prison January 23rd.  It was actually February 23rd.

18       MS. MARSTON:  He said February.

19       MR. CULLER:  He did.  I just misheard it.  I

20  apologize.

21       THE COURT:  You can question him on his testimony,

22  you can impeach him with what he might have said on another

23  occasion, but you can't impeach on things forbidden by this

24  court.

25       MR. MACKEY:  I understand, Your Honor.  That was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

777

TERRELL TADEO - CROSS

1    clearly a mistake on my part.

2            (End of side-bar conference.)

3                CROSS EXAMINATION (Cont'd.)

4    BY MR. MACKEY:

5    Q.   Now, Agent Tadeo, you stated that you referred to your

6    notes while testifying on direct; isn't that correct?

7    A.   Yes, sir.

8    Q.   Now, are your notes a transcript of your interview?

9    A.   No, sir.

10   Q.   So who typed your notes?

11   A.   I did.

12   Q.   You typed them yourself.

13   A.   Yes, sir.

14   Q.   And you typed them from the notes you took or from a

15   recording of the interview?

16   A.   From the notes I took.

17   Q.   And what did you do with the notes you took?

18   A.   I destroyed them once it was reduced to writing in the

19   form of typing.

20   Q.   Well, didn't you think you were -- this case would go to

21   court?

22   A.   I assume all cases are going to go to court.

23   Q.   And didn't you think that those notes would be useful?

24   A.   I've been very consistent with the way I handle my notes

25   based on my agency's policy and we are permitted to destroy

             Cheryl A. Nuccio, RMR-CRR (704)350-7494


                           778

TERRELL TADEO - CROSS

1  our handwritten notes once it is a typed interview.

2  Q.   Well, the question was, didn't you think the notes would

3  be beneficial if this case went to trial?

4            MS. MARSTON:  Objection, asked and answered.

5            THE COURT:  Sustained.

6  Q.   Now, how do you take your notes?  Do you take your notes

7  in shorthand?

8  A.   I take notes as the interview proceeds and then type

9  those notes into an interview.

10  Q.   How do you take your notes?

11            MS. MARSTON:  Objection, asked and answered.

12            THE COURT:  Sustained.

13  Q.   Do you write your notes?

14  A.   Yes.

15  Q.   Do you use what is called shorthand?

16            MS. MARSTON:  Objection, asked and answered.

17            THE COURT:  Overruled.

18  A.   No, I'm not trained in shorthand.

19  Q.   So you just write just like everyday people write.

20  A.   Correct.

21  Q.   And when you transcribe them, do you paraphrase?

22  A.   I use my handwritten notes to refresh my memory from the

23  interview as I prepare my typewritten interview which is a

24  summary of the interview.

25  Q.   So you type them in your own words using the handwritten

Cheryl A. Nuccio, RMR-CRR (704)350-7494

779

TERRELL TADEO - CROSS

1   notes to refresh your memory; isn't that correct?

2   A.   Essentially.

3   Q.   Okay.  So when you were testifying on direct and reading

4   certain passages from your typed interview notes, you were

5   reading paraphrased passages; isn't that correct?

6   A.   I was reading what I remembered the content of my

7   interview with your client as I recalled it from my notes.

8   Q.   That were paraphrased.

9   A.   I'm not sure what your question is.

10  Q.   Well, you stated a few seconds ago that you look at the

11  notes to refresh your memory, then you type it up in your own

12  words; isn't that what you just stated?

13       MS. MARSTON:  Objection, asked and answered.

14       THE COURT:  Overruled.

15  A.   I try to keep the interview as accurate to the content

16  that I hear from an individual I'm interviewing and some of

17  the words are, you know, my verbiage; but the content is what

18  I receive from the person I'm interviewing.

19  Q.   Okay.  So that's paraphrasing it, correct?

20  A.   That's fine.

21  Q.   No, is that correct?

22       MS. MARSTON:  Objection, asked and answered.

23       THE COURT:  Sustained.

24  Q.   Now, when did you first meet Nicholas Ragin?

25  A.   On -- it was October 19th heading into October 20th, the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

780

TERRELL TADEO - CROSS

1    day he was arrested.

2    Q.   Of 2001, 2002, 2003 --

3    A.   2004.

4    Q.   2004.

5    A.   That's correct.

6    Q.   And what was the date of the indictment on this case?

7    A.   There were actually two indictments.

8    Q.   The first one.

9         MS. MARSTON:  Objection, relevancy.

10        THE COURT:  Sustained.

11   Q.   Now, did you -- you said that when you met my client,

12   that there was an interview and you did not get a waiver of

13   Miranda rights.  Is that what you stated on direct?

14   A.   I did get a waiver of Miranda.

15   Q.   You did get a waiver.

16   A.   Yes.

17   Q.   Written waiver.

18   A.   No, verbal.

19   Q.   Verbal waiver.  Well, who got the written waiver?

20   A.   I was in charge of the interview and conducting it with

21   my partner, and I took a verbal waiving of the Miranda rights

22   from your client.

23   Q.   But there was -- was there any written documentation from

24   that interview?

25   A.   I typed a summary as we've discussed.  There is no

Cheryl A. Nuccio, RMR-CRR (704)350-7494

781

TERRELL TADEO - CROSS

1  written Miranda waiver.

2  Q.   Okay.  Now, you were asked on direct about a letter.  Do

3  you remember that -- do you remember being asked about a

4  letter?

5  A.   I do.

6  Q.   All right.  And you were shown that letter to refresh

7  your memory, correct?

8  A.   Correct.

9  Q.   Do you still remember it?

10  A.   Generally, yes.

11  Q.   Okay.  And in that letter, Nicholas Ragin wrote to the

12  judge, didn't he?  Not this judge but another judge, didn't

13  he?

14  A.   I believe that's correct.

15  Q.   And he wrote about you; isn't that correct?

16  A.   That's correct.

17  Q.   And he complained to that judge that you had, I guess,

18  tried to convince him to testify against other people, didn't

19  he?

20  A.   That's what he alleged, correct.  That's correct.

21  Q.   And that you told him what you wanted him to say; isn't

22  that correct?

23  A.   That's what he alleged.

24  Q.   And he's not the only person to allege that, is he?

25  A.   There -- the individual he's referring to --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

782

TERRELL TADEO - CROSS

1   Q.    The question is --

2            MS. MARSTON:  Objection.

3   Q.    -- is he the only person --

4            THE COURT:  Hang on a second.  Allow the witness to

5   finish his answer and you can ask your next question.

6   A.    The individual he's referring to was also alleging a

7   similar situation.

8   Q.    The -- that you tried -- you told them what you wanted

9   them to say against other people.

10  A.    That's what they were alleging, yes.

11  Q.    Okay.  Now, did they make that complaint to anyone other

12  than the judge that they wrote, that Nicholas wrote the letter

13  to?

14           MS. MARSTON:  Objection.

15           THE COURT:   Sustained.

16  Q.    Now, did you offer Nicholas Ragin anything in exchange

17  for his testimony?

18           MS. MARSTON:  Objection.

19           THE COURT:  Overruled.

20  A.    No.

21  Q.    Did you offer to help him get out of jail?

22  A.    In order -- I'm not -- can you restate your question.

23  Q.    Did you offer to help Nicholas Ragin get out of jail if

24  he would help you?

25  A.    No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

783

TERRELL TADEO - CROSS

1   Q.   Did you recommend to the U.S. attorney Karen Marston
2   to -- for her to recommend that he be released in exchange for
3   helping you?
4   A.   When it came to the question of his detention, I advised
5   the U.S. Attorney's Office that I would not oppose it at the
6   time it came up as an issue.
7   Q.   So now I'm confused.  Were you about to say something?
8   A.   Yeah.  I was asked as I always am for my opinion.  It's
9   the decision of the United States Attorney's Office and
10  ultimately the judge handling the detention hearing.  I
11  advised the U.S. Attorney's Office that I did not, at the time
12  his detention first came up, oppose that detention -- I mean,
13  oppose his release.
14  Q.   And was that because you had told him that you wanted him
15  to help you?
16  A.   At that time it was based on my knowledge of him, his
17  likelihood to flee, the charges, his danger to the community.
18  Those were the main -- those are the primary reasons.
19  Q.   So because of those reasons, you say today that you just
20  were not opposed to him being released; is that correct?
21  A.   Initially I was not opposed.
22  Q.   Now, after he wrote this letter that we've been talking
23  about, you became opposed, didn't you?
24  A.   The question of detention had already been handled long
25  ago at the time of that letter.  I was out of the equation at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

784

TERRELL TADEO - CROSS

1   that time.

2   Q.   So is it your testimony that at his detention hearing,

3   your position had not changed as a result of the letters that

4   he wrote?

5   A.   At his detention hearing I went on the knowledge I had of

6   him at the time and I reflected my opinion to the U.S.

7   Attorney's Office that I specifically in my opinion to them

8   was not opposing his release.

9   Q.   Okay.  Was -- did there come a time where you did oppose

10  it in a detention hearing in this building?

11  A.   The government did oppose his release in a detention

12  hearing, I believe, and at that point the circumstances had

13  become to where it was -- it was really kind of a moot

14  question as to my opinion at that point.

15  Q.   Okay.  Let me ask you this.  You said you worked on I

16  think you said four hundred federal cases or federal

17  defendants.  Isn't that what you said?

18  A.   That's correct.

19  Q.   Okay.  Does the U.S. Attorney's Office normally consult

20  with you in determining if they're going to be opposed to a

21  release or not?

22  A.   It's up to each prosecutor if they ask my opinion or not,

23  but it is still my opinion.  It ultimately comes from the

24  prosecutor's office and then ultimately the judge that handles

25  the hearing as to detention.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

785

TERRELL TADEO - CROSS

1  Q.   Were you consulted on this case?

2  A.   I believe I answered that question.  I can give my answer

3  again if you want me to.

4  Q.   Well, the question is were you consulted on this case?

5  A.   As to your client?

6  Q.   Exactly.

7  A.   I believe I was asked and I believe that as I had

8  previously stated that my position at that time was I was not

9  opposing it in my opinion to the prosecutor's office, the U.S.

10  Attorney's Office.

11  Q.   Didn't you want him to get out and help you?

12  A.   I mean, that's a question that varies from case to case.

13  In his case at the time, based on my interview with him, I

14  thought he had some information that was worth pursuing, yes.

15  Q.   Does that mean the answer to my question is yes?

16  A.   State your question again, please.

17  Q.   Didn't you want him to get out and help you?

18  A.   I want to further my investigation, so if he was deemed

19  appropriate for release and had some information I could

20  follow up on, then, yes, I would have followed up and allowed

21  him to assist in some of my other investigations.

22  Q.   And how is it that you wanted him to assist you in your

23  other investigations?

24            MR. CULLER:  Objection.

25            THE COURT:  Sustained.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

786

TERRELL TADEO - REDIRECT

1   Q.   Now --

2           MR. MACKEY:  One second, Your Honor.

3           (Counsel and defendant conferred.)

4   BY MR. MACKEY:

5   Q.   Now, you stated a few minutes ago that -- when I asked

6   you the date of the indictment, you stated there were two

7   indictments.

8           MS. MARSTON:  Objection.

9           THE COURT:  Sustained.

10  Q.   When Mr. Ragin was indicted in October when you referred

11  to, what was he indicted for?

12          MS. MARSTON:  Objection.

13          THE COURT:  Sustained.

14          MR. MACKEY:  No further questions at this time, Your

15  Honor.

16          THE COURT:  Mr. Brown.

17          MR. BROWN:  No questions, Your Honor.

18          THE COURT:  Any redirect?

19          MS. MARSTON:  Very brief.

20                       REDIRECT EXAMINATION

21  BY MS. MARSTON:

22  Q.   Sir, there was a bunch of talk about the various

23  detention hearings and bond review.  Based on the information

24  that had been provided about various suppliers during the

25  course of defendant Nicholas Ragin's interview, what were you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERRELL TADEO - REDIRECT

1    seeking to do with those various suppliers:  John, I believe

2    it was a Ferguson, Black, those various suppliers he had

3    named?

4    A.   I take the information I'm provided in an attempt to

5    further my investigation and effect the source's arrest.

6    Q.   So if there was a period of time that you weren't opposed

7    to his release on bond, was it because you were trying to work

8    those suppliers?

9    A.   That's correct.

10   Q.   And is that a normal course of action that you take to

11   further various investigations?

12   A.   Yes, ma'am.

13   Q.   And did there come pretty quickly a point in time that

14   you learned information that made it so you did oppose bond?

15   A.   That's correct.

16   Q.   Did that information have anything to do with the letter

17   that was written to a judge?

18   A.   No.

19   Q.   What did that information have to do with?

20              MR. ADOLF:  Objection.

21              THE COURT:  Sustained.

22              MS. MARSTON:  No further questions.

23              MR. ADOLF:  Your Honor, before the witness is

24   excused, may I make a brief offer of proof at side-bar?

25              THE COURT:  You may.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

788

3:04CR271-7

June 25, 2006

Dear Judge Conrad,

I am writing this letter on behalf of the unacceptable conduct I am recieving from my attorney Nakita Mackey. Since October of 2004 I have experienced nothing but conflict and frustration from Mr. Mackey. I tried two or three times already to have him removed from my case. This is my last attempt.

To make this brief Mr. Mackey had all of A months to investigate and research my case before trial. Out of those A months I was offered two plea bargains, one of which I recieved but he never came back to discuss it with me like he said he would before the deadline. The other plea I never saw. I found out about it at an Inquiry Hearing and by then the deadline had passed on it also. I wrote a motion requesting my discovery material because he said that he wasn't gonna give it to me. The motion was written on Feb. 13, 2005. Judge Horn honered my motion and I recieved what I thought was all of my motion, I didn't find out until like the second week of trial that I hadn't recieved everything. He held on to material specifically about me and it was made available way before trial even started, that most definately is a Brady violation.

Mr. Mackey advised me to go to trial. I don't know what the reason for that was because he certainly wasn't prepared when the time came. The witnesses got

789

on the stand. Witnesses he was suppose to have questioned before the trial date even arrived. He even had the audacity to fall asleep "twice" during the trial. But for the most part I was really upset when he refused to let me testify. If you can remember I was going to testify in the beginning but there was a change in circumstances. The change was that Mr. Mackey wasn't going to ask me any questions once I got on the stand which wouldn't have left me any room to tell my side of the story. Plus he didn't contact any of my witnesses.

Trial ended April 21, 2006 and I haven't heard a word from Mr. Mackey. He told me after the trial that he'd come see me after May 2, 2006 when the election was over. I requested my trial transcripts so I could go through it to see if I could find any errors and he still has yet to get in touch with me. My last contact attempt was on June 20, 2006 and his secretary told me that he would be over to see me that day. It is now June 25, 2006 and there still has been no sign of Mr. Mackey. If at all possible I would like Mr. Mackey off of my case and request new counsel for my sentencing hearing because I feel that Mr. Mackey is not capable of arguing the issues and preserving the facts that I need for my appeal.

Thank You For Your Time

#25 18 19         Nicholas Ragin

790